**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (JH 7258)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the putative Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GANESH KASILINGAM, Individually and On Behalf of All Others Similarly Situated, | **CASE No.: 1:20-cv-03459-PAC** |
| Plaintiff, | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA, | **CLASS ACTION** |
| Defendants. | |

## TABLE OF CONTENTS

I.  INTRODUCTION .............................................................................................. 1

II.  JURISDICTION AND VENUE ....................................................................... 4

III.  PARTIES ......................................................................................................... 5

IV.  NON-PARTIES ................................................................................................ 6

V.  BACKGROUND ............................................................................................. 7

VI.  DEFENDANTS OVERSTATE TILRAY'S MARGINS AND THE VALUE OF THE ABG AGREEMENT ............................................................................. 8

  A.  Investors Focused On Tilray's Gross Margins ................................................. 8

  B.  Defendants Overstated Tilray's Gross Margins ............................................. 10

    1.  Defendants Understated Cost of Sales By Excluding Labor and Materials .................. 10

    2.  Defendants Understated Cost of Sales By Recording Worthless Waste As Valuable Byproduct .................................................................................... 12

  C.  Defendants Misleadingly Characterize An Investor Relations Stunt As A Major Accomplishment ............................................................................... 14

    1.  Tilray Agrees To Pay ABG $100 Million To Prop Up Its Share Price .......................... 14

VII.  FALSE STATEMENTS ................................................................................ 16

VIII.  LOSS CAUSATION ...................................................................................... 32

  A.  Defendants Admit That Retailers Had Not Been Interested In CBD Products ................. 32

  B.  Defendants Renegotiate the ABG Agreement, Impair the ABG Agreement By 86%, and Reduce the Value of Tilray's Inventory by 44% ............................................. 33

IX.  DEFENDANTS ADMIT THAT TILRAY WAITED UNTIL THE END OF THE YEAR TO CORRECTLY VALUE INVENTORY ...................................... 35

X.  ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER .................................. 36

  A.  Defendant Kennedy's False Statements Allowed Him To Maintain Voting Control Over Tilray ................................................................................... 36

    1.  Kennedy and Two Close Associates Control Tilray While Owning Less Than A Third of Privateer, Tilray's Founder ...................................................................... 36

2.    Privateer Investors Faced a Huge Tax Bill If It Sold Its Tilray Shares ........................... 37

3.    Kennedy Avoids Taxes While Maintaining Corporate Control Over Tilray ................ 38

4.    Kennedy Needed Privateer Investors to Consent To the Share Exchange And Not Exercise Their Rights to Appraisal ............................................................... 39

CLASS ACTION ALLEGATIONS ........................................................................................ 41

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET) ........ 43

CLAIMS FOR RELIEF ......................................................................................................... 45

FIRST CLAIM ...................................................................................................................45

SECOND CLAIM ..............................................................................................................48

PRAYER FOR RELIEF ........................................................................................................ 49

DEMAND FOR TRIAL BY JURY ....................................................................................... 50

Lead Plaintiff Saul Kassin and Named Plaintiffs Craig Scoggin, Surinder Chandok, and Leslie Rose ("Plaintiffs"), individually and on behalf of all others similarly situated, for their Complaint against Defendants Tilray, Inc., Brendan Kennedy, and Mark Castaneda, allege the following based on personal knowledge as to themselves and their own acts and information and belief as to all other matters.

## I.  INTRODUCTION

1.      This is a securities class action brought on behalf of all persons who purchased Tilray common stock on the NASDAQ from January 16, 2019 through March 2, 2020, both dates inclusive ("Class Period"). Excluded from the Class are (i) Defendants, (ii) officers and directors of Tilray and Privateer Holdings, Inc. ("Privateer"), and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii).

2.      In July 2018, Tilray held an IPO that left most of its shares in the hands of its controlling shareholder Privateer and other shareholders who had agreed not to sell their shares for 6 months. In January 2019, that lockup expired – nearly doubling the number of shares which could be publicly traded, and causing Tilray's stock price to fall 17% that same day. To keep Tilray's stock price from falling further, Defendants caused Tilray to enter into, and touted, a purported revolutionary deal that was in truth no more than an expensive investor relations stunt. Then, during 2019, Tilray inflated its inventory by placing a value of tens of millions of dollars on unsellable waste. Defendants deceived investors to transfer control of Tilray from Privateer to Kennedy and two business associates personally through a share exchange which closed in December 2019. Their purpose accomplished, in March 2020, Defendants wrote down 86% of the value of the agreement and 44% of Tilray's total inventories, causing its stock price to collapse,

and damaging investors. Months later, Defendant Kennedy would admit that Tilray had *deliberately* recorded waste as inventory, thus admitting to fraud.

3.      Tilray held its IPO in July 2018. After the IPO, Privateer still held 82% of Tilray's economic interest, with approximately an additional 9% held by pre-IPO investors who had agreed not to sell their shares for 6 months.

4.      The number of Tilray shares available for public sale would nearly double when the lockup expired, even excluding Privateer's shares. Predictably, on January 15, 2019, the first day the lockup expired, Tilray's stock price fell by 17%.

5.      Defendants anticipated that the lockup's expiry would put pressure on Tilray's stock price. So on January 15, after trading closed, they announced they had reached an agreement with Authentic Brands Group ("ABG" and "ABG Agreement") to co-market cannabis- and hemp-related brands throughout the world. The ABG Agreement's announcement halted the decline in Tilray's stock price.

6.      Though Defendants billed the ABG Agreement as a revolutionary deal which would bootstrap worldwide sales, it was no more than a ruinously expensive investor relations stunt. According to one well-placed Tilray insider, Kennedy and Tilray's other representative had spent *mere days* negotiating the ABG Agreement. The insider reports that Kennedy caused Tilray to enter into the ABG agreement for one main reason: to "prop up Tilray's stock [price]." The deal was so favorable to ABG – it required Tilray to pay ABG at least $100 million in cash and stock – that ABG could not help but sign. Tilray's own branding experts protested that the deal was worth far less than Tilray had paid for it, which the insider reported was only what all senior executives already knew. Yet throughout 2019, Tilray recorded the ABG Agreement on its balance sheet at the full value of what it had paid for it. Indeed, Defendants went further. They told investors that Tilray had survived ABG's thorough vetting (there wasn't any) which showed that

2

Tilray had a great deal to offer leading brands (only if it offered them absurdly favorable terms), presaging a bright future for the company.

7.      Tilray also manipulated its gross margins. In the two quarters after its IPO, Tilray's gross margins had fallen from 55% to 31% - raising doubts about whether Tilray could survive in a fiercely competitive field.  Trying to establish through deception what they could not accomplish through operational efficiency, Defendants artificially inflated Tilray's gross margins by recording costs of sales as overhead and recording tens of millions of dollars of unsellable stems, twigs, and other worthless parts of the marijuana plant (collectively referred to in the industry as "trim") as valuable inventory. These measures created the misleading impression that Tilray was improving its gross margins throughout the Class Period.

8.      Defendants made these materially misleading statements in service of a scheme to maintain personal control over Tilray while avoiding more than a hundred million dollars in taxes. Kennedy and two associates founded Tilray as a subsidiary of an investment vehicle, Privateer. By 2019, the three collectively held less than a third of the economic interest in Privateer, though they maintained voting control through Privateer supervoting stock. The three hatched a plan that would cause Privateer to distribute all its supervoting stock to them, leaving other Privateer investors with ordinary shares ("Share Exchange"). They needed these other investors' consent; their fraud helped secure that consent.

9.      Having pushed through the Share Exchange in December 2019, Defendants could stop overstating Tilray's financial condition. In January 2019, Tilray announced that it had renegotiated the ABG Agreement to reduce its scope. A little more than a month after that, announcing its Q4 2019 earnings, Tilray revealed that it had impaired the value of the ABG Agreement by 86% and reduced the value of its inventory by 44%.

10.     Then, in announcing its Q1 2020 earnings, Kennedy revealed that in 2019 he had deliberately overstated Tilray's inventory by recording worthless trim as valuable inventory:

> The other thing that I would mention about our gross margins is that we'll probably see a little bit of pressure on that due to the fact that we're accounting for our byproduct on a zero basis. And so I guess historically what's happened is that byproduct has been built up on the balance sheet and that's why there have been significant write-offs for us as well as for I guess in our industry, other industry players. And what we're doing is we're – except for a few instances, we are attributing zero value to that byproduct. ***So everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year.***

11.     When Tilray announced that it renegotiated the ABG Agreement, the price of its stock fell by 8.8%, damaging investors. When Tilray announced in summarizing its Q4 2019 financial performance that it would write down the ABG Agreement and revalue its inventory, the price of its stock fell by 15.2%. The next trading day, Tilray's stock price fell a further 3.9% even as the stock prices of the market in general and of cannabis companies rose significantly.

12.     At the start of the Class Period, Tilray's shares traded for nearly $100. Today, they fetch less than $5. Tilray investors who trusted in the Defendants and the integrity of Tilray's financial statements have lost nearly their entire investment.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered into and subsequent damages were suffered in this judicial district.

16.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## III.   PARTIES

17.     Lead Plaintiff Saul Kassin, as set forth in his PSLRA certification which was previously filed and is incorporated by reference, purchased Tilray shares at artificially inflated prices during the Class Period and was damaged thereby.

18.     Plaintiffs Craig Scoggin, Surinder Chandok, and Leslie Rose, as set forth in their PSLRA certifications filed as Exhibits to this Complaint, purchased Tilray shares at artificially inflated prices during the Class Period and were damaged thereby.

19.     Defendant Tilray produces and sells cannabis, hemp, and related products. Tilray grows cannabis in both Canada and Portugal, where it built a large open-air cannabis farm. Tilray has sold medical marijuana or made it available for clinical trials in Argentina, Australia, Canada, Chile, Croatia, Cyprus, the Czech Republic, Germany, Israel, Ireland, New Zealand, South Africa, Switzerland, the United States, and the United Kingdom. Tilray sells marijuana for recreational use in Canada, and hemp and hemp-derived CBD products in the U.S. and nineteen other countries.

20.      Since July 2018, Tilray's shares have traded on the NASDAQ under ticker TLRY. As of the beginning of the Class Period, investment fund Privateer Holdings, Inc. held shares accounting for approximately 82% of the economic interest in, and 93% of the voting power over, Tilray. Tilray was thus a "controlled company" under NASDAQ rules.

21.     Defendant Brendan Kennedy has served as Tilray's President and Chief Executive Officer, and a member of its Board, since January 2018. Kennedy has also served as Chief Executive Officer of Tilray's Canadian subsidiary since 2018. Kennedy also served as Privateer's

Executive Chairman from its founding in 2011 through its dissolution in December 2019. Kennedy has worked exclusively in the cannabis field since 2011. Until its dissolution, Kennedy and its other two co-founders held a majority of Privateer's voting power which, in turn, held a majority voting interest in Tilray. Thus, Kennedy and Privateer's other two co-founders indirectly held voting control over Tilray.

22.     Defendant Mark Castaneda served as Tilray's Chief Financial Officer and Treasurer from March 2018 through March 2020. Castaneda served as CFO of various public companies for substantially the entire period from 1997 through the close of the Class Period. Castaneda holds a BS in Accountancy, is a CPA, and worked for Deloitte & Touche between 1988 and 1997.

## IV.    NON-PARTIES

23.     Former Employee 1 ("FE 1") worked as a Senior R&D Manager at Privateer from April 2017 to November 2018. In November 2018, Privateer moved FE 1 along with FE 1's entire group to Tilray to become Tilray employees. FE 1 kept the same responsibilities. FE 1's title at Tilray was Senior Program Manager. FE 1 worked for Tilray from November 2018 through March 2020. FE 1 reported to Engineering Manager Brent Harrison, who reported to Drew Reynolds, Executive Vice President of Operations Expansion, who reported to Kennedy.

24.     Former Employee 2 ("FE 2") served as Tilray's Senior Manager of Purchasing in Toronto from October 2019 through May 2020. FE 2 reported to Steve Hatami, a Tilray Vice President, who reported to Greg Christopher, Tilray's Executive Vice President of Operations, who reported to Kennedy. FE 2's responsibilities included procurement for Tilray's four Canadian facilities.

25.     Former Employee 3 ("FE 3") was a Tilray Vice President between February 2018 and October 2019. FE 3's duties included overseeing Tilray's business development outside of Canada. FE 3 was "heavily involved with strategic initiatives."

26.     In 2011, Kennedy, Michael Blue and Christian Groh founded Privateer Holdings, Inc. to invest in the then-infant cannabis industry. In 2014, the three then founded Tilray's predecessor as a Privateer subsidiary, alongside a number of other cannabis-related companies. Between 2011 and 2017, Privateer raised hundreds of millions of dollars from outside investors. By the beginning of the Class Period (January 2019), Privateer had disposed of substantially all of its assets except Tilray shares. For their Tilray investment, Kennedy, Blue, and Groh relinquished about two-thirds of their economic interest in Privateer, but they retained a majority voting position through supervoting shares.

## V.    BACKGROUND

27.     Cannabis products are made from hemp and marijuana and their derivatives.

28.     Hemp and marijuana are legal categories. Hemp, by definition, is derived from plants that contain less than 0.3% THC by weight, the psychoactive ingredient in cannabis; marijuana derives from plants that contain more than 0.3% THC.

29.     THC is concentrated in the cannabis plant's flowers and buds. Because marijuana plants are grown for their THC, producers typically use the marijuana plant's flower and buds to make sellable products for medical or recreational uses.

30.     Marijuana plants also have leaves, stalks, twigs, and stems. These parts of the marijuana plant, called "trim" in the industry, are generally considered waste. Producers can, if they are lucky, sell trim to third parties for minimal value or use them to make extracts. But typically, producers simply dispose of the trim.

31.     Cannabis plants also contain cannabidiol, commonly known as CBD. Producers can use industrial processes to make CBD oil, which can then be added to foods, topical lotions and oils, and other products. Many consumers believe that CBD has positive medical benefits. Producers can in theory derive CBD from marijuana plants, but most derive it from hemp as it has more CBD and creates fewer regulatory requirements. CBD can be extracted from hemp plant's stems and seeds, in addition to its flower.

32.     Marijuana is legal for both medical and recreational uses in Uruguay and Canada. As of the end of 2018, Cannabis was legal for medical uses in 41 countries.

33.     Many U.S. states, including New York, have repealed prohibitions against marijuana for medical uses. Others have also repealed prohibitions against adult recreational use. Marijuana remains illegal under federal law but is prosecuted only in exceptional circumstances or in states where it is illegal.

34.     Hemp, though, is legal under federal law, as is hemp-derived CBD. The sole significant regulatory obstacle to the use of hemp-derived CBD is that its addition to an FDA-regulated product may, in the FDA's view, adulterate the product. But the FDA does not enforce the prohibition and has publicly stated that it will not.

## VI.     DEFENDANTS OVERSTATE TILRAY'S MARGINS AND THE VALUE OF THE ABG AGREEMENT

### A.  Investors Focused On Tilray's Gross Margins

35.     Gross margins are a critical metric for a growing company like Tilray.

36.     Defendants recognized that investors closely monitored Tilray's gross margins. Defendant Castaneda consistently ended the prepared remarks portion of earnings calls by calling attention to two key metrics that, he said, made Tilray an attractive investment. One, was his claim that Tilray would reach and sustain gross margins of more than 50% over the long term.

37.     Cost of sales is an accounting measure that includes all the costs directly related to manufacturing and selling products but excludes all other costs, such as indirect overhead and sales and marketing costs. The two main components of cost of sales are materials and labor.

38.     Gross margins are a measure of how much money a company makes on each product it sells. Gross margin is defined as net revenue minus cost of sales divided by net revenue.

39.     Gross margins are relatively sticky or static. Overhead typically does not grow proportionately with size. In contrast, the cost of goods sold is generally stable and does not tend to decrease dramatically even as companies scale up production – meaning that gross margins do not decrease as sales increase.[1] Put another way, there are few economies of scale for cost of sales, but there are many economies of scale in general overhead that is comprised of fixed costs.

40.     The last reported results in Tilray's IPO documents were those for Q1 2018.  There, Tilray's gross margins were 55%. Tilray's gross margins fell to 46% in Q2 2018, the first quarter it announced after its July 2018 IPO, and to a mere 31% in Q3 2018.

41.     Tilray's low gross margins after its IPO drew analyst concern. In a March 8, 2019 report, a Jefferies analyst initiated coverage of Tilray at a rating of Underperform – the only such rating Jefferies had issued in the past 12 months. The Jefferies analyst set out as one important reason that Tilray's cost of sales "appears [to be] one of the least efficient" of similar companies, behind peers Canopy and Aurora.

42.     Understanding that Tilray's poor gross margins disturbed investors, during the Class period, Defendants deceived investors by both overstating inventory and understating labor costs (both inputs to cost of sales) – thus overstating gross margins.

---

[1] https://www.newhope.com/managing-your-business/5-reasons-gross-margin-so-important-investors-brands; https://twosigmaventures.com/blog/article/why-gross-margins-matter/

**B. Defendants Overstated Tilray's Gross Margins**

*1. Defendants Understated Cost of Sales By Excluding Labor and Materials*

43.      FE 1 was intimately involved in Tilray's process of accounting for costs of sales. FE 1's work focused on high-level planning, particularly for products.

44.      FE 1's primary responsibility was creating Bills of Materials for Tilray's products.

45.      The Bills of Materials FE 1 created were a detailed list of all the materials and labor that went into an end product for sale and the quantities thereof.

46.      FE 1's projects were mostly, in FE 1's words, "enterprise level," rather than just for one segment or subsidiary.

47.      FE 1 was one of the Tilray employees who ensured, or rather tried to ensure, that Tilray accurately recorded the costs of making its products.

48.      The costs FE 1 recorded were then entered into specialized accounting software

49.      According to FE 1, Tilray did not accurately record in its accounting software the true costs of making its products (i.e. costs of sales). Rather, Tilray consistently understated these costs. FE 1 remembers many examples. For example, FE 1 recalls telling one of Tilray's Toronto-based employees responsible for cost accounting that she needed to include the costs of labor in costs of sales. The employee rationalized her failure to do so by claiming that the amount must have been small because it consisted of a few seconds for each labor step. FE 1 responded to the employee that these costs were significant; while any individual employee might spend only a few seconds on each product, because Tilray produced product on an assembly line, the labor of many employees would be required for each finished product. FE 1 said that aggregated labor costs were a "true and direct cost" that must be included in the cost of finished products.

50.      The employee who refused to include labor costs when recording the cost of sales in Tilray's accounting software acted on the directions of senior Tilray Management.  According

to FE 1, Tilray's Technology Manager, Ontario Operations, who oversaw data entry in connection with the Bills of Materials, costs of sales, and inventory accounting, gave his employees improper instructions on entering data. Though FE 1 was "very vocal" about the incorrect directions, neither, the Technology Manager nor anyone else at Tilray corrected the directions.

51.     One of FE 1's particular concerns was pre-rolled marijuana cigarettes, called "pre-rolls".  According to FE 1, beginning in the last quarter of 2018, Tilray accumulated finished products, including millions of pre-rolls. Pre-rolls are "super labor-intensive" and "sell cheap". Because they cost a lot in labor but are inexpensive, they increase top-line revenue but are not necessarily profitable – if their costs are recorded properly by including labor costs. FE 1 is certain that Tilray artificially lowered the pre-roll's cost of sales because FE 1 used Tilray's software to look up cost of sales for the pre-rolls. FE 1 then saw that the cost per product that Tilray calculated did not include all the labor costs FE 1 had identified in the pre-roll's Bill of Materials.

52.     Yet the flawed Bills of Materials FE 1 helped create were the foundation of Tilray's financial reporting. According to FE 1, to prepare financial statements, Tilray first exported financial information from the specialized software in which FE 1 stored it into an Excel spreadsheet. Tilray then used the Excel spreadsheet as the starting point to generate financial statements. Thus, the errors in the Bills of Materials would carry over into the financial statements. According to FE 1, the costs that had not been correctly entered as costs of sales were instead improperly recorded as general and administrative expenses to make the financial statements balance, where they would not affect gross margins.

53.     FE 1 internally raised alarms about Tilray's inaccurate financial statements. She told her boss Steve Hatami that because the Bills of Materials did not include all costs, using them to generate financial statements would understate cost of sales – or, as FE 1 told Hatami, "garbage in, garbage out." In response, Hatami repeatedly swore at FE 1.

11

54.     At one time, FE 1 accidentally opened the wrong folder on Tilray's shared drive document. The folder contained documents created by Tilray's marketing department. FE 1 opened one of the documents, and was shocked. The document listed costs of sales for a CBD oil cartridge. FE 1 was familiar with the costs of that product – FE 1 had created its Bill of Materials. Yet while FE 1's Bill of Materials listed the cost of sales as at least $20 per cartridge, the marketing materials listed cost of sales at $12.

2.   *Defendants Understated Cost of Sales By Recording Worthless Waste As Valuable Byproduct*

55.     Manufacturing creates intermediate and sellable products. Often, these products cannot be sold or finished before the close of the reporting period. The unsold and unfinished products are recorded on financial statements as inventory at the lesser of the costs of production or the net realizable value.

56.     Cost of sales is calculated as the cost of the portion of net inventory that was sold during the reporting period. Thus, the formula for cost of sales is: (1) Inventory at beginning of reporting period *minus* (2) inventory at end of reporting period *plus* (3) direct labor, direct materials, and direct overhead (e.g. commissions) attributed to sold products.

57.     During the 2019 fiscal year, Tilray accumulated more than one hundred million dollars in inventory on its financial statements. According to both FE 1 and FE 2, much of Tilray's inventory consisted of unsellable waste. According to these same insiders, Tilray well knew that much of the recorded inventory had no value.

58.     In December 2019, FE 1 made two trips to Tilray's Ontario, Canada facilities. While there, FE 1 was asked questions by employees of Tilray's finance department. FE 1 was told by these employees that Tilray had accumulated in inventory very large quantities of unusable materials.

59.     FE 1 learned that many of the products had never been worth anything in the first place. Tilray's production generated substantial "end of run" materials, meaning leftover raw materials that cannot be used in the manufacture of additional products – i.e., trim. With no way to sell these end of run materials, Tilray should have classified them as waste. Thus, for example, if it costs Tilray $10 in materials and labor to create one gram of sellable cannabis, but the process also creates unsellable trim, Tilray should record the cannabis as having a value of $10 in its inventory and zero value to the trim. Then, if the gram were later sold, Tilray should debit the inventory by $10.

60.     But Tilray recorded a value for the end of run materials on its financial statements. Treating end of run materials as valuable product overstated both inventory and gross margin when the sellable cannabis was sold.

61.     The following table shows how improperly attributing value to the end-of-run waste materials will inflate gross margins and inventory values, if Tilray were able to sell the gram of cannabis for $10 and recorded the value of the end-of-run materials as $5.

|  | Revenue | Cost of Goods Sold | Gross Margin | Inventory |
|---|---|---|---|---|
| Treating trim as waste per GAAP | $10 | $10 | 0% | $0 |
| Falsely treating trim as inventory | $10 | $5 | 50% | $5 |

62.     Tilray ultimately included ***more than $40 million*** of trim in its financial statements. Thus, by misclassifying trim, Defendants dramatically improved Tilray's apparent financial performance.

63.      FE 1 learned that in some cases that Tilray had created certain materials specifically for products that Tilray had planned to offer but had cancelled before product launch. Tilray could not resell the materials or reuse them in other products.

64.      FE 2 corroborates FE 1's account. FE 2 cites an example of obsolete product recorded as valuable inventory. According to FE 2, Tilray purchased a variety of custom formulated oils, which were oils containing precise specifications of THC and CBD oil mixes and potencies. The formulated oils were not generic ingredients and could not be reused in other products. In 2019, Tilray accumulated "single digit millions of Canadian dollars" (about $750,000-$7,500,000) of formulated oils to use in its wellness brand products. Tilray then "killed the brand" and, indeed, abandoned formulated oils altogether. Yet Tilray continued to classify the formulated oils as inventory on its financial statements at the cost of acquisition even though the formulated oils had no resale value and Tilray had no use for it in manufacturing any of its products.

## C. Defendants Misleadingly Characterize An Investor Relations Stunt As A Major Accomplishment

### 1. Tilray Agrees To Pay ABG $100 Million To Prop Up Its Share Price

65.      In January 2019, Tilray reached an agreement with Authentic Brands Group, LLC ("ABG" and "ABG Agreement"). ABG owns and co-markets 50 leadings brands throughout the world, including Juicy Couture, Brooks Brothers, Shaquille O'Neal, and Elvis Presley. At the time the parties signed the ABG Agreement, ABG's brands did not offer cannabis or CBD-related products. The purpose of the ABG Agreement, according to Tilray, was to expand ABG's brands into cannabis- and CBD-related products throughout the world.

66.      The ABG Agreement's principal terms were:

a.      Tilray initially pays ABG $100 million in cash and stock, and up to $150 million in future consideration ("Additional Tilray Consideration");

b.      Tilray is ABG's preferred supplier of cannabis and CBD-related ingredients;

      c.      Tilray receives up to 49% of net revenue from cannabis products bearing ABG's brands' names, with a guaranteed annual minimum payment of $10 million ("Revenue Interest");

      d.      Unless and until Tilray pays the full Additional Tilray Consideration, Tilray's Revenue Interest will be reduced by the percentage of unpaid total consideration. Thus, for example, if Tilray did not pay any Additional Tilray Consideration, then Tilray would only receive 40% of the Revenue Interest and if ABG did not sell any products in a given year, Tilray would only be entitled to $4 million.

67.      As set out below, Defendants told investors that the ABG Agreement was a well-crafted plan between two well-suited partners who would aggressively exploit the market for cannabis and CBD products. In truth, Tilray rushed into the ABG Agreement for an improper purpose and quickly realized the agreement was worth far less than Tilray had paid for it.

68.      FE 3 reports that the ABG Agreement was proposed, negotiated, and closed in literally a matter of days. Tilray had only two representatives, one of whom was Defendant Kennedy, negotiate the agreement. These representatives barely consulted with anyone else at Tilray. FE 3 called Tilray's due diligence into the ABG Agreement "very irresponsible."

69.      According to FE 3, the main reason Kennedy had entered into the ABG Agreement to "prop up Tilray's stock [price]"by "to mak[ing] a big splash."

70.      The timing of the ABG Agreement supports FE 3's account of its purpose. In connection with Tilray's IPO, pre-IPO investors signed lock-up agreements preventing them from selling their shares for 6 months. The lock-up expired before trading on January 15, 2019. That very day, after trading, Tilray announced the ABG Agreement. The newly-released shares nearly

doubled Tilray's existing public float.[2] On January 15, Tilray's stock price fell by 17% on volume three times higher than the previous day's, but the announcement of the ABG Agreement arrested the fall.

71.     According to FE 3, it was "immediately very clear" that the ABG Agreement was not worth what Tilray had paid for it. Tilray's own branding employees "push[ed] back" on the deal, asking "what are we going to do?" with ABG brands. Indeed, according FE 3, it was apparent the ABG Agreement was "never going to bear fruit" the "second the deal was signed." According to FE 3, the eventual write-off had nothing to do with the U.S. regulatory market.

## VII.   FALSE STATEMENTS

72.     The Class Period begins on January 16, 2019. The previous day, after close of trading, Tilray announced that it had entered into an agreement with Authentic Brands Group LLC ("ABG" and "ABG Agreement").

73.     In a press release announcing the ABG Agreement, Defendants stated:

NANAIMO, B.C. – Today, Tilray, Inc. (NASDAQ: TLRY), a global pioneer in cannabis production and distribution, and Authentic Brands Group (ABG), an owner of a portfolio of global lifestyle and entertainment brands, announced that they have signed a long-term revenue sharing agreement to market and distribute a portfolio of consumer cannabis products within ABG's brand portfolio in jurisdictions where regulations permit.

*     *     *     *     *

"We are thrilled to partner with ABG, a global leader known for expertly managing and marketing an owned portfolio of iconic brands," said Brendan Kennedy, Tilray President and CEO. "As we work to expand Tilray's global presence, this agreement leverages our complementary strengths and will be accretive to our shareholders as we reach new consumers across the entertainment, fashion, beauty, home and health and wellness sectors. We look forward to working with ABG to bring unique and sought-after branded cannabis products to the marketplace."

---

[2] Not counting Tilray shares held by Privateer, as it had publicly stated it would not sell its shares.

74.     Defendants' statements were misleading and made with scienter because: (a) the ABG Agreement was hastily thrown together in a matter of days to prop up Tilray's stock price; (b) Defendants understood that the ABG Agreement would not be accretive but would instead have to be impaired (i.e. written down on Tilray's financial statements); and (c) the ABG Agreement did not leverage Tilray and ABG's strengths, but instead was a one-sided giveaway to ABG.

75.     On March 18, 2018, Tilray held a call to discuss its Q4 2018 earnings. On that call, Defendant Kennedy stated that "[o]ur revenue sharing agreement with Authentic Brands Group (ABG) is a long-term partnership designed to leverage ABG's portfolio of more than 50 of the world's most iconic brands, as well as their extensive distribution network across North America."

76.     Defendants' statements were misleading and made with scienter because: (a) the ABG Agreement was hastily thrown together in a matter of days to prop up Tilray's stock price; and (b) the ABG Agreement did not leverage Tilray and ABG's strengths, but instead was a one-sided giveaway to ABG.

77.     On that same call, Defendant Kennedy stated:

Q: Thank you for the detail around your interest in the CBD products market in the U.S., and given the FDA's stance, I'm hoping you can help me understand kind of your approach and your view on what the company expects on this front. It's our understanding that large CPG companies are putting out RFPs for fairly large quantities of CBD isolate in the U.S. Is that something that Tilray plans to be meaningful in?

**Defendant Kennedy**: It is. So, we've signed an initial supply agreement for a number of different CBD products from either farmers or groups of farmers or processors within the United States. And we anticipate signing additional agreements, additional supply agreements, in the coming months and quarters. ***There's tremendous demand for CBD isolate and hemp-derived CBD extracts.***

*            *            *            *            *

With Manitoba Harvest**,** if you can imagine buyers at Amazon, Whole Foods, Costco, Albertsons, as they're looking to put CBD products on their shelves, there are a lot of unknown brands out there and a lot of unknown sources of CBD. And

those retailers, they're going to go with a brand they know and a supply chain they trust, like Manitoba Harvest, which has been in that business for years. They're the world's largest hemp food manufacturer.

78.     On that same call, Defendant Kennedy stated:

Q:  [] With respect to your comments earlier, [Defendant Kennedy], on investing in the United States, what could that look like in the near to medium term before we see any sort of federally legal cannabis framework in place? What sort of forms could that take on?

**Defendant Kennedy**: [] [I]f you think about our partnership with Authentic Brands Group, they own over 50 of the world's most iconic brands and we have been meeting with them to determine not only which brands, but which products we're going to bring to market by the end of the year. And I expect that we'll see products from Authentic Brands Group brands, such as something like Nine West by year-end."

79.     The statements were misleading and made with scienter because: (a) as Defendants would later admit, even by August 2019, retailers and consumer packaged good companies were still not interested in stocking CBD-related products unless and until the FDA unambiguously decided that CBD was not an adulterant, *see* ¶137, below; and (b) as a result there was little demand for CBD isolate and hemp-derived CBD extracts.

80.     On March 25, 2019 Tilray filed its 10-K for the year ended December 31, 2018 ("2018 10-K"). Kennedy and Castaneda signed the 2018 10-K.

81.     The 2018 10-K falsely stated:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

82.     The financial statements set out in the 2018 10-K also reported the following financial metrics for the year ended December 31, 2018:

| Revenue | $43.1 million |
| Cost of Sales | $28.9 million |
| Gross margin ($) | $14.3 million |
| Gross margin (% of revenue) | 33% |
| Inventory | $16.2 million |
| General & administrative expenses ($) | $31.3 million |
| General & administrative expenses (% of revenue) | 73% |

83.     Defendants' statements were false and made with scienter because: (a) Tilray recorded unsellable trim as inventory in violation of GAAP and its own inventory valuation policy; (b) Tilray understated its cost of sales by recording materials and labor as general and administrative expenses in violation of GAAP; and (c) as a result of (a) and (b), Tilray overstated both inventory and gross margins.

84.     On May 14, 2019, Tilray held a call to discuss its Q1 2019 earnings ("Q1 2019 Earnings Call").

85.     On the Q1 2019 earnings call, Defendant Kennedy stated:

Q:   [] You mentioned about pursuing other strategic partnerships. So I was wondering if you could elaborate on what specific verticals would be higher up in your pecking order and if you're putting any sort of timeline or range of timelines in terms of when we could see another strategic partnership be announced.

**Defendant Kennedy**: [] As we see cannabis disrupting a number of other industries, we've been inundated with contacts from Fortune 500 companies who

are interested in exploring partnerships with Tilray. And it's a range of companies from a broad variety of industries. And generally, the deals that have been done with other companies. We generally talk to those people at some point in their process, right? Imagine if you're a business development person at a Fortune 500 company that's just looking at the cannabis industry, that person wouldn't be doing their job if they didn't talk to us.

*[W]e're also starting to have conversations with US retailers, who are interested in carrying CBD products in the second half of this year. Some of the conversations are focused around carrying our products and other conversations revolved around essentially contract manufacturing some of their in-house brands using Tilray-sourced cannabidiol [CBD].*

86.     Asked another question about CBD in the U.S., Defendants again told investors that retailers were clamoring for CBD products:

Q: [] Real quick one, touch base on kind of the CBD opportunity in the US. What type of – when talking to retailers, what type of product opportunities are you seeing from the topical to the tinctures and such for CBD? []

**Defendant Castaneda**: Yes, we're expecting – we're having lots of conversations with lots of different retailers. ***They all want everything.*** I think one big surprise for me over the last six months, one changing dynamic that is really different in the US is that a lot of the demand right now is driven by consumers and retailers and not the large CPG companies that we were talking about earlier in one of the earlier questions. But every large retailer is looking for a wide array of CBD products today and this change is really being driven by them. They're way ahead of the curve compared to the CPG companies.

[] ***On the Authentic Brands Group side, looking at lots of different topicals under some of their brands and expect to launch topical series of products, set of products, in the second half of this year.*** And then I've had lots of conversations with large CPG companies that are interested in products that we would never manufacture ourselves, whether it's antiperspirant or things like that. And what they're looking for is a Tilray-certified CBD ingredient.

87.     Asked specifically whether retailers were holding off on making purchases in light of regulatory concerns, Defendant Kennedy claimed that enough retailers were already committed to stocking both topical and ingestible CBD such that Tilray would see a quick ramp up in the second half of 2019:

Q: And really quick on ingestibles. Do you think some of these larger retailers are waiting for FDA clarity here? We may have a[n FDA] [hearing] on May 31st, but

how do you think they're going to move with ingestibles versus the more topical side of products?

**Defendant Kennedy**: [] So there's no – there's not one answer. There are retailers in the US that are going to do this no matter what which I think is going to lead to a really interesting second half of the year. And so there are retailers in the US that aren't waiting for the FDA and then there – as you can imagine, there are more conservative retailers that are going to wait and see what happens with some of the FDA hearings at the end of this month and over the course of this summer.

88.     The statements were misleading and made with scienter because: (a) as further set out below at ¶137, Defendants admitted that even by August 2019, few retailers showed any interest in stocking any CBD-based products in light of FDA regulatory uncertainty; (b) as a result, it was not the case that "all" retailers wanted "everything"; and (c) as a result, there was no prospect of anything more than immaterial sales of CBD ingestible products in the US unless the FDA ruled that CBD was not an adulterant.

89.     On the call, Defendant Kennedy also volunteered that Tilray's ability to reach the ABG Agreement was evidence that consumer packaged goods companies saw Tilray as an attractive partner:

Q:  [] Just thinking about it from a perspective of a CPG company, evaluating the cannabis opportunity. What do you feel are the advantages or merits for a CPG company to partner with a Canadian-licensed producer versus considering a strategy such as leveraging offtake from a more dedicated extraction company and then just using their own CPG brands for whether it's with the U.S. CPG market or other markets out there.

**Defendant Kennedy**: [W]e know how to partner well not only with pharmaceutical and alcohol companies but with companies like Authentic Brands Group that own over 50 iconic brands. They went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone.

90.     These statements were false and made with scienter because: (a) Tilray had only secured the ABG Agreement by offering ABG absurdly favorable, one-sided terms; and (b) ABG had not vetted Tilray, and instead took Tilray's $100 million after just a few days' negotiations.

91.     On May 15, 2019, Tilray filed its 10-Q for Q1 2019 ("Q1 2019 10-Q"). Kennedy

and Castaneda signed the Q1 2019 10-Q.

92.     The Q1 2019 10-Q falsely stated:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such
as pre-harvested cannabis plants and by-products to be extracted. The costs of
growing cannabis including but not limited to labor, utilities, nutrition and
irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using
weighted average cost. Cost includes expenditures directly related to
manufacturing and distribution of the products. Primary costs include raw
materials, packaging, direct labor, overhead, shipping and the depreciation of
manufacturing equipment and production facilities determined at normal capacity.
Manufacturing overhead and related expenses include salaries, wages, employee
benefits, utilities, maintenance and property taxes.

Net realizable value is defined as the estimated selling price in the ordinary course
of business, less reasonably predictable costs of completion, disposal and
transportation. At the end of each reporting period, the Company performs an
assessment of inventory obsolescence to measure inventory at the lower of cost or
net realizable value. Factors considered in the determination of obsolescence
include slow-moving or non-marketable items.

93.     The Q1 2019 10-Q stated that:

Inventory is written down for any obsolescence or when the net realizable value of
inventory is less than the carrying value. For the three months ended March 31,
2019, the Company recorded write-downs within work-in-process
of $1,626[,000] in cost of sales. There were no write-downs in cost of sales for the
comparable period in 2018.

94.     The financial statements set out in the Q1 2019 10-Q also reported the following

financial metrics for the quarter ended March 31, 2019:

### Tilray, Inc. Financials for the Three Months Ended March 30, 2019

| Revenue | $23.0 million |
| Cost of Sales ($) | $17.7 million |
| Gross margin ($) | $5.4 million |
| Gross margin (% of revenue) | 23% |

| Inventory | $48.7 million |
|---|---|
| General & administrative expenses ($) | $12.8 million |
| General & administrative expenses (% of revenue) | 56% |

95.     The statements misleading and made with scienter because: (a) Tilray recorded unsellable trim as inventory, in violation of GAAP and Tilray's own inventory valuation policy; (b) Tilray understated its cost of sales by recording materials and labor as general and administrative expenses in violation of GAAP; and (c) as a result of (a) and (b), Tilray overstated both inventory and gross margins.

96.     In its Q1-Q3 2019 10-Qs, Tilray recorded the value of the ABG Agreement as the consideration Tilray paid for it. Tilray recorded the majority of the value of the agreement as an intangible asset with an indefinite life.[3]

97.     The Q1 2019 10-Q provided that:

As of March 31, 2019, the Company recorded an intangible asset with indefinite life in the amount of $151,096[,000] for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of this intangible asset was calculated as the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. As of March 31, 2019, the Company recorded a deferred tax liability of $31,730[,000] relating to this intangible asset.

98.     GAAP provision ASC 350-30 governs accounting and financial reporting of intangible assets.

99.     GAAP provision ASC 360-35-18 directs that "[a]n intangible asset that is not subject to amortization shall be tested for impairment annually and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired."

100.     As further set out above, according to FE 3, Defendants understood that the ABG Agreement was worth far less than what Tilray paid for it during or shortly after its execution.

---

[3] The value of the guaranteed payments was recorded as a combination of assets and equity.

Accordingly, Defendants were required to test the ABG Agreement for impairment before recording it in Tilray's financial statements included in its 2019 10-Q.

101.    To test for impairment, GAAP provision ASC 360-35-18B directs that companies shall "assess all relevant events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite-lived intangible asset." After the examination, if the company determines that it is more likely than not that impairment was warranted, the company should proceed to a quantitative evaluation of the amount of impairment.

102.    As further set out above, according to FE 3, Defendants understood that the ABG Agreement was worth far less than what Tilray paid for it during or shortly after its execution. Because it is more likely than not that the value of the ABG Agreement was impaired, Defendants were required to conduct a quantitative impairment test before recording the ABG Agreement on Tilray's balance sheet set out in its Q1, Q2 andQ3 2019 10-Q. ASC 350-30-35-18A.[4]

103.    GAAP then directs a quantitative test, which is set out in ASC 360-35-19:

> The quantitative impairment test for an indefinite-lived intangible asset shall consist of a comparison of the fair value of the asset with its carrying amount. If the carrying amount of an intangible asset exceeds its fair value, an entity shall recognize an impairment loss in an amount equal to that excess. After an impairment loss is recognized, the adjusted carrying amount of the intangible asset shall be its new accounting basis.

---

[4] Similarly, Tilray's impairment policy, set out in each of the Q1-Q3 2018 10-Qs, provided that:

> Goodwill and indefinite life intangible assets are tested for impairment annually, or more frequently when events or circumstances indicate that impairment may have occurred. As part of the impairment evaluation, the Company may elect to perform an assessment of qualitative factors. If this qualitative assessment indicates that it is more likely than not that the fair value of the indefinite-lived intangible asset or the reporting unit (for goodwill) is less than its carrying value, a quantitative impairment test to compare the fair value to the carrying value and record an impairment charge if the carrying value exceeds the fair value is conducted.

104. GAAP and Tilray's impairment policy therefore required that Defendants impair the ABG Agreement. Defendants' failure to do so was a knowingly or recklessly false statement.

105. In Q4 2019, Tilray would impair the ABG Agreement by $102.6 million. As set out in ¶¶65-71, above, the conditions necessitating impairment already existed in Q1 2019. Thus, Tilray was required to impair the ABG Agreement in Q1 2019 by $102.6 million. Because it failed to do so, Defendants overstated Tilray's assets and understated its net loss by $102.6 million in the Q1 2019 10-1Q.

106. On June 12, 2019, Tilray presented at the Stifel Cross Sector Insight Conference.

107. In prepared remarks, Defendant Kennedy stated:

Consumers are going into Whole Foods and saying where are your CBD products, where are your hemp products, and the retailers are scrambling to find products to fill their shelf. So they are really driving this change in the US.

108. The statements were misleading and made with scienter because as further set out below at ¶137, Defendants would later admit that even by August 2019, most retailers were not attempting to find products unless and until the FDA rules that CBD is not an adulterant.

109. On August 13, 2019, Tilray held a call to discuss its Q2 2019 earnings ("Q2 2019 Earnings Call").

110. There, Defendants continued to reassure investors that the ABG agreement was bearing returns. In prepared remarks, Defendant Kennedy stated:

Our strategic partnership with Authentic Brands Group, which we announced in Q1, continues to build momentum with our first product launch planned for the second half of the year in the United States. The ABG partnership is a first of its kind deal leveraging ABG's portfolio of more than 50 of the world's most iconic brands for the global CBD market.

111. Defendants' statements were misleading and made with scienter because: (a) the ABG Agreement was hastily thrown together in a matter of days to prop up Tilray's stock price; (b) Tilray quickly realized the ABG Agreement was worth far less than Tilray had paid for it; and

(c) as a result, the ABG Agreement was not building momentum, but rather resulting in a loss for

Tilray.

112.    About inventory, Defendant Kennedy stated:

We're building inventory as we await [] GMP licenses and we'll continue to harvest on a weekly and monthly basis and build inventory until we have those additional GMP certifications.

113.    The statement was false because Tilray was accumulating inventory not because

Tilray was aiming to accumulate product for profitable sale but instead because Tilray was

improperly accounting for the unsellable trim created in the manufacturing process as inventory.

114.    On August 13, Tilray filed its 10-Q for the quarter ended June 30, 2019 ("Q2 2019

10-Q"). Kennedy and Castaneda signed the Q2 2019 10-Q.

115.    The Q2 2019 10-Q provided:

*Inventory*

Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

116.    The financial statements set out in the Q2 2019 10-Q reported the following

financial metrics for the quarter ended June 30, 2019:

| Revenue | $45.9 million |
|---|---|
| Cost of Sales ($) | $33.6 million |
| Gross margin ($) | $12.3 million |
| Gross margin (% of revenue) | 27% |
| Inventory | $75.3 million |
| General & administrative expenses ($) | $16.5 million |
| General & administrative expenses (% of revenue) | 36% |

117.    The statements were false and made with scienter because: (a) Tilray recorded unsellable trim as inventory, in violation of GAAP and Tilray's own inventory valuation policy; (b) Tilray understated its cost of sales by recording materials and labor as general and administrative expenses in violation of GAAP; and (c) as a result of (a) and (b), Tilray overstated both inventory and gross margins.

118.    The Q2 2019 10-Q also provided that:

As of June 30, 2019, the Company recorded intangible assets with indefinite life in the amount of $119,366 for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of these intangible assets was calculated using the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. During the three months ended June 30, 2019, the Company reversed the deferred tax liability of $31,730 that should not be recorded as part of these intangible assets.

119.    The statement was false and made scienter because, for the reasons set out in ¶¶96-105 above, Tilray was required to impair the ABG Agreement. As a result of failing to impair the ABG Agreement, Tilray's Q2 2019 10-Q overstated its assets and understated its net loss by $102.6 million.

120.    In addition, ASC 360-35-18B provides a non-exhaustive list of factors to consider in determining whether to impair assets, which includes:

c. Legal, regulatory, contractual, political, business, or other factors, including asset-specific factors that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset

*        *        *        *        *

27

e.  Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers), or a change in the market for an entity's products or services due to the effects of obsolescence, demand, competition, or other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing business environment, and expected changes in distribution channels) that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset

121.    Even if Tilray did not need to impair the ABG Agreement on its Q1 2019 10-Q, it would still be have to impair it on the Q2 and Q3 2019 10-Qs. Though there would be no change in the FDA's position between August 2019 and March 2020, Tilray would impair the ABG Agreement in Q4 2019 because of regulatory uncertainty from the FDA. Because the conditions constituting the "regulatory uncertainty" that served as Tilray's excuse to impair the ABG Agreement already existed in August 2019, Tilray was required to impair the agreement in the Q2 2019 10-Q. For this additional reason, Tilray's failure to impair the ABG Agreement misled investors.

122.    On November 12, 2019, Tilray held a call to discuss its Q3 2019 earnings ("Q3 2019 Earnings Call").

123.    On the Q3 2019 Earnings Call, Defendants made statements giving the misleading impression that the ABG Agreement was succeeding. Kennedy said in prepared remarks that "Tilray is also working with ABG to commercialize other brands in Europe, by early 2020." Kennedy also said that "[w]e will continue to build a platform of brands and products through acquisitions and partnerships, such as [] Authentic Brands Group, [] which we expect to launch CBD products by the end of the year."

124.    In the question and answer portion of the Q3 2019 Earnings Call, Defendant Castaneda stated that "[l]ooking at the revenue ramp for really more 2020 there's very little US CBD in those numbers. So [any U.S. CBD revenues] would primarily be upside." At the close of

the earnings call, Defendant Castaneda added "[t]he CBD internally our models are pretty conservative just because we are waiting for the FDA."

125.    Asked about the steps Tilray was taking to sell CBD in the US, Defendant Kennedy stated:

> It's something that we are focused on building – continuing to build out the team that will execute on that strategy. There's still a lot of retailers in the US that will not – they will not buy or they won't sell, they won't stock products that contain CBD and are edible or digestible. And so nutritional supplements, dietary supplements. They're waiting for some clarification from the FDA. And that's where a large part of the market in the US is right now in terms of digestible products. And so, they're sort of at the starting block waiting to be able to sell those products.
>
> ***On the other hand, there are retailers who are interested in selling topical products that contain CBD. It's why with the ABG agreement the first product that we are introducing there are topicals.*** And then generally the smaller retailers in the US, some of the smaller sort of health and wellness focused grocery retailers, are stocking some digestible edible CBD products. But it's still growing gradually. And so, we are out meeting with those buyers and introducing them to the ABG [] products. But even they are waiting a bit to see what sort of clarification comes from the FDA.

126.    Then, asked about the US CBD market, Defendant Castaneda stated:

> Yes. So, on just the – we kind of bifurcate the food versus the CBD. And the CBD internally our models are pretty conservative just because we are waiting for the FDA. And we do believe that with FDA clearance that will be a step change. We just can't – we don't know what that timing is.
>
> So we're modeling pretty conservatively for 2020 for US CBD. Until we have that regulatory change, we are not going to adjust our numbers up.

127.    Yet Defendants did not impair the value of the ABG Agreement in Tilray's 10-Q for Q3 2019 ("Q3 2019 10-Q"). As a result of failing to impair the ABG Agreement, Tilray's Q3 2019 10-Q overstated its assets and understated its net loss by $102.6 million.

128.    Defendants' statements were misleading and made with scienter because: (a) Defendants stated that Tilray did not expect significant US CBD sales in 2020 and that this prediction was incorporated into its financial model; (b) GAAP requires companies to impair

intangible assets when they know facts showing that the discounted cash flows from the asset are less than the asset's carrying value; (c) Defendants did not impair the ABG Agreement; (d) Defendants would cite exactly the same facts to impair the value of the ABG Agreement in Q4 2019 which they cited in Q3 2019; (e) Defendants stated that Tilray and ABG would among other things shortly introduce ABG-branded products in the EU and topical products in the U.S.; and therefore (f) Defendants gave the misleading impression that the delays in the CBD market in the U.S. did not materially reduce the value of the ABG Agreement.

129.     Analysts were encouraged by the disclosures. A Cantor Fitzgerald analyst wrote in a November 15, 2019 report that "[w]e have an outperform rating on [Tilray]. We believe that access to strong and established U.S. brands [] position[s] [Tilray] to capitalize on the industry's robust growth."

130.     Defendants also gave the misleading impression that the unsellable trim recorded in Tilray's inventories was worth its carrying value. In prepared remarks, Defendant Castaneda stated:

> Additionally, I'd like to update investors on our inventory balances, which during the quarter have increased. As we have reported, we have been cultivating product and building inventory in our Portugal facility for almost a year, and this quarter we just began selling this inventory.
>
> We are in the process of a couple more G[ood] M[anufacturing] P[ractices] certifications for selling finished product and for extraction. Until we receive these certifications, we will continue to add some inventory in Portugal. Additionally, in Canada, based on current regulations, we primarily sell flower and flower products, which leaves byproduct for extraction in large supply and 2.0 products are not allowed to sell today. We expect this inventory and balance to continue until we are able to convert this inventory to 2.0 products. We expect inventory levels to start to decrease throughout 2020.

131.     Then, in the question and answer portion of the Q3 2019 Earnings Call, asked about a bulk low-priced product Tilray had introduced that quarter, Defendant Kennedy stated:

> [W]e have launched that product [targeted at value customers] and that brand in Canada and we were very pleased with the results. A lot of that product is typically

a product that we wouldn't sell under our existing higher quality, higher priced brands. And so these products give us an opportunity to generate revenue from product that otherwise would have either been sold to another [company] or extracted. And so **it was** – it **gave** us the opportunity to generate additional revenue.

132.    Also on November 12, 2019, Tilray filed its Q3 2019 10-Q. The Q3 2019 10-Q

provided:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

133.    The Q3 2019 10-Q set out the following financial metrics:

| | |
|---|---|
| Revenue | $51.1 million |
| Cost of Sales ($) | $35.2 million |
| Gross margin ($) | $15.9 million |
| Gross margin (% of revenue) | 31% |
| Inventory | $111.5 million |
| General & administrative expenses ($) | $20.0 million |
| General & administrative expenses (% of revenue) | 39% |

134.    The statements were false and misleading and made with scienter because: (a) the

trim was not sellable; (b) as a result, the unsellable trim was improperly recorded as inventory on

Tilray's financial statements in violation of GAAP and Tilray's own inventory valuation policy; (c) Tilray's costs of sales failed to include substantial costs from labor and materials in violation of GAAP; (d) as a result, Tilray's inventory and gross margins were both overstated; and © Defendants' affirmative statements gave the misleading impressions that Tilray could sell the worthless trim generated by marijuana production as part of Tilray's value brand, or once additional products like marijuana gummies, vape, or drinks could be legally sold in Canada in December 2019.

135. On November 25, 2019, an analyst from Cantor Fitzgerald issued a report summarizing a conference call the firm had hosted between Defendant Castaneda and investors. According to the analyst's summary, Castaneda stated that Tilray "has a better read on consumer demand, thus avoiding the need to make revisions for returns like other companies (it had already foreseen demand was weak for oils and gel caps)."

136. Defendants' statements were false and misleading and made with scienter because: (a) the trim was not sellable; (b) as a result, Tilray improperly recorded trim as inventory on Tilray's financial statements in violation of GAAP and Tilray's inventory valuation policy; (c) as a result, Tilray's inventory and gross margins were both overstated; and (d) Defendant Castaneda's statements gave the misleading impression that Tilray had already made any necessary adjustments to the value of its inventory.

## VIII.   LOSS CAUSATION

### A.  Defendants Admit That Retailers Had Not Been Interested In CBD Products

137. On the August 14, 2019, Q2 2019 earnings call, in response to analyst questions, Defendant Kennedy admitted that contrary to his claim that large stores were already buying and stocking CBDs, a majority of stores were not purchasing CBD in light of FDA regulatory uncertainty:

Q: Okay. Great. And I was just also hoping for potentially more color in terms of how you guys see the ramp on the CBD side in the US in the back half of the year.

**Defendant Castaneda**: So the ramp will be somewhat dependent upon how much clarity the FDA does give. ***We do see a lot of the major retailers holding off, especially on the ingestible products, until they have more clarity***. As that clarity comes in the second half, we see significant ramp in the second half of the year. If it does not, we see a much slower ramp on the CBD side for again, on ingestible side.

138.    As a result, on August 14, 2019, Tilray's stock price fell from its previous close of

$46.20 to close at $39.04, down 16.5%, damaging investors.

**B.  Defendants Renegotiate the ABG Agreement, Impair the ABG Agreement By 86%, and Reduce the Value of Tilray's Inventory by 44%**

139.    On January 30, 2020, Tilray announced that it had renegotiated the ABG

Agreement. The renegotiated agreement released ABG from making any guaranteed minimum

annual payments. Instead, the renegotiated agreement provided that ABG would ***not*** pay the first

$10 million that would otherwise be due under the ABG Agreement each year. Thus, Tilray would

only start earning Revenue Interest when sales reached a level that would otherwise entitle it to

$10,000,001 in payments from ABG. In exchange, ABG released Tilray from its obligation to pay

additional consideration of $83.3 million in cash or stock. The news surprised the markets because

Tilray had boasted that the guaranteed annual payments were a key provision that aligned ABG's

incentives with Tilray's and suggested difficulties with the ABG Agreement.

140.    On January 30, 2020, the price of Tilray's shares fell from their previous close of

$19.22 to close at $17.54, down 8.8%, damaging investors.

141.    On March 2, 2020, Tilray filed its 10-K for the year ended December 31, 2019, and

held a conference call to discuss its Q4 2019 results ("Q4 2019 Statements").

142.    Tilray claimed in the Q4 2019 Statements that it had impaired the ABG Agreement

by $102.6 million, or 85.9% of its value because of regulatory uncertainty in the U.S for CBD.

The impairment was a surprise to investors because the regulatory environment had not changed

at all since the Q2 2019 earnings call and, further, on the Q3 2019 Earnings Call, Defendants had stated that the regulatory environment for CBD was not likely to change in the near future. Indeed, the ABG Agreement was worldwide and Defendants had stated that Tilray was exploring sales in other jurisdictions, like the European Union, and pursuing other products that were not affected, like topicals. See ¶¶123, 125, above. Thus, Defendants' statements had left the misleading impression that Tilray had managed to work around any regulatory uncertainty. Tilray's impairment of the ABG Agreement revealed that these statements had been false.

143.    In truth, the impairment resulted from the fact that the ABG Agreement had only ever been worth a fraction of what Tilray paid for it, as Defendants had realized at the time, or shortly after, Tilray entered into it.

144.    In the Q4 2019 Statements, Tilray also revalued its inventory. Tilray reduced the value of its inventory as of December 31, 2019 by $68.6 million, or 44% of the value of the total inventory at the time. Tilray's announcement surprised the market because GAAP and Tilray's accounting policy mandated that inventory be valued on every financial statement at the lesser of the cost of sales or the net realizable value. Thus, Tilray's disclosure revealed to investors that Tilray had overstated its inventory, understated its cost of sales, and overstated gross profit and margins.

145.    On March 3, 2020, the price of Tilray's shares fell from its previous close of $15.35 to close at $13.02, down 15.2%, damaging investors.

146.    On March 4, 2020, even as overall stock prices and the prices of other cannabis companies rose substantially, the price of Tilray's shares fell from its previous close of $13.02 to close at $12.51, down 3.9%.

147.    Tilray's disclosures surprised even the professional analysts who covered Tilray.

a.   A Jefferies analyst commented in a March 3, 2020 report that the "Key Takeaway" from the news was:

**"Little to get excited about on Q4 with sales/[gross margin]/EBITDA all worsening sequentially, significant impairments on both inventories/ABG agreement [and two other factors]."** (emphasis in original).

Later in the report, the Jefferies analyst commented: **"[t]rust ultimately needed for rerating:** [] [U]ltimately, we think Tilray also needs to address trust and credibility before re-rating. We would flag [] universally positive comments before today on ABG[.]" (emphasis in original). Jefferies added that "the market is unlikely to believe until it sees."

b.   A Cantor Fitzgerald analyst commented in a March 3, 2020 report that "[w]e continue to think Tilray's disclosure is the worst among the Canadian [cannabis Licensed Producers] that we track."

## IX.   DEFENDANTS ADMIT THAT TILRAY WAITED UNTIL THE END OF THE YEAR TO CORRECTLY VALUE INVENTORY

148.   In announcing its Q4 2019 financials, Tilray wrote off $69 million in inventory, or about 44% of its total inventory. At the time, Defendants explained the revaluation thus:

We incurred inventory valuation adjustments primarily for cannabis oil products, which did not have the sell through opportunity, as many cannabis derivative products were not available for sale under the regulatory framework until December 2019, resulting in a significant accumulation of cannabis oil and cannabis by-product to be converted into oil. The total inventory valuation adjustment of $63.5 million (C$82.6 million) reflects our estimate of excess product based on current sales forecasts, which have been reduced from previous estimates due to the slower than expected transition of the Canadian adult use market than expected.

149.   Defendants' explanation made no sense. Tilray only revalued the inventory in December 2019, which is exactly when it became legal to sell the products in which the inventory

purportedly would be used. Further, the December 2019 starting date to sell the products had been suggested by Canada by May 2019 and set in stone by June 2019.

150.    Defendants' claim was a false exculpatory statement. On May 11, 2020, after the close of the Class Period, Defendant Kennedy finally admitted that Tilray's improper practice of recording trim as inventory had driven the write-off:

> The other thing that I would mention about our gross margins is that we'll probably see a little bit of pressure on that due to the fact that we're accounting for our byproduct on a zero basis. And so I guess historically what's happened is that byproduct has been built up on the balance sheet and that's why there have been significant write-offs for us as well as for I guess in our industry, other industry players. And what we're doing is we're – except for a few instances, we are attributing zero value to that byproduct. So everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year.

151.    As set out above, both GAAP and Tilray's own accounting policy required it to value inventory at its net realizable value in every 10-Q and every 10-K. Yet Kennedy admitted that Tilray waited until the end of the year to revalue inventory. Kennedy thus admitted that Tilray's recorded inventory in Q1-Q3 2019 was false and that he knew the reported inventory figures were false when he signed the financial statements that falsely reported them.

## X.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### A.    Defendant Kennedy's False Statements Allowed Him To Maintain Voting Control Over Tilray

#### 1.    *Kennedy and Two Close Associates Control Tilray While Owning Less Than A Third of Privateer, Tilray's Founder*

152.    Even as Defendants made false statements, Kennedy contemplated and then entered into a transaction that would provide him and two close colleagues with concrete, personal benefits – voting control of Tilray and avoidance of taxes

153.    Defendant Kennedy, alongside two close associates Michael Blue and Christian Groh, founded Privateer in 2011. They then established Tilray's predecessor as a Privateer subsidiary, one of its portfolio companies.

154.    By 2019, Kennedy, Blue, and Groh personally held 71% of Privateer's voting stock, but only 29% of its economic interest.

155.    In January 2018, Privateer reorganized its corporate operations in a transaction that created Tilray. Privateer was issued 75 million shares of Tilray in exchange for the assets of Tilray's predecessor. Of these, 16,666,667 were Class 1 supervoting shares, each entitling the holder to 10 votes, and 58,333,333 were Class 2 ordinary shares, each with one vote.

156.    In July 2018, Privateer took Tilray public through an IPO, selling approximately 9 million new shares of Class 2 Stock.  At the time of the IPO, other shareholders held slightly less than 8 million Class 2 shares. The IPO left Privateer with 93% voting power over Tilray, but only an 82% economic interest.

157.    Following the IPO, though Kennedy, Blue, and Groh held less than a third of the economic interest in Tilray, they were its controlling shareholders because they held 71% of the voting power over Privateer which in turn held more than 90% of the voting power over Tilray.

   *2.  Privateer Investors Faced a Huge Tax Bill If It Sold Its Tilray Shares*

158.     By the time the Tilray IPO lock-up expired in January 2019, Privateer's only material asset was its Tilray shares.

159.    Because substantially all of Kennedy's shares were held indirectly through his ownership of Privateer, to monetize his interest, Kennedy would first have to force Privateer to sell Tilray shares and then distribute the proceeds to existing Tilray investors. Both steps would be taxable events. In essence, there would be two levels of taxes, one for Privateer and one for each Tilray investor, including Kennedy, Blue and Groh.

160.    The cost basis for Privateer's Tilray shares was approximately $0.43. During the Class Period, Tilray's stock price never closed below $14.50, so substantially all of the proceeds Privateer could obtain from selling Tilray shares would be capital gains subject to U.S. tax. Thus, before proceeding to a distribution, Privateer would already have paid 21% of the sales proceeds as capital gains taxes.

161.    But to receive any money, Kennedy would have to make Privateer distribute the proceeds. Kennedy and other Privateer investors would then pay long-term capital gains taxes on the distribution from Privateer at a rate of 23.8%.

162.    If he sought to monetize his interest, Kennedy would face a tax bill of approximately 40% of the proceeds. If they sold all their Tilray shares at the $17/share IPO price, Kennedy, Blue, and Groh would collectively face a tax bill of more than $100 million.

### 3.  Kennedy Avoids Taxes While Maintaining Corporate Control Over Tilray

163.    Kennedy, Blue, and Groh hatched and implemented a transaction that would both (a) avoid the 40% tax bill and (b) maintain their voting control over Tilray.

164.    The transaction ("Share Exchange") had three elements:

a.      Tilray cancels all of Privateer's Tilray shares;

b.      Tilray acquires all of Privateer's shares; and

c.      Tilray issues new shares to Privateer investors *mostly* in proportion to their economic interest in Privateer.

165.    Under IRS guidance on corporate liquidation, the issuance of new shares to Privateer investors in these circumstances is not a taxable event. Thus, if Privateer investors thereafter wanted to liquidate their shares, they would only face personal income taxes.

166.     The Share Exchange's terms, though, were tilted heavily in favor of Kennedy, Blue, and Groh. While other Privateer investors would only receive Class 2 ordinary shares, the

three would receive *all* of Privateer's Class 1 supervoting shares. Giving effect to the Share Exchange would leave Kennedy, Blue, and Groh with only 31% of the economic interest in Tilray, but 73% of its voting power. Thus, Kennedy, Blue, and Groh would maintain personal majority control over Tilray with a hefty margin to sell their own Tilray shares or have Tilray issue new shares to raise proceeds or pay for acquisitions.

### 4. *Kennedy Needed Privateer Investors to Consent To the Share Exchange And Not Exercise Their Rights to Appraisal*

167.     But Kennedy needed other Privateer investors to sign on to his scheme. Article IV(E)(2) of Privateer's Charter would have to be amended to permit Privateer to distribute all Class I Tilray shares to Kennedy, Blue, and Groh, because it required that all in-kind distributions to Privateer investors be *pari passu*. Article IV(D)(2)(b)(i) required a majority of shares, without regard to supervoting status, for any such amendment. Thus, Kennedy needed the support of a majority of Privateer investors to proceed with the Share Exchange on terms that allowed them to keep voting control over Tilray.

168.     Privateer investors, moreover, had other options which might stymie the Share Exchange. Under Delaware law, the Share Exchange gave Privateer investors a right to appraisal of their Privateer shares. Privateer non-controlling investors accounted for more than half the economic interest in Tilray. Tilray could not afford to buy back more than half of its share capital. Further, the belief that other Privateer investors would exercise their appraisal rights could create the equivalent of a bank run, as investors concerned that Tilray faced too many appraisals to be viable were pushed to seek appraisal themselves.

169.     An additional provision of the Share Exchange created a dilemma. Privateer investors had invested as long before as eight years earlier. As part of the Share Exchange, Privateer investors would agree to a further two-year lockup. The Share Exchange contemplated that during the lockup, the Board of Directors would periodically release a portion of Privateer

investors' Tilray shares for resale. But the Board would control the timing and amount of any releases. As Tilray was a money-losing enterprise with a volatile share price, Privateer investors faced the real risk that their Tilray shares would be worth little – or nothing – when the Board released them for resale.

170.    In contrast, appraisal permitted Privateer investors to lock in the value of their shares. Though an appraisal proceeding might take time, at the close, the court would appraise the value of Privateer investors' shares as of the date of the Share Exchange. Thus, any Tilray missteps occurring thereafter would not reduce the investor's payout.

171.    Defendants' false statements overstated Tilray's gross margins, overstated its assets, and created the false impression that Tilray had a profitable agreement with ABG. These statements were necessary to give Privateer investors confidence that Tilray's share price would hold up during the two-year lockup. Thus misled, Privateer investors *would not* exercise their appraisal rights. Tilray *would not* have to pay tens or hundreds of millions of dollars. And Kennedy *would not* lose corporate control over Tilray though he, Blue, and Groh held only 31% of its economic interest. The misleading statements were also necessary to convince Privateer investors to grant Kennedy, Blue, and Groh, supervoting shares.

172.    Corporate control over Tilray was valuable to Kennedy. Among other things, it permitted self-dealing. As of the end of 2018, Tilray licensed seven of its ten Canadian recreational marijuana brands from Privateer and its former subsidiaries. Kennedy also used control over Tilray to negotiate grossly unfair terms in the Share Exchange.

173.    Indeed, the terms of the Share Exchange made it clear that Kennedy valued control. They allowed Kennedy to terminate the Share Exchange if he could not secure approval of Privateer's investors to allow it to award all its supervoting stock to Blue, Groh, and him.

174. Thus, Defendants' false statements allowed Kennedy, Blue, and Groh to realize two concrete and personal benefits: (a) realize tax savings of more than $50 million; and (b) maintain control over Tilray.

175. Defendants' false statements were perfectly timed to deceive Privateer investors. Privateer sent Tilray a letter of intent regarding the Share Exchange on January 9, 2019, a week before Tilray announced the ABG Agreement. The Share Exchange closed on December 12, 2019. A month later, Tilray would announce that it had renegotiated the ABG Agreement to remove the guaranteed $10 million payments and reduce its scope. Less than three months later, Tilray would impair the ABG Agreement by 86% and reduce the valuation of its inventory by $68 million, or 44% of its total value.

## CLASS ACTION ALLEGATIONS

176. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tilray securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are (i) Defendants, (ii) officers and directors of Tilray and Privateer Holdings, Inc. ("Privateer"), and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii).

177. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tilray common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds

or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tilray or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

178.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

179.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

180.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

• whether the federal securities laws were violated by Defendants' acts as alleged herein;

• whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tilray;

• whether the Individual Defendants caused Tilray to issue false and misleading financial statements during the Class Period;

• whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

• whether the prices of Tilray securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

42

•     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

181.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET)

182.     The market for Tilray's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Tilray's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Tilray's securities and market information relating to Tilray, and have been damaged thereby.

183.     During the Class Period, the artificial inflation of Tilray's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Tilray's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Tilray and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially

43

inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

184.   At all relevant times, the market for Tilray's securities was an efficient market for the following reasons, among others:

a.   Tilray shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   As a regulated issuer, Tilray filed periodic public reports with the SEC and/or the NASDAQ;

c.   On average, 40.3% of Tilray's float traded every week, permitting a ***very strong*** presumption of efficiency;

d.   Tilray regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.   Tilray was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

f.   At least 20 firms made a market in Tilray securities;

g.   New company-specific information was rapidly reflected in Tilray's stock price; and

h.   Tilray met the requirements for filing a Registration Statement on Form S-3.

185.    As a result of the foregoing, the market for Tilray's securities promptly digested current information regarding Tilray from all publicly available sources and reflected such information in Tilray's share price.  Under these circumstances, all purchasers of Tilray's securities during the Class Period suffered similar injury through their purchase of Tilray's securities at artificially inflated prices and a presumption of reliance applies.

186.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **CLAIMS FOR RELIEF**

## **FIRST CLAIM**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

187.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

188.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

189.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tilray securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Tilray securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

190.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tilray securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tilray's finances and business prospects.

191.     By virtue of their positions at Tilray, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made,

although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

192.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Tilray, the Individual Defendants had knowledge of the details of Tilray's internal affairs.

193.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tilray.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tilray's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tilray securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Tilray's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tilray securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

194.    During the Class Period, Tilray securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of Tilray securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Tilray securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Tilray securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

195.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

196.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements regarding its prospects to the investing public.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

197.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

198.    During the Class Period, the Individual Defendants participated in the operation and management of Tilray, and conducted and participated, directly and indirectly, in the conduct of Tilray's business affairs.  Because of their senior positions, they knew the adverse non-public information about Tilray's misstatements regarding its business and operations.

199.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tilray's operations, and to correct promptly any public statements issued by Tilray which had become materially false or misleading.

200.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tilray disseminated in the marketplace during the Class Period concerning Tilray's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tilray to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Tilray within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tilray securities.

201.   Each of the Individual Defendants, therefore, acted as a controlling person of Tilray.  By reason of their senior management positions and/or being directors of Tilray, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Tilray to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Tilray and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

202.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tilray.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand judgment against Defendants as follows:

49

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: October 5, 2020                         Respectfully submitted,

                                                               THE ROSEN LAW FIRM, P.A.

                                                               /s/ Jonathan Horne
                                                               Jonathan Horne (JH 7258)
                                                               Laurence M. Rosen, Esq. (LR 5733)
                                                               275 Madison Avenue, 40th Floor
                                                               New York, New York 10016
                                                               Telephone: (212) 686-1060
                                                               Fax: (212) 202-3827
                                                               Email: jhorne@rosenlegal.com
                                                               Email: lrosen@rosenlegal.com

                                                               *Lead Counsel for Plaintiffs and the putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2020, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/Jonathan Horne</u>