**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GANESH KASILINGAM, individually and on
behalf of all others similarly situated,

                Plaintiff,

- against-

TILRAY, INC., BRENDAN KENNEDY, and
MARK CASTANEDA,

                Defendants.

Case No. 20-cv-03459-PAC

---

**MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

I.    Introduction ............................................................................................................. 1

II.   Factual Background .................................................................................................. 3

     A.    Tilray is a Leader in the Nascent Global Cannabis Industry ..................................... 3

     B.    The Farm Bill Spurs Tilray to Enter into First of Its Kind ABG Agreement. ......... 4

     C.    Tilray's 2018 10-K Reflects Continued Growth and Identifies Material
         Weakness .................................................................................................................... 6

     D.    Tilray Worked Hard to Properly Account for and Capitalize on ABG
         Agreement. .................................................................................................................. 7

     E.    Privateer Proposes Mutually Beneficial Downstream Merger. ................................. 8

     F.    Developments at the End of 2019 Raise Concerns about the ABG
         Agreement's Near-Term Profitability, and Tilray Takes Appropriate Action. ....... 9

     G.    Tilray's 2019 10-K Recognizes ABG Impairment and Writes Down
         Inventory. .................................................................................................................. 10

III.  Legal Argument ...................................................................................................... 12

     A.    Heightened Pleading Standards Govern Plaintiffs' Claims .................................... 12

     B.    None of the Challenged Statements were Materially False or Misleading ............. 12

         1.    Positive Statements about the ABG Deal .................................................... 12

         2.    Statements Regarding U.S. Interest in CBD Products ................................. 14

         3.    Statements Reporting ABG's Valuation, and Tilray's Assets and Net
            Loss ............................................................................................................. 16

         4.    Statements Regarding Inventory .................................................................. 19

         5.    Statements Reporting Cost of Sales and Gross Margins ............................. 21

     C.    Plaintiffs Cannot Allege a Strong Inference of Scienter ........................................ 22

IV.   Conclusion .............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
  No. 17-cv-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ...................................18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...................................................................................................25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...............................................................................................18

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)..............................................................................................................21

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)............................................................................................22, 23

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)....................................................................................14

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)..................................................................................................17

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................................23

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
  No. 09-cv-01740, 2013 WL 1188050 (D. Conn. Mar. 23, 2013) ...........................................19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................................... *passim*

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ..........................................................................................24, 25

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019)........................................................................14, 21, 24

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019).....................................................................................................14

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...................................................................................................14

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999)..............................................................................................15, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).........................................................................................................12, 23

*Turner v. MagicJack VocalTec, Ltd.*,
No. 13-cv-0448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) ...............................................23

**Statutes**

15 U.S.C. § 78u-4(b)............................................................................................................12, 23

**Other Sources**

Alexander Beadle, "Canada's Edibles Market Gets Off to a Slow Start,"
*Analytical Cannabis*, Dec. 20, 2019, *available at*
*https://www.analyticalcannabis.com/articles/canadas-edibles-market-*
*gets-off-to-a-slow-start-312161* ...........................................................................................11

FDA, Consumer Update on CBD, last updated Mar. 5, 2020, *available at*
*https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-*
*what-were-working-find-out-about-products-containing-cannabis-or-cannabis*......................9

FDA, "FDA is Committed to Sound, Science-based Policy on CBD," July 17,
2019, *available at https://www.fda.gov/news-events/fda-voices/fda-committed-*
*sound-science-based-policy-cbd* ...........................................................................................7

FDA, "FDA warns 15 companies for illegally selling various products containing
cannabidiol as agency details safety concerns," Nov. 25, 2019, *available at*
*https://www.fda.gov/news-events/press-announcements/fda-warns-15-*
*companies-illegally-selling-various-products-containing-cannabidiol-agency-*
*details* ...................................................................................................................................9

FDA, "Notice of Public Hearing; request for comments," Apr. 3, 2019, *available*
*at https://www.federalregister.gov/documents/2019/04/03/2019-*
*06436/scientific-data-and-information-about-products-containing-cannabis-*
*or-cannabis-derived-compounds* ...........................................................................................7

FDA, "Statement from FDA Commissioner Scott Gottlieb, M.D., on signing of
the Agriculture Improvement Act and the agency's regulation of products
containing cannabis and cannabis-derived compounds," Dec. 20, 2018,
*available at https://www.fda.gov/news-events/press-*
*announcements/statement-fda-commissioner-scott-gottlieb-md-signing-*
*agriculture-improvement-act-and-agencys*............................................................................5

Nathaniel Meyersohn, "Barneys. Neiman Marcus. America's stores are taking the leap into cannabis products," *CNN Business*, Feb. 13, 2019, *available at https://www.cnn.com/2019/02/12/business/cbd-cannabis-dsw-neiman-marcus-barneys-retail/index.html* ...................................................................................................4

Sam Reisman, "Why 2019 Was a Tipping Point for BigLaw and Cannabis," *Law360*, Oct. 15, 2019, *available at https://www.law360.com/articles/1205603/why-2019-was-a-tipping-point-for-biglaw-and-cannabis*........................................................................................................5

Kelly Tyko, "Walgreens will sell CBD products in nearly 1,500 stores," USA TODAY, Mar. 28, 2019, *available at https://www.usatoday.com/story/money/2019/03/27/walgreens-sell-cbd-products-nearly-1-500-drugstores-report-says/3295939002/* .....................................................4

Alicia Wallace, "CBD product sales are booming. Now the FDA needs to weigh in," *CNN Business*, July 9, 2019, *available at https://www.cnn.com/2019/07/09/business/cbd-sales-fda/index.html* ......................................9

## I.    INTRODUCTION

Tilray, Inc. is a Canadian pharmaceutical and cannabis company that has become a global leader in legal cannabis research, cultivation, processing, and distribution. Tilray has always taken a long-term view with respect to its nascent industry: the legal cannabis market remains subject to a great deal of regulatory uncertainty in the near-term, but its future is exceptionally bright, estimated to be a $150 billion global industry in coming years, with $22 billion of that in the U.S. hemp-derived cannabidiol ("CBD") market alone.[1] *See* Ex. 1[2] (5/14/19 Tr.), at 4-5.

From the beginning, strong branding has been a key component of this long-term vision. Tilray has maintained a rigorous focus on quality, invested heavily in research and development, and cultivated important partnerships (including with Sandoz AG, the generic division of pharmaceutical giant Novartis, and multinational brewer Anheuser-Busch InBev ("AB InBev")) that have helped position Tilray as an early leader in the global medical cannabis market and one of the foremost providers of high-quality cannabis products worldwide. Thus, when the opportunity arose in early 2019 to join forces with Authentic Brands Group ("ABG")—a brand management company with a global portfolio of established brands—it seemed like the perfect partnership at the perfect time: the United States Agricultural Improvement Act of 2018 (the "Farm Bill") had just been enacted and was widely viewed as opening up the U.S. market for CBD products. The resulting ABG deal afforded Tilray access to a diverse portfolio of well-known brands and an established distribution system that the Defendants believed would give Tilray a significant leg up in this new and lucrative U.S. market.

But the industry's hopes and expectations for regulatory clarity and a quick path forward in the U.S. did not materialize. By the end of 2019, it had become clear that the U.S. Food and

---

[1] All $ references are in US$, all emphasis is added, and all internal citations are omitted unless otherwise indicated.
[2] Numbered exhibits are attached to the Defendants' Request for Judicial Notice, filed concurrently herewith.

1

Drug Administration ("FDA") was not moving quickly to greenlight CBD. Accordingly, Tilray conducted an impairment analysis on the value of the ABG Agreement, recognized an impairment, and renegotiated the Agreement to better align with the new regulatory and market conditions.

Based on the wisdom that comes from knowing the outcome, Plaintiffs now claim that the ABG Agreement was never worth what Tilray paid for it and should have been impaired immediately; that various positive statements in 2019 about the ABG agreement and its prospects (and certain unrelated statements about inventory, cost of services, and gross margins) were materially false and misleading; and that all of this was in service of a vaguely alleged motive-less fraud. Nothing in the Amended Complaint ("AC") supports these baseless assertions.

*First, none of the challenged statements were false or misleading.* Plaintiffs attack five different categories of statements, detailed below, but each challenged statement was a true statement of fact or opinion at the time, and Plaintiffs have not alleged any facts to the contrary. Plaintiffs' attempts to plead fraud-by-hindsight are unavailing and cannot ground their claims.

*Second, Plaintiffs cannot plead the required strong inference of scienter.* Supreme Court precedent requires courts to weigh the competing inferences to be drawn from factual allegations in their full context. Here, the facts and inferences show good faith conduct, and the posited fraud makes no sense. Tilray's public filings show that the Company worked closely with outside experts to ensure that it was fairly valuing and accounting for the ABG Agreement as well as its inventory, and properly handling other critical (and complicated) accounting policies. Moreover, neither of the individual defendants—CEO Brendan Kennedy, and CFO at-the-time Mark Castaneda—is alleged to have made any unusual or suspicious stock sales during the period; indeed, they retained significant amounts of their holdings, setting themselves up, on Plaintiffs' theory, to be victims of the fraud they allegedly perpetrated. For motive, Plaintiffs offer only the implausible theory that

2

the allegedly false and misleading statements—and the ABG Agreement itself—were part of some elaborate scheme by Mr. Kennedy to trick other shareholders of Tilray's controlling company, Privateer Holdings, into agreeing to a downstream merger with Tilray that was in both Tilray's *and the Privateer shareholders'* interests. Such weak, illogical scienter allegations are insufficient as a matter of law, especially when weighed against strong competing inferences of good faith.

Because Plaintiffs have not pleaded—and cannot plead—either that any of the challenged statements were materially false or misleading, or a strong inference of scienter with respect to any Defendant, the Amended Complaint should be dismissed in its entirety with prejudice.

## II.    FACTUAL BACKGROUND

### A.  Tilray is a Leader in the Nascent Global Cannabis Industry

Tilray is a global pioneer in what is widely expected to be a $150 billion cannabis industry. Ex. 1 (5/14/19 Tr.), at 4-5. It was the first medical cannabis producer with a production facility in North America to be Good Manufacturing Practices ("GMP") certified; the first producer to export medical cannabis from North America to Africa, Australia, Europe, and Latin America; and among the first to be licensed to cultivate and process medical cannabis in two countries, Canada and Portugal. Ex. 2 (2019 10-K), at 2. In July 2018, Tilray held an initial public offering and became the first cannabis company to IPO in the U.S. and trade on NASDAQ. *See* AC ¶¶ 2, 20.

The Company's products are now available in fifteen countries spanning five continents and fall into three main channels—global medical cannabis, Canadian adult-use cannabis, and hemp products, including hemp-derived CBD—each of which involves different regulatory frameworks, geographic areas of operation, and profit margins. Ex. 2 (2019 10-K) at 1-8. The Company's global growth strategy is focused on six top-line performance drivers that call for particular attention to quality control and strong branding. Ex. 3 (3/18/19 Tr.), at 3. Tilray has worked hard to achieve both, in part by partnering with established global industry leaders. In

December 2018 (several weeks before signing the ABG deal), Tilray announced that it had entered into a global framework agreement with Sandoz to jointly develop and commercialize high-quality pharmaceutical medical cannabis products. Ex. 4 (2018 10-K), at 3. That same month, Tilray also formed a partnership with AB InBev to research and develop cannabis-based beverages. *Id.*

### B.  The Farm Bill Spurs Tilray to Enter into First of Its Kind ABG Agreement.

Regulated medical cannabis has been legal in Canada since 2001, but it was not until October 2018 that Canada legalized recreational cannabis use. The Cannabis Act left the regulation of sales and retail stores to Canada's individual provinces, but it limited legal sales initially to certain dried cannabis and oil products, with the expectation that new classes of edibles, topicals, and extracts ("2.0" products) would be permitted a year later. *See id.* at 13.

Around the same time, the United States took its first major step towards legalizing certain cannabis products at the federal level. The Farm Bill, signed into law December 20, 2018, exempted hemp and hemp-derived products from the U.S. Controlled Substances Act, paving the way for nationwide use, sale, manufacture, and distribution of hemp-derived CBD (a non-psychoactive component in cannabis plants), even as it explicitly preserved the FDA's regulatory authority over CBD products. *Id.* at 22. A number of individual states had previously legalized medical and/or recreational cannabis use, but the Farm Bill marked the first significant relaxation of strict federal controls and was widely heralded as a watershed moment. In the following months, industry analysts, cannabis companies, and the media expressed broad optimism that the U.S. CBD market was now in play and that the FDA would soon clarify the regulatory path forward, ushering in a new era of CBD products widely available at mainstream retail outlets across the U.S.[3] Indeed,

---

[3] *See, e.g.*, Nathaniel Meyersohn, "Barneys. Neiman Marcus. America's stores are taking the leap into cannabis products," *CNN Business*, Feb. 13, 2019; Kelly Tyko, "Walgreens will sell CBD products in nearly 1,500 stores," USA TODAY, Mar. 28, 2019.

FDA Commissioner Gottlieb's official statement on the Farm Bill indicated as much, recognizing the "potential opportunities that cannabis or cannabis-derived compounds could offer and . . . the significant public interest in these possibilities" and pledging that the FDA would "continue to take steps to make the pathways for the lawful marketing of [CBD] products more efficient."[4]

In the midst of all this industry optimism, Tilray learned that ABG was looking to partner with a cannabis company. It was an attractive prospect, particularly for a brand-focused Company like Tilray: ABG owns more than 50 well-known global lifestyle and entertainment brands (e.g., Brooks Brothers, Forever 21, Greg Norman, Nine West) and has an established global network of manufacturers, operators, and retailers, generating approximately $9 billion in retail sales annually. Ex. 5 (1/15/19 Press Release). ABG represented a unique opportunity to partner with a large portfolio of diverse, established brands positioned for U.S. and international markets. The timing was perfect, and Tilray acted quickly before another cannabis company could steal the opportunity.

The ABG Agreement was carefully negotiated and vetted with assistance from outside experts. *See id.* at 2 ("Tilray's financial advisor on the transaction was BofA Merrill Lynch. [ABG]'s legal advisor . . . was Paul, Weiss . . . .").[5] On January 15, 2019, the parties announced a long-term revenue sharing agreement to develop, market, and distribute a portfolio of consumer cannabis products within ABG's brand portfolio worldwide, with immediate focus on CBD in the U.S. *Id.* Under the terms of the agreement ("ABG Agreement"), Tilray became the preferred supplier of active cannabinoid ingredients for ABG-branded products and acquired the right to receive up to 49% of the net revenue from those products in perpetuity, with a guaranteed

---

[4] FDA, "Statement from FDA Commissioner Scott Gottlieb, M.D., on signing of the Agriculture Improvement Act and the agency's regulation of products containing cannabis and cannabis-derived compounds," Dec. 20, 2018.
[5] In early 2019, many law firms were still reluctant to be publicly associated with cannabis engagements and preferred not to be publicly identified. *See* Sam Reisman, "Why 2019 Was a Tipping Point for BigLaw and Cannabis," *Law360*, Oct. 15, 2019. While only ABG's counsel is listed, it stands to reason that Tilray was well-represented too.

minimum of up to $10 million annually for 10 years. Ex. 5 (1/15/19 8-K), Item 1.01. In exchange, Tilray agreed to pay approximately $100 million in cash and stock up front, plus (a) additional consideration in stock (valued at $66,666,667) upon triggers relating to the sale of CBD being legal in the U.S. (Tilray paid this amount in March 2019); and (b) further consideration ($83,333,333 in a combination, at ABG's election, of up to $16,666,666 in cash and the remainder in common stock), upon certain triggers relating to the regulatory status of tetrahydrocannibiniol ("THC") in the U.S. *See id.*

Hot on the heels of the Farm Bill, both parties expressed genuine optimism that the deal would be profitable sooner rather than later. Ex. 5 (1/15/19 Press Release). Just a month later, Tilray further signaled its confidence in the U.S. CBD market, acquiring Manitoba Harvest—"the world's largest hemp food company with a retail network of approximately 16,000 stores across North America, including Costco, Amazon, and Wal-Mart" for $317 million. Ex. 4 (2018 10-K), at 4; Ex. 3 (3/18/19 Tr.), at 4.

### C. Tilray's 2018 10-K Reflects Continued Growth and Identifies Material Weakness

In their public filing and earnings call in March 2019, Defendants expressed continued optimism about the Farm Bill, the ABG Agreement, the Manitoba Harvest acquisition, and industry momentum generally. *See, e.g.*, Ex. 3 (3/18/19 Tr.), at 5; Ex. 4 (2018 10-K), at 3-4. But Tilray's 2018 10-K also explicitly warned that both the regulatory framework for and future profitability of the ABG deal remained uncertain. Ex. 4 (2018 10-K), at 23. In addition, the 2018 10-K reflected certain common corporate growing pains: it identified a material weakness as of December 31, 2018 in Tilray's internal controls for financial reporting "relating to inventory costing and the financial close process." *Id.* at 58. The Company explained that management was working to remedy this deficiency by "increasing the depth and experience within our accounting and finance organization, as well as designing and implementing improved processes and internal

6

controls . . . ." *Id.* Still, Tilray's outside auditor, Deloitte LLP, concluded that the 10-K "present[ed] fairly, in all material respects, the financial position of the Company." *Id.* at F-2.

### D.  Tilray Worked Hard to Properly Account for and Capitalize on ABG Agreement.

In the months following the ABG Agreement, Tilray consulted extensively with Deloitte and other outside experts to ensure that it was properly accounting for this complex transaction. Because the guaranteed minimum payments under the Agreement met the definition of a loan pursuant to Generally Accepted Accounting Principles ("GAAP"), a portion of the Agreement's value was accounted for as a loan, while most of it was recorded as an indefinite-lived intangible asset. Ex. 2 (2019 10-K), at F-28, F-3-5. Consistent with GAAP, that indefinite-lived intangible asset was "calculated using the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above." *Id.* at F-29. Tilray also worked closely with ABG to identify ABG brands especially well-suited to CBD product offerings and to develop those product plans as quickly as possible. *See* Ex. 3 (3/18/19 Tr.), at 14; Ex. 1 (5/14/19 Tr.), at 18.

This forward momentum in the spring and summer of 2019 reflected broad industry optimism about the rapidly growing U.S. CBD market. The FDA was moving ahead with its listening and information-gathering efforts: in April, it formed an internal working group and issued a call for scientific information and public comments on CBD, and on May 31 it convened a public hearing to hear directly from stakeholders.[6] Meanwhile, CBD had become the hot new thing across many industries, and consumer packaged good ("CPG") companies and retailers all over the U.S. were trying to get in on it.[7] In the March and May earnings calls, Tilray described

---

[6]    FDA, "Notice of Public Hearing; request for comments," Apr. 3, 2019, *available at https://www.federalregister.gov/documents/2019/04/03/2019-06436/scientific-data-and-information-about-products-containing-cannabis-or-cannabis-derived-compounds*; FDA, "FDA is Committed to Sound, Science-based Policy on CBD," July 17, 2019, *available at https://www.fda.gov/news-events/fda-voices/fda-committed-sound-science-based-policy-cbd*.
[7] *See supra* note 3; Ex. 3 (3/18/19 Tr.), at 12-13.

how it was receiving large numbers of contacts from retailers expressing interest in potential CBD partnerships. *See* Ex. 3 (3/18/19 Tr.), at 12-13; Ex. 1 (5/14/19 Tr.), at 9. At the same time, it acknowledged this was not the case for all retailers: "[T]here are retailers in the U.S. that aren't waiting for the FDA. And then there—as you can imagine, there are more conservative retailers that are going to wait and see what happens with some of the FDA hearings at the end of this month and over the course of this summer." Ex. 1 (5/14/19 Tr.), at 18.

### E. Privateer Proposes Mutually Beneficial Downstream Merger.

Amidst all this excitement, Tilray and its founder and majority stockholder—private equity firm Privateer Holdings (started by Mr. Kennedy and two others)—also were working to unwind Privateer's interest in Tilray. Following Tilray's IPO, Privateer held approximately 82% of Tilray's economic interest, but all of its shares were subject to a six-month lockup. AC ¶¶ 3, 70. Rather than sell those shares for billions of dollars when the lockup expired in January 2019, defendant Kennedy and the other Privateer investors announced ahead of time that Privateer would continue to hold its shares to avoid the negative effects that large sales all at once might have on Tilray's stock price. *See id.* But by this time Privateer had divested itself of substantially all its other investments and was interested in doing the same with respect to Tilray. *See id.* ¶ 158. After some negotiation, Tilray and Privateer arrived at a mutually beneficial path forward: a downstream merger through which Tilray would cancel all of Privateer's existing shares and issue new shares to each Privateer investor individually, according to their pro-rata Privateer ownership[8]; in turn, the Privateer investors agreed to further lock up their newly issued shares with phased release controlled by Tilray's board. This transaction served all parties' interests, allowing Privateer to fully unwind, ensuring orderly, controlled release of Privateer's large number of Tilray shares, and

---

[8] Except that all Class 1 shares were reissued to Privateer's three founders, increasing their voting control of Tilray from 66% to an even higher percentage, per Plaintiffs' pleadings. AC ¶¶ 156-57, 167.

providing tax benefits (as Plaintiffs note) to *all* Privateer investors if and when they sold their shares. *See id.* ¶¶ 158-66. The downstream merger was finalized on December 12, 2019, the old Privateer shares were cancelled and new ones issued, and Privateer was dissolved shortly thereafter. *Id.* ¶ 21.

### F. Developments at the End of 2019 Raise Concerns about the ABG Agreement's Near-Term Profitability, and Tilray Takes Appropriate Action.

The Industry and retailer enthusiasm around CBD lasted well into the latter half of the year,[9] but the longer the FDA's process dragged on without clarity, the more reluctant retailers became to stock CBD products, particularly ingestibles. Mr. Kennedy explained in August that they were starting to see "a lot of the major retailers holding off, especially on the ingestible products until they have more clarity. As that clarity comes in the second half, we see a significant ramp in the second half of the year. If it does not, we see a much slower ramp on the CBD side . . . on the ingestible side." Ex. 6 (8/13/19 Tr.), at 13. Even so, the Company was still seeing significant retail interest in topicals—which raised fewer FDA concerns—and it still expected to roll out the first ABG-branded products by year end. Ex. 7 (11/12/19 Tr.), at 11, 17.

On November 25, 2020, however, the FDA surprised the industry: that day it sent warning letters to 15 companies for selling CBD products in illegal ways—more than twice as many as it had previously issued in all of 2019—and it revised its Consumer Update to state that "CBD has the potential to harm you" and that the FDA could not conclude that CBD is "generally recognized as safe (GRAS)."[10] After months of silence, these actions signaled that the FDA still had

---

[9] *See, e.g.*, Alicia Wallace, "CBD product sales are booming. Now the FDA needs to weigh in," *CNN Business*, July 9, 2019 (describing enormous retail and consumer interest in CBD).

[10] *See* FDA, "FDA warns 15 companies for illegally selling various products containing cannabidiol as agency details safety concerns," Nov. 25, 2019, *available at https://www.fda.gov/news-events/press-announcements/fda-warns-15-companies-illegally-selling-various-products-containing-cannabidiol-agency-details*; FDA, Consumer Update on CBD, last updated Mar. 5, 2020, *available at https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis*.

substantial concerns and no plan yet for a regulatory path forward, and it led even more retailers to hold off on stocking or partnering on CBD products. This new landscape had consequences for Tilray's ABG partnership as well—ABG was having increasing trouble getting distribution traction for the first CBD product rollout, and updated sales projections at the end of the year showed that the Agreement's path to profitability would take longer than anticipated.

These were disappointing developments, but Tilray did everything it could to mitigate the damage. It consulted closely with Deloitte and other experts to evaluate the financial and accounting impacts of the revised forecast, including conducting an impairment analysis. And in January 2020, the Company successfully renegotiated the ABG Agreement to better reflect this altered regulatory and commercial landscape and the parties' revised expectations regarding time to profitability. The Amended Agreement eliminated Tilray's obligation to pay the additional $83.3 million in cash and stock upon certain THC-related triggers, ensuring Tilray would not have to pay out additional cash or equity for a deal that would not be profitable soon, and in exchange, Tilray gave up its right to guaranteed minimum payments. Notably, the parties left the long-term profit sharing rights in place; they fully expect the deal to be profitable eventually.

### G. Tilray's 2019 10-K Recognizes ABG Impairment and Writes Down Inventory.

Pursuant to GAAP and with assistance from outside experts, Tilray conducted an impairment analysis on the indefinite-lived intangible asset associated with the ABG Agreement and determined that the fair value was below the carrying value. Ex. 2 (2019 10-K), at F-35. It recognized "[a]n impairment of $112.1 million . . . in 2019 primarily due to the analysis of future cash flows for our ABG Profit Participation Agreement, which have been reduced due to the delayed clarity from the FDA regarding CBD products in the United States." *Id.* at 67. Both the 2019 10-K and Deloitte's Audit Report reflect that this impairment analysis was highly subjective and arrived at only after extensive consultation with and advice from Deloitte, which in turn had

10

to call in its own specialists. *See id.* at 55-56 ("Critical Accounting Policies and Significant Judgments and Estimates") (impairment analysis "requires the application of judgment, historical experience, and external and internal sources of information"); F-2-F-4 (Audit Report). Indeed, these audit issues received special scrutiny in light of the additional material weaknesses identified in the 2019 10-K regarding the Company not having "a sufficient complement of accounting and financial reporting personnel with an appropriate level of knowledge," and not having adequate processes or controls to support accurate financial reporting. *Id.* at 77; 79-80 (Deloitte's Report on Internal Controls) ("These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements . . . . and this report does not affect our [unqualified opinion on the financial statements.]").

The 2019 10-K also announced significant inventory write-downs based on developments in the Canadian adult-use market. Throughout 2019, Tilray had valued its inventory, pursuant to GAAP, based on the reasonable judgment that its increasing supply of flower by-product or "trim" continued to have realizable value because it would eventually be extracted for use in the new 2.0 products Canada was set to legalize in late 2019. Ex. 7 (11/12/19 Tr.), at 8-9. When the Canadian 2.0 market actually opened in December 2019, however, it quickly became apparent that it would not grow as rapidly as expected.[11] As a result, Tilray—like many of its competitors—wrote down inventory to match this new market reality: "The total inventory valuation adjustment of $63.5 million . . . reflects our estimate of excess product based on current sales forecasts, which have been reduced from previous estimates due to the slower than expected transition of the Canadian adult use market." *Id.* at 64.

---

[11] *See* Alexander Beadle, "Canada's Edibles Market Gets Off to a Slow Start," *Analytical Cannabis*, Dec. 20, 2019.

### III.    LEGAL ARGUMENT

#### A.  Heightened Pleading Standards Govern Plaintiffs' Claims

Securities fraud claims must meet the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("Reform Act"). Under Section 10(b), a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and, "with respect to each act or omission," must "state with particularity facts giving rise to a strong inference" of scienter—that is, that *the particular defendant* made each allegedly false or misleading statement intentionally or with deliberate recklessness.[12] 15 U.S.C. § 78u-4(b)(1)(B), (2)(A). A "strong inference" of scienter is "more than merely plausible or reasonable"; it must be "powerful" and "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). In performing this analysis, courts must consider the full factual context of the statements and conduct at issue. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015); *Tellabs*, 551 U.S. at 323-24; *see also* Defendants' Request for Full Context Review and/or Judicial Notice, filed concurrently herewith. Here, Plaintiffs' claims fail for several independent reasons.

#### B.  None of the Challenged Statements were Materially False or Misleading

Plaintiffs challenge five categories of statements, grouped below. They do not and cannot plead that any statement in any category was false or misleading.

##### 1.  Positive Statements about the ABG Deal

Plaintiffs challenge a variety of positive statements Defendants made about the ABG Agreement and its prospects from the time it was signed through November 2019: that the ABG Agreement was a "first of its kind" deal that "leverages our complementary strengths and is

---

[12] Of course, each Individual Defendant is only legally responsible for the statements he made. Mr. Kennedy and Mr. Castaneda both signed the financial statements, but each made different statements on earnings calls.

accretive"; that Tilray was meeting with ABG to decide which brands and products to bring to market first and the partnership was continuing to "build momentum"; that Tilray was a particularly attractive partner because other industry leaders had already decided to partner with it; that Defendants expected to launch a topical ABG product by year end; that they were working to commercialize ABG brands in Europe by early 2020; and, in November, that they still expected to launch an ABG product by year end even though many retailers were "waiting a bit to see what sort of clarification comes from the FDA." AC ¶¶ 73, 78, 86, 89, 109-10, 123, 125.

These optimistic statements express the Defendants' subjective views and/or characterizations of matters open to interpretation; as such, they properly constitute statements of opinion under the securities laws. *Omnicare*, 575 U.S. at 183 ("An opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'"). For such a statement of opinion to be false or misleading under *Omnicare*, a plaintiff must do more than allege that it turned out to be incorrect: he must plead (1) facts sufficient to show that the speaker did not actually hold the stated belief at the time the statement was made; or (2) "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 188-89, 194. Plaintiffs offer no such allegations here: to the contrary, the facts before the Court demonstrate Defendants genuinely believed these statements—that the partnership was building momentum and leveraged their complementary strengths, that Tilray was particularly attractive to potential partners in part because it had already been chosen as a partner by other well-respected companies,[13] and that Tilray planned and expected to bring an ABG topical product to market by year end.

---

[13] To the extent this opinion statement involves an embedded fact—that Tilray was "vetted" by ABG and other partners—Plaintiffs have not pleaded any facts to the contrary. FE 3 does not claim to have been involved in Tilray's negotiations with ABG (or any other partner) or to have any basis for personal knowledge regarding that process.

13

No pleaded facts suggest that Mr. Kennedy or Mr. Castaneda did not believe these opinion statements at the time, and Plaintiffs have not pleaded that any particular omitted facts rendered them misleading in context. The fact that Defendants stated in November that they were seeing more U.S. retailers holding off on CBD, and that their "pretty conservative" internal revenue ramp models included very little U.S. CBD for 2020, is perfectly consistent with their still being on track to launch the first ABG product by year end and still working to commercialize products in Europe by early 2020. Nor do the allegations of former employees ("FEs") in the Amended Complaint suggest otherwise, as they offer none of the particularized pleadings required to establish a basis for personal knowledge regarding their allegations. *See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (CW allegations must be sufficiently detailed "to support the probability that a person in the position occupied by the source would possess the information alleged.").[14] In addition, most of these challenged opinion statements also are non-actionable "puffery" and/or forward-looking statements protected under the Reform Act's safe harbor.[15]

### 2. Statements Regarding U.S. Interest in CBD Products

Much the same analysis applies to the challenged statements Defendants made between March and June of 2019 indicating that they were seeing strong interest from U.S. retailers for CBD products, that they were having conversations with large CPG companies and retailers about

---

[14] *See also In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (discounting CW allegations because even allegation that CW was "intimately involved" in clinical trials did not establish basis for knowing about all aspects of trials, what information was communicated to defendants, or what conclusions they reached). FE 3's vague allegation that he was a Tilray "Vice President" who was "heavily involved in strategic initiatives" is nearly identical to *Elan*'s insufficient CW pleadings. AC ¶ 25.

[15] *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (expressions of optimism or opinion that are "too general to cause a reasonable investor to rely upon them" are non-actionable puffery); *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (Reform Act protects forward-looking statements that are either (a) identified as such and accompanied by meaningful cautionary language; or (b) immaterial, or (c) not made with actual knowledge of falsity). Here, the forward-looking statements were genuinely believed to be true by Defendants, were so vague as to be immaterial, and were identified as such and accompanied by meaningful cautionary language. *See* Ex. 5 (1/15/19 Press Release), at 2; Ex. 3 (3/18/19 Tr.), at 2-3; Ex. 1 (5/14/19 Tr.), at 2-3; Ex. 6 (8/13/19 Tr.) at 2-3; Ex. 7 (11/12/19 Tr.), at 2-3.

those products, and, later, that some retailers were still expressing interest but some were waiting to see what would happen with the FDA later in the year. AC ¶¶ 77, 85-87, 106-07.

These too were true and not misleading statements of opinion expressing the Defendants' subjective experiences and views on market conditions at each point in time. Tilray's acquisition of Manitoba Harvest and payment in March 2019 of additional consideration under the ABG Agreement related to legalization of CBD strongly indicate that Defendants genuinely believed their optimistic statements about the U.S. CBD market. No facts suggest the Defendants were *not* seeing strong interest from U.S. CPG and retail companies in the spring and summer and being inundated with contacts from these potential commercial partners who "all want[ed] everything" in May 2019 (AC ¶ 86); indeed, media coverage from the time suggests they were (*see supra* note 3). Nor were these statements misleading: Defendants stated in the same call that while they were seeing strong retail interest, some retailers were choosing to wait for FDA clarity. Ex. 1 (5/14/19 Tr.), at 18. And when retailer delay increased towards the end of the summer, Defendants disclosed that too. Ex. 6 (8/13/19 Tr.), at 13 ("We do see a lot of the major retailers holding off, especially on the ingestible products until they have more clarity.").

Plaintiff's assertion that this statement about market conditions in *August* somehow shows that the same must have been true in March, May, and June when the challenged statements were made is both illogical and impermissible fraud by hindsight. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999). Tilray's experience was a microcosm of the industry, and its statements about demand over time closely tracked and reflected the changing reality of the U.S. CBD market in 2019. The industry gradually transitioned from euphoric optimism early in 2019 to more measured enthusiasm as FDA review dragged on, and then increasing uncertainty late in the year when the FDA still had not identified a path forward and ultimately signaled, at the end

15

of November, that it might not do so for some time. *See supra* § II.B-D, F. Defendants truthfully explained their view of the market and where they were, and were not, seeing interest and demand, and Plaintiffs have not demonstrated these statements were misleading in context.

### 3. Statements Reporting ABG's Valuation, and Tilray's Assets and Net Loss

The third category is the heart of Plaintiffs' suit—the baseless assertion that the ABG Agreement was never valuable and should have been impaired immediately, and that Defendants' "failure to do so [in the Q1, Q2, and Q3 2019 10-Qs] was a knowingly or recklessly false statement" that resulted in the Company overstating its assets and understating net loss. AC ¶¶ 96-105, 118-21, 127. This is classic fraud-by-hindsight. The valuation and impairment analysis for the ABG Agreement required complex, subjective judgment calls that rendered the challenged statements opinions under the securities laws, and Plaintiffs have not pleaded any facts suggesting that these were false or misleading under *Omnicare*.

As explained in its Q1 2019 10-Q, the Company originally valued the ABG Agreement at the cost of the cash and stock consideration Tilray paid for it, most of which was recorded as an intangible asset with indefinite life. *Id.* ¶¶ 96-97. Plaintiffs do not dispute this initial valuation under GAAP, but argue that ASC 360-35-18 *required* Tilray to conduct an impairment analysis almost as soon as it was signed, and that the quantitative impairment analysis under ASC 360-35-19 *required* Tilray to impair the ABG Agreement throughout 2019. Not so. Even a cursory review of those GAAP provisions demonstrates that they are not clear, "objective" rules as Plaintiffs suggest; they require a number of highly subjective estimates and judgment calls on which even expert accountants may differ. ASC 360-35-18 requires management to test for impairment annually or whenever, in their subjective judgment, "events or changes in circumstances indicate that it is *more likely than not* that the asset is impaired." *Id.* ¶ 99; ¶ 120 (ASC 360-35-18B identifies non-exhaustive list of factors to consider, including "legal, regulatory, contractual, political,

business, or other factors, including asset-specific factors" that could affect fair value). If management concludes that this qualitative analysis indicates, in all the circumstances, that it is more likely than not that the asset's fair value is less than its carrying value, then they must conduct a quantitative comparison of those values. *Id.* ¶¶ 101, 103 (ASC 360-35-18B & -19). Deloitte's Audit Report identified this fair value estimate as a Critical Audit Matter that was among the most complicated and subjective accounting issues it evaluated in its year-end audit:

> In determining the fair value of the ABG participation rights for purposes of the impairment test using a discounted cash flow approach, the judgments and assumptions with the highest degree of impact and subjectivity are the discount rate and forecasted rate of future CBD related revenue growth for ABG. Auditing management's assumptions used in the ABG participation rights impairment analysis required a high degree of auditor judgment and an increased extent of audit effort, including the need to involve fair value specialists.[16]

Thus the relevant GAAP provisions required the Defendants, in consultation with Tilray's outside experts, to make a series of subjective judgments: first to determine whether the fair value of Tilray's profit participation rights, including the guaranteed minimum payments to Tilray, under the Agreement was more likely than not impaired *in all the circumstances*; and then, if (and only if) so, to estimate that fair value based on various financial assumptions and projections about the CBD market generally and ABG's future sales.

Where reported financial metrics—e.g., the value of an indefinite-lived intangible asset— are based on subjective estimates and judgment calls of the type described above, courts have found them to constitute statements of opinion for purposes of the securities laws. *See, e.g., Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011) (estimates of goodwill under GAAP

---

[16] Ex. 2 (2019 10-K), at F-4-F-5; *see also id.* ("With the assistance of our fair value specialists [we] [e]valuated the rate of future revenue growth to assess the reasonableness against market expectations and [e]valuated the reasonableness of the discount rate by (1) testing the source information . . . and (2) developing a range of independent estimates and comparing those to the discount rate selected by management.").

are opinion statement because they "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017) (same); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545 (LAK), 2019 WL 4257110, at *13-22 (S.D.N.Y. Sept. 9, 2019) (similar). And under *Omnicare*, a statement of *opinion* is only false or misleading if the speaker did not actually believe it at the time or if specific, contemporaneous omitted facts rendered it misleading in context. 575 U.S. at 188-89, 194.

Here, Plaintiffs have not pleaded any facts, as opposed to conclusory allegations, suggesting that the Defendants did not actually believe the reported carrying value for the ABG Agreement to be fair when each 2019 10-Q was filed, or that particular omitted facts at the time rendered those reported values misleading. Indeed, the facts before the Court suggest the opposite. The fact that Defendants consistently consulted outside experts from the beginning regarding their valuation, accounting, and impairment analysis for the ABG Agreement—and that Deloitte and its specialists ultimately approved of those estimates—gave the Defendants every reason to believe that their financial reports fairly valued the ABG Agreement. Contrary to Plaintiffs' assertions, "conditions necessitating impairment" did not already exist in the first quarter of 2019; indeed, they did not exist until late November and December 2019, at which point the Company tested for and ultimately recognized an impairment in compliance with GAAP. There was significant retail interest in CBD and industry optimism that the FDA would find a viable path forward quickly as FDA Commissioner Gottlieb had indicated, and the deal's carrying value was very much in line with these market conditions. *See supra*. By fall more U.S. retailers were taking a conservative approach, but the industry still expected clarity soon from the FDA. Instead, on November 25 the FDA stepped up CBD enforcement efforts and clearly stated for the first time both that it did not

18

consider CBD generally safe and that it had no near-term regulatory path. This was significant new information that, in combination with updated sales forecasts from ABG, appropriately caused Tilray to test for impairment, recognize an impairment, and renegotiate the terms of the agreement.

Plaintiffs' assertion that Defendants should have reached a different determination earlier is nothing more than impermissible fraud by hindsight. *See Omnicare*, 575 U.S. at 186 (securities laws "do[] not allow investors to second-guess inherently subjective and uncertain assessments" and are not an "invitation to Monday-morning quarterback an issuer's opinion"); *Stevelman*, 174 F.3d at 85 ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud.").[17]

### 4. Statements Regarding Inventory

Whereas the original Complaint concerned only statements related to the ABG Agreement, the AC now also alleges that Tilray fraudulently overstated inventory throughout 2019 by assigning "unsellable trim" value in violation of GAAP and its own inventory policy. AC ¶¶ 80-81, 91-93, 112, 114-15, 130-32. To the contrary, as Defendants clearly explained to investors throughout 2019, their inventory valuations—consistent with GAAP—included flower by-products that were not yet sellable *because they expected to process and sell them starting in late 2019* when the new 2.0 products would be allowed in the Canadian adult-use market. Each financial statement in 2019 detailed Tilray's inventory valuation policy as follows:

> Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and *by-products to be extracted*. . . . Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. . . . Net realizable value is defined as the *estimated*

---

[17] FE 3 baldly asserts that it was "immediately very clear" that the ABG Agreement was not worth what Tilray had paid for it and that it was "never going to bear fruit" (AC ¶ 71), but the AC does not establish any basis for FE 3 having personal knowledge about the Agreement, its negotiations, its prospects, or the complicated accounting judgments that factor into asset valuation and impairment analysis under GAAP. Such conclusory and unsupported allegations deserve no weight, if the Court considers them at all. *See, e.g.*, *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-cv-01740, 2013 WL 1188050, at *36 (D. Conn. Mar. 23, 2013) (rejecting allegations from CW not "alleged to have had any connection to" projections).

19

> *selling price in the ordinary course of business*, less reasonably predictable costs of completion, disposal and transportation. At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value.[18]

Defendants also truthfully explained, as late as November, that the increasing inventory balances were part of a long-term sales plan: they were stockpiling product at the new Portugal facility while awaiting further GMP certifications, and were accumulating a growing supply of flower by-product in Canada with the expectation that they would begin extracting and using it for 2.0 products towards the end of the year. AC ¶ 130 (quoting 11/12/19 earnings call).

With the wisdom of hindsight, Plaintiffs now claim that those inventory estimates were false and misleading and should have been written down sooner. But the fact that Defendants' expectations for the 2.0 market may have proven too optimistic does not suggest that these opinion statements were false or misleading when made. Inventory valuation, like the ABG Agreement valuation and impairment analysis, required a host of subjective judgments and estimates: management had to estimate the value of by-product inventory based on its best judgment, in light of innumerable market factors, as to the likely demand and selling price for by-product in the new Canadian 2.0 adult-use market once it opened. The significant subjectivity involved in this accounting treatment rendered the resulting inventory valuation a statement of opinion, and Plaintiffs have not demonstrated either that the Defendants did not believe the challenged inventory valuations when they were reported, or that they omitted particular facts that rendered the inventory valuations misleading. Quite the opposite, Defendants' statements throughout 2019 transparently explained to investors why they considered by-product to have realizable value: they genuinely believed the trim would be extracted and sold in 2.0 products in the near future, and thus

---

[18] AC ¶¶ 81, 92, 115, 132 (quoting same language in 2018 10-K, and 2019 Q1, Q2, and Q3 10-Qs respectively).

20

it was both appropriate and necessary to include it in Tilray's inventory estimate.[19] The fact that the anticipated value did not fully materialize does not mean that these opinion statements were false or misleading when made, or that Tilray was required to write down inventory earlier. Once the Canadian market opened in December 2019, it quickly became clear that the small number of provincial retail outlets was limiting demand for 2.0 products and that the industry had an oversupply of by-product and extracted oils for this reduced market.[20] At that point, Tilray appropriately wrote down inventory to reflect the new market conditions, and valued by-products at zero moving forward in light of these changed circumstances.[21] All this indicates good faith.

### 5. Statements Reporting Cost of Sales and Gross Margins

Finally, for many of the same reasons, the costs of sales and gross margins Tilray reported in its financial statements in 2019 were truthful and not misleading statements of opinion, and Plaintiffs have not alleged any facts to the contrary.[22] *See* AC ¶¶ 82-83, 94-95, 116-117, 133-34. To the extent Plaintiffs' challenge to these statements depends on their allegations of false inventory valuations—which factor into cost of sales and gross margins estimates—those claims are without merit for the reasons discussed above. The only other allegations Plaintiffs offer are two former lower-level employees' alleged assertions that certain specialized pieces of Tilray's accounting systems did not reflect all costs in the ways the FEs thought they should. These

---

[19] The FEs offer no support for their conclusory assertions that the by-product at issue was all "unsellable waste": they have not established any basis for personally knowing what reasonably could or could not be sold at that time or in the future in the Canadian 2.0 market. *See Schiro*, 396 F. Supp. 3d at 305.

[20] This is a different problem than the provisions for returns many competitors were forced to make around the same time. Plaintiffs have not alleged that Tilray made any such revisions for returned oil or gel products, and no pleadings undermine the sincerity of Tilray's belief that it had a "better read on consumer demand, thus avoiding the need to make revisions for returns like other companies." AC ¶ 135.

[21] *See* AC ¶ 150. This going-forward change in practice was not, as Plaintiffs claim, an *admission* that Tilray's prior valuation of trim as inventory was "improper," but an appropriate adjustment based on changed market conditions.

[22] Plaintiffs also fail to plead loss causation with respect to these statements: they have not alleged that any "hidden truth" was revealed with respect to cost of sales and gross margins—as opposed to inventory—causing Plaintiffs' alleged losses. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

observations are entirely consistent with Tilray's own assessment at the time that deficiencies in its inventory accounting system and other issues with the Company's financial function constituted a material weakness. But these observations do not suggest that cost of sales or gross margins *as ultimately reported in Tilray's financial statements* were materially false or misleading, and indeed they were not. Neither of the FEs claims to have been part of the Finance team that prepared Tilray's financial reports or to have otherwise had a basis for personal knowledge of that process, and their suppositions about how information displayed in their local systems or in forms they prepared was used to calculate overall cost of sales and gross margins is both unsupported and demonstrably false. Because the Company was aware of the limitations of its cost accounting systems and software, central finance used only the raw local sales data, rather than locally-prepared summaries or forms, to build its own calculation of cost of sales and gross margins for financial reporting purposes, and those calculations did in fact incorporate all necessary costs of sales as required by GAAP and described in the Company's financial statements.

Not surprisingly then, Tilray's expert outside auditors—who were well aware of the material weaknesses *and gave extra scrutiny to the Company's inventory costing and related accounting functions as a result*—determined that the Company's 2018 and 2019 10-Ks (including cost of sales and gross margins) were GAAP compliant and fairly presented the financial condition of the Company, notwithstanding the weaknesses identified. Ex. 2 (2019 10-K), at F-2-F-6. By their own description, the FEs' knowledge bases are simply too limited to suggest otherwise.

### C.  Plaintiffs Cannot Allege a Strong Inference of Scienter

Plaintiffs' Section 10(b) claim fails for another, independent reason: lack of scienter. To plead scienter, a plaintiff must state "with particularity" facts giving rise to a "strong inference" that each defendant acted with "an intent to deceive, manipulate, or defraud" with respect to each alleged false or misleading statement. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP*

22

*Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); 15 U.S.C. § 78u-4(b)(2). This strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. And this "inherently comparative" inquiry—unlike the usual motion to dismiss analysis—requires courts to weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24.[23]

Here, non-fraudulent inferences abound. Neither Mr. Kennedy nor Mr. Castaneda is alleged to have made any unusual or suspicious stock sales[24]—a fact which cuts strongly against scienter and confirms that they in fact believed in the Company's future and the value of its stock.[25] Moreover, everything about how the Defendants handled Tilray's financial reporting bespeaks good faith. The material weakness findings in the 2018 and 2019 10-Ks reflect that they were aware of and working hard to remedy deficiencies in the Company's financial functions, including those "relating to inventory costing and the financial close process." These efforts and public disclosures show that the Defendants were paying close attention and doing everything they could to ensure that Tilray's public statements fairly represented its financial condition to investors despite any deficiencies. Moreover, the Defendants conscientiously sought out expert advice on complex accounting issues at every turn. Outside accounting experts (who in turn called in their own experts) were repeatedly consulted about the proper way to account for the ABG Agreement and its later Amendment. They advised on and vetted the initial valuation and the later impairment analysis, as well as the Company's inventory valuations—paying special attention to all of these

---

[23] In the Second Circuit, scienter can be established by alleging facts showing either motive-and-opportunity for fraud or "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Defendants' discussion here is framed within the Supreme Court's *Tellabs* analysis but addresses both Second Circuit prongs.

[24] *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) ("[I]t is well established that trades under 10b5–1 plan do not raise a strong inference of scienter.").

[25] *See, e.g.*, *Acito*, 47 F.3d at 54 (lack of stock sales undermines scienter); *Turner v. MagicJack VocalTec, Ltd.*, No. 13-cv-0448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (lack of sales "rebuts an inference of scienter").

issues in light of the material weakness findings—and ultimately Deloitte issued unqualified audit opinions with respect to both the 2018 and 2019 10-Ks. All this strongly suggests good faith.

Against these strong inferences of good faith conduct, Plaintiffs' allegations are especially weak. Plaintiffs offer no specific factual allegations whatsoever with respect to Mr. Castaneda, relying entirely on the boilerplate assertion that he and Mr. Kennedy must have known that the challenged statements were false or misleading "[b]y virtue of their positions" and their having made certain of the statements. AC ¶¶ 191. This is insufficient as a matter of law to plead scienter. *See, e.g.*, *Schiro*, 396 F. Supp. 3d at 308 (rejecting inference of scienter based on senior position).

With respect to Mr. Kennedy, the only additional allegation Plaintiffs offer is the baseless assertion that Tilray's downstream merger with Privateer somehow provided him a motive for entering into the ABG Agreement and allegedly artificially inflating Tilray's stock price throughout 2019. It did not. As Plaintiffs acknowledge, Mr. Kennedy and the other two Privateer founders already had voting control of Tilray (AC ¶ 157); the downstream merger merely maintained that control while providing *all Privateer shareholders* with certain tax benefits when they eventually sold their stock. Moreover, the Privateer merger benefitted Tilray as well: it further locked up Privateer's large number of Tilray shares, giving Tilray's board control over their phased release and ensuring they would not hit the market all at once. If Mr. Kennedy had truly wanted to cash in on his large Privateer-owned Tilray stock holdings, he could simply have sold those shares for billions of dollars when the IPO lockup expired in January 2019. Instead, Mr. Kennedy acted against his own financial interest, orchestrating an additional lockup of Privateer's shares for the benefit of Tilray and its shareholders, and developing a plan to unwind Privateer's holdings that would ensure the smooth, controlled release of those shares into the market. All this strongly suggests Mr. Kennedy's belief in and commitment to the future of the Company. *Cf. Ronconi v.*

24

*Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter where insiders "miss[ed] the boat").

A motive-less alleged fraud rarely survives the Reform Act's strict scrutiny, and Plaintiffs' allegations support this maxim. Here, the most reasonable inference to be drawn from all of these pleaded facts is that the Defendants (and their outside experts) actually believed in the value of the ABG Agreement; believed they were properly valuing and accounting for that Agreement (as well as inventory) at each point in time; and believed they were fairly representing those financial matters to investors. When the market and regulatory landscapes later changed, the Company proactively reviewed the ABG agreement with expert assistance and determined that significant impairments were necessary; it also appropriately wrote down inventory when those market conditions changed so significantly that it was no longer worth its carrying value. In short, the facts and allegations before the Court demonstrate that the Defendants were paying attention, working conscientiously to fix problems in their financial processes, and engaging outside experts to help them do so and make up for any internal deficiencies in the meantime. All this suggests responsible corporate stewardship, not fraud or recklessness.

## IV.    CONCLUSION

Because Plaintiffs fail to state a claim under Section 10(b), their Section 20(a) claim must be dismissed as well.[26] Moreover, repleading here would be futile: Plaintiffs' theories are flawed and additional pleading cannot fix them. Accordingly, the Court should dismiss the Amended Complaint with prejudice.

---

[26] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Dated: December 4, 2020                    Respectfully submitted,


                                           BAKER & HOSTETLER LLP


                                           By:   */s Douglas W. Greene*
                                                 Douglas W. Greene (*pro hac vice*)
                                                 dgreene@bakerlaw.com
                                                 Tiffany A. Miao
                                                 tmiao@bakerlaw.com
                                                 45 Rockefeller Plaza
                                                 New York, NY 10111
                                                 Telephone: 212.589.4200

                                                 Genevieve G. York-Erwin
                                                 gyorkerwin@bakerlaw.com
                                                 999 Third Avenue, Suite 3900
                                                 Seattle, WA  98104
                                                 Telephone: 206.566.7079

                                                 *Attorneys for Defendants*

26