**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the putative Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GANESH KASILINGAM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,<br><br>Defendants. | **CASE No.: 1:20-cv-03459-PAC**<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br><u>**CLASS ACTION**</u> |

**TABLE OF CONTENTS**

I.   INTRODUCTION..................................................................................................... 1

II.  FACTS ................................................................................................................... 2

   A. Defendants ......................................................................................................... 2

   B. Cannabis Products.............................................................................................. 2

   C. Defendants Value A Pile of Marijuana Plant Scraps At More Than $40 Million in
      Inventory............................................................................................................. 3

   D. Defendants Inflate Tilray's Gross Margins To Allay Market Concerns ....................... 4

   E. Defendants Call A Promotional Stunt A Long-Term Partnership ................................ 6

   F. Defendants Use Their False Statements To Maintain Control Over Tilray.................... 7

   G. Defendants Are Forced To Reveal their False Statements............................................ 8

III. ARGUMENT........................................................................................................... 9

   A. Standards............................................................................................................ 9

   B. The Court Should Deny Defendants' Motion To Dismiss Because It Improperly Relies
      On Matters Outside the Pleadings......................................................................... 10

   C. The Complaint Sufficiently Alleges that the Former Employees Know What They
      Report................................................................................................................ 11

   D. The Complaint Adequately Alleges Falsity ................................................................ 12

     1.   Defendants Made False Statements of Fact About Tilray's Inventory ........................... 12

     2.   The Court Cannot Ignore the Complaint's Well-Pled Allegations That Defendants
        Overstated Tilray's Gross Margins ........................................................................ 16

     3.   Defendants Made False Statements About CBD Demand ............................................ 17

     4.   Defendants Mischaracterized the Giveaway to ABG As A Productive Partnership...... 19

     5.   Defendants Overstated the Value of the ABG Agreement............................................. 20

     6.   Tilray Auditor Deloitte Did Not Sign Off on Defendants' False Statements ................. 21

**E.  The Complaint Sufficiently Alleges Scienter** ................................................................. 22

    *1.    The Complaint Alleges a Motive* ....................................................................... 23

    *2.    The Complaint Alleges Recklessness* ................................................................ 24

**IV.  CONCLUSION** ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................................. 14

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................................. 21

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ......................................................... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ......................................................... 9

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
No. 20-CV-2031 (JSR), 2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)..................................... 12

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)...................................................................................... 11, 13, 24

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................................... 14

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)............................................................................................ 15, 22

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................................... 11

*In re Dynagas LNG Partners LP Sec. Litig.*,
No. 19-CV-4512 (AJN), 2020 WL 6947521 (S.D.N.Y. Nov. 25, 2020) ................................. 15

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008)................................................................................... 12

*In re Mylan N.V. Sec. Litig.*,
No. 16-CV-7926 (JPO), 2020 WL 1673811 (S.D.N.Y. Apr. 6, 2020) .................................... 16

*In re Salix Pharm., Ltd.*,
No. 14-CV-8925 (KMW), 2016 WL 1629341........................................................................ 14

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)................................................................................................... 10

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)....................................................................... 20

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)...................................................................................... 10

*Marcus v. Frome*,
329 F. Supp. 2d 464 (S.D.N.Y. 2004)........................................................................ 23

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011) ............................................................................................... 22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).......................................................................... 12, 23, 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) .................................................................................................... 14

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019) ........................................................................ 23

*Peifa Xu v. Gridsum Holding Inc.*,
No. 18 CIV. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020)................... 24

*S.E.C. v. Espuelas*,
698 F. Supp. 2d 415 (S.D.N.Y. 2010)........................................................................ 21

*S.E.C. v. McCarthy*,
322 F.3d 650 (9th Cir. 2003)...................................................................................... 11

*S.E.C. v. Todd*,
642 F.3d 1207 (9th Cir. 2011).................................................................................... 12

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
968 F.3d 204 (2d Cir. 2020)....................................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ........................... 9, 22, 25

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013)........................................................................... 9

*Villella v. Chem. & Mining Co. of Chile Inc.*,
2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ............................................................. 9

## Statutes

15 U.S.C. §78u-4(b)(2)(A)............................................................................................... 22

15 U.S.C. § 78u-4(b)(1) ............................................................................................................... 9

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................................... 9

**Regulations**

17 C.F.R. § 210.2-01(c)(4)(i).................................................................................................... 11

## I.    INTRODUCTION[1]

The facts properly before the Court show that the Complaint states a claim.

In early 2019, Defendants hatched a plan to complete a transaction ("Share Exchange") that would permit them to sell their Tilray shares while still maintaining their voting control. When Tilray's share price unexpectedly collapsed, imperiling the Share Exchange, Defendants took prompt action: they lied to investors. Defendants proposed, negotiated, and signed a nine-figure agreement in a matter of days. Tilray secured the agreement ("ABG Agreement") by making an offer so rich that the counterparty (ABG) could not help but sign. But Defendants told investors the giveaway was a "long-term partnership" that resulted from ABG's "vet[ting]" – taking for Tilray a seal of approval it had never been granted. Defendants took prompt action to address Tilray's collapsing gross margins, too; there as well, they lied to investors. They recognized a pile of unsellable marijuana plant castoffs as a more-than-$40 million asset on Tilray's financial statements. Defendants closed the Share Exchange in December 2019; within months, and with their auditor Deloitte looking over their shoulder, they scaled down the ABG Agreement and wrote off both the pile of marijuana plant waste and 86% of the ABG Agreement.

Thus, the Complaint sufficiently alleges that Defendants made false statements with scienter – the only two elements Defendants challenge.

When filing a motion to dismiss, a defendant must assume all the facts alleged in the Complaint are true. Defendants – in their own words – have not done so. Instead, Defendants stake

---

[1] Unless otherwise noted, all emphases are added and citations omitted. Citations to "¶_" are to Paragraphs of Plaintiffs' Amended Complaint, Dkt. # 78. Citations to "Def.Br. _" are to pages of Defendants' memorandum of law in support of their motion to dismiss the Amended Complaint, Dkt. # 83. Citations to "RJN Ex. _" are to exhibits to Defendants' Request For Full Context Review And/Or Judicial Notice, Dkt. # 84. Citations to "Horne Dec. Ex. _" are to Exhibits to the Declaration of Jonathan Horne, filed herewith. Citations to "RJN Opp'n _" are to Pages of the Plaintiffs' Opposition to the RJN.

their motion to dismiss on the bizarre legal argument that in securities cases, unlike all other cases, the court may take judicial notice of documents for the truth asserted therein.

Defendants are  wrong, as Plaintiffs show in opposing the motion Defendants have tellingly styled a "***Request For Full Context Review*** And/Or Judicial Notice". Both the Second Circuit and the Supreme Court have held as much. But Defendants meld the facts they improperly present and the few facts they cite which are properly before the Court into a holistic whole. They then argue that based on that whole, the Complaint does not state a claim. Because they are based on the wrong legal standard, Defendants' arguments are without merit.

The Court should deny Defendants' motion to dismiss.

## II.  FACTS

### A.  Defendants

Defendant Tilray produces and sells cannabis, hemp, and related products. ¶19. During the Class Period, Tilray's stock traded on the NASDAQ. ¶20.  Defendant Brendan Kennedy has worked exclusively in the cannabis field since co-founding Tilray's parent, Privateer Holdings, in 2011. ¶21. He has served as Tilray's President, CEO, and Board Member since January 2018, as well as the CEO of its Canadian subsidiary. *Id.* Defendant Castenada served as Tilray's CFO from March 2018 through March 2020. ¶22. When he took office, he had spent substantially all of the previous 21 years as a public company CFO. *Id.* He holds a BS in Accountancy, is a CPA, and worked for Deloitte & Touche between 1988 and 1997. *Id.*

The Class consists of all persons who persons who purchased Tilray common stock on the NASDAQ between January 16, 2019 and March 2, 2020. ¶1.

### B.  Cannabis Products

Cannabis products are made from hemp and marijuana and each of their derivatives. ¶27. Hemp by definition is derived from plants with less than 0.3% by weight of THC, the psychoactive

2

ingredient in Cannabis; marijuana derives from plants with more than 0.3%. ¶28. Hemp and marijuana are distinct legal categories under federal U.S. law. Unlike marijuana, hemp is not a controlled substance. ¶34. Since the 2018 Farm Bill, the sole federal legal impediment to the sale of hemp-derived CBD has been the FDA's view that CBD is an adulterant. ¶34.

THC is concentrated in the marijuana plant's flowers and buds. ¶29. The remaining parts of the marijuana plant – leaves, stalks, twigs, and stems – are called "trim" and, as the name suggests, are considered waste. ¶30. Producers are lucky if they can either sell trim to third parties at a nominal price. *Id.* More commonly, producers simply dispose of the trim. *Id.*

### C. Defendants Value A Pile of Marijuana Plant Scraps At More Than $40 Million in Inventory

Companies must report inventory – raw materials, intermediate and sellable products – on their balance sheets. ¶55. Accounting rules required that Tilray record its inventory on each of its quarterly or annual balance sheets at the *lesser* of its cost of production or the amount of money Tilray could make by selling it, net of selling costs. ¶55.

During the Class Period, Defendants claimed on Tilray's financial statements that it accumulated more than one hundred million dollars in inventory. ¶57. It began 2019 with $16.2 million in reported inventory, rising to $111.5 million by September 30. ¶¶82, 133. Defendants reported in Tilray's financial statements that "[i]nventory is stated at the lower of costs *or net realizable value"*, which they defined as *"the estimated selling price in the ordinary course of business*, less reasonably predictable costs of completion, disposal and transportation." *E.g.* ¶¶81, 132. Defendant Kennedy added on an August 13 earnings call that the inventory consisted of valuable marijuana plants – flowers and buds – rather than worthless trim:

> We're building inventory as we await [] G[ood] M[anufacturing] P[ractices]
> licenses [to sell marijuana] and we'll continue to harvest on a weekly and monthly
> basis and build inventory until we have those additional GMP certifications.

¶112.

In fact, nearly a third of Tilray's inventory consisted of worthless marijuana plant scrap. ¶¶ 62, 148.  Tilray stored rather than disposed of the waste generated when it harvested marijuana buds and flowers. ¶¶59, 150. In Tilray's Q3 2019 financial statements, Defendants fraudulently placed a valuation on this hulking pile of castoffs of more than $40 million. ¶62.  As Kennedy admitted after the close of the Class Period, the excess inventory resulted from Defendants' decision to recognize waste as inventory and then write it off at the end of the year:

> The other thing that I would mention about our gross margins is that we'll probably see a little bit of pressure on that due to the fact that we're [now] accounting for our byproduct [i.e., trim] on a zero basis. And so [] historically what's happened is that byproduct has been built up on the balance sheet and that's why there have been significant write-offs for us as well as for I guess in our industry, other industry players. And what we're doing is [] except for a few instances [] attributing zero value to that byproduct. ***So everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year.***

¶150.

### D.  Defendants Inflate Tilray's Gross Margins To Allay Market Concerns

In the quarter immediately preceding its IPO, Q1 2018, Tilray reported gross margins of 55%. ¶40. These margins fell to 46% in the next quarter, and 31% by Q3 2018. *Id*. In March 2019, a Jefferies analyst cited these poor margins in rating Tilray at Underperform – the only such rating Jefferies had issued in the previous 12 months. *Id.*

Recording waste as inventory made Tilray seem more profitable. A company's gross margin shows how much money the company can make by producing and selling its products. ¶38. Gross margins are derived not only from revenues but from any changes in the value of inventory over the reporting period. ¶56. Thus, recording waste as valuable inventory necessarily overstates gross margins because it allocates a portion of the costs of goods sold to the waste. ¶61.

Only direct costs of producing and selling products (including direct overhead like sales commissions), collectively called costs of sales, are subtracted from this total to reach gross

4

margins. ¶¶55, 56. Gross margins are an important metric for growing companies like Tilray because there are more economies of scale in overhead than in costs of sales. ¶39. Defendants consistently promised investors that Tilray's gross margins would reach 50% over the long term, recognizing the metric's importance. ¶36. Thus, misclassifying costs of goods sold as overhead will make the company seem more appealing to investors.

FE 1, a senior R&D Manager, ¶23, created Bills of Materials for Tilray's products which showed exactly what parts and labor were necessary to make Tilray's products, and their costs. ¶45. The costs the Bills of Materials reflected were entered into documents created in Tilray's specialized accounting software. ¶52. Tilray then exported the costs to an Excel spreadsheet to prepare its financial statements. *Id.* Thus, any misstatements in Tilray's Bills of Materials carried over onto its publicly-filed financial statements. *Id.*

For a year, FE 1 battled with Tilray's senior managers to have the Bills of Materials reflect Tilray's true costs of sales, even as Tilray consistently removed true costs from the Bills. ¶49. For example, FE 1 told one of Tilray's Toronto-based employees that she needed to include labor expenses in costs of sales. *Id.* Acting on directions from Tilray's Technology Manager, Ontario Operations, a senior Tilray manager, the employee refused. ¶50. The employee said that each individual interaction took only a few seconds – ignoring that because Tilray operates an assembly line, the labor of many employees was required to create finished product. ¶49. When FE 1 was "very vocal" in pointing out the misstatements, Tilray did not correct it. ¶50.

FE 1 was particularly concerned with Tilray's pre-rolled marijuana cigarettes, called pre-rolls, millions of which were accumulated in Tilray inventory beginning in Q4 2018. ¶51. Because pre-rolls are "super labor-intensive" but "sell cheap", omitting labor costs could dramatically increase pre-rolls' perceived profitability. *Id.* Yet FE 1 used Tilray's software to look up costs of

5

sales for the pre-rolls – and found that the cost per product did not include all the labor costs FE 1 had identified in the pre-roll Bill of Materials. *Id.*

FE 1 told FE 1's boss Hatami that using the flawed Bills of Materials to generate financial statements would understate costs of sales – as FE 1 put it, "garbage in, garbage out". ¶53.

**E. Defendants Call A Promotional Stunt A Long-Term Partnership**

ABG owns and co-markets 50 leading brands that would be familiar to most Americans, like Juicy Couture, Brooks Brothers, Shaquille O'Neal, and Elvis Presley. ¶65. In January 2019, Tilray announced that it had reached a nine-figure agreement to supply cannabis products for potential ABG products ("ABG Agreement"). ¶66. The agreement called for Tilray to immediately pay ABG $100 million in cash and stock and in return Tilray would receive 19.6% of net revenue from sales of such products. ¶66 a., d. The ABG Agreement also gave Tilray an option to pay up to $150 million more for up to 29.4% of additional revenues. ¶66 c., d. If Tilray fully exercised the option, it would earn 49% of revenues from ABG-branded Tilray-supplied products. ¶66 d.

Defendants told investors that the ABG agreement was a well-crafted plan between two well-suited partners who would aggressively exploit the market for cannabis and CBD products. ¶67. In truth, the ABG Agreement was proposed, negotiated (by Kennedy and just one other Tilray employee), and signed, in literally just a few days. ¶68. Kennedy and the other Tilray employee barely consulted with anyone else at Tilray. ¶69. The ABG Agreement's purpose was to halt a collapse in Tilray's stock price following the end of a share lockup which doubled Tilray's existing public float. ¶70. Tilray's own branding employees asked "what are we going to do?" with ABG's brands, none of which had anything to do with cannabis or CBD. ¶71.

Defendants improperly recorded the value of the ABG Agreement on Tilray's financial statements as the price Tilray paid for it. Accounting rules and Tilray's own accounting policy required Tilray to test for impairment, and impair, the ABG Agreement if its value fell below its

6

carrying value. ¶¶98-102 & n.4. Yet Tilray maintained the ABG Agreement's carrying value until March 2020 – when it wrote down 86% of it. ¶142.

### F. Defendants Use Their False Statements To Maintain Control Over Tilray

Until December 2019, Tilray's co-founders (including Defendant Kennedy) controlled Tilray indirectly through their control of Privateer, Tilray's controlling shareholder. ¶156. Privateer held 82% of the economic interest in Tilray but, through super-voting shares, held 90% of its voting power. ¶ 157. The co-founders held only 29% of the economic interest in Privateer, but, through super-voting shares, held 71% of its voting power. ¶154.

The co-founders could not readily sell their interest in Tilray. Privateer could only distribute proceeds from its sales of Tilray stock *pari passu* (i.e. equally to each share). ¶167. They would have to cause Privateer to sell more than three Tilray shares to generate the same benefit to themselves as selling one of their own shares. ¶167. Further, they would pay taxes twice on their sales, both Privateer's corporate tax and their own individual taxes, for a total of about 40%. ¶162. For every dollar of Tilray share Privateer sold, they would receive about 17 cents.

From the beginning of the Class Period through December 2019, Defendants were pursuing a plan ("Share Exchange") that would let them earn more from selling their Tilray shares while maintaining control over Tilray. The Share Exchange's first step was for Tilray to cancel all of Privateer's Tilray shares and then acquire all of Privateer's shares. ¶164. Tilray would then reissue Privateer's common and super-voting shares to its pre-Share Exchange shareholders – ***but*** all of the super-voting shares would be issued to the co-founders. ¶166. Then, the co-founders would hold 31% of Tilray's economic interest but control 73% of its voting interest. ¶166.[2]

---

[2] According to Tilray, Kennedy received performance shares and options in 2018. Horne Dec. Ex. 1 at 22.

Because they aimed to violate Privateer's requirement that distributions be *pari passu*, the co-founders needed a majority vote of its shares for the Share Exchange. ¶167. The Share Exchange required that all of the Privateer investors agree to a two-year lockup. ¶169. If Privateer investors knew that Tilray significantly overstated its margins, that more than $40 million of its inventory was unsellable waste, and that the ABG Agreement was a mere publicity stunt, Privateer investors would have believed that Tilray was too risky for a two-year lockup and withheld their consent. ¶171. Thus, Defendants had a motive to make false statements to permit the Share Exchange to proceed and allow them to sell shares and maintain control of Tilray. ¶174.

**G. Defendants Are Forced To Reveal their False Statements**

Defendants' scheme began to unravel on the August Q2 2019 earnings call. There, Defendants disclosed that contrary to their earlier statements that major retailers had already moved to stock and sell CBD products, the retailers were "holding off." ¶137. The next trading day, Tilray's stock price fell from its previous close of $46.20 to close at $39.04, down 16.5. ¶138.

But Defendants' principal revelations fell shortly after the Share Exchange's December 2019 closing date. On January 30, 2020, Tilray announced that it had renegotiated the ABG Agreement, releasing Tilray from the obligation to pay additional consideration of $83.3 million in cash or stock but also eliminating the $10 million in guaranteed annual payments. ¶139. The renegotiated agreement signaled trouble because Tilray had boasted that the guaranteed annual payments were a key term because they aligned ABG's interests with Tilray's. ¶139. That day, Tilray's stock price fell from its previous close of $19.22 to close at $17.54, down 8.8%. ¶140.

Then, in Tilray's 2019 10-K and accompanying earnings call, Defendants admitted that Tilray had overstated its inventory by $68.6 million and wrote down 86% of the ABG Agreement's value. ¶¶142, 144. Over the next two days, Tilray's stock price fell from $15.35 to $12.51. ¶145.

8

Analysts were shocked. Citing "universally positive comments before today on ABG[]", a Jefferies analyst concluded on March 3 that "trust ultimately needed for rerating." ¶147 a. A Cantor Fitzgerald analyst commented that "[w]e continue to think that Tilray's disclosure is the worst among the Canadian [cannabis licensed producers] that we track." ¶147. b.

## III.   ARGUMENT

### A.  Standards

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).  To survive the motion, a complaint need only allege sufficient facts to "state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "Rule 12(b)(6) does not countenance [] dismissals based on a judge's disbelief of a complaint's factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

Defendants only argue that the Complaint insufficiently alleges two elements of Plaintiffs' claim, that they (1) made misstatements or omissions of material fact ("falsity"), (2) with scienter. *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 467 (S.D.N.Y. 2013).

Claims under Section 10(b) sound in fraud and are subject to the pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Rule 9(b) merely requires that Plaintiffs "identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent," which the PSLRA's pleading standards substantially mimic. *Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *5 (S.D.N.Y. Mar. 28, 2017); 15 U.S.C. § 78u-4(b)(1). "Even with the heightened pleading standard under Rule 9(b) and the

Securities Reform Act [courts] do not require pleading of detailed evidentiary matters in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

### B. The Court Should Deny Defendants' Motion To Dismiss Because It Improperly Relies On Matters Outside the Pleadings

The PSLRA vests Defendants with extraordinary defenses, including heightened pleading standards for falsity and scienter. Defendants claim the PSLRA also provides them with a substantive right to rely on their own version of the facts in moving to dismiss. Defendants cite the Complaint 6 times in their 9-page statement of the facts. They cite extrinsic documents (by a conservative count) 44 times, mostly for the truth of their contents, and ask the Court to accept their say-so for 16 propositions. By this conservative measure – Defendants either rely on the Complaint for innocuous points or misstate its allegations – Defendants' account of the facts at issue in this case relies 10 times as much on improper rather than on proper facts.

Defendants make their brazen argument for their claim that the Court can consider these improper sources in their accompanying "Request For Full Context Review And/Or Judicial Notice", which Plaintiffs' opposition shows is meritless. Indeed, as the Ninth Circuit held ***after*** the decisions Defendants cite in support of their argument, "[i]f defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Worse, where they can be checked, Defendants' statements are often false. Defendants claim that the FDA first disclosed that it was concerned that CBD posed safety risks in November 2019, an announcement the FDA had already made thrice earlier in 2019. 17-18, below. Defendants claim that Tilray consulted closely with Deloitte in correctly valuing the

ABG Agreement – a serious accusation because as Tilray's auditor, Deloitte was not ***allowed*** to consult on the preparation of its financial statements. 17 C.F.R. § 210.2-01(c)(4)(i).

But in raising their arguments, Defendants so closely mix permissible and impermissible facts – and rely so heavily on the latter – that it is not possible to fairly reconstruct Defendants' arguments to rely solely on permissible facts. Defendants staked their motion on a far-fetched legal argument; because that argument is wrong, the Court should deny Defendants' motion to dismiss.[3]

## C. The Complaint Sufficiently Alleges that the Former Employees Know What They Report

Allegations drawn from former employees suffice if they "support the probability that a person in the position occupied by the source would possess the information alleged." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). Thus, Plaintiffs need not "plead exact job titles, describe the sources' responsibilities and duties in detail or allege access to specific company documents." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004) (confidential witness in charge of material coordination could speak to existence of warehouse). Here, the Complaint alleges FE 3's job title, job description, and dates of employment. ¶25. FE 3's job involved overseeing Tilray's business development outside of Canada. *Id.* FE 3 was "heavily involved with strategic initiatives." *Id.* The ABG Agreement was a strategic initiative for business development outside of Canada. FE 3 had to know details about it in order to do his or her job. Contra Def.Br. 13.Moreover, even if the Complaint did not sufficiently allege FE 3's actual knowledge, plaintiffs may rely on former employees even "where those sources offer indirect knowledge, that is, information and belief that

---

[3] Formulating arguments for Defendants and then relying on them to dismiss Plaintiffs' case without giving a sufficient opportunity to respond violates due process. *See S.E.C. v. McCarthy*, 322 F.3d 650, 659 (9th Cir. 2003) (reversible error to enter judgment without giving affected party opportunity to respond).

is hearsay but plausible." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, No. 20-CV-2031 (JSR), 2020 WL 4547217, at *5 (S.D.N.Y. Aug. 6, 2020).[4]

Though Defendants arbitrarily declare that only employees in its finance department would know how Bills of Materials were used, Def.Br. 22-23, because generating Bills of Materials was FE 1's job, FE 1 would have to know how Tilray used these Bills of Materials. Indeed, FE 1 clearly knew that Bills of Materials were used to generate financial statements, as FE 1 told FE 1's boss that the practice was inappropriate. And the Complaint alleges FE 1's basis to know that the inventory was waste: that's what Tilray's finance employee told FE . Contra Def.Br. 21 & n.19.

### D. The Complaint Adequately Alleges Falsity

#### 1. *Defendants Made False Statements of Fact About Tilray's Inventory*

"When managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws." *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000). The Complaint alleges that Defendants recorded a colossal pile of marijuana waste as more than $40 million in inventory in Tilray's Q3 2019 financial statements, as Tilray's finance department told FE 1. ¶58. By ascribing a value to the waste created in generating marijuana products, Defendants falsely claimed lower costs of production and higher gross margins, thus presenting a misleading picture of Tilray's financial health. ¶61. Moreover, there is no subjective judgment involved because it is objectively improper to ascribe a value to waste. *See S.E.C. v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011) (whether accounting treatment was correct was question of fact because it depended on objective determination). Thus, Defendants made false statements of fact.

---

[4] Defendants also compare the wording of the FE 3 allegations to confidential source 5 ("CS 5") in *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008). Def.Br. 14 n. 14. They omit a crucial fact: CS 5 was not a company employee. Instead, CS 5 was an outside doctor who used the company's drug on CS 5's patients in clinical trials that were not at issue in the case. Horne Dec. Ex 2 ¶154. So CS 5 could not possibly know what the company's executives knew.

Citing their own purportedly exculpatory statements as if the Court could assume they are true, Def.Br. 19, Defendants claim that though the marijuana plant waste presently had no value but that they hoped it would, one day, if the cannabis 2.0 products it purportedly would be used to make were legalized and if a market developed.  But the "explanation for the [] inventory spike that [Defendants] offer[] is entitled to little weight at this stage of litigation, when we must accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Employees' Retirement System of Government of the Virgin Islands*, 794 F.3d at 307. The Complaint sufficiently alleges that the trim Defendants wrote off was waste, and Defendants offer no proper inferences to undercut the allegations. Moreover, the explanation Defendants offer in their brief that demand for cannabis 2.0 products was unexpectedly low contradicts their own statements. Defendants claimed that the product demand for cannabis 2.0 products ***exceeded*** their estimates – leaving Tilray "trying to increase our manufacturing capacity rapidly so that we can ensure that we capture market share and capture shelf space." Horne Dec. Ex. 3 at 17.[5]

In any case, the self-serving position Defendants take in this case is not exculpatory. Defendants ***admit*** that the only reason the extracts had any value was that Tilray intended to use them to make cannabis 2.0 products. Def. Br. at 20. They ***admit*** that under Canadian law, at the time of the financial statements, it was unlawful to sell cannabis 2.0 products. *Id.* They ***admit*** that there was no market for the marijuana plant waste when they recognized them as inventory on their financial statements. *Id.* They ***admit*** that – at best – they hoped the marijuana plant waste would have value one day, if it were legalized and if a market took off. *Id*

---

[5] Defendants mischaracterize the only evidence they cite for their claim, an article published online by Analytical Cannabis. Def.Br. 11 n. 11. That article was published before data on the cannabis rollout came out and claims that the rollout is "***expected to be***" slow, citing facts that were known well before Defendants made their false statements. https://www.analyticalcannabis.com/articles/canadas-edibles-market-gets-off-to-a-slow-start-312161

13

Under both GAAP and Tilray's accounting policy, Tilray cannot recognize goods as inventory unless there is an active market for the goods. Defendants stated in Tilray's accounting policy that it recorded inventory as *the lesser* of its cost or *"the estimated selling price **in the ordinary course of business**"* (less selling expenses) – not that it recognized as inventory product that may be worth something someday. Likewise, under GAAP, items that ***may*** have value if an event outside the company's control transpires are contingent benefits. ASC 450-30-25-1. (Horne Dec. Ex. 4). Contingent benefits cannot be recorded on the balance sheet as inventory or any other asset. *Id.* Thus, Defendants' mere hope that legalization of cannabis 2.0 would create a market for marijuana plant waste does not allow them to record the waste as valuable inventory.

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015) recognizes that many opinion statements include objective embedded false statements of fact which, if false, can support liability. *Accord Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) ("[i]f [the embedded statement of fact] has [] not occurred, the statement of opinion is actionable because an embedded but complete 'statement of material fact' [] can be proven false."). Accounting entries like inventory are often the result of both subjective judgment and objective provisions; the failure to follow an objective provision makes the resulting financial statements a false statement of fact. *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017) (although revenue recognition requires judgment, defendants' recognition of nonmonetary transaction as revenue was not statement of opinion because it did not require judgment to know such transactions cannot be recognized as revenues).[6]

Here, Defendants' purported recognition of a contingent benefit as inventory violates GAAP's objective provisions. Further, Tilray's accounting policy states that it recognizes

---

[6] Indeed, Judge Wood has held that a statement of inventory is a statement of fact, not opinion. *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *12 n. 10 (S.D.N.Y. Apr. 22, 2016).

inventory only if it has a selling price "in the ordinary course of business." Thus, by including in Tilray's inventory currently-worthless marijuana plant waste that was illegal to sell, Defendants made an embedded – and false – statement of fact.

Nor is there any merit to Defendants' claim that they advised the markets that Tilray's inventory included tens of millions of dollars of worthless trim. Defendants advance a truth-on-the-market defense, which is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *accord In re Dynagas LNG Partners LP Sec. Litig.*, No. 19-CV-4512 (AJN), 2020 WL 6947521, at *12 (S.D.N.Y. Nov. 25, 2020). Defendants similarly asserted that the overstatements were immaterial because, in other parts of the financial statements, they disclosed "sufficient accurate information to neutralize any misleading impressions created by [defendant company's] financial reports." *Ganino*, 228 F.3d 168. The Second Circuit rejected defendants' "truth on the market" defense because a vague disclosure of facts in financial statements is not as "intens[e]" and "creidbl[e]" as false entries in the financial statements. *Id*.

The vague references in Tilray's financial statements that Tilray produces "by-product" as one of its works in progress which it can use as an extract clearly do not meet the high threshold *Ganino* requires. For one thing, trim that cannot be turned into valuable product until legislation changes is not "in progress" and moreover, Defendants claimed they recorded it at its selling price, which is not true as there was no market. For another, Defendants did not explain what "by-product" was. It could have been hemp trim, which can immediately be turned into CBD extracts. Or it could have been lower-quality marijuana which could be resold under a different brand or to a different producer. In either case, the by-product would be correctly recognized as inventory because it is worth something when the financial statements are filed.

15

Likewise, Defendants' statement on the Q3 2019 earnings call did not disclose that there was currently no market for the trim nor that it accounted for a third of Tilray's inventory. And by recognizing the inventory on Tilray's financial statements, Defendants represented that it was worth something today, whatever they said on an earnings call.

2. *The Court Cannot Ignore the Complaint's Well-Pled Allegations That Defendants Overstated Tilray's Gross Margins*

Defendants employed two schemes to overstate Tilray's gross margins. First, Defendants overstated gross margins by recognizing worthless waste as inventory. See 12-16, above. Defendants raise no argument challenging the impact of inventory on gross margins, effectively conceding that because the Complaint sufficiently alleges that Tilray overstated its inventory it overstated its gross margins as well. Second, FE 1 reports that FE 1 fought a losing battle to have Tilray's Bills of Materials reflect its true costs. Any misstatements in the Bills of Materials would carry over when Tilray used them to generate its financial statements.

Defendants' only response is to deny the Complaint's allegations and insist that Tilray did not use Bills of Materials to generate financial statements. For this, Defendants do not even offer improper support. They offer no support at all. They just say it. Def.Br. 22. Courts do not, should not, and cannot dismiss complaints merely because defendants contest their allegations. *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2020 WL 1673811, at *5 (S.D.N.Y. Apr. 6, 2020).

Moreover, Defendants' explanation makes no sense. They acknowledge that it is unusual for a company not to use Bills of Materials to generate financial statements; they claim that because of its poor internal controls, Tilray simply could not generate accurate ones, and so relied on other information to create financial statements. But if the data used to generate financial statements are accurate and the data used to generate Bills of Materials are not, Tilray would use the financial statements to generate Bills of Materials, rather than relying on knowingly inaccurate information.

16

### 3.   Defendants Made False Statements About CBD Demand

Until August 2019, Defendants claimed that retailers were already purchasing CBD products *en masse*. Defendants stated in March 2019 that "[t]here's tremendous demand for CBD isolate and hemp-derived CBD extracts." ¶77. In May 2019, they said that Tilray had "lots of conversations with lots of different retailers" and "[t]hey all want everything." ¶87. Asked specifically whether regulatory uncertainty was a concern for ingestibles (i.e. foods or drinks), Defendants stated that "[t]here are retailers in the US that are going to do this no matter what." ¶87. So many, in fact, that they "are going to lead us to a really interesting second half of this year" even if no one else does. *Id.* Then, in June, Defendants added that "retailers are scrambling to find [CBD] products to fill their shelf," specially mentioning Whole Foods. ¶107.

In August 2019, Defendants admitted that there never had been any such demand. As to "nutritional supplements, dietary supplements", a "large part of the market" is waiting for FDA clarity. ¶125. In fact, only "*some* of the *smaller* sort of health and wellness focused grocery retailers" were interested in stocking CBD ingestibles. *Id.*

Defendants recast their March, May, and June statements as predictions of future market demand that never materialized. Def.Br. 15. But present tense statements that retailers "all want everything" or that there is "tremendous demand" are not about the future. They did not describe demand that failed to materialize; they claimed existing demand that did not exist.[7]

Finally, Defendants' explanation that demand disappeared in 2019 because retailers retreated under stricter regulation, Def.Br. 15-16, makes no sense because the FDA's messaging was consistent from the signing of the 2018 Farm Bill through the end of 2019. To claim the regulatory climate was favorable, Defendants cite a statement made by FDA Commissioner Scott

---

[7] Defendants argue that they believed in good faith that the market for CBD would take off, but a good faith belief that a market will take off does not immunize a false statement that it already has.

17

Gottlieb on the passage of the 2018 Farm Bill. In that statement, Gottlieb emphasized that "Selling unapproved [CBD] products with unsubstantiated therapeutic claims is []a violation of the law" and "it's unlawful under the FD&C Act to introduce food containing added CBD or THC into interstate commerce, or to market CBD or THC products as, or in, dietary supplements, regardless of whether the substances are hemp-derived."[8] On April 2, 2019, Gottlieb stated that CBD raises "serious risks", including "the potential for liver injury," as well as "unresolved questions regarding [] cumulative exposure to CBD." Gottlieb also noted "open questions" about whether allowing CBD would "undermin[e] the drug approval process or diminish[] commercial incentives for further clinical study."[9] The FDA reiterated its position and safety concerns in an April 2019 announcement where it noted that CBD had serious potential side effects.[10] In July, the FDA reiterated these same concerns and side effects.[11] Throughout 2019, the FDA issued warning letters to producers who made claims about CBD's health benefits. The warning letters issued in November 2019, which Defendants cite, similarly warned producers who had made unproven claims about CBD's health benefits. The FDA's November 2019 warnings about CBD's side-effects came after three specific earlier warnings. Thus, Defendants' claim that they themselves, as well as retailers, were at first euphoric about CBD's chances but then decided not to order because of regulatory uncertainty are not true; the FDA's position did not change.[12]

---

[8] https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-signing-agriculture-improvement-act-and-agencys

[9] https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-steps-advance-agencys-continued-evaluation

[10] https://www.federalregister.gov/documents/2019/04/03/2019-06436/scientific-data-and-information-about-products-containing-cannabis-or-cannabis-derived-compounds

[11] https://www.fda.gov/news-events/contressional-testimony/hemp-productions-and-2018-farm-bill-07252019

[12] Defendants cite two articles that refer to demand for topical CBD; one claims there is little demand for ingestibles.

4.  *Defendants Mischaracterized the Giveaway to ABG As A Productive Partnership*

Defendants created the misleading impression that the ABG Agreement resulted from thoughtful consideration and thorough vetting on both sides. For example, in announcing the agreement, Defendant Kennedy stated that it "leverages our complementary strengths and will be accretive to our shareholders." ¶73. Then, on a March 2019 call to discuss Tilray's Q4 2018 earnings, Defendant Kennedy stated that "[o]ur revenue sharing agreement with Authentic Brands Group [] is a long-term partnership designed to leverage ABG's portfolio[…]". ¶75. And on an August 2019 call to discuss Tilray's Q2 2019 earnings, Defendant Kennedy touted the ABG Agreement as a seal of approval, claiming "[w]e know how to partner well [] with companies like Authentic Brands Group [] [t]hey went through a [] vetting process and decided it's much better for them in the long run to partner with Tilray than do it alone." ¶90.

These statements mischaracterized the ABG Agreement. It was signed literally days after its proposal. ¶68. There was no time for ABG to do any due diligence on Tilray. Nor was there any need. Tilray offered ABG so much money for signing the ABG Agreement that the deal would be lucrative for ABG even if it completely failed.

Defendants' statements about ABG contain false embedded statements of facts. Defendants' statement that other partners would find Tilray attractive because of ABG's "vetting" presupposes that ABG actually "vetted" Tilray; it did not. Defendants' statements that the ABG Agreement would have a positive long-term impact because it was designed to leverage the parties' strengths presumes that this was the agreement's design, though Tilray entered into it solely to prop up its stock price, ¶69, while ABG entered into it because Tilray offered so much money. These factual claims were not incidental. Kennedy signed the ABG Agreement even though it was a bad deal for Tilray so that he could claim ABG's seal of approval to prop up Tilray's stock price.

19

*Id.* Thus, Defendants' statements present and historical statements about how the ABG Agreement was negotiated and its nature materially misled investors.[13]

To support their claim that they did not make false statements, Defendants impermissibly rely on facts taken outside the pleadings. As they do throughout their brief, Defendants claim they relied on the advice of certain largely unidentified experts. Def.Br. 23. They point to a press release which states that they had a financial advisor, and intimate that they were represented by legal counsel (though even the press release does not say as much). Def.Br. 5 & n.5. Even if the Court could cognize these facts – it cannot – that Defendants had advice does not mean it was the advisors' job to tell Defendants whether the ABG Agreement was a good deal. See RJN Opp. 5-6

Some other facts Defendants simply make up. They claim Tilray learned that ABG was seeking a deal with a CBD company, Def.Br. 5; the complaint nowhere says as much. They claim Tilray sought to reach a deal with ABG to ensure it did not reach a deal with Tilray's competitors, *id.*; the Complaint alleges that Defendants aimed to increase Tilray's stock price. Defendants offer no support – not even facts improperly derived from judicial notice – for either "fact".

5. *Defendants Overstated the Value of the ABG Agreement*

Tilray improperly recorded the value of the ABG Agreement on its financial statements. GAAP and Tilray's own accounting policies both required it to impair the value of the ABG Agreement if the agreement was worth less than Tilray paid for it. *E.g.* ¶¶99-102 & n.4. Defendants signed the ABG Agreement to claim ABG's seal of approval to prop up its stock price. Indeed, Tilray's own branding experts told Defendants the ABG Agreement was worth little. ¶71. And the very conditions that Defendants cited as reasons to impair the ABG Agreement – regulatory

---

[13] "[S]tatements [] whose accuracy can be determined at the time they were made, are not forward-looking statements falling within the PSLRA's safe harbor." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (earnings target not forward-looking statement because reason statement was false was that it incorporated false assumption).

uncertainty – existed from the beginning of the Class Period.[14] Thus, Defendants knew the ABG Agreement was worth less than its carrying value and required impairment when Tilray signed it.

Defendants claim that they could not impair the ABG Agreement because the accounting rules were complicated. Def.Br. 16-17. But Defendants conflate the perhaps difficult question of *how* substantially to impair the ABG Agreement – whether 80% or 90% – with the easy question of whether it should be substantially impaired. *See S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 429 (S.D.N.Y. 2010) ("While accounting for barter may be complex, the concept of barter itself is not.").

Finally, Defendants claim Tilray "consulted closely with Deloitte and other experts to evaluate the financial and accounting impacts." Def.Br. 17-18. Management alone is responsible for preparation of the financial statements. The phantom experts appear nowhere in the Complaint. Defendants cannot simply have courts assume that experts told them they applied the correct accounting treatment to defeat well-pled allegations of accounting fraud, or no complaint could ever survive the pleadings.

6. *Tilray Auditor Deloitte Did Not Sign Off on Defendants' False Statements*

Defendants rely on Tilray's auditor's sign-off and the absence of a restatement as evidence that it did not make false statements. Def.Br. 18-19, 22. In general, though, "that the financial statements for the year in question were not restated does not end [plaintiff's] case when [plaintiff] has otherwise met the pleading requirements of the PSLRA." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (upholding complaint alleging securities fraud even in light of auditor's subsequent clean audit opinion on allegedly misstated financial results).

---

[14] While Defendants claim the FDA's position changed, it remained constant throughout 2019. See 18, above.

21

Moreover, Deloitte did not sign off on Defendants' misstatements. The only financial statements Deloitte audited during the Class Period were for the year ended December 31, 2018. Though material, the amount of waste Tilray recorded as inventory was relatively small in those financial statements. It skyrocketed during 2019, as reflected in quarterly financial statements Deloitte did not audit. The waste was written off in Tilray's 2019 10-K after Deloitte's audit. Similarly, because the ABG Agreement was signed in January 2019, it was not recorded on the 2018 financial statements Deloitte audited. Instead, it was recorded in Tilray's Q1-Q3 2019 10-Qs, until it was written down by 86% at Deloitte's next audit. Thus, Deloitte expressed its disapproval of Defendants' accounting treatment for both inventory and the ABG Agreement at its first opportunity.

### E. The Complaint Sufficiently Alleges Scienter

A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 324. The PSLRA requires allegations that, viewed holistically, give rise to a strong inference of scienter. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322-23 (2011). Although the inference of scienter must be more than merely "reasonable," it need not be irrefutable, or even the "most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. In this Circuit, scienter "can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168-69. The Court analyses motive and recklessness allegations holistically. *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 213 n.11 (2d Cir. 2020).

### 1.  *The Complaint Alleges a Motive*

Motive allegations suffice when they "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307. Allegations that a defendant made false statements to push through an acquisition show motive, *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 170 (D. Conn. 2019), as do allegations that a defendant would receive shares as a result of the false statements. *Marcus v. Frome*, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004).

From shortly before the beginning of the Class Period through December 2019, Defendants were pursuing a transaction that would allow Kennedy to sell his indirectly-held Tilray stock while maintaining control (along with his cofounders). The transaction exposed Privateer investors to extraordinary risks: they had to agree to a two-year lockup of their shares. Tilray is a young company that has never made a profit and whose stock price oscillated between $85.61 on January 16, 2019 and $14.43 on March 2, 2020.

Defendants' false statements were tailored to convince Privateer investors that notwithstanding the lock-up, the Share Exchange was in their best interests. Overstating gross margins – both by excluding costs and recognizing $40 million of waste as inventory – overstated its profitability and gave investors the misleading impression that Tilray was a top competitor and safe investment. And touting the ABG Agreement and ABG's "vetting" allowed Tilray to claim that it could secure partnerships with powerful companies, thus making it seem safer. Their benefits realized, Defendants corrected the false statements in early 2020.

Thus, Defendants' false statements allowed them to realize a "concrete and personal" benefit – being able to sell their Tilray shares and maintain voting control over it.

23

### 2. The Complaint Alleges Recklessness

Allegations of recklessness will suffice if they show that Defendants "[1] engaged in deliberately illegal behavior; [2] knew facts or had access to information suggesting that their public statements were not accurate; or [3] failed to check information they had a duty to monitor." *Employees' Retirement System of Government of the Virgin Islands*, 794 F.3d at 306. The Complaint alleges scienter in each of these ways.

"Intentional misconduct is easily identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information." *Novak*, 216 F.3d at 308. Plaintiffs adequately allege scienter by showing defendants deliberately failed to mark down worthless inventory. *Id.* at 11. After the Class Period, Defendant Kennedy made clear that it was a Tilray policy to recognize unsellable waste as valuable inventory and mark it down at year end. ¶150 ("[W]e are attributing zero value to that byproduct [s]o everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year."). Thus, as in *Novak*, Defendants' conduct was reckless. And because deliberately marking up unsellable waste as inventory overstated Tilray's gross margins, Defendants had scienter for those statements, too. Scienter is especially clear for Defendant Castenada, who when he made his false statements had a 30-year career in accounting, including 21 years as a public company CFO. Further, because the policies at issues are relatively simple – don't include unsellable waste as inventory – their violation supports an inference of scienter. *Peifa Xu v. Gridsum Holding Inc.*, No. 18 CIV. 3655 (ER), 2020 WL 1508748, at *8 (S.D.N.Y. Mar. 30, 2020).

Defendant Kennedy personally negotiated the ABG Agreement, deliberately entering into it to prop up Tilray's stock price, and overruling Tilray's branding experts who told him the deal

24

was not worth what Tilray paid for it. So he "knew facts [] suggesting that their public statements were not accurate."

Finally, under both GAAP and Tilray's accounting policy, Defendants had a duty to affirmatively determine the actual value of Tilray's inventory every time they reported it on Tilray's financial statements. They also had an obligation to determine whether to impair the ABG Agreement whenever the value appeared to be below its carrying value. They thus "failed to check information they had a duty to monitor."

Viewed holistically, the Complaint tells the story of Defendants' desperate reaction to Tilray's stock price collapse in early 2019. Defendants offered ABG a deal so lucrative it could hardly refuse, then misstated the negotiations to give the impression that ABG had vetted Tilray. Defendants addressed collapsing margins by recognizing tens of millions of dollars of worthless marijuana plant scraps as valuable inventory. They used the room their false statements provided to negotiate a transaction that gave them permanent voting control over Tilray even as they sold their shares. With the transaction closed, and with Deloitte looking over their shoulders, Defendants renegotiated and impaired ABG Agreement and revalued Tilray's inventory.

Because Defendants do not offer a nonculpable inference "***from the facts alleged***" – they provide their own set of facts and argue from there, Def.Br. 23-24, 25 – the culpable inferences is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324

## IV.  CONCLUSION

For the foregoing reasons, the Court should leave the factual questions Defendants raise to summary judgment and deny their motion to dismiss in full.

Dated: January 25, 2021                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           /s/ Jonathan Horne
                                           Jonathan Horne (JH 7258)
                                           Laurence M. Rosen, Esq. (LR 5733)
                                           275 Madison Avenue, 40th Floor
                                           New York, New York 10016
                                           Telephone: (212) 686-1060
                                           Fax: (212) 202-3827
                                           Email: jhorne@rosenlegal.com
                                           Email: lrosen@rosenlegal.com

                                           *Lead Counsel for Lead Plaintiff and Class*

26

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Jonathan Horne