**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANESH KASILINGAM, individually and on behalf of all others similarly situated,<br><br><br>     Plaintiff,<br><br>- against-<br><br>TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,<br><br>     Defendants. | Case No. 20-cv-03459 (PAC) (KNF) |

**REPLY BRIEF IN FURTHER SUPPORT OF THE DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

I.      None of the Challenged Statements were Materially False or Misleading..........................2

        A.      Positive Statements About the ABG Partnership and Its Prospects ........................2

        B.      Statements Regarding U.S. Retail Interest in CBD Products ..................................4

        C.      Valuation of the ABG Agreement ...........................................................................5

        D.      Statements Regarding Inventory..............................................................................6

        E.      Statements Reporting Cost of Sales and Gross Margins ........................................8

II.     Plaintiffs Cannot Allege a Strong Inference of Scienter.......................................................9

III.    Conclusion ...........................................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)....................................................................................................10

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011)...................................................................................10

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020).....................................................................................4

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008).....................................................................................4

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
  No. 09-cv-01740, 2013 WL 1188050 (D. Conn. Mar. 23, 2013) ............................................4

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................................2

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019)...................................................................................10

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999)......................................................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................................9

Plaintiffs' claims here are classic fraud-by-hindsight. At the beginning of 2019, both the U.S. CBD[1] market and the Canadian adult-use cannabis market appeared poised to take off: the Farm Bill had just removed hemp products from the U.S. Controlled Substances Act, paving the way for sale in the U.S. of hemp-derived CBD, and Canada had just legalized the sale and purchase of dried cannabis products for recreational use, with edibles and other "2.0" products slated to follow later in the year. It was in this optimistic environment—well known to cannabis investors—that Tilray formed a partnership with established brand-management company ABG to develop and market CBD products for the new U.S. CBD market. And it was in this environment that Tilray, like many of its competitors, began to accumulate dried cannabis byproduct inventory, i.e., useable trim,[2] for sale and use both in the near-term and later in the year when the Canadian 2.0 market opened. Neither of these well-intentioned business strategies worked out as planned (at least in the short-term), and subsequent market conditions led Tilray to significantly impair the value of the ABG Agreement and write down the value of its byproduct inventory in early 2020. But the mere fact of these later impairments does not, by itself, suggest that the original valuations—which constituted opinions under the securities laws—were false or misleading at the time, or that any Defendant made a false or misleading statement on purpose.

Plaintiffs devote much of their Opposition ("Opp.") to attacking Defendants' supporting materials, insisting that the Court must not consider any of the important, public-knowledge context surrounding the challenged statements, presumably because it makes even more obvious the deep flaws in their claims. As detailed in the Defendants' Reply in support of their RJN, all of

---

[1] Unless otherwise indicated, all emphasis is added and internal quotation marks and citations omitted, and defined terms have the same meaning as in the Defendants' Mem. of Law in support of their MTD ("Defs. Mem.") (Dkt. #83).
[2] "Trim" is an industry term that includes both the usable and unusable plant parts leftover after cannabis flower products have been harvested and manufactured. Tilray never recorded unusable cannabis "waste" as inventory. Like its competitors, it routinely recorded *usable* trim, i.e. plant parts that could be extracted and processed to create additional products, as inventory. *See* Defendants' RJN (Dkt. #84) Ex. 2, at F-18.

these materials are properly before the Court: procedural judicial notice rules allow for their consideration and the substantive securities law *requires* it. But even if the Court were to ignore all of these contextualizing materials, Plaintiffs' claims still fail: (1) the challenged statements all are statements of opinion, and the Amended Complaint fails, on its face, to allege that the Defendants did not genuinely believe them to be truthful at the time, or that particular omitted facts rendered them misleading in context;[3] and (2) no factual allegations support the thoroughly implausible theory of motive Plaintiffs advance, or otherwise suggest that any Defendant acted with scienter; indeed, the pleaded facts far more strongly suggest good faith. The Amended Complaint, on its face, does not meet the Reform Act's strict pleading standards. The materials properly submitted by Defendants with their Motion to Dismiss make this insufficiency even more obvious, but no outside materials are necessary to reach this inescapable conclusion.

## I.    None of the Challenged Statements were Materially False or Misleading

Plaintiffs fail to plead any false statement in any category of challenged statements.

### A.  Positive Statements About the ABG Partnership and Its Prospects

Plaintiffs do not contest that the statements in this category are statements of opinion, or that many of them also are non-actionable puffery and/or protected forward-looking statements. Opp. 19-20. Instead, Plaintiffs argue that a few of these challenged opinions contain false embedded facts, and/or give the misleading impression that the ABG Agreement resulted from thoughtful consideration and "vetting" and was entered into as a strategic partnership, when allegedly (i) the deal was struck so fast that there was no chance for "vetting," and (ii) Tilray's and ABG's actual motivations (allegedly) were to prop up Tilray's stock price, and to make a bunch of easy money, respectively. No allegations support either contention.

---

[3] *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89, 94 (2015).

Properly read, the statements indicating that the ABG Agreement "leverages our complementary strengths and will be accretive to our shareholders" and "is a long-term partnership designed to leverage ABG's portfolio" are, on their face, pure statements of opinion, the falsity of which Plaintiffs have not sufficiently pleaded. But even if certain challenged statements were viewed as containing embedded facts—i.e., that the ABG Agreement was a strategic partnership entered into in good faith, and/or that ABG in fact "vetted" the Agreement—Plaintiffs have not pleaded any facts indicating the embedded facts were false. No *facts*, as opposed to conclusory assertions, suggest that the ABG Agreement was anything other than a good faith effort to form a profitable branding partnership at a time when Tilray and the rest of its industry expected the U.S. market for CBD goods to grow rapidly. The allegation that the Agreement "was proposed, negotiated, and closed in literally a matter of days" (AC ¶ 68) does not suggest that the deal was done for an improper purpose or that it was not properly vetted on either side—companies routinely move quickly on strategic opportunities, particularly where the opportunity is competitive and attractive, and appropriate due diligence happens quickly as well in those circumstances. Moreover, the challenged "vetting" statement was made with respect to multiple partnerships, not just ABG,[4] and no pleadings suggest that any of these well-established partners— Sandoz, InBev, etc.—did not in fact carefully vet Tilray before joining forces. Tilray's consistent ability to attract and successfully partner with major industry players certainly would seem to give other potential partners comfort in doing business with Tilray.

Nor do FE 3's conclusory allegations indicate otherwise. Courts routinely reject conclusory allegations from confidential witnesses with no basis for personal knowledge. *See* Defs. Mem. 14

---

[4] AC ¶ 89 ("[W]e know how to partner well not only with pharmaceutical and alcohol companies but with companies like [ABG] that own over 50 iconic brands. They went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone.").

3

& n.14, 19 n.17 (citing cases). Plaintiffs do not contest this, but claim they have laid a sufficient foundation simply by pleading that FE 3 was a Vice President at Tilray during the time period, was involved to some unspecified degree in "business development outside of Canada," and was "heavily involved with strategic initiatives." AC ¶ 25; Opp. 11. But FE 3 does not claim to have had any involvement in the negotiation or vetting process for the ABG Agreement itself,[5] or to have any basis for knowing Mr. Kennedy's motivations regarding the Agreement; thus his bare assertions that the due diligence was "irresponsible" and that Mr. Kennedy's purpose was to "prop up Tilray's stock [price]" are entitled to no weight. *See, e.g.*, *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (allegation that CW was "intimately involved" in clinical trials did not establish basis for knowing about all aspects of trials, including what information was communicated to defendants, or what conclusions they reached);[6] *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-cv-01740, 2013 WL 1188050, at *36 (D. Conn. Mar. 23, 2013) (rejecting allegations from CWs with no alleged connection to the financial forecasting at issue).

### B.  Statements Regarding U.S. Retail Interest in CBD Products

Likewise, the challenged statements regarding U.S. CPG and retailers' interest in CBD products in the first half of 2019 were true and not misleading statements of opinion, reflecting the Defendants' subjective experiences and views on the U.S. CBD market at each point in time. Presumably because Plaintiffs understand there *was* in fact significant retail interest in CBD when the statements were made, they try instead to characterize the challenged statements as referring to existing orders and sales. Opp. 17 ("Defendants claimed that retailers were already purchasing

---

[5] This is unlike CW 1 in *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123 (S.D.N.Y. 2020)—*see* Opp. 11-12—who claimed to have personally worked on the project about which he offered testimony and to have discussed the project with others who also had personal knowledge of it. *Id.* at 132.

[6] That the confidential witness in *Elan* was not a company employee (Opp. 12 n.4) is a distinction without a difference. *Elan* turned not on the identity of the confidential witness's employer, but whether the factual allegations, taken together, "indicat[ed] that CS 4 was in a position to have knowledge regarding" the subject of his allegations—namely, the knowledge, beliefs, and intentions of the individual defendants. 543 F. Supp. 2d at 220.

4

CBD products *en masse*."). But the statements on their face are about retail interest in potential products and partnerships for later in the year, not current sales.[7] Indeed, Plaintiffs themselves quote Mr. Kennedy as stating that all this interest "I think is going to lead to a really interesting *second half of the year*." Opp. 17 & AC ¶ 87 (quoting 5/14/19 Tr.).

No factual allegations suggest that Defendants were not actually seeing strong interest and being inundated with contacts from potential CPG and retail customers in the spring and summer of 2019, when the challenged statements were made. No confidential witness says Tilray was not seeing this interest; no news articles, analyst reports, or industry sources suggest it. Rather, Plaintiffs rely entirely on the fact that Tilray stated *in August* that at that later point in time it was seeing a lot of retailers holding off and waiting for FDA clarity. This says nothing about the level of retail interest Tilray was seeing earlier in the year, and it certainly does not "admit[] that there never had been any such demand." Opp. 17. Plaintiffs' arguments to the contrary are impermissible fraud by hindsight. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

## C.  Valuation of the ABG Agreement

The same is true with respect to the challenged statements reporting ABG's valuation prior to impairment: these were true and not misleading statements of opinion. As Defendants explained in their opening brief—and Plaintiffs do not contest—where reported financial metrics (e.g., the value of an indefinite-lived intangible asset) are based on significant subjective estimates and judgment calls, they constitute opinions under the securities laws. Defs. Mem. 17-18. Valuation of

---

[7] *See, e.g.*, AC ¶ 77 (3/18/19 call: analyst notes "large CPG companies are putting out [Requests for Proposals] for fairly large quantities of CBD isolate" and Kennedy responds "[t]here's tremendous demand for CBD isolate and hemp-derived CBD extracts . . . . [I]f you can imagine buyers at [big retailers] as they're looking to put CBD products on their shelves . . . **they're going to** go with a brand they know and a supply chain they trust"); *Id.* ¶¶ 85-87 (5/14/19 call: "[W]e've been inundated with contacts from Fortune 500 companies who are **interested in exploring partnerships** . . . . [W]e're also **starting to have conversations** with US retailers, who are **interested in carrying CBD products in the second half of this year**. . . . [W]e're having **lots of conversations** with lots of different retailers. They all want everything.").

the ABG Agreement—and the decision whether to impair—required precisely these types of complex judgment calls, rendering the resulting valuation a statement of opinion.

Plaintiffs concede that how much to impair might be "difficult," but claim the determination *whether* to impair was an "easy question." Opp. 21. Not so. ASC 360-35-18 governs the latter analysis, requiring management to test for impairment annually or whenever, in their subjective judgment, "events or changes in circumstances indicate that it is *more likely than not* that the asset is impaired." AC ¶ 99; ¶ 120 (ASC 360-35-18B identifies non-exhaustive list of factors to consider, including "[l]egal, regulatory, contractual, political, business, or other factors, including asset-specific factors" that could affect fair value). By its terms, this analysis is not cut and dry; it required Defendants to exercise subjective judgment in determining whether legal, regulatory, business, and other market conditions, in all the circumstances, indicated it was more likely than not that the ABG Agreement was no longer worth what Tilray had paid for it. Accordingly, each reported valuation properly constitutes a statement of opinion.

No factual pleadings suggest that Defendants did not believe the carrying value of the ABG Agreement to be fair and truthful at the time, or that any particular omitted facts rendered the valuations misleading. Indeed, the Defendants clearly explained their ongoing plans and expectations for ABG-branded products on each earnings call, expressing their continued belief in the value of the partnership.[8] As before, the mere fact that FE 3 believes the value of the Agreement should have been written down earlier is of no consequence; he lacks any basis for his assertion, and does not claim personal knowledge as to the Defendants' beliefs at any time. *Supra* pp. 3-4.

### D. Statements Regarding Inventory

Acknowledging the weakness of their ABG Agreement allegations, Plaintiffs' Opposition

---

[8] RJN Ex. 3 (3/18/19 Tr.), at 4, 14; RJN Ex. 1 (5/14/19 Tr.), at 18; RJN Ex. 6 (8/13/19 Tr.), at 14; RJN Ex. 7 (11/12/19 Tr.), at 10-11, 17.

pivots to new claims regarding inventory and gross margins. These claims fail too.

First, inventory valuation required significant subjective judgments that rendered the resulting valuations statements of opinion. Defs. Mem. 19-21. Each of Tilray's financial statements explained that, consistent with GAAP, it valued the various components of its inventory—including "by-products to be extracted"—at "the lower of cost or net realizable value . . . defined as the estimated selling price in the ordinary course of business." AC ¶¶ 81, 92, 115, 132. Plaintiffs argue that there was "no subjective judgment involved because it is objectively improper to ascribe value to waste" (Opp. 12), but this assumes the very point in question. The "byproduct" that Tilray recorded as inventory never included cannabis "waste"; it included only the useable portion of "trim" that could be sold in bulk and/or extracted for use in additional products. No pleaded *facts* suggest that the byproduct included in inventory was objectively value-less when the statements were made.[9] As Defendants explained to investors, they—like many of their competitors—believed the byproduct had value: they were currently selling portions of it in bulk, and they expected to extract and sell more of it after the new Canadian 2.0 market opened in late 2019. *See, e.g.*, AC ¶ 130. The mere fact that subsequent changes in market conditions led the Company to write down the value months later does not suggest that the Defendants did not genuinely believe the valuations when made or that they were misleading in context.[10]

Plaintiffs also argue that GAAP and Tilray's accounting policy only allowed it to value inventory if there was an "active market for the goods," and that assigning value to byproduct violated GAAP because the value was dependent on a future "event outside the company's

---

[9] FE 1 and FE 2 have not alleged any basis for personal knowledge regarding their conclusory assertion that the by-product was "unsellable waste," or any specific facts that might suggest it.

[10] Mr. Kennedy's explanation in May 2020 that the Company would be valuing byproduct on a zero-basis *moving forward* did not "admit" or even suggest that byproduct should have been valued this way at any earlier point in time. This was an appropriate adjustment that many in the industry were making based on changed market conditions.

control" and thus was a "contingent benefit" under ASC 450-30-25-1. This is incorrect. Tilray had active markets for byproduct, which it sold in bulk and as extracted oil. *See* AC ¶ 131 (referencing it as "product that otherwise would have either been sold to another [company] or extracted"); RJN Ex. 2, at 3 (2019 10-K showing $25 million in bulk sales). Moreover, the byproduct's value was not "contingent"; as Plaintiffs themselves acknowledge, the December 2019 starting date for selling 2.0 products had been "set in stone by June 2019." AC ¶ 149. The Canadian 2.0 market did not require additional legislative action; it was simply awaiting its previously set start date.

Inventory valuation is intended to fairly summarize management's best understanding as to the value of existing goods that have not yet been sold. That is precisely what Tilray did: it clearly explained in its earnings materials that inventory included multiple components—including products stocking up in Portugal ahead of additional GMP certifications, as well as byproduct for bulk sale or later extraction—and explained how it assigned value to those products. AC ¶ 131.[11]

### E. Statements Reporting Cost of Sales and Gross Margins

Plaintiffs' claims regarding the costs of sales and gross margins reported in Tilray's 2019 financial statements largely depend on Plaintiffs' inventory valuation claims, and fail for the same reasons. The only additional allegations are FE 1's and FE 2's claim that certain Bills of Materials failed to account for some costs. But neither FE alleges any basis for personally knowing how those Bills of Materials contributed, if at all, to the Finance Department's calculation of cost of sales and gross margins for financial reporting purposes.[12] There has been no restatement or any other indication that the costs of sales were improperly calculated as Plaintiffs speculate. To the contrary, Deloitte vetted Tilray's financial statements at the end of 2019 with particular care, given

---

[11] Plaintiffs call this a "truth-on-the-market defense," but it is critical context: investors were well apprised that byproduct was included in inventory and that the value included expected sale and use after the 2.0 market opened.

[12] FE 1 claims to have worked as a Program Manager within Tilray's Operations hierarchy and does not explain how he would know anything about how Finance calculated overall cost of sales for financial results.

the material weaknesses identified, and it issued an unqualified opinion. Defs. Mem. 10-11, 22.[13]

## II.     Plaintiffs Cannot Allege a Strong Inference of Scienter

Finally, all of Plaintiffs' claims also fail for the independent reason that they cannot allege the requisite "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007). Plaintiffs' only alleged motive is an unsupported conspiracy theory—that Mr. Kennedy allegedly orchestrated both the ABG deal itself and the challenged statements solely in order to prop up Tilray's share price to trick Privateer investors into agreeing to a downstream merger with Tilray so that he and the other Privateer co-founders could sell their Tilray shares with fewer taxes while maintaining voting control. According to Plaintiffs, "[t]heir benefits realized, Defendants corrected the false statements in early 2020." Opp. 23.

This makes no sense. First, Mr. Kennedy and the other co-founders already had control and the ability to sell Privateer's Tilray shares. Moreover, the downstream merger afforded all Privateer shareholders—not just its founders—the same tax benefits. Perhaps most importantly, Mr. Kennedy is not alleged to have sold any stock during the class period. Plaintiffs claim that Defendants corrected the allegedly false statements once "their benefits [had been] realized," but Mr. Kennedy is not alleged to have realized *any* financial benefit before the Company announced the ABG impairment and inventory write-downs, driving down the stock price. To the contrary, on Plaintiffs' theory, he coordinated this elaborate scheme to prop up the stock price just long enough to get the downstream merger approved, only to then drop the stock price without first selling any of those hard-won directly-owned shares. All this is highly implausible; the far more compelling inference to be drawn from the alleged facts is that Mr. Kennedy was acting in good

---

[13] Moreover, the cost of sales and gross margins statements cannot ground Plaintiffs' claims for the separate reason that Plaintiffs have not pleaded loss causation: no "hidden truth" was revealed in early 2020 with respect to cost of sales or gross margins—as opposed to the inventory write-down—causing Plaintiffs' alleged losses.

faith, trying to effectuate a merger that served both Tilray's and Privateer's interests, and that he believed in the long-term value of the ABG deal, the Company, and its stock.

Beyond their improbable theory of motive, Plaintiffs offer nothing more than generalized assertions that Mr. Kennedy and Mr. Castaneda must have been reckless given their positions, experience, and access to information. Indeed, Mr. Castaneda's extensive experience as a public company CFO is the only scienter argument advanced against him. Opp. 24. As courts routinely hold, such general allegations are insufficient to establish scienter.[14]

Motive-less fraud claims rarely survive a motion to dismiss and with good reason—absent a plausible motive, rarely can a plaintiff plead particularized facts demonstrating conscious misbehavior or recklessness or that fraud is more likely than good faith. That is the case here; viewed holistically, the factual pleadings fail to suggest any inference of culpable knowledge or intent, much less a strong one. The most reasonable inference to be drawn from the pleaded facts is that the Defendants were working hard to advance the interests of a Company they truly believed in and to fairly present its financial condition and prospects to investors. The mere fact that the ABG Agreement (and byproduct inventory) turned out in hindsight not to be as profitable as hoped does not transform these good intentions into culpable conduct.

## III.    CONCLUSION

Plaintiffs fail to state a claim under Section 10(b) and thus their Section 20(a) claims fail as well.[15] Plaintiffs' theories are so flawed that any effort to replead would be futile. Accordingly, Defendants respectfully ask the Court to dismiss the Amended Complaint with prejudice.

---

[14] *See, e.g.*, *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) (allegations based on defendants' position, "educational backgrounds," and "extensive experience" in the industry were insufficient to suggest scienter); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 308 (S.D.N.Y. 2019) ("[T]o allege scienter based on access to information . . . a plaintiff must either 'specifically identify the reports or statements that are contradictory to the statements made' or 'provide specific instances in which Defendants received information that was contrary to their public declarations.'").
[15] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Dated: February 24, 2021                    Respectfully submitted,

                                            **BAKER & HOSTETLER LLP**


                                            By:  /s/ Douglas W. Greene
                                            _____

                                            Douglas W. Greene (*pro hac vice*)
                                            dgreene@bakerlaw.com
                                            Tiffany A. Miao
                                            tmiao@bakerlaw.com
                                            45 Rockefeller Plaza
                                            New York, NY 10111
                                            Telephone: 212.589.4200

                                            Genevieve G. York-Erwin
                                            gyorkerwin@bakerlaw.com
                                            999 Third Avenue, Suite 3900
                                            Seattle, WA 98104
                                            Telephone: 206.566.7079

                                            *Attorneys for Defendants*

11