UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GANESH KASILINGAM, Individually and          :
on Behalf of All Others Similarly Situated,   :
                                              :
                    *Plaintiffs*,             :
                                              :
          -against-                           :        20-cv-03459 (PAC)
                                              :
TILRAY, INC., BRENDAN KENNEDY,                :        **OPINION & ORDER**
and MARK CASTANEDA,                           :
                                              :
                    *Defendants*.             :
------------------------------------------------------------------X

     Lead Plaintiff Saul Kassin and Named Plaintiffs Craig Scoggin, Surinder Chandok, and

Leslie Rose ("Plaintiffs") bring this putative class action lawsuit against Brendan Kennedy

("Kennedy"), Mark Castaneda ("Castaneda"), and Tilray, Inc. ("Tilray" and together with

Kennedy and Castaneda, "Defendants") alleging securities fraud under Sections 10(b) and 20(a)

of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and SEC

Rule 10b-5, 17 C.F.R. § 2401.10b-5. Plaintiffs allege that Defendants promulgated materially

false and misleading statements to artificially inflate the price of Tilray's stock.

     Defendants now move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure. Because, for the reasons set forth below, the Court finds that Plaintiffs have failed to

adequately plead scienter, the motion is **GRANTED** without prejudice and with leave to replead.

## BACKGROUND

### I.    The Defendants

     The following allegations are drawn from the Amended Complaint.[1] Tilray is a publicly

traded pharmaceutical and cannabis company that sells "cannabis, hemp, and related products."

---

[1] Because the Court finds that the Amended Complaint fails to adequately state a claim for relief, and grants
Defendants' motion to dismiss on that basis, it denies as moot Defendants' request for full context review.

Am. Compl. ¶ 19, ECF No. 78. Due to legal and regulatory differences across international markets, Tilray's distribution strategy differs with respect to each country it conducts business in. For example, in countries where recreational marijuana use is permitted (e.g., Canada), Tilray distributes recreational cannabis products. *Id.* But in countries where recreational use is not yet legalized (e.g., the United States), it sells hemp-related products for recreational use. *Id.*

The individual defendants served as Tilray corporate officers during the period relevant to this case. Kennedy has served as Tilray's President, Chief Executive Officer, and a member of its Board of Directors since January 2018. Am. Compl. ¶ 21. Castaneda served as Tilray's Chief Financial Officer from March 2018 to March 2020. *Id.* at ¶ 22.

## II.    Tilray's Corporate Evolution

In 2011, Kennedy and two non-parties, Michael Blue and Christian Groh (together, the "Kennedy Group"), founded Privateer Holdings, Inc. in order to invest in the nascent cannabis industry. Am. Compl. ¶ 153. In 2014, Tilray's predecessor company was formed as a subsidiary of Privateer by way of "hundreds of millions of dollars from outside investors." *Id.* at ¶ 26.

In July 2018, Tilray held an initial public offering (IPO) in which it issued roughly nine million new shares of Class 2 stock. Am. Compl. ¶ 156. Following the IPO, Privateer emerged with an 82% ownership stake in Tilray and 93% voting power over Tilray's management. *Id.* In addition, pre-IPO investors also emerged with a 9% economic interest in Tilray. *Id.* at ¶ 3. These investors, along with Privateer, consented to a six-month lockup agreement by which they agreed not to sell their shares until January 2019. *Id.* At all relevant times, Kennedy and his partners held voting control over Privateer and by extension, Tilray.

On December 12, 2019, Tilray executed a downstream merger with Privateer (the "Share Exchange") as part of the effort to wind down Privateer's operations. Am. Compl. ¶¶ 164, 175. This lawsuit arises from Defendants' actions and motivations surrounding that transaction.

## III.    The Amended Complaint

Plaintiffs are persons who purchased Tilray common stock between January 16, 2019 and March 2, 2020 (the "Class Period"). According to Plaintiffs, Defendants made materially false and misleading statements throughout the Class Period to inflate Tilray's stock price until the Share Exchange closed. They claim the Share Exchange was the culmination of a premeditated scheme contemplated to provide the Kennedy Group with both (1) ongoing voting control of Tilray and (2) a lesser tax burden should they choose to offload their shares. Am. Compl. ¶ 152.

### A.    The Share Exchange

Prior to the Share Exchange, although the Kennedy Group were already, in effect, Tilray's controlling shareholders through their 71% voting interest in Privateer, and Privateer's 93% post-IPO voting interest in Tilray, this tiered arrangement held at least one significant drawback: taxes. Am. Compl. ¶ 157. Should any of the Kennedy Group wish to monetize their interest in Tilray, they would have to force Privateer to sell Tilray shares and distribute the sale proceeds to existing investors (including themselves). *Id.* at ¶ 159. Because each of these steps would be taxable events, they would effectively be double-taxed. *Id.* at ¶¶ 159–61. To illustrate, Plaintiffs allege, if the Kennedy Group had each cashed out their Tilray interest at the $17/share IPO price, their collective tax bill would have exceeded $100 million. *Id.* at ¶ 162.

Plaintiffs claim the Share Exchange was Kennedy's solution to this problem. By its terms, (1) Privateer's shares in Tilray were canceled; (2) Tilray acquired all of Privateer's shares; and (3) Tilray issued new shares to Privateer's investors "mostly" in proportion to their economic interest

3

in Privateer; the Kennedy Group received all of Privateer's supervoting shares. Am. Compl. ¶¶ 163, 166. As a result, although they emerged with only 31% of the economic interest in Tilray, they maintained 73% of its voting power. *Id.* at ¶¶ 166, 172. In addition to ongoing voting control, because the issuance of new Tilray shares to Privateer investors was not a taxable event, if Kennedy or his associates (or any other Privateer investors) wished to liquidate their Tilray shares, they now would now only be subject to personal income taxes. *Id.* at ¶ 165.

Kennedy's final hurdle, Plaintiffs allege, was the challenge of convincing other Privateer investors to agree to all of this. Am. Compl. ¶ 167. For the plan to work, not only would Kennedy have to persuade them to consent to a necessary amendment to the Privateer Charter, but he would also need them to not exercise their appraisal rights *en masse*. *Id.* at ¶¶ 167–68. Thus, in order to assure the Kennedy Group the benefits of the Share Exchange, Plaintiffs claim Defendants made a series of false or misleading statements "necessary to give Privateer investors confidence that Tilray's share price would hold up." Am. Compl. ¶ 171. Defendants allegedly made each of these statements between the date Privateer sent Tilray a letter of intent regarding the Share Exchange, January 9, 2019, and the date the Share Exchange closed, December 12, 2019. *Id.* at ¶ 175.

Plaintiffs do not allege that Castaneda, Kennedy, or the other members of the Kennedy Group made any suspicious stock sales during the Class Period.

**B.   False or Misleading Statements**

The statements alleged in the Amended Complaint to be false or misleading fall into two buckets: (1) statements about Tilray's partnership with Authentic Brands Group ("ABG" and the "ABG Agreement") and, relatedly, demand for Tilray's products among U.S. retailers and consumers; and (2) statements about Tilray's gross margins, labor costs, and inventory.

### 1.    ABG Agreement and U.S. Demand

On January 15, 2019, Tilray announced it had entered into a global co-marketing deal with ABG, a prominent brand management company that owns and co-markets brands such as Juicy Couture and Brooks Brothers. Am. Compl. ¶¶ 5, 65. The ABG Agreement had been negotiated and finalized over a matter of "just a few days." *Id.* at ¶¶ 68, 90. Per its terms, Tilray would pay ABG $100 million in cash and stock along with up to $150 million in future consideration. *Id.* at ¶ 66. In return, Tilray would become ABG's "preferred" cannabis and CBD-related ingredient supplier[2] as ABG sought to expand into the cannabis space for the first time. *Id.* at ¶¶ 65–66. Subject to certain restrictions, Tilray would receive a guaranteed minimum annual payment of $10 million and up to 49% of net revenue from ABG's branded cannabis products. *Id.* at ¶ 66.

In a press release, Tilray introduced the agreement to its investors as a means to "expand Tilray's global presence" by leveraging the two companies' "complementary strengths" and allowing Tilray to "reach new consumers." Am. Compl. ¶ 73. In fact, Plaintiffs claim, Tilray "quickly realized the agreement was worth far less than Tilray had paid for it." *Id.* at ¶ 67. Not only was the ABG Agreement "rushed" into by Kennedy and just one other Tilray representative, with minimal internal deliberation, but according to Former Employee 3 ("FE 3") it was the product of "very irresponsible" due diligence, with Kennedy "push[ing] back" against the company's dissenting branding employees. *Id.* at ¶¶ 67–71. According to FE 3, "it was apparent the ABG Agreement was 'never going to bear fruit' the 'second the deal was signed.'" *Id.* at ¶ 71.

Per FE 3, the deal was nothing more than a "big splash" to "prop up Tilray's stock [price]." Am. Compl. ¶ 69. On the day of the announcement, the lockup agreements precluding Tilray's

---

[2] The Amended Complaint defines CBD as a chemical that is derived from the flower, stem, and seeds of both the hemp and marijuana strains of the cannabis plant; it can be used in a variety of products, including foods, oils, and lotions. Am. Compl. ¶ 31.

pre-IPO investors from selling their shares had expired, effectively doubling Tilray's existing public float and causing the company's stock price to fall by 17%. *Id.* at ¶ 70. According to Plaintiffs, the ABG announcement "arrested the fall." *Id.*

Throughout 2019, Plaintiffs claim Defendants continued to exaggerate the value of the ABG Agreement. They highlight a series of Defendants' statements lauding the agreement, including during the initial January 2019 press release, a June 2019 presentation, and quarterly earnings calls in March, May, August, and November of 2019. Am. Compl. ¶¶ 73–75, 85–86, 106–10, 123–26, 137. On several of these occasions, Defendants also offered optimistic assessments of U.S. retailer and consumer demand for cannabis products. For instance, based on encouraging conversations with retailers, Kennedy reported "tremendous" U.S. demand, and that retailers were "scrambling" to stock cannabis products. *Id.* at ¶¶ 77, 85–89, 107.

Defendants also frequently discussed the impact of regulatory uncertainty on the U.S. market. For example, on the Q1 2019 earnings call, Kennedy stated that "there are retailers in the US that aren't waiting for the FDA and then . . . there are more conservative retailers that are going to wait and see what happens with some of the FDA hearings at the end of this month and over the course of this summer." Am. Compl. ¶ 87. On the Q3 2019 earnings call, he again noted that while "there are retailers who are interested in selling topical products that contain CBD," many "[a]re waiting for some clarification from the FDA." *Id.* at ¶ 125. Castaneda added that "we do believe that with FDA clearance that will be a step change. We just . . . don't know what that timing is. So we're modeling pretty conservatively for 2020 for US CBD. Until we have that regulatory change, we are not going to adjust our numbers up." *Id.* at ¶ 126. In at least one case,

these discussions affected Tilray's stock price: after Castaneda[3] said on the Q2 2019 call that "[w]e do see a lot of the major retailers holding off, especially on the ingestible products, until they have more clarity [from the FDA]," Tilray's stock price fell by 16.5%. *Id.* at ¶¶ 137–38.

Plaintiffs further allege that in each of its Q1–Q3 2019 10-Q forms, Tilray inflated the value of the ABG Agreement. Am. Compl. ¶¶ 35–36. They calculate that the Q2 and Q3 filings each overstated Tilray's assets and understated its net losses by $102.6 million, in violation of GAAP and Tilray's own accounting policies, which both direct the company to test an intangible asset for impairment when circumstances suggest the asset's fair value may have changed. *Id.* at ¶¶ 98–104, 119–21, 127. And because the regulatory landscape that eventually convinced the company to impair the ABG Agreement by $102.6 million on March 2, 2020 already existed in Q1 2019, and did not change between August 2019 and March 2020, Plaintiffs claim Tilray's decision not to impair the asset in its previous filings was fraudulent. *Id.* at ¶¶ 105, 121, 142.

### 2. Labor Costs and Inventory

Plaintiffs also allege the company habitually overstated its gross margin, a "critical metric" that "investors closely monitored." Am. Compl. ¶¶ 35–36. Gross margin derives from net revenue and cost of sales. *Id.* at ¶ 38. Cost of sales, in turn, equals "(1) [i]nventory at beginning of reporting period *minus* (2) inventory at end of reporting period *plus* (3) direct labor, direct materials, and direct overhead." *Id.* at ¶ 56. Accordingly, gross margins can be exaggerated by overstating inventory or by understating labor costs. *Id.* at ¶ 42. Plaintiffs claim Defendants did both. *Id.*

First, they allege Tilray understated its labor costs by failing to adequately account for various labor-intensive tasks. Am. Compl. ¶ 49. According to Former Employee 1 ("FE 1"), a

---

[3] The Amended Complaint introduces these statements as if they will be attributed to Kennedy, but eventually attributes them to Castaneda. Am. Compl. ¶ 137.

Tilray employee acting "on the directions of senior Tilray Management" refused to account for the labor costs associated with assembly-line production, despite FE 1's "very vocal" objections. *Id.* at ¶¶ 49–50. Next, Plaintiffs claim Tilray overstated its inventory by ascribing significant value to materials, including various oils, that had no resale value and could not be otherwise repurposed. *Id.* at ¶ 64. FE 1 claims to have been told by members of Tilray's finance staff that the company "had accumulated in inventory very large quantities of unusable materials." *Id.* at ¶¶ 58, 59, 63.

Finally, Plaintiffs allege Tilray overstated the inventory value of "trim"—the leaves, stalks, twigs, and stems of the cannabis plant that, they claim, are "generally considered waste." Am. Compl. ¶ 30. At best, Plaintiffs assert, producers can "sell trim to third parties for minimal value or use them to make extracts." *Id.* More often, however, trim is discarded as "unsellable waste." *Id.* at ¶¶ 30, 57. Nonetheless, Plaintiffs allege Tilray included over $40 million of trim as inventory in financial filings, including its 2018 10-K form (filed in March 2019), and its Q1–Q3 2019 10-Q forms. *Id.* at ¶62, 80, 82, 91, 94, 114, 116, 132. Plaintiffs claim these decisions violated GAAP and Tilray's own accounting policy, which defines inventory in relevant part as a product of a given material's "estimated selling price in the ordinary course of business." *Id.* at ¶ 81.

The Q2 and Q3 filings were followed by earnings calls where Plaintiffs claim Defendants again exaggerated inventory. Am. Compl. ¶¶ 109, 122. These calls included Kennedy's claims that Tilray was "very pleased" with the success of a low-priced product it had recently launched, and that because "[a] lot of that product is typically a product that we wouldn't sell under our existing higher quality, higher priced brands," these offerings unlocked new revenue opportunities. *Id.* at ¶ 131. Plaintiffs similarly take issue with a November 2019 call where, per an analyst's summary, Castaneda bragged that Tilray "has a better read on consumer demand, thus avoiding the need to make revisions for returns like other companies (it had already foreseen demand was

weak for oils and gel caps)." *Id.* at ¶ 135. Plaintiffs claim these statements created the "misleading impression" that Tilray had already adequately adjusted its inventory values. *Id.* at ¶ 136.

### C.    Loss Causation

In fact, Plaintiffs allege, Tilray did not adjust its inventory values until after the Share Exchange was complete—just one of many steps the company took in early 2020 that caused the price of its stock to fall. First, on January 30, 2020, Tilray announced that it had renegotiated the ABG Agreement. Am. Compl. ¶ 139. The new deal released ABG from its obligation to pay the first $10 million guaranteed minimum annual payment; Tilray would "only start earning Revenue Interest when sales reached a level that would otherwise entitle it to $10,000,001 in payments from ABG." *Id.* In exchange, Tilray was released from its obligation to pay ABG $83.3 million in cash or stock. *Id.* The price of Tilray shares fell 8.8% that day, from $19.22 to $17.54. *Id.* at ¶ 140.

Then, on March 2, 2020, Tilray filed its 2019 10-K and held a conference call to explain its Q4 numbers. Am. Compl. ¶ 141. In its Q4 2019 statements, the company had impaired the value of the ABG Agreement by $102.6 million, or just under 86% of its original value, due to regulatory uncertainty in the U.S. *Id.* at ¶ 142. According to the Amended Complaint, this "surprise[d]" investors because "the regulatory environment had not changed at all since the Q2 2019 earnings call," and because on the Q3 2019 earnings call, "Defendants had stated that the regulatory environment for CBD was not likely to change in the near future." *Id.*

In its Q4 2019 statements, Tilray also reduced the value of its inventory by $68.6 million, 44% of its previous value. Am. Compl. ¶ 144. This, too, "surprised" investors; the next day, the price of Tilray's shares fell 15.2%, from $15.35 to $13.02. *Id.* at ¶¶ 144–45. A day later, March 4, 2020, Tilray's share price fell an additional 3.9% to $12.51 "even as overall stock prices and the prices of other cannabis companies rose substantially." *Id.* at ¶ 146.

Plaintiffs allege that Tilray's explanation for the inventory adjustment has changed over time. The company initially attributed the change to Canadian market conditions. Am. Compl. ¶ 148. Plaintiffs claim this rationale "made no sense," and that two months later, on May 11, 2020, Tilray switched tacks when Kennedy announced Tilray would now be "accounting for our byproduct on a zero basis" as opposed to "historically what's happened," which was that "byproduct has been built up on the balance sheet and that's why there have been significant write-offs for us as well as for I guess in our industry, other industry players." *Id.* at ¶¶ 149–50.

Plaintiffs claim that Defendants' collective alleged misstatements and subsequent disclosures have had a catastrophic effect on their portfolios. Per the Amended Complaint, at the beginning of the Class Period, Tilray's shares traded for "nearly $100" per share. Am. Compl. ¶ 12. At the commencement of this action, they traded for "less than $5" per share. *Id.*

## DISCUSSION

### I.    Applicable Law

#### A.    Pleading Standards

When considering a Rule 12(b)(6) motion, the Court accepts as true all factual allegations contained in the complaint and draws all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). It does not "assay the weight of the evidence which might be offered," but rather the complaint's "legal feasibility." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011) (internal quotation marks and citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Allegations of securities fraud must meet the heightened pleading standards of Fed. R. Civ. P. 9(b): "[i]n alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake." *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under this standard, plaintiffs alleging fraud must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99.

A securities fraud complaint must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that a viable securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter, with respect to each act or omission. 15 U.S.C. § 78u-4(b)(2). That requisite state of mind is "an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007s). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible;'" it must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### B.   Exchange Act Claims

A successful claim under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, requires plaintiffs to show that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 265–66 (S.D.N.Y. 2014) (cleaned up).

## II.   Analysis of Scienter Allegations

The Court reviews Plaintiffs' scienter allegations holistically, not in isolation. *Tellabs*, 551 U.S. at 310 ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not . . . any individual allegation, scrutinized in isolation."). However, because Plaintiffs' scienter claims vary by defendant, the Court organizes its analysis accordingly.[4]

To survive a motion to dismiss, a plaintiff must demonstrate scienter by pleading facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Although Plaintiffs avail themselves of both avenues, they do not do so universally. The specific allegations of motive in the Amended Complaint pertain only to Kennedy, while conscious misbehavior and recklessness is alleged of all Defendants.

### A. Individualized Allegations

#### i. Defendant Kennedy

Plaintiffs have failed to adequately allege scienter through Kennedy's purported motive to defraud investors. "Motive can be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity can be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged." *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11-cv-7968 (JPO), 2013 WL 144041, at *11 (S.D.N.Y. Jan. 14, 2013) (cleaned up), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013). To survive a motion to dismiss, a plaintiff may not simply plead "motives that are generally possessed by most corporate directors and officers;" "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Whether inflating stock prices to facilitate an acquisition establishes motive sufficient to satisfy the PSLRA's heightened pleading

---

[4] Because the Court holds that Plaintiffs fail to adequately allege scienter, and therefore dismisses their claims on that basis without prejudice, it declines at this time to reach the other elements required of Rule 10b-5 claims.

standards "presents a close[] question," with courts falling on either side depending on the facts alleged. *Agnico-Eagle Mines*, 2013 WL 144041, at *12 (collecting cases); *see also Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) ("[I]n some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter.").

Plaintiffs allege that Kennedy, on behalf of the Kennedy Group, had the motive and opportunity to deliberately inflate Tilray's value for a period sufficient to finalize the Share Exchange. The Share Exchange would in turn allow the Kennedy Group to maintain voting control of Tilray while also unlocking the ability to sell off Tilray shares in the future with a reduced tax burden. Accordingly, Plaintiffs claim, once the Share Exchange closed on December 12, 2019, Kennedy no longer had an incentive to continue misleading investors, and as a result Defendants quickly began walking back the lies they had perpetuated in 2019.

While this narrative is perhaps not implausible, it raises as many questions as it answers. Crucially, Plaintiffs do not allege that the Kennedy Group sold any of their own stock during the relevant period, nor that they received any direct financial benefit from the alleged scheme prior to Tilray announcing its decision to impair the ABG Agreement and write down inventory, which immediately, dramatically, and foreseeably tanked Tilray's stock price. Nor do Plaintiffs allege that Kennedy or his associates ever *planned* to do so, even if that plan never materialized.

Plaintiffs thus ask the Court to derive a strong inference of scienter where, they claim, a defendant artificially inflated stock prices intending all along to allow them to collapse—while deliberately choosing not to capitalize on his fraud prior to engineering the announcements that prompted that collapse. They maintain that the plan's aim was to allow the Kennedy Group to offload Tilray shares free of a hefty tax bill, while hoarding voting control of the company. They concede that the trio already controlled Tilray prior to the Share Exchange, and that the tax

advantages the Share Exchange unlocked were shared by all Privateer shareholders, not just the Kennedy Group. They simply contend that Kennedy's motive was to enjoy both benefits at once.

But without articulating any theory for how these nominal boons would have been to Kennedy's actual benefit after Tilray's share price foreseeably plummeted, Plaintiffs leave their motive narrative unfinished. They fail to explain how, when Kennedy was forming his plan, there was any "likely prospect" that the future post-collapse tax benefits would outweigh the foreseeable post-collapse loss in value of the stock he apparently intended to hold onto. *Agnico-Eagle Mines*, 2013 WL 144041, at *11; *see also Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (scienter inadequately pleaded where the complaint failed to allege "personal gain" stemming from defendants' alleged effort to inflate stock prices to complete a corporate acquisition).

To the contrary, unlike in the cases Plaintiffs cite in support of their theory, their own pleadings suggest that among those most harmed by the natural and intentional consequences of this purported scheme was the schemer himself. *Cf. Marcus v. Frome*, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (scienter adequately alleged where defendants "obtained tangible and *valuable assets and income*") (emphasis added); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 170 (D. Conn. 2019) (scienter adequately alleged where defendants' misstatements were calibrated to allow them to acquire a valuable competitor). Surely the alleged $100 million tax bill[5] the Kennedy Group would have absorbed had they divested at $17/share in 2018 is rivaled, if not dwarfed, by the 95% loss in share value (Am. Compl. ¶ 12) prompted by Defendants' allegedly premeditated corrective disclosures. When the purported fraudster "miss[es] the boat this dramatically," or in this case, opts to go down with the ship, the fraud

---

[5] Plaintiffs claim that the Kennedy Group "realize[d] tax savings of more than $50 million" (Am. Compl. ¶ 174), but offer no specific basis for this number. The Court presumes it is a hypothetical figure derived from their $100 million IPO estimate and the Kennedy Group's reduced tax burden, post-Share Exchange, upon the hypothetical sale of their Tilray stock at some unspecified price. Plaintiffs, again, do not allege that any such sales took place.

inference is weakened. *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

Plaintiffs' motive theory has other shortcomings as well. As further set forth below, Plaintiffs fail to explain how any of this would have benefitted Castaneda, who is nonetheless alleged to have been a willing co-conspirator. Nor does the Amended Complaint articulate why continued voting control of a post-collapse Tilray would have been so dear to Kennedy.[6] In short, Plaintiffs ask the Court to confidently infer, based on the current pleadings, that Kennedy's motive was to dishonestly manufacture continued control of a dramatically devalued company whose shares he could then offload in a more cost-efficient manner—without a strategy to actually do so prior to his premeditated deadline for torpedoing his own stock.

The Court cannot do so. Other, stronger, inferences are lurking within the Amended Complaint. While the motion to dismiss stage is not the proper setting to resolve factual disputes, under the PSLRA's heightened pleading standards, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. In this case, there are many. For example, the frequent FDA discussion peppered throughout the alleged misstatements support a strong inference that Defendants grounded their projections in apparently errant, but genuine, optimism that regulatory developments were imminent, and retreated only after accepting that the FDA was not planning to act as Defendants had hoped and expected. Other less innocuous, but nonetheless unactionable inferences also flow naturally from the Amended Complaint, including that Defendants acted out

---

[6] The only specific reasons Plaintiffs offer to substantiate this proposition would likely have been nullified by the Share Exchange. First, Plaintiffs' claim that Kennedy "used control over Tilray to negotiate grossly unfair terms in the Share Exchange" (Am. Compl. ¶ 172) would of course have been moot after the Share Exchange closed. Second, although the Amended Complaint does not detail the precise post-merger corporate arrangement, Plaintiffs' claim that voting control permitted Kennedy to self-deal by licensing Tilray brands to Privateer and its subsidiaries would doubtless have been affected by the two entities merging. The Court recognizes that Kennedy may have had other reasons to place such a premium on ongoing voting control over Tilray, even after its post-disclosure crash, but cannot discern any from the Amended Complaint.

of a general "desire for the corporation to appear profitable," *Kalnit*, 264 F.3d at 139, and that their various misjudgments were "at best, a product of . . . negligence." *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 148 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 754 (2d Cir. 2009).

Therefore, while Plaintiffs have perhaps presented a *plausible* motive, their pleadings fail to conjure the *strong* inference required under the PSLRA. However, because the Court recognizes that Plaintiffs may be able to cure the Amended Complaint's deficiencies, it grants Defendants' motion to dismiss without prejudice and with leave to replead. *See* Fed. R. Civ. P. 15(a); *In re Authentidate Holding Corp.*, No. 05-cv-5323 (LTS) (DFE), 2006 WL 2034644, at *4 (S.D.N.Y. July 14, 2006) ("Although leave to amend is not automatic, a plaintiff generally is to be afforded an opportunity to test his claim on the merits.") (citing *Foman v. Davis*, 371 U.S. 178, 182).

### ii. Defendant Castaneda

Plaintiffs allege no specific facts suggesting Castaneda possessed a motive to defraud. Unlike Kennedy, Castaneda is not part of the Kennedy Group, and thus did not stand to similarly benefit from the Share Exchange. And like Kennedy, Castaneda is not alleged to have sold any stock during the relevant period. Indeed, aside from the conscious misbehavior and recklessness alleged of all Defendants, discussed below, the Amended Complaint is bereft of any specific scienter allegations against Castaneda. At best, Plaintiffs claim that "[b]y virtue of [his] position[]," Castaneda had knowledge of the alleged falsities and "intended thereby to deceive Plaintiffs." Am. Compl. ¶ 191. They insist, in similarly conclusory fashion, that "[s]cienter is especially clear for [Castaneda], who when he made his false statements had a 30-year career in accounting, including 21 years as a public company CFO." Pls.' Mot. in Opp'n 24, ECF No. 87.

But scienter cannot simply be presumed from a defendant's organizational role or professional expertise. Such "bare assertions, without any further facts or details, do not

adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements." *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006). Thus, these conclusory allegations do nothing to disturb the Court's view that Plaintiffs have failed to adequately allege that Castaneda acted with scienter.

### B. Conscious Misbehavior and Recklessness Allegations against All Defendants

Even when motive has not adequately been alleged, "it is still possible to plead scienter by identifying" a defendant's conscious misbehavior or recklessness, "though the strength of the circumstantial allegations must be correspondingly greater." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010) (quoting *Kalnit*, 264 F.3d at 142). While "intentional misconduct is easily identified since it encompasses deliberate illegal behavior[,] . . . [r]ecklessness is harder to identify with such precision and consistency." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). A finding of recklessness requires a showing of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (cleaned up). To successfully allege recklessness, the plaintiff must plead "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Medis*, 586 F. Supp. 2d at 142 (quoting *Novak*, 216 F.3d at 312).

In the Second Circuit, a series of "important limitations on the scope of liability for securities fraud based on reckless conduct" have been imposed. *Novak*, 216 F.3d at 309. These include a refusal to entertain "fraud by hindsight" claims. *See In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 2012 WL 1353523, at *9 (S.D.N.Y. Apr. 12, 2012) (criticizing the practice of pleading "a retrospective critique" of defendants' actions) (citing *Novak*, 216 F.3d at 309). "Corporate officials need not be clairvoyant. . . . [A]llegations that defendants should have

anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309.  Furthermore, to raise an inference of conscious misbehavior or recklessness, the plaintiff must "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Id.* at 308.  This obligates the plaintiff to "identify the reports or statements containing this information." *Id.* at 309. Absent fraudulent intent, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Id.*

Courts may credit allegations by confidential employees "provided [the sources] are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.  However, "[c]ourts have generally been hostile to non-particular allegations from [confidential witnesses]" included in a complaint where such allegations are conclusory, vague, or otherwise "insufficiently particularized." *ODS Cap. LLC v. JA Solar Holdings Co.*, No. 18-cv-12083 (ALC), 2020 WL 7028639, at *9 (S.D.N.Y. Nov. 30, 2020) (collecting cases).

Plaintiffs argue that, even absent motive, they have alleged conscious misbehavior or recklessness sufficient to plead that an array of statements relating both to the ABG Agreement and to inventory and labor costs were made with scienter.  They claim that for three successive quarters, Tilray overvalued its assets and inventory and understated its labor costs.  Therefore, they contend, because Defendants either knew or should have known that assets and inventory were overstated and labor costs were understated, these statements were made with scienter.

The Court disagrees.  Plaintiffs' scienter allegations rely on the fundamental premise that Defendants either knew or should have known their statements were false.  The Amended Complaint fails to establish this premise.

### i. ABG Agreement and U.S. Demand

Plaintiffs allege that Kennedy knew almost instantly that the ABG Agreement was effectively worthless to the company. They claim that the deal closed after mere days of negotiation, over the objections of Tilray's branding employees, and, in the eyes of FE 3, derelict due diligence. Accordingly, they first take aim at a series of statements Defendants made soon after the partnership closed touting the ABG Agreement as one that would expand Tilray's presence through leveraging ABG's brand and distribution strengths.

But Plaintiffs' allegations regarding the circumstances of the agreement's formation, even if true, fail to establish that Defendants were insincere in their belief that access to ABG's brand portfolio and distribution networks would be of significant value to Tilray. Although the Court finds, for purposes of this motion, that the confidential former employees cited in the Amended Complaint "are described . . . with sufficient particularity to support the probability that [they] possess the information alleged," *Novak*, 216 F.3d at 314, it notes that FE 3's characterization of the company's due diligence merely reflects FE 3's *own* "insufficiently particular" perception. *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19-cv-10067 (PAE), 2020 WL 4734989, at *11 (S.D.N.Y. Aug. 14, 2020). Plaintiffs do not allege, through FE 3 or elsewhere, "the kind of required specific factual allegations (by [confidential witnesses] or otherwise)" to suggest that Kennedy or other Tilray decisionmakers subjectively felt the company's due diligence was lacking, much less that they believed the deal to be worse for the company than advertised. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Absent such facts pertaining to Defendants' state of mind, the Court deems the FE 3 allegations too "vague, speculative, and conclusory" to be probative of conscious misbehavior or recklessness. *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019).

Plaintiffs next argue that, to the extent the ABG Agreement's lack of value was not immediately apparent, it became obvious over the course of 2019, despite Defendants' public assertions to the contrary. They allege that even though Defendants "quickly realized" (Am. Compl. ¶ 67) their mistake, they continued to fraudulently trumpet the ABG Agreement's value in public statements in May, June, August, and November 2019, as well as in their Q1–Q3 10-Q filings. Plaintiffs assert several arguments in support of these claims.

First, Plaintiffs claim Defendants knew that demand from U.S. retailers and consumers was lower than they repeatedly suggested, which in turn rendered their bullish public assessments of the ABG Agreement willfully or recklessly false. They underscore statements in which, for example, Kennedy suggested that there was "tremendous" U.S. demand (Am. Compl. ¶ 77) and that retailers were "scrambling" (Am. Compl. ¶ 107) for cannabis product supply. Because they were aware that FDA uncertainty was chilling demand, Plaintiffs argue Defendants knew these statements to be lies. But Plaintiffs allege no facts suggesting that Defendants had not, in fact, had encouraging conversations with retailers, let alone any other specific facts pertaining to Kennedy or Castaneda's state of mind. By contrast, the Amended Complaint documents Defendants' open and repeated discussion of U.S. regulatory uncertainty, its link to U.S. demand, and, by extension, the ABG Agreement. In fact, Plaintiffs acknowledge that one such admission had already caused Tilray's stock price to fall 16.5% in August 2019—well within the period in which Plaintiffs claim Defendants were continuing to mislead investors regarding U.S. demand.

Second, Plaintiffs argue that this very transparency regarding FDA uncertainty itself misled investors into believing that Tilray's models already aptly reflected the regulatory environment. They highlight Castaneda's August 2019 statement that Tilray was modeling conservatively for the U.S. and that additional FDA clarity was likely to encourage the company to make more

optimistic projections.  But Plaintiffs again fail to allege any facts suggesting that Castaneda did

not believe what he was saying to be true.  To the contrary, the statements in the Amended

Complaint seems to suggest that Tilray's projections would indeed have been higher with

additional FDA clearance.  *See, e.g.*, Am. Compl. ¶ 126.

Relatedly, Plaintiffs argue that Tilray's eventual decision to impair the ABG Agreement

due to regulatory uncertainty exposed its prior optimism as fraudulent.  But this is nothing more

than an impermissible "retrospective critique."  *Bank of Am. Corp. Sec.*, 2012 WL 1353523, at *6.

Tilray certainly appears to have overestimated, by orders of magnitude, both the value of the ABG

Agreement and the likelihood of fortuitous regulatory change.  But being wrong—even

embarrassingly so—is not the same as being dishonest.  Even as the Amended Complaint "strongly

suggests that the defendants should have been more alert and more skeptical," it fails to establish

that they were "promoting a fraud."  *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 573

(S.D.N.Y. 2007) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

Third, Plaintiffs take issue with Tilray's decision to attribute its eventual impairment of the

ABG Agreement to regulatory uncertainty.  They insist this rationale cannot be squared with the

reality that the FDA's position did not change between August 2019 and March 2020.  But this

stance misrepresents the nature of uncertainty.  The Amended Complaint is replete with statements

from throughout 2019 indicating that Defendants were confident that imminent FDA action would

meaningfully boost their outlook in the U.S. market.  To be sure, the FDA did not take any such

action between August 2019 and March 2020.  But it does not follow that expectant stakeholders

should likewise have stood still over the same period.  In an environment of uncertainty, regulatory

inertia is itself relevant data for companies relying on the prospect of change.  It can be especially

germane to bullish companies like Tilray for whom inaction may be a signal to temper their

optimism. That Tilray's more sober 2020 view of the regulatory landscape incorporated "different assumptions" than its more optimistic 2019 predictions does not enhance the scienter inference relative to the other, stronger, unactionable inferences embedded within the Amended Complaint that the Court has already addressed. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010).

Nonetheless, Plaintiffs claim, the impairment "surprise[d]" investors because Defendants had themselves "stated that the regulatory environment for CBD was not likely to change in the near future" on Tilray's Q3 2019 earnings call. Am. Compl. ¶ 142. But Plaintiffs' actual detailed account of that call contains no such statement. Per the Amended Complaint, Castaneda and Kennedy merely stated that the company was "waiting" on the FDA and again acknowledged the impact on the market of this ongoing uncertainty. Am. Compl. ¶¶ 125–26.

Finally, Plaintiffs argue that Tilray's decision to impair the ABG agreement in its 2020 filings, in conjunction with the above allegations, demonstrates that by declining to do so earlier, Defendants consciously or recklessly "failed to check information they had a duty to monitor," in violation of GAAP and its own accounting procedures. *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks and citations omitted). But, once again, the notion that any information Defendants had such a duty to monitor would have cured their ultimately misguided optimism rests upon an impermissible "retrospective critique." *Bank of Am. Corp. Sec.*, 2012 WL 1353523, at *6. The essence of Plaintiffs' claim is that, because Defendants' FDA hopes ultimately rang false, and the ABG Agreement therefore proved less valuable than initially advertised, Defendants either knew or should have known that their assessments over the first three quarters of its lifespan were inflated. This is the definition of fraud by hindsight: "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Agnico-Eagle Mines*, 2013 WL

22

144041, at *13 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995)); *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Managers . . . are entitled to investigate for a reasonable time, until they have a full story to reveal."). Nor, without "fraudulent intent," can Plaintiffs' allegation that Tilray violated GAAP and its own accounting policies by failing to impair the ABG Agreement sooner create an inference of scienter. *Novak*, 216 F.3d at 309. Thus, absent motive, or some other reason to scrutinize the contours of the timeline, the Court cannot infer from one quarter's disclosure an intent to defraud in prior quarters.

In this case, the Court acknowledges that Plaintiffs' motive allegations are relevant to the precise timeline. For the reasons set forth above, should Plaintiffs be able to cure the deficiencies in their motive allegations in a future pleading, the Court may revisit this point. However, absent a strong motive inference, the Court finds that Plaintiffs have failed to plead conscious misbehavior or recklessness surrounding Defendants' statements about the ABG Agreement and U.S. demand.

### ii. Labor Costs and Inventory

Plaintiffs next contend Defendants knew or should have known that Tilray was overstating inventory and understating labor costs. First, they claim the company's failure to account for labor-intensive tasks and processes was willful or reckless because it was done over the objections of a former employee and "on the directions of senior Tilray Management." Am. Compl. ¶¶ 49–50. The Court notes at the outset that this vague confidential allegation is again "insufficiently particular" to satisfy the PSLRA's heightened pleading standards. *Altimeo*, 2020 WL 4734989, at *11. But even assuming that this unsupported, generic assertion were true, it still fails to suggest anything more sinister than a disagreement among staff regarding accounting protocols. Plaintiffs plead no facts sufficient to infer a fraudulent state of mind among "senior Tilray Management" (Am. Compl. ¶ 50), much less specific managers, nor any other facts "from which one could infer

that either of the individual defendants knew or had reason to know anything about the [alleged falsity]." *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008).

Plaintiffs' claims regarding Tilray's alleged practice of overvaluing various "unusable" (Am. Compl. ¶ 58) materials that no longer had resale or repurpose value similarly rely on two mid-level employees' vague and conclusory assertions.   Aside from being insufficiently particularized, these confidential reports again simply depict discord among Tilray staff regarding the potential marketability of these materials. Moreover, "none of these employees claims to have spoken with or otherwise notified . . . any individual defendant" of their dissenting views. *Kinross*, 957 F. Supp. 2d at 304.[7]  For these reasons, these allegations also fail to clear the high bar courts have erected for conscious misbehavior or recklessness pleadings. *See Kalnit*, 264 F.3d at 142.

The centerpiece of Plaintiffs' inventory scienter theory is similarly flawed. Plaintiffs allege that Defendants throughout 2019 fraudulently inflated, by tens of millions of dollars, Tilray's inventory figures with cannabis plant trim they knew was "unsellable waste." Am. Compl. ¶ 57. Plaintiffs cite several statements made by Kennedy and Castaneda on calls in August and November asserting, for example, that the company was "building inventory" (Am. Compl. ¶ 112) and "very pleased" (Am. Compl. ¶ 131) with the market for the low-priced products derived from materials unsuitable for other offerings, such as trim.  They claim that these statements were willfully false because they misled investors into thinking the trim had non-negligible value when Defendants in fact knew it did not.  Plaintiffs also object to a series of Tilray's financial filings, including its 2018 10-K and its Q1–Q3 2019 10-Q forms.  They argue that each of these statements were made with scienter because they violated both GAAP and the company's own inventory

---

[7] None of the three former employees quoted in the Amended Complaint are alleged to have reported directly to Kennedy or Castaneda. Am. Compl. ¶¶ 23–25.

valuation policy.  Plaintiffs further argue that because these polices are "relatively simple—don't include unsellable waste as inventory" (Pls.' Mot. in Opp'n 24, ECF No. 87), by violating them, Defendants either lied, or at best, recklessly failed to monitor information they had a duty to check.

These scienter claims all fail for the same fundamental reason.  Each is built atop the faulty foundational premise that the Amended Complaint establishes that Defendants knew, or should have known, that much of their inventory was worthless.  To start, the Plaintiffs offer no non-conclusory allegations showing that, at the time of their statements, either Kennedy or Castaneda actually knew or had been presented with information indicating that Tilray's trim was worthless, or that it could not in fact be incorporated into Tilray's low-priced offerings—or indeed that trim constituted such a large share of Tilray's inventory.  *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F.Supp.2d 261, 272–73 (S.D.N.Y. 2009) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").  Meanwhile, Plaintiffs concede that there is at least some market for trim.  Further, their pleadings again suggest that Defendants based their optimism in the belief that FDA action would unlock significant value in the U.S. market.  As set forth above, the Amended Complaint fails to establish a strong inference that this optimism, although misguided, was disingenuous.

Further, despite Plaintiffs' claims to the contrary, the mere fact that Tilray subsequently reduced its inventory valuation, without more, again cannot sustain the allegation that the company's failure to do so earlier was fraudulent.  *See Agnico-Eagle Mines*, 2013 WL 144041, at *13.  Plaintiffs place significant weight on their assertion that Kennedy "admitted that Tilray waited until the end of the year to revalue inventory" in a May 11, 2020 statement in which he disclosed that Tilray would now be "attributing zero value to . . . byproduct." Am. Compl. ¶¶ 150–51.  But nowhere in that statement, as quoted in the Amended Complaint, does Kennedy suggest

that the company deliberately *waited* to adopt this approach. Kennedy simply articulates Tilray's rationale for *now* doing so; he does not address why it did not do so earlier. Thus, Plaintiffs' attempt to impute Kennedy's May 2020 state of mind onto Tilray's 2019 statements—including its purported GAAP and accounting policy violations—is again impermissible fraud by hindsight.

Plaintiffs have thus failed to plead scienter through conscious misbehavior or recklessness.

### C.  Corporate Scienter

Because plaintiffs fail to plead scienter with respect to any individual defendant, and assert no specific corporate scienter allegations independent from their claims against Kennedy and Castaneda, they also fail to allege that Tilray acted with corporate scienter. *See Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503 (S.D.N.Y. 2013).

### III.  Analysis of Section 20(a) Claim

Under Section 20(a) of the Exchange Act, an officer of a company may be held accountable for the company's misrepresentations. However, it is a "primary requirement of pleading a claim under section 20(a) that the plaintiff allege facts showing a primary violation by the controlled person." *Oklahoma Firefighters Pension*, 951 F. Supp. 2d at 504. Because Plaintiffs have failed to allege a primary violation by any defendant, their accompanying Section 20(a) claim must also be dismissed. *See Slayton*, 604 F.3d at 778; *ATSI*, 493 F.3d at 108.

### CONCLUSION

Defendants' motion to dismiss is granted without prejudice and with leave for plaintiffs to replead. The Clerk of the Court is directed to terminate this motion at ECF 82.

Dated: New York, New York                  SO ORDERED
       September 27, 2021

                                         HONORABLE PAUL A. CROTTY
                                         United States District Judge