**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (JH 7258)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANESH KASILINGAM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,<br><br>Defendants. | CASE No.: **1:20-cv-03459-PAC**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**CLASS ACTION** |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 5

III.   PARTIES ............................................................................................................ 6

IV.    IMPORTANT NON-PARTIES .......................................................................... 7

V.     BACKGROUND ................................................................................................ 8

VI.    DEFENDANTS OVERSTATE TILRAY'S MARGINS AND THE VALUE OF THE ABG
       AGREEMENT .................................................................................................... 9

   A.  Investors Focused On Tilray's Gross Margins ................................................ 9

   B.  Defendants Overstated Tilray's Gross Margins .............................................. 11

       1.  Defendants Understated Cost of Sales by Excluding Labor and Materials .................. 11

       2.  Defendants Understated Cost of Sales By Recording Worthless Waste As Valuable
           Byproduct .................................................................................................... 13

   C.  Defendants Misleadingly Characterize an Investor Relations Stunt As A Major
       Accomplishment ............................................................................................. 16

       1.  Tilray Agrees To Pay ABG $100 Million To Prop Up Its Share Price ........................ 16

       2.  The ABG Agreement Appears to Be the Realization of Tilray's Goals ...................... 18

VII.   FALSE STATEMENTS ...................................................................................... 19

VIII.  LOSS CAUSATION ........................................................................................... 34

   A.  Defendants Renegotiate the ABG Agreement ................................................ 34

   B.  Defendants Impair the ABG Agreement By 86%, and Reduce the Value of Tilray's
       Inventory by 44% ............................................................................................ 35

IX.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER ................... 36

   A.  Kennedy Admits that Tilray Did Not Follow GAAP ...................................... 36

   B.  Tilray's "Favorite Metric" Is Extracts Revenue ............................................ 37

   C.  But for COVID-19, Defendant Kennedy's False Statements Would Have Given Him
       Control Over the World's Largest Cannabis Company .................................... 38

1.   Step 1: Defendant Kennedy Makes False Statements To Obtain Personal Control Over Tilray ........................................................................................ 38

i.   Kennedy and Two Close Associates Control Tilray While Owning Less Than A Third of Tilray's Shares ........................................................................ 38

ii.   Kennedy Avoids Taxes While Securing Corporate Control Over Tilray ................... 40

2.   Step 2: Kennedy Uses His Control to Pursue a Merger That Would Have Him Head the World's Largest Cannabis Company, Nearly Succeeds, But Fails Because of COVID-19 ........................................................................................ 42

i.   Kennedy Nearly Succeeds In Making Himself CEO of the World's Largest Cannabis Company ........................................................................................ 42

ii.   Kennedy's Plan Comes to Naught Because of COVID-19 ........................................ 46

iii.   The Controlling Shareholders Lose Control ............................................................. 48

iv.   Kennedy Uses His Control Over Tilray's Board of Directors To Push Through the Aphria Merger ........................................................................................ 50

v.   Defendants Had to Complete the Share Exchange Before the Aphria Merger ........... 51

D.   Defendant Kennedy Sold $26,310,803.10 of Stock During the Class Period ................. 51

E.   Additional Self-Dealing ........................................................................................ 54

F.   Tilray Uses Its Stock As Currency For Acquisitions ........................................................................................ 55

G.   The Volume of Trading In Tilray's Stock Increases Suspiciously After the Share Exchange ........................................................................................ 56

CLASS ACTION ALLEGATIONS ........................................................................................ 58

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET) ........ 60

CLAIMS FOR RELIEF ........................................................................................ 62

FIRST CLAIM ........................................................................................ 62

SECOND CLAIM ........................................................................................ 65

COUNT III ........................................................................................ 66

PRAYER FOR RELIEF ........................................................................................ 68

DEMAND FOR TRIAL BY JURY ........................................................................................ 68

Lead Plaintiff Saul Kassin and Named Plaintiffs Craig Scoggin, Surinder Chandok, and Leslie Rose ("Plaintiffs"), individually and on behalf of all others similarly situated, for their Complaint against Defendants Tilray, Inc. and Brendan Kennedy, allege the following based on personal knowledge as to themselves and their own acts and information and belief as to all other matters.

## I.    INTRODUCTION[1]

1.     This is a securities class action brought on behalf of all persons who purchased Tilray common stock on the NASDAQ from January 16, 2019 through March 2, 2020, both dates inclusive ("Class Period"), and who held such shares through at least one corrective disclosure. Excluded from the Class are (i) Defendants, (ii) officers and directors of Tilray and Privateer Holdings, Inc. ("Privateer"), and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii).

2.     For years, Kennedy has been telling anyone who will listen that the current upstart cannabis companies – Tilray and its competitors – are in a struggle whose three or four winners will dominate a $200 billion per year market. Kennedy wants to lead one of those companies and saw that the best way forward was to merge with another large company. But for that, he needed to personally control Tilray. To convince investors to give him personal control, Kennedy misstated financial metrics which overstated Tilray's stability and suggested it was reaching its business goals – key factors for a company in an industry that has only existed for a few years. Even as he was securing personal control, Kennedy was negotiating a merger with another cannabis almost exactly Tilray's size, Aphria Inc. The combined company would be the largest

---

[1] All emphases are added. All quotations from written sources with Canadian or UK spelling have been edited to American spelling.

cannabis company by revenues in the world, positioning it to become one of those three or four market leaders. Kennedy offered Aphria a deal that was not particularly favorable to Tilray's shareholders – but made Kennedy the combined company's CEO. With personal control over Tilray, Kennedy could have delivered on the offer. But he never got a chance, because the discussions were culminating in early March 2020 and collapsed with COVID-19.

3.      In July 2018, Tilray held an IPO that left more than 80% of its shares in the hands of its controlling shareholder Privateer, a private equity fund which, by the beginning of the Class Period, only held Tilray shares. About half of the remaining shares were freely tradable; the other half, a mere 10% of its total shares, were subject to a lockup agreement.

4.      In January 2019, that lockup on the remaining 10% expired and the shares were freely tradeable. Adding only 10% of Tilray's shares to its float caused its stock price to fall 17% in one day.

5.      To keep Tilray's stock price from falling further and to secure additional benefits, Defendants caused Tilray to enter into, and touted, a purported co-branding deal with one of the world's largest brand owners, Authentic Brands Group ("ABG"). Kennedy boasted that the deal was a strategic masterstroke that followed long discussions between the two companies, culminating in a month's intense negotiations. He claimed that the deal was worth the more than $100 million Tilray had paid for it, and Tilray's financial statements carried the ABG Agreement at the full consideration Tilray paid for it. He also told investors that ABG had vetted Tilray and, by conferring its seal of approval, showed Tilray had a great deal to offer leading brands.

6.      Not remotely. Kennedy and Tilray's other representative had spent ***mere days*** negotiating, and conducting due diligence for, the ABG Agreement. According to one insider, Kennedy caused Tilray to enter into the ABG agreement for one main reason: to "prop up Tilray's stock [price]." Tilray's own branding experts protested that the deal offered far less to Tilray than

what it had paid for it. And ABG hadn't vetted Tilray; Tilray had driven a truck full of money to ABG's headquarters and demanded so little in return that ABG would have been crazy to refuse.

7.      Defendants did more to convince investors of Tilray's stability. Young companies like Tilray are often judged by their gross margins, which essentially measures the portion of revenues that are not spent producing and selling the goods sold. Companies easily achieve economies of scale on overhead, but it is far more difficult to reduce unit costs or increase their sale price. Yet in the two quarters after its IPO, Tilray's gross margins had fallen from 55% to 31%, raising doubts about whether Tilray could survive in a fiercely competitive field. To allay investor concerns, Tilray recognized more than $40 million of unsellable marijuana plant waste as valuable inventory. Defendants subtracted the $40 million from Tilray's cost of sales, improving its margins, and making it seem far more profitable and promising than it really was.

8.      Kennedy made these false and misleading statements to secure personal voting control over Tilray. Kennedy and two long-time friends ("Controlling Shareholders") control Privateer through supervoting Privateer shares. In turn, Privateer owns most of Tilray's ordinary Class 2 shares, but it controls Tilray by holding all of its supervoting Class 1 shares, which collectively hold more votes than all the Class 2 shares put together. Thus, the Controlling Shareholders indirectly control Tilray.

9.      The Controlling Shareholders needed the votes of Privateer's other shareholders to secure personal control over Tilray. To avoid flooding the market with new freely tradable Privateer shares, the Controlling Shareholders also had to get Privateer's other shareholders to agree to a two-year lockup.

10.     The Controlling Shareholders  were asking a lot. A two-year lockup of shares in a volatile company in a nascent industry like Tilray is risky.

11.     It is to convince Privateer investors to agree to the lockup that Defendants overstated Tilray's stability and progress on its business plan.

12.     Kennedy succeeded: the other Privateer shareholders agreed to the Share Exchange. But securing personal control over Tilray was only the first step in his scheme. For years, Kennedy had told reporters and investors that the cannabis market was in its infancy and would reach sales of $200 billion per year. Kennedy had told them, too, that just like in the beer industry, that $200 billion market would be dominated by three or four giant companies.

13.     Even as Kennedy pushed through the Share Exchange, he was negotiating a merger with Aphria, a cannabis company almost equal Tilray's size. In a February 2020 draft Letter of Interest, Kennedy offered Aphria attractive terms meant to close the deal quickly. The offer barely attached any premium to Tilray shares, despite its historically higher valuation. But Kennedy insisted on one term: he would be the combined company's CEO.

14.     Having secured personal control over Tilray, and facing Aphria's impending due diligence that would reveal his duplicity, Kennedy disclosed the truth in January and March 2020. In January, Defendants announced that Tilray had renegotiated the ABG deal. The new deal was drastically smaller. Then in March 2020, Defendants wrote down 86% of the value of the ABG Agreement and 44% of Tilray's total inventories. Both disclosures caused Tilray's stock price to fall, damaging investors. Months later, Defendant Kennedy would admit that Tilray had deliberately recorded waste as inventory.

15.     But like so many plans pursued in February 2020, Kennedy's scheme did not come to pass. Aphria dropped negotiations on March 18, when an anxious world did not know what the next day would bring, let alone the next year. Aphria fared better through COVID-19 than Tilray. When the deal finally closed in December 2020, Aphria was more than twice Tilray's size. And Kennedy even lost the personal control that gave him a negotiating edge. COVID-19 forced Tilray

to sell almost 40 million shares and warrants at rock-bottom prices, triggering a provision in its certificate of incorporation which automatically converted Class 1 supervoting shares into Class 2 ordinary shares when the former accounted for fewer than 10% of the total. With no Class 1 shares, Kennedy and his friends no longer controlled Tilray.

16.     Kennedy had more success chasing money than power. He made more than $26 million net selling Tilray shares during the Class Period. He timed his sales well: he made most of his sales either within two weeks after he began making false statements or within about two months before the corrective disclosures. They also violated a pledge he had made not to sell Tilray shares.

17.     Through his indirect control, Kennedy used Tilray as a piggybank. When he was short on cash, he had Tilray purchase a company Privateer owned 30% of, paying himself $2.4 million, paying other Privateer investors nothing, and paying the company's 70% owner a mere $3.2 million, and that in shares.

18.     Kennedy misled investors about Tilray. He sold tens of millions of dollars of Tilray shares. He tried to make himself CEO of the world's largest cannabis company and, but for COVID-19, would have succeeded. The investors he misled did not fare nearly as well. At the close of the Class Period, Tilray's shares traded for about $5 – down more than 95% from their Class Period highs.

## II.    JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered into and subsequent damages were suffered in this judicial district.

22.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## III.   PARTIES

23.     Lead Plaintiff Saul Kassin, and Named Plaintiffs Craig Scoggin, Surinder Chandok, and Leslie Rose, as set forth in their PSLRA certification which were previously filed and are incorporated by reference, purchased Tilray shares at artificially inflated prices during the Class Period and were damaged thereby.

24.     Defendant Tilray produces and sells marijuana, hemp, and related products. Tilray grows hemp and marijuana in both Canada and Portugal, where it built a large open-air marijuana farm. Tilray has sold medical marijuana or made it available for clinical trials in Argentina, Australia, Canada, Chile, Croatia, Cyprus, the Czech Republic, Germany, Israel, Ireland, New Zealand, South Africa, Switzerland, the United States, and the United Kingdom. Tilray sells marijuana for recreational use in Canada, and hemp and hemp-derived CBD products in the U.S. and nineteen other countries.

25.     Since July 2018, Tilray's shares have traded on the NASDAQ under ticker TLRY. As of the beginning of the Class Period, investment fund Privateer Holdings, Inc. held shares accounting for approximately 82% of the economic interest in, and 93% of the voting power over, Tilray. Tilray was thus a "controlled company" under NASDAQ rules.

26.     Defendant Brendan Kennedy has served as Tilray's President and Chief Executive Officer, and a member of its Board, since January 2018, and Chief Executive Officer of Tilray's Canadian subsidiary since 2018. Kennedy also served as Privateer's Executive Chairman from its founding in 2011 through its dissolution in December 2019. Kennedy has worked exclusively in the cannabis field since 2011. Until Privateer's dissolution, Kennedy and two of his longtime friends held a majority of Privateer's voting power which, in turn, held a majority voting interest in Tilray. Thus, Kennedy and his friends held indirect voting control over Tilray.

## IV.     IMPORTANT NON-PARTIES

27.     Former Employee 1 ("FE 1") worked as a Senior R&D Manager at Privateer from April 2017 to November 2018. In November 2018, FE 1 and other Privateer were transferred to Tilray. FE 1's new title was Senior Program Manager, but FE 1's responsibilities did not change. FE 1 worked for Tilray until March 2020. FE 1 reported to Engineering Manager Brent Harrison, who reported to Drew Reynolds, Executive Vice President of Operations Expansion, who reported to Kennedy.

28.     Former Employee 2 ("FE 2") served as Tilray's Senior Manager of Purchasing in Toronto from October 2019 through May 2020. FE 2 reported to Steve Hatami, a Tilray Vice President, who reported to Greg Christopher, Tilray's Executive Vice President of Operations, who reported to Kennedy. FE 2's responsibilities included procurement for Tilray's four Canadian facilities.

29.     Former Employee 3 ("FE 3") served as a Tilray Vice President between February 2018 and October 2019. FE 3's duties included overseeing Tilray's business development outside of Canada. FE 3 was "heavily involved with strategic initiatives."

30.     In 2011, Kennedy, Michael Blue and Christian Groh ("Controlling Shareholders") founded Privateer Holdings, Inc. to invest in the then-illegal cannabis industry. In 2014, the three

launched Tilray's predecessor as a Privateer subsidiary, alongside a number of other cannabis-related companies. By the beginning of the Class Period (January 2019), Privateer had disposed of substantially all of its assets except Tilray shares.

31.    Between 2011 and 2017, Privateer raised hundreds of millions of dollars from outside investors. To secure these investments, the Controlling Shareholders relinquished about two-thirds of their economic interest in Privateer, while retaining majority voting control through supervoting Privateer shares.

## V.    BACKGROUND

32.    Marijuana, hemp, and their derivates all come from the same plant: *cannabis sativa*. Marijuana and hemp are not distinct plants but rather legal categories. By definition, *cannabis sativa* that contains (by weight) less than 0.3% THC is hemp; *cannabis sativa* that contains more than 0.3% is marijuana. This Complaint uses "marijuana" and "hemp" to refer to each legal category seperately, and "cannabis" to refer to both collectively.

33.    In December 2018, the U.S. Farm Bill removed hemp from the list of controlled substances, but not marijuana.

34.    The different legal treatment creates a vast gulf between hemp and marijuana. While the federal prohibition against marijuana is rarely enforced, it remains a controlled substance. Because of that federal prohibition, companies that sell products made from marijuana plants in the U.S. ***even in states that have legalized their sale*** face substantial obstacles obtaining bank loans or other services from large banks or, like Tilray, listing on a national securities exchange. For that reason, Tilray cannot violate federal law to sell marijuana products in states where it is legal, even though as a practical matter it would not face prosecution.

35.     THC is concentrated in the marijuana plant's flowers and buds. Because marijuana plants are grown for their THC, producers typically use the marijuana plant's flower and buds to make sellable products for medical or recreational uses.

36.     Cannabis plants also have leaves, stalks, twigs, and stems. These byproducts of the cannabis plant are called "trim" in the industry. Marijuana plant trim is generally considered waste. It contains too little THC to be smoked, is federally prohibited in the U.S., and until December 2019, could not lawfully be used in edibles, foods, beverages, or other products in Canada.

37.     Cannabis plants also contain cannabidiol, commonly known as CBD. Producers can use industrial processes to make CBD oil, which can then be added to foods, topical lotions and oils, and other products. Many consumers believe that CBD has positive medical benefits.

38.     Producers derive CBD from hemp plants. CBD can be extracted from hemp plant's stems and seeds, in addition to its flower. Producers can in theory derive CBD from marijuana plants, but marijuana has less CBD and is federally prohibited in the U.S. Tilray did not use any part of its marijuana plants to make adult use CBD. According to FE 2, Tilray produced its CBD oils from hemp sourced from a Canadian company, B.C. Hemp.

39.     The sole significant regulatory obstacle to the use of hemp-derived CBD is that its addition to an FDA-regulated product may, in the FDA's view, adulterate the product.

## VI.     DEFENDANTS OVERSTATE TILRAY'S MARGINS AND THE VALUE OF THE ABG AGREEMENT

### A.     Investors Focused On Tilray's Gross Margins

40.     Gross margins, a critical metric for small but growing company like Tilray, measure how much money a company makes on each product it sells. Gross margin is defined as net revenue minus cost of sales divided by net revenue.

41.     Cost of sales is an accounting measure that includes all the costs directly related to manufacturing and selling products but excludes all other costs, such as indirect overhead and sales and marketing costs. The two main components of cost of sales are materials and labor.

42.     Gross margins are relatively sticky or static. Unlike overhead, cost of sales tend to grow proportionally with revenues.[2] Put another way, there are few economies of scale in cost of sales, but there are many economies of scale in general overhead because it is largely composed of fixed costs.

43.     Defendants recognized that investors closely monitored Tilray's gross margins. Non-Defendant Tilray CFO Castaneda consistently ended the prepared remarks portion of earnings calls by calling attention to two key metrics that, he said, made Tilray an attractive investment. One was his claim that Tilray would reach and sustain gross margins of more than 50% over the long term.

44.     The last reported results in Tilray's IPO were those for Q1 2018. In that quarter, Tilray's gross margins were 55%. Tilray's gross margins fell to 46% in Q2 2018, the first quarter it announced after its July 2018 IPO, and to a mere 31% in Q3 2018, the last quarter before the Class Period.

45.     Tilray's low gross margins drew analyst concern. In a March 8, 2019 report, a Jefferies analyst initiated coverage of Tilray at a rating of Underperform – the only such rating Jefferies had issued in the past 12 months. The Jefferies analyst gave Tilray the poor rating in part because its cost of sales "appears [to be] one of the least efficient" of similar companies, behind peers Canopy and Aurora.

---

[2] Ryan Caldbeck, *5 reasons gross margin is so important to investors & brands*, June 12, 2013, available at https://www.newhope.com/managing-your-business/5-reasons-gross-margin-so-important-investors-brands; Villi Iltchev, *Why Gross Margins Matter*, November 21, 2019, available at https://twosigmaventures.com/blog/article/why-gross-margins-matter/

46.     Understanding that Tilray's poor gross margins disturbed investors, during the Class period, Defendants deceived investors by both overstating inventory and understating labor costs (both inputs to cost of sales) – thus overstating gross margins.

**B.     Defendants Overstated Tilray's Gross Margins**

*1.     Defendants Understated Cost of Sales by Excluding Labor and Materials*

47.     FE 1 had a variety of responsibilities at Tilray. In 2018 through a portion of 2019, FE 1's work focused on high-level planning. FE 1 developed processes to account for Tilray's cost of sales. FE 1's responsibility was to take particular products and, for each product, determine and price the various materials and labor that went into making the product. The resulting report, called a Bill of Materials, allowed Tilray to determine its cost of sales for particular products and, thereby, its overall cost of sales.

48.     In 2019, as the Bills of Materials were developed for each product, FE 1's role shifted to developing and supervising Tilray's processes that ensured that Tilray employees would accurately enter costs of materials and labor into Tilray's system.

49.     According to FE 1, Tilray consistently understated the costs of the labor incurred in creating its products. FE 1 reports that Tilray's Technology Manager, Ontario Operations, who oversaw data entry in connection with the Bills of Materials, costs of sales, and inventory accounting, gave his employees improper instructions on entering data. Though FE 1 was "very vocal" about the incorrect directions, neither the Technology Manager nor anyone else at Tilray corrected the directions.

50.     These directions were frequently obviously wrong. For example, FE 1 observed a Toronto-based employee responsible for cost accounting exclude the costs of labor from costs of sales. FE 1 then corrected the employee. Confronted, the employee rationalized that the amount must have been small because it consisted of a few seconds for each labor step. FE 1 responded to

11

the employee that these costs were significant; while any individual employee might spend only a few seconds on each product, because Tilray produced product on an assembly line, the labor of many employees would be required for each finished product. In fact, FE 1 told the employee, Tilray had about a dozen employees working full time on a manufacturing line making that particular product, not to mention all the other employees involved in the process of manufacturing it. FE 1 said that aggregated labor costs were a "true and direct cost" that must be included in the cost of finished products. But, acting on instructions from the Technology Manager, the employee continued to exclude labor costs.

51.     FE 1's concerns that Tilray was not including costs of labor were particularly acute when it came to pre-rolled marijuana cigarettes, called "pre-rolls". According to FE 1, beginning in the last quarter of 2018, Tilray started accumulating millions of pre-rolls. Pre-rolls are "super labor-intensive" and "sell cheap". Because they cost a lot in labor but sell at a low price, excluding labor costs substantially overstates the pre-rolls' profitability. FE 1 is certain that Tilray artificially lowered the pre-roll's cost of sales because FE 1 used Tilray's software to look up cost of sales for the pre-rolls. FE 1 then saw that the labor costs Tilray reported were substantially lower than those FE 1 had established.

52.     Yet the flawed Bills of Materials FE 1 helped create were the foundation of Tilray's financial reporting. According to FE 1, to prepare financial statements, Tilray first exported financial information from the specialized software in which FE 1 stored it into an Excel spreadsheet. Tilray then used the Excel spreadsheet as the starting point to generate financial statements. Thus, the errors in the Bills of Materials would carry over into the financial statements.

53.     According to FE 1, the costs that had not been correctly entered as costs of sales were instead improperly recorded as general and administrative expenses (indirect overhead) to

make the financial statements balance. Classified as overhead, the costs would not be worrying. Investors would assume the costs would not grow proportionally with revenues.

54.     FE 1 raised internal alarms about Tilray's inaccurate financial statements. FE 1 told FE 1's boss Steve Hatami that because the Bills of Materials did not include all costs, using them to generate financial statements would understate cost of sales – or, as FE 1 told Hatami, "garbage in, garbage out." Hatami then repeatedly swore at FE 1.

55.     FE 2 corroborates FE 1's account. FE 2 cites an example of obsolete product recorded as valuable inventory. According to FE 2, Tilray purchased a variety of custom formulated oils, which were oils containing precise specifications of THC and CBD oil mixes and potencies. The formulated oils were not generic ingredients and could not be reused in other products. In 2019, Tilray accumulated "single digit millions of Canadian dollars" (about $750,000-$7,500,000) of formulated oils to use in its wellness brand products. Tilray then "killed the brand" and, indeed, abandoned formulated oils altogether. Yet Tilray continued to classify the formulated oils as inventory on its financial statements at the cost of acquisition. Because the formulated oils had no resale value and no use, they should not have been recorded as inventory at all.

   2.     *Defendants Understated Cost of Sales By Recording Worthless Waste As Valuable Byproduct*

56.     Manufacturing creates intermediate and sellable products. Often, these products are not sold or finished before the close of the reporting period. The unsold and unfinished products are recorded on financial statements as inventory at the lesser of the costs of production or the net realizable value.

57.     The formula for cost of sales reflects that some of the valuable immediately sellable product created in a particular period may still be in inventory when the period closes. Thus, the formula for costs of sales is: (1) Inventory at beginning of reporting period (2) *minus* inventory at

13

end of reporting period (3) *plus* direct labor, direct materials, and direct overhead (e.g. commissions) attributed to sold products.

58.     During its 2019 fiscal year, Tilray accumulated more than $100 million  in inventory on its financial statements. According to both FE 1 and FE 2, much of Tilray's inventory consisted of unsellable waste.

59.     In December 2019, FE 1 made two trips to Tilray's Ontario, Canada facilities. While there, FE 1 was asked questions by employees of Tilray's finance department. FE 1 was told by these employees that Tilray had accumulated in inventory very large quantities of unusable materials.

60.     FE 1 learned that many of the products had never been worth anything in the first place. Tilray's production of marijuana generated substantial "end of run" materials, meaning leftover raw materials that cannot be used in the manufacture of additional products – i.e., trim.

61.     FE 1 personally saw the materials. In a visit to Tilray's warehouses, FE 1 observed kilograms and kilograms of trim "sitting on a shelf." There were "bags and bags, boxes and boxes" of end-of-run materials. Moreover, unlike with its other products, Tilray did not provide any information internally about the value of these products. Instead, Tilray internally recorded the inventory at an "unknown, unspecified value." The items usually had no value assigned to them in Tilray's internal systems.

62.     With no way to sell these end of run materials from marijuana plants, Tilray should have classified them as waste. Thus, for example, if it costs Tilray $10 in materials and labor to create one gram of sellable marijuana, but the process also creates unsellable trim, Tilray should record the marijuana in its inventory as the lesser of $10 or the amount of money it can make by selling it. Then, if the gram were later sold for $10, Tilray should debit the inventory by $10.

63.     But while Tilray did not value the trim for internal purposes, it recorded a value for them on its financial statements. In fact, Tilray ultimately recorded *more than $40 million of marijuana plant trim* in its Q3 2019 financial statements.

64.     By misclassifying trim, Defendants embellished Tilray's financial performance. As a matter of accounting, every dollar of inventory on Tilray's financial statements is subtracted from its cost of sales. The following table shows how improperly attributing value to the end-of-run waste materials will inflate gross margins and inventory values, if Tilray produced two grams of marijuana and was able to sell one while recording the value of the end-of-run materials as $5.

| Realizable price of marijuana | Action | Revenue | Inventory | Cost of Goods Sold | Gross Margin |
|---|---|---|---|---|---|
| $20 | Treating trim as waste per GAAP | $20 | $10 | $20 | $33^{1/3}$% |
| | Falsely treating trim as inventory | $20 | $15 | $15 | **57.1%** |
| $10 | Treating trim as waste per GAAP | $10 | $10 | $20 | 0% |
| | Falsely treating trim as inventory | $10 | $15 | $15 | **40%** |

65.     Tilray could never hope to sell its marijuana trim in the U.S. during any reasonable time frame. Under U.S. law, marijuana plants and any CBD derived from them are controlled substances. The marijuana trim that Tilray had accumulated could only lawfully be sold in the U.S. if and when the federal government legalized marijuana – which, during the Class Period, was not on the horizon. While that prohibition was almost never enforced in states in which marijuana was legal, Tilray's banking relationships and NASDAQ listing depended on compliance with federal law.

66.     During the Class Period, there was no market for marijuana trim in Canada, either. Canada planned to legalize marijuana in two steps. In the first step, which occurred before the

Class Period, Canada legalized the sale of marijuana buds and flowers, which are used to make marijuana cigarettes. Marijuana plant trim could not be used in edibles or beverages, topicals, or extracts, whether ingested or inhaled. In the second step, colloquially known as Cannabis 2.0, Canada would legalize the sale of these products.

67.     As Tilray explained in its 2019 10-K:

> [C]urrently, limited classes of cannabis, including dried cannabis and [CBD] oils, are permitted for sale into the medical and adult-use markets. New classes, including edibles, topicals, and extracts (both ingested and inhaled), are expected to be permitted on or before October 17, 2019[.]

68.     At the beginning of the Class Period, Canada had not scheduled the legalization of Cannabis 2.0 products. In July 2019, Canada scheduled that legalization for December 2019. Before then, there was no market for marijuana plant trim.

69.     GAAP prohibits companies from recording inventory that has no immediate use. Products that may develop a use in the future should be recorded as a contingent asset. "A contingency that might result in a gain usually should not be reflected in the financial statements because to do so might be to recognize revenue before its realization." ASC 450-30-25-1. To record assets that might have a value in the future misleadingly conceals that for a variety of reasons, a market might never even develop. Thus, none of the financial statements Tilray filed during the Class Period could recognize trim as inventory.

**C.     Defendants Misleadingly Characterize an Investor Relations Stunt As A Major Accomplishment**

*1.     Tilray Agrees To Pay ABG $100 Million To Prop Up Its Share Price*

70.     On January 14, 2019, Tilray reached a co-branding agreement with Authentic Brands Group, LLC ("ABG" and "ABG Agreement"). ABG owns and co-markets 50 leadings brands throughout the world, including Juicy Couture, Brooks Brothers, Shaquille O'Neal, and

Elvis Presley. When Tilray signed the ABG Agreement, ABG's brands did not offer cannabis or CBD-related products. According to Tilray, the ABG Agreement's purpose was to expand ABG's brands into cannabis- and CBD-related products throughout the world.

71.     The ABG Agreement's principal terms were:

a.     Tilray initially pays ABG $100 million in cash and stock, and up to $150 million in future consideration ("Additional Tilray Consideration");

b.     Tilray is ABG's preferred supplier of cannabis and CBD-related ingredients;

c.     Tilray receives up to 49% of net revenue from cannabis products bearing ABG's brands' names, with a guaranteed annual minimum payment of $10 million ("Revenue Interest");

d.     Unless and until Tilray pays the full Additional Tilray Consideration, Tilray's Revenue Interest will be reduced by the percentage of unpaid total consideration. Thus, for example, if Tilray did not pay any Additional Tilray Consideration, then Tilray would only receive 40% of the Revenue Interest, or about 12% of the net revenue. The guaranteed minimum annual payment would be $4 million.

72.     In Q1 2019, Tilray invested $33 million in Additional Consideration.

73.     FE 3 reports that the ABG Agreement was proposed, negotiated, and closed in literally a matter of days. Further, according to FE 3, only two Tilray representatives, one of whom was Defendant Kennedy, negotiated the ABG agreement. These representatives barely consulted with anyone else at Tilray. FE 3 called Tilray's due diligence into the ABG Agreement "very irresponsible." According to FE 3, the main reason Kennedy had entered into the ABG Agreement to "prop up Tilray's stock [price]" by "mak[ing] a big splash."

74.     Mere days are not enough to consider and negotiate, and conduct due diligence on, a complex licensing agreement requiring Tilray to pay a minimum of $100 million.

75.     The timing of the ABG Agreement supports FE 3's account of its purpose. In connection with Tilray's IPO, pre-IPO investors signed lock-up agreements preventing them from selling their shares for 6 months. The lock-up expired before trading on January 15, 2019. The newly-released shares nearly doubled Tilray's existing public float.[3] On January 15, Tilray's stock price fell by 17% on volume three times higher than the previous day's. That very day, after trading, Tilray announced the ABG Agreement. The announcement of the ABG Agreement arrested the fall.

76.     According to FE 3, it was "immediately very clear" that the ABG Agreement was not worth what Tilray had paid for it. Tilray's own branding employees "push[ed] back" on the deal, asking "what are we going to do?" with ABG brands. Indeed, according FE 3, it was apparent the ABG Agreement was "never going to bear fruit" the "second the deal was signed." According to FE 3, the eventual write-off had nothing to do with the U.S. regulatory market.

>    2.     *The ABG Agreement Appears to Be the Realization of Tilray's Goals*

77.     For years, Kennedy has been telling the public that the future of cannabis companies, and of Tilray in particular, is branded products. Kennedy told volteface, an industry publication, as early as March 2016:

>    Brands are everything.[] Brands are how you win. Any consumer will choose a branded product over something in a plastic baggy. Brands inspire confidence and trust. Brands imply legitimacy. They reduce barriers to change. They give comfort to consumers. People are looking for a product which is safe, properly labelled, and consistent from experience to experience.

78.     Kennedy continued to express the view that the future of the cannabis industry is branded products. For example, Kennedy told Market Watch in an interview published on July 22, 2018 that:

>    It is still day one in the industry, that's how we think about it. And the challenge that we faced with some investors is how this industry is going to change. I like to

---

[3] Not counting Tilray shares held by Privateer, as it had publicly stated it would not sell its shares.

say Ziploc is the biggest brand in the cannabis industry and over the next few years you're going to see that change, you're going to see real brands and real companies.

79.     Indeed, to hear Kennedy tell it, there is little money to be made by growing cannabis. To take just one example, in a September 18, 2018 appearance on Mad Money, Kennedy told the host:

> Q: You know that all the addition in cannabis when we saw it happen in Oregon, prices went through the floor. It's the cheapest in America. You're not concerned that with all of the different supply coming on, that you could have a considerable collapse even in Canadian prices?
>
> **Defendant Kennedy:** No, it's like valuing ABI [a beer company] on the price of wheat. ***Cannabis is a raw material. It is an ingredient that we use in these branded products. You're not going to see the commoditization of the finished product in the brands.*** You'll see price segmentation, value brands, premium brands, but you won't see commoditization of the brands across the spectrum.

80.     Thus, the ABG Agreement was critical to investors because it seemed to show that Tilray was creating successful branded products.

## VII.    FALSE STATEMENTS

81.     The Class Period begins on January 16, 2019. The previous day, after close of trading, Tilray announced that it had entered into the ABG Agreement.

82.     In a press release announcing the ABG Agreement, Defendants stated:

> NANAIMO, B.C. – Today, Tilray, Inc. (NASDAQ: TLRY), a global pioneer in cannabis production and distribution, and Authentic Brands Group (ABG), an owner of a portfolio of global lifestyle and entertainment brands, announced that they have signed a long-term revenue sharing agreement to market and distribute a portfolio of consumer cannabis products within ABG's brand portfolio in jurisdictions where regulations permit.
>
> *         *         *         *         *
>
> "We are thrilled to partner with ABG, a global leader known for expertly managing and marketing an owned portfolio of iconic brands," said Brendan Kennedy, Tilray President and CEO. "As we work to expand Tilray's global presence, ***this agreement leverages our complementary strengths and will be accretive to our shareholders*** as we reach new consumers across the entertainment, fashion, beauty, home and health and wellness sectors. We look forward to working with ABG to bring unique and sought-after branded cannabis products to the marketplace."

83.     Kennedy's statements were misleading because: (a) reasonable investors would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days, all to prop up Tilray's stock price; (b) Defendants understood that the ABG Agreement would not be accretive but would instead have to be impaired (i.e. written down on Tilray's financial statements); (c) the ABG Agreement did not leverage Tilray and ABG's strengths, but instead was a one-sided giveaway to ABG; and, therefore, (d) Defendant Kennedy's statements gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

84.     A January 16, 2019 article in the Financial Post quoted Kennedy as saying:

"The reason we signed this agreement is because we're getting a global license to use these very iconic brand names*. That fits into our strategy of valuing brands — we believe brands matter and are the future of this industry,*" Tilray CEO Brendan Kennedy told the Financial Post.

*"They liked our focus on research and science, and when the U.S. Farm Bill passed [on December 20, 2018], things started coming together,"* Kennedy said.[4]

85.     Kennedy's statements were false or misleading because: (a) there were no discussions of the ABG Agreement before the U.S. Farm Bill; (b) the ABG Agreement was not proposed until mere days before January 14; (c) it is not possible to adequately consider, negotiate, and conduct due diligence on, a $100 million agreement in mere days; and, therefore, (d) Defendant Kennedy's statements gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence

86.     On March 18, 2019, Tilray held a call to discuss its Q4 2018 earnings. On that call, Defendant Kennedy stated that *"[o]ur revenue sharing agreement with Authentic Brands Group (ABG) is a long-term partnership designed to leverage ABG's portfolio of more than 50 of the*

---

[4] Kennedy tweeted a link to the article from his personal twitter account.

*world's most iconic brands, as well as their extensive distribution network across North America.*"

87.     Kennedy's statements were misleading because: (a) reasonable investors would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days to prop up Tilray's stock price; (b) the ABG Agreement did not leverage ABG's portfolio, but instead was a one-sided giveaway to ABG; and, therefore, (c) Defendant Kennedy's statements gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

88.     On March 25, 2019 Tilray filed its 10-K for the year ended December 31, 2018 ("2018 10-K"). Kennedy signed the 2018 10-K.

89.     The 2018 10-K falsely stated:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

**Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation.** At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

90.     The financial statements published in the 2018 10-K also reported the following financial metrics for the year ended December 31, 2018:

| Revenue | $43.1 million |
|---|---|
| Cost of Sales | $28.9 million |
| Gross margin ($) | $14.3 million |
| Gross margin (% of revenue) | 33% |
| Inventory | $16.2 million |
| General & administrative expenses ($) | $31.3 million |
| General & administrative expenses (% of revenue) | 73% |

91.     Defendants' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e), Defendants overstated both Tilray's inventory and gross margins.

92.     On May 14, 2019, Tilray held a call to discuss its Q1 2019 earnings ("Q1 2019 Earnings Call").

93.     On the call, Defendant Kennedy volunteered that Defendants' ability to convince ABG to do business with Tilray was evidence that consumer packaged goods companies saw Tilray as an attractive partner:

Q:  [] Just thinking about it from a perspective of a CPG [consumer packaged goods] company, evaluating the cannabis opportunity. What do you feel are the

advantages or merits for a CPG company to partner with a Canadian-licensed producer versus considering a strategy such as leveraging offtake from a more dedicated extraction company and then just using their own CPG brands for whether it's with the U.S. CPG market or other markets out there.

**Defendant Kennedy:** *[W]e know how to partner well not only with pharmaceutical and alcohol companies but with companies like Authentic Brands Group that own over 50 iconic brands. They went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone.*

94.     Kennedy's statements misleading because: (a) reasonable investors would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days to prop up Tilray's stock price; (b) ABG did not vet Tilray, but instead, the ABG Agreement was proposed, negotiated, and closed within a matter of days, and therefore there was no time to vet Tilray; (c) ABG did not vet Tilray because Tilray's offer was so generous that it would have been crazy for ABG not to agree; and therefore, (d) Defendant Kennedy's statements gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

95.     On May 15, 2019, Tilray filed its 10-Q for Q1 2019 ("Q1 2019 10-Q"). Kennedy signed the Q1 2019 10-Q.

96.     The Q1 2019 10-Q falsely stated:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

23

***Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation***. At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

97.     The Q1 2019 10-Q stated that:

***Inventory is written down for any obsolescence or when the net realizable value of inventory is less than the carrying value***. For the three months ended March 31, 2019, the Company recorded write-downs within work-in-process of $1,626[,000] in cost of sales. There were no write-downs in cost of sales for the comparable period in 2018.

98.     The financial statements set out in the Q1 2019 10-Q also reported the following financial metrics for the quarter ended March 31, 2019:

| | |
|---|---|
| Revenue | $23.0 million |
| Cost of Sales ($) | $17.7 million |
| Gross margin ($) | $5.4 million |
| Gross margin (% of revenue) | 23% |
| Inventory | $48.7 million |
| General & administrative expenses ($) | $12.8 million |
| General & administrative expenses (% of revenue) | 56% |

99.     Defendants' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim

could not be sold in the ordinary course of business; and (f) as a result of (a)-(e) Defendants overstated both Tilray's inventory and gross margins.

100.    In its Q1-Q3 2019 10-Qs, Tilray recorded the value of the ABG Agreement as the consideration Tilray paid for it. Tilray recorded the majority of the value of the agreement as an intangible asset with an indefinite life.[5]

101.    The Q1 2019 10-Q provided that:

> As of March 31, 2019, the Company recorded an intangible asset with indefinite life in the amount of $151,096[,000] for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of this intangible asset was calculated as the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. As of March 31, 2019, the Company recorded a deferred tax liability of $31,730[,000] relating to this intangible asset.

102.    GAAP provision ASC 350-30 governs accounting and financial reporting of intangible assets.

103.    GAAP provision ASC 360-35-18 directs that "[a]n intangible asset that is not subject to amortization shall be tested for impairment annually and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired."

104.    To test for impairment, GAAP provision ASC 360-35-18B directs that companies shall "assess all relevant events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite-lived intangible asset." After the examination, if the company determines that it is more likely than not that impairment was warranted, the company should proceed to a quantitative evaluation of the amount of impairment.

105.    GAAP then directs a quantitative test, which is set out in ASC 360-35-19: [6]

---

[5] The value of the guaranteed payments was recorded as a combination of assets and equity.

[6] Similarly, Tilray's impairment policy, set out in each of the Q1-Q3 2018 10-Qs, provided that:

> Goodwill and indefinite life intangible assets are tested for impairment annually, or more frequently when events or circumstances indicate that impairment may have occurred. As

The quantitative impairment test for an indefinite-lived intangible asset shall consist of a comparison of the fair value of the asset with its carrying amount. If the carrying amount of an intangible asset exceeds its fair value, an entity shall recognize an impairment loss in an amount equal to that excess. After an impairment loss is recognized, the adjusted carrying amount of the intangible asset shall be its new accounting basis.

106.    Thus, Defendants' statements were false and misleading because: (a) as set out above, Defendants were aware of facts showing and understood that the ABG Agreement was worth less than Defendants paid for it; (b) as a result, ASC 360-35-18 required Defendants to test for impairment, ASC 360-35-18B required Defendants to run a quantitative test for impairment, and ASC 360-35-19 required Tilray to impair the ABG Agreement by $102.6 million; (c) Defendants' failure to impair the ABG Agreement gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

107.    On August 13, 2019, Tilray held a call to discuss its Q2 2019 earnings ("Q2 2019 Earnings Call").

108.    There, Defendants continued to reassure investors that the ABG agreement was bearing returns. In prepared remarks, Defendant Kennedy stated:

Our strategic partnership with Authentic Brands Group, which we announced in Q1, continues to build momentum with our first product launch planned for the second half of the year in the United States. ***The ABG partnership is a first of its kind deal leveraging ABG's portfolio of more than 50 of the world's most iconic brands for the global CBD market.***

---

part of the impairment evaluation, the Company may elect to perform an assessment of qualitative factors. If this qualitative assessment indicates that it is more likely than not that the fair value of the indefinite-lived intangible asset or the reporting unit (for goodwill) is less than its carrying value, a quantitative impairment test to compare the fair value to the carrying value and record an impairment charge if the carrying value exceeds the fair value is conducted.

109.    Kennedy's statements were misleading because: (a) reasonable investors would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days to prop up Tilray's stock price; (b) Defendants understood that the ABG Agreement would not be accretive but would instead have to be impaired (i.e. written down on Tilray's financial statements); (c) the ABG Agreement did not leverage ABG's portfolio, but instead was a one-sided giveaway to ABG; and, therefore, (d) Defendant Kennedy's statements gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

110.    About inventory, Defendant Kennedy stated:

> **We're building inventory as we await [] GMP [Good Manufacturing Practices] licenses [for the Portugal operations]** and we'll continue to harvest on a weekly and monthly basis and build inventory until we have those additional GMP certifications.

111.    Kennedy's statements were misleading because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e) whatever small amounts of inventory Tilray accumulated in Portugal paled next to Tilray's huge inventory buildup from improperly recognizing marijuana plant trim as inventory.

27

112.     On August 13, Tilray filed its 10-Q for the quarter ended June 30, 2019 ("Q2 2019
10-Q"). Kennedy signed the Q2 2019 10-Q.

113.     The Q2 2019 10-Q provided:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such
as pre-harvested cannabis plants and by-products to be extracted. The costs of
growing cannabis including but not limited to labor, utilities, nutrition and
irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using
weighted    average    cost.    Cost    includes expenditures directly    related    to
manufacturing and distribution of the products. Primary costs include raw
materials, packaging, direct labor, overhead, shipping and the depreciation of
manufacturing equipment and production facilities determined at normal capacity.
Manufacturing overhead and related expenses include salaries, wages, employee
benefits, utilities, maintenance and property taxes.

**Net realizable value is defined as the estimated selling price in the ordinary
course of business, less reasonably predictable costs of completion, disposal and
transportation.** At the end of each reporting period, the Company performs an
assessment of inventory obsolescence to measure inventory at the lower of cost or
net realizable value. Factors considered in the determination of obsolescence
include slow-moving or non-marketable items.

114.     The financial statements set out in the Q2 2019 10-Q reported the following
financial metrics for the quarter ended June 30, 2019:

| Revenue | $45.9 million |
|---|---|
| Cost of Sales ($) | $33.6 million |
| Gross margin ($) | $12.3 million |
| Gross margin (% of revenue) | 27% |
| Inventory | $75.3 million |
| General & administrative expenses ($) | $16.5 million |
| General & administrative expenses (% of revenue) | 36% |

115.     Defendants' statements were false because: (a) Tilray recognized marijuana plant
trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray
could not recognize marijuana plant trim as inventory because there was no immediate use for it;
(d) marijuana plant trim might never become sellable if, for example, Canada did not legalize

28

marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e), Defendants overstated both Tilray's inventory and gross margins.

116.    The Q2 2019 10-Q also provided that:

As of June 30, 2019, the Company recorded intangible assets with indefinite life in the amount of $119,366[,000] for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of these intangible assets was calculated using the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. During the three months ended June 30, 2019, the Company reversed the deferred tax liability of $31,730[,000] that should not be recorded as part of these intangible assets.

117.    Defendants' statements were false because: (a) as set out above, Defendants were aware of facts showing and understood that the ABG Agreement was worth less than Defendants paid for it; (b) as a result, ASC 360-35-18 required Defendants to test for impairment, ASC 360-35-18B required Defendants to run a quantitative test for impairment, and ASC 360-35-19 required Tilray to impair the ABG Agreement by $102.6 million; (c) Defendants' failure to impair the ABG Agreement gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

118.    In addition, ASC 360-35-18B provides a non-exhaustive list of factors to consider in determining whether to impair assets, which includes:

c. Legal, regulatory, contractual, political, business, or other factors, including asset-specific factors that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset

*       *       *       *       *

29

e. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers), or a change in the market for an entity's products or services due to the effects of obsolescence, demand, competition, or other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing business environment, and expected changes in distribution channels) that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset

119.    In Q4 2019, Tilray would impair the ABG Agreement by $102.6 million citing the impact of regulatory uncertainty on potential CBD sales.

120.    Both the regulatory uncertainty and the impact existed when Tilray issues its Q2 2019 financial statements. On the Q2 2019 call, Defendant Kennedy explained that a majority of stores were not purchasing CBD in light of FDA regulatory uncertainty:

Q: Okay. Great. And I was just also hoping for potentially more color in terms of how you guys see the ramp on the CBD side in the US in the back half of the year.

**Defendant Kennedy**: So the ramp will be somewhat dependent upon how much clarity the FDA does give. ***We do see a lot of the major retailers holding off, especially on the ingestible products, until they have more clarity***. As that clarity comes in the second half, we see significant ramp in the second half of the year. If it does not, we see a much slower ramp on the CBD side for again, on ingestible side.

121.    Even if Tilray did not need to impair the ABG Agreement on its Q1 2019 10-Q, it would still have to impair it on the Q2 and Q3 2019 10-Qs. Though there would be no change in the FDA's position between August 2019 and March 2020, Tilray would impair the ABG Agreement in Q4 2019 because of regulatory uncertainty from the FDA. Because the conditions constituting the "regulatory uncertainty" that served as Tilray's excuse to impair the ABG Agreement already existed in August 2019, Tilray was required to impair the agreement in the Q2 2019 10-Q. For this additional reason, Tilray's failure to impair the ABG Agreement misled investors.

122.     On November 12, 2019, Tilray filed its Q3 2019 for the three months ended September 30, 2019 ("Q3 2019 10-Q") and held a call to discuss its Q3 2019 earnings ("Q3 2019 Earnings Call").

123.     The Q3 2019 10-Q provided that:

As of June 30, 2019, the Company recorded intangible assets with indefinite life in the amount of $119,366[,000] for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of these intangible assets was calculated using the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. During the three months ended June 30, 2019, the Company reversed the deferred tax liability of $31,730[,000] that should not be recorded as part of these intangible assets.

124.     Defendants' statements were false because: (a) as set out above, Defendants were aware of facts showing and understood that the ABG Agreement was worth less than Defendants paid for it; (b) as a result, ASC 360-35-18 required Defendants to test for impairment, ASC 360-35-18B required Defendants to run a quantitative test for impairment, and ASC 360-35-19 required Tilray to impair the ABG Agreement by $102.6 million; (c) Defendants' failure to impair the ABG Agreement gave investors the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

125.     The statement was also false for the reasons set out in ¶121 above, namely that the regulatory uncertainty and its consequences that caused Tilray to impair the ABG Agreement in Q4 2019 already existed in Q3 2019.

126.     Moreover, in Q3 2019, Tilray made it very clear that it was well aware of the regulatory uncertainty and its consequences and was adjusting its financial metrics to take it into account.

127.     In the question-and-answer portion of the Q3 2019 Earnings Call, Castaneda stated that "[l]ooking at the revenue ramp for really more 2020 there's very little US CBD in those numbers. So [any U.S. CBD revenues] would primarily be upside." At the close of the earnings

call, Castaneda added "[t]he CBD internally our models are pretty conservative just because we are waiting for the FDA."

128.    Asked about the US CBD market, Castaneda stated:

Yes. So, on just the – we kind of bifurcate the food versus the CBD. And the CBD internally our models are pretty conservative just because we are waiting for the FDA. And we do believe that with FDA clearance that will be a step change. We just can't – we don't know what that timing is.

***So we're modeling pretty conservatively for 2020 for US CBD. Until we have that regulatory change, we are not going to adjust our numbers up.***

129.    But Defendants gave the misleading impression that they were working around the regulatory uncertainty in the U.S. CBD market. Kennedy said in prepared remarks that "Tilray is also working with ABG to commercialize other brands in Europe, by early 2020." Kennedy also said that "[w]e will continue to build a platform of brands and products through acquisitions and partnerships, such as [] Authentic Brands Group, [] which we expect to launch CBD products by the end of the year."

130.    Then, asked about the steps Tilray was taking to sell CBD in the US, Defendant Kennedy stated:

It's something that we are focused on building – continuing to build out the team that will execute on that strategy. There's still a lot of retailers in the US that will not – they will not buy or they won't sell, they won't stock products that contain CBD and are edible or digestible. And so nutritional supplements, dietary supplements. They're waiting for some clarification from the FDA. And that's where a large part of the market in the US is right now in terms of digestible products. And so, they're sort of at the starting block waiting to be able to sell those products.

***On the other hand, there are retailers who are interested in selling topical products that contain CBD. It's why with the ABG agreement the first product that we are introducing there are topicals.*** And then generally the smaller retailers in the US, some of the smaller sort of health and wellness focused grocery retailers, are stocking some digestible edible CBD products. But it's still growing gradually. And so, we are out meeting with those buyers and introducing them to the ABG [] products. But even they are waiting a bit to see what sort of clarification comes from the FDA.

32

131.    Thus, even if Tilray did not need to impair the ABG Agreement on its Q1 or Q2 2019 10-Qs, it would still have to impair it on the Q3 2019 10-Q because: (a) Defendants stated that Tilray did not expect significant US CBD sales in 2020 and that this prediction was incorporated into its financial model; (b) GAAP requires companies to impair intangible assets when they know facts showing that the discounted cash flows from the asset are less than the asset's carrying value; (c) Defendants did not impair the ABG Agreement; (d) Defendants would cite exactly the same facts to impair the value of the ABG Agreement in Q4 2019 which they cited in Q3 2019; (e) Defendants stated that Tilray and ABG would among other things shortly introduce ABG-branded products in the EU and topical products in the U.S.; and therefore (f) Defendants gave the misleading impression that the delays in the CBD market in the U.S. did not materially reduce the value of the ABG Agreement.

132.    Analysts were encouraged by the disclosures. A Cantor Fitzgerald analyst wrote in a November 15, 2019 report that "[w]e have an outperform rating on [Tilray]. We believe that access to strong and established U.S. brands [] position[s] [Tilray] to capitalize on the industry's robust growth."

133.    On November 12, 2019, Tilray filed its Q3 2019 10-Q. The Q3 2019 10-Q provided:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

***Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and***

33

*transportation.* At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

134.    The Q3 2019 10-Q set out the following financial metrics:

| Revenue | $51.1 million |
|---|---|
| Cost of Sales ($) | $35.2 million |
| Gross margin ($) | $15.9 million |
| Gross margin (% of revenue) | 31% |
| Inventory | $111.5 million |
| General & administrative expenses ($) | $20.0 million |
| General & administrative expenses (% of revenue) | 39% |

135.    Defendants' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e), Defendants overstated both Tilray's inventory and gross margins.

## VIII.   LOSS CAUSATION

### A.    Defendants Renegotiate the ABG Agreement

136.    On January 30, 2020, Defendants announced that Tilray had renegotiated the ABG Agreement. The renegotiated agreement released ABG from its obligation to make guaranteed minimum annual payments. Instead, the renegotiated agreement provided that ABG would ***not*** pay

the first $10 million that would otherwise be due under the ABG Agreement each year. Thus, Tilray would only start earning Revenue Interest when sales reached a level that would otherwise entitle it to $10,000,001 in payments from ABG. In exchange, ABG released Tilray from its obligation to pay Additional Consideration of $83.3 million in cash or stock. The news surprised the markets because Tilray had boasted that the guaranteed annual payments were a key provision that aligned ABG's incentives with Tilray's and suggested difficulties with the ABG Agreement.

137.    On January 30, 2020, the price of Tilray's shares fell from their previous close of $19.22 to close at $17.54, down 8.8%, damaging investors.

**B.     Defendants Impair the ABG Agreement By 86%, and Reduce the Value of Tilray's Inventory by 44%**

138.    On March 2, 2020, Tilray filed its 10-K for the year ended December 31, 2019, and held a conference call to discuss its Q4 2019 results ("Q4 2019 Statements").

139.    Tilray claimed in the Q4 2019 Statements that it had impaired the ABG Agreement by $102.6 million, or 85.9% of its value because of regulatory uncertainty in the U.S for CBD.

140.    The impairment surprised the market. As an analyst employed by Jefferies wrote in a March 3, 2020 report that the "Key Takeaway" from Tilray's Q4 2019 results was:

> **"Little to get excited about on Q4 with sales/[gross margin]/EBITDA all worsening sequentially, significant impairments on both inventories/ABG agreement [and two other factors]."**
> Later in the report, the Jefferies analyst commented: **"[t]rust ultimately needed for rerating:** [] [U]ltimately, we think Tilray also needs to address trust and credibility before re-rating. *We would flag [] universally positive comments before today on ABG[.]*"
> The analyst added that "the market is unlikely to believe until it sees."
> (first and second emphases in original; third emphasis added)

141.    In truth, Defendants impaired the ABG Agreement because it was a reckless $100 million throw of the dice, was proposed and negotiated and all due diligence completed in a few

days, and had only ever been worth a fraction of what Tilray paid for it, as Defendants had realized at the time.

142.    Tilray also reduced the value of its inventory as of December 31, 2019 by $68.6 million, or 44% of the value of the total inventory at the time.

143.    On March 3, 2020, the price of Tilray's shares fell from its previous close of $15.35 to close at $13.02, down 15.2%, damaging investors.

144.    On March 4, 2020, even as overall stock prices and the prices of other cannabis companies rose substantially, the price of Tilray's shares fell from its previous close of $13.02 to close at $12.51, down 3.9%.

145.    Summing up, an analyst employed by Cantor Fitzgerald wrote in a March 3, 2020 report that: "[w]e continue to think Tilray's disclosure is the worst among the Canadian [cannabis Licensed Producers] that we track."

## IX.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### A.    Kennedy Admits that Tilray Did Not Follow GAAP

146.    In Tilray's 2019 10-K filed March 2, 2020, Defendants explained that Tilray wrote inventory down because a market for marijuana oils did not develop after Canada legalized edibles and beverages in December 2019:

> We incurred inventory valuation adjustments primarily for cannabis oil products, which did not have the sell through opportunity, as many cannabis derivative products were not available for sale under the regulatory framework until December 2019, resulting in a significant accumulation of cannabis oil and cannabis by-product to be converted into oil. The total inventory valuation adjustment of $63.5 million (C$82.6 million) reflects our estimate of excess product based on current sales forecasts, which have been reduced from previous estimates due to the slower than expected transition of the Canadian adult use market than expected.

147.    Thus, Defendants admitted that they had been valuing trim as inventory based on an expectation that a market would develop, rather than based on the existence of a market.

148. Then, on May 11, 2020, after the close of the Class Period, Defendant Kennedy admitted that their recognition of byproduct as inventory meant Tilray's gross margins did not reflect its true "cost structure".

> The other thing that I would mention about our gross margins is that we'll probably see a little bit of pressure on that due to the fact that we're accounting for our byproduct on a zero basis. And so I guess *historically what's happened is that byproduct has been built up on the balance sheet and that's why there have been significant write-offs for us as well as for I guess in our industry, other industry players. And what we're doing is we're – except for a few instances, we are attributing zero value to that byproduct. So everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year.*

149. Kennedy's statement contains three admissions. First, Kennedy admits that Tilray had been valuing unsellable derivatives on its balance sheet with the hope that Tilray could sell it later if a market developed. Under GAAP, inventory cannot be recognized unless there is a currently existing market. Materials that might be sold if a market develops are contingent gains. Thus, Kennedy admits to violating GAAP. Second, Kennedy admits that Tilray's strategy had been to recognize byproduct as inventory and write it off at the end of the year. This policy, too, violates GAAP: the value of inventory must be measured every time it is placed on financial statements. And third, Kennedy admits that because of Tilray's policies, its cost of sales did not reflect its true "cost structure". Thus, Kennedy admits to two policies that violate GAAP and admits that the two policies make its financial statements misleading.

## B.     Tilray's "Favorite Metric" Is Extracts Revenue

150. Defendants fixated their attention on extracts and the byproduct used to produce them. In an August 2018 Reddit Ask Me anything discussion, Kennedy told investors that extracts revenue is Tilray's "favorite metric" and something it "pay[s] very close attention to":

> Question: If you would have to nominate your favorite financial metric that is of most importance to you and where you pay a lot of attention to, to get it right - which one would it be?

37

**Defendant Kennedy**: *Our favorite metric is extracts revenue. We believe that the future of both medical and adult use cannabis will be in various value-add, non-combustible form factors. So that's one metric we pay very close attention to* in addition to all of our other KPIs [Key Performance Indicators] discussed in our prospectus.

C.     **But for COVID-19, Defendant Kennedy's False Statements Would Have Given Him Control Over the World's Largest Cannabis Company**

*1.     Step 1: Defendant Kennedy Makes False Statements To Obtain Personal Control Over Tilray*

i.     Kennedy and Two Close Associates Control Tilray While Owning Less Than A Third of Tilray's Shares

151.     Even as Defendants made false statements, Kennedy contemplated and then entered into a transaction that would give him and the other two Controlling Shareholders personal control over Tilray while avoiding taxes.

152.     Defendant Kennedy, alongside friends and close associates Michael Blue and Christian Groh ("Controlling Shareholders"), founded Privateer in 2011. In 2014, they established Tilray's predecessor as a Privateer portfolio company.

153.     In January 2018, a Privateer reorganization created Tilray in its current form. Privateer was issued 75 million shares of Tilray in exchange for the assets of Tilray's predecessor. Of these, 16,666,667 were Class 1 supervoting shares, each entitling the holder to 10 votes, and 58,333,333 were Class 2 ordinary shares, each with one vote.

154.     In July 2018, Privateer took Tilray public through an IPO. Tilray sold about 9 million new Class 2 shares to the public. At the time of the IPO, non-Privateer shareholders held slightly less than 8 million Class 2 shares. The IPO left Privateer with 93% voting power over Tilray, but only an 82% economic interest.

155.    Just before the Share Exchange, though the Controlling Shareholders only held 29% the economic interest in Tilray, they were its controlling shareholders because they held 71% of the voting power over Privateer which in turn held more than 90% of the voting power over Tilray.

156.    Exercising indirect control over Tilray through Privateer came with several disadvantages for the Controlling Shareholders. First, the Controlling Shareholders had to exercise control through Privateer. Yet Privateer's charter provided that for several kinds of decisions, its supervoting shares would not receive extra votes, meaning that the Controlling Shareholders would not control Tilray or Privateer for those decisions. Second, the Controlling Shareholders would not receive much of the proceeds from selling Privateer's Tilray stock. Sales proceeds would be distributed *pari passu* to Privateer investors based on their economic interest in Privateer. Thus, to receive proceeds equivalent to selling one personally-held share, the Controlling Shareholders had to sell three Privateer-held Tilray shares. Third, because Privateer held more than 80% of Tilray's stock, any substantial sales of its shares would dramatically increase the number of Tilray shares available for trading. The mere suspicion that it might sell its shares would drive down Tilray's stock price.

157.    And fourth, any sales of Privateer's Tilray stock would be subject to double taxation. When Privateer sold its shares, it would have to pay 21% taxes on its profits. Because Privateer's cost basis for its Tilray shares was approximately $0.43, it would pay taxes on substantially all of the sales proceeds. Then, when Privateer distributed cash to its investors, they would have to pay long-term capital gains taxes of 23.8% on their distribution.

158.    If he sought to monetize his interest, Kennedy would face a tax bill of more than 40% of the proceeds. If they sold all their Tilray shares at the $17/share IPO price, the Controlling Shareholders would collectively face a tax bill of more than $100 million.

ii.      Kennedy Avoids Taxes While Securing Corporate Control Over Tilray

159.    The Controlling Shareholders hatched and implemented a scheme that would (a) eliminate Privateer's corporate sales tax, (b) control the flow of Privateer investors' Tilray shares into the market, and (c) secure personal control over Tilray ("Share Exchange").

160.    The Share Exchange had four elements:

a.      Tilray cancels all of Privateer's Tilray shares;

b.      Tilray acquires all of Privateer's shares;

c.      Tilray issues new shares to Privateer investors in proportion to their economic interest in Privateer, but all its supervoting shares are issued to the Controlling Shareholders; and

d.      Privateer investors agree to a two-year lockup.

161.    To obtain personal control over Tilray, the Controlling Shareholders needed Privateer investors' consent. While other Privateer investors would only receive Class 2 ordinary shares, the three would receive ***all*** of Privateer's Class 1 supervoting shares. Giving effect to the Share Exchange would leave the Controlling Shareholders with only 31% of the economic interest in Tilray but 73% of its voting power. Thus, the Controlling Shareholders would maintain personal majority control over Tilray with a hefty margin to sell their own Tilray shares or have Tilray issue new shares to raise proceeds or pay for acquisitions.

162.    Article IV(E)(2) of Privateer's Charter would have to be amended to permit Privateer to distribute all Class I Tilray shares to the Controlling Shares because it required that all in-kind distributions to Privateer investors be *pari passu*. Article IV(D)(2)(b)(i) required a majority of shares, without regard to supervoting status, for any such amendment. Thus, Kennedy needed the support of investors holding a majority of Privateer's shares to proceed with the Share Exchange on terms that gave the Controlling Shareholders personal voting control over Tilray.

163.     The terms of the Share Exchange made it clear that Kennedy valued control. Kennedy could terminate the Share Exchange if of the other Privateer investors declined to award him and the other Controlling Shareholders all the supervoting shares.

164.     Privateer investors, moreover, had other options to stymie the Share Exchange. Under Delaware law, the Share Exchange gave Privateer investors a right to appraisal of their Privateer shares. Privateer non-controlling investors accounted for more than half the economic interest in Tilray. Tilray could not afford to buy back more than half of its share capital. Further, the belief that other Privateer investors would exercise their appraisal rights could create the equivalent of a bank run, as investors concerned that Tilray faced too many appraisals to be viable were pushed to seek appraisal themselves.

165.     The Controlling Shareholders asked Privateer investors to agree to a substantial burden. Privateer investors had invested their money as early as 2011. Tilray had succeeded, but Privateer investors had not been able to sell their shares. Now, the Controlling Shareholders were asking Privateer investors to agree to two more years of lockup.

166.     Tilray was a risky investment. Tilray is a young, unprofitable company operating in a nascent, quick-moving industry. Tilray's stock price was volatile because it was based not on what profits Tilray was making right now but rather investors' expectations of how profitable it could become in the future. Tilray's stock price might increase in the following years, but it could also crash. With a two-year lockup, Privateer investors could not sell their Tilray shares if the investment grew too risky for them, or if they wanted to make a profit.

167.     Defendants' false statements were of the type that would reassure anxious Privateer investors. By overstating Tilray's gross margins, Defendants made it seem that it would be relatively simple for Tilray to become profitable. And by concealing that the ABG Agreement was a publicity stunt, Kennedy helped convince Privateer investors that Tilray was succeeding at the

41

very strategy he had publicly touted: developing branded products. Defendants' false statements helped convince Privateer investors to vote their shares in favor of the Share Exchange.

168.    And the statements were perfectly timed to influence Privateer investors. Privateer sent Tilray a letter of intent regarding the Share Exchange on January 9, 2019, a week before Tilray announced the ABG Agreement. The Share Exchange closed on December 12, 2019. A month later, Tilray would announce that it had renegotiated the ABG Agreement to remove the guaranteed $10 million payments and reduce its scope. Less than three months later, Tilray would impair the ABG Agreement by 86% and reduce the valuation of its inventory by $68 million, or 44% of its total value. And, as further set out below, Defendants only corrected their misstatements when Aphria was about to find out about them in its due diligence.

    2.    *Step 2: Kennedy Uses His Control to Pursue a Merger That Would Have Him Head the World's Largest Cannabis Company, Nearly Succeeds, But Fails Because of COVID-19*

        i.    Kennedy Nearly Succeeds In Making Himself CEO of the World's Largest Cannabis Company

169.    Defendants told investors that cannabis was a nascent market that would quickly reach enormous size. Tilray's IPO Registration Statement provided:

> We believe we are witnessing a global paradigm shift transforming the multibillion dollar cannabis industry from a state of prohibition to a state of legalization, but the legal market is still in its early stages. Moreover, we expect the number of countries with legalized regimes to continue to increase, creating numerous and sizable opportunities for market participants, including us. According to the United Nations, the global cannabis market, including the illicit market, is estimated to be $150 billion, annually, and approximately 3.8% of the adult population, or over 180 million people, are estimated to be cannabis users.

170.    Defendants told investors Tilray aimed to be one of the largest companies in this market.

171.    In an August 2, 2018 Reddit Ask Me Anything discussion, Kennedy stated that:
"We are building a global company to be a market leader over the long-term, and appreciate that
many of our investors will be with us for the long haul."

172.    On Jim Cramer's Mad Money on September 18, 2018, Defendant Kennedy stated
that: "Our intent is to build a company that dominates part of this $150 billion industry. I think
you'll see multiple hundred billion-dollar companies. We don't want to partner with ABI [AB
Inbev, a beer conglomerate]. We want to build ABI."[7]

173.    On December 20, 2018, Kennedy told Yahoo Finance that:

It's early days in this industry and we're not interested in being bought or acquired,
unlike two of our competitors in Canada who have been bought by Ultra and
Constellation. We control our own destiny and that's one of the things I'm most
proud of. You know, we want to continue to partner with other global pioneers who
are leaders in their respective sectors, but we think it's way too early to give up
control of our own destiny.

174.    On May 5, 2019, he told Marijuana Venture that:

[T]his is a global paradigm shift, and while many companies look at it myopically,
in terms of their corner of the world or their niche within cannabis, we really look
at cannabis legalization as a global event. Companies with trusted brands and a
multinational supply chain will be the companies that win.

175.    On the Q2 2019 earnings call, Kennedy told investors not to focus on Tilray's
profitability because it was trying "to dominate [the] global [cannabis] industry":

If your company is [] small to midsize  [] those companies should be focused on
profitability. But you only see an opportunity like this once in your lifetime. And if
you're trying to dominate a global industry, you'd be constraining yourself if you
were focusing entirely on profitability at this point. Globally, it's very early in the
emergence of a $200 billion industry. And globally, if now is not the time to invest,
I don't know when is.

176.    And Kennedy was clear exactly what Tilray needed to do to survive: become one
of the three or four companies that, he claimed, would dominate the cannabis industry.

_____

[7] In January 2019, Tilray partnered with ABI.

43

177.   At the November 4, 2015 Web Summit in Dublin, he stated that "Cannabis is the only thing we put into our bodies that is not branded in any way. That will change."

178.   On October 16, 2019, he told Weed on Wall Street that he wanted to build a "massive" cannabis company:

> And I tell our employees, I tell our investors that this is just day one. I think globally, this is $150 to 200 billion industry. We're investing for the future, we've been doing this for eight and a half years. We have a long, patient, methodical view on how to build a massive company in this industry.

179.   In a December 18, 2019 CNBC interview, Kennedy stated that only three or four companies would dominate the cannabis industry:

> Well, what I believe is that the cannabis industry globally adult-use and medical is somewhere between 150 to a $200 billion industry. And I think it ends up looking something like the global beer industry, where three or four companies control a dominant portion, 75, 80% of that market share. And so if three companies are divvying up a 150 billion industry, they'll each have a revenue somewhere around 50 billion. And so that's how I get to, there'll be three companies that have a hundred billion valuation and we would like to be one of those companies; we're methodical, we're patient. It's early days in this industry.

180.   In a March 6, 2020 article, the Wall Street Journal observed that Kennedy "thinks that consolidation will continue, leaving the cannabis sector looking a look a lot like the beer business, with two or three companies dominating the marketplace." It then quoted him as saying "[o]ur strategy is to position ourselves so that we are one of those three companies[.]"

181.   In the August 2018 Ask Me Anything discussion, Kennedy specifically linked his control of Tilray with his pursuit of an acquisition of or merger with a large company:

> We believe that our industry is evolving rapidly - and sometimes in a wacky way - and that the dual share structure will enable us to control our own destiny as opportunities develop around the world. Many of our investors are long on us as a company, believe in our management team, and want us to be able to determine our own future.
>
> You're already seeing Fortune 500 companies do deals in the space and I think you'll see more as the year progresses. We may be a year or two away from an acquisition, but continue to believe it's inevitable.

182.    In fall 2019, Tilray initiated merger discussions with Aphria, Inc., a large Canadian cannabis company focusing on the Canadian market ("Aphria Merger"). With Aphria roughly Tilray's size, the combined company would create the world's largest cannabis business by revenues in the world.

183.    Discussions proceeded rapidly. On November 22, Aphria's CEO met with a member of Tilray's Board of Directors. (Kennedy could not attend because of a late-breaking conflict).

184.    Only six days later, the companies signed a mutual non-disclosure agreement.

185.    On December 18, 2019, the companies held a senior executive meeting to discuss the Aphria Merger.

186.    Thereafter, the companies made frenetic efforts to push through the Aphria Merger. On January 14, 2020, Kennedy and Aphria's CEO had a further meeting. A week later, Kennedy and other senior Tilray executives toured Aphria's facilities. Tilray and Aphria each engaged financial advisors. After another February 5, 2020 senior executive meeting that included financial advisors, on February 10, Kennedy and other senior Tilray executives again toured Aphria's facilities.

187.    On February 14, 2020, Tilray provided Aphria a draft of a non-binding term sheet for a stock-for-stock merger. Tilray anticipated a quick closing; the term sheet proposed an exclusivity period that terminated on March 2, 2020.

188.    Kennedy's term sheet was not favorable to Tilray investors. His proposal would see former Tilray shareholders own only 56% of the combined company. In January and February 2020, Tilray's market value hovered around 54-55% of the combined company's market capitalization. Before January 2020, Tilray had usually been worth more than 60% of the combined company. Kennedy's first offer did not reflect Tilray's true value.

189.    Yet it did ensure Kennedy would serve as the CEO of the combined company:

On February 14, 2020, Tilray provided Aphria with an initial draft of a non-binding term sheet regarding a potential combination of the two businesses. Mr. Kennedy and Mr. Simon had a discussion regarding the key components of the draft term sheet and potential next steps. The draft term sheet contemplated, among other things: (i) that the transaction would be structured as an all-stock merger, with shareholders of Tilray and Aphria owning 56% and 44% of the Combined Company, respectively; (ii) a governance structure that would include (A) *Mr. Kennedy as CEO* and [Aphria CEO] Mr. Simon as Executive Chairman, and (B) a board of directors comprised of 8 members total, 4 directors designated by Tilray and 4 designated by Aphria; (iii) that the Combined Company would be called "Tilray"; and (iv) an exclusivity period through March 2, 2020, which was expected to coincide with the announcement of Tilray's Q4 2019 earnings. *At this point, Tilray's stock was trading at a higher level than Aphria's stock.*

190.    On February 27, 2020, Aphria's CEO attended a Tilray Board meeting.

191.    At the time, the Controlling Shareholders continued to control Tilray. The Controlling Shareholders could, by themselves, ensure shareholder approval of the combination. Their votes meant Tilray would not have to undertake the long and uncertain process of securing investors' consent. Further, by ensuring a quick approval, Kennedy made the combination more attractive to Aphria, a carrot he could use to make himself CEO.[8]

192.    For years, Kennedy had publicly stated that the global cannabis market would run to the hundreds of billions of dollars in annual revenues and would be controlled by three or four large companies. The Aphria Merger gave Kennedy a chance not only to create one of those companies but to lead it. Kennedy's goal was within his grasp.

      ii.    Kennedy's Plan Comes to Naught Because of COVID-19

---

[8] Delaware courts recognize that being able to guarantee closing is a valuable asset in a merger or acquisition. *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 960 (Del. Ch. 2007); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (noting that in mergers, stockholders "get to protect themselves by voting no if they believe that their bargaining agent has done a poor job[.]"). Deal certainty is part of the consideration a counterparty receives in a merger.

193.    On January 15, 2020, Canada activated a COVID-19 Emergency Operations Center. In early March, COVID-19 ravaged Northern Italy. On March 11, the World Health Organization declared COVID-19 a pandemic. On March 13, Washington State's Governor ordered all public and private schools closed. Beginning mid-March, New York suffered a devastating wave of infections. On March 16, all New York City schools were closed.

194.    On March 18, 2020, Aphria's CEO told his Board of Directors that discussions of the Aphria Merger would be placed on hold in light of the COVID-19 pandemic. COVID-19 create havoc everywhere in the world, including in Tilray and Aphria's stock prices. With stock prices so volatile, it was not possible to create a reasonable exchange ratio for the Aphria Merger.

195.    On or about March 25, 2020, Kennedy suggested to Aphria an equity ownership split of exactly 50% for Tilray and 50% for Aphria. Tilray's charter requires a favorable vote of all shares regardless of supervoting status to approve any change of control transactions. Amended and Restated Certificate of Incorporation of Tilray, Inc., IV.D.2.(c). Tilray's charter defines a change of control to include a merger where ***more than*** 50% of the shares would be held by the counterparty. *Id.* IV.D.1.(a). Thus, Kennedy proposed the precise equity ownership split that would permit the Controlling Shareholders to force the Aphria Merger through.

196.    Over the next year, Aphria would repeatedly place the transaction on hold in light of other concerns. These discussions eventually succeeded. The Aphria Merger closed on December 15, 2020. Tilray and Aphria determined the proportion of the combined company each of their shareholders would hold by reference to their respective market capitalizations as of close of trading that day. Aphria's had grown substantially through COVID-19; Tilray's had shrunk. By then, Tilray's market capitalization was only 32.6% of Aphria's.

197.    With Aphria accounting for more than two-thirds of the combined company, Aphria's CEO naturally became the combined company's CEO. Kennedy was relegated to the role of Director.

iii.    The Controlling Shareholders Lose Control

198.    Since Tilray's IPO, its Certificate of Incorporation has provided that supervoting Class 1 shares would be converted into ordinary Class 2 shares once they accounted for less than 10% of Tilray's shares:

> "***Final Conversion Date***" means 5:00 p.m. in New York City, New York on the first Trading Day falling on or after the date on which the outstanding shares of Class 1 Common Stock represent less than ten percent (10%) of the aggregate number of shares of the then outstanding Class 1 Common Stock and Class 2 Common Stock.
>
> *            *            *            *            *
>
> **Final Conversion Date**. On the Final Conversion Date, each one (1) issued and outstanding share of Class 1 Common Stock shall automatically, without any further action, convert into one (1) fully paid and nonassessable share of Class 2 Common Stock

199.    COVID-19 created uncertainty about whether Tilray could even survive. Before COVID-19, Tilray acknowledged that its ability to continue as a going concern depended on its ability to manage capital outflows. As Tilray's 2020 10-K noted:

> These financial statements have been prepared on a going concern basis, which assumes that the Company will continue in operation for the foreseeable future and, accordingly, will be able to realize its assets and discharge its liabilities in the normal course of operations as they come due. The Company's ability to continue as a going concern is dependent upon obtaining additional financing to meet anticipated cash needs for working capital and capital expenditures through the next twelve months.
>
> *            *            *            *            *
>
> ***Should there be constraints on access to capital under the at-the-market program, the Company can manage cash-outflows through reduced capital expenditures and managing the operational expenses of the business that pertain to future***

*investments that are discretionary in nature. Accordingly, the Company has concluded that it is probable that it is able to implement plans that would effectively mitigate the conditions and events that raise substantial doubt about the entity's ability to continue as a going concern for the next twelve months.*

200.    Tilray's 2020 10-K accordingly did not contain a warning that there was substantial doubt that Tilray could continue as a going concern.

201.    But that was before COVID-19. As Defendant Kennedy later acknowledged on Tilray's Q1 2020 earnings call, "the COVID-19 pandemic provides a level of uncertainty for Tilray and the broader industry."

202.    As a result, on March 17, 2020, Tilray was forced to sell shares on brutal terms. Tilray sold a total of 19 million ordinary shares, each with a warrant to purchase an additional ordinary share at an exercise price of $5.95, for $4.76,[9] for gross proceeds of $90 million. The offering added up to 38 million more shares to Tilray's existing 98,561,398 shares, each for a third of the IPO price.

203.    In July 2020, enough Tilray warrant holders exercised their warrants to trigger the Final Conversion Date. All of the Controlling Shareholders' supervoting shares were converted into ordinary shares, eliminating their control.

204.    After that, the Controlling Shareholders could no longer deliver the votes to approve the combination.

205.    If a company's shares are largely held by discrete institutions, the company can call the institutions to ensure they vote their proxies. But Tilray's shareholder base largely consisted of retail, not institutional, investors. It cannot feasibly call a large number of small shareholders.

206.    Shareholders were called to vote on the Aphria Merger in April 2021.

---

[9] Of these, 11,750,000 million consisted of pre-funded warrants which could be exercised for a nominal sum. Purchasing a pre-funded warrant lets investors defer the tax and disclosure consequences of share ownership, but a pre-funded warrant and a share are economically identical.

207.    Ultimately, only 69 million of Tilray's 179 million outstanding shares were voted at the Special Meeting.

iv.    Kennedy Uses His Control Over Tilray's Board of Directors To Push Through the Aphria Merger

208.    During the Class Period and when shareholders voted on the Aphria Merger, Tilray's Board had five Directors. In April 2021, directors had last been elected in May 2020, when the Controlling Shareholders still controlled Tilray.

209.    Tilray shareholders challenged the Share Exchange in Delaware Court as a conflicted transaction. To survive Defendants' motion to dismiss, they had to allege that at least three of the three directors were conflicted.

210.    Chancellor McCormick ruled that three of the directors, all of whom still sat on Tilray's Board in April 2021, could not fairly consider the transaction because they were beholden to Kennedy, Privateer, or both.

211.    Tilray announced it would hold a Special Meeting to vote on the Aphria Merger on April 16, 2021, at 11:00 am.

212.    On April 8, Tilray held a Board Meeting to discuss the proxy solicitation process. At the meeting, Tilray's proxy solicitor told the Board that it was unlikely that Tilray could reach quorum, citing the number of retail investors.

213.    On April 15, 2021, Tilray published a Press Release announcing the postponement of the Special Meeting to April 30, 2021.

214.    On April 16, 2021, Tilray's Board of Directors approved an amendment to Tilray's bylaws to reduce the quorum requirement for shareholder meetings from one half to one third of all votes.

215.    Had the directors not amended the charter, the 69 million shares voted at the meeting would not have sufficed to secure a quorum.

v.    Defendants Had to Complete the Share Exchange Before the Aphria Merger

216.    Chancellor McCormick's ruling that Greenwood, Auerbach and Kennedy were conflicted triggered the entire fairness standard. On that question, she ruled that the transaction was not entirely fair to Tilray minority shareholders because Tilray had enormous leverage over the Controlling Shareholders but failed to use it. *In re Tilray, Inc. Reorganization Litig.*, No. CV 2020-0137-KSJM, 2021 WL 2199123, at *15 (Del. Ch. June 1, 2021). The Controlling Shareholders could secure these benefits because they controlled Tilray.

217.    Were Tilray to merge with Aphria ***before*** the Share Exchange, the Controlling Shareholders could not secure terms as beneficial. After the Aphria merger, Tilray would not be subject to their control. With an uncontrolled negotiating partner, the Controlling Shareholders could not secure a deal nearly as sweet.

218.    Further, Defendants had to make the corrective disclosures before, not after, the Aphria Merger. The Aphria Merger was a multi-billion-dollar transaction. Aphria would naturally request, and expect, copious due diligence, particularly on accounting topics. Defendants could not hope to hide from Aphria the "bags and bags, boxes and boxes" of trim that made up 44% of Tilray's inventory. Nor could they hide that the ABG Agreement was illusory.

219.    Thus, Defendants disclosed the skeletons in Tilray's closet just as Aphria was about to look through it.

**D.    Defendant Kennedy Sold $26,310,803.10 of Stock During the Class Period**

220.    During the Class Period, Defendant Kennedy sold 643,164 of Tilray stock for $28,389,051.71:

| Type of transaction[10] | Date | Shares sold (received) | Price | Total proceeds |
|---|---|---|---|---|
| Restricted stock vesting | January 23, 2019 | (375,000) | 0 | 0 |
| Stock sale | January 24, 2019 | 149,916 | $74.21 | $11,125,266.36 |
| Exercise of stock options | March 1, 2019 | (50,000) | $7.76 | ($388,000) |
| Open market sales | | 53,897 | $79.49 | $4,284,272.53 |
| | | 14,437 | $80.40 | $1,160,734.80 |
| | | 7,454 | $81.67 | $608,768.18 |
| | | 11,351 | $82.14 | $932,371.14 |
| Exercise of stock options | April 1, 2019 | (50,000) | $7.76 | ($388,000) |
| Restricted stock vesting | | (47,875) | 0 | 0 |
| Open Market Sales | | 52,758 | $63.03 | $3,325,336.74 |
| | | 32,539 | $63.84 | $2,077,289.76 |
| | | 1,842 | $64.73 | $119,232.66 |
| | | 18,970 | $63.78 | $1,209,906.60 |
| Grant | May 31, 2019 | (76,000) | 0 | 0 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | July 1, 2019 | (30,472) | 0 | 0 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | October 1, 2019 | (28,414) | 0 | 0 |
| Open market sale | December 11, 2019 | 100,000 | $18.30 | $1,830,000.00 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | January 1, 2020 | (32,986) | 0 | 0 |

[10] Excluding receipt of shares subject to a lock-up agreement.

| Open market sales | January 13, 2020 | 29,593 | $15.52 | $459,283.36 |
|---|---|---|---|---|
| | | 67,113 | $16.74 | $1,123,471.62 |
| | | 3,294 | $17.34 | $57,117.96 |
| Exercise of stock options | February 13, 2020 | (100,000) | ($7.76) | ($776,000) |
| Open market sale | | 100,000 | $16.28 | $1,628,000.00 |
| Total sales | **643,164** | | | |
| Total net sales | **(147,583)** | | | |
| Total proceeds | **$28,389,051.71** | | | |

221.    Defendant Kennedy's sales proceeds were almost pure profit. Kennedy got his shares from Privateer's initial investment in Tilray in 2014. At the IPO price of $17/share, Privateer's shares were worth $1.275 billion. Of this, $1.242 billion was profit. Thus, Kennedy's purchase price for the shares he sold was a small number of pennies per share.

222.    The timing of Kennedy's stock sales was suspicious. Kennedy made his largest sales, by proceeds, within a week of the beginning of the Class Period. He made his largest sales, by number of shares sold, in the last months of the Class Period, just before the corrective disclosures.

223.    Kennedy's sales were all the more unusual because they violated a pledge not to sell shares.

224.    On January 6, 2019, Kennedy told Fortune that he had not sold any of his shares. Fortune also reported that Kennedy "promises he won't [sell shares] when post-IPO restrictions lift in January". The article was published on January 16, about a week before Kennedy sold $11,125,116.44 in shares.

225.    Indeed, in an October 17, 2018, interview with Bloomberg, Kennedy had linked his lack of stock sales to his confidence in Tilray:

> **Q:** Those big gains that we've seen in Tilray stock since the IPO. I'm curious, have you sold any of your own stock?
> **Defendant Kennedy:** Zero.

**Q:** Zero? Have you been a buyer of any more?

**Defendant Kennedy:** There was a public disclosure of a share purchase on the date of an IPO. So I was a buyer at the IPO.

**Q:** All right. So you're holding on to the shares.

**Defendant Kennedy:** *I haven't sold a share, don't expect to sell a share. I've been doing this for eight years. I have a long-term view of the opportunity. It's a global growth opportunity.* While today is a historic day, it is day one and *we expect to be in this industry for a very long time and grow a very large company* that not only is successful and obtain significant market share in Canada but gains significant market share in other medical cannabis countries and other adult-use countries around the world.

226.     Finally, Defendants' sales amounted to a large part of the common shares that were available to sell. Because Privateer held so many of Tilray's shares, its tradeable float was relatively small. At the beginning of the Class Period, only about 17 million Tilray shares were freely tradeable and not held by Privateer. Kennedy's large stock sales would not only signal his lack of confidence, they would significantly increase the number of tradeable Tilray shares, thus reducing their price.

**E.     Additional Self-Dealing**

227.     The Controlling Shareholders had previously used their control over Tilray to benefit themselves at Tilray's expense.

228.     As of the end of 2018, Tilray licensed seven of its ten Canadian recreational marijuana brands from Privateer and its former subsidiaries.

229.     In July 2019, Kennedy faced a significant personal tax bill. To secure the cash necessary to pay the bill, Kennedy caused Tilray to purchase Smith & Sinclair, Ltd., which was 30% owned by Privateer. In 2019, Smith & Sinclair lost $2.7 million on revenues of $1.6 million.

230.     Tilray paid approximately $2.4 million for Privateer's stake. Privateer then distributed the $2.4 million directly to Kennedy without paying anything to other Privateer investors. For the 70% not owned by Privateer, Tilray paid 79,289 shares and approximately $2 million in contingent consideration.

231.    In its next audited financial statements, Tilray re-measured the value of the contingent consideration to $420, showing that the contingent consideration was a mere fig-leaf to conceal that Tilray was paying a disproportionate price for Privateer's interest. Tilray's re-valuation of the contingent consideration to *precisely* $420 (a prominent reference in the cannabis community)[11] suggests the contingent consideration was, and had always been, a joke at the expense of shareholders whose cash Kennedy appropriated for himself.

232.    Tilray and Privateer share office space at 2701 Eastlake Avenue E, Seattle, WA 98102. From January through May 2019, Tilray made payments towards Privateer's lease of these joint offices. In May 2019, Tilray paid Privateer $1 million and assumed the lease. Tilray's financial statements do not record any subsequent payments from Privateer for lease, yet Kennedy, Blue, and Groh continue to work on Privateer business out of the shared Tilray and Privateer offices.

233.    Tilray pays Privateer Management a monthly retainer of $25,000 to provide unspecified services.

**F.    Tilray Uses Its Stock As Currency For Acquisitions**

234.    Tilray used its stock to acquire companies:

a.    Tilray issues 1,680,214 shares in connection with the ABG Agreement;

b.    In February 2019, Tilray issued 180,332 shares in connection with its acquisition of Natura Natural Holdings Inc.

c.    In mid-2019, Tilray issued 2,109,252 shares in connection with its acquisition of Manitoba Harvest;

---

[11] *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 923 n.10 (N.D. Cal. 2020); Maureen Meehan, *Fifty Years of 420 and The Waldos: Time Flies When You're Having Fun*, available at https://hightimes.com/culture/fifty-years-420-waldos/

d.   In July 2019, Tilray issued 79,289 shares in connection with the acquisition of Smith &

Sinclair Ltd.

e.   In September 2019, Tilray issued 354,049 shares in connection with three transactions.

**G.    The Volume of Trading In Tilray's Stock Increases Suspiciously After the Share**

**Exchange**

235.    Privateer investors were required to sign a lockup agreement to receive Tilray

shares in the Share Exchange ("Privateer Lockup"). Each lockup agreement provided:

[T]he undersigned holder of Privateer Capital Stock and/or options to purchase Privateer
Capital Stock is required to execute and deliver this Lock-up Agreement as a condition to the
receipt of such holder's portion of the Total Merger Consideration. In light of the benefits that
the Merger will confer upon the undersigned, and for good and valuable consideration, the
receipt and sufficiency of which are hereby acknowledged, the undersigned pursuant to the
Merger Agreement agrees with the Company that, during the period beginning on the Closing
Date through and including the second anniversary of the Closing Date, *the undersigned will*
*not, without the prior written consent of the Company, Transfer, or announce the intention*
*to Transfer, any shares of Class 1 Common Stock of the Company, par value $0.0001 per*
*share, or Class 2 Common Stock of the Company, par value $0.0001 per share (collectively,*
*the "Common Stock"), that constitute Stock Merger Consideration* (including, without
limitation, Common Stock which may be deemed to be beneficially owned by the undersigned
in accordance with the rules and regulations promulgated under the Securities Act of 1933, as
amended (the "Securities Act"), (such shares, the "Beneficially Owned Shares")) or securities
convertible into or exercisable or exchangeable for Common Stock that constitute Option
Merger Consideration (collectively, such Common Stock and other securities, the "Merger
Consideration Securities").

236.    The Privateer Lockup categorically prohibited all unsanctioned sales during the

first year after the Share Exchange closed:

The restrictions set forth herein shall lapse as follows:

(1) as of the first anniversary of the Closing Date, the restrictions with respect to 50% of the
Applicable Securities shall lapse (for purposes of clarification, all Cash Consideration Shares
and all Permitted Sales shall be credited towards and deemed to be included in such 50% lapse)
[]

237.    The Privateer Lockup provided a limited exception for "Permitted Sales". These

sales had to be authorized by Tilray's Board of Directors:

"***Permitted Sale***" shall mean a sale of Merger Consideration Securities (i) in any Offering or (ii) following the Closing, in any other registered public offering, block trade or strategic sale ***approved or arranged by the Company, in each case at the discretion of the Board of Directors of the Company*** (subject to the Company's policies regarding approval of affiliate transactions).

238.    Further, a Permitted Sale was material non-public information, such that the

Company had to disclose its existence:

The undersigned acknowledges and agrees that information regarding any Offering or any other Permitted Sale will constitute "material non-public information" pursuant to applicable securities Laws.

239.    Thus, no former Privateer investor could sell any Tilray shares received in the

Privateer Agreement without Tilray's Board's authorization and public disclosure of the sale.

240.    Tilray did not disclose any Permitted Sales during the remainder of the Class

Period.

241.    Yet shortly after the Privateer Agreement, trading volume in Tilray shares soared:



242.    On average, approximately 1.8 million shares traded daily during the Class Period.

The average trading volume for the 90 days preceding the closing of the Privateer Agreement was

also approximately 1.8 million shares. The average trading volume from the date of the Privateer

Agreement through the close of the Class Period was 3.6 million shares.

243.    On January 14 and 15, 2020, 30.0 million Tilray shares were traded. At the time,

only approximately 25.2 million shares were authorized for trading.

244.    The Privateer Lockup provided that the Tilray shares provided to investors as part

of the Privateer Agreement would bear a legend indicating that the shares could not be resold:

***The undersigned hereby consents to the placing of legends on the certificates representing the shares of Common Stock issued as, or received upon the conversion of, the Merger***

57

***Consideration Securities or the entry of stop transfer instructions with the Company's transfer agent and/or any other duly appointed transfer agent of the Company with respect to any Merger Consideration Securities.*** In furtherance of the foregoing, the Company and any other duly appointed transfer agent of the Company for the registration or transfer of shares of Common Stock are hereby authorized to decline to make any Transfer of shares of Common Stock if such Transfer would constitute a violation or breach of this Lock-up Agreement.

245.    Accordingly, it would have been difficult or impossible for Privateer investors to sell the Tilray shares they received through the Privateer Agreement.

246.    Thus, any Permitted Sales were authorized by Privateer's Board, but not disclosed to the public in violation of the Privateer Lock-Up's terms. At the time, the Controlling Shareholders continued to hold majority control over Tilray.

247.    The definition of Permitted Sale in the Privateer Lock-Up provides:

The Company will only conduct a Permitted Sale to the extent that each applicable Former Holder shall have an opportunity to sell a portion of his, her or its Merger Consideration Securities on a proportionate, pro rata basis relative to all other applicable Former Holders.

248.    Accordingly, the Controlling Shareholders would share proportionally in any Permitted Sales after the Share Exchange.

## CLASS ACTION ALLEGATIONS

249.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tilray securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are (i) Defendants, (ii) officers and directors of Tilray and Privateer Holdings, Inc. ("Privateer"), and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii).

250.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tilray common stock was actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tilray or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

251.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

252.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

253.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

•       whether the federal securities laws were violated by Defendants' acts as alleged herein;

•       whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tilray;

•       whether the Individual Defendants caused Tilray to issue false and misleading financial statements during the Class Period;

•       whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tilray securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

254.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET)**

255.    The market for Tilray's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Tilray's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Tilray's securities and market information relating to Tilray, and have been damaged thereby.

256.    During the Class Period, the artificial inflation of Tilray's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Tilray's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Tilray and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company

shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

257.    At all relevant times, the market for Tilray's securities was an efficient market for the following reasons, among others:

a.    Tilray shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, Tilray filed periodic public reports with the SEC and/or the NASDAQ;

c.    On average, 40.3% of Tilray's float traded every week, permitting a *very strong* presumption of efficiency;

d.    Tilray regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.    Tilray was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

f.    At least 20 firms made a market in Tilray securities;

g.    New company-specific information was rapidly reflected in Tilray's stock price; and

h.    Tilray met the requirements for filing a Registration Statement on Form S-3.

258.     As a result of the foregoing, the market for Tilray's securities promptly digested current information regarding Tilray from all publicly available sources and reflected such information in Tilray's share price.  Under these circumstances, all purchasers of Tilray's securities during the Class Period suffered similar injury through their purchase of Tilray's securities at artificially inflated prices and a presumption of reliance applies.

259.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

260.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

261.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

262.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tilray securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Tilray securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

263.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tilray securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tilray's finances and business prospects.

264.     By virtue of his position at Tilray, Kennedy had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Kennedy acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such

facts were readily available to him.  Said acts and omissions were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

265.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the CEO and a Director of Tilray, Kennedy had knowledge of the details of Tilray's internal affairs.

266.     Kennedy is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, Kennedy was able to and did, directly or indirectly, control the content of the statements of Tilray.  As an officer and director a publicly-held company, Kennedy had a duty to disseminate timely, accurate, and truthful information with respect to Tilray's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tilray securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Tilray's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tilray securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

267.     During the Class Period, Tilray securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tilray securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise

acquired said securities, or would not have purchased or otherwise acquired them at the inflated

prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class,

the true value of Tilray securities was substantially lower than the prices paid by Plaintiff and the

other members of the Class.  The market price of Tilray securities declined sharply upon public

disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

268.    By reason of the conduct alleged herein, Defendants knowingly or recklessly,

directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder.

269.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented statements regarding its prospects to the

investing public.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against Kennedy

270.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

271.    During the Class Period, Kennedy participated in the operation and management of

Tilray, and conducted and participated, directly and indirectly, in the conduct of Tilray's business

affairs. Because of his senior position, he knew the adverse non-public information about Tilray's

misstatements regarding its business and operations.

272.     As an officer and director of a publicly owned company, Kennedy had a duty to disseminate accurate and truthful information with respect to Tilray's operations, and to correct promptly any public statements issued by Tilray which had become materially false or misleading.

273.     Because of his position of control and authority as a senior officer, Kennedy was able to, and did, control the contents of the various reports, press releases and public filings which Tilray disseminated in the marketplace during the Class Period concerning Tilray's results of operations. Throughout the Class Period, Kennedy exercised his power and authority to cause Tilray to engage in the wrongful acts complained of herein. Kennedy therefore, was a "controlling person" of Tilray within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Tilray securities.

274.     By reason of his senior management positions and directorship of Tilray, Kennedy had the power to direct the actions of, and exercised the same to cause, Tilray to engage in the unlawful acts and conduct complained of herein. Kennedy exercised control over the general operations of Tilray and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

275.     By reason of the above conduct, Kennedy is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tilray.

## COUNT III
### For Violation of §20A of the Exchange Act
### <u>Against Defendant Kennedy</u>

276.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count III is brought pursuant to §20A of the Exchange Act against Kennedy, on behalf of Plaintiffs who were damaged by Kennedy's insider trading

277.    As detailed herein, Kennedy was in possession of material, non-public information concerning Tilray. Kennedy took advantage of his possession of material, non-public information regarding Tilray to obtain millions of dollars in insider trading profits during the Class Period.

278.    Kennedy's sales of common stock were made contemporaneously with Plaintiffs' purchases of Tilray common stock during the Class Period:

| Kennedy Transaction | | | Contemporaneous purchase | | | |
|---|---|---|---|---|---|---|
| Date | Number of shares sold | Total proceeds | Purchaser | Date | Number of shares purchased | Price |
| January 24, 2019 | 149,916 | $11,125,116.44 | Kassim | January 22, 2019 | 6,000 | $73.47 |
| | | | | January 23, 2019 | 1,000 | $72.00 |
| | | | Chandok | January 22, 2019 | 1,000 | $90 |
| March 1, 2019 | 87,139 | $6,986,082.09 | Kassim | March 4, 2019 | 1,000 | $76.15 |
| | | | | March 6, 2019 | 4,000 | $76.38 |
| | | | Rose | March 7, 2019 | 100 | $73.77 |
| | | | | | 100 | $72.00 |
| | | | | March 8, 2019 | 100 | $64.86 |
| April 1, 2019 | 106,109 | $6,731,994.23 | Kassim | April 1, 2019 | 4,000 | $63.46 |
| | | | Rose | April 4, 2019 | 100 | $60.93 |
| | | | | | 60 | $60.95 |
| | | | | | 40 | $60.98 |
| | | | | | 100 | $64.90 |
| | | | | | 100 | $60.94 |
| December 11, 2019 | 100,000 | $1,829,540.00 | Scoggin | December 5, 2019 | 238 | $18.78 |
| | | | | December 16, 2019 | 25 | $18.18 |

279.    Plaintiffs who purchased shares of Tilray common stock contemporaneously with sales by Kennedy suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange

Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.


Dated: December 3, 2021                    Respectfully submitted,

                                           THE ROSEN LAW FIRM, P.A.

                                           /s/ Jonathan Horne
                                           Jonathan Horne (JH 7258)
                                           Laurence M. Rosen, Esq. (LR 5733)
                                           275 Madison Avenue, 40th Floor
                                           New York, New York 10016
                                           Telephone: (212) 686-1060
                                           Fax: (212) 202-3827
                                           Email: jhorne@rosenlegal.com
                                           Email: lrosen@rosenlegal.com

                                           *Lead Counsel for Plaintiffs and the putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 3, 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/Jonathan Horne</u>