**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANESH KASILINGAM, individually and on behalf of all others similarly situated,<br><br><br>                Plaintiff,<br><br>- against-<br><br>TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,<br><br>                Defendants. | Case No. 20-cv-03459-PAC |

## MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

I.    Introduction................................................................................................................1

II.   Factual Background ....................................................................................................3

    A.    Tilray is a Leader in the Nascent Global Cannabis Industry. ..................................3

    B.    The Farm Bill Spurs Tilray to Enter into First of Its Kind ABG Agreement. .........4

    C.    Tilray's 2018 10-K Reflects Continued Growth and Identifies Material
        Weakness. ................................................................................................................6

    D.    Tilray Worked Hard to Properly Account for and Capitalize on ABG
        Agreement.................................................................................................................7

    E.    Privateer Proposes Mutually Beneficial Downstream Merger. ...............................8

    F.    Developments at the End of 2019 Raise Concerns about the ABG
        Agreement's Near-Term Profitability, and Tilray Takes Appropriate Action. .......9

    G.    Tilray's 2019 10-K Recognizes ABG Impairment and Writes Down
        Inventory.................................................................................................................10

    H.    Tilray and Aphria Negotiate and Consummate a Merger.......................................11

III.  Legal Argument .......................................................................................................12

    A.    Heightened Pleading Standards Govern Plaintiffs' Claims...................................12

    B.    The Challenged Statements Were True and Not Misleading..................................12

        1.    Positive Statements about the ABG Deal ....................................................12

        2.    Statements Reporting ABG's Valuation, and Tilray's Assets and Net
            Loss.............................................................................................................14

        3.    Statements Regarding Inventory..................................................................16

        4.    Statements Reporting Cost of Sales and Gross Margins .............................18

    C.    Plaintiffs Cannot Allege a Strong Inference of Scienter.......................................19

    D.    Plaintiffs Cannot State a Section 20A Claim for Insider Trading. ........................25

IV.   Conclusion ...............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
No. 17-cv-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ...................................16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................................................................................................25

*In re Axonyx Sec. Litig.*,
No. 05-cv-2307 (TPG), 2009 WL 812244 (S.D.N.Y. Mar. 27, 2009)....................................25

*In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*,
No. 09-md-2058 (PKC), 2011 WL 3211472 (S.D.N.Y. July 29, 2011) .................................23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .................................................................................................15

*Dempsey v. Vieau*,
130 F. Supp. 3d 809 (S.D.N.Y. 2015).....................................................................................17

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................................18

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...................................................................................................19

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008).....................................................................................14

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)...................................................................................................15

*In re Gildan Activewear, Inc. Sec. Litig.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009).....................................................................................21

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011).....................................................................................20

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)...................................................................................................23

*In re Keryx BioPharmaceuticals, Inc. Sec. Litig.*,
No. 13-cv-1307 (KBF), 2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ...............................20, 21

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
No. 19-cv-7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .................................24

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty.*
*Ret. Ass'n v. MDC Partners, Inc.*,
No. 15-cv-6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ...................................21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).................................................................................12, 13, 14, 16

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .................................................................................23

*Russo v. Bruce*,
777 F. Supp. 2d 505 (S.D.N.Y. 2011).....................................................................23

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019).........................................................14, 18, 24

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019).....................................................................................14

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)....................................................................................14

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..........................................................................................12, 19

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016).....................................................................................25

*In re Yukos Oil Co. Sec. Litig.*,
No. 04-cv-5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .................................23

**Statutes**

15 U.S.C. § 78t-1(a)...................................................................................................25

15 U.S.C. § 78u-4(b)...........................................................................................12, 19

**Other Authorities**

Alexander Beadle, "Canada's Edibles Market Gets Off to a Slow Start,"
*Analytical Cannabis*, Dec. 20, 2019, *available at*
*https://www.analyticalcannabis.com/articles/canadas-edibles-market-gets-off-
to-a-slow-start-312161* ........................................................................................10

FDA, Consumer Update on CBD, last updated Mar. 5, 2020, *available at*
*https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-
what-were-working-find-out-about-products-containing-cannabis-or-cannabis*.....................9

FDA, "FDA is Committed to Sound, Science-based Policy on CBD," July 17,
2019, *available at https://www.fda.gov/news-events/fda-voices/fda-committed-
sound-science-based-policy-cbd* ...................................................................................7

FDA, "FDA warns 15 companies for illegally selling various products containing
cannabidiol as agency details safety concerns," Nov. 25, 2019, *available at*
*https://www.fda.gov/news-events/press-announcements/fda-warns-15-
companies-illegally-selling-various-products-containing-cannabidiol-agency-
details* ................................................................................................................9

FDA, "Notice of Public Hearing; request for comments," Apr. 3, 2019, *available
at https://www.federalregister.gov/documents/2019/04/03/2019-
06436/scientific-data-and-information-about-products-containing-cannabis-
or-cannabis-derived-compounds* ....................................................................................7

FDA, "Statement from FDA Commissioner Scott Gottlieb, M.D., on signing of
the Agriculture Improvement Act and the agency's regulation of products
containing cannabis and cannabis-derived compounds," Dec. 20, 2018,
*available at https://www.fda.gov/news-events/press-
announcements/statement-fda-commissioner-scott-gottlieb-md-signing-
agriculture-improvement-act-and-agencys* .....................................................................5

Ed Lin, "Marijuana Stock Tilray is Slumping. 2 Executives are Making Big
Sales," Barron's, Apr. 8, 2019, *available at*
*https://www.barrons.com/articles/tilray-stock-insider-sales-51554495643* ..........................21

Ed Lin, "Tilray Executives are Selling the Marijuana Stock," Barron's, Jan. 30,
2019, *available at https://www.barrons.com/articles/tilray-ceo-sells-stock-
51548860821*.........................................................................................................21

Nathaniel Meyersohn, "Barneys. Neiman Marcus. America's stores are taking the
leap into cannabis products," *CNN Business*, Feb. 13, 2019, *available at*
*https://www.cnn.com/2019/02/12/business/cbd-cannabis-dsw-neiman-marcus-
barneys-retail/index.html* ............................................................................................5

Kelly Tyko, "Walgreens will sell CBD products in nearly 1,500 stores," USA TODAY, Mar. 28, 2019, *available at https://www.usatoday.com/story/money/2019/03/27/walgreens-sell-cbd-products-nearly-1-500-drugstores-report-says/3295939002/* ...................................................5

Alicia Wallace, "CBD product sales are booming. Now the FDA needs to weigh in," *CNN Business*, July 9, 2019, *available at https://www.cnn.com/2019/07/09/business/cbd-sales-fda/index.html* .......................................9

## I.     INTRODUCTION

This is Plaintiffs' third failed attempt to cobble together a coherent case. On September 27, 2021, this Court dismissed the First Amended Complaint ("FAC") holding that Plaintiffs "failed to adequately plead scienter." 9/27/21 Opinion & Order (Dkt. #92; "Op."), at 1. The Court found, among other things, that the scienter allegations against Mr. Kennedy (the former CEO of Tilray, Inc. ("Tilray")) suffered from a number of "shortcomings" and that there were "many" stronger, opposing non-culpable inferences.[1] *Id.* at 15. The Court also found that Plaintiffs' allegations were "vague, speculative, and conclusory," constituted "impermissible retrospective critique" and "fraud by hindsight," and "fail[ed] to establish that Defendants were insincere in the[] belief[s]" expressed in the challenged statements. *Id.* at 19, 21-22, 26 (citations and quotations omitted).

Plaintiffs' original scienter theory posited that Mr. Kennedy made the challenged statements to inflate Tilray's stock price so that he could effectuate a downstream merger between Tilray and its controlling shareholder, Privateer Holdings ("Privateer")—allegedly in order to maintain voting control over Tilray while enjoying a reduced tax burden if he sold his shares. *Id.* at 13. Having had that theory rejected by the Court, Plaintiffs now conjure up an even more preposterous theory of motive: that the downstream merger was in fact only a "first step" in a long con to effectuate a *second* merger that could have made (but did not) Mr. Kennedy CEO of the "world's largest cannabis company." SAC ¶¶ 12-13, 18, 151-92. But Plaintiffs have not conjured up any additional facts that might support this elaborate and farfetched theory or otherwise fix the pleading deficiencies this Court identified with respect to scienter. And Plaintiffs still fail to plead falsity. Plaintiffs have had ample opportunity to plead a claim and cannot, due to the fundamental flaws detailed here and in Defendants' motion to dismiss the FAC.

---

[1] Plaintiffs no longer name Mark Castaneda (Tilray's former CFO) as a defendant in this case. SAC ¶ 43.

*    *    *

The facts in this case are straightforward. Tilray is a global cannabis-lifestyle and consumer packaged goods company with operations in Canada, the United States, Europe, Australia, and Latin America. It has become a global leader in legal cannabis research, cultivation, processing, and distribution. Tilray has always taken a long-term view with respect to its nascent industry: the legal cannabis market remains subject to a great deal of regulatory uncertainty in the near-term, but its future is exceptionally bright, estimated to be a $150 billion global industry in coming years, with $22 billion of that in the U.S. hemp-derived cannabidiol ("CBD") market alone.[2] *See* Ex. 1[3] (5/14/19 Tr.), at 3-5.

From the beginning, strong branding has been a key component of this long-term vision. Tilray has maintained a rigorous focus on quality, invested heavily in research and development, and cultivated important partnerships that have helped position it as an early leader in the global medical cannabis market. Thus, when the opportunity arose in early 2019 to join forces with Authentic Brands Group ("ABG")—a brand management company with a global portfolio—it seemed like the perfect partnership at the perfect time: the U.S. Agricultural Improvement Act of 2018 (the "Farm Bill") had just been enacted and was widely viewed as opening up the U.S. market for CBD products.

But the industry's hopes and expectations for regulatory clarity and a quick path forward in the U.S. did not materialize. By the end of 2019, it had become clear that the U.S. Food and Drug Administration ("FDA") was not moving quickly to greenlight CBD. Accordingly, Tilray conducted an impairment analysis on the value of the ABG Agreement, recognized an impairment,

---

[2] All $ references are in US$, all emphasis is added, and all internal quotation marks and citations are omitted unless otherwise indicated.

[3] Numbered exhibits are attached to the Declaration of Douglas W. Greene and discussed in Defendants' Request for Full Context Review and/or Judicial Notice ("RJN"), filed concurrently herewith.

and renegotiated the Agreement to better align with the new regulatory and market conditions.

Based on the wisdom that comes from knowing the outcome, Plaintiffs claim that the ABG Agreement was never worth what Tilray paid for it and should have been impaired immediately; that various positive statements in 2019 about the ABG agreement and its prospects (and certain unrelated statements about inventory) were materially false and misleading; and that all this was in service of a vaguely alleged motive-less fraud. Nothing in the SAC supports these assertions.

*First, none of the challenged statements were false or misleading.* Plaintiffs attack four categories of statements, detailed below, but each challenged statement was a true statement of fact or opinion at the applicable time, and Plaintiffs have not alleged any facts to the contrary. Plaintiffs' attempts to plead fraud-by-hindsight are unavailing and cannot ground their claims.

*Second, Plaintiffs cannot plead the requisite strong inference that Mr. Kennedy—the only remaining individual defendant—acted with scienter.* As described further below, Plaintiffs' new theory of scienter is even more illogical than the prior iteration. Supreme Court precedent requires courts to weigh the competing inferences to be drawn from factual allegations in their full context. Here, the posited fraud makes no sense, and the facts and inferences demonstrate Mr. Kennedy's good faith. Because Plaintiffs still cannot plead a false or misleading statement, or a strong inference that Mr. Kennedy made any such statement with scienter, the SAC should be dismissed in its entirety with prejudice.

## II.    FACTUAL BACKGROUND

### A.  Tilray is a Leader in the Nascent Global Cannabis Industry.

Tilray is a global pioneer in what is widely expected to be a $150 billion cannabis industry. It was the first medical cannabis producer with a production facility in North America to be Good Manufacturing Practices ("GMP") certified; the first producer to export medical cannabis from North America to Africa, Australia, Europe, and Latin America; and among the first to be licensed

3

to cultivate and process medical cannabis in two countries, Canada and Portugal. Ex. 2 (2019 10-K), at 2. In July 2018, Tilray held an initial public offering and became the first cannabis company to IPO in the U.S. and trade on NASDAQ. *See* SAC ¶¶ 3, 25.

The Company's products are available across five continents and fall into three main channels—global medical cannabis, Canadian adult-use cannabis, and hemp products, including CBD—each of which involves different regulatory frameworks, areas of operation, and profit margins. Ex. 2 (2019 10-K), at 1-8. The Company's global growth strategy is focused on six top-line performance drivers that demand attention to quality control and strong branding. Ex. 3 (3/18/19 Tr.), at 3. Tilray has worked hard to achieve both, in part by partnering with established industry leaders. In December 2018 (several weeks before signing the ABG deal), Tilray announced it had entered into a global framework agreement with Sandoz AG (the generic division of pharmaceutical giant Novartis) to develop and commercialize high-quality pharmaceutical medical cannabis products. Ex. 4 (2018 10-K), at 3. That same month, Tilray also partnered with multinational brewer Anheuser-Busch InBev to develop cannabis-based beverages. *Id.*

**B.  The Farm Bill Spurs Tilray to Enter into First of Its Kind ABG Agreement.**

Regulated medical cannabis has been legal in Canada since 2001, but it was not until October 2018 that Canada legalized recreational cannabis use. The Cannabis Act left the regulation of sales and retail stores to Canada's individual provinces, but it limited legal sales initially to certain dried cannabis and oil products, with the expectation that new classes of edibles, topicals, and extracts ("2.0" products) would be permitted a year later. *See id.* at 13.

Around the same time, the U.S. took its first major step towards legalizing certain cannabis products at the federal level. The Farm Bill, signed into law December 20, 2018, exempted hemp and hemp-derived products from the U.S. Controlled Substances Act, paving the way for nationwide use, sale, manufacture, and distribution of CBD (a non-psychoactive component in

4

cannabis plants), while preserving the FDA's regulatory authority over CBD products. *Id.* at 22. The Farm Bill marked the first significant relaxation of federal controls and was heralded as a watershed moment. In the following months, industry analysts, cannabis companies, and the media expressed broad optimism that the U.S. CBD market was now in play and that the FDA would soon clarify the regulatory path forward, ushering in a new era of CBD products widely available across the U.S.[4] Indeed, FDA Commissioner Gottlieb's official statement on the Farm Bill recognized the "potential opportunities that cannabis or cannabis-derived compounds could offer and . . . the significant public interest in these possibilities," and pledged that the FDA would continue "to make the pathways for the lawful marketing of [CBD] products more efficient."[5]

In the midst of all this industry optimism, Tilray learned that ABG was looking to partner with a cannabis company. It was an attractive opportunity, particularly for a brand-focused company like Tilray: ABG owns more than 50 well-known global lifestyle and entertainment brands (e.g., Brooks Brothers, Forever 21, Greg Norman, Nine West) and has an established global network of manufacturers, operators, and retailers, generating approximately $9 billion in retail sales annually. Ex. 5 (1/15/19 PR). The ABG Agreement was carefully negotiated and vetted with assistance from outside experts.[6] On January 15, 2019, the parties announced a long-term revenue sharing agreement to develop, market, and distribute a portfolio of consumer cannabis products within ABG's brand portfolio worldwide, with immediate focus on CBD in the U.S. *Id.* Under the agreement ("ABG Agreement"), Tilray became the preferred supplier of active cannabinoid ingredients for ABG-branded products and acquired the right to receive up to 49% of the net

---

[4] *See, e.g.*, Nathaniel Meyersohn, "Barneys. Neiman Marcus. America's stores are taking the leap into cannabis products," *CNN Business*, Feb. 13, 2019; Kelly Tyko, "Walgreens will sell CBD products in nearly 1,500 stores," USA TODAY, Mar. 28, 2019.

[5] FDA, "Statement from FDA Commissioner Scott Gottlieb, M.D., on signing of the Agriculture Improvement Act and the agency's regulation of products containing cannabis and cannabis-derived compounds," Dec. 20, 2018.

[6] Ex. 5 (1/15/19 PR), at 2 ("Tilray's financial advisor on the transaction was BofA Merrill Lynch. [ABG]'s legal advisor . . . was Paul, Weiss . . . .").

revenue from those products in perpetuity, with a guaranteed minimum of up to $10 million annually for 10 years. Ex. 5 (1/15/19 8-K), Item 1.01. In exchange, Tilray agreed to pay approximately $100 million in cash and stock up front, plus (a) additional consideration in stock (valued at $66,666,667) upon triggers relating to the sale of CBD being legal in the U.S. (Tilray paid this amount in March 2019); and (b) further consideration ($83,333,333 in a combination, at ABG's election, of up to $16,666,666 in cash and the remainder in common stock), upon certain triggers relating to the regulatory status of tetrahydrocannabinol ("THC") in the U.S. *See id.*

The Farm Bill gave both parties genuine optimism that the deal would be profitable sooner rather than later. Ex. 5 (1/15/19 PR). Just a month after signing the ABG Agreement, Tilray further signaled its confidence in the U.S. CBD market, acquiring Manitoba Harvest—"the world's largest hemp food company"—for $317 million. Ex. 4 (2018 10-K), at 4; Ex. 3 (3/18/19 Tr.), at 4.

## C. Tilray's 2018 10-K Reflects Continued Growth and Identifies Material Weakness.

In their public filing and earnings call in March 2019, Defendants expressed continued optimism about the Farm Bill, the ABG Agreement, the Manitoba Harvest acquisition, and industry momentum generally. *See, e.g.*, Ex. 3 (3/18/19 Tr.), at 5; Ex. 4 (2018 10-K), at 3-4. But Tilray's 2018 10-K also explicitly warned that both the regulatory framework for and future profitability of the ABG deal remained uncertain, and outlined the potential impacts of these clearly identified risk factors. Ex. 4 (2018 10-K), at 22-23. In addition, the 2018 10-K reflected certain common corporate growing pains: it identified a material weakness as of December 31, 2018 in Tilray's internal controls for financial reporting "relating to inventory costing and the financial close process." *Id.* at 58. The Company explained that management was working to remedy this deficiency by "increasing the depth and experience within our accounting and finance organization, as well as designing and implementing improved processes and internal controls . . . ." *Id.* Still, Tilray's outside auditor, Deloitte LLP, concluded that the 10-K "present[ed] fairly, in

6

all material respects, the financial position of the Company." *Id.* at F-2.

### D. Tilray Worked Hard to Properly Account for and Capitalize on ABG Agreement.

Following the ABG Agreement, Tilray consulted extensively with Deloitte and other experts to ensure it was properly accounting for this complex transaction. Because the guaranteed payments under the Agreement met the definition of a loan under Generally Accepted Accounting Principles ("GAAP"), that portion of the Agreement's value was accounted for as a loan, while most of it was recorded as an indefinite-lived intangible asset. Ex. 2 (2019 10-K), at F-28-9, F-3-5. Consistent with GAAP, that indefinite-lived intangible asset was "calculated using the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above." *Id.* at F-29. Tilray also worked closely with ABG to identify ABG brands especially well-suited to CBD product offerings and to develop those product plans as quickly as possible.[7]

In the spring and summer of 2019, there was broad industry optimism about the rapidly growing U.S. CBD market. In April, the FDA formed an internal working group and issued a call for scientific information and public comment, and on May 31 it convened a public hearing to hear directly from stakeholders.[8] Meanwhile, CBD had become the hot new thing across many industries, and consumer packaged good ("CPG") companies and retailers all over the U.S. were trying to get in on it.[9] In the March and May earnings calls, Tilray described how it was receiving large numbers of contacts from retailers interested in CBD partnerships. *See* Ex. 3 (3/18/19 Tr.), at 12-13; Ex. 1 (5/14/19 Tr.), at 9. At the same time, it acknowledged this was not the case for all retailers: "[T]here are retailers in the U.S. that aren't waiting for the FDA. And then there—as you

---

[7] See Ex. 3 (3/18/19 Tr.), at 14; Ex. 1 (5/14/19 Tr.), at 18.

[8] FDA, "Notice of Public Hearing; request for comments," Apr. 3, 2019, *available at https://www.federalregister.gov/documents/2019/04/03/2019-06436/scientific-data-and-information-about-products-containing-cannabis-or-cannabis-derived-compounds*; FDA, "FDA is Committed to Sound, Science-based Policy on CBD," July 17, 2019, *available at https://www.fda.gov/news-events/fda-voices/fda-committed-sound-science-based-policy-cbd.*

[9] *See supra* note 4; Ex. 3 (3/18/19 Tr.), at 12-13.

can imagine, there are more conservative retailers that are going to wait and see what happens with some of the FDA hearings . . . over the course of this summer." Ex. 1 (5/14/19 Tr.), at 18.

### E. Privateer Proposes Mutually Beneficial Downstream Merger.

Amidst all this excitement, Tilray and its founder and majority stockholder—private equity firm Privateer Holdings (started by Mr. Kennedy and two others)—also were working to unwind Privateer's interest in Tilray. Following Tilray's IPO, Privateer held approximately 82% of Tilray's economic interest, but all of its shares were subject to a six-month lockup. SAC ¶¶ 3, 25, 154. Rather than sell those shares for billions of dollars when the lockup expired in January 2019, Mr. Kennedy and the other Privateer investors announced ahead of time that, for the time being, Privateer would continue to hold its shares to avoid the negative impact that large sales might have on Tilray's stock price. *See id.* ¶ 75 n.3. After some negotiation, Tilray and Privateer arrived at a mutually beneficial path forward: a downstream merger through which Tilray would cancel all of Privateer's existing shares and issue new shares to each Privateer investor, according to their pro-rata Privateer ownership[10]; in turn, the Privateer investors agreed to lock up their newly issued shares with phased release controlled by Tilray's board. This transaction served all parties' interests, allowing Privateer to unwind, ensuring orderly, controlled release of its large number of Tilray shares, and providing tax benefits (as Plaintiffs note) to *all* Privateer investors if and when they sold their shares. *See id.* ¶¶ 156-58. On September 9, 2019, the relevant parties executed the Agreement and Plan of Merger and Reorganization (the "Downstream Merger Agreement"). Ex. 8 (9/10/19 Form 8-K). On December 12, 2019, Tilray stockholders approved the downstream merger, the old Privateer shares were cancelled and new ones issued, and Privateer was dissolved shortly thereafter. *Id.* ¶ 160-68.

---

[10] Except that all Class 1 shares were reissued to Privateer's three founders, maintaining their voting control over Tilray. SAC ¶¶ 154-55, 161.

8

**F.    Developments at the End of 2019 Raise Concerns about the ABG Agreement's Near-Term Profitability, and Tilray Takes Appropriate Action.**

Enthusiasm around CBD lasted well into the latter half of 2019,[11] but the longer the FDA's process dragged on, the more reluctant retailers became to stock CBD products. Mr. Castaneda explained in August that they were starting to see "a lot of the major retailers holding off, especially on the ingestible products until they have more clarity. As that clarity comes in the second half, we see a significant ramp in the second half of the year. If it does not, we see a much slower ramp on the CBD side . . . on the ingestible side." Ex. 6 (8/13/19 Tr.), at 13. Even so, the Company was seeing significant retail interest in topicals—which raised fewer FDA concerns—and expected to roll out the first ABG-branded products by year end. Ex. 7 (11/12/19 Tr.), at 11, 17.

On November 25, 2019, however, the FDA surprised the industry: that day it sent warning letters to 15 companies for selling CBD products in illegal ways and revised its Consumer Update to state, among other things, that the FDA could not conclude that CBD is "generally recognized as safe (GRAS)."[12] After months of silence, these actions signaled that the FDA still had substantial concerns, leading more retailers to hold off on CBD products. This new landscape had consequences for Tilray's ABG partnership as well—ABG's updated year-end sales projections showed that the Agreement's path to profitability would take longer than anticipated.

Tilray worked hard to mitigate the damage. It consulted with Deloitte and other experts to evaluate the financial and accounting impacts of the revised forecast, including an impairment analysis. And in January 2020, Tilray renegotiated the ABG Agreement to better reflect the altered

---

[11] *See, e.g.*, Alicia Wallace, "CBD product sales are booming. Now the FDA needs to weigh in," *CNN Business*, July 9, 2019 (describing enormous retail and consumer interest in CBD).

[12] *See* FDA, "FDA warns 15 companies for illegally selling various products containing cannabidiol as agency details safety concerns," Nov. 25, 2019, *available at https://www.fda.gov/news-events/press-announcements/fda-warns-15-companies-illegally-selling-various-products-containing-cannabidiol-agency-details*; FDA, Consumer Update on CBD, last updated Mar. 5, 2020, *available at https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis*.

regulatory and commercial landscape and the parties' revised expectations regarding time to profitability.

### G. Tilray's 2019 10-K Recognizes ABG Impairment and Writes Down Inventory.

Pursuant to GAAP and with assistance from outside experts, Tilray conducted an impairment analysis on the indefinite-lived intangible asset associated with the ABG Agreement and determined that the fair value was below the carrying value. Ex. 2 (2019 10-K), at F-35. It recognized "[a]n impairment of $112.1 million . . . in 2019 primarily due to the analysis of future cash flows for our ABG Profit Participation Agreement, which have been reduced due to the delayed clarity from the FDA regarding CBD products in the United States." *Id.* at 67. As described below, both the 2019 10-K and Deloitte's Audit Report reflect that this impairment analysis was highly subjective and arrived at only after extensive consultation with and advice from Deloitte, which in turn had to call in its own specialists. *See id.* at 55-56; F-2-F-4 (Audit Report).

The 2019 10-K also announced inventory write-downs based on developments in the Canadian adult-use market. Throughout 2019, Tilray had valued certain "by-product"— specifically, the usable portion of "trim" that could be sold in bulk and/or extracted for use in additional products—as inventory, pursuant to GAAP, based on current bulk sales and the judgment that this by-product would have additional value in the future when it could be extracted for use in the 2.0 products Canada was set to legalize in late 2019. Ex. 7 (11/12/19 Tr.), at 8-9. When the Canadian 2.0 market opened in December 2019, however, it became apparent that it would not grow as rapidly as expected.[13] As a result, Tilray—like many of its competitors—wrote down inventory to match this new reality: "The total inventory valuation adjustment of $63.5 million . . . reflects our estimate of excess product based on current sales forecasts, which have

---

[13] *See* Alexander Beadle, "Canada's Edibles Market Gets Off to a Slow Start," *Analytical Cannabis*, Dec. 20, 2019.

been reduced from previous estimates due to the slower than expected transition of the Canadian adult use market[.]" Ex. 2 (2019 10-K), at 64.

### H. Tilray and Aphria Negotiate and Consummate a Merger.

Notwithstanding these challenges, Tilray never lost faith in the global cannabis industry's potential. In October 2019, a unique opportunity presented itself: a representative from an investment bank active in the cannabis industry contacted Mr. Kennedy and Andrew Pucher, Tilray's Chief Corporate Development Officer, to propose a meeting with Irwin Simon, the Chairman and CEO of Aphria Inc. ("Aphria"), an Ontario-based cannabis company, to "discuss the state of the industry and each other's businesses." Ex. 9 (3/12/21 Proxy), at 47. On November 22, 2019, Mr. Pucher and Mr. Simon held that initial meeting (Mr. Kennedy was not in attendance) wherein they agreed that the companies' global operations were "highly complementary" and that "a combination of the businesses could result in significant new business opportunities and cost and revenue synergies." *Id*. Six days later, Aphria and Tilray entered into a mutual non-disclosure agreement governing the negotiation of a potential transaction. SAC ¶¶ 182-84. Each party was represented by sophisticated advisors. Ex. 9 (3/12/21 Proxy), at 48, 51, 55-6.

On February 14, 2020, Tilray provided Aphria with an initial draft of a non-binding term sheet, which contemplated an all-stock merger wherein shareholders of Tilray and Aphria would respectively own equity interests of 56% and 44% in the combined company (reflecting Tilray's higher share price and market capitalization), with Mr. Kennedy as CEO and Mr. Simon as Executive Chairman. SAC ¶ 189. In late March, however—amid pandemic-induced, global stock slides and volatility—the share prices of Tilray and Aphria began to converge, and Mr. Kennedy revised the offer to contemplate a 50/50 equity split. *Id.* ¶ 195. Negotiations continued throughout 2020, and, on December 15, 2020, the parties reached a deal: Aphria and Tilray would enjoy an equity split of 62%-38%, respectively (now reflecting Aphria's higher share price), with Mr.

Simon as CEO and Mr. Kennedy as a director. *Id.* ¶¶ 196-97; Ex. 9 (3/12/21 Proxy), at 56, 58. On May 3, 2021, the merger closed, and the combined company operates under the name "Tilray."

## III.   LEGAL ARGUMENT

### A.  Heightened Pleading Standards Govern Plaintiffs' Claims.

Securities fraud claims must meet the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("Reform Act") and Rule 9(b). Under Section 10(b), a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and, "with respect to each act or omission," must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(1)(B), (2)(A). A "strong inference" is "more than merely plausible or reasonable"; it must be "powerful" and "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). And in performing this analysis, courts must consider the full factual context of the statements and conduct at issue. *Id.* at 323-34; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015); *see also* RJN. Plaintiffs' claims fail for several independent reasons.

### B.  The Challenged Statements Were True and Not Misleading.

Plaintiffs challenge four categories of statements, grouped below. They do not and cannot plead that any statement in any category was false or misleading.

#### 1.  Positive Statements about the ABG Deal

Plaintiffs challenge a variety of positive statements Mr. Kennedy made about the ABG Agreement from the time it was signed through November 2019: that the ABG Agreement was a "first of its kind" deal that "leverages our complementary strengths and is accretive"; that the passing of the U.S. Farm Bill was an important impetus for partnering with ABG; that Tilray was meeting with ABG to decide which brands and products to bring to market first and the partnership

was continuing to "build momentum"; that Tilray was a particularly attractive partner; that they were working to commercialize ABG brands in Europe by early 2020; and, in November, that they still expected to launch an ABG product by year end. SAC ¶¶ 82-87, 92-94, 107-09, 120, 129-31.[14]

These optimistic statements express the Defendants' subjective views and/or characterizations of matters open to interpretation; as such, they constitute statements of opinion under the securities laws. *Omnicare*, 575 U.S. at 183. For a statement of opinion to be false or misleading under *Omnicare*, a plaintiff must do more than allege that it turned out to be incorrect: he must plead (1) facts sufficient to show that the speaker did not actually hold the stated belief at the time the statement was made; or (2) "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 188-89, 194.

The SAC, like the FAC, fails to plead any facts suggesting that Mr. Kennedy did not genuinely believe these opinion statements at the time, or that any particular omitted facts rendered them misleading in context.[15] *See* Op. 19-23. Statements in August and November 2019 by Mr. Kennedy indicating that they were seeing more U.S. retailers holding off on edible CBD products, and by Mr. Castaneda (no longer a Defendant) stating that Tilray's "pretty conservative" internal revenue models included very little U.S. CBD for 2020, are perfectly consistent with Tilray still being on track to launch the first ABG product—a topical—by year end and to commercialize products in Europe by early 2020. Nor do the allegations of former employees ("FEs") suggest otherwise, as they offer none of the particularized pleadings required to establish a basis for

---

[14] Mr. Kennedy, of course, is only legally responsible for the statements he made.

[15] To the limited extent these and other opinion statements involve an embedded fact—that Tilray was "vetted" by ABG and other partners, or that Tilray conducted "significant negotiations and due diligence" before signing the ABG Agreement—Plaintiffs have not pleaded any facts to the contrary. FE 3 does not claim to have been involved in or to have any personal knowledge of these negotiations. And nothing in the SAC disturbs this Court's sound conclusion that FE 3's allegations are too vague, speculative, and conclusory to suggest Mr. Kennedy believed "the company's due diligence was lacking" or that the ABG Agreement was "worse for the company than advertised." Op. 19.

13

personal knowledge regarding their allegations. *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (CW allegations must be sufficiently detailed "to support the probability that a person in the position occupied by the source would possess the information alleged.").[16] In addition, most of these challenged opinion statements also are non-actionable "puffery"[17] and/or forward-looking statements protected under the Reform Act's safe harbor.[18]

### 2.   Statements Reporting ABG's Valuation, and Tilray's Assets and Net Loss

The second category is the heart of Plaintiffs' suit—the baseless assertion that the ABG Agreement was never valuable and should have been impaired immediately, and that Defendants' failure to do so rendered statements in Tilray's 2019 10-Qs knowingly or recklessly "false and misleading." SAC ¶¶ 100-06, 116-25. This is classic fraud-by-hindsight. The valuation and impairment analysis for the ABG Agreement required complex, subjective judgment calls that rendered the challenged statements opinions under the securities laws, and Plaintiffs have not pleaded any facts suggesting that these were false or misleading under *Omnicare*.

As explained in its Q1 2019 10-Q, the Company originally valued the ABG Agreement at the cost of the cash and stock consideration Tilray paid for it, most of which was recorded as an intangible asset with indefinite life. *Id.* ¶¶ 100-01. Plaintiffs do not dispute this initial valuation under GAAP, but argue that ASC 360-35-18 *required* Tilray to conduct an impairment analysis almost as soon as it was signed, and that the quantitative impairment analysis under ASC 360-35-19 *required* Tilray to impair the ABG Agreement throughout 2019. Not so. Even a cursory review

---

[16] *See also In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (CW "intimately involved" in clinical trials did not establish basis for knowing about all aspects of trials or what defendants knew).

[17] *See* SAC ¶¶ 82, 84, 86, 108; *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (expressions of optimism or opinion that are "too general to cause a reasonable investor to rely upon them" are non-actionable puffery).

[18] *See* SAC ¶¶ 82, 108, 120, 129-30; *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (safe harbor protects forward-looking statements that are (a) identified as such and accompanied by meaningful cautionary language; *or* (b) immaterial, *or* (c) not made with actual knowledge of falsity). Here, the forward-looking statements were genuinely believed by Mr. Kennedy, were so vague as to be immaterial, and were identified as such and accompanied by meaningful cautionary language. *See* Ex. 5 (1/15/19 PR), at 2; Ex. 6 (8/13/19 Tr.) at 2-3; Ex. 7 (11/12/19 Tr.), at 2-3.

of those GAAP provisions demonstrates that they require highly subjective estimates and judgment calls on which even expert accountants may differ.[19] *Id.* ¶¶ 103-05. The relevant GAAP provisions required the Defendants, in consultation with Tilray's outside experts, to make a series of subjective judgments: first to determine whether the fair value of Tilray's profit participation rights, including the guaranteed minimum payments to Tilray, under the Agreement was more likely than not impaired *in all the circumstances*; and then, if (and only if) so, to estimate that fair value based on various financial assumptions and projections about the CBD market generally and ABG's future sales. *Id.* Deloitte identified this fair value estimate as a Critical Audit Matter that was among the most complicated and subjective accounting issues in its year-end audit:

> In determining the fair value of the ABG participation rights for purposes of the impairment test . . . the judgments and assumptions with the highest degree of impact and subjectivity are the discount rate and forecasted rate of future CBD related revenue growth for ABG. Auditing management's assumptions used in [this] analysis required a high degree of auditor judgment and an increased extent of audit effort, including the need to involve fair value specialists.[20]

Where reported financial metrics—e.g., the value of an indefinite-lived intangible asset— are based on subjective estimates and judgment calls of the type described above, courts have found them to constitute statements of opinion for purposes of the securities laws. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011) (estimates of goodwill under GAAP are opinion statements because they "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir.

---

[19] ASC 360-35-18 requires management to test for impairment annually or whenever, in their subjective judgment, "events or changes in circumstances indicate that it is more likely than not that the asset is impaired." ASC 360-35-18B identifies non-exhaustive list of factors to consider, including "legal, regulatory, contractual, political, business, or other factors, including asset-specific factors" that could affect fair value.

[20] Ex. 2 (2019 10-K), at F-4-F-5; *see also id.* ("With the assistance of our fair value specialists [we] [e]valuated the rate of future revenue growth to assess the reasonableness against market expectations and [e]valuated the reasonableness of the discount rate by (1) testing the source information . . . and (2) developing a range of independent estimates and comparing those to the discount rate selected by management.").

15

2017) (same); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545 (LAK), 2019 WL 4257110, at *13-22 (S.D.N.Y. Sept. 9, 2019) (similar). Here, Plaintiffs have not pleaded any facts, as opposed to conclusory allegations, suggesting that Mr. Kennedy did not believe the reported carrying value for the ABG Agreement to be fair when each 2019 10-Q was filed, or that particular omitted facts at the time rendered those reported values misleading. Indeed, the facts before the Court suggest the opposite. The fact that Tilray consistently consulted outside experts from the beginning regarding its valuation, accounting, and impairment analysis for the ABG Agreement— and that Deloitte and its specialists ultimately approved of those estimates—gave Mr. Kennedy every reason to believe that Tilray's financial reports fairly valued the ABG Agreement. The "conditions necessitating impairment" did not exist until late November-December 2019—when the FDA stated for the first time that it did not consider CBD generally safe and that it had no near-term regulatory path, and Tilray received updated sales forecasts from ABG—at which point the Company tested for and recognized an impairment in compliance with GAAP.

As this Court has already concluded in the context of scienter, Plaintiffs' assertion that Defendants should have reached a different determination earlier is nothing more than impermissible fraud-by-hindsight. Op. 21-23; *see also Omnicare*, 575 U.S. at 186 (securities laws "do[] not allow investors to second-guess inherently subjective and uncertain assessments" and are not an "invitation to Monday-morning quarterback an issuer's opinion").[21]

### 3. Statements Regarding Inventory

The SAC also alleges that Tilray fraudulently overstated inventory throughout 2019 by assigning "unsellable trim" value in violation of GAAP. SAC ¶¶ 88-91, 95-99, 110-15, 133-35.

---

[21] FE 3 baldly asserts that it was "immediately very clear" that the ABG Agreement was not worth what Tilray had paid for it (SAC ¶ 76), but FE 3 does not allege any basis for personally knowing about the Agreement, its negotiations, its prospects, or the complicated accounting judgments involved in its valuation. *See* Op. 19.

16

To the contrary, as Defendants clearly explained throughout 2019, they—like their competitors—believed the by-product recorded as inventory had value: Tilray was currently selling portions of it in bulk, and expected to extract and sell even more of it after the Canadian 2.0 market opened in late 2019. *See, e.g.*, Ex. 7 (11/12/19 Tr.), at 8-9; Ex. 2 (2019 10-K), at 3 ($25 million in bulk sales). Each financial statement in 2019 detailed Tilray's inventory valuation policy as follows:

> Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and *by-products to be extracted*. . . . Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. . . . Net realizable value is defined as the *estimated selling price in the ordinary course of business*, less reasonably predictable costs of completion, disposal and transportation. At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value.

SAC ¶¶ 89, 96, 113, 133. And Defendants truthfully explained, as late as November, that the increasing inventory balances were part of a long-term sales plan: they were stockpiling product at the new Portugal facility while awaiting further GMP certifications, and were accumulating flower by-product in Canada expecting to begin extracting and using it for 2.0 products when the Canadian 2.0 market opened in December 2019. SAC ¶ 110; Ex. 7 (11/12/19 Tr.), at 8-9.

With the wisdom of hindsight, Plaintiffs claim that those inventory estimates were false and misleading and should have been written down sooner. But the fact that Tilray's expectations for the 2.0 market may have proven too optimistic does not suggest that Mr. Kennedy did not believe these opinion statements at the time. *See* Op. 25; *Dempsey v. Vieau*, 130 F. Supp. 3d 809, 818 (S.D.N.Y. 2015) (rejecting falsity argument related to inventory write-downs for "fail[ure] to allege that Defendants did not honestly believe the opinion"). Inventory valuation, like the ABG Agreement valuation and impairment, required a host of subjective judgments: management had to estimate the value of by-product inventory based on its best judgment, in light of innumerable market factors, as to its value in the current marketplace as well as the likely demand and selling

17

price in the new Canadian 2.0 market once it opened.[22] The fact that the estimated value did not fully materialize does not mean that these opinion statements were false when made, or that Tilray was required to write down inventory earlier. Once the Canadian 2.0 market opened in December 2019, it became clear that the small number of provincial retail outlets was limiting demand for 2.0 products and that the industry had an oversupply of by-product and extracted oils. At that point, Tilray wrote down inventory to reflect new market conditions, and valued by-products at zero moving forward.[23]

### 4. Statements Reporting Cost of Sales and Gross Margins

Finally, for many of the same reasons, the cost of sales and gross margins Tilray reported in 2019 were truthful and not misleading statements of opinion, and Plaintiffs have not alleged any facts to the contrary.[24] *See* SAC ¶¶ 40-69, 90-91, 98-99, 114-15, 134-35. To the extent Plaintiffs' challenge to these statements depends on their allegations of false inventory valuations—which factor into cost of sales and gross margins estimates—those claims fail for the reasons discussed above. The only other allegations Plaintiffs offer are two lower-level FEs' assertions that certain pieces of Tilray's accounting systems did not reflect all costs in the ways the FEs thought they should. As this Court previously concluded, these FE reports "simply depict discord among Tilray staff" and "fail[] to suggest anything more sinister than a disagreement among staff regarding accounting protocols." *See* Op. 23-24. Neither of the FEs claims to have been involved in preparing Tilray's financial reports or to have any basis for personally knowing how the Company prepared

---

[22] The FEs offer no support for their conclusory assertions that the by-product was all "unsellable waste": they do not allege any basis for personally knowing what reasonably could or could not be sold at that time or in the future Canadian 2.0 market. *See Schiro*, 396 F. Supp. 3d at 305.

[23] *See* SAC ¶ 148. This going-forward change—the first in the industry—was not, as Plaintiffs claim, an *admission* that Tilray's prior valuation of trim was "improper," but an appropriate adjustment based on changed market conditions. *See* Op. at 25-26.

[24] Plaintiffs also fail to plead loss causation with respect to these statements: they have not alleged that any "hidden truth" was revealed with respect to cost of sales and gross margins—as opposed to inventory—causing Plaintiffs' alleged losses. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

18

them. In truth, the Finance team used only raw local sales data, rather than summaries, for financial reporting purposes. The FEs' observations are consistent with Tilray's own assessment that deficiencies in its inventory accounting system constituted a material weakness, but do not suggest that there was anything wrong with the cost of sales and gross margins reported to investors. To the contrary, Tilray's outside auditors—who were well aware of the material weaknesses *and gave extra scrutiny to the Company's inventory accounting*—determined that Tilray's 2018 and 2019 10-Ks (including cost of sales and gross margins) were GAAP compliant and fairly presented the financial condition of the Company. Ex. 2 (2019 10-K), at F-2-F-6.

### C. Plaintiffs Cannot Allege a Strong Inference of Scienter.

Plaintiffs' Section 10(b) claim fails for another, independent reason: lack of scienter. To plead scienter, Plaintiffs must state "with particularity" facts giving rise to a "strong inference" that Mr. Kennedy acted with "an intent to deceive, manipulate, or defraud" with respect to each alleged false or misleading statement. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); 15 U.S.C. § 78u-4(b)(2). This strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. And this "inherently comparative" inquiry requires courts to weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24.[25]

Here, non-fraudulent inferences abound. Everything about how Mr. Kennedy and the executive team handled Tilray's financial reporting bespeaks good faith. The material weakness findings in the 2018 and 2019 10-Ks reflect that they were aware of and working hard to remedy

---

[25] In the Second Circuit, scienter can be established by alleging facts showing either motive-and-opportunity for fraud or "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Defendants' discussion here is framed within the Supreme Court's *Tellabs* analysis but addresses both Second Circuit prongs.

deficiencies in Tilray's financial functions, including those "relating to inventory costing." These efforts and disclosures show that Mr. Kennedy and the other executives were doing everything they could to ensure that Tilray's public statements fairly represented its financial condition to investors. Moreover, they conscientiously sought out expert advice on complex accounting issues at every turn. Outside accounting experts advised on and vetted Tilray's initial valuation of the ABG Agreement and the later impairment analysis, as well as its inventory valuations, and ultimately Deloitte issued unqualified audit opinions with respect to both the 2018 and 2019 10-Ks. And, as this Court previously concluded, "the frequent FDA discussion peppered throughout the alleged misstatements support a strong inference that Defendants grounded their projections in . . . genuine[] optimism that regulatory developments were imminent, and retreated only after accepting that the FDA was not planning to act as Defendants had hoped and expected." Op. 15.

Against these strong inferences of good faith conduct, Plaintiffs' allegations—even on the third try—remain especially weak. Plaintiffs now claim for the first time that certain stock sales by Mr. Kennedy during the Class Period show motive. But these were not alleged in the FAC for good reason: none of the sales was "unusual or suspicious in timing or amount." *In re Keryx BioPharmaceuticals, Inc. Sec. Litig.*, No. 13-cv-1307 (KBF), 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014). Twelve of the fourteen stock sales were pursuant to a 10b5-1 plan and "it is well established that trades under [a] 10b5-1 plan do not raise a strong inference of scienter." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011)).[26] The remaining two sales (on January 24, 2019 and April 2, 2019) coincided with the vesting of Mr. Kennedy's Restricted Stock Units ("RSUs"), and Tilray's Equity Incentive Plan and Restricted Stock Unit Grant Notice provide mechanisms (including stock sales) to satisfy tax withholding obligations upon vesting of RSUs.[27]

---

[26] *See* Ex. 10 (Form 4s), at 6-9, 13, 19-21.
[27] *See* Ex. 10 (Form 4s), at 5, 8-9; Ex. 11 (2018 Tilray Equity Incentive Plan), at 14; Ex. 12 (Tilray Restricted Stock

Sales of shares "executed to cover the tax withholding obligations due upon the vesting of shares of restricted stock . . . are not indicative of fraud." *Keryx*, 2014 WL 585658, at *13.[28] Nor were the sales suspicious in amount. All told, Mr. Kennedy sold 643,164 shares during the Class Period. SAC ¶ 220. This represents only 15.7% of his overall *direct* holdings at the beginning of the Class Period,[29] and only 3.7% of his overall *direct* holdings at the end of the Class Period.[30] Such small total sales amounts do not support an inference of scienter.[31] Moreover, the fact that Mr. Kennedy repeatedly agreed to lock up large portions of his shares and retained the vast majority of his holdings beyond when "Tilray announc[ed] its decision to impair the ABG Agreement and write down inventory, which immediately, dramatically, and foreseeably tanked Tilray's stock price" (Op. 13), would mean, on Plaintiffs' theory, that he intentionally set himself up to be among the biggest victims of his own fraud. The far more reasonable inference is that he genuinely believed in the Company and the long-term value of its stock.

Unable to allege any personal financial motive for Mr. Kennedy, Plaintiffs have concocted an even more elaborate fraudulent scheme. Whereas the FAC alleged that Mr. Kennedy made false and misleading statements in order to effectuate the downstream merger with Privateer (to maintain voting control over Tilray while realizing tax benefits), the SAC now alleges that the

---

Unit Grant Notice), at 6; Ex. 13 (Mr. Kennedy's Employment Agreement with Tilray), at 2-3; *see also* Ed Lin, *Tilray Executives are Selling the Marijuana Stock*, Barron's, Jan. 30, 2019 ("The sales recorded . . . were a matter of complying with Tilray's vesting policy for restricted stock units . . . A Tilray spokeswoman noted that [] Kennedy [did not sell] 'any of the net settled shares for personal gain.'"); Ed Lin, *Marijuana Stock Tilray is Slumping. 2 Executives are Making Big Sales*, Barron's, Apr. 8, 2019.

[28] *See also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15-cv-6034 (RJS), 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (collecting cases).

[29] 4,108,441 in stock options, RSUs, and Class 2 Common Stock. Ex. 10 (7/18/18 Form 3; Form 4s), at 1-4. This does not reflect Mr. Kennedy's holdings in Tilray through Privateer prior to the downstream merger.

[30] 17,372,973 in stock options, RSUs, and Class 1 and 2 Common Stock. Ex. 10 (Form 4s), at 4-22. Mr. Kennedy also held 1,049,825 Class 2 shares through a family trust and an additional 158,746 Class 1 shares and 76,414 Class 2 shares through Skyline & Mayfair LLC. *See* Ex. 10 (Form 4s), at 14.

[31] *See, e.g., In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (no scienter where defendants sold 22.5% and 4.9% of their overall holdings in the company). Indeed, the stock sales represent only 4.6% of just Mr. Kennedy's directly owned *common stock* (excluding options and RSUs) at the end of the Class Period (13,965,738 Class 1 & 2 Common Stock shares). *See* Ex. 10 (Form 4s), at 14-22.

21

downstream merger was merely a "first step" in a longer con to propel Mr. Kennedy to CEO of the "world's largest cannabis company." SAC ¶ 18. And whereas the FAC alleged that Mr. Kennedy waited until consummation of the downstream merger to disclose the alleged fraud, the SAC now claims that he was forced to announce the ABG impairment and inventory write-down in early 2020 because of Aphria's (entirely foreseeable) "impending due diligence." *Id.* ¶¶ 14, 219.

This is pure speculation, unsupported by any factual pleadings. No FE claims to have ever interacted with Mr. Kennedy, much less to know what he thought or intended at any time; no "smoking gun" documents reflect any fraudulent scheme. Instead, Plaintiffs rely largely on prescient public statements Mr. Kennedy made about the cannabis industry—the remarkable market opportunity, the likelihood of consolidation, his desire to position Tilray as one of the leaders in this new industry—as evidence of the vast fraudulent scheme Plaintiffs posit. It is not. The fact that Mr. Kennedy identified a market opportunity and pursued it for the good of Tilray and its shareholders demonstrates foresight and strong leadership, not fraud.

The Court has previously rejected the "first step" in Plaintiffs' alleged scheme, noting that Mr. Kennedy and the other two Privateer founders *already had* voting control of Tilray prior to the downstream merger, and that the downstream merger provided all Privateer shareholders with the same tax benefits when they eventually sold their stock. *See* Op. 2, 13-16. The "second step" is equally illogical and factually unsupported. As an initial matter, the timeline does not make sense. Plaintiffs claim that Mr. Kennedy started his alleged fraud in January 2019 to effectuate the downstream merger which was in turn necessary to effectuate the Aphria merger. SAC ¶ 2. But the Downstream Merger Agreement was signed on September 9, 2019—a month before the initial meeting with Aphria was even proposed by a *third party*. *See supra* at 8, 11.

Plaintiffs' theory is illogical in several other respects as well. Plaintiffs claim that Mr.

22

Kennedy made the allegedly false and misleading statements to inflate Tilray's share price so that he could become CEO of a combined Tilray-Aphria entity, but that he then chose to publicly disclose the ABG impairment and inventory write-downs ahead of Aphria's "impending due diligence,"[32] knowing it could cause a stock price drop and destroy his leverage. *See* SAC ¶¶ 14, 189, 197. This makes no sense. A merger with Aphria was always going to require due diligence (*id.* ¶ 218): if the goal was to become CEO of the combined entity, why would Mr. Kennedy have lied about things he knew due diligence would uncover, potentially tanking the stock price and the deal before he could achieve his alleged objective? Plaintiffs also gloss over the fact that it was Mr. Kennedy who (1) later proposed a 50/50 equity split once the companies' share prices converged, (2) lost his controlling interest in Tilray, and (3) ultimately negotiated the merger without becoming CEO. SAC ¶¶ 195-203. As this Court previously noted, "[w]hen the purported fraudster 'miss[es] the boat this dramatically . . . the fraud inference is weakened." *See* Op. 14-15 (citing *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001)).

Even assuming Mr. Kennedy did want to become CEO of the "world's largest cannabis company," such ambition is not indicative of fraud.[33] The desire to acquire another company as a "realization of a long term business goal" or to "enhance [one's] executive position[] . . . and the prestige obtained thereby" does not establish scienter. *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09-md-2058 (PKC), 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011); *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011).[34]

---

[32] Nor have Plaintiffs pled with any particularity how this "impending due diligence" would actually have exposed any alleged fraud or why Mr. Kennedy would choose to *publicly* disclose any such information, given that the due diligence was confidential under the parties' mutual non-disclosure agreement. *See supra* at 11.

[33] *See also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("motives that are generally possessed by most corporate directors and officers" insufficient to establish fraud).

[34] The same is true with respect to the generalized allegation that "Tilray used its stock to acquire companies" (SAC ¶ 234); this is insufficient to establish motive. *See In re Yukos Oil Co. Sec. Litig.*, No. 04-cv-5243 (WHP), 2006 WL 3026024, at *18 (S.D.N.Y. Oct. 25, 2006) ("generalized allegations that company sought to inflate stock price to effectuate merger are insufficient" to establish scienter).

Nor can Plaintiffs circumstantially plead scienter. *See Kalnit*, 264 F.3d at 142 ("Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater."). The simple fact of Mr. Kennedy's executive position does not suggest that he knew any statement was false or misleading when it was made. *See, e.g.*, *Schiro*, 396 F. Supp. 3d at 308 (rejecting inference of scienter based on senior position). Nor do various statements Plaintiffs incorrectly characterize as "admissions." Plaintiffs' allegation related to Mr. Kennedy's May 2020 statement that Tilray would attribute "zero value" to cannabis by-product going forward (SAC ¶ 148) has already been rejected by this Court as fraud-by-hindsight and not indicative of scienter. *See* Op. 25-26. Likewise, Mr. Kennedy's pre-Class Period statement that Tilray's "favorite metric is extracts revenue" (SAC ¶ 150) does not suggest fraudulent intent; if anything, it demonstrates Mr. Kennedy's sincere, long-held belief in the promise of cannabis extract. Finally, Plaintiffs' vague allegations of "additional self-dealing" (SAC ¶¶ 227-33) and "suspicious" increases in Tilray stock trading after the downstream merger (¶¶ 235-48) have nothing to do with the challenged statements and are unsupported by sufficiently specific factual allegations.[35]

A motive-less alleged fraud rarely survives the Reform Act's strict scrutiny, and Plaintiffs' allegations support this maxim. Even after a third round of pleadings, the most compelling inference is still one of good faith—that Mr. Kennedy genuinely believed in the value of the ABG Agreement; believed Tilray was properly valuing and accounting for that Agreement (as well as inventory); and believed it was fairly representing those financial matters to investors. When the market and regulatory landscapes changed, Tilray proactively reviewed the ABG Agreement with expert assistance and determined that impairments were necessary, and also appropriately wrote

---

[35] *See, e.g.*, *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19-cv-7536 (NRB), 2021 WL 1199035, at *23 (S.D.N.Y. Mar. 30, 2021) (rejecting plaintiffs' attempt to "weave together . . . vague factual allegations, hearsay, and insinuation to produce a peculiar theory of the [] defendants' scienter").

24

down inventory. All this suggests responsible corporate stewardship, not fraud.

### D.  Plaintiffs Cannot State a Section 20A Claim for Insider Trading.

To plead a 20A claim against Mr. Kennedy, Plaintiffs must allege that he traded his shares contemporaneously with Plaintiffs while in possession of "material nonpublic information," and that he committed a "predicate violation" under the Exchange Act. 15 U.S.C. § 78t–1(a); *In re Axonyx Sec. Litig.*, No. 05-cv-2307 (TPG), 2009 WL 812244, at *5 (S.D.N.Y. Mar. 27, 2009). Section 20A claims are subject to the heightened pleading standards of Rule 9(b) and the Reform Act. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.50 (S.D.N.Y. 2008).

Here, Plaintiffs claim that Mr. Kennedy sold Tilray stock between January 24 and December 11, 2019, while allegedly in possession of material nonpublic information "concerning Tilray." SAC ¶¶ 277-78. This is too vague even to meet a notice pleading standard, much less Rule 9(b)'s particularity requirements: Plaintiffs fail to allege any specific material nonpublic information Mr. Kennedy had at the time of any particular sale.[36] And the only "predicate violation" Plaintiffs allege is that Mr. Kennedy violated Sections 10(b) and 20(a). As discussed above, Plaintiffs cannot state a predicate 10(b) or 20(a) claim without pleading falsity and scienter—which they have failed to do.[37] These flaws require dismissal of Plaintiffs' 20A claim.

## IV.   CONCLUSION

Because Plaintiffs cannot state a Section 10(b) claim, their Sections 20(a) and 20A claims also fail.[38] Moreover, repleading here would be futile: Plaintiffs have now had three chances, over almost two years, to sufficiently plead these claims and cannot do so. They should not get another chance. Defendants respectfully request that the Court dismiss the SAC with prejudice.

---

[36] If Plaintiffs mean that Mr. Kennedy knew, at the time of any particular sale, that the ABG Agreement had to be impaired or that Tilray's inventory was overvalued, Plaintiffs have not sufficiently pled any such thing.
[37] *Tongue v. Sanofi*, 816 F.3d 199, 209 n.12 (2d Cir. 2016). The pleadings regarding Mr. Kennedy are insufficient for the same reasons identified in the scienter discussion above. *See supra* § III.C.
[38] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Dated: February 2, 2022                          Respectfully submitted,


                                                 BAKER & HOSTETLER LLP


                                            By:  */s/Douglas W. Greene*

                                                 Douglas W. Greene (*pro hac vice*)
                                                 dgreene@bakerlaw.com
                                                 Zachary R. Taylor
                                                 ztaylor@bakerlaw.com
                                                 45 Rockefeller Plaza
                                                 New York, NY 10111
                                                 Telephone: 212.589.4200

                                                 Genevieve G. York-Erwin
                                                 gyorkerwin@bakerlaw.com
                                                 999 Third Avenue, Suite 3900
                                                 Seattle, WA  98104
                                                 Telephone: 206.566.7079

                                                 *Attorneys for Defendants*