**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANESH KASILINGAM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br><br> v. <br><br><br> TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA, <br><br> Defendants. | **CASE No.: 1:20-cv-03459-PAC** <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br><br> <u>**CLASS ACTION**</u> |

**TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................... 1

II.  FACTS ...................................................................................................................... 2

   A.   Tilray Signs the ABG Agreement ..................................................................... 2

   B.   Tilray Improperly Records Marijuana Plant Waste As Inventory On the Mere Hope that a Market Would Develop ......................................................................... 3

   C.   Kennedy Tries to Make Himself CEO of the World's Largest Cannabis Company . 5

      1.   Kennedy gains personal control over Tilray .................................................. 5

      2.   Kennedy Puts His Direct Control to Use ...................................................... 6

   D.   Defendants' Statements Cause Plaintiffs' Losses............................................... 8

III. THE COMPLAINT ADEQUATELY ALLEGES FALSITY ....................................... 8

   A.   Standard............................................................................................................ 8

   B.   Defendants Misleadingly Described Their Due Diligence for the ABG Agreement ... 9

   C.   Defendants Overstated the Value of the ABG Agreement ........................................ 11

   D.   Defendants Overstated Inventories and Gross Margins by Recording Marijuana Plant Trim as Inventory While Its Sale Was Still Illegal ............................................... 13

IV.  THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER ................................ 15

   A.   Standard.............................................................................................................. 15

   B.   The Complaint Sufficiently Alleges Kennedy's Motive.............................................. 15

      1.   Kennedy's Stock Sales Give Rise to A Strong Inference of Scienter ...................... 16

      2.   The Complaint Sufficiently Alleges Kennedy's Motive to Maintain Control of Tilray............................................................................................................ 21

   C.   The Complaint's Recklessness Allegations Support Scienter ..................................... 24

   D.   The Complaint Sufficiently Alleges Insider Trading and Control Person Claims ... 25

V.   CONCLUSION ........................................................................................................ 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) .................................................................................. 13

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
   19 F.4th 145 (2d Cir. 2021).............................................................................. 8, 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................ 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 8

*Dempsey v. Vieau*,
   130 F. Supp. 3d 809 (S.D.N.Y. 2015).................................................................. 14

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)...................................................................... 17, 18, 20

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................... 20

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................. 17, 19

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000)................................................................................ 15

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ........................................................ 17

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................... 20

*Hedick v. The Kraft Heinz Co.*,
   2021 WL 3566602 (N.D. Ill. Aug. 11, 2021)......................................................... 12

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008)................................................................... 22

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010).................................................................... 9

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................... 18

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ........................................................ 12

*In re Bank Of Am. Corp. Sec., Derivative, And Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  2011 WL 3211472 (S.D.N.Y. July 29, 2011) ......................................................... 23

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................. 6, 21

*In re Complete Mgmt. Inc. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001).................................................................... 22

*In re ForceField Energy Inc. Sec. Litig.*,
  2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ........................................................ 12

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021).................................................................................... 15

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020).......................................................... 21

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
  2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ........................................................... 20

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010).................................................................... 15

*In re Nevsun Res. Ltd.*,
  2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013)........................................................ 16

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................... 16

*In re Rsrv. Fund Sec. & Derivative Litig.*,
  732 F. Supp. 2d 310 (S.D.N.Y. 2010).................................................................... 22

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..................................................................................... 16

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010).................................................................... 20

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012).................................................................................. 13

iii

*In re Vivendi Universal, S.A.*,
　381 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................................................... 22

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
　818 F.3d 85 (2d Cir. 2016)............................................................................................... 16, 23

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
　14 F.4th 141 (2d Cir. 2021)............................................................................................... 9, 10

*Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*,
　2013 WL 6728869 (D. Vt. Dec. 20, 2013)............................................................................. 17

*Meyer v. Concordia Int'l Corp.*,
　2017 WL 4083603 (S.D.N.Y. July 28, 2017) ........................................................................ 23

*Miller v. Donnini*,
　2015 WL 1431103 (D. Mass. Mar. 27, 2015) ....................................................................... 11

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*,
　2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ...................................................................... 20

*Nguyen v. New Link Genetics Corp.*,
　297 F. Supp. 3d 472 (S.D.N.Y. 2018).................................................................................... 18

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
　320 F.3d 920 (9th Cir. 2003)................................................................................................. 18

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000).................................................................................................. 15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
　575 U.S. 175 (2015) .............................................................................................................. 11

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
　432 F. Supp. 3d 131 (D. Conn. 2019) .............................................................................. 21, 22

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
　2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) .................................................................... 17, 19

*Puddu v. 6D Glob. Techs., Inc.*,
　2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ....................................................................... 15

*Russo v. Bruce*,
　777 F. Supp. 2d 505 (S.D.N.Y. 2011)................................................................................... 23

*S.E.C. v. Espuelas*,
　698 F. Supp. 2d 415 (S.D.N.Y. 2010)................................................................................... 13

*Sec. & Exch. Comm'n v. SBB Rsch. Grp., LLC*,
    2020 WL 6075873 (N.D. Ill. Oct. 15, 2020) ............................................................ 11

*Senn v. Hickey*,
    No. 03-CV-4372 (DMC), 2005 WL 3465657 (D.N.J. Dec. 19, 2005) ...................................... 18

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) .................................................................................. 15

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
    2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) .............................................................. 9

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ....................................................... 21, 24

*Stevelman v. Alias Rsch. Inc.*,
    174 F.3d 79 (2d Cir. 1999) .................................................................................. 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................................................... 8, 15

*Tomaszewski v. Trevena, Inc.*,
    482 F. Supp. 3d 317 (E.D. Pa. 2020) ..................................................................... 9

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) .............................................................. 16

*Underland v. Alter*,
    2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) .............................................................. 12

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ............................................................ 9

## Statutes

15 U.S.C. §78u-4(b)(2)(A) .......................................................................................... 15

## Rules

Fed. R. Evid. 1006 ................................................................................................... 6

## I.  INTRODUCTION[1]

The Complaint addresses all of the Court's stated objections in dismissing the First Amended Complaint ("FAC"). The Court found that the FAC did not sufficiently allege Kennedy sold stock; the Complaint alleges he sold more than $28 million in stock, beginning two weeks after he promised not to sell any shares at all. The Court found that the FAC did not sufficiently allege Kennedy put his direct control of Tilray to use; the Complaint alleges he attempted to close a merger that would leave him CEO of the world's largest cannabis company. The Court found that the FAC did not sufficiently allege that Kennedy did not believe mere days of due diligence was enough for a nine-figure business transaction; the Complaint now alleges that Kennedy falsely told investors the diligence took more than a month. With these added allegations, the scienter inference is more than plausible: it is cogent and compelling.

The Complaint adequately alleges scienter. On January 6, 2019, Kennedy promised that he would not sell any of his Tilray shares when post-IPO restrictions lifted. On January 15, Kennedy touted the ABG Agreement that he falsely claimed he had spent a month negotiating. In fact Tilray's "due diligence" was a matter of a few days, and the agreement aimed only to halt a decline in Tilray's stock price. Nine days later, Kennedy broke his promise. He sold $11.1 million of shares. In total, Kennedy sold 643,164 shares for $28.4 million in proceeds during the Class Period, with his last sales occurring just before he revealed the truth his false statements had concealed.

While profiting handsomely from his Class Period stock sales, Kennedy leveraged his false statements to secure direct control over Tilray. Having secured control, Kennedy tried to push

---

[1] Citations to "¶ _" are to the Second Amended Complaint ("Complaint"), dkt. # 95. Citations to "Op. __" are to the Court's Opinion & Order dismissing the First Amended Complaint ("FAC"), dkt. # 92. Citations to "Def.Br. _" are to Defendants' Memorandum of Law in support of their motion to dismiss the Complaint ("Motion"), dkt. #100. Citations to "Greene Dec. Ex. _" are to the Declaration of Douglas W. Greene in support of the Motion, dkt. # 102. Citations to "Horne Dec. _" are to the Declaration of Jonathan Horne, filed herewith. Unless otherwise noted, all emphases are added and citations omitted. Defendants are Tilray, Inc. and Brendan Kennedy. The Class Period is from January 16, 2019, through March 2, 2020, both dates inclusive.

1

through a long-anticipated merger that would have made him CEO of the world's largest cannabis company, while undervaluing Tilray so the transaction could close more easily. But for COVID, he would have succeeded.

In response to the motive allegations, Defendants rely on arguments that are inconsistent with both the pleaded allegations, which must be taken as true, and the "facts" they put before this Court. Defendants' claim that Kennedy sold only a small percentage of his shares, rather than the 21.1% of his available shares he actually sold, relies on restricted shares and options that would not vest for years and which Kennedy *could not sell* during the Class Period. Their argument that many of Kennedy's sales were made pursuant to 10b5-1 sales plan only strengthens the scienter inference. In truth, Kennedy inappropriately made sales not provided for in the 10b5-1 sales plan and he set up the plans accounting for most sales *during the Class Period*, after his false statements. Finally, their argument that Kennedy sold shares to pay a tax bill is irrelevant at the pleading stage. In any case, Kennedy's $28.4 million proceeds from stock sales dwarf any tax bill.

As to falsity, the Complaint alleges with specificity that Kennedy made false statements of fact when he actionably overstated the due diligence he conducted into the ABG Agreement, mooting Defendants' argument that Kennedy might somehow have thought a few days' worth of due diligence was sufficient for a nine-figure agreement. The Complaint also substantially improves the inventory allegations by pointing to specific Generally Accepted Accounting Principles ("GAAP") that Defendants violated.

The Court should deny Defendants' motion to dismiss.

## II.    FACTS

### A. Tilray Signs the ABG Agreement

Defendant Kennedy co-founded Tilray's parent, Privateer Holdings, in 2011. ¶26 He has served as Tilray's President, CEO, and Board Member since January 2018. *Id.*

2

Marijuana and hemp come from the same plant. ¶32. By definition, marijuana plants contain more than 0.3% THC by weight; those with less than 0.3% THC are hemp. *Id.* The December 2018 U.S. Farm Bill removed hemp and hemp-derived CBD, but not marijuana, from the list of controlled substances. ¶33.

In January 2019, Tilray announced that it had reached a nine-figure agreement to supply cannabis products to ABG, a brand owner. ¶70. Tilray paid ABG $100 million in cash and stock for 19.6% of net revenues from sales of ABG-branded cannabis products and had the option to buy a further revenue interest of up to 29.4% for up to $150 million. ¶71.

Defendants told investors that the ABG agreement had been negotiated over more than a month and was a well-crafted plan between two well-suited partners. ¶¶82-83. In truth, the ABG Agreement was proposed, negotiated, and closed in literally just a few days, and only Kennedy and only one other Tilray employee participated in the negotiation. ¶73. The rush was necessary to halt a collapse in Tilray's stock price after IPO shares were released from lock-up. ¶75.

GAAP and Tilray's accounting policy required it to test for impairment and impair the ABG Agreement if there were indications that its value had fallen below what Tilray paid. ¶¶102-05. Tilray had indications: its own branding employees asked "what are we going to do?" with ABG's brands, as none had anything to do with cannabis. ¶76. Tilray was required to impair the ABG Agreement in the first filing in which it was recorded, its Q1 2020 10-Q, but continued to report the ABG Agreement at full value until an 86% impairment in March 2020. ¶139.

## B. Tilray Improperly Records Marijuana Plant Waste As Inventory On the Mere Hope that a Market Would Develop

Tilray overstated its gross margins in connection with its primary market, Canada, which accounted for nearly all and almost 80% of Tilray's revenues in 2018 and 2019, respectively. Greene Dec. Ex. 2 at F-54. Gross margins are an important metric for growing companies like

3

Tilray because they exclude overhead, where a growing company can expect to achieve economies of scale. The numerator in gross margins includes not only revenues but also changes in inventory during the reporting period. ¶56. The denominator includes only direct costs of producing and selling products (including direct overhead like sales commissions), collectively called costs of sales. ¶¶55, 56. Tilray told investors on quarterly calls that its gross margins would reach 50% over the long term, ¶36, but they were collapsing. In the last quarter reported in its IPO, Q1 2018, Tilray reported gross margins of 55%. ¶40. These margins fell to 46% in Q2 and 31% in Q3. *Id.*

Marijuana products use a marijuana plant's flowers and bud. The rest of the plant, leaves, stalks, twigs, and stems, are collectively called "trim". ¶36. Marijuana trim is illegal under federal U.S. law. ¶36. But until December 2019, there was no Canadian market, either. ¶36. Marijuana trim contain too little THC to be smoked and too little CBD to be used in CBD products (Tilray used hemp plants instead). ¶¶36-38. While marijuana trim can be used to make THC edibles, beverages, and the like, these products could not be sold in Canada until their December 2019 legalization colloquially known as Cannabis 2.0. ¶¶68; 67 (Tilray acknowledging that "[n]ew classes, including edibles, topicals, and extracts (both ingested and inhaled), are expected to be permitted *on or before October 17, 2019*," the then-anticipated legalization date). Until then, producers typically destroyed marijuana trim. ¶36; Spencer Harwood, *Canadian pot growers say marijuana byproduct a wasted opportunity for industry*, May 12, 2018.[2]

Tilray acknowledged internally that its marijuana trim valuation was speculative. FE 1, a senior R&D Manager who prepared Bills of Materials that aimed to reflect product costs, ¶¶23, 52, reports that Tilray's internal records assigned trim an "unknown, unspecified value," and FE 1 saw "bags and bags, boxes and boxes" of trim in Tilray's warehouses. ¶61.

---

[2] https://tinyurl.com/d762s2ee.

4

Inventory must be recorded at its selling price in the ordinary course of business. ¶¶69, 89. Speculative products that cannot be sold in the ordinary course of business because there is no market must instead be disclosed as contingent benefits. ¶69. *Id.* Yet Defendants artificially inflated Tilray's gross margins by recording trim as inventory. ¶63.

Tilray also improperly understated costs of goods sold by omitting certain metrics, including labor, in preparing Bills of Material, instead classifying these costs as general and administrative expenses. ¶¶50-51. FE 1 reported that the costs of materials for one major product was substantially lower than what FE 1 had calculated. ¶51. The Bills of Materials were then used to prepare financial statements. ¶53. According to FE 2, Tilray's Senior Manager of Purchasing, ¶28, Tilray continued to record single-purpose ingredients as valuable inventory even after abandoning the products the ingredients would have been used in. ¶55.

## C. Kennedy Tries to Make Himself CEO of the World's Largest Cannabis Company

### 1. *Kennedy gains direct control over Tilray*

Until a December 2019 share exchange ("Share Exchange"), Kennedy and Tilray's two other co-founders ("Controlling Shareholders") controlled Tilray indirectly through Privateer, Tilray's parent. ¶155. Privateer held 82% of Tilray's shares but, through super-voting shares, held 90% of its voting power. ¶154. The Controlling Shareholders held 29% of the economic interest in Privateer, but, through super-voting Privateer shares, held 71% of its voting power. ¶155.

Before the Share Exchange, the Controlling Shareholders could not readily monetize their indirect interest in Tilray. Privateer could only distribute proceeds from its sales of Tilray stock *pari passu* (equally to each share). ¶156. Further, Privateer itself would have to pay corporate tax on any sales, so the Controlling Shareholders would be taxed twice on the sales proceeds.  ¶162.

Thus, for every dollar of Tilray share Privateer sold, Kennedy would receive 8 cents. Horne Dec. Ex. 1 at 2-3.[3]

In the Share Exchange, Tilray would cancel Privateer's Tilray shares and reissue an equivalent number to Privateer's shareholders. ¶160. Privateer shareholders would share proportionally in its economic interest in Tilray, but all of Privateer's supervoting Tilray shares would be awarded to the Controlling Shareholders. ¶161. The Controlling Shareholders would hold 31% of Tilray's economic interest but 73% of its voting interest. *Id.*

Because the Share Exchange's distribution was not *pari passu*, holders of a majority of Privateer's shares, regardless of whether the shares were supervoting, would have to vote in support. ¶162. All Privateer investors had to agree to a two-year lockup. ¶¶165, 167. If Privateer investors knew that Tilray significantly overstated its margins, that more than $40 million of its inventory was unsellable waste, and that the ABG Agreement was a mere publicity stunt, Privateer investors might think Tilray too risky for a two-year lockup and withhold their consent. ¶167.

### 2. *Kennedy Puts His Direct Control to Use*

Kennedy stated for years that the cannabis market would grow to $150-200 billion in annual sales and be dominated by 3-4 giant multi-brand companies. ¶¶170-79. The giants would emerge through consolidation, not competition. ¶180. He said in August 2018 that a major acquisition by a Fortune 500 company was "inevitable" and only "a year or two away." ¶181. Supervoting shares would "enable us to control our own destiny as opportunities develop around the world." *Id.*

---

[3] Exhibit 1 is a summary of Kennedy's share sales and holdings and the proceeds he realized upon their sale. It is admissible as a "summary, chart, or calculation to prove the contents of voluminous writings" under Fed. R. Evid. 1006. *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011).

Kennedy had to close the Share Exchange before closing a merger. Until the Share Exchange, Kennedy would need the votes of a majority of Privateer shares regardless of supervoting status to consummate any transaction that left Privateer without voting control over Tilray. ¶156; Horne Dec. Ex. 2 at 3 (requiring vote of all shares regardless of preference in any Liquidation); 4 (defining Liquidation to include any transaction in which Privateer no longer holds a majority of surviving company's stock). And Kennedy could not hope for the Share Exchange's sweetheart terms if he did not control Tilray.  ¶217. After the Share Exchange, the Controlling Shareholders could push through any merger by themselves so long as Tilray owned at least 50% of the combined company's shares. ¶195. Further, Kennedy could provide deal certainty to the partner, making a combination more attractive. ¶191.

An opportunity presented itself just as Kennedy was completing the Share Exchange. Kennedy and Aphria Inc., a large Canadian cannabis company, initiated merger discussions in fall 2019. ¶182. The combined cannabis company would be the world's largest by revenues. *Id.* After frenetic negotiations, executive meetings, and site visits, on February 14, 2020, Kennedy sent Aphria a term sheet for a stock-for-stock merger, with an exclusivity period elapsing on March 2, 2020. ¶187. The offer served Kennedy's interests by making him the combined company's CEO, but not Tilray's investors' because it only gave them 56% of the combined company. ¶¶188-89.

Aphria did not move as promptly as Kennedy wished. And by March 18, with both companies reeling from COVID, Aphria had shelved the merger entirely. ¶194. Kennedy's response to Aphria's rejection was telling. On March 25, Kennedy proposed a 50:50 merger – the exact division that would let him push the merger through without other Tilray shareholders. ¶195. Aphria rejected the offer. By the time the merger closed in December 2020, Tilray's capitalization was only 32.6% of the combined company's, and Kennedy could not make himself CEO. ¶196.

### D.  Defendants' Statements Cause Plaintiffs' Losses

On January 30, 2020, Tilray announced that it had renegotiated the ABG Agreement, releasing Tilray from the obligation to pay additional consideration of $83.3 million in cash or stock but also eliminating the $10 million in guaranteed annual payments from ABG. ¶136. The renegotiated agreement signaled trouble because Tilray had boasted that the guaranteed annual payments were a key term that aligned ABG's interests with Tilray's. *Id.* On this news, Tilray's stock price fell 8.8% from its previous close of $19.22 to close at $17.54. ¶140.

Then, in Tilray's 2019 10-K filed March 2, 2020, and accompanying earnings call, Kennedy admitted that Tilray had reduced the value of Tilray's inventory by $68.6 million, and impaired the ABG Agreement by 86%. ¶139. Over the next two days, Tilray's stock price fell from $15.35 to $12.51. ¶¶143-44. Citing "universally positive comments before today on ABG[]," a Jefferies analyst concluded on March 3 that "trust ultimately needed for rerating." ¶140 a. A Cantor Fitzgerald analyst commented that "[w]e continue to think that Tilray's disclosure is the worst among the Canadian [cannabis licensed producers] that we track." ¶145.

## III.    THE COMPLAINT ADEQUATELY ALLEGES FALSITY

### A.    Standard

A complaint survives by alleging facts "stat[ing] a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even in actions alleging securities fraud, "courts must [] accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "Rule 12(b)(6) does not countenance [] dismissals based on a judge's disbelief of a complaint's factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Defendants here argue that the Complaint insufficiently alleges falsity and scienter. "Although pleading standards are heightened for securities fraud claims, '[courts] must be careful not to mistake heightened pleading standards for impossible ones.'" *Altimeo Asset*

8

*Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021). For falsity, plaintiffs must merely "identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." *Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *5 (S.D.N.Y. Mar. 28, 2017); *Altimeo*, 19 F.4th at 150 (noting that Rule 9(b) and PSLRA falsity standards are co-extensive).

In determining whether the Complaint sufficiently alleges falsity, the Court does ***not*** consider competing nonculpable inferences. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021) (refusing to consider defendants' theory because "we are required to credit the plaintiffs' plausible theory when evaluating a Rule 12(b)(6) motion."). That analysis is reserved for scienter, where the Court can also consider additional facts ***supporting*** scienter.

The Complaint adequately pleads falsity. Defendants argue "facts" they either baldly assert or draw from outside the pleadings, neither of which may be considered on a motion to dismiss. The Court may, and should, summarily deny Defendants' motion. *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 329 (E.D. Pa. 2020) (denying motion to dismiss because "it is not possible to excise the [improper] documents or parse the proper arguments from the improper.").

## B. Defendants Misleadingly Described Their Due Diligence for the ABG Agreement

Executives closing large corporate transactions receive extensive information that is not publicly shared. Because investors rely on executives to exercise their judgment based on that information, executives' factual statements describing their negotiations and due diligence are material. Executives mislead investors by overstating the diligence conducted. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *3 (N.D. Cal. Oct. 19, 2021) (claim stated by "averr[ing] that Defendants assured investors about their diligence, even though their diligence was less than what an investor would believe their statement meant."); *In re*

9

*Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 527 (S.D.N.Y. 2010) (false statement that company conducted specific test in due diligence actionable).

On a motion to dismiss, Plaintiffs' plausible interpretation of a statement is accepted without comparing it to any competing interpretation. *IWA*, 14 F.4th at 147. The Complaint alleges a new false statement that the FAC did not: Kennedy falsely asserted that ABG "liked our focus on research and science, and when the U.S. Farm Bill passed [on December 20, 2018], things started coming together." ¶84. A more than plausible inference from this statement is that negotiations began at some point before December 20, accelerated thereafter, and culminated on January 14, 2019, when the ABG Agreement was executed. Kennedy's statement, however, was a lie. In truth, as FE 3 reports,[4] the negotiation and resulting due diligence took a handful of days.

Kennedy's statements overstating due diligence were not made in a vacuum. He had long maintained that "brands are everything." ¶77. In a stand-alone press release, Tilray referred to the ABG Agreement as a "long-term" agreement with the owner of "iconic brands." ¶82. Indeed, the $100 million Tilray paid for the agreement was seven times its Q1 2019 gross income. ¶90. Kennedy's statement that the parties negotiated a nine-figure agreement for over a month suggests sufficient due diligence to realize Tilray's long-held business plan. That the negotiations took just a few days, the truth, shows Tilray rashly gambled $100 million.

Kennedy continued to mislead investors about the due diligence. Asked whether consumer packaged goods company should launch their own brands or partner with Tilray, Kennedy said ABG "went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone." ¶93. A "vetting process" is *extensive*. Merriam-Webster explains that the "most familiar" meaning of vetting is "to subject a person or thing to

---

[4] *Contra* Defendants, the Court has already found that the Complaint sufficiently describes all former employees' to support the inference they possess the information alleged. Op. 19.

10

scrutiny; to examine for flaws."[5] The investor education website Investopedia insists that "[v]etting is the process of ***thoroughly investigating*** an individual, company, or other entity before making a decision to go forward with a joint project."[6] For a $100 million transaction, "vetting" is not completed in a matter of days, so Kennedy's statement was misleading.

Nor is the question, as Defendants claim and the Court ruled in considering the FAC (¶84) whether Kennedy subjectively believed the due diligence was adequate. Unlike the FAC, the Complaint alleges that Kennedy made false and misleading statements about the due diligence itself. Those statements are misleading even if Kennedy somehow believed two days sufficed to kick the hood on a nine-figure agreement. In any case, that Kennedy lied about the extent of due diligence supports an inference that he did not believe the actual due diligence had been adequate.

The Complaint adequately alleges that Kennedy's statements that the ABG Agreement had taken more than a month to negotiate and that ABG had "vetted" Tilray are false or misleading.

## C. Defendants Overstated the Value of the ABG Agreement

Opinion statements are misleading if, among other things, they contain false embedded statements of fact. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015). While some financial statement provisions require subjective judgment, GAAP usually requires that management perform particular objective steps in calculating the provision. Management's reporting contains an embedded statement of fact that it took these objective steps. For example, while valuation of complex securities involves some subjective judgment, failure to obtain academic validation of an otherwise-appropriate technique makes the valuation false. *Sec. & Exch. Comm'n v. SBB Rsch. Grp., LLC*, 2020 WL 6075873, at *3 (N.D. Ill. Oct. 15, 2020).

---

[5] Merriam-Webster, A Brief History of the Verb Vet, https://www.merriam-webster.com/dictionary/vet#note-1

[6] https://www.investopedia.com/terms/v/vetting.asp. "Many courts have cited to Investopedia for purposes of a definition in the context of a motion to dismiss." *Miller v. Donnini*, 2015 WL 1431103, at *6 (D. Mass. Mar. 27, 2015), *report and recommendation adopted in relevant part* 2015 WL 1431075 (D. Mass. Mar. 27, 2015).

11

While a provision for losses from customers who will not be able to pay is subjective, if defendants do not follow their specified methodology or fail to disclose concrete steps they took that increases credit risk, their statements are false. *Underland v. Alter*, 2011 WL 4017908, at \*9 (E.D. Pa. Sept. 9, 2011) (credit provision misleading because company failed to follow reported methodology); *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*17 (S.D.N.Y. Nov. 18, 2019) (credit provision misleading for omitting to disclose hiring less creditworthy multilevel marketing salespeople).

These principles apply to Defendants' failure to impair the ABG Agreement. While the amount of goodwill impairment is an opinion, falsity is adequately alleged by showing that the conditions mandating a test for impairment had occurred. *E.g. In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at \*13 (S.D.N.Y. Mar. 29, 2017) ("Whether [] circumstances are sufficient to trigger a duty to reassess goodwill is a factual question that should not be resolved on a motion to dismiss."); *accord Hedick v. The Kraft Heinz Co.*, 2021 WL 3566602, at \*9 (N.D. Ill. Aug. 11, 2021). GAAP and Tilray's accounting policies demanded an impairment test and impairment if the ABG Agreement was worth less than Tilray paid for it. *E.g.* ¶¶101-105 & n. 6, 118. There was good reason to impair: Tilray's own branding experts pushed back on the ABG Agreement and asked Defendants "what are we going to do?" with it. ¶76. While Defendants advance regulatory uncertainty as the reason for the 2020 impairment, that is a question for summary judgment. FE 3 reports the impairment was unrelated to regulatory uncertainty, *id.*, and the documents Defendants cited show the FDA took a position in December 2018 and reiterated it throughout the Class Period. Horne Dec. Ex. 3; Def.Br. 9-10. Thus, Defendants knew the ABG Agreement was worth less than Tilray paid for it and were required to impair it on Tilray's Q1-Q3 financial statements.[7]

---

[7] Defendants' claim that they could not impair the ABG Agreement because the applicable accounting rules were complicated conflates the perhaps difficult question of *how* substantially to impair the ABG Agreement with the easy

Finally, Defendants claim Tilray "consulted closely with Deloitte and other experts to evaluate the financial and accounting impacts." Management alone is responsible for preparing the financial statements. Tilray's 2018 annual financial statements, which Deloitte audited, did not record the ABG Agreement because it was signed in January 2019.[8] Deloitte audited Tilray's annual financial statements, not its quarterlies. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 700 (9th Cir. 2012). Deloitte only appears in the 2019 10-K in which Tilray rejected its Class Period-accounting treatment of the ABG Agreement and its inventory. Deloitte contested Defendants at its first opportunity.

### D. Defendants Overstated Inventories and Gross Margins by Recording Marijuana Plant Trim as Inventory While Its Sale Was Still Illegal

Defendants violated GAAP by recording marijuana trim as inventory before the passage of Cannabis 2.0 legalized the products that employed marijuana trim. Under GAAP, only products for which there currently exists a market may be recorded on the financial statements as inventory. ¶69. Tilray's accounting policy similarly provides that inventory is stated at "the lower of cost or net realizable value," with the latter defined as "the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation." *E.g.* ¶96. Products that *might* have value *if* a market develops should be disclosed as contingent assets to properly alert investors that any valuation is speculative. *Id.* Events outside of Tilray's control could have caused it to realize less revenue from marijuana trim than its carrying value (or none). For example, Canada might not legalize the products that use marijuana trim or delayed legalization, or a market for Cannabis 2.0 products might not develop, or might in practice be

---

question of whether it should be substantially impaired. *See S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 429 (S.D.N.Y. 2010) ("[w]hile accounting for barter may be complex, the concept of barter itself is not.").

[8] Moreover, "that the financial statements for the year in question were not restated does not end [plaintiff's] case when [plaintiff] has otherwise met the pleading requirements of the PSLRA." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

based on flower or bud, not trim, or the market might be so flooded that Tilray's trim had no value. ¶99. Absent a market to establish trim's price, its value was speculative, and recording it in inventory made Tilray's financial statements materially false.

Defendants ignore the Complaint, arguing that they subjectively believed that a market would develop. This argument *concedes* that Defendants violated GAAP.[9] Defendants' subjective belief that a market *would* develop does not make it any less improper to record the trim as inventory. Further, Defendants' precipitous write-off of all their trim inventory in financial statements as of December 31, 2019, shows that they did not honestly believe that the marijuana trim was worth the value they reported.

Defendants' arguments that there might have been a market for trim before December 2019 are better left to summary judgment. In any case, none of the documents they cite suggests that there was such a market. Defendants point to a statement in Tilray's 2019 10-K that Tilray was purportedly selling "bulk," which Defendants seem to maintain is a reference to marijuana trim, rather than to their own definition of "bulk's" ordinary meaning: "wholesale." Greene Dec. Ex. 2 at 47 ("We generate revenues from [] wholesale of bulk and finished product to other Licensed Producers.").[10] Defendants also cite their statements in Tilray's 2019 10-K that they sell byproduct. But Defendants sell hemp, too, whose trim – unlike marijuana plants' – had a use before December 2019: making CBD products. And even if Defendants had been able to sell some limited amount

---

[9]*Dempsey v. Vieau*, 130 F. Supp. 3d 809, 815 (S.D.N.Y. 2015), *adhered to on reconsideration,* No. 13 CV 6883-LTS, 2016 WL 3351081 (S.D.N.Y. June 15, 2016) is inapposite because unlike determining whether there is a market for inventory, determining the valuation of inventory that had been properly recorded is a matter of judgment.

[10] Defendants may be referencing the definition of "bulk" in Canadian Good Manufacturing Practices ("CGMP"). But while CGMP distinguish between "finished" and "bulk" products, bulk just means unpackaged. Good manufacturing practices guide for drug products (GUI-0001), Appendix A – Terms, definition of "bulk", available at https://tinyurl.com/ydrenh4u

14

of marijuana plant trim before December 2019, these rare and cheap sales did not support the assertion that the entire crop could be sold at higher prices.[11]

The Complaint sufficiently alleges that Defendants' financial statements recording marijuana trim as inventory were materially false.

## IV.    THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER

### A. Standard

The Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" 15 U.S.C. §78u-4(b)(2)(A), which in this Circuit includes recklessness. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020). A "strong inference" is at least as probable as any competing nonculpable inference. *Tellabs*, 551 U.S. at 334. Plaintiffs can allege scienter through "circumstantial allegations" or allegations of defendants' "motive and opportunity" to make false statements. *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021). Courts analyze scienter allegations holistically. *Id.*

### B. The Complaint Sufficiently Alleges Kennedy's Motive

Motive allegations suffice if they show that the defendant obtained a "concrete and personal" benefit from the fraud, *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000), or could have

---

[11] On Tilray's Q3 2019 earnings call, non-defendant Castaneda said that "[a]dditionally, in Canada, based on current regulations, we primarily sell flower and flower products, which leaves byproduct for extraction in large supply and 2.0 products are not allowed to sell today." Greene Dec. Ex. 7 at 9. The truth-on-the-market defense is "intensely fact-specific and [] rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Courts do not recognize the defense when a defendant contemporaneously denies the allegations, as Tilray did by recording marijuana trim as inventory. *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021). Moreover, on the same call, Kennedy claimed that Tilray had two products ready for Cannabis 2.0, but both were CBD products presumably made with hemp, for which there already existed a market. Greene Dec. Ex. 7 at 4-5. Castaneda discussed the causes of rising inventory levels in a previous earnings call without even mentioning Canadian products as a cause until Q3, suggesting any accumulation was minor. ¶110. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 584 (S.D.N.Y. 2010) (slide in which defendants arguably disclosed problem not truth-on-the-market; slide was ambiguous as to whether figure was just RMBS exposure or total, and defendants made statements contradicting slide on other occasions).

expected to. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016). The Court did not discern a strong motive in the FAC because it did not allege Kennedy sold stock or used his direct control over Tilray to secure a benefit. Op. 13-14. The Complaint now alleges that Kennedy sold $28.4 million of stock, made more than $2.4 million from self-interested transactions with Tilray, and tried to use his direct control over Tilray to complete an acquisition that would leave him the CEO of the world's largest marijuana company.

### 1. Kennedy's Stock Sales Give Rise to A Strong Inference of Scienter

The Second Circuit has held that "unusual" stock sales support scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). To determine whether sales are "unusual", courts consider the timing of the sales, *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999), as well as other factors like the amount and percentage of shares sold. *Scholastic*, 252 F.3d at 75. Because Kennedy is the only individual defendant, other insiders' sales are irrelevant. *Id.*

**Timing**: Stock sales made shortly after false statements are suspicious because they suggest insiders are trying to profit from the statements. *Stevelman*, 174 F.3d at 86. Stock sales shortly before a corrective disclosure are also suspicious because they suggest insiders are trying to cash out before the truth comes out. *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999).

In October 2018, Kennedy publicly stated that he "didn't expect to sell a share" because of his "long-term view of [Tilray's] opportunity." ¶225. On January 6, 2019, he told Fortune magazine he "promise[s] he won't" sell shares when IPO restrictions lifted in January.[12] ¶224.

---

[12] Regardless of any lockup, that Kennedy sold his stock at the first available opportunity three weeks after telling a reporter he would not sell any stock supports scienter. *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *18 (C.D. Cal. Aug. 4, 2017). Moreover, Kennedy's impending stock sales gave him a motive to mislead investors about the ABG Agreement.

On January 15, Kennedy announced the ABG Agreement. Then, on January 24 – 18 days after he promised not to sell any stock – Kennedy sold almost 150,000 shares for $11.1 million. On March 1 and April 1, Kennedy sold nearly 200,000 more for another $12.9 million net of option exercise costs. All of Kennedy's stock sales occurred during the Class Period, within 75 calendar days after his first false statement, or within 82 days of the last corrective disclosure.

**Comparable period**: Kennedy purchased 14,706 additional shares in Tilray's IPO. ¶225; Ex. 10 at 3. He did not sell these shares before the Class Period.

**Net changes in shareholdings**: While an insider's increasing overall holdings during the class period may cut against an inference of scienter. It does not here because substantially all of the shares Kennedy could have sold were restricted stock units ("RSUs") or stock options that vested during the Class Period. The only sellable shares Kennedy personally owned at the beginning of the Class Period were the 14,706 shares he purchased in the IPO.

**Gross proceeds**: Kennedy's sales of $28.4 million in shares are far higher than amounts courts have ruled suspicious. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (sales generating gross proceeds of $49 million split between two defendants and three non-defendants were suspicious);[13] *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (two defendants each selling about $6 million).

**Net proceeds:** Kennedy paid a few pennies for each of his shares. ¶221. Kennedy's sales proceeds were almost entirely profit, which supports scienter. *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at \*10 (S.D.N.Y. Aug. 8, 2012).

**Percentage of total holdings sold**: A court found sales of 13% and 17% of total shares probative of scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019

---

[13] The amounts and timing are set out in the opinion the Second Circuit reversed, *Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2013 WL 6728869, at \*12 (D. Vt. Dec. 20, 2013).

17

WL 2360942, at *5 (S.D.N.Y. Mar. 4, 2019). The Second Circuit has held that sales of 18% of 38% of insiders' shares sufficient even when the timing was not particularly suspicious. *Blanford*, 794 F.3d at 308. And courts have found far lower percentages sufficient when the timing of the sales was suspicious. *Senn v. Hickey*, No. 03-CV-4372 (DMC), 2005 WL 3465657, at *4 (D.N.J. Dec. 19, 2005), *adhered to on reconsideration,* No. CIVA 03-CV-4372 DMC, 2006 WL 1891756 (D.N.J. July 10, 2006) (sale of 11.8% of stock while defendant was aware of investigation into wrongdoing suspicious in the midst of investigation of wrongdoing).

In calculating total shares available for sale, courts exclude from the denominator shares that an executive cannot actually sell, such as unvested shares or shares subject to a lock up. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 497 (S.D.N.Y. 2018), *rev'd in part on other grounds* 965 F.3d 165 (2d Cir. 2020) (not counting unvested shares because denominator is shares insider could have sold). "[T]he decisive question in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) (emphasis in original). Moreover, many of Kennedy's shares were supervoting Class 1 shares which he needed to maintain control, and courts exclude such shares from the denominator. *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003).

The Tilray shares held by Privateer are also excluded from the denominator. Until the Share Exchange, Kennedy held the majority of his Tilray shares through Privateer. While Kennedy controlled Privateer's Tilray shares, he did not meaningfully own them. If it sold any shares, he would collect 8 cents for every dollar sold. Horne Dec. Ex. 1 at 2-3. Moreover, as Privateer owned more than 80% of Tilray's shares, its sales would cause panic that would decrease the price

18

Kennedy could realize when he sold the shares he personally held. For the same reason, Kennedy could not complete the Share Exchange without agreeing to a lockup. With no lockup, Privateer's float would instantly quintuple, with the new shares awarded to investors who would promptly sell because they had held their shares for half a decade. Thus, Kennedy could not sell his Privateer-held shares after the Share Exchange.

Taking these practical restrictions into account, Kennedy sold: (a) **34.0%** of the 1,899,706 shares that were available to sell as of January 24, 2019; (b) **21.1%** of the 3,049,201.52 shares available to sell during the Class Period, including all RSUs and options that vested before its close; and (c) **26.7%** of the 2,406,037.52 shares that Kennedy could still sell as of the close of the Class Period.  Horne Dec. Ex. 1 at 1.

Thus, all the factors courts have considered in examining stock sales point in the same direction: Kennedy's were suspicious. Defendants' arguments to the contrary are meritless.

**10b5-1 plan**: Defendants cite Kennedy's 10b5-1 plan, which governed some of his class period stock sales, as exculpatory. But defendants who assert a 10b5-1 plan must at a minimum show the plan's terms, including the date it was adopted. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010); *Tableau*, 2019 WL 2360942, at \*6. That is because insiders like Kennedy game 10b5-1 plans by entering into them while in possession of material non-public information or shortly before the relevant sales. Horne Dec. Ex. 4 at 1-2.

Kennedy mailed the Forms 144 setting out his 10b5-1 plans so that they would never be available on EDGAR. Horne Dec. Ex. 5 at 1,3,5,7 (stamps showing Form 144 was received by the SEC's mailroom). In his motion, he concealed the Forms 144 setting out his 10b5-1 plans. Kennedy has good reason to present this misleading picture: the plans support scienter. Kennedy entered into his first 10b5-1 plan not years before his sales, but on ***December 29, 2018***. Horne Dec.

19

Ex. 5 at 2. ***Four weeks later***, he sold $11.1 million of shares not included in the plan. He sold another unplanned 18,970 shares in April for an extra $1.2 million.  Greene Dec. Ex. 10;  ¶220. Insiders can enter into 10b5-1 plans for any number of reasons, but the Court should infer that Kennedy departed from a plan so soon after its creation to cash in on his false statements.

Kennedy's end-of-Class-Period sales conducted through a 10b5-1 plan are not exculpatory, either. Though Defendants misleadingly state that all the sales were pursuant to "a" 10b5-1 plan, the Forms 144 Kennedy withholds show that he adopted two more 10b5-1 plans ***during*** the Class Period, in September and December 2019. Horne Dec. Ex. 5 at 4,6,8. These were the plans that governed Kennedy's December 2019-February 2020 sales. *Id.* Because Kennedy adopted the plans after he had made false statements after his false statements, they are not exculpatory. *Blanford*, 794 F.3d at 309 (10b5-1 plan adopted during class period not exculpatory).[14]

**Tax liability**: Kennedy claims, as well, that the January 2019 sales were to pay off a tax liability. Courts do not consider whether a sale was for tax purposes in determining whether it suggests scienter. *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) ("Money is fungible; in-kind and take-home cash sales affect the seller's bottom line equally."); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010) (similar). Even if Kennedy faced a tax bill, he has not shown that he did not otherwise have enough money to pay it or that Tilray even withheld any income. Kennedy's argument is inappropriate until summary judgment or trial.

Moreover, in the two cases Kennedy cites, ***the Forms 4 themselves*** indicated that the sales were to satisfy a tax obligation. *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014); *N. Collier Fire Control & Rescue Dist. Firefighter*

---

[14] The sole case Defendants cite acknowledges that insiders must enter into the 10b5-1 plan before learning the information making their statements false. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 584 n.9 (S.D.N.Y. 2011).

20

*Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at \*20 (S.D.N.Y. Sept. 30, 2016). Forms 4 are completed under penalty of perjury. *Bear Stearns*, 763 F. Supp. 2d at 583. That Kennedy chose not to claim the sales were for tax purposes in his Forms 4 means his bare assertion that they were intended to pay taxes are not before this Court.

Finally, Kennedy sold $28.4 million in shares. His proceeds dwarf any tax bill he could conceivably have faced.

### 2. *The Complaint Sufficiently Alleges Kennedy's Motive to Maintain Control of Tilray*

While "a generalized desire to maintain a higher stock price will not rise to the level of motive [] the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 169 (D. Conn. 2019). Thus, for example, while a company's generic desire to raise money does not support scienter, "[a]n executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at \*11 (S.D.N.Y. June 16, 2020). Similarly, a generic desire to hold on to a job does not support scienter, but "an executive's realistic fears that his or her career is at stake can support a particularized motive supporting scienter." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at \*10 (E.D. Pa. Mar. 25, 2020). In each case, "[t]he question turns [] on the concreteness of the allegations. *Teva*, 432 F. Supp. 3d at 169.

The Court found the motive the FAC alleged, effecting a tax-free distribution while maintaining control over Tilray, did not support a strong inference of scienter because it did not "articulate why continued voting control of a post-collapse Tilray would have been so dear to Kennedy." Op. 15. The Complaint establishes that control was important so Kennedy could continue to engage in self-dealing and pursue a career-defining merger.

21

The desire to earn revenues at the company's expense provides a concrete and personal benefit that can support scienter. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 620 (S.D.N.Y. 2008) (generating additional fees from investment supplied motive); *accord In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 320 (S.D.N.Y. 2010) (same, as does personal stake in company). The Complaint pleads several instances of Kennedy's self-dealing. In one case, Kennedy had Tilray purchase a failing company partially owned by Privateer, paying himself $2.4 million in cash, the non-Privateer shareholders in stock, and the other Privateer investors nothing. ¶¶229-31. He made Tilray pay Privateer $1 million to assume the lease of Privateer's offices and then allowed Privateer to operate rent-free in Tilray's offices. ¶232. He made Tilray pay Privateer a $25,000 monthly retainer for unspecified services. ¶233. Kennedy could keep monetizing his control over Tilray as long as he maintained it.

Whether pursuit of an acquisition suffices to plead a motive is an "extremely contextual" question. *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001); Op. 12-13. Courts find the allegations sufficient if the plaintiff plausibly links the artificial inflation to one or more specific acquisitions alleged in the complaint. *Teva*, 432 F. Supp. 3d at 169; *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (acquisition of three companies identified in the complaint sufficiently alleged motive).

The Complaint's allegations suffice. Kennedy publicly stated for years before and during the Class Period that three or four giant companies would dominate the cannabis market, with the rest relegated to insignificance. ¶¶172-80. In August 2018, he stated that a Fortune 500 company would purchase a cannabis company within a few years. ¶181. He sought to have Tilray become one of these dominant companies through a large merger. ¶¶178-81. He also maintained that his supervoting stock was essential because it would allow him to choose Tilray's fate. ¶181.

Kennedy used the direct control he had secured through the Share Exchange when he sought to close the Aphria merger in March 2020. His proposal undervalued Tilray but would have left him CEO of the world's largest cannabis company. Aphria rejected his attempt because of the uncertainty COVID created. He then made one last-ditch effort to complete a merger that would leave Tilray investors with 50% of the combined company, the ***exact*** ownership percentage that would let him push the agreement without consulting other Tilray investors. This is exactly the kind of concrete and particular benefit from an acquisition that supports an inference of scienter.[15]

Defendants' arguments focus on the wrong transaction. Defendants point out that Kennedy pushed for the Share Exchange before identifying a specific transaction with Aphria. They likewise claim the plan makes no sense because Kennedy would have to disclose his statements were false before closing the Aphria merger. But the Complaint alleges that Kennedy made false statements ***to complete the Share Exchange***, so that he could choose Tilray's fate. The Share Exchange gave him what he wanted regardless of what he would have to disclose thereafter.

Defendants argue that Kennedy's scheme was hardly foolproof, but it need not be. In *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *6 (S.D.N.Y. July 28, 2017), defendants concealed that they had fired 43% of the sales force for their top-selling product even as they solicited buyout bids. The defendants' scheme had an obvious problem: how would they conceal the firings from any buyers? Indeed, that's exactly what happened: the buyers walked away citing concerns about the company's ability to sustain profitability. The buyout was nonetheless a sufficient motive on a motion to dismiss, as it was plausible that it could succeed. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*,

---

[15] Defendants urge this court to ignore the weight of authority requiring a contextual analysis and instead apply mere rules of thumb. Their cases are distinguishable. The already-prestigious Bank of America CEO's desire to acquire Merrill Lynch for some small additional prestige is nothing like Kennedy's desire to close an acquisition necessary to Tilray's very survival. *In re Bank Of Am. Corp. Sec., Derivative, And Emp. Ret. Income Sec. Act (ERISA) Litig.*, 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011). *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011) is inapposite as there was no acquisition; the plaintiffs claimed the defendants inflated the company's stock price so it would make more money in a stock offering.

818 F.3d 85, 97 (2d Cir. 2016). Kennedy did what he could to position himself to push through the merger. That his scheme was not certain to succeed hardly distinguishes it from other fraudsters' "reckless [] gambles" that are familiar to this District court's. *Skiadas*, 2020 WL 3268495, at *12.

## C. The Complaint's Recklessness Allegations Support Scienter

In dismissing the FAC, the Court ruled that it may "revisit" the recklessness allegations if the Complaint added a motive. Op. 23. Defendants do not present a non-culpable inference that is drawn from all and only the facts properly before the Court. The purported non-culpable inference they suggest, set out in their facts section, is drawn almost exclusively from extrinsic documents they seek to have the Court accept for the truth of their contents. Def.Br. 3-12. Thus, the culpable inference wins by default.

In any case, the motive and recklessness allegations holistically support an inference of scienter that is far more plausible than any non-culpable inference. Kennedy entered the Class Period a paper billionaire with no practical way to convert most of his shares into cash. Worse, he faced a ticking time bomb: Privateer investors would predictably clamor to sell their shares, but allowing them to would quintuple Tilray's float, driving down its stock price. A stock price collapse on January 15, 2019 when a relatively small number of theretofore locked-up shares became freely tradeable proved the risk.

Kennedy gambled that a quick, splashy agreement that purportedly confirming Tilray was achieving its business plan would inspire confidence. Understanding that a hasty $100 million expenditure is the last thing investors want to see, he lied about the amount of due diligence Tilray had conducted. Nine days later, and despite an eighteen-day old promise not to, Kennedy sold his shares. He sold more on March 1 and April 1. A lot of them: he made $24 million, life-changing wealth, after options exercise costs from these three sales.

24

Kennedy tried to address another deficiency in Tilray's performance. He violated accounting principles by recognizing waste as inventory based on the fig leaf that it might be worth something someday. He thus overstated gross margins, addressing concerns that Tilray could not grow to be profitable.

Kennedy's false statements allowed him to pursue a long-held goal. He has repeatedly told investors that three or four brand-owning companies would dominate a cannabis market that would grow to $150-200 billion. Kennedy has worked in the cannabis industry since 2011; he wants to *lead* one of those companies. Kennedy used his false statements to assuage Privateer investors so they would give him direct control over Tilray and consent to a two-year lockup so that he could pursue a career-defining merger. Having sold millions of dollars' more of his shares and secured direct control over Tilray, and with a merger impending, Kennedy revealed that much of Tilray's inventory was waste and that the ABG Agreement was worth 14% of what Tilray paid for it. His scheme only failed because the ultimate bolt from the blue – COVID – upended his plans.

Kennedy's false statements were an integral part of his plan to generate wealth and become a world-straddling cannabis mogul. Moreover, as to the ABG Agreement, Kennedy made false statements about things he had personally done.

Thus, read holistically, the Complaint's motive and recklessness allegations support an inference that is at least as strong as any competing culpable inference.

### D.  The Complaint Sufficiently Alleges Insider Trading and Control Person Claims

Defendants claim the insider trading and control person claims fail because the Complaint fails to plead an underlying violation of Section 10(b). Def.Br. 25 n.6. Because Defendants are wrong, these claims are well pled.

### V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

25

Dated: March 24, 2022                       Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            /s/ Jonathan Horne
                                            Jonathan Horne (JH 7258)
                                            Laurence M. Rosen, Esq. (LR 5733)
                                            275 Madison Avenue, 40th Floor
                                            New York, New York 10016
                                            Telephone: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Email: jhorne@rosenlegal.com
                                            Email: lrosen@rosenlegal.com

                                            *Lead Counsel for Lead Plaintiff and Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Jonathan Horne