**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GANESH KASILINGAM, individually and
on behalf of all others similarly situated,

Plaintiff,

- against-

TILRAY, INC., BRENDAN KENNEDY,
and MARK CASTANEDA,

Defendants.

Case No. 20-cv-03459 (PAC) (KNF)

**REPLY BRIEF IN FURTHER SUPPORT OF THE DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

I.      None of the Challenged Statements Were Materially False or Misleading.........................2

        A.      Positive Statements About the ABG Agreement........................................................2

        B.      Statements About Valuation of the ABG Agreement................................................4

        C.      Statements About Inventory and Gross Margins.......................................................4

II.     Plaintiffs Cannot Allege a Strong Inference of Scienter.........................................................5

III.    Conclusion ................................................................................................................................10

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ...................................................................................................8

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................................7

*Chapman v. Mueller Water Prod., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................................................................................9

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
  2021 WL 4481119 (S.D.N.Y. Sept. 30, 2021)........................................................................9

*In re Cybershop.com Sec. Litig.*,
  189 F. Supp. 2d 214 (D.N.J. 2002) ........................................................................................8

*In re Farfetch Ltd. Sec. Litig.*,
  2021 WL 4461264 (S.D.N.Y. Sept. 29, 2021).....................................................................7, 9

*Freeman v. Decio*,
  584 F.2d 186 (7th Cir. 1978) ..................................................................................................6

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009)..............................................................................6, 7, 9

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) ..................................................................................................7

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014).......................................................................................9

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty.*
  *Ret. Ass'n v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)......................................................................7, 8

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................................................2, 3

*In re Peritus Software Servs., Inc. Sec. Litig.*,
  52 F. Supp. 2d 211 (D. Mass. 1999) .......................................................................................7

*Reilly v. U.S. Physical Therapy, Inc.*,
  2018 WL 3559089 (S.D.N.Y. July 23, 2018)..........................................................................9

*In re Skechers USA, Inc. Sec. Litig.*,
   444 F. Supp. 3d 498 (S.D.N.Y. 2020)...................................................................................6

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999).................................................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................................5, 10

*Villare v. Abiomed, Inc.*,
   2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)..................................................................10

*Woolgar v. Kingstone Companies, Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020)................................................................................8

Plaintiffs' claims here are classic fraud-by-hindsight. At the beginning of 2019, both the U.S. CBD[1] market and the Canadian adult-use cannabis market appeared poised to take off: the Farm Bill had just removed hemp products from the U.S. Controlled Substances Act, and Canada had just legalized dried cannabis products for recreational use, with edibles and other "2.0" products slated to follow later in the year. It was in this optimistic environment—well known to cannabis investors—that Tilray formed a partnership with established brand-management company ABG to develop and market CBD products for the new U.S. CBD market. And it was in this environment that Tilray, like many of its competitors, began accumulating larger amounts of cannabis byproduct inventory (i.e., useable trim)[2] for sale and use both in the near-term and later in the year when the Canadian 2.0 market opened. Neither of these well-intentioned business strategies worked out as planned, and subsequent market conditions led Tilray to impair the value of the ABG Agreement and write down the value of its byproduct inventory in early 2020. But the mere fact of these later impairments does not suggest that the original valuations—opinions under the securities laws—were false or misleading at the time, or that they were made with scienter.

The Court recognized these shortcomings when it dismissed the First Amended Complaint ("FAC"). 9/27/21 Opinion & Order (Dkt. #92; "Op."), at 19, 21-22, 26. Plaintiffs now claim to have "address[ed] all of the Court's stated objections in dismissing the [FAC]." Pl. Opp. to Def's Mot. to Dismiss (Dkt. #103; "Pl. Opp."), at 1. Not so—the SAC is essentially the FAC with two additional, weak scienter arguments: (1) that Mr. Kennedy's true motive for the alleged fraud was to accomplish the downstream merger with Privateer so that he could then accomplish some other,

---

[1] Unless otherwise indicated, all emphasis is added and internal quotation marks and citations omitted; defined terms have the same meaning as in the Defendants' Mem. of Law in support of their MTD ("Def. Mem.") (Dkt. #100); "Ex. __" refers to the exhibits attached to the Declaration of Douglas Greene (Dkt. #102).

[2] "Trim" refers to both the usable and unusable plant parts leftover after cannabis flower products have been harvested and manufactured. Tilray, like its competitors, recorded only *usable* trim (i.e. byproduct that could be extracted and processed to create additional products)—and not unusable "waste"—as inventory. *See* Ex. 2, at F-18; Ex. 4, at F-10.

1

theoretical merger—not even identified until shortly before the purported fraud was revealed—that would make him CEO of the world's largest cannabis company; and (2) that Mr. Kennedy sold stock during the class period. *Id.* Neither suffices. The Court did not simply invite Plaintiffs to return to the Court with *any* additional theory of motive, or details of *any* stock sales—it directed Plaintiffs to plead facts supporting a *strong*, *cogent*, *and compelling* inference of scienter. They have failed again to do so, and their falsity allegations are equally insufficient.

Plaintiffs have been afforded ample opportunity—in three complaints over more than 18 months—to sufficiently plead their claims. They simply cannot, due to the fundamental flaws identified in Defendants' briefing and the Court's prior opinion. Accordingly, Defendants respectfully ask the Court to dismiss the SAC in its entirety with prejudice.[3]

## I. None of the Challenged Statements Were Materially False or Misleading

Plaintiffs fail to plead any false statement in any category of challenged statements.[4]

### A. Positive Statements About the ABG Agreement

Plaintiffs do not defend their challenge to the many general, positive statements about the ABG Agreement, comprising protected opinions, puffery, and/or forward-looking statements. Pl. Opp. 9-11; Def. Mem. 12-14. Instead, Plaintiffs focus on just two statements by Mr. Kennedy expressing his views that (1) ABG "liked our focus on research and science, and when the U.S. Farm Bill passed [on Dec. 20, 2018], things started coming together," and (2) that one of the advantages Mr. Kennedy believed large consumer packaged goods ("CPG") companies saw in

---

[3] Plaintiffs' request that the Court summarily deny the Motion to Dismiss should be rejected out of hand. Pl. Opp. 9. As explained in Defendants' RJN and RJN Reply (filed herewith), all of the context provided in the Motion is properly before the Court under the federal securities laws and procedural rules. And despite Plaintiffs' assertion to the contrary, the Court is perfectly capable of assessing the claims and defenses in this case, as it did with the FAC.

[4] Plaintiffs claim the Court must accept any "plausible" interpretation they allege regarding falsity without considering any "competing interpretation" in light of context. Pl. Opp. 10. This is incorrect: the Court must determine how a reasonable investor would have understood the challenged statements in their full context, which necessarily requires it to consider not only Plaintiffs' interpretation but also other reasonable interpretations in light of the surrounding context. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015).

partnering with Tilray was that "ABG went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone." Pl. Opp. 9-11.

For a statement of opinion to be false or misleading, Plaintiffs must sufficiently allege that Defendants did not genuinely believe it or that particular omitted facts rendered it misleading in context. *See Omnicare*, 575 U.S. at 188-89, 94. No factual pleadings suggest that Mr. Kennedy did not believe his opinion statements or that omitted facts rendered them misleading. Relying on the same insufficient FE allegations as in the FAC, Plaintiffs argue that these statements gave the misleading impression that the ABG Agreement resulted from thoughtful due diligence and "vetting," when allegedly it was negotiated so fast there was no chance for "vetting." But even crediting FE 3's vague assertion that the ABG Agreement was negotiated in "a matter of days" (SAC ¶ 73), this does not undercut either statement. Plaintiffs interpret the first statement as indicating that negotiation of the ABG Agreement "began at some point before December 20 [2018]" (Pl. Opp. 10), but the statement says nothing about "negotiations." It says only that ABG took an interest in Tilray for a particular reason (its scientific approach), and that passage of the Farm Bill spurred the parties to seriously consider a partnership—a timeline that is entirely consistent with FE 3's allegation that negotiations took place over a short period. Likewise, the second challenged statement simply says that ABG vetted Tilray with an eye to strategic concerns similar to a CPG company, and FE 3's allegations are not to the contrary. As the Court previously found, "FE 3's characterization of the company's due diligence [as 'very irresponsible'] merely reflects FE 3's *own* 'insufficiently particular' perception" (Op. 19); it does not by itself establish that the due diligence was insufficient (or that any Defendant believed it to be so), and it in no way undercuts the undisputed fact that ABG conducted due diligence on Tilray.[5]

---

[5] Indeed, FE 3 says nothing about *ABG*'s due diligence, only that *Tilray's* (allegedly) was "irresponsible." SAC ¶ 73.

### B. Statements About Valuation of the ABG Agreement

Plaintiffs' challenge to the ABG Agreement valuations prior to impairment fails too. Def. Mem. 14-16. Plaintiffs concede that the valuations are opinions, but argue—with classic circularity—that they were false because Defendants must not have actually followed the GAAP process for testing impairment as they claimed, since they did not impair earlier. Pl. Opp. 12.

This theory has no support in law or fact. Plaintiffs allege no facts whatsoever suggesting that the Defendants did not believe the ABG Agreement valuations at the time, or that Tilray did not follow the process it reported for testing for impairment. They assert only that because FE 3 claims (without support) that it was "immediately very clear" that the Agreement wasn't worth what Tilray paid for it, Defendants must or should have felt the same; and that because Defendants did not impair earlier, they must not have followed the impairment-testing policies they claimed. The Court has already rejected this theory in the scienter context: "The essence of Plaintiffs' claim is that, because Defendants' FDA hopes ultimately rang false, and the ABG Agreement therefore proved less valuable than initially advertised, Defendants either knew or should have known that their assessments over the first three quarters of its lifespan were inflated. This is the definition of fraud by hindsight." Op. 22. The same reasoning applies here, and compels the same result.

### C. Statements About Inventory and Gross Margins

The challenged statements reporting Tilray's inventory are likewise true and not misleading statements of opinion that required significant subjective judgment calls.[6] Def. Mem. 16-18. Plaintiffs assert that Tilray's write-down of trim inventory in 2020 "shows that they did not honestly believe that the marijuana trim was worth the value they reported" earlier in the class period. Pl. Opp. 14. Again, this Court has already rejected such flawed reasoning: "[T]he mere fact

---

[6] The Opposition seemingly abandons any claims concerning gross margin except as they involve inventory valuation. Pl. Opp. 13-14. All statements in this category are true and not misleading statements of opinion. Def. Mem. 18-19.

that Tilray subsequently reduced its inventory valuation, without more . . . cannot sustain the allegation that the company's failure to do so earlier was fraudulent." Op. 25. And, like the FAC, the SAC "offer[s] no non-conclusory allegations showing that, at the time of their statements, [Defendants] actually knew or had been presented with information indicating that Tilray's trim was worthless, or that it could not in fact be incorporated into Tilray's low-priced offerings." *Id.*

Plaintiffs also argue there was no market for "trim" until December 2019, rendering its earlier inclusion in inventory violative of GAAP. Pl. Opp. 13. But this is incorrect, and Plaintiffs' about-face exposes the disingenuousness of their argument: in the FAC, Plaintiffs conceded that "[p]roducers can . . . sell trim to third parties for minimal value or use them to make extracts." FAC ¶ 30; *see also id.* ¶ 131; Op. 25 ("Plaintiffs concede that there is at least some market for trim."). There *was* a market for trim and extract throughout the class period, it simply was not as large as Tilray and the industry believed it would be when the Canadian 2.0 market opened. *See* Ex. 2, at 63 ("extracts" were 23% of 2019 cannabis revenue).[7] Defendants did their best to fairly estimate the value in light of numerous market factors and, as with the FAC, Plaintiffs fail to allege any facts suggesting that Defendants believed it was worthless when Tilray valued it. Op. 25.

## II.    Plaintiffs Cannot Allege a Strong Inference of Scienter

Plaintiffs' claims also fail for the independent reason that they still cannot allege the requisite "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007). Plaintiffs' only alleged motive is an unsupported two-step conspiracy theory—that Mr. Kennedy supposedly orchestrated the ABG deal and made the challenged statements in order to prop up Tilray's share price to: *first*, trick Privateer investors into agreeing to a downstream merger with Tilray so that he and the other Privateer co-founders could sell their Tilray shares with

---

[7] *See also* Ex. 7 (11/12/19 Tr.), at 12-13 (explaining "a lot of byproduct on the market that people are using for extraction" is driving down price so now Tilray's "keeping all that byproduct or oil that we've been selling" instead).

fewer taxes while maintaining voting control; and, *second*, use that (shared) control to effectuate a second merger—entirely theoretical until an opportunity with Aphria materialized in late 2019— that would (hopefully) make Mr. Kennedy CEO of the world's largest cannabis company.

Plaintiffs offer no facts—none—in support of this wild theory. Instead, they ask the Court to infer from generic statements Mr. Kennedy made about the growth potential of the cannabis industry, the likelihood of future consolidation, and Tilray's long-term goal of becoming a dominant player, that Mr. Kennedy lied to the market about the ABG Agreement and inventory in furtherance of this two-step professional long-game. This is not cogent or compelling—it's absurd, particularly in light of the fact that Mr. Kennedy foreseeably suffered significant net financial *loss* as a result of the purported fraud, and ultimately negotiated and consummated the very same merger wherein the controlling shareholders lost control of Tilray and he *did not* become CEO.[8]

Faced with the patent weakness of this main fraud theory, the SAC tacks on several disjointed purported "additional facts further probative of scienter"—most notably, stock sales by Mr. Kennedy. SAC ¶¶ 16, 220-26; Pl. Opp. 16-21. Plaintiffs (concededly) only bring these up now because the Court noted that they failed to do so in the FAC (presumably because Plaintiffs too recognized that there was nothing "unusual or suspicious" about the sales). *See* Pl. Opp. 1. But "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter,"[9] and the most compelling inference to be drawn from Mr. Kennedy's stock sale history is one of good faith.

Typically, stock sales support an inference of scienter where the defendant takes advantage of the allegedly artificially inflated stock price for personal financial gain.[10] However, where a

---

[8] Plaintiffs' assertion that Mr. Kennedy would have become CEO but for the COVID-19 pandemic (Pl. Opp. 25) is pure speculation—the terms of the merger negotiations tracked Tilray's and Aphria's relative stock prices, which were subject to innumerable market factors. SAC ¶ 189. And even assuming Mr. Kennedy did want to become CEO of a combined company, that is merely a general corporate motive insufficient to show scienter. Def. Mem. 23.

[9] *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020).

[10] *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009); *Freeman v. Decio*, 584 F.2d 186, 197 n.44 (7th Cir. 1978); *see also* Pl. Opp. 16.

defendant preserves a significant amount of his or her holdings (or *increases* them), courts infer good faith because the insider's overall investment shows an alignment of interest with other shareholders in the company's success.[11] Thus, stock sales are only probative of scienter if they are sufficiently "unusual" or "suspicious" in timing or amount. *Gildan*, 636 F. Supp. 2d at 270.

Mr. Kennedy's sales were not unusual or suspicious in either respect. Plaintiffs cite three stock sale dates as indicative of suspicious timing: a January 24, 2019 sale of approximately 150,000 shares; and sales on March 1 and April 1-2, 2019 of approximately 200,000 shares, collectively. Pl. Opp. 17. The January 24 sale allegedly was "suspicious" because it occurred soon after announcement of the ABG Agreement,[12] but three other things happened around the same time: (1) the lock-up on Mr. Kennedy's (and every other Tilray shareholder's) IPO shares expired;[13] (2) 375,000 of his restricted stock units ("RSUs") vested pursuant to Tilray's 2018 Equity Incentive Plan; and (3) vesting of those RSUs created a taxable event. Def. Mem. 20. Plaintiffs do not—and cannot—allege facts demonstrating that the January 24 sale was within Mr. Kennedy's discretion; the most reasonable inference is that the timing of the January 24 sale was due to the vesting of Mr. Kennedy's RSUs and the related instantaneous tax obligation, which does not suggest scienter.[14] Nor were the March 1 and April 1-2 sales unusual or suspicious in timing. Plaintiffs do not explain (or cite any authority for) why sales months after the signing of the ABG

---

[11] *See, e.g., In re Farfetch Ltd. Sec. Litig.*, 2021 WL 4461264, at *5 (S.D.N.Y. Sept. 29, 2021).

[12] Plaintiffs also argue that two late-2018/early-2019 media sources in which Mr. Kennedy said (or reportedly said) that he was a long-term investor and did not expect to sell his Tilray shares when the IPO lockup lifted show scienter in light of the January 24 sale (Pl. Opp. 16), but this is a red herring. These statements are not alleged to have been false or misleading and have no bearing on Mr. Kennedy's intent with respect to the challenged statements. Moreover, it is clear in context that Mr. Kennedy was talking about not "cashing in" his holdings—very different than selling newly-vested shares to cover a tax burden as is the most reasonable inference with respect to the January 24 sale.

[13] Pl. Opp. 16. Courts have found that stock sales upon expiration of a lock-up are not indicative of suspicious timing. *See, e.g., Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 543-44 (5th Cir. 2008); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 225 (D. Mass. 1999).

[14] Plaintiffs' assertion that "[c]ourts do not consider whether a sale was for tax purposes in determining whether it suggests scienter" (Pl. Opp. 20) is plainly wrong. *See, e.g., N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

Agreement are suspicious, and courts routinely hold otherwise.[15] Moreover, eight of the nine sales on these dates were executed pursuant to a 10b5-1 plan Mr. Kennedy implemented before the class period. It is well-established that trades executed pursuant to 10b5-1 plans do not give rise to an inference of scienter. *See, e.g.*, *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355-56 (2d Cir. 2022) ("[T]he vast majority of the sales were conducted pursuant to a 10b5-1 trading plan or were executed for procedural purposes, and therefore could not be timed suspiciously."). And the timing of the remaining sale on April 2, is not suspicious—like the January 24 sale, it coincided directly with the vesting of Mr. Kennedy's RSUs. Def. Mem. 20.

Plaintiffs note that two of Mr. Kennedy's 10b5-1 plans were implemented during the class period (Pl. Opp. 19-20), but fail to explain how this suggests scienter. *See Bristol-Myers*, 28 F.4th at 356 n.4 (rejecting attacks on 10b5-1 plan for failure "to allege facts indicating that the plan was not given or entered into in good faith"). Mr. Kennedy only sold 474,278 shares during the class period pursuant to 10b5-1 plans, and that number is *dwarfed* by his 10b5-1 sales *after* revelation of the alleged fraud and the resulting stock price drop—4,600,000 shares of Class 2 Common Stock between June 16, 2020 and November 6, 2020.[16] That Mr. Kennedy sold nearly ten-times more shares under his 10b5-1 plan in the eight months following revelation of the alleged fraud than he did under 10b5-1 plans during the class period defeats any suggestion that he was "gaming" the plans to capitalize on non-public information, and cuts strongly against scienter.[17]

For essentially the same reasons, Plaintiffs also cannot demonstrate that Mr. Kennedy's

---

[15] *See, e.g.*, *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 235 (D.N.J. 2002) (stock sales one month after challenged statement not unusual or suspicious). Plaintiffs similarly fail to explain why stock sales "within 82 days of the last corrective disclosure" are suspiciously timed. Pl. Opp. 17. To the contrary, "[c]ourts in the Second Circuit have found that stock sales are not indicative of scienter when they are more than two months before" corrective disclosures. *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 235 (S.D.N.Y. 2020).

[16] *See* Form 4s filed with the SEC for Mr. Kennedy between 4/3/20 and 11/10/20, *available at* *https://www.sec.gov/edgar/browse/?CIK=1731348&owner=exclude*.

[17] *See MDC Partners, Inc.*, 2016 WL 5794774, at *19 n.9 ("fact that [defendant] waited to sell millions of shares until [the company's] stock price had dropped following the revelation of the alleged fraud cuts against [scienter]").

sales were unusual or suspicious in amount. Plaintiffs note that he sold $28.4 million in shares during the class period and point to a couple of cases where lower values were found suspicious in those circumstances. Pl. Opp. 17. But the "dollar amount cannot be considered in isolation" in determining whether stock sales are unusual or suspicious. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 586 n.23 (S.D.N.Y. 2014). Indeed, many courts have found stock sales at values far *higher* than $28.4 million not indicative of scienter on similar pleadings.[18]

Here, Mr. Kennedy maintained the vast majority of his holdings during the class period, strongly indicating good faith. *See* Def. Mem. 21 (sales represented 15.7% of his overall direct holdings at beginning of class period and 3.7% at end). Plaintiffs object to the inclusion of certain of Mr. Kennedy's unvested RSUs and options, and shares subject to lock-up, in calculating his overall holdings for these purposes (Pl. Opp. 18), but courts in this circuit frequently include such shares in their calculations.[19] And even accepting, *arguendo*, Plaintiffs' calculation of Mr. Kennedy's relevant holdings over the class period and his stock-sales-to-overall-holdings percentage (between 21.1% and 34%; Pl. Opp. 19), that percentage is still too low to show scienter. *See Farfetch*, 2021 WL 4461264, at *5 (sale of 50% of holdings insufficient because such low sales volumes "demonstrate that defendants remained heavily invested").[20] Moreover, Mr. Kennedy stood to increase his holdings in the Company by millions of shares that he knew would ultimately vest or become tradeable after expiration of the downstream merger lock-up: by Plaintiffs' own calculations, his holdings went from 14,706 shares at the beginning of the class period to 2,406,037 shares at the end of the class period. Pl. Opp. 17, 19. It makes no sense that

---

[18] *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 2021 WL 4481119, at *5 (S.D.N.Y. Sept. 30, 2021) ($44 million by one defendant); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 585 ($184 million by one defendant); *Gildan*, 636 F. Supp. 2d at 271 ($96 million between two defendants).

[19] *See, e.g.*, *Gildan*, 636 F. Supp. 2d at 271 n.5.

[20] *See also Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (same re sale of 65.6%); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (same re sale of 44%).

Mr. Kennedy would multiply his holdings 163-times over and then hold the majority of that increase, knowing the stock was artificially inflated and doomed to collapse.[21]

Finally, Plaintiffs' argument that vaguely alleged instances of purported "self-dealing" suggest scienter is equally flawed. Pl. Opp. 22. No facts demonstrate the impropriety of any of the alleged transactions, which have nothing to do with the challenged statements or Plaintiffs' theory of fraud; nor do Plaintiffs specify what future self-dealing Mr. Kennedy supposedly sought to pursue after the downstream or Aphria mergers. Even assuming the truth of these unsupported allegations, it makes no sense that Mr. Kennedy would set himself up to potentially lose $100 million or more in stock value in order (allegedly) to maintain the ability to "self-deal" for small amounts here or there—an "opportunity" that in any case disappeared when Mr. Kennedy himself negotiated the Aphria merger wherein he lost both his voting power and his position as CEO.

Viewing the record holistically, as *Tellabs* directs, the most reasonable inference is that Mr. Kennedy was working hard to advance the interests of a Company he truly believed in and to fairly present its financial condition and prospects to investors. The mere fact that the ABG Agreement (and byproduct inventory) turned out in hindsight not to be as profitable as anticipated does not transform his good intentions into culpable conduct.

## III.    CONCLUSION

Plaintiffs' claims fail under Section 10(b); their Section 20(a) and 20A claims thus fail as well.[22] Because no amount of repleading can fix the fundamental flaws in Plaintiffs' claims, Defendants respectfully ask the Court to dismiss the Second Amended Complaint with prejudice.

---

[21] *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021) (rejecting stock sale allegations; "even if [defendant] realized some proceeds (and profit) from stock sales during the Class Period, his holdings . . . actually *increased* during that period"). Plaintiffs cite no authority for their conclusory assertion that the Court should ignore Mr. Kennedy's increase in holdings because it resulted from vesting of RSUs and stock options. Pl. Opp. 17.

[22] Def. Mem. 25. Plaintiffs' § 20A claim fails not only for lack of a predicate § 10(b) violation but also for the other reasons identified in Defendants' opening brief, which the Opposition does not answer. *Id.*; Pl. Opp. 25.

Dated: May 9, 2022                          Respectfully submitted,


                                            **BAKER & HOSTETLER LLP**


                                   By:    */s/ Douglas W. Greene*

                                            Douglas W. Greene (*pro hac vice*)
                                            dgreene@bakerlaw.com
                                            Zachary R. Taylor
                                            ztaylor@bakerlaw.com
                                            45 Rockefeller Plaza
                                            New York, NY 10111
                                            Telephone: 212.589.4200

                                            Genevieve G. York-Erwin
                                            gyorkerwin@bakerlaw.com
                                            999 Third Avenue, Suite 3900
                                            Seattle, WA 98104
                                            Telephone: 206.566.7079

                                          *Attorneys for Defendants*