# Exhibit A

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**August 23, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

INDIANA PUBLIC RETIREMENT
SYSTEM, individually and on behalf of all
others similarly situated; PUBLIC
SCHOOL TEACHERS' PENSION AND
RETIREMENT FUND OF CHICAGO,
individually and on behalf of all others
similarly situated,

     Plaintiffs - Appellants,

v.

PLURALSIGHT, INC.; AARON
SKONNARD; JAMES BUDGE; GARY
CRITTENDEN; SCOTT DORSEY; ARNE
DUNCAN; RYAN HINKLE; LEAH
JOHNSON; TIMOTHY MAUDLIN;
FREDERICK ONION; BRAD RENCHER;
BONITA STEWART; KARENANN
TERRELL; MORGAN STANLEY & CO;
JP MORGAN SECURITIES,

     Defendants - Appellees.

------------------------------

ROBERT J. JACKSON, JR.; LUIS A.
AGUILAR; LYNN E. TURNER; DANIEL
J. TAYLOR; JOSHUA MITTS; M. TODD
HENDERSON; NEJAT SEYHUN; ALAN
JAGOLINZER; STANLEY VELIOTIS;
PHILLIP QUINN; BRADFORD LYNCH,

     Amicus Curiae.

No. 21-4058

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 1:19-CV-00128-JNP-DBP)**

_____

Carol V. Gilden, Cohen Milstein Sellers & Toll, Chicago, Illinois (Joel P. Laitman, Steven J. Toll, Benjamin F. Jackson, and Norhan Bassiouny, Cohen, Milstein Sellers & Toll, New York, New York; and Keith M. Woodwell, Clyde Snow & Sessions, Salt Lake City, Utah, with her on the briefs) for Plaintiffs – Appellants.

Gregory L. Watts, Wilson Sonsini Goodrich & Rosati, P.C., Seattle, Washington (John C. Roberts Jr., Wilson Sonsini Goodrich & Rosati, P.C., Seattle, Washington; Ignacio E. Salceda, Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California; Jason W. Hardin and Sarah C. Vaughn of Fabian VanCott, Salt Lake City, Utah, with him on the brief) for Defendants – Appellees.

David W. Scofield, Peters | Scofield, Sandy, Utah, Jonathan A. Gardner, Carol C. Villegas, and Ross Kamhi, Labaton Sucharow LLP, New York, New York, and Jeremy A. Lieberman and Emma Gilmore, Pomerantz, LLP, New York, New York, filed an Amicus Curiae brief in support of Appellants.

_____

Before **ROSSMAN**, **KELLY**, and **MURPHY**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

Founded in 2004, Defendant Pluralsight is a software company offering a cloud-based technology skills platform. Pluralsight sells subscriptions to its various products and services, including a library of thousands of skills courses. Defendant Aaron Skonnard is Pluralsight's Chief Executive Officer. Defendant James Budge is the Chief Financial Officer. Plaintiffs purchased Pluralsight stock between January 16, 2019, and July 31, 2019.

Beginning on January 16, 2019, Mr. Skonnard and Mr. Budge allegedly made materially false and misleading statements about the size and productivity of Pluralsight's sales force, which Plaintiffs claim artificially inflated Pluralsight's stock price, including during a secondary public offering ("SPO") in March 2019. Pluralsight announced disappointing second-quarter earnings on July 31, 2019. Defendants attributed the low earnings to a shortage of sales representatives earlier in the year—but this explanation contradicted representations Pluralsight made in the first quarter of 2019 about the size of its sales force. The day after the announcement, Pluralsight's stock dropped nearly 40%.

Lead Plaintiffs Indiana Public Retirement System ("INPRS") and Public School Teachers' Pension and Retirement Fund of Chicago ("CTPF") brought claims on behalf of a putative class of Pluralsight stock holders under the Securities Exchange Act of 1934 ("Exchange Act"), and the Securities Act of 1933 ("Securities Act") in federal district court in Utah. Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), contending Plaintiffs failed to adequately allege (1) any materially false or misleading statements or omissions and (2) that Defendants acted with the requisite scienter. The district court found one statement (of eighteen alleged) was materially false or misleading but dismissed Plaintiffs' Exchange Act claims because the complaint failed to allege a strong inference of scienter. The district court dismissed Plaintiffs' Securities Act claims because none of the statements in Pluralsight's SPO documents were materially false or misleading. As

part of its analysis, the district court concluded Plaintiffs failed to plead a violation of SEC Regulation S–K as the basis for a claim under either Act.

This appeal asks us to decide whether the district court properly dismissed Plaintiffs' complaint. Exercising jurisdiction under 28 U.S.C. § 1291, and applying de novo review, we reverse and remand. We conclude the district court erred in dismissing Plaintiffs' Exchange Act claims. Although the district court correctly determined that Plaintiffs sufficiently alleged only one materially false or misleading statement, the district court's scienter determination was erroneous, as we will explain. We also conclude the district court relied on erroneous reasoning to dismiss the alleged violation of Item 303 of SEC Regulation S–K, so we must remand for further consideration of Plaintiffs' Exchange Act and Securities Act claims based on the alleged Item 303 violation, consistent with this opinion. We otherwise affirm the district court's dismissal of Plaintiffs' Securities Act claims.

## I.   Background

### A.   Factual allegations[1]

### 1.   Pluralsight relied on "billings" growth to attract investors and Defendants assured investors they closely monitored the sales force data that drove billings.

Pluralsight was not profitable, so it relied primarily on its quarterly "billings" growth to attract investors. It defined "billings" as "total revenue plus the change in deferred revenue in the period." Aplts. App. vol. 1 at 58. Quarterly billings generally

---

[1] The background facts derive from the well-pleaded allegations in the complaint.

reflected amounts invoiced to customers that quarter, including subscription renewals, sales of additional products or services to existing customers, and sales to new customers. "While revenue in a given quarter provided investors with a snapshot in time, billings were a crucial indicator of the future revenue and cash flow that the Company would realize from deals that the sales representatives had executed in that quarter." *Id.* at 59. In Pluralsight's SEC filings, earnings calls, and presentations to investors, Defendants repeatedly stated that billings growth was Pluralsight's "key business metric" and a "key factor affecting [the company's] long-term performance." *Id.*

Defendants also told investors and analysts that Pluralsight's sales force—including both the number of its sales representatives and their productivity—was the primary driver of Pluralsight's billings growth. For example, in an August 2018 earnings call with analysts and investors, Mr. Budge attributed Pluralsight's billings growth to its "heavy" investment in "sales and marketing" and the "efficiencies" that resulted from having more "tenured sales reps." *Id.* at 62. During a meeting at Pluralsight's annual conference, Pluralsight Live, Mr. Budge told analysts and investors that Pluralsight's billings growth depended on the sales representative headcount and the ability of those representatives to meet their sales quotas. Mr. Skonnard and Mr. Budge made similar comments attributing Pluralsight's billings success to its sales force capacity in an earnings call with analysts and investors in October 2018.

Defendants told investors they carefully monitored the data surrounding its billings growth—Pluralsight's "key business metric"—including the number of sales representatives, their productivity, and deals in the "pipeline." Because they closely tracked this data, Defendants maintained they could reliably predict billings about six months in advance. As part of its internal planning and forecasting, Defendants followed a sales representative's progression from hiring through "ramping up to take on a full sales quota." *Id.* at 61. This "ramping up" process to become a quota-bearing sales representative, Mr. Budge explained, took between six months and two years. *Id.* Defendants also used a "pipeline" to track the progression of potential sales, from identifying a potential customer to closing a deal. The pipeline indicated the number of potential deals, when Pluralsight expected the deals to close, and how sales representatives were performing relative to their sales quotas. For example, in the August 2018 earnings call, Mr. Budge explained that, to meet its quarterly billings "targets," Pluralsight relied heavily on deals that took "5 to 6 months" to progress through the pipeline. *Id.* at 63. And Pluralsight could reliably approximate quarterly billings growth about six months in advance.

Given Defendants' assurances about how closely they tracked Pluralsight's "key business metric," investors and analysts routinely incorporated Defendants' statements about the size and productivity of Pluralsight's sales force into their reports, basing their investment recommendations and decisions on these statements. For example, the day after Pluralsight's August 2018 earnings call, a J.P. Morgan

analyst report noted, "We believe the heavy investments undertaken by the company last year to ramp up its sales force is starting to pay off." *Id.* at 62-63.

> **2.    Throughout the class period, Defendants repeatedly touted the size and productivity of Pluralsight's sales force.**

On January 16, 2019, Mr. Budge spoke at the annual Needham Growth Conference and highlighted the size and effectiveness of Pluralsight's sales force. During a Q&A session with analysts and investors, Mr. Budge explained that over the last few years Pluralsight had only "about 80 quota-bearing reps and little infrastructure around our sales reps," but he further stated, "[T]he aggregate quota-bearing reps went from about 80 at that time to today we have about 250." Aplts. App. vol. 1 at 105-06. He also claimed Pluralsight was "starting to see some of the efficiencies of [its] models," that it "built out some of the infrastructure around sales to scale," and that the sales force was "killing it." *Id.* at 106. Mr. Budge made similar representations about Pluralsight's sales force in an earnings call on February 13, 2019. *Id.* at 108 ("Total quota-bearing reps closing in at around 240 . . . more goodness from them.").

On February 21, 2019, Pluralsight filed its 2018 Form 10–K with the SEC, signed by Mr. Skonnard and Mr. Budge. The Form 10–K stated that Pluralsight had "a large direct sales force to focus on business sales" and had "been able to drive substantial increases in the productivity and effectiveness of [its] sales personnel." *Id.* at 69. The Form 10–K also contained a list of "risk factors"—several addressed the possibility that deficiencies in the sales force could negatively affect Pluralsight's

business. One risk factor provided "there is no guarantee that [Pluralsight's] investments [in sales and marketing] will succeed." *Id.* at 70. Another cautioned:

> If we are unable to hire, develop, and retain talented sales or marketing personnel, if our new sales or marketing personnel are unable to achieve desired productivity levels in a reasonable period of time, or if our sales and marketing programs are not effective, our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

*Id.* In March 2019, these statements from the Form 10–K were included in documents filed with the SEC in Pluralsight's SPO.

On May 1, 2019, during an earnings call, Mr. Budge again discussed the size and expansion of Pluralsight's sales force. He said, "we like where we are with our sales reps" and "we're on pace" to have "300-plus reps by the time we exit the year." *Id.* at 77-78. Investors and analysts continued to consider these statements when making investment decisions and recommendations. Immediately after the earnings call on May 1, 2019, for example, J.P. Morgan issued a report increasing its "price target" for Pluralsight stock, and SunTrust recommended Pluralsight as a "buy." *Id.* at 79. In June, a SunTrust report highlighted for investors the "benefits still to accrue from [Pluralsight's] sales capacity expansion": "The company has expanded its sales capacity over a multi-year basis and we estimate total sales headcount to approximate 300 by the end of 2019. Several years of significant growth in sales headcount and increasing productivity from tenured sales reps bodes very well for [business-to-business] billings activity this year." *Id.*

**3.    Billings growth dropped off in the second quarter of 2019, and Defendants attributed the decline to a shortage of sales representatives.**

On July 31, 2019, following five consecutive quarters of greater than 40% billings growth year-over-year, Pluralsight announced that billings grew only 23% in the second quarter of 2019. Pluralsight's Form 10–Q, filed on July 31, 2019, revealed for the first time that Pluralsight had been "slower in hiring additional sales representatives than planned for 2019." *Id.* at 81.

That same day, Mr. Skonnard and Mr. Budge elaborated on the disappointing second-quarter returns during an earnings call. Mr. Budge explained, "We're about 250 quota-bearing reps right now. And that's about the number of bodies we wanted to have at this time in the year, but they didn't come into the year early enough . . . . [W]e're a few months behind there, that's been the big impact." *Id.* at 82. According to Mr. Budge,

> there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter.

*Id.* Mr. Skonnard and Mr. Budge both told investors that, notwithstanding these delays, Pluralsight was "nearly caught up" on its sales capacity plan. *Id.* at 83. When an analyst asked, "[W]hy didn't we hear this on last quarter's call?" Mr. Budge stated, "Well, we were still hitting our numbers." *Id.* (alteration in original). However, he acknowledged those "numbers" were driven not by the size of the sales

force but by "an accelerated productivity out of reps that was not sustainable in the second quarter. We just needed more bodies to soak that up." *Id.*

The next day, Pluralsight's share price dropped nearly 40% from $30.69 to $18.56.

Six months later, at the Needham Growth Conference in January 2020, Mr. Budge explained in a Q&A that Pluralsight "came out of 2018 going into 2019 with about 200 quota-bearing sales reps." *Id.* at 87. "We came into the year with fewer sales reps than we had planned – than we had hoped for." *Id.* Mr. Budge explained, "We just didn't have enough reps." *Id.*

## B.    Procedural history

Plaintiffs brought three claims under the Exchange Act on behalf of a putative class of persons who purchased Pluralsight stock between January 16, 2019, and July 31, 2019. Count I alleges Pluralsight, Mr. Skonnard, and Mr. Budge fraudulently or recklessly made eighteen materially false and misleading statements and omissions in violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. In Count II, Plaintiffs allege Mr. Skonnard and Mr. Budge are liable under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which creates liability for certain "controlling persons" of entities who violate securities laws. Count III alleges Mr. Skonnard and Mr. Budge engaged in insider trading in violation of section 20A of the Exchange Act, 15 U.S.C. § 78t-1(a).

Plaintiff INPRS also alleged three claims under the Securities Act on behalf of persons who purchased stock traceable to the SPO. The Securities Act claims are

brought against Pluralsight, Mr. Skonnard, and Mr. Budge; ten members of Pluralsight's board of directors who were signatories to the registration statement filed with the SPO ("Signer Defendants"); and the co-lead underwriters for the SPO ("Underwriter Defendants") who prepared the SPO's registration statement and prospectus (collectively, "offering documents"). In Count IV, Plaintiffs allege all defendants negligently made false and materially misleading statements in the offering documents in violation of section 11 of the Securities Act, 15 U.S.C. § 77k. Count V claims Pluralsight and the Underwriter Defendants negligently made materially false statements in the prospectus in violation of section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2). And finally, Count VI alleges the Signer Defendants are liable as controlling persons under section 15 of the Securities Act, 15 U.S.C. § 77o.

Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion.

As for the Exchange Act claims, the district court found Mr. Budge's statement on January 16, 2019, that "today we have about 250" quota-bearing sales representatives was materially false and misleading. Aplts. App. vol. 3 at 638-39. The district court concluded, however, that Plaintiffs failed to plead a "strong, cogent inference of scienter" as required by the Private Securities Litigation Reform Act of 1995. *Id.* at 667. According to the district court, the remaining statements alleged were not materially false or misleading—rather, they were accurate statements of historical fact and/or nonactionable statements of corporate optimism and puffery.

11

The district court further determined Defendants' offering documents did not violate Item 303 of Regulation S–K, 17 C.F.R. § 229.303(b)(2)(ii), which requires disclosure of known trends reasonably likely to have a material impact on net sales; nor did they fail to disclose "risk factors" in violation of Item 105, 17 C.F.R. § 229.105. Accordingly, the district court dismissed Count I. Because the claims raised in Counts II and III required a predicate Exchange Act violation, i.e., the section 10(b) violation alleged in Count I, the district court dismissed those counts as well.

The district court dismissed Plaintiffs' Securities Act claims for substantially the same reasons—concluding as to Counts IV and V that the statements in the offering documents were not materially misleading and Defendants did not violate Regulation S–K. Count VI was dismissed for lack of a predicate Securities Act violation.

Plaintiffs timely appealed.

## II.    Discussion

### A.    Standard of Review

"Dismissals under Rule 12(b)(6) are reviewed de novo." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015). "In conducting de novo review, we accept the well-pleaded allegations of the complaint and construe them in the light most favorable to the plaintiff." *Id.* "We consider the complaint as a whole, along with the documents incorporated by reference into the complaint or publicly filed with the Securities and Exchange Commission." *Id.*

**B.      Section 10(b) claim**

"Section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder 'prohibit making any material misstatement or omission in connection with the purchase or sale of any security.'" *Smallen v. W. Union Co.*, 950 F.3d 1297, 1304 (10th Cir. 2020) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)) (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5). To establish a violation under section 10(b) and Rule 10b–5, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co.*, 573 U.S. at 267. Only the first two elements are at issue in this appeal.

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a heightened pleading standard applies to allegations of a material misrepresentation or omission and scienter. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) (citing Pub. L. No. 104–67, 109 Stat. 737). "In order to overcome a motion to dismiss, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)).

13

"Further, it is not enough for a plaintiff to allege generally that the defendant acted with scienter, as permitted under Fed. R. Civ. P. 9(b)." *Id.* "The plaintiff must, 'with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (alteration in original) (quoting § 78u–4(b)(2)). Notwithstanding this heightened pleading standard, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### 1.    Material Misrepresentations

Plaintiffs identify eighteen statements by Defendants Pluralsight, Mr. Skonnard, and Mr. Budge that allegedly give rise to liability under section 10(b). Plaintiffs claim these statements were misrepresentations of material facts or were misleading, given Defendants' omission of material facts. The district court determined only one statement was materially false or misleading. We agree.

To sufficiently plead falsity, the complaint must allege facts to "support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018) (citation omitted). We have identified factors relevant to determining whether falsity has been sufficiently pleaded under section 10(b):

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the

14

sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Id.* at 1298-99 (citation omitted).

"[W]hen the claim is for omission of a material fact, the plaintiff must show the defendant had a duty to disclose the omitted information." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1162 (10th Cir. 2018). "[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (second alteration in original) (quoting 17 C.F.R. § 240.10b–5(b)). "[I]f a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1125 (10th Cir. 1997).

It is not enough for a defendant's statement or omission to be false or misleading, it must also be material. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman*, 120 F.3d at 1119; *see also Matrixx Initiatives, Inc.*, 563 U.S. at 38 ("[T]his materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having

15

significantly altered the "total mix" of information made available.'" (citation

omitted)). "In this regard, we have distinguished between statements that are material

and those that are 'mere puffing . . . not capable of objective verification.'" *Level 3*,

667 F.3d at 1339 (alteration in original) (citation omitted). "Vague, optimistic

statements are not actionable because reasonable investors do not rely on them in

making investment decisions." *Id.* (citation omitted).

Our decision in *Level 3* is instructive on a critical legal principle at issue here:

the distinction between material misstatements and mere puffery. There, plaintiff-

shareholders sued defendants under section 10(b) for making allegedly false and

misleading statements about the progress of integrating defendants' recent

telecommunications acquisitions. *Id.* at 1337-38. We found "general, forward-looking

expressions of confidence in future integration progress" were not material

misstatements; nor were "broad claims by defendants regarding integration efforts,"

including: (1) the "integration of all the acquired companies is progressing well and

we're beginning to see the benefits of synergies from those transactions"; and (2) the

"overall integration effort is tracking within expectations in this regard, and the

overall customer experience is still positive." *Id.* at 1340. Observing the difference

between actionable misstatements and mere puffery, we explained, "These are all the

'kind of rosy affirmation[s] commonly heard from corporate managers and

numbingly familiar to the marketplace—loosely optimistic statements that are so

vague, so lacking in specificity . . . that no reasonable investor could find them

16

important.'" *Id.* (alterations in original) (citation omitted). Such statements are "not capable of objective verification." *Id.* at 1339 (citation omitted).

But we also determined in *Level 3* that several "particularly concrete" statements were "potentially actionable" because they "did cross the line from corporate optimism and puffery to objectively verifiable matters of fact"—namely, (1) the "majority" of the integration was complete, "ahead of plan" and "under budget"; (2) a "majority of the physical network interconnection are completed"; (3) the integration efforts were "85%, 90% done"; and (4) "[m]ost of the physical integration of WilTel is now complete." *Id.* at 1340. *Level 3* teaches that positive generalizations about a company's performance will typically not give rise to liability under section 10(b); rather, to be actionable, the statements must be grounded in concrete metrics or other objectively verifiable data. Saying that a project is "progressing well" is likely not actionable, but saying it is "90% done" potentially is.

With this applicable law in mind and guided by the standard of review for a motion to dismiss under Rule 12(b)(6), we turn to the alleged misstatements here.

### i.    January 16, 2019, Needham Growth Conference (Statements 1-4)[2]

On January 16, 2019, Mr. Budge participated in a Q&A session with analysts and investors at the Needham Growth Conference. Plaintiffs allege Mr. Budge made

---

[2] Defendants prepared a chart of allegedly false or misleading statements from the complaint and attached it as an exhibit to their motion to dismiss. Although Defendants' chart lists thirty statements, Plaintiffs clarified that only eighteen were alleged to be false or misleading. Plaintiffs and the district court adopted Defendants' numbering of the statements for reference, and the parties again refer to these

four materially false and misleading statements and omitted material facts during this session, in violation of section 10(b).

First, Plaintiffs point to Mr. Budge's statement providing concrete information about Pluralsight's growing sales force. He stated that in recent years Pluralsight only had "about 80 quota-bearing reps and little infrastructure around our sales reps. . . . [T]he aggregate quota-bearing sales reps went from about 80 at that time to today we have about 250." Aplts. App. vol. 1 at 105-06. The complaint alleges, "Budge's statement about the absolute quota-bearing sales representative headcount being 'about 250' was false because Budge later admitted to investors that '[w]e came out of 2018 going into 2019 with about 200 quota-bearing sales reps.'" *Id.* at 106-07 (alteration in original). In the district court, Defendants maintained this statement was not false when made, particularly since it was couched in approximating language.

The district court concluded Plaintiffs sufficiently alleged Mr. Budge's statement that "today we have about 250" quota-bearing sales representatives was materially false. The allegations of falsity were sufficient, the district court reasoned, given Mr. Budge's later statement in January 2020 that Pluralsight had only 200 quota-bearing sales representatives coming into 2019; and the false statement was

---

statement numbers on appeal. We also refer to these statement numbers and include Defendants' chart in an appendix for convenience. However, for purposes of our substantive analysis, we rely solely on the statements as alleged in the complaint.

"material in light of how central Pluralsight's sales force numbers were to its billings growth." Aplts. App. vol. 3 at 639. We agree.

The complaint alleges Mr. Budge stated on January 16, 2019, that "today we have about 250" quota-bearing sales representatives, but he later explained Pluralsight had only "about 200" quota-bearing sales representatives coming into 2019. This allegation, which we accept as true, strongly suggests Pluralsight could not have had "about 250" quota-bearing sales representatives on January 16, 2019. This would have required Pluralsight to ramp up an additional 50 sales representatives in just two weeks, an unlikely scenario given that Pluralsight's stated goal was to have 300 quota-bearing sales representatives by the end of the year. Moreover, in July 2019, Mr. Budge stated Pluralsight only had "about 250 quota-bearing reps right now," because it had been "dozens of reps" behind until "early to mid second quarter" of 2019. Aplts. App. vol. 1 at 82. It is not reasonable to infer Pluralsight had "about 250" quota-bearing sales representatives in January 2019 if the company did not actually reach that number until the second quarter of 2019. Rather, these allegations "support a reasonable belief" that Mr. Budge's statement on January 16, 2019, was false or misleading. *Level 3*, 667 F.3d at 1341 (citation omitted).

Defendants contend Plaintiffs' allegation that the "about 250" statement was false is inadequately pleaded because it is not "inherently inconsistent" with Mr. Budge's later statement that Pluralsight had "about 200" quota-bearing sales representatives. Aplees. Br. at 23. Defendants suggest Mr. Budge's estimation could

19

have been true because (1) the actual number of sales representatives could have been somewhere between 200 and 250, such that "about 200" and "about 250" are both accurate; (2) both could have been accurate if going into 2019 the number was closer to 200 but by January 16, 2019, it was closer to 250; or (3) Mr. Budge could have been correct when he said "about 250" and simply misremembered or misspoke when he said "about 200" a year later.

We need not evaluate Defendants' hypotheticals. Our task is to determine whether the well-pleaded factual allegations, accepted as true and construed in favor of Plaintiffs, "support a reasonable belief that the defendants['] statements identified by the plaintiff were false or misleading." *Level 3*, 667 F.3d at 1341 (alteration in original) (citation omitted). The PLSRA's heightened pleading standard requires Plaintiffs to "specify . . . the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). It does not, as Defendants seem to assume, demand that Plaintiffs negate every alternative explanation to adequately plead falsity. Plaintiffs have readily met the PLSRA standard here, as the district court correctly determined.

To the extent Defendants reprise their argument that Mr. Budge's statement was not *literally* false because he used approximating language (i.e., "about"), that is beside the point. Rule 10b–5 also applies to "misleading" statements. *Basic Inc.*, 485 U.S. at 238 ("[I]n order to prevail on a Rule 10b–5 claim, a plaintiff must show that the statements were *misleading* . . . ."). Here, Mr. Budge's statement that "today we have about 250" quota-bearing sales representatives was at least misleading even if

20

not literally false—that is, assuming the accurate figure was "about 200," as we must in light of the well-pleaded allegations.

Defendants do not contest materiality, and for good reason. Mr. Budge's statement that "today we have about 250" quota-bearing sales representatives on January 16, 2019, is "objectively verifiable" information "a reasonable investor would consider . . . important." *Level 3*, 667 F.3d at 1339-40 (citation omitted). The complaint alleges Defendants repeatedly touted the size and productivity of Pluralsight's sales force, explained they were the primary factors driving billings growth—Pluralsight's key business metric—and used this information to attract investors. The complaint also alleges analysts consistently asked about Pluralsight's sales force numbers, relayed Mr. Budge's representations in their reports to investors, and factored Mr. Budge's statements into their investment recommendations.

We thus agree with the district court that Plaintiffs adequately alleged Mr. Budge's statement that Pluralsight had "about 250" sales representatives was both false and material. As to the other alleged statements made on January 16, 2019, those are not actionable, as we explain.

The complaint alleges three additional statements from the same Q&A on January 16, 2019, were false or misleading: (1) Pluralsight was "seeing some of the efficiencies in [its sales] model"; (2) Pluralsight "built out some of the infrastructure

21

around sales to scale"; and (3) Pluralsight "had a lot of great sales reps. They're killing it." Aplts. App. vol. 1 at 106.[3]

The district court ruled these statements were not actionable, finding them to be expressions of optimism, opinion, and puffery or accurate statements of historic fact. The district court also determined the statements did not give rise to a duty to disclose Pluralsight's alleged 25% sales capacity gap—i.e., that Pluralsight had only 200 quota-bearing sales representatives, not the 250 Mr. Budge said it had.

On appeal, Plaintiffs argue these statements about the size and performance of Pluralsight's sales force were "objectively verifiable" and thus actionable. Aplts. Opening Br. at 41. Having chosen to speak on the subject of Pluralsight's sales force, Plaintiffs maintain, Mr. Budge could not then fail to disclose the company was 25% understaffed without materially misleading investors. Defendants insist Plaintiffs have not adequately pleaded that any statements are false (e.g., there is no allegation Pluralsight was not starting to see "efficiencies"); many statements were accurate statements of historical fact (e.g., "In the second quarter of [2018] . . . we built out some of the infrastructure around sales to scale."); and other statements are merely expressions of puffery (e.g., that the sales team is "killing it"). Aplees. Br. at 26-27.

---

[3] Plaintiffs criticize the district court for analyzing the allegedly false and misleading statements in isolation, and not in context. While we address statements individually for the sake of organization and clarity and at times quote only selected portions of the alleged misrepresentations for brevity, we nonetheless conduct our analysis mindful of the full context in which the statements are presented in the complaint. *See Grossman*, 120 F.3d at 1121 ("In assessing the materiality of the alleged statements and omissions at issue here, we must consider the context in which the statements were made.").

The district court correctly determined these other three statements from January 16, 2019, are not actionable.[4] For example, saying Pluralsight was "starting to see the efficiencies," is precisely the sort of statement we found was not materially misleading in *Level 3*—the company was "beginning to see the benefits of synergies." 667 F.3d at 1340. Thus, it is not actionable. We reach the same conclusion about Mr. Budge's representation that Pluralsight "built out some of the infrastructure around sales to scale." Even assuming this statement can be objectively verified, Plaintiffs have pleaded no facts to support this statement was false or misleading as required by the PSLRA. *See Nakkhumpun*, 782 F.3d at 1147 ("[Plaintiff must] explain why the statement was misleading, and allege with particularity his basis for believing that the statement was false."). Finally, saying Pluralsight's sales representatives were "killing it" is a statement "so vague, so lacking in specificity . . . that no reasonable investor could find [it] important." *Level 3*, 667 F.3d at 1340 (first alteration in original) (citation omitted).

The district court further held these statements did not give rise to a duty to disclose material facts, and again, we agree. As we explained, these statements are not materially false or misleading. It follows that Mr. Budge incurred no duty to disclose additional material facts. *See Matrixx Initiatives, Inc.*, 563 U.S. at 44

---

[4] The district court rejected Defendants' argument that these statements were protected by the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c)(1), which provides protection against liability for certain forward-looking statements. Defendants raise this argument again on appeal. However, because we agree with the district court's reasoning for finding these statements not actionable, we need not consider this alternative ground for affirmance.

("Disclosure is required under these provisions only when necessary 'to make . . .

statements made, in the light of the circumstances under which they were made, not

misleading.'" (alteration in original) (quoting 17 C.F.R. § 240.10b–5(b))).

The district court correctly concluded only Mr. Budge's first statement—that

Pluralsight had "about 250" quota-bearing sales representatives on January 16,

2019—was both (1) false or misleading and (2) material under section 10(b) and Rule

10b–5.

### ii.        February 13, 2019, Earnings Call (Statement 8)

On February 13, 2019, Pluralsight released its financial results for the fourth

quarter of 2018, and Mr. Skonnard and Mr. Budge held an earnings call with analysts

and investors. Plaintiffs allege that Mr. Budge made the following materially

misleading statement on that call:

> Total quota-bearing reps closing in at around 240, we expect that to grow
> to probably over 300 as we roll through 2019. . . . So more reps to come,
> more on quota on the [s]treet and more goodness from them.

Aplts. App. vol. 1 at 108 (first alteration in original). The district court concluded

this statement was not actionable, reasoning Plaintiffs did not specifically allege the

"around 240" estimation was false and the remainder of the statement constituted

forward-looking expressions of optimism and puffery incapable of objective

verification. We discern no error.

On appeal, Plaintiffs insist the district court erred in finding this statement to

be mere optimism and puffery, contending the statement was "objective and

verifiable by reference to Pluralsight's 2019 sales ramp capacity plan, sales quotas,

billing targets, and the deal pipeline." Aplts. Opening Br. at 36.[5] According to

Plaintiffs, even "general statements of optimism, when taken in context, may form a

basis for a securities fraud claim when those statements address specific aspects of a

company's operation that the speaker knows to be performing poorly." *Id.* at 37

(quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017)

(internal quotation marks omitted)). We are not persuaded.

Mr. Budge's expectation that the sales force would eventually grow to over

300 quota-bearing representatives and there would be "more goodness from them" is

forward-looking optimism and thus not actionable under section 10(b). Plaintiffs'

contrary assertion relies on distinguishable cases involving general expressions of

optimism about an outcome that, unlike here, the speaker knew for sure would never

come to pass. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1143 ("For example, reassuring

investors that 'everything [was] going fine' with FDA approval when the company

knew FDA approval would never come was materially misleading." (alteration in

original)). No allegations in the complaint suggest Mr. Budge knew Pluralsight could

not "grow to potentially over 300" quota-bearing sales representatives by the end of

2019. Rather, some allegations actually support the inference that Mr. Budge's

optimism was well founded. For example, in the July 31, 2019, earnings call, Mr.

---

[5] In their opening brief, Plaintiffs do not challenge the district court's conclusion that they failed to allege the 240 figure was false. Plaintiffs attempt to challenge this aspect of the district court's ruling for the first time in their reply brief. We deem this argument waived. *Burke v. Regalado*, 935 F.3d 960, 1018 n.44 (10th Cir. 2019) ("[A]n appellant generally waives an argument by waiting to make it in a reply brief.").

Budge stated that Pluralsight had nearly caught up with its internal sales ramping plan. And on January 14, 2020, Mr. Budge reported that Pluralsight had grown to about 320 quota-bearing sales representatives.

Plaintiffs failed to adequately plead factual allegations demonstrating that Mr. Budge's forward-looking statement was materially misleading, and the district court did not err in determining the February 13, 2019, earnings-call statement was not actionable.

### iii.    February 21, 2019, Form 10–K and March 7, 2019, SPO Offering Documents (Statements 11, 17-18)

Pluralsight's Form 10–K filed on February 21, 2019, included the following statement under "Growth Strategy": "We have a large direct sales force . . . . We have also been able to drive substantial increases in the productivity and effectiveness of our sales personnel over time as they gain more experience selling subscriptions to our platform." Aplts. App. vol. 1 at 110. This same statement was also included in the SPO offering documents on March 7, 2019, along with the statement: "We have significantly expanded our direct sales force to focus on business sales . . . ." *Id.* at 117. In the complaint, Plaintiffs alleged these statements were false or misleading because, when they were made, Defendants knew Pluralsight had an insufficient number of sales representatives to sustain its billings growth.

The district court concluded these were expressions of corporate puffery and optimism, and we agree.

On appeal, Plaintiffs insist these statements are actionable. Whether the sales force was sufficiently "large" to be "effective" and "productive" was objectively verifiable, Plaintiffs maintain, by reference to Pluralsight's "ramp capacity plan, billings pipeline records, and sales quota records." Aplts. Opening Br. at 40-41. Thus, Plaintiffs claim, these statements paint a misleading picture. But as Plaintiffs concede in a footnote, the statements that the sales force is "large" and that Pluralsight has increased "productivity and effectiveness . . . over time" are not false. *Id.* at 40 n.15. And, contrary to Plaintiffs' contention, these representations about the size, efficiency, and productivity of the sales force do not implicitly reference any of Pluralsight's internal metrics, such as its "ramp capacity plan, billings pipeline records, and sales quota records." *Id.* at 40-41. They are merely "rosy affirmation[s]" and "no reasonable investor could find them important." *Level 3*, 667 F.3d at 1340 (alteration in original) (citation omitted). The district court did not err in deciding these statements were neither false nor material.

### iv.    Risk Factors in Form 10–K filed February 21, 2019, and SPO Offering Documents (Statements 12-15, 19, and 25)

As part of Pluralsight's 10–K filing, it disclosed four "Risk Factors" Plaintiffs allege were false or misleading:

(1)    As we continue to expand our sales efforts to business customers, we will need to continue to increase the investments we make in sales and marketing, and there is no guarantee that our investments will succeed and contribute to additional customer acquisition and revenue growth.

(2)    If we are unable to hire, develop, and retain talented sales or marketing personnel, if our new sales or marketing personnel are unable to achieve

desired productivity levels in a reasonable period of time, or if our sales and marketing programs are not effective, our ability to broaden our customer base and achieve broader market acceptance of our platform could be harmed.

(3)    If we fail to retain key employees or to recruit qualified technical and sales personnel, our business could be harmed . . . . As we expand our business, our continued success will also depend in part, on our ability to attract and retain qualified sales, marketing, and operational personnel capable of supporting a larger and more diverse customer base.

(4)    If we fail to effectively manage our growth, our business and results of operations could be harmed . . . . We intend to continue to invest to expand our business, including investing in . . . sales and marketing operations, hiring additional personnel . . . . If we do not achieve the benefits anticipated from these investments, or if the achievement of these benefits is delayed, our results of operations may be adversely affected.

Aplts. App. vol. 1 at 112-15. These same risk factors were later incorporated into the SPO offering documents in March and a Form 10–Q filed in May.

In district court, Plaintiffs maintained these risk-factor statements were misleading because they implied the risks identified had not yet come to fruition when, in fact, the risks had already materialized and directly threatened Pluralsight's business. The complaint alleges Defendants knew, when the risk factors were disclosed, that Pluralsight had fallen behind its sales ramp capacity plan and would struggle to maintain its billings growth. The district court rejected Plaintiffs' argument, and as we explain, so do we.

The district court first observed several courts have found risk factors not actionable under section 10(b) because they are "inherently *prospective* in nature." *Id.* vol. 3 at 646 (quoting *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th

Cir. 2015)); *id.* at 647 (listing district court decisions). "[A] reasonable investor would be unlikely to infer anything regarding the current state of a corporation's . . . operations from a statement intended to educate the investor on *future* harms." *Id.* at 646-47 (quoting *Bondali*, 620 F. App'x at 491). The district court further concluded, even assuming risk factors can support section 10(b) liability under certain circumstances, each risk factor challenged here was not materially misleading.[6]

As to the first risk factor, the court found a reasonable investor would be unlikely to read its "generic language about Pluralsight expanding its sales efforts and investing in sales and marketing and be misled into thinking that Pluralsight either was or was not behind in its sales force ramping capacity." *Id.* at 647.

As to the second risk factor, the district court found while "Plaintiffs argue that the risk that Pluralsight's sales capacity gap posed to the company's billings growth had already materialized, it is not evident that this is true." *Id.* at 648. Though the statements were made on February 21, 2019, the district court explained, the "effect of the company's sales capacity gap did not materialize until the second quarter of 2019." *Id.* at 648-49. Thus, the district court concluded, "Plaintiffs have not sufficiently alleged that the risk created by Pluralsight's sales capacity gap had materialized at the time that Statement 13 [the second risk factor] was made, and

---

[6] The district court also held the PSLRA safe harbor provision did not apply because "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." Aplts. App. vol. 3 at 644-45 (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). On appeal, Defendants maintain the safe harbor provision applies. Again, because we agree with the district court's reasoning, we need not consider alternative grounds. *See supra* note 5.

Statement 13 is therefore unactionable." *Id.* at 649. The district court found the third and fourth risk factors unactionable for the same reasons. *Id.* at 649-50.

On appeal, Plaintiffs contend the district court erred in concluding the risk factors were not misleading and the risks had not already materialized. According to Plaintiffs, the risk factors "misled investors by stating Pluralsight might have trouble hiring and ramping sales representatives, while omitting the company was already months and dozens of representatives behind, severely threatening billings growth." Aplts. Reply Br. at 17 (emphasis omitted). We discern no error.

Where risk factors have been found materially misleading, the risk had materialized or was virtually certain to occur. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("Risk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." (alterations in original) (citation omitted)), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022); *Karth v. Keryx Biopharms., Inc.*, 6 F.4th 123, 138 (1st Cir. 2021) ("A company must also disclose a relevant risk if that risk had already begun to materialize."); *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) ("[C]autionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again."); *id.* ("[T]here is a 'critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge that the event *will* occur'—particularly where that distinction holds

30

'enormous significance' for investors." (quoting *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008))). Even if we assume, as the district court did, that risk factors could be materially misleading under certain circumstances, we are not persuaded those circumstances exist here.

Plaintiffs primarily rely on *Alphabet*, but that case is readily distinguishable. There, plaintiffs alleged Google failed to disclose that a software glitch had exposed the "personal private data" of hundreds of thousands of Google+ users over a three-year period. 1 F.4th at 695. Internal records revealed Google chose not to disclose the glitch to avoid the associated negative consequences, including increased regulatory scrutiny and loss of public trust. *Id.* at 696-97. Despite learning of this vulnerability—which had materialized—the company's 10–Q made no changes to its risk factors, continuing to provide a generic warning that cybersecurity concerns could damage the company's reputation and hurt its business. *Id.* at 702.

This risk factor was materially misleading, the Ninth Circuit held, because Google *already* had suffered a massive cybersecurity vulnerability. *Id.* at 702-03. And disclosure of the vulnerability was virtually certain to result in the warned-of harm to its business. *Id.* at 703. The court of appeals rejected Google's argument that its omission was not materially misleading because the company "had already remediated the software glitch . . . before it made the 10-Q statements." *Id.* at 704. As the Ninth Circuit explained, "the material implications of a bug that improperly exposed user data for three years were not eliminated merely by plugging the hole in Google+'s security." *Id.*

31

In *Alphabet*, the risk disclosed had materialized, so it could no longer be characterized as a risk without creating a misleading impression. Here, by contrast, even if Pluralsight had already fallen behind its sales ramp capacity plan by February 2019, that problem could still be remedied at the time Pluralsight disclosed the risk to investors. Put simply, Google could not undo the data breach, but Pluralsight could hire more sales representatives.[7]

Plaintiffs insist the risk *had* materialized because the lack of sales representatives was already "severely threatening billings growth." Aplts. Reply Br. at 17. But, as Defendants correctly observe, nothing in the complaint supports the inference that Defendants knew Pluralsight was so far behind in its sales ramp capacity plan that it was virtually certain to cause harm to the business. *See Karth*, 6 F.4th at 139 (concluding risk factors not misleading where plaintiff "plead[ed] no facts suggesting [Defendant] should have thought . . . that a production stoppage would necessarily yield an uncorrectable supply interruption").

The district court correctly determined the risk factors disclosed in Pluralsight's 10–K filing were not actionable.[8]

---

[7] This in no way disturbs our conclusion that, as Plaintiffs allege, affirmatively misrepresenting the number of quota-bearing sales representatives would recklessly mislead investors. *See infra* Section II.B.2.

[8] Plaintiffs contend the district court failed to construe the complaint in their favor when stating it was "not evident" the risk had materialized. We need not address this issue because, on de novo review, we conclude the risk factors were not materially misleading. *See Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) ("Because our review is de novo, we need not separately address Plaintiff's argument that the district court erred by viewing evidence in the light most favorable to the City and by treating disputed issues of fact as undisputed.").

v.    **May 1, 2019, Conference Call with analysts and investors (Statements 27-28)**

Finally, Plaintiffs identify two allegedly false and/or misleading statements made by Mr. Budge during a May 1, 2019, conference call with analysts and investors.[9] When asked by a SunTrust analyst how Pluralsight was "doing in terms of the hiring to [Pluralsight's] targeted sales headcount by the end of the year," Mr. Budge responded:

> Look, we like where we are with our sales reps. We're committed to continue to grow the sales force. We have a plan to grow into the high 200s, even cross over 300s in quota bearing reps this year 2019 which continues on the really outstanding progression we've had over the last few years where we've massively expanded our sales force from 80 quota bearing reps two years ago to – at this point over – at the end of this year over 300. So love our growth there. Our retention is excellent. I think compared to industry average, we'd always like it to be higher and the churn to be lower, particularly with our sales reps. But it's a function when there is a little bit more turnover in sales, often in the first quarter or so. We've experienced some of that. It's normal. We planned for that and that's – we're still committed, and we see a clear path to having 300-plus reps by the time we exit the year. So the short answer is we're on pace.

Aplts. App. vol 1 at 122-23.

---

[9] In their complaint, Plaintiffs allege that two other statements (Statements 29-30) made by Mr. Skonnard during the earnings call also were materially false or misleading. The district court held otherwise. On appeal, Plaintiffs develop no argument challenging that ruling and instead address Mr. Skonnard's statements in two sentences in a footnote. We deem this argument waived. *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

Later, in response to another question about whether there was any "limiting factor on the pace of sales headcount growth," Mr. Budge answered:

> We – there's probably only so many reps we could hire in any given year. We do have a pace to it that between our people team and our sales management teams that puts people through good rigor on the kind of reps that we would like to hire into our organization. And we like the direction we're going on both a top and bottom line. We like the fact that we've been cash flow profitable for three straight quarters now. We would like to continue that. As long as we can continue to drive growth of greater than 40% and near 50% on B2B, then that's sufficient for us over time. And we think that will grow a long and sustainable business model for us.

*Id.* at 125.

The district court found these statements "replete with unactionable optimism and puffery." *Id.* vol. 3 at 653; *id.* at 655 (same reasons). We agree.

On appeal, Plaintiffs focus on Mr. Budge's statement that Pluralsight was "on pace" with its hiring of sales representatives, contending the district court's conclusion is contrary to our holding in *Level 3*. According to Plaintiffs, Mr. Budge's statements about being "on pace" are comparable to the statements in *Level 3* about a project being mostly complete, ahead of plan, and under budget—statements we concluded in *Level 3* were objectively verifiable and therefore potentially actionable. Defendants maintain "on pace" is too vague and, in any event, nothing in the complaint indicates Pluralsight was not actually "on pace" in May 2019 to have 300 quota-bearing sales representatives by the end of the year.

Plaintiffs' contention that the statement "we're on pace" could be sufficiently concrete to be actionable is well taken as a general matter, but their argument is

unavailing under the circumstances here. We held in *Level 3* that saying a "majority of [the project] was complete" was actionable. 667 F.3d at 1340. But we also held that representing the project was "tracking within expectations" was not. *Id.*[10] Being "on pace" is more akin to the latter statement. Consistent with our precedent, we discern no error in the district court's conclusion that the May 1, 2019, statements were not actionable.

In any event, as Defendants correctly observe, the complaint lacks sufficient allegations to infer the "on pace" statement was false. Interpreted in the light most favorable to Plaintiffs, the complaint indicates Pluralsight was on pace with its hiring of sales representatives by May 2019. Consider, for example, Mr. Budge's statement on July 31, 2019, that Pluralsight had been delayed in hiring sales representatives until "early to mid second quarter." Aplts. App. vol. 1 at 82. May 1, 2019—the day Mr. Budge represented "we're on pace"—is just about early-to-mid-second quarter. No allegations contradict this. The district court did not err in finding these statements were not materially false or misleading, and we reject Plaintiffs' contrary arguments.

\* \* \*

---

[10] Even more on point is the dissent in *Anderson v. Spirit Aerosys. Holdings, Inc.*, 827 F.3d 1229 (10th Cir. 2016), which precisely articulated the point Plaintiffs argue here: "Spirit internally measured whether the projects were meeting quarter-by-quarter cost forecasts. Whether the projects were 'on track' or 'on plan' was objectively verifiable each quarter." *Id.* at 1254 (Lucero, J., dissenting). Plaintiffs rely on *Anderson* in their reply, but they fail to appreciate or acknowledge that the relied-on portions came from the dissent, which evidently the majority did not endorse.

In sum, the district court correctly determined the only materially false or misleading statement alleged in the complaint was Mr. Budge's representation on January 16, 2019, that "today we have about 250" quota-bearing sales representatives. The remaining statements Plaintiffs identify do not give rise to liability under section 10(b) and Rule 10b–5 because, as the district court correctly concluded, they are accurate statements of historical fact or expressions of corporate optimism that would not mislead reasonable investors.

## 2. Scienter

"Scienter is '"a mental state embracing [1] intent to deceive, manipulate, or defraud," or [2] recklessness.'" *Smallen*, 950 F.3d at 1304 (alterations in original) (citation omitted). "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." *Id.* (citation omitted). Here, we need consider only the less culpable mental state of recklessness. Recklessness is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015) (citation omitted). "In the securities-fraud context, recklessness is akin to conscious disregard . . . ." *Smallen*, 950 F.3d at 1305.

Under the PSLRA, a plaintiff must, "with respect to each act or omission alleged . . . state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). "In assessing the sufficiency of a plaintiff's allegations under the

PSLRA, a court 'must consider the complaint in its entirety' and decide 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Smallen*, 930 F.3d at 1305 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007)). "Although an inference of scienter 'need not be irrefutable, *i.e.*, of the "smoking-gun" genre,' it 'must be more than merely plausible or reasonable.'" *Id.* (quoting *Tellabs*, 551 U.S. at 324). "Because the inference must be 'powerful or cogent' not only in its own right but 'strong in light of other explanations[,]' we must 'consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'" *Id.* (alteration in original) (quoting *Tellabs*, 551 U.S. at 323-24). "Under this standard, a complaint survives dismissal 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 324).

As we explained, and the district court correctly determined, Plaintiffs adequately alleged one misleading statement of material fact—Mr. Budge's statement on January 16, 2019, that "today we have about 250" quota-bearing sales representatives. Our scienter analysis thus focuses on this one statement.[11] That is, we

---

[11] We note the parties did not concentrate their scienter arguments on this particular statement. Both here and in the district court, the parties generally debated whether Defendants recklessly misrepresented the size, efficiency, and productivity of Pluralsight's sales team throughout the class period. Consistent with the applicable law that guides our analysis, we remain focused squarely on the scienter arguments

consider whether the complaint supports a strong inference that Mr. Budge knew his January 16, 2019, statement about the number of Pluralsight's sales representatives presented a danger of misleading buyers and sellers or that the danger was so obvious he must have known of it. *See Zagg*, 797 F.3d at 1201.

The complaint specifically alleges five facts to support scienter:

(1) Mr. Budge admitted he knew about the capacity gap in an earnings call on July 31, 2019;

(2) Mr. Budge represented he closely monitored Pluralsight's sales force numbers;

(3) Mr. Budge knew the sales force capacity was vital to investors and Pluralsight's stock price;

(4) Mr. Budge emphasized that sales force capacity to generate billings was at the core of Pluralsight's business model; and

(5) Mr. Skonnard's and Mr. Budge's highly suspicious trading during the class period.

The district court addressed each allegation and found none supported a strong inference of scienter. We disagree. These allegations strongly support the inference that Mr. Budge knew his January 16, 2019, statement was false or misleading when he made it; the statement presented an obvious risk of misleading buyers or sellers; and Mr. Budge had a financial motive for making the misleading representation. "[A]ssess[ing] all the allegations holistically," *Tellabs*, 551 U.S. at 326, we conclude the complaint supports an inference of scienter at least as compelling as any nonculpable inference. The district court erred in holding otherwise.

---

relevant solely to Mr. Budge's misrepresentation that Pluralsight had about 250 quota-bearing sales representatives on January 16, 2019.

i.    **Mr. Budge's July 31, 2019, statements regarding Pluralsight's first-quarter sales capacity gap support a strong inference of scienter.**

In an earnings call with investors and analysts on July 31, 2019, Mr. Budge explained the reason for Pluralsight's disappointing second-quarter returns:

> We're about 250 quota-bearing reps right now. And that's about the number of bodies we wanted to have at this time in the year, but they didn't come into the year early enough . . . . [W]e're a few months behind there, that's been the big impact. . . . Simply put, there was dozen – there were dozens of reps that we needed to bring on board at the end of last year, beginning into this year, so they would ramp and become fully productive in the second quarter. And there was for a number of reasons delays in bringing them on board until, kind of, early to mid second quarter. The nice thing is they'll be fully ramped as we move into the third quarter and certainly well ramped as we move into the fourth quarter, but we just didn't have enough ramped capacity in our system in really the first and second quarter, and it expressed itself with the outcome you saw in the second quarter.

Aplts. App. vol. 1 at 82. When specifically asked by an analyst, "[W]hy didn't we hear this on last quarter's call?" Mr. Budge responded, "Well, we were still hitting our numbers." *Id.* at 83 (alteration in original).

Six months later, at the 2020 Needham Growth Conference, Mr. Budge again addressed Pluralsight's shortage of sales representatives: "I think it's somewhat well documented we . . . . came into the year [2019] with fewer sales reps than we had planned – than we had hoped for." *Id.* at 87. "We came out of 2018 going into 2019 with about 200 quota-bearing sales reps." *Id.*

The complaint alleges these statements by Mr. Budge in July 2019 and January 2020 support the inference that in January 2019 Mr. Budge already knew Pluralsight

39

had only 200, not about 250, quota-bearing sales representatives. It is notable, Plaintiffs maintain, that Mr. Budge never claimed he was unaware of the problem— rather, he provided a justification for his misrepresentations: "We were still hitting our numbers."[12]

The district court reasoned it was more likely the July 31, 2019, statements were "nonculpable, hindsight expressions" that did not support an inference of scienter. *Id.* vol. 3 at 660. The district court found Mr. Budge's explanation at best "ambiguous," and concluded "ambiguities do not support an inference of scienter." *Id.* (citing *Tellabs*, 551 U.S. at 326). Moreover, the district court agreed with Defendants that, even assuming Mr. Budge knew Pluralsight was behind in the size of its sales force, Plaintiffs failed to adequately allege Defendants knew this information was material and that failing to disclose it would likely mislead investors. The district court concluded Mr. Budge's response that Pluralsight was still hitting its numbers suggests Mr. Budge reasonably believed any deficiency in sales force numbers would not materially affect the company's billings—therefore, he reasonably believed disclosure of the deficiency was not required. The district court ultimately concluded Mr. Budge's statements "provide marginal, if any, support for a scienter inference." *Id.* at 661.

---

[12] The parties and the district court all understand Mr. Budge's reference to "hitting [their] numbers" as referring to billings, as opposed to, for example, number of sales representatives. We do the same.

Plaintiffs urge reversal, contending Mr. Budge repeatedly admitted he knew Pluralsight was short on sales representatives at the beginning of 2019. This interpretation of Mr. Budge's statements, Plaintiffs insist, is at least as plausible as the district court's "hindsight" interpretation. Plaintiffs also challenge the district court's reliance on Defendants' claim that, because Pluralsight was still hitting its numbers in the first quarter of 2019, they had no reason to believe the shortage of sales representatives would materially affect billings growth.

Defendants urge affirmance, insisting the district court's "hindsight" interpretation is far more plausible. For example, at the outset of the earnings call, Mr. Skonnard reflected, "I'd like to share what we learned . . . ." *Id.* vol. 2 at 414. According to Defendants, even assuming they actually knew of the sales headcount shortage in January 2019, there are insufficient allegations to support an inference they knew the deficit would materially impact billings growth in the second quarter of 2019. It is not enough for Plaintiffs to allege Pluralsight knew material facts but ignored them, Defendants insist, it "is the danger of misleading investors that must be known or recklessly ignored." Aplees. Br. at 41.

As we explain, the district court erred in concluding Mr. Budge's statements provided "marginal, if any support" for an inference of scienter. Though the PSLRA imposes a heightened burden on Plaintiffs to plead allegations supporting a *strong* inference of scienter, we must first apply general pleading standards when evaluating the underlying factual allegations—that is, "accept[] all well-pleaded factual allegations in the complaint as true and constru[e] them in the light most favorable to

41

the plaintiff." *Level 3*, 667 F.3d at 1339; *accord Tellabs*, 551 U.S. at 322 ("*First,*

faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must as with

any motion to dismiss for failure to plead a claim on which relief can be granted,

accept all factual allegations in the complaint as true."). Mr. Budge's statements on

July 31, 2019, support the inference he knew his representation on January 16,

2019—"today we have about 250" quota-bearing sales representatives—presented a

danger of misleading investors, or at least that the danger was so obvious he must

have known of it.

As Plaintiffs allege, Mr. Budge never claimed he was previously unaware of

the shortage. It is possible Mr. Budge only discovered during a "hindsight review"

that Pluralsight did not, in fact, have "about 250" quota-bearing sales representatives

at the beginning of the year as he had previously represented. But, on the record

before us and guided by a methodical application of the standard of review, an

equally compelling inference is that Mr. Budge knew Pluralsight did not have about

250 quota-bearing sales representatives in January 2019, but he hoped Pluralsight

could maintain its billings growth and obscure his misrepresentation.

The complaint describes contemporaneous reports from analysts interpreting

Mr. Budge's comments just as we do. As Plaintiffs correctly observe, the district

court disregarded that "multiple analysts contemporaneously reported that

Defendants admitted that they knew of the capacity gap" and failed to disclose it.

Aplts. Br. at 60. For example, one report issued the day after the July 31, 2019,

earnings call stated the "hiring issue was known earlier" and "[m]anagement pointed

out that it saw it was behind on sales hiring coming into the year, but we are now just hearing about it." Aplts. App. vol. 1 at 85 (alteration in original). A later industry article criticized "management's lack of transparency in information sharing" and described the exchange on the earnings call as "one of the analysts calling [Mr. Budge] out for not sharing this information as soon as it happened during the Q1 earnings call." *Id*. at 86.

To be sure, Mr. Budge never admitted he knowingly misrepresented the size of the sales force in January 2019, but a "smoking gun" is not required. *See Tellabs*, 551 U.S. at 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre . . . ."). Viewing the factual allegations in the light most favorable to Plaintiffs, as we must at this stage of the proceedings, the complaint considered in its entirety readily compels the inference that Mr. Budge knew Pluralsight had only "about 200" quota-bearing sales representatives on January 16, 2019, but failed to disclose this material fact, instead overstating the real number by 25%.

As Plaintiffs persuasively argue, the district court relied too heavily on Mr. Budge's later explanation that Pluralsight was still hitting its numbers as proof that Pluralsight "did not know that a failure to disclose the gap would mislead investors." Aplts. App. vol. 3 at 661. An equally compelling inference to be drawn from the allegations is that Mr. Budge knew overstating Pluralsight's number of quota-bearing sales representatives was likely to mislead investors. This is so for several reasons.

43

First, the complaint plausibly alleges Mr. Budge knew a shortage of quota-bearing sales representatives in the first quarter could not impact billings growth in that same quarter. Mr. Budge explained to analysts and investors that sales usually took several months to close and quarterly billings largely reflected sales that representatives initiated in a previous quarter. It is fair to infer, particularly given what is alleged about Pluralsight's business model, Mr. Budge would have known Pluralsight "hitting [its] numbers" in the first quarter of 2019 was no indication future billings growth would be unaffected by a shortage of quota-bearing sales representatives in January 2019.

Significantly, even if Mr. Budge was reasonably optimistic that billings growth in the second quarter would be unaffected, that does not render the number of quota-bearing sales representatives in January 2019 immaterial. Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc.*, 563 U.S. at 38 (citation omitted). As Mr. Budge repeatedly emphasized to analysts and investors, two data points were the primary drivers of Pluralsight's billings growth: the number of sales representatives *and* their productivity. The number of quota-bearing sales representatives was an essential part of the "total mix" of information important to reasonable investors. That Mr. Budge might have hoped Pluralsight could rely on the productivity of its existing sales force to make up for a deficit in the number of

44

quota-bearing sales representatives does not render this critical component of its "key business metric" immaterial.

We hold Mr. Budge's statements (1) support the inference that he knew he had materially mispresented the number of quota-bearing sales representatives in January 2019, and (2) do not support the inference that he did not appreciate the danger of misleading investors. *See Zagg*, 797 F.3d at 1201(Recklessness is conduct that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."). The district court's erroneous contrary determination contributed to its ultimately incorrect conclusion that Plaintiffs failed to plead a strong inference of scienter.

### ii.      Mr. Budge's statements about closely monitoring sales force numbers support a strong inference of scienter.

The complaint alleges Mr. Budge consistently represented to analysts and investors that he carefully monitored sales force data, including the number of sales representatives and their productivity, in addition to forthcoming deals in the pipeline. The district court accepted the truth of these allegations and assumed they supported an inference that Mr. Budge knew about the lack of quota-bearing sales representatives but failed to disclose it. But the district court found these allegations failed to demonstrate Defendants knew their nondisclosure would mislead investors, and thus did not support a strong inference of scienter. Aplts. App. vol. 3 at 666.

On appeal, Plaintiffs maintain Mr. Budge recklessly misrepresented the number of quota-bearing sales representatives, particularly given his assurances to

investors, as alleged in the complaint, that he reviewed specific data regarding

Pluralsight's sales force and deal pipeline. Defendants contend these allegations are

insufficient under our precedent even to support the inference that Mr. Budge knew

about the shortage, let alone recklessly misrepresented the total number of sale

representatives. Defendants point to *Level 3*, where we found allegations that

defendants "monitored [a contested program] through regular meetings and reports"

insufficient, Aplees. Br. at 42 (alteration in original) (quoting *Level 3*, 667 F.3d at

1344), and *Anderson*, where we found insufficient allegations that defendants were

"intimately involved" in projects and "provided assurances" about them, where there

was no claim defendants had actually viewed the data, *id.* (quoting *Anderson*, 827

F.3d at 1246).

We agree with Plaintiffs. *Level 3* and *Anderson* are distinguishable. Those

cases involved alleged misrepresentations in complex projections about progress on

particular projects of massive scale. In *Level 3*, even assuming the defendants had

access to internal reports that conflicted with their progress reports, we concluded

defendants were at most negligent by failing to put together "a great volume of

puzzle pieces." 667 F.3d at 1344-45. Likewise, in *Anderson*, we assumed defendants

were "briefed on the underlying cost data while attending meetings where the three

projects were discussed," but we still could not conclude they "*knew* that the projects

were unlikely to meet forecasts." 827 F.3d at 1246.

This case is different. Pluralsight's number of quota-bearing sales

representatives is a single objectively verifiable data point that Pluralsight considered

46

part of its key business metric, that Mr. Budge repeatedly represented he monitored, and that he regularly reported to investors and analysts. Under these circumstances, it is reasonable to infer Mr. Budge knew Pluralsight did not actually have "about 250" quota-bearing sales representatives when he allegedly made that misrepresentation on January 16, 2019. *See Quality Sys.*, 865 F.3d at 1145-46 (concluding knowledge of falsity was adequately pleaded where "executives themselves told investors they had real-time access to, and knowledge of, sales information . . . . [and] repeatedly described the state of [the company's] sales pipeline to analysts and investors").[13]

### iii.   Mr. Budge's statements that sales force capacity was vital to investors and the core of Pluralsight's business model support a strong inference of scienter.

The complaint alleges Mr. Budge repeatedly told investors the size of the sales force was at the core of Pluralsight's business model and that he knew investors relied on his representations. Without elaboration, the district court found "these allegations do not support a strong inference of scienter for the same reasons stated above in its analysis of Plaintiffs' preceding scienter allegations." Aplts. App. vol. 3 at 666-67. We disagree.

As Plaintiffs emphasize on appeal, Mr. Budge repeatedly stressed to investors the importance of the size of the sales force to billings growth, which in turn was the

---

[13] Indeed, at oral argument, Defendants' counsel effectively conceded that Mr. Budge would have known the number of quota-bearing sales representatives in January 2019. When pressed whether Defendants' argument was that Mr. Budge "didn't know" the number or thought the number "didn't matter," counsel clarified his argument was that "it didn't matter." Oral Arg. at 26:10.

47

key metric relied on to attract investors. The complaint alleges investors consistently asked about the size of the sales force at conferences and during earnings calls. And analysts relied on Mr. Budge's representations about Pluralsight's sales force in making investment recommendations. Under these circumstances, there can be no serious question that affirmatively misrepresenting the number of Pluralsight's quota-bearing sales representatives presented a danger of misleading investors. The district court erred in finding otherwise.

> ### iv.    Suspicious trading within the class period supports a strong inference of scienter.

"[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference . . . ." *Tellabs*, 551 U.S. at 325. "While suspicious insider stock trading is evidence of motive and weighs in favor of inferring fraudulent intent, the amount of profit realized through executive stock sales, standing alone, is insufficient to support an inference of scienter." *Smallen*, 950 F.3d at 1310. In *Smallen*, we articulated factors courts use to "determine whether trading activity is suspicious . . . including 'the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.'" *Id.* (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001)).

According to the complaint, misrepresentations made by Mr. Skonnard and Mr. Budge artificially inflated Pluralsight's stock price. Plaintiffs allege that, by selling substantially more stock during the class period than they did before or after,

Mr. Skonnard and Mr. Budge reaped the benefits of their misrepresentations. In their motion to dismiss, Defendants contended their trades are not evidence of motive. The trades were triggered automatically, Defendants explained, either (1) under Rule 10b5–1 plans[14] set up before the class period or (2) as part of an agreement to satisfy Pluralsight's tax liability. According to Defendants, the timing of the trades during the class period was not suspicious because Mr. Skonnard and Mr. Budge had been in a customary 180-day post-IPO lock-up period until two months before the class period. Finally, they argued Mr. Skonnard sold less than 5% of his total holdings and, contrary to Plaintiffs' calculation, Mr. Budge sold only 12% of his shares—when factoring in he vested into additional shares and his other sales were automatic.

The district court concluded the stock sales "only provide[d] minimal support for an inference of scienter." Aplts. App. vol. 3 at 664. The district court relied exclusively on our conclusion in *Level 3* that where defendants "retained a substantial percentage of their . . . holdings" and "the sales were made pursuant to 'automatic transactions' set up prior to the class period to pay withholding taxes that became due," these two "considerations rebut[ted] any inference of scienter we might otherwise draw regarding these sales." 667 F.3d at 1346-47.

On appeal, Plaintiffs challenge the district court's conclusion about motive, contending it was error to rely on *Level 3*; that Rule 10b5–1 plans, without more, do

---

[14] "A 10b5–1 plan is an agreement which allows corporate insiders to set a schedule by which to sell shares over time . . . ." *Elam v. Neidorff*, 544 F.3d 921, 928 n.3 (8th Cir. 2008) (quoting *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 n.4 (5th Cir. 2007)).

*not* rebut an inference of scienter; and that, in this case, the *Smallen* factors support an inference of scienter. Defendants continue to insist that automatic sales under Rule 10b5–1 trading plans are not suspect, and the *Smallen* factors do not support an inference of scienter.

As we explain, the district court erred in concluding Defendants' trades provided only marginal support for an inference of scienter. First, we agree with Plaintiffs that, under the circumstances here, *Level 3* does not foreclose the scienter inference, and the district court mistakenly assumed otherwise. In *Level 3*, we found the inference of scienter rebutted where the defendants "retained a substantial percentage of their . . . holdings" and "the sales were made pursuant to 'automatic transactions' set up prior to the class period *to pay withholding taxes that became due*." 667 F.3d at 1346 (emphasis added). Plaintiffs correctly observe that, in *Level 3*, we did not consider Rule 10b5–1 plans nor hold that *all* automatic transactions set up before a class period rebut any inference of scienter. The distinction makes a difference here. Only 8,210 of Mr. Budge's shares were sold to cover taxes, while over 333,000 shares were sold under a Rule 10b5–1 plan.

Moreover, Plaintiffs contend that the existence of a Rule 10b5–1 plan, without more, does *not* automatically rebut an inference of scienter.[15] As Plaintiffs correctly

---

[15] Most of Plaintiffs' argument on this point derives from an amici curiae brief submitted by "a group of professors, scholars, financial economists, and former federal securities regulators who have conducted and compiled decades of research on Rule 10b5–1 plans and their usage . . . ." Amici Br. at 5.

50

explain, the text and history of Rule 10b5–1 shows that such plans can be manipulated easily for personal financial gain and thus cannot rebut the inference that personal financial gain was a motive for Defendants' material misrepresentations.[16] Rule 10b5–1 plans are meant only to set up advance trades to rebut the presumption of trading on insider information. Plaintiffs contend these plans do not prevent an officer from setting up automatic trades and then making false statements to artificially inflate the stock price to trigger those automatic trades—and that is what Plaintiffs allege occurred here. *See* Aplts. App. vol. 1 at 90 ("Once the Officer Defendants knew when their trades were scheduled to occur, they had every incentive to make false and misleading statements, and conceal material adverse information, to artificially boost the Company's share price."). We agree that Rule 10b5-1 plans do not per se rebut an inference of scienter.

The stated purpose of Rule 10b5–1 is to "define[] when a purchase or sale constitutes trading 'on the basis of' material nonpublic information in insider trading cases brought under Section 10(b) of the Act and Rule 10b–5 thereunder." 17 C.F.R. § 240.10b5–1. It also provides an affirmative defense where the trade was made under a plan adopted before the insider learned the information, and the plan specified, or included a formula for determining, "the amount of securities to be purchased or sold and the price at which and the date on which the securities were to

---

[16] Plaintiffs and amici also rely on empirical evidence. However, this evidence was not before the district court, and they have not asked us to take judicial notice nor provided any basis for us to consider this evidence in the first instance. Therefore, we do not consider it.

be purchased or sold." *Id.* § 240.10b5–1(c)(1)(i); *accord United States v. Nacchio*, 519 F.3d 1140, 1147 (10th Cir. 2008), *vacated in part on reh'g en banc*, 555 F.3d 1234 (2009) ("Under SEC [Rule 10b5–1(c)], if a person has no material inside information when he '[a]dopt[s] a written plan for trading securities,' and that plan sets fixed rules for when he will buy and sell shares in the future, then his trades are not 'on the basis of' inside information even if he later does acquire inside information.") (alterations in original). Thus, Rule 10b5–1 plans can be an affirmative defense to a charge that an insider traded "on the basis of" material nonpublic information. But the rule itself says nothing of whether such a plan can rebut an inference that an insider acted with scienter in making material misrepresentations in connection with the sale or purchase of securities.

As Plaintiffs and amici observe, a defendant who knows the schedule of their 10b5–1 plan could be motivated to make material misrepresentations affecting the stock price to their benefit before a scheduled sale or to trigger a sale at a particular price. Thus, we hold the mere fact that a trade was made under a 10b5–1 plan does not per se rebut the inference of scienter where, as here, a defendant was allegedly motivated to mispresent or withhold material information to affect a stock price in anticipation of a previously scheduled trade. The district court erred in concluding that *Level 3* held otherwise.

Defendants do not offer any persuasive contrary arguments, simply citing other circuits' decisions recognizing that 10b5–1 plans *can* rebut an inference of scienter. *See Elam*, 544 F.3d at 928; *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d

874, 891 (4th Cir. 2014); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008). These cases are not persuasive here. *Elam* stands for the proposition, at most, that a 10b5–1 trading plan "can raise an inference that the sales were . . . not suspicious," particularly where "the stock sales at issue represent only a small portion of each seller's overall holdings." 544 F.3d at 928 (citation omitted) (finding no inference of scienter where defendants sold 5.3% and 2.4% of their holdings under Rule 10b5-1 plans). This is a far cry from Defendants' contention that a Rule 10b5–1 trading plan per se "rebut[s] any inference of scienter." Aplees. Br. at 47. Similarly, in *Yates*, the Fourth Circuit stated that defendants' trades under a Rule 10b5–1 plan "further weaken[ed]" any inference of scienter after determining the trades were not suspicious because they "occurred at fairly regular intervals and amounts compared to earlier periods." 744 F.3d at 891. In *Metzler*, a footnote suggests that sales under pre-determined plans "may" rebut an inference of scienter, but that proposition did not figure into the court's analysis. 540 F.3d at 1067 n.11. None of these decisions meaningfully resolve Plaintiffs' arguments or disturb our conclusion.

Finally, the parties dispute on appeal, as they did in the district court, whether the complaint's allegations support an inference of scienter under the *Smallen* factors: "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." 950 F.3d at 1310. Plaintiffs contend these factors support an inference of scienter because (1) Mr. Skonnard and Mr. Budge sold at prices roughly 75% higher than the price

after the class period; (2) Mr. Budge sold nearly 40% of his holdings while Mr. Skonnard sold all but 3.6% needed to maintain majority control; (3) Mr. Skonnard sold $22 million in shares during the class period versus $4.5 million after; Mr. Budge sold $519k during versus $19k after; and (4) both defendant officers sold during the class period. Defendants insist the total sales volume—5% for Mr. Skonnard and 12% for Mr. Budge—was minimal and the timing of their sales—following a customary 180-day post-IPO lock-up period—was not suspicious. Defendants also emphasize they retained the vast majority of their stock, so they "miss[ed] the boat" along with every other investor. Aplees. Br. at 49.

We agree with Plaintiffs that the *Smallen* factors support an inference of scienter. Plaintiffs sufficiently allege Defendants profited greatly from their stock sales within the class period; Mr. Budge in particular sold a significant portion of his holdings; the volume of sales within the class period was dramatically higher than outside it; and both defendants sold within the class period. To be sure, Defendants have pointed to some allegations potentially mitigating the suspicion surrounding their trades, but not enough to undermine the reasonable inference, at the motion-to-dismiss stage, that Mr. Budge was motivated to materially misrepresent the size and productivity of Pluralsight's sales force by the prospect of personal financial gain.

> **v.    Assessing the allegations holistically, the inference of scienter is at least as compelling as any nonculpable inference.**

We "must consider the complaint in its entirety" and decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. The complaint survives dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Here, the inference of scienter—that is, that Mr. Budge misrepresented the size of the sales force in reckless disregard of the danger of misleading investors—is at least as compelling as any nonculpable inference.

As we have explained, the complaint sufficiently alleges:

- Mr. Budge repeatedly told investors and analysts that the size and productivity of Pluralsight's sales force was critical to its financial success and that he closely monitored these figures.

- Mr. Budge assured investors and analysts Pluralsight could accurately forecast billings growth months in advance because sales took several months to close and sales representatives took several months to ramp up.

- Mr. Budge frequently fielded questions from investors and analysts about the size and productivity of Pluralsight's sales force during Q&A sessions and earnings calls.

- Analysts routinely incorporated Mr. Budge's representations about the size and productivity of Pluralsight's sales force into their reports, basing investment recommendations on his statements.

55

- In a Q&A with investors and analysts in January 2019, Mr. Budge reported that Pluralsight had "about 250" quota-bearing sales representatives, over-representing the true number—"about 200"—by 25%.

- Throughout the first and second quarters of 2019, Pluralsight's stock price increased, and Mr. Budge made over $500,000 selling a significant portion of his shares.

- When Pluralsight announced a drop in billings growth in the second quarter of 2019, Mr. Budge attributed it to a lack of sales representatives. He explained Pluralsight failed to hire enough new sales representatives coming into the year, which resulted in not having enough quota-bearing sales representatives in the first quarter. He stated Pluralsight had been behind by dozens of sales representatives and only now had "about 250" quota-bearing sales representatives.

From these well-pleaded factual allegations, it is plausible to infer that Mr. Budge knew his January 16, 2019, statement that "today we have about 250" quota-bearing sales representatives presented a danger of misleading investors.

According to Defendants, the more plausible inference is that Mr. Budge did not know he misrepresented the size of the sales force or that his knowing misrepresentation was merely negligent.[17] We disagree. While these inferences are

---

[17] At oral argument, counsel essentially conceded that Mr. Budge would have known the correct number of quota-bearing sales representatives and instead argued

also plausible, they are not *more plausible* than the inference that Mr. Budge

recklessly misrepresented the size of Pluralsight's sales force. Thus, "a reasonable

person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

The district court erred in deciding otherwise. We therefore reverse the district

court's grant of the motion to dismiss Plaintiffs' claim under section 10(b) of the

Exchange Act.

## C.   Additional Exchange Act Claims

### 1.   Items 303 and 105 of SEC Regulation S–K

In addition to the materially misleading statements discussed above, the

complaint also alleges Rule 10(b) violations based on Defendants' failure to make

disclosures as required by Items 303 and 105 of SEC Regulation S–K.

#### i.   Item 303

"Item 303 of Regulation S–K requires disclosure in offering documents of,

among other things . . . any 'known trends or uncertainties that have had or that the

registrant reasonably expects will have a material favorable or unfavorable impact on

net sales or revenues or income from continuing operations.'" *Slater v. A.G. Edwards

& Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013) (quoting 17 C.F.R.

§ 229.303(b)(2)(iii)). "In interpreting the scope of Item 303, courts have relied on

guidance from the SEC, which explains that a duty to disclose arises 'where a trend,

---

his misrepresentation and failure to disclose the true number constituted mere
negligence. Oral Arg. at 23:25.

demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Id.* (alteration in original) (citation omitted).

The complaint alleges Defendants violated Item 303 by failing to disclose that Pluralsight was months behind its sales ramp capacity plan, which was likely to negatively impact its billings. In their motion to dismiss, Defendants argued the complaint lacked allegations that the sales capacity gap was a "known trend" under Item 303 that was "reasonably likely" to negatively affect Pluralsight's billings. According to Defendants, Pluralsight sustained its billings growth in the first quarter notwithstanding the alleged capacity gap, and the two months during which they allegedly knew about the sales capacity gap cannot constitute a "trend" within the meaning of Item 303.

The district court found Plaintiffs did not sufficiently allege Defendants knew the alleged capacity gap would materially impact billings growth, and on that basis, failed to adequately plead an Item 303 violation. According to the district court, "Pluralsight's strong billings growth in the first quarter of 2019 despite the alleged sales capacity gap did not render it reasonably likely that the sales capacity gap would materially impact billings growth—in fact, it provided evidentiary support for the opposite result." Aplts. App. vol. 3 at 669. The district court expressly declined to address whether the alleged two-month sales capacity gap constituted a trend within the meaning of Item 303.

On appeal, Plaintiffs maintain they adequately pleaded an Item 303 violation, and they attack the district court's reason for determining otherwise. According to Plaintiffs, the district court erred in assuming that Pluralsight's first-quarter billings growth meant Defendants knew no sales capacity gap was likely to affect future billings growth. We agree.

The complaint states Mr. Budge told analysts and investors that Pluralsight relied heavily on deals that took several months to close, and thus quarterly billings primarily reflected deals initiated in a previous quarter. As we have explained, these allegations support the inference that Defendants knew the impact of a shortage of quota-bearing sales representatives in the first quarter of 2019 would not manifest in that same quarter's billings. *See supra* Section II.B.2.i. Plaintiffs thus plausibly alleged Defendants knew first quarter billings growth did not mean the sales capacity gap would not affect future billings. Indeed, that is the gravamen of the complaint— Defendants repeatedly emphasized that the size of its sales force was key to billings growth; they knew Pluralsight faced a sales capacity gap; and the failure to disclose the deficit was misleading. The district court's contrary conclusion, which is unsupported by the allegations in the complaint, cannot form the basis for dismissing the Item 303 violation. *See Slater*, 719 F.3d at 1197 (alteration in original) (citation omitted).

We do not hold, however, that Plaintiffs have sufficiently alleged an Item 303 violation giving rise to a valid claim under section 10(b) and Rule 10b–5. Defendants raise two alternative grounds for affirmance. First, Defendants reprise their position

that two months of being behind an internal sales ramp capacity plan does not

constitute a "trend" within the meaning of Item 303. Aplees. Br. at 35 (citing *Kapps*

*v. Torch Offshore, Inc.*, 379 F.3d 207, 218 (5th Cir. 2004) (five-month price decrease

not a "trend")). They also maintain an Item 303 violation does not give rise to Rule

10b–5 liability. *See, e.g.*, *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000). *But see*

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

We need not reach these open questions—the district court did not pass on

them and the parties give them very little attention in their appellate briefing. Rather,

on remand, the district court may address these issues in the first instance. *See*

*Apartment Inv. & Mgmt. Co. v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1198 (10th Cir.

2010) ("[B]ecause these issues have not been ruled on by the district court we will

leave them to the district court on remand."); *Evers v. Regents of Univ. of Colo.*, 509

F.3d 1304, 1310 (10th Cir. 2007) ("[T]he better practice [is] leaving the matter to the

district court in the first instance."). If the district court concludes Defendants

violated Item 303 and that such violations can give rise to Rule 10b–5 liability, then

the district court must also decide whether Defendants acted with scienter in violating

Item 303.

### ii.     Item 105

Item 105 requires that offering documents contain "under the caption 'Risk

Factors' a discussion of the material factors that make an investment in the registrant

or offering speculative or risky." 17 C.F.R. § 229.105(a). The parties and the district

court effectively rely on and reference their previous discussions as to whether the

"Risk Factor" statements were misleading. We do the same. As we have explained, the risk factors were not materially misleading. Therefore, Plaintiffs have not adequately alleged a violation of Item 105.

### 2.   Sections 20(a) and 20A of the Exchange Act

The district court dismissed Plaintiffs' Exchange Act claims under sections 20(a) and 20A because they require a "predicate violation" of the Exchange Act, i.e., the section 10(b) violation the district court dismissed. Aplts. App. vol. 3 at 670-71 ("[B]oth sides agree that a Section 20A claim is dependent on a violation of the [Exchange] Act.") (second alteration in original) (citation omitted); s*ee* *Level 3*, 667 F.3d at 1347 ("Because plaintiff's complaint does not allege 'a primary violation of the securities laws,' his Section 20(a) claim also fails." (citation omitted)).

We have concluded Plaintiffs adequately pleaded a section 10(b) violation. Accordingly, we vacate the district court's dismissal of the sections 20(a) and 20A claims, which rested solely on its mistaken legal conclusion about the section 10(b) violation.

### D.   Securities Act Claims

Our analysis of Plaintiffs' Exchange Act claims largely controls Plaintiffs' Securities Act claims as well. Indeed, the parties and the district court incorporated their previous arguments and discussion. We will address Plaintiffs' Securities Act claims in short order.

61

Plaintiffs' claims under sections 11 and 12(a) of the Securities Act require a false or misleading statement in a registration statement and prospectus, respectively. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). In its section 10(b) analysis, the district court concluded the registration statements and prospectus did not contain materially false or misleading statements. "Plaintiffs' Sections 11 and 12(a)(2) claims fail because the statements in Pluralsight's Offering Documents that Plaintiffs cite as the basis of their claims are not actionable under Section 11 and 12(a)(2) for the same reasons . . . they were not actionable under Section 10(b) of the Exchange Act." Aplts. App. vol. 3 at 673-74. The district court also agreed with Defendants that "Plaintiffs' claims under Regulation S-K Items 303 and 105 related to their Securities Act claims should fail for the same reasons that their Items 303 and 105 claims related to their Exchange Act claims should fail." *Id.* at 674.

As we explained in our section 10(b) analysis, we agree with the district court that Plaintiffs have not adequately pleaded materially false statements in the registration statement or prospectus, with the potential exception of the alleged Item 303 violation. We rejected the district court's reason for concluding the Item 303 claim should fail under the Exchange Act. For the same reason, we conclude the district court erred in holding Plaintiffs' Item 303 claim fails under the Securities Act. On remand, the district court may consider in the first instance whether two months of being behind an internal sales ramp capacity plan constitutes

a "trend" within the meaning of Item 303. We otherwise affirm the district court's

dismissal of Plaintiffs' claims under sections 11 and 12(a) of the Securities Act.[18]

Plaintiffs' section 15 claim requires an underlying Securities Act violation.

The district court concluded, "Plaintiffs' failure to plead a primary Securities Act

claim precludes a Section 15 claim. . . . Accordingly, the Motion to Dismiss on this

ground is granted." *Id.* As we explained, we mostly agree with the district court that

Plaintiffs failed to adequately plead a predicate Securities Act claim, the only

exception being a potential Item 303 violation. Thus, except to the extent Plaintiffs

have sufficiently pleaded a Securities Act violation based on Item 303, which the

district court will decide in the first instance consistent with this opinion, we affirm

the district court's dismissal of the section 15 claim.

### III.    Conclusion

We reverse in part the district court's dismissal of the complaint and remand

for further proceedings consistent with this opinion.

---

[18] Below, the parties disputed whether the heightened pleading requirement of Rule 9(b) applied to Plaintiffs' section 11 and 12(a)(2) claims because, as Defendants argued, they sound in fraud. The district court rejected Defendants' argument and held that only the Rule 8 standard applied. On appeal, Defendants offer a one-sentence assertion that Rule 9(b) applies. We will not address the issue because it is inadequately briefed. *Hardman*, 297 F.3d at 1131. And because we agree with the district court, we need not address alternative grounds for affirmance.