UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GANESH KASILINGAM, Individually and    :
on Behalf of All Others Similarly Situated,    :
    :
    *Plaintiffs*,    :
    :
    -against-    :    20-cv-03459 (PAC)
    :
TILRAY, INC., BRENDAN KENNEDY,    :    **OPINION & ORDER**
and MARK CASTANEDA,    :
    :
    *Defendants.*    :
------------------------------------------------------------------X

Following the dismissal of Plaintiffs' First Amended Complaint ("FAC") without prejudice, Defendants Tilray, Inc. and Brendan Kennedy now move to dismiss Plaintiffs' Second Amended Complaint ("SAC"). The SAC asserts securities fraud claims against both Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as control person liability against Kennedy under Section 20(a) of the Exchange Act.[1] The motion is GRANTED in part and DENIED in part.

## BACKGROUND

The Court articulated the backdrop of this case in its previous Opinion, and now reiterates key facts and summarizes newly pleaded allegations. *See Kasilingam v. Tilray, Inc.*, No. 20-cv-03459, 2021 WL 4429788 (S.D.N.Y. Sep. 27, 2021).

All allegations are drawn from the SAC and documents incorporated therein. However, as they did in their first motion to dismiss, Defendants ask the Court to conduct a full context review and take judicial notice of certain documents. Req. Full Context Rev., ECF No. 101. Defendants specifically asks the Court to review documents as "integral" to Plaintiff's complaint; SEC filings

---

[1] 15 U.S.C. §§ 78j, 78t(a); 17 C.F.R. § 240.10b-5.

as a matter of public record; and news articles discussing Tilray and the cannabis industry. *Id.* The Court disagrees with Defendants that it is required to do a "full context review" on a motion to dismiss in a securities fraud action. *Id.* at 1–2; *see Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382 (S.D.N.Y. 2020) (noting that the rules surrounding securities fraud complaints "permit" courts to consider documents incorporated into the complaint and matters of judicial notice), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). Further, to the extent the Court *does* consider Defendants' extensive record, it may only do so to "determine what the documents stated," not for the truth of the matter asserted. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

Defendants rely on these documents to contradict the allegations in the complaint. *See, e.g.,* Def's MOL at 10 n.13, ECF No. 100. It is improper for this Court to supplant the allegations of the Plaintiff at the pleadings stage, so it declines to take judicial notice of Defendants' news articles. *see Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 380–81 (E.D.N.Y. 2009) ("Despite the several 'heightened' pleading requirements imposed on securities fraud plaintiffs, their allegations are still accepted as true at the 12(b)(6) stage." (citations omitted)); *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 763 (S.D.N.Y. 2019) ("[C]ourts may take judicial notice not of the truth in news articles, but that their contents are publicly available."). Defendants further produce several SEC published documents. While many of these documents are referenced in the SAC and appropriate to consider on a motion to dismiss,[2] several are undated and/or unsigned, and therefore unverifiable.[3] *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 262 n.4

---

[2] See Greene Decl., Exs. 2, ,4 ,5, 8, 9, 10.

[3] See Greene Decl., Exs. 11, 12.

(S.D.N.Y. 2008). Therefore, though the Court reviews all documents incorporated into the SAC,[4] it declines to review the unincorporated SEC documents. *Gray*, 454 F. Supp. 3d at 383 (declining to review SEC documents that are not incorporated into the complaint). The Court reserves further review of the documents for summary judgment. *See In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 418 (S.D.N.Y. 2007).

## I.     The Parties and Class Period

Defendant Tilray, Inc. ("Tilray") is a publicly traded company that produces and sells marijuana, hemp, and related products globally. SAC ¶¶ 24–25, ECF No. 95. Defendant Kennedy has been Tilray's President and Chief Executive Officer since January 2018.[5] *Id.* ¶ 26. In 2011, Kennedy and other non-party individuals (the "Kennedy Group") created Privateer Holdings Incorporated ("Privateer") to invest in the nascent cannabis industry. *Id.* ¶ 30. In 2014, the Kennedy Group formed Tilray's predecessor as a Privateer subsidiary. *Id.* Over time, the Kennedy Group privately sold economic interest in Privateer but retained voting control through "supervoting" shares. *Id.* ¶ 31. In July 2018, when Tilray held its initial public offering, Privateer purchased the majority of the shares. *Id.* ¶ 3.

Plaintiffs are purchasers of Tilray common stock during the purported Class Period—from January 16, 2019, through March 2, 2020. *Id.* ¶ 1. They bring this action on behalf of a putative class of those who purchased Tilray stock during said Class Period, which spans from the day after Tilray entered a high-profile co-marketing deal with Authentic Brands Group (the "ABG Agreement") until the day Tilray announced it had impaired its valuation of the ABG Agreement

---

[4] This includes Kennedy's Forms 3 and 4s from the relevant time period, which may be considered for the truth of the matter asserted. *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011).

[5] Mark Castaneda is no longer named as a defendant in the SAC.

by $102.6 million and also written down the value of its inventory by $68.2 million. *Id.* ¶¶ 81, 138–45. Before it was impaired, under the ABG Agreement, Tilray would have paid ABG $100 million, and an additional $150 million in future consideration. *Id.* ¶ 71(a). In exchange, Tilray would expand globally as ABG's preferred cannabis supplier, receiving up to 49% of net revenue from ABG-branded cannabis and a guaranteed $10 million payment annually. *Id.* ¶¶ 70–71. The Agreement was later renegotiated to relieve Tilray of its obligation to pay future consideration. *Id.* ¶ 136. In exchange, ABG was relieved of its obligation to pay Tilray $10 million annually. *Id.* According to Plaintiffs, Defendants made materially false and misleading statements throughout the Class Period to inflate Tilray's stock price. *Tilray*, 2021 WL 4429788, at *2.

## II.    The Share Exchange and the Aphria Merger

Just before the Class Period began, Privateer sent a letter of intent stating its desire to execute a downstream merger with Tilray (the "Share Exchange"). *Id.* ¶¶ 160, 168. The Share Exchange was completed on December 12, 2019. *Id.* Plaintiffs allege the Share Exchange had three goals: "(a) eliminate Privateer's corporate sales tax, (b) control the flow of Privateer investors' Tilray shares into the market, and (c) secure personal control over Tilray . . . ." *Id.* ¶ 159. As part of the Share Exchange, investors agreed to a two-year lockup (the "Lockup Agreement") during which time they could not sell their shares. *Id.* ¶ 160(d).

Meanwhile, in Fall 2019, Tilray entered merger negotiations with a large Canadian company, Aphria Incorporated ("Aphria"). *Id.* ¶ 182. In 2020, Aphria would "repeatedly place the transaction on hold in light of other concerns," including the COVID-19 pandemic. *Id.* ¶ 196. Eventually, on December 15, 2020, the companies merged (the "Aphria Merger"). *Id.* The Class Period ended on March 2, 2020, when the allegedly false statements were disclosed in Tilray's quarterly earnings call and year-end filings for 2019. *Id.* ¶¶ 138–45.

4

### III.   Misleading Statements

The SAC reiterates prior allegations concerning Defendants' alleged exaggeration of Tilray's gross margins and the value of the ABG Agreement. *See Tilray*, 2021 WL 4429788, at *3–6.  The alleged false statements fall into three categories: (1) the value of Tilray's inventory and its gross margins; (2) the misclassification of labor as an input; and (3) the value of the ABG Agreement.

### A.   *Inventory*

Plaintiffs allege Defendants overstated inventory to exaggerate Tilray's gross margins, a "critical metric" which made the company appear more profitable than it was.  SAC ¶¶ 40, 63. During the Class Period, when asked about the market for CBD in the United States, Kennedy said, "we're modeling pretty conservatively for 2020 for US CBD.  Until we have that regulatory change, we are not going to adjust our numbers up." *Id.* ¶ 128.  Kennedy also claimed that Tilray was "building inventory." *Id.* ¶ 110.  Despite Kennedy's assurances of the company's "conservative" modeling, Tilray's SEC filings indicated significant growth in its inventory.[6]

According to Plaintiffs, this growth was a farce.  They allege Tilray overvalued "worthless" trim—materials left over after harvesting the buds and flowers of the cannabis plant—and other unsellable formulated oils.  SAC ¶¶ 55, 63, 99, 111.  They cite one former employee's recollection of "bags and bags, and boxes and boxes of end-of-run materials," materials which were not given a defined internal value but ascribed a value on financial statements of over $40 million. *Id.* ¶¶ 61– 63 (internal quotation marks omitted).  Plaintiffs allege there was "no way to sell" these materials

---

[6] Tilray's reported inventory grew from $16.2 million at the end of 2018, to $48.7 million after the first quarter of 2019, to $75.3 million halfway through 2019, and ultimately $111.5 million at the end of the third quarter of 2019. *Id.* ¶¶ 90, 98, 114, 134.

and "Tilray should have classified them as waste." *Id.* ¶ 62. Similarly, according to another former employee, Tilray valued worthless, non-reusable oils between $750,000 and $7,500,000. *Id.* ¶ 55.

All told, Tilray allegedly inflated its stock by over $68 million throughout the Class Period, until March 2, 2020, when the company accurately wrote down its inventory. Tilray's public filings state that, "[n]et realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation." *Id.* ¶¶ 89, 96, 97, 113, 133. In reality, by ascribing value to trim unrelated to "the ordinary course of business," Defendants allegedly violated Generally Accepted Accounting Principles ("GAAP"). *Id.* ¶¶ 61, 91, 99. Similarly, the unsellable oils were allegedly given a false value, in violation of GAAP, and their true value was only reflected once inventory was written down at the end of the Class Period. *Id.*

Plaintiffs allege that on May 11, 2020, after the close of the Class Period, Kennedy said that the inventory was written down "[s]o everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year." *Id.* ¶ 148. This statement, according to Plaintiffs, constitutes Kennedy's admission that Defendants violated GAAP because the inventory should have always had the correct cost structure. *Id.* ¶ 149.

### B.   *Labor*

Plaintiffs next allege that Defendants understated the cost of labor in the Bills of Materials, which carries over into the financial statements. Specifically, Plaintiffs take issue with Defendants' calculation of the labor required to produce certain products, including marijuana pre-rolls. *Id.* ¶¶ 51–53. One former employee was "certain that Tilray artificially lowered the pre-roll's cost of sales" after seeing that labor costs were "were substantially lower than those [the

employee] had established." *Id.* ¶ 51. According to the SAC, this labor cost was incorrectly recorded as indirect overhead to mislead investors. *Id.* ¶ 53.

### C.    *ABG Agreement*

Finally, Plaintiffs allege that Defendants made multiple misleading statements regarding the ABG Agreement.   As previously mentioned, the Agreement essentially specified that Tilray would pay ABG $100 million and $150 million in future consideration in exchange for ABG's services globalizing the Tilray brand.  SAC ¶ 70.

Kennedy made several statements trumpeting the value of the ABG Agreement.  He was quoted in a news article commenting that the ABG Agreement arose because "[ABG] liked [Tilray's] focus on research and science, and when the U.S. Farm Bill passed [on December 20, 2018], things started coming together." *Id.* ¶ 84.[7] He also highlighted the "vetting process" the companies underwent and the Agreement's "first of its kind" nature. *Id.* ¶¶ 93, 108.

Tilray's quarterly filings and earnings calls also reflected high hopes for the Agreement. *See Id.* ¶¶ 116, 120, 123, 130. Tilray's first financial statement after the ABG Agreement recorded that the Agreement was worth over $151 million. *Id.* ¶ 101. He explained that "this agreement leverages our complementary strengths and will be accretive to our shareholders" and that the "revenue sharing" component would be "a long-term partnership designed to leverage ABG's portfolio . . . ." *Id.* ¶¶ 82, 86.

Plaintiffs claim these statements were demonstrably false.  To start, they allege the Agreement was negotiated and executed within "literally a matter of days," a rush job inconsistent with Kennedy's remarks on the Agreement.  SAC ¶ 73.  It further alleges that Tilray overvalued

---

[7] The U.S. Farm Bill passed on December 20, 2018, where Congress removed hemp from the list of controlled substances under federal law.  SAC ¶ 33.   While the Bill only legalized hemp, it was the first time cannabis was made federally legal in the United States.

the Agreement at $100 million to arrest the fall in Tilray's stock price that had begun on January 15, 2019.[8]  *Id.*  According to the SAC, the Agreement was created and overvalued in this matter partially to stop a fall in Tilray's stock price that had begun on January 15, 2019.  *Id.* ¶ 75.  The alleged true value of the Agreement came to light on January 30, 2020—when Tilray renegotiated the Agreement to relieve both parties of their obligatory payments.  On March 2, 2020, Tilray confirmed the extent of the devaluation by disclosing on its Q4 2019 Statements that it impaired the ABG Agreement by $102.6 million.  *Id.* ¶¶ 136–39.

## IV.  Sale of Securities

On January 24, 2019, Kennedy sold over $11 million worth of his individual stock.  SAC ¶¶ 220–22; Greene Decl., Ex 10, ECF No. 102-10.  This sale occurred less than two weeks after Kennedy promised not to sell any of his Tilray shares.  *Id.* ¶¶ 224–25.  All told, Kennedy sold over $28 million worth of his stock during the Class Period, at a high profit margin—his original "purchase price for the shares he sold was a small number of pennies per share."  *Id.* ¶¶ 220–21.[9]

## V.  Smith & Sinclair Acquisition

In July 2019, "Kennedy caused Tilray to purchase Smith & Sinclair," a company that was 30% owned by Privateer.  SAC ¶ 229.  Kennedy received all $2.4 million of the Privateer-related proceeds from the sale.  *Id.* ¶ 230.  For the other 70% not owned by Privateer, Tilray paid 79,289 shares and a contingent consideration of approximately $2 million.  *Id.* at 230.  Subsequent financial statements revalued that consideration from $2 million to $420.  *Id.* ¶ 231.

---

[8] Tilray's stock price fell approximately 17% on volume "three times higher than the previous day[]."  *Id.* ¶ 75.

[9] Privateer also allegedly authorized suspicious sales after the Privateer Share Exchange that exceeded the total allowable amount of permitted sales pursuant to the Lockup Agreement.  *Id.* ¶¶ 241–46.

## VI.    Kennedy's Aspirations

The SAC alleges Kennedy made these false statements to overvalue Tilray and accomplish a series of corporate goals, including to help him avoid a sizeable tax bill and secure personal control over the world's largest cannabis company. SAC ¶ 151. The Kennedy Group had indirect control of Tilray through its majority voting shares in Privateer, which owned 90% of Tilray's voting power. *Id.* ¶ 155. However, this indirect ownership came at disadvantage: the power of the Kennedy Group's supervoting power only applied to certain kinds of decisions; any sale of Privateer stocks was to be distributed evenly amongst shareholders; any sale of Privateer stock would drive down Tilray's price because Tilray was controlled by Privateer; and any sales of Privateer's Tilray stock would be subject to double taxation. *Id.* ¶¶ 156–57. If anyone in the Kennedy Group sought to monetize their interest in the companies, they "would face a tax bill of more than 40% of the proceeds." *Id.* ¶ 158. Plaintiffs allege that Kennedy made the false statements at issue to make it "seem that it would be relatively simple for Tilray to become profitable" and to "convince Privateer investors that Tilray was succeeding at the very strategy [Kennedy] had publicly touted: developing branded products." *Id.* ¶ 167. Essentially, "Defendants' false statements helped convince Privateer investors to vote their shares in favor of the Share Exchange." *Id.*

Plaintiffs further allege that Kennedy's desires are reflected in various statements he made about the cannabis industry and his intent to be at its helm. *Id.* ¶ 192. Kennedy explained that he believed only three or four companies would dominate the potentially $200 billion industry and he expected to be leading one of those. *Id.* ¶¶ 175–80. Plaintiffs claim that Kennedy pursued the Aphria Merger vigorously, because "by ensuring a quick approval, Kennedy made the combination more attractive to Aphria, a carrot he could use to make himself CEO." *Id.* ¶ 191. However,

"Kennedy's term sheet was not favorable to Tilray investors." *Id.* ¶ 188. The Aphria Merger was delayed due to Covid-19, and eventually concluded on December 15, 2020. *Id.* ¶ 196. The two companies' value had changed over the pandemic and Aphria was now worth more than two-thirds of the combined company, so Aphria's CEO became the combined company's CEO while Kennedy became a Director. *Id.* ¶ 197.

Plaintiffs allege the timing of Kennedy's actions is also important because, were "Tilray to merge with Aphria *before* the Share Exchange, the Controlling Shareholders could not secure terms as beneficial" under the deal because they would lose their control. *Id.* ¶ 217 (emphasis in original). Furthermore, Defendants had to make the "corrective disclosures" before the Aphria Merger because "Aphria would naturally request, and expect, copious due diligence . . . Defendants could not hope to hide from Aphria the 'bags and bags, boxes and boxes' of trim that made up 44% of Tilray's inventory. Nor could they hide that the ABG Agreement was illusory." *Id.* ¶ 218.

## VII.   Damage to Investors

Plaintiffs allege that Defendants' misstatements caused immediate falls in stock prices. SAC ¶¶ 137–44. First, the renegotiation relieved ABG of its obligatory annual $10 million payment, and in exchange Tilray would not pay the $83.3 million in cash or stock. *Id.* ¶ 136. "The news surprised the markets because Tilray had boasted that the guaranteed annual payments were a key provision that aligned ABG's incentives with Tilray's and suggested difficulties with the ABG Agreement." *Id.* On January 30, 2020, the same day that the renegotiation was announced, Tilray's stock dropped nearly 8.8%. *Id.* ¶ 137. Subsequently on March 2, 2020, the ABG Agreement was impaired by over 80% of its value, which was announced the same day in Tilray's year-end filings and on a quarterly earnings call. *Id.* ¶¶ 138–39. At the same time, Tilray

announced a writing down of its inventory by $68.6 million, over 40% of its total value. *Id.* ¶ 142. These announcements caused Tilray's stock price to fall about 18% over the next two days. *Id.* ¶¶ 143–44. From their all-time high during the Class Period to "the close of the Class Period, Tilray's shares traded for about $5 – down more than 95% from their Class Period highs." *Id.* ¶ 18.

## DISCUSSION

### I.    Applicable Law

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When ruling on a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court accepts as true all the allegations in the complaint and draws every inference in favor of the plaintiff. *Twombly*, 550 U.S. at 555.

Securities fraud claims must meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires the plaintiff to state with "particularity the circumstances constituting fraud." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007)). Additionally, claims brought pursuant to Rule 10b-5 must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u–4(b). The plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted). The plaintiff must also "state with

particularity facts giving rise to a strong inference of scienter." *In re Sketchers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 511 (S.D.N.Y. 2020) (citing *Anschutz Corp.*, 690 F.3d at 108).

Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder make it "unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege that the defendant: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied;[10] and (5) that plaintiffs' reliance was the proximate cause of their injury." *Sketchers*, 444 F. Supp. 3d at 511–12 (citing *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019)).

## II.   Misstatements and Omissions of Material Fact

Plaintiffs must first allege that Defendants made misstatements or omissions of material fact. A statement or omission is actionable under Section 10(b) of the Exchange Act and Rule 10(b)-5 if it is both false and material. *Sketchers*, 444 F. Supp. 3d at 512. Falsity must exist at the time the statement was made. *Id.* The test for materiality is an objective one, evaluating each statement from the perspective of the "ordinary investor." *Rosi v. Aclaris Therapeutics, Inc.*, No. 19-cv-7118, 2021 WL 1177505, at *9 (S.D.N.Y. Mar. 29, 2021) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015)). As to omissions, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Plaintiffs' allegations of false

---

[10] Defendants do not contest the third or fourth elements, and the Court finds that they are adequately pled; therefore, those elements are not discussed.

statements fall into three general categories: (1) the value of Tilray's inventory and its gross margins; (2) the misclassification of labor as an input; and (3) the value of the ABG Agreement.

### A.    Falsity[11]

#### 1.    Inventory

Plaintiffs have plausibly alleged that Defendants made false statements overvaluing materials that had negligible value. The former employee's allegations about essentially worthless oils that were valued between $750,000 and $7,500,000, coupled with the subsequent documenting of Tilray's inventory, demonstrate both how and why the statements were misleading. At the time the company ascribed value to the oils—each time Tilray made quarterly statements, and Kennedy approved them—those oils allegedly had negligible financial value. *See Novak v. Kasaks*, 216 F.3d 300, 304 (2d Cir. 2000) (finding falsity where defendants were "accounting for inventory that they knew to be obsolete and nearly worthless at inflated values"). Those statements were therefore plausibly alleged to be "false."

Similarly, Kennedy's claim that Tilray was "building" inventory was false because the trim had little to no value at the time it was being accumulated. Defendants claimed—in their 2018 10-K, Q1 2019-10Q, Q2 2019-10Q, and Q3 2019-10Q—that inventory was growing significantly: from $16.2 million to $110.5 million. But when Tilray wrote down its inventory just months later in March 2020, $68.6 million of that inventory growth was revealed to have been a mirage.

Furthermore, the false statements in the quarterly filings violated GAAP, which further bolsters the claim that Defendants misled investors. *In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010) (denying a motion to dismiss where plaintiff alleged GAAP violations).

---

[11] Because the Court, for reasons explained *infra*, finds that the loss causation is not met with respect to the labor statements, it does not discuss the labor statements' alleged falsity.

Plaintiffs allege Defendants' statement in the filings that value was "the estimated selling price in the ordinary course of business" would have been false because various items that had been accounted for had no selling price in the ordinary course of business. *In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 239 (S.D.N.Y. 2018) (holding revenue statements later corrected to be valued at 15% less than the original valuation to be false). These allegations of GAAP violations are sufficient at the pleadings stage, despite Defendants' arguments to the contrary and references to outside accounting experts. *See Citigroup*, 723 F. Supp. 2d at 594 (reserving a determination on GAAP violations for a later point in the litigation).

Finally, Kennedy made statements related to the false inventory claims that were misleading. For example, the claim "we are not going to adjust our number up" misled investors to believe that Tilray was accurately and conservatively reporting its inventory, when really the numbers were already inflated. *See Iwa Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145–46 (2d Cir. 2021) (statements about the status of the company's inventory were misleading because those statements would lead a reasonable investor to believe otherwise).

### 2. The ABG Agreement

Likewise, Plaintiffs have plausibly alleged that Defendants made false statements touting the value of the ABG Agreement. The SAC alleges that Defendants lied about the value of the ABG Agreement from the moment of its inception. Defendants contend that the statements, including Tilray's accounting and related SEC filings, are too subjective to be actionable. Defs.' MOL at 14–15. However, taking Plaintiffs' allegations as true, Defendants reported in their financial disclosures that the ABG Agreement was worth $102.6 million more than it was actually worth—an objective figure.

Likewise, Defendants' statements bolstering the Agreement are plausibly false because they implied untrue facts. *See Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106, 2017 WL 1169629, at *10 (S.D.N.Y. Mar. 28, 2017). Kennedy's statement that "[ABG] liked our focus . . . and when the . . . Farm Bill passed . . . things started coming together," could imply that Tilray commenced discussions with ABG at least prior to December 20, 2018—when the Farm Bill passed. Plaintiffs allege that in reality, there were only a few days of negotiations total that did not commence until nearly a month later. *Abramson*, 965 F.3d at 174 (opinions are misleading when they imply contrary facts). The later impairment of the Agreement further indicates the plausible falsity of the claims. *CannaVest*, 307 F. Supp. 3d at 238.

The parties dispute the extent to which the Agreement was indeed carefully planned and negotiated. Defendants argue that "[t]he ABG Agreement was carefully negotiated and vetted with assistance from outside experts." Defs.' MOL at 5. Conversely, Plaintiffs allege that it is partly the lack of careful negotiation and vetting that makes the announcement of the ABG agreement, the related statements by Kennedy, and the subsequent valuation, misleading. Because the Court is ruling on a motion to dismiss, it does not need to decide which of these accounts is correct. *Tellabs, Inc.*, 551 U.S. at 322. Rather, the Court asks if the alleged statements were plausibly false at the time they were made. *Sketchers*, 444 F. Supp. 3d at 512.

Plaintiffs plead such falsity. For one, the SAC sufficiently alleges that the ABG Agreement was hastily put together to arrest a falling stock price and the statements describing its potential value were false. SAC ¶ 73. Further, just as the misstatements regarding inventory were false, statements related to the ABG Agreement and the company's subsequent failure to abide by GAAP render Kennedy's statements and Tilray's related filings false. *In re Citigroup Bond Litig.*, 723 F. Supp. 2d at 594. Nor were these statements accompanied by sufficient cautionary language, or

15

plausibly believed by Kennedy, at the time they were made. *Villella*, 2017 WL 1169629, at *10 (holding that opinion statements were actionable because Defendant knew or should have known that they were false when made).

      B.    *Materiality*

"A statement is materially misleading when the defendants' representations, taken together and in context, would have misled a reasonable investor." *Altimeo Asset Mgmt.*, 19 F.4th at 151 (internal quotations omitted). The question is whether the falsity would have significantly altered the total mix of available information. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Generally, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Gray v. Alpha & Omega Semiconductor, Ltd.*, No. 20-CV-2414, 2021 WL 4429499, at *7 (S.D.N.Y. Sep. 27, 2021) (cleaned up).

Defendants do not challenge the materiality of the inventory statements or the report on the valuation ABG Agreement's valuation, and rightly so. A reasonable investor could find the absence of tens of millions of dollars of inventory, or the overvaluation of an Agreement by $100 million, to be material. *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 234 (S.D.N.Y. 2006) (finding fraudulent statement causing artificially inflated prices to be material).

The only statements Defendants do contest as to materiality are the positive statements about the ABG Agreement. Defs.' MOL at 14 n.18. However, the Court cannot conclude at this preliminary stage that these statements about the "long-term relationship" of the Agreement—one designed to "leverage ABG's portfolio" and be "accretive to shareholders"—did not alter the mix of available information upon which an investor would rely as a matter of law. *Altimeo Asset*

*Mgmt.*, 19 F.4th at 151 (finding statements regarding potential negotiations to be material and holding that materiality should rarely be decided on a motion to dismiss); *see also United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("Determination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination."). Plaintiffs have adequately pleaded that these misstatements were material given the fall in Tilray stock after the corrections were made. *Gray*, 2021 WL 4429499, at *7 (a misstatement is rarely dismissed on materiality grounds).[12]

## III. Scienter

The SAC also alleges a strong inference of scienter by explaining how Kennedy had both motive and opportunity to commit fraud. To adequately plead securities fraud, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4. Courts must inquire whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "Though Rule 9(b) of the Federal Rules requires a heightened pleading standard for allegations of fraud, great specificity is not required with respect to allegations of scienter." *La Pecora Bianca Holdings, LLC v. Empowered Hosp. LLC*, No. 19-cv-09655, 2021 WL 1164267, at *6 (S.D.N.Y. Mar. 25, 2021) (cleaned up). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . ." *Tellabs*, 551 U.S. at 322–23 (emphasis in original).

Plaintiffs adequately plead scienter when they allege facts that either show defendants had both "motive and opportunity to commit fraud" or facts that constitute "strong circumstantial

---

[12] Defendants to not contest that the alleged misstatements are attributable to Kennedy and Tilray. Because the Court agrees, it does not discuss the issue.

evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW*, 553 F.3d at 198.

Motive is adequately pleaded by showing "the concrete benefits that could be realized from . . .

the allegedly misleading statements or nondisclosures; opportunity [is] shown by alleging the

means used and the likely prospect of achieving concrete benefits by the means alleged."

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015);

*see also Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061, 2021 WL 1198566, at *11 (S.D.N.Y.

Mar. 30, 2021). Strong circumstantial evidence of scienter can be shown where the defendants:

"(1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately

illegal behavior; (3) knew facts or had access to information suggesting that their public statements

were not accurate; or (4) failed to check information they had a duty to monitor." *Sketchers*, 444

F. Supp. 3d at 513 (citing *ECA & Local 134 IBEW*, 553 F.3d at 198–99).

A.   *Individual Scienter: Sale of Stocks During Share Exchange*

Defendant Kennedy's alleged stock sales throughout the Class Period plausibly indicate

motive and opportunity to commit fraud. On motive, the SAC plausibly alleges that Kennedy

significantly and foreseeably received a concrete, personal benefit from the alleged fraud by selling

a significant amount of his tradeable stock just after the announcement of the ABG Agreement.

*See Puddu*, 2021 WL 1198566, at *12 (motive existed for defendant who was allegedly involved

in a scheme to inflate stock prices and sold his shares at a profit). On opportunity, the Plaintiffs'

plausibly allege the ABG Agreement significantly arrested the fall of the Tilray stock price. *See*

*id.*; *Blanford*, 794 F.3d at 309 (finding scienter when Defendants created a false narrative of growth

and had the opportunity to personally benefit throughout the class period).

Defendants argue that the Kennedy Group made a conscious decision not to sell their

shares, indicating an absence of fraud. Defs. MOL at 8 ("[r]ather than sell those shares for billions

of dollars when the lockup expired in January 2019, Mr. Kennedy . . . announced . . . Privateer would continue to hold its shares to avoid the negative impact that large sales might have on Tilray's stock price."). Even taking these claims at face value, Kennedy himself *did* sell his shares, personally making millions of dollars in the process. Kennedy's initial sale during the Class Period and the subsequent sales over the course of the Class Period, taken together, creates a reasonable inference of scienter at least as compelling as Defendants' alternative theory. *Tellabs*, 551 U.S. at 324; *see In re Nevsun Res. Ltd.*, No. 12 CIV. 1845, 2013 WL 6017402, at *13 (S.D.N.Y. Sept. 27, 2013) (finding timing and magnitude of stock sales by controlling persons sufficed to create a strong inference of scienter when sales worth almost $3 million took place shortly after a sale of part of company).

Defendants also point to a 10b5-1 plan—consistent with 12 of the 14 relevant sales—as also negating Plaintiffs' scienter allegations.[13] Def's MOL at 20–21; Greene Decl., Ex. 5, ECF No. 102-10; *see e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) ("It is well established that trades under 10b5-1 plan do not raise a strong inference of scienter." (cleaned up)). But the mere presence of a 10b5-1 plan is not a complete defense to scienter. *See, e.g.*, *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 489 (S.D.N.Y. 2021) ("10b5-1 trading plans that are entered into during the alleged fraudulent activity . . . are not a complete defense to scienter because the insider might be aware of an impending price drop and could use a 10b5-1 plan to make his or her premeditated stock dump appear legitimate."). Plaintiffs allege—and Defendants do not dispute—that Kennedy entered into his first plan merely two weeks before the Class Period started, *cf id.* at 488–89 (finding no scienter where the plan was entered

---

[13] The Court declines to address Defendants' argument regarding the vesting of Kennedy's Restricted Stock Units because that argument relies on documents this Court declined to consider. *Supra* at 2–3.

into "well before" the start of the class period), and then entered into an additional two *during* the Class Period. Pls.' Opp., ECF No. 103 at 19–20. Thus, the 10b5-1 plans, at most, present a possible defense to some—but not all—of the relevant sales. Plaintiffs further plausibly allege that Kennedy had notice of the alleged fraud before entering into the 10b5-1 plans. SAC ¶¶ 87–91 (alleging misstatements involving Tilray's 10-K for Q4 of 2018); *see also see Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) ("A Rule 10b5–1 trading plan may give rise to an inference of scienter because 'a clever insider might "maximize" their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5–1 plan.'" (citation omitted)).

Defendants allege that the suspicious timing of the trades was irrelevant because Kennedy sold much more of his stock *after* the Class Period. Reply at 9–10, ECF No. 106. This argument alone is insufficient to dismiss the complaint because "it is not dispositive that the defendants retained some of their stock," as "it is possible that they were attempting to soften their losses without drawing attention to their stock sales. There were plainly substantial stock sales during the class period for a substantial amount of money, stocks sales that could be characterized as unusual." *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17 CV 5753 (JGK), 2019 WL 2360942, at \*6 (S.D.N.Y. Mar. 4, 2019). Thus, the 10b5-1 plan does not preclude the allegation that Kennedy's trades were suspiciously timed.

Finally, Defendants assert that the "efforts and disclosures" connected to the ABG Agreement do not indicate scienter, but rather show that "Mr. Kennedy and the other executives were doing everything they could to ensure that Tilray's public statements fairly represented its financial condition to investors." Defs.' MOL at 20. While it is possible that Kennedy believed in the value of the ABG Agreement and did not intend to misrepresent the value of inventory, that

story is not as plausible as Plaintiffs' given Kennedy's stock sales and the progression of his leadership at Tilray. Kennedy's statements collectively suggest that he was knowingly pursuing personal benefit without regard to the priorities of the Tilray shareholders. *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *13 (timing and magnitude of sales alone are indicative of scienter).

While Kennedy was allegedly making false statements about inventory, margins, and the ABG agreement, he was also pursuing a merger that would make him the head of the largest cannabis company in the world. *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) (finding scienter when Defendants failed to disclose and adequately evaluate the risk in an aggressive expansion program). Misrepresenting the value of Tilray's inventory and overstating the ABG Agreement's value are exactly the kinds of actions that would mislead investors while benefitting Kennedy. *Blanford*, 794 F.3d at 303 (finding scienter for defendants who made misrepresentations about inventory, performance, and growth misconstrue the strength of their company's business). Furthermore, Plaintiffs plausibly allege that Kennedy caused Tilray to purchase Smith & Sinclair to avoid a sizeable tax bill, keeping the direct proceeds for himself and writing down the initially valued $2 million consideration to $420.[14] These allegations further support a strong indication of scienter sufficient to survive a motion to dismiss.

B.    *Corporate Scienter*

For a corporate defendant, the pleaded facts "must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead

---

[14] This write down is particularly probative because it is unlikely to be a coincidence that Kennedy valued the consideration at $420—a number synonymous with marijuana usage. *See In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 923 n.10 (N.D. Cal. 2020).

it for an individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Kennedy's position as President and CEO satisfies this approach. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017).

## IV. Loss Causation

A securities fraud claim must allege "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs need only show "some indication of the loss and the causal connection . . . ." *Id.* at 347. "[This] burden is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). "When an omission or misrepresentation prevents a non-inflated price from falling, that omission or misrepresentation introduces inflation into the stock." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 325 (S.D.N.Y. 2016). Loss causation is adequately pleaded by alleging "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud or that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (cleaned up).

Plaintiffs have adequately pleaded loss causation with respect to most of the statements at issue. The corrective disclosures of the alleged fraud resulted in a significant market reaction. *Id.* (holding that past misstatements could have been relied upon until the time where they were allegedly disclosed, and this question is one of fact not suitable for resolution on a motion to dismiss). Because of the disclosures of the reduced value of Tilray inventory and impairment of the ABG Agreement, the company's stock fell by more than $4.50.

However, Plaintiffs have not adequately alleged loss causation as to the misrepresentation of labor costs. Defs.' MOL at 18, n.24. The "corrective disclosures" on March 2, 2020 wrote

down inventory and impaired the ABG Agreement, causing significant losses. But the SAC does not allege any impact from the allegedly altered labor costs. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (to establish loss causation, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security"). Here, there was no disclosure or other allegations of loss related to suppressed labor costs.

## V.    Section 20 Claims

Finally, Plaintiffs have adequately alleged that Defendant Kennedy is a control person with respect to Tilray under Section 20(a) of the Exchange Act. Section 20(a) provides that any person who "controls any person liable under" the Exchange Act is liable to the same extent as the controlled person, "unless the controlling person acted in good faith" and did not cause the "acts constituting the violation . . . ." 15 U.S.C. § 78t(a). To establish controlling person liability, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). "While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage." *In re Am. Int'l Grp.*, 741 F. Supp. 2d at 534–35.

The SAC meets all three requirements. First, as explained *supra*, Plaintiffs have adequately alleged that Tilray violated Section 10(b) of the Exchange Act and that it primarily did so through Kennedy's actions. Second, Kennedy is a controlling person given his position as President and CEO of Tilray. 17. C.F.R. § 240.12b-2 (control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the

ownership of voting securities, by contract, or otherwise"). Third, the requirement that the controlling person be a "culpable participant" is properly alleged "by the same allegations that satisfy the scienter pleading requirements." *In re Am. Int'l Grp.*, 741 F. Supp. 2d at 535. As previously mentioned, Plaintiffs' allegations against Kennedy satisfy the scienter requirements at the pleading stage. Therefore, Plaintiffs have alleged Kennedy's controlling person liability.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** as to the labor statements. It is otherwise **DENIED**. The Clerk is directed to terminate the motion at ECF No. 99.

Dated: New York, New York
　　　September 2𝓍, 2022

SO ORDERED

_____
HONORABLE PAUL A. CROTTY
United States District Judge

24