**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (JH 7258)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANESH KASILINGAM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,<br><br>Defendants. | **CASE No.: 1:20-cv-03459-PAC**<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION** |

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

Kennedy Overstates Tilray's Inventory ........ 2

Kennedy Conceals that He Spent Mere Days Negotiating A $250 Million Agreement ........ 3

Kennedy Reveals His Prior Statements Were False When Tilray's Financial Statements Are Audited ........ 4

Kennedy Sold His Stock at Artificially Inflated Prices ........ 4

Kennedy Secured Personal Control Over Tilray ........ 5

II. JURISDICTION AND VENUE ........ 6

III. PARTIES ........ 7

IV. IMPORTANT NON-PARTIES ........ 8

V. BACKGROUND ........ 9

VI. DEFENDANTS OVERSTATE TILRAY'S MARGINS AND THE VALUE OF THE ABG AGREEMENT ........ 10

A. Tilray Operates Almost Entirely in Canada ........ 10

B. Tilray Improperly Recognizes Marijuana Plant Trim As Inventory ........ 13

C. Companies May Not Record Inventory That Will Only Have Value If An Event Outside the Company's Control Occurs ........ 16

D. By Recording Trim As Valuable Inventory, Defendants Overstated Tilray's Gross Margin, a Key Metric For Investors ........ 17

E. Defendants Misleadingly Characterize An Investor Relations Stunt As A Major Accomplishment ........ 19

1. For Years, Kennedy Claims that the Key to Tilray's Success is Branding ........ 19

2. Kennedy Enters Into A Rushed Agreement With ABG After Conducting Virtually No Due Diligence ........ 20

VII. FALSE STATEMENTS ........ 22

VIII. LOSS CAUSATION ........ 26

A. Defendants Renegotiate the ABG Agreement ........ 26

B. Tilray Impairs the ABG Agreement By 86% and Writes Off 44% of Its Inventory ........ 27

IX. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER ........ 28

A. Kennedy Admits that Tilray Did Not Review Inventory for Write-Offs Until Its Annual Financial Statements ........ 28

B. Defendant Kennedy Sold $28 million of Tilray Shares During the Class Period ........ 30

1. Kennedy's Stock sales Were significant Both As a Proportion of His Total Stockholdings and For the Total Proceeds They Generated ........ 30

2. The Timing of Kennedy's Sales was Suspicious ........ 33

3. Kennedy Entered Into His 10b5-1 Plans at Suspicious Times ........ 34

4. The Net Changes in Kennedy's Shareholdings Supports an Inference of Scienter ........ 35

C. Kennedy Engaged In Additional Self-Dealing ........ 35

D. But for COVID-19, Defendant Kennedy's False Statements Would Have Given Him Control Over the World's Largest Cannabis Company ........ 37

1. Kennedy Makes False Statements To Obtain Personal Control Over Tilray ........ 37

i. Kennedy and Two Close Associates Control Tilray While Owning Less Than a Third of Tilray's Shares ........ 37

ii. Kennedy Avoids Taxes While Securing Corporate Control Over Tilray ........ 38

2. By Seizing Personal Control Over Tilray, Kennedy Set Himself Up to Engage In Large-Scale Mergers & Acquisitions Wherein He Could Pursue His Own Interests At the Expense of Other Shareholders' ........ 41

3. Kennedy Nearly Succeeds In Making Himself CEO of the World's Largest Cannabis Company ........ 43

4. Kennedy's Plan Comes to Naught Because of COVID-19 ........ 45

5. The Controlling Shareholders Lose Control ........ 47

E. Tilray Uses Its Stock as Currency for Acquisitions ........ 48

F. The Volume of Trading in Tilray's Stock Increases Suspiciously After the Share Exchange ........ 49

CLASS ACTION ALLEGATIONS ........ 52

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET) ........ 54

CLAIMS FOR RELIEF ........ 56

FIRST CLAIM ........ 56

SECOND CLAIM ........ 59

COUNT III ........ 60

PRAYER FOR RELIEF ........ 62

DEMAND FOR TRIAL BY JURY ........ 62

Lead Plaintiff Saul Kassin and Named Plaintiffs Craig Scoggin, Surinder Chandok, and Leslie Rose ("Plaintiffs"), individually and on behalf of all others similarly situated, for their Complaint against Defendants Tilray, Inc. and Brendan Kennedy, allege the following based on personal knowledge as to themselves and their own acts and information and belief as to all other matters.

## I. INTRODUCTION[1]

1. This is a securities class action brought on behalf of all persons who purchased Tilray common stock on the NASDAQ from January 16, 2019 through March 2, 2020, both dates inclusive ("Class Period"), and who held such shares through at least one corrective disclosure. Excluded from the Class are (i) Defendants, (ii) officers and directors of Tilray and Privateer Holdings, Inc. ("Privateer"), and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii).

2. At the beginning of the Class Period, Tilray was a poor performer in the crowded field of Canadian cannabis producers. To hide its competitive disadvantage, Kennedy misleadingly recorded waste product as valuable inventory, an accounting trick that boosted Tilray's gross margins—a key metric for growing companies. He also passed off a one-sided giveaway to a brand holding company—Authentic Brands Group—negotiated in just a few days as a carefully crafted partnership agreement that had taken six weeks to accomplish ("ABG Agreement"). These false statements caused Tilray's stock price to remain artificially inflated even as investors soured on cannabis companies. Kennedy put this artificial inflation to good use: selling $28 million of his own Tilray shares, engaging in self-dealing transactions, obtaining personal control over Tilray,

[1] All emphases are added. All quotations from written sources with Canadian or UK spelling have been edited to American spelling.

and using Tilray's stock as currency to acquire other companies. In early 2020, when Tilray's auditor predictably discovered that Tilray had been categorizing waste as inventory, Tilray wrote off almost $50 million in inventory, even as it renegotiated and then impaired the ABG Agreement by 86%. Tilray's stock price fell, damaging investors.

***Kennedy Overstates Tilray's Inventory***

3. Tilray's primary market, the source of more than 95% of its 2018 revenues, is Canada.

4. In late 2018, Canada legalized some forms of marijuana for recreational use. But the regulations held back much more than they allowed: it remained unlawful to sell anything that contained something other than pure cannabis products, such as edible or topical marijuana products, among others.

5. Tilray's Canadian operations generated copious amounts of marijuana plant cast-offs that were of low quality. These stalks, twigs, stems, and some of the marijuana plant's leaves, are collectively called "trim". There was no ready market for trim, as most of the products it could be used to make were still illegal, even in Canada.

6. With no ready market, Tilray could not, consistent with U.S. Generally Accepted Accounting Principles ("GAAP"), record trim as inventory on its financial statements.

7. Yet during 2019, Tilray recorded almost $50 million of worthless Canadian trim—or almost a third of its global 2019 revenues—on its financial statements as valuable inventory.

8. Gross margins are a key metric for growing companies like Tilray because they are sticky and more difficult to raise through economies of scale.

9. By recording trim as inventory, Tilray could reduce its cost of sales dollar-for-dollar. Reducing its cost of sales, in turn, increased Tilray's gross margins. Thus, Kennedy made Tilray seem far more appealing than its true gross margins would show.

10. In its 2019 10-K—its first audited statements after the inventory accumulation began—Tilray wrote off $49.3 million of trim created by its Canadian operations.

11. After the Class Period, Kennedy admitted that instead of recording trim accurately on Tilray financial statements, he had recorded the trim at an inflated value and waited for Tilray's end-of-year audit to write it off.

***Kennedy Conceals that He Spent Mere Days Negotiating A $250 Million Agreement***

12. In July 2018, Tilray held an IPO that left more than 80% of its shares in the hands of its controlling shareholder, Privateer. Privateer was a private equity fund which, by the beginning of the Class Period, only held Tilray shares. About half of the remaining shares were freely tradable; the other half, a mere 10% of its total shares, were subject to a lockup agreement.

13. In January 2019, that lockup on the remaining 10% expired and the shares were freely tradeable. Adding only 10% of Tilray's shares to its float caused its stock price to fall 17% in one day.

14. To prop up Tilray's stock price, Tilray entered into, and touted, a co-branding deal with one of the world's largest brand owners, Authentic Brands Group ("ABG"). Kennedy told investors that the ABG Agreement was the realization of Tilray's long professed goal of creating a major cannabis brand. Kennedy boasted that the deal was a strategic masterstroke that followed ***six weeks*** of intense discussions and negotiations between the two companies. He also told investors that ABG had vetted Tilray and that ABG's seal of approval showed Tilray had a great deal to offer leading brands.

15. Not remotely. Instead of six weeks, Kennedy and Tilray's sole other representative had spent ***mere days*** negotiating with ABG. According to one insider, Kennedy caused Tilray to enter into the ABG agreement for one main reason: to "prop up Tilray's stock [price]." Tilray's own branding experts protested that the deal offered far less to Tilray than what it had paid for it.

And ABG hadn't vetted Tilray; Tilray had driven a truck full of money to ABG's headquarters and demanded so little in return that ABG would have been crazy to refuse. Regardless of Kennedy's subjective beliefs about the ABG Agreement, his false statements about the negotiation timeline concealed that it was a reckless shot in the dark.

***Kennedy Reveals His Prior Statements Were False When Tilray's Financial Statements Are Audited***

16. On January 30, 2020, after close of trading, Tilray announced that it had renegotiated the ABG Agreement.

17. The new terms were puzzling because they relieved ABG of its obligation to pay a minimum of $10 million in licensing fees to Tilray every year. Kennedy had earlier told investors this provision was a centerpiece of the ABG Agreement because it gave ABG a strong incentive to invest in the partnership.

18. On January 31, Tilray's stock price fell 8.8%, damaging investors.

19. Then on March 2, 2020, after close of trading, Tilray filed its 2019 10-K. Tilray's results were an utter disaster; it wrote off 44% of its inventory and impaired the ABG Agreement by 86%.

20. On March 3 and 4, 2020, Tilray's stock price fell 18.5%, damaging investors.

***Kennedy Sold His Stock at Artificially Inflated Prices***

21. During the Class Period, Kennedy sold $28 million of his personally-held Tilray stock.

22. All his sales took place less than 90 days after his first false statement on January 15, 2019, or less than 90 days before the filing of Tilray's 2019 10-K on March 2, 2020, which closes the Class Period. He did not sell any shares during the middle 253 days of the Class Period.

23. While some of his sales were made under to Rule 10b5-1 plans, Kennedy either entered into the plans shortly before making his first false statements or the plans provided that the

sales would occur shortly before Tilray would have to file its 2019 10-K, which would predictably reveal the overstatements. Kennedy did not sell any shares in the middle 253 days of the Class Period when he knew his fraud would not be exposed.

24. Kennedy also used his control to cause Tilray to engage in transactions that advanced his own interest over shareholders', including in one instance paying $2.4 million in cash for Kenedy's shares in a worthless company.

25. Tilray's elevated stock price also helped Kennedy carry out an acquisition spree. During the Class Period, Tilray spent almost $500 million of its stock as consideration for acquisitions or the ABG Agreement—more than three times as much as the cash it raised in its IPO.

***Kennedy Secured Personal Control Over Tilray***

26. At the beginning of the Class Period, most of Tilray's shares were held by a holding company, Privateer. Kennedy and two long-time friends ("Controlling Shareholders") control Privateer, through supervoting Privateer shares. In turn, while Privateer held most of Tilray's ordinary Class 2 shares, it held all of Tilray's supervoting Class 1 shares, which collectively hold more votes than all the Class 2 shares put together. Thus, at the beginning of the Class Period, the Controlling Shareholders controlled Tilray indirectly, through Privateer.

27. Kennedy and the other Controlling Shareholders sought personal control over Tilray. They proposed a transaction whereby Privateer would dissolve and distribute all its Tilray shares to its shareholders in proportion to their economic interest but distribute all the supervoting shares to the Controlling Shareholders ("Share Exchange"). But to do so, the Controlling Shareholders needed the votes of Privateer's other shareholders. And to avoid flooding the market with new freely tradable Privateer shares, the Controlling Shareholders also had to get Privateer's other shareholders to agree to a two-year lockup.

28. The Controlling Shareholders were asking a lot. A two-year lockup of shares in a volatile company in a nascent industry like Tilray is risky.

29. Kennedy's false and misleading statements overstated Tilray's profitability, and therefore its stability, and gave the impression that Tilray was succeeding in its plan to create world-leading cannabis brands. They were precisely the kind of statements that would convince investors to agree to a two-year lockup.

30. Even as Kennedy pushed through the Share Exchange, he was negotiating a merger with another large Canada-focused cannabis company, Aphria. Because he had controlling votes, the merger would have given Kennedy the opportunity to benefit himself over his shareholders' interest at an unprecedented scale. It was only COVID-19's arrival on U.S. shores that prevented him from completing the transaction.

* * * * *

31. Kennedy misled investors about Tilray. He sold tens of millions of dollars of Tilray shares. He tried to make himself CEO of the world's largest cannabis company in a transaction rife with self-dealing and, but for COVID-19, would have succeeded. The investors he misled did not fare nearly as well. At the close of the Class Period, Tilray's shares traded for about $5—down more than 95% from their Class Period highs.

## II. JURISDICTION AND VENUE

32. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

33. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

34. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered into and subsequent damages were suffered in this judicial district.

35. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## III. PARTIES

36. Lead Plaintiff Saul Kassin, and Named Plaintiffs Craig Scoggin, Surinder Chandok, and Leslie Rose, as set forth in their PSLRA certification which were previously filed and are incorporated by reference, purchased Tilray shares at artificially inflated prices during the Class Period and were damaged thereby.

37. Defendant Tilray produces and sells marijuana, hemp, and related products. Tilray grows hemp and marijuana in both Canada and Portugal, where it built a large open-air marijuana farm. Tilray has historically earned almost all its revenues selling marijuana, hemp, and derivatives for medical or recreational uses in the Canadian market and, during the Class Period, continued to earn more than three quarters of its revenues from Canada.

38. Since July 2018, Tilray's shares have traded on the NASDAQ under ticker TLRY. As of the beginning of the Class Period, investment fund Privateer Holdings, Inc. held shares accounting for approximately 82% of the economic interest in, and 93% of the voting power over, Tilray. Tilray was thus a "controlled company" under NASDAQ rules.

39. Defendant Brendan Kennedy served as Tilray's President and Chief Executive Officer, and a member of its Board, since January 2018, and Chief Executive Officer of Tilray's Canadian subsidiary since 2018. Kennedy served in all three positions through the end of the Class

Period. Kennedy also served as Privateer's Executive Chairman from its founding in 2011 through its dissolution in December 2019. Kennedy has worked exclusively in the cannabis field since 2011. Until Privateer's dissolution, Kennedy and two of his longtime friends held a majority of Privateer's voting power which, in turn, held a majority voting interest in Tilray. After Privateer's dissolution, Kennedy and his friends personally controlled Tilray through supervoting shares.

## IV. IMPORTANT NON-PARTIES

40. Former Employee 1 ("FE 1") worked as a Senior R&D Manager at Privateer from April 2017 to November 2018. In November 2018, FE 1 and other Privateer employees were transferred to Tilray. FE 1's new title was Senior Program Manager, but FE 1's responsibilities did not change. FE 1 worked for Tilray until March 2020. FE 1 reported to Engineering Manager Brent Harrison, who reported to Drew Reynolds, Executive Vice President of Operations Expansion, who reported to Kennedy.

41. Former Employee 2 ("FE 2") served as Tilray's Senior Manager of Purchasing in Toronto from October 2019 through May 2020. FE 2 reported to Steve Hatami, a Tilray Vice President, who reported to Greg Christopher, Tilray's Executive Vice President of Operations, who reported to Kennedy. FE 2's responsibilities included procurement for Tilray's four Canadian facilities.

42. Former Employee 3 ("FE 3") served as a Tilray Vice President between February 2018 and October 2019. FE 3's duties included overseeing Tilray's business development outside of Canada. FE 3 was "heavily involved with strategic initiatives."

43. In 2011, Kennedy, Michael Blue and Christian Groh ("Controlling Shareholders") founded Privateer Holdings, Inc. to invest in the then-illegal cannabis industry. In 2014, the three launched Tilray's predecessor as a Privateer subsidiary, alongside a number of other cannabis-

related companies. By February 2019, Privateer had disposed of substantially all its assets except Tilray shares.

44. Between 2011 and 2017, Privateer raised hundreds of millions of dollars from outside investors. To secure these investments, the Controlling Shareholders relinquished about two-thirds of their economic interest in Privateer, while retaining majority voting control through supervoting Privateer shares.

## V. BACKGROUND

45. Marijuana, hemp, and their derivatives all come from the same plant: *cannabis sativa*. Marijuana and hemp are not distinct plants but rather legal categories. By definition, *cannabis sativa* that contains (by weight) less than 0.3% THC (the active ingredient) is hemp; *cannabis sativa* that contains more than 0.3% is marijuana. In practice, hemp and marijuana products are grown from different plants.[2]

46. Traditionally, both hemp and marijuana were illegal in the U.S. But in December 2018, the U.S. Farm Bill removed hemp from the list of controlled substances, but not marijuana.

47. The different legal treatment creates a gulf between hemp and marijuana. While the federal prohibition against marijuana is rarely enforced in states which have legalized it, marijuana remains a controlled substance. Because of the federal prohibition, companies that sell products made from marijuana plants in the U.S. face substantial obstacles obtaining bank loans or other services from large banks even in states that have legalized their sale.

48. For Tilray, which is listed on a national securities exchange, selling marijuana or its derivatives in nominal violation of federal law is simply not an option.

[2] This Complaint uses "marijuana" and "hemp" to refer to each legal category separately, and "cannabis" to refer to both collectively.

49. THC is concentrated in the marijuana plant's flowers, buds, and certain of its leaves[3]. Because marijuana plants are grown for their THC, producers typically use the marijuana plant's flowers, buds, and certain of its leaves, to make sellable products for medical or recreational uses.

50. Cannabis plants also have other leaves, stalks, twigs, and stems. These byproducts of the cannabis plant are called "trim" in the industry. Marijuana plant trim is generally considered waste. It is of low quality and contains too little THC to be smoked. It is federally prohibited in the U.S. Marijuana plant trim is customarily extracted and used alongside other ingredients to make products but, until December 2019, these products could not lawfully be sold, even in Canada.

51. Tilray could never hope to sell its marijuana trim in the U.S. during any reasonable time frame. Under U.S. law, marijuana plants and any CBD derived from them are controlled substances. The marijuana trim that Tilray had accumulated could only lawfully be sold in the U.S. if and when the federal government legalized marijuana—which, during the Class Period, was not on the horizon.

## VI. DEFENDANTS OVERSTATE TILRAY'S MARGINS AND THE VALUE OF THE ABG AGREEMENT

### A. Tilray Operates Almost Entirely in Canada

52. Before and continuing through the Class Period, Tilray earned the vast majority of its revenues from sales in Canada.

53. In the years ended December 31, 2016, 2017, 2018, and 2019, Tilray earned 100%, 96.3%, and 93.2%, and 78.0% of its revenues from sales in Canada.

[3] Specifically, sugar leaves contain enough THC, but fan leaves do not.

54. As in the U.S., Canadian regulations historically distinguished between hemp and marijuana and drew the line between the two at 0.3% THC content.

55. In June 2018, Canada enacted legislation ("Cannabis Act") that would legalize marijuana for recreational use (which the industry calls "Adult Use").

56. The Cannabis Act legalized the sale of dried marijuana, THC oil, and marijuana seeds and plants, effective October 2018.

57. The Cannabis Act and the regulations implementing it strictly restricted the types of cannabis that could be sold. The Canadian Cannabis Regulations, SOR/2018-144 Part 6, 93(1), which implemented the Cannabis Act, prohibited the sale of any cannabis product that "contain[ed] any substance other than the cannabis."

58. All other marijuana products, such as marijuana-infused foods or drinks (edibles), products applied to the skin (topicals), and products extracted from the marijuana plant (extracts)—the traditional uses for marijuana plant trim—would remain illegal unless and until the Canadian government enacted additional regulations legalizing them.

59. Edibles, topicals, and the like raise health concerns that differ from those presented by smoking marijuana. Products like gummies, candy, or chocolate may appeal to children. The products' potency may differ from the advertised amount. Moreover, edibles can take up to an hour to take effect. So, users who do not experience an immediate high from edibles may mistakenly think they have not eaten an effective dose, and eat more. This can lead to marijuana poisoning, one of whose symptoms is acute psychosis.[4]

60. Because of the additional risks presented by products containing cannabis, there was no guarantee that the Canadian government would legalize any particular marijuana products,

[4]Anisha R. Turner et al, Marijuana Toxicity, July 31, 2023, available at <https://www.ncbi.nlm.nih.gov/books/NBK430823/>

or indeed any marijuana products at all. And if it chose to approve the products, there was no guarantee that the Canadian government would approve the products on any particular timeline.

61. In June 2019, the Canadian government enacted new regulations partially permitting the sale of edibles, topicals, and extracts. Once again, however, Canada did not approve any particular products. Rather, the new regulations provided that beginning on October 17, 2019, producers would be able to submit their products (including packaging) to the Canadian government for approval. The Canadian government would then evaluate each application, taking at least 60 days, and decide whether to permit or deny the sale of particular product and the use of certain packaging.[5] The earliest approvals would occur on December 16, 2019. Officials were careful to note that applicants should not expect a rubber stamp. Rather, the responsible agency, Health Canada, would determine, case by case, whether the products warranted approval. And the news release announcing the legalization stated that "[i]t is expected that ***a limited selection of products will appear gradually*** in physical or online stores, and no earlier than mid-December 2019."[6]

62. While Tilray was able to sell medical marijuana plant oil in Canada prior to December 2019, its sales were tiny. Tilray's total global medical marijuana sales in 2018 and 2019, including not just THC oil but also dried flower/leaf, were $20.2 million and $25.9 million, respectively. According to the 2018 Canadian Cannabis Survey, about 71% of medical cannabis users reported having used dried leaves or flowers. Only 21% reported having used cannabis oil

---

[5] Jeremiah Rodriguez, *Cannabis edibles are now legal: Everything you need to know*, October 15, 2019, CTV News. available at https://www.ctvnews.ca/canada/cannabis-edibles-are-now-legal-everything-you-need-to-know-1.4639484?cache=yes%23section-links_7.135.

[6] Health Canada, *Health Canada finalizes regulations for the production and sale of edible cannabis, cannabis extracts and cannabis topicals*, June 14, 2019, available at https://www.canada.ca/en/health-canada/news/2019/06/health-canada-finalizes-regulations-for-the-production-and-sale-of-edible-cannabis-cannabis-extracts-and-cannabis-topicals.html.

from a licensed producer like Tilray. The majority of Tilray's medical marijuana sales would have consisted of dried flower or leaf.[7]

63. Moreover, Tilray needed the Canadian government to approve its products ***promptly***. Marijuana products are perishable. Properly harvested, dried, cured, and stored marijuana can last for six months to a year.[8] But stored marijuana products steadily lose their potency and, thus their quality. Moreover, because deterioration is not uniform, operators using old marijuana cannot precisely calibrate the amount of THC in their product. They thus risk selling products that do not contain as much THC as advertised, or worse, contains more, exceeding legal THC limits and potentially endangering customers. And like other agricultural products, marijuana can develop mold.

64. Thus, Tilray's trim would only have value if (a) the Canadian government approved the sale of the products in which Tilray would use the trim (b) early enough that Tilray can sell the product before the trim goes to waste.

**B. Tilray Improperly Recognizes Marijuana Plant Trim As Inventory**

65. Manufacturing creates intermediate and sellable products. Often, these products are not sold or finished before the close of the reporting period. The unsold and unfinished products are recorded on financial statements as inventory at the lesser of the costs of production or the net realizable value.

66. Tilray started 2019 with only $16.2 million in inventory. In 2019, Tilray accumulated more than $100 million in inventory:

---

[7] Health Canada, Canadian Cannabis Survey 2018 Summary, available at https://www.canada.ca/en/services/health/publications/drugs-health-products/canadian-cannabis-survey-2018-summary.html#_Theme_4

[8] Nick Lindsey, Does Weed Go Bad & How Long Does it Last?, January 6, 2023, High Times, available at https://hightimes.com/guides/how-long-does-weed-stay-good-for/; Adrienne Santos-Longhurst, How to Tell if Cannabis is Past Its Prime, February 24, 2020, Healthline, available at <https://www.healthline.com/health/does-weed-go-bad>

| Q1 | Q2 | Q3 | Q4[9] |
|---|---|---|---|
| $48.7 mln | $75.3 mln | $110.5 mln | $155.9 million |

67. The purported increase in Tilray's inventory in 2019, ($140.2 million) almost matched its total 2019 revenue ($167.1 million).

68. However, almost a third of Tilray's recorded revenue consisted of marijuana plant trim for which there was at the time no ready market. Tilray's 2019 10-K filed March 2, 2020 reported that Tilray was writing off tens of millions of dollars of inventory because "***many cannabis derivative products were not available for sale under the regulatory framework until December 2019, resulting in a significant accumulation of cannabis oil and cannabis by-product to be converted into oil.***"

69. According to the 10-K, approximately $49.3 million of this write-off consisted of trim and trim-based oils that Tilray had kept only on the chance that they could be used in products after the December 2019 legalization. The sum amounted to approximately 31.5% of Tilray's outstanding inventory Tilray as of the end of Q4 2019 (before write-offs).

70. According to both FE 1 and FE 2, much of Tilray's inventory consisted of unsellable products, some of which had already begun to go to waste.

71. In December 2019, FE 1 made two trips to Tilray's Ontario, Canada facilities. While there, FE 1 was asked questions by employees of Tilray's finance department. FE 1 was told by these employees that Tilray had accumulated in inventory very large quantities of unusable materials.

[9] Including amounts written off in Q4 2019.

72. FE 1 learned that many of the products had never been worth anything in the first place. Tilray's production of marijuana generated substantial "end-of-run" materials, meaning leftover raw materials that cannot be used in the manufacture of additional products—i.e., trim.

73. FE 1 personally saw the materials. In a visit to Tilray's warehouses, FE 1 observed vast quantities of trim "sitting on a shelf." There were "bags and bags, boxes and boxes" of end-of-run materials.

74. Tilray internally recorded valuations for its other products and inventory, if only for cost accounting. Moreover, Tilray's external financial statements recorded its trim as inventory and assigned it a valuation.

75. Yet according to FE 1, Tilray did not record an internal valuation for its end-of-run materials.

76. According to FE 1, Tilray's inventory had already begun to spoil during the Class Period. In June 2019, FE 1 traveled to Tilray's offices in Ontario, Canada, for a meeting. There, she was told that numerous pallets of marijuana had developed mold and could not be used. She was also told that Tilray had undertaken specific experimental tests, ultimately without success, to clean the mold.

77. FE 2 cites an example of an obsolete product recorded as valuable inventory. According to FE 2, Tilray purchased a variety of custom formulated oils, which were oils containing precise specifications of THC and CBD oil mixes and potencies. The formulated oils were not generic ingredients and could not be reused in other products or resold. In 2019, Tilray accumulated "single digit millions of Canadian dollars" (about $750,000-$7,500,000) of formulated oils to use in its wellness brand products. Tilray then "killed the brand" and, indeed, abandoned formulated oils altogether. Yet Tilray continued to classify the formulated oils as

inventory on its financial statements at the cost of acquisition. Because the formulated oils had no resale value and no use, they should not have been recorded as inventory at all.

**C. Companies May Not Record Inventory That Will Only Have Value If An Event Outside the Company's Control Occurs**

78. Generally Accepted Accounting Principles ("GAAP") requires that companies record inventory as the lower of the costs of production ***or*** net realizable value.

79. A fundamental GAAP principle is that financial statements cannot count chickens before they hatch. In line with this principle, if a product can only be sold if a contingency that is outside the company's control occurs, then the company cannot record the product as inventory. Under GAAP, a contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) that will ultimately be resolved when one or more future events occur or fail to occur." ASC-450-20-20. "A contingency that might result in a gain usually ***should not be*** reflected in the financial statements because to do so might be to recognize revenue before its realization." ASC 450-30-25-1. A contingent gain should not be recorded before until assets are readily convertible to cash.[10]

80. Tilray accumulated far too much marijuana plant trim to sell other than as edibles, topicals, or other extracts.

81. Yet Tilray's ability to sell those products depended on events outside of Tilray's control. Before June 2019, the Canadian government had not finally decided to approve a second wave of cannabis products, or when. After June 2019, Tilray knew it would only be able to sell products that the Canadian government specifically approved. Moreover, the Canadian government had noted that at first, few products would be approved.

[10] PwC, November 20, 2021, 23.5: Gain Contingencies, available at https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/financial_statement_/financial_statement___18_US/chapter_23_commitmen_US/235_gain_contingenci_US.html .

82. As a result, Tilray could not recognize trim as inventory. It had to record the value of its trim as $0 and, at most, disclose that the trim could be worth more if Tilray received the Canadian government's permission to sell. It could only record the inventory as a contingent gain if and when the Canadian government approved Tilray's products and a market developed.

**D. By Recording Trim As Valuable Inventory, Defendants Overstated Tilray's Gross Margin, a Key Metric for Investors**

83. Gross margins measure how much money a company makes on each product it sells.

84. Gross margins are defined as net revenue minus cost of sales divided by net revenue.

85. Cost of sales, an accounting metric, includes all the costs directly related to manufacturing and selling products but excludes all other costs, such as indirect overhead and sales and marketing costs. The formula for costs of sales in a given quarter is: (1) Inventory at beginning of reporting period (2) minus inventory at end of reporting period (3) plus direct labor, direct materials, and direct overhead (e.g., commissions) attributed to sold products.

86. Gross margins are a critical metric for small but growing companies like Tilray. They are relatively sticky or static. Unlike overhead, costs of sales tend to grow proportionally with revenues.[11] Put another way, there are few economies of scale in cost of sales, but there are many economies of scale in general overhead because it is largely composed of fixed costs.

87. Defendants recognized that investors closely monitored Tilray's gross margins. Non-Defendant Tilray CFO Castaneda consistently ended the prepared remarks portion of earnings calls by calling attention to two key metrics that, he said, made Tilray an attractive investment.

---

[11] Ryan Caldbeck, *5 reasons gross margin is so important to investors & brands*, June 12, 2013, available at https://www.newhope.com/managing-your-business/5-reasons-gross-margin-so-important-investors-brands; Villi Iltchev, *Why Gross Margins Matter*, November 21, 2019, available at https://twosigmaventures.com/blog/article/why-gross-margins-matter/

One was his claim that Tilray would reach and sustain gross margins of more than 50% over the long term.

88. The last reported results in Tilray's IPO were those for Q1 2018. In that quarter, Tilray's gross margins were 55%. Tilray's gross margins fell to 46% in Q2 2018, the first quarter it announced after its July 2018 IPO, and to 31% in Q3 2018, the last quarter whose results Tilray reported before the Class Period.

89. Tilray's low gross margins drew analyst concern. In a March 8, 2019 report, a Jefferies analyst initiated coverage of Tilray at a rating of Underperform, alongside only 6.5% of total Jefferies recommendations. The Jefferies analyst gave Tilray the poor rating in part because its cost of sales "appears [to be] one of the least efficient" of similar companies, behind peers Canopy and Aurora.

90. Understanding that Tilray's poor gross margins disturbed investors, during the Class period, Defendants deceived investors by overstating inventory—thus overstating gross margins.

91. By misclassifying trim, Defendants embellished Tilray's financial performance. As a matter of accounting, every dollar of inventory on Tilray's financial statements is subtracted from its cost of sales. The following table shows how improperly attributing value to the end-of-run waste materials will inflate gross margins and inventory values, if Tilray produced two grams of marijuana and was able to sell one while recording the value of the end-of-run materials as $5:

| Realizable price of marijuana | Action | Revenue | Inventory | Cost of Goods Sold | Gross Margin |
|---|---|---|---|---|---|
| $20 | Treating trim as waste per GAAP | $20 | $10 | $20 | $33^{1/3}$% |
| | Falsely treating trim as inventory | $20 | $15 | $15 | **57.1%** |
| $10 | Treating trim as waste per GAAP | $10 | $10 | $20 | 0% |
| | Falsely treating trim as inventory | $10 | $15 | $15 | **40%** |

### E. Defendants Misleadingly Characterize An Investor Relations Stunt As A Major Accomplishment

#### *1. For Years, Kennedy Claims that the Key to Tilray's Success is Branding*

92. For years, Kennedy has been telling the public that the future of cannabis companies, and of Tilray in particular, is branded products. Kennedy told *volteface*, an industry publication, as early as March 2016:

> Brands are everything.[] Brands are how you win. Any consumer will choose a branded product over something in a plastic baggy. Brands inspire confidence and trust. Brands imply legitimacy. They reduce barriers to change. They give comfort to consumers. People are looking for a product which is safe, properly labelled, and consistent from experience to experience.

93. Kennedy continued to express the view that branded products are the key to domination of the cannabis industry. For example, Kennedy told Market Watch in an interview published on July 22, 2018 that:

> It is still day one in the industry, that's how we think about it. And the challenge that we faced with some investors is how this industry is going to change. I like to say Ziploc is the biggest brand in the cannabis industry and over the next few years you're going to see that change, you're going to see real brands and real companies.

94. Indeed, to hear Kennedy tell it, there is little money to be made by growing cannabis. To take just one example, in a September 18, 2018 appearance on Mad Money, Kennedy told the host:

> Q: You know that all the addition in cannabis when we saw it happen in Oregon, prices went through the floor. It's the cheapest in America. You're not concerned that with all of the different supply coming on, that you could have a considerable collapse even in Canadian prices?
>
> **Defendant Kennedy:** No, it's like valuing ABI [a beer company] on the price of wheat. ***Cannabis is a raw material. It is an ingredient that we use in these branded products. You're not going to see the commoditization of the finished product in the brands.*** You'll see price segmentation, value brands, premium brands, but you won't see commoditization of the brands across the spectrum.

*2. Kennedy Enters Into A Rushed Agreement With ABG After Conducting Virtually No Due Diligence*

95. On January 15, 2019, Tilray reached a co-branding agreement with Authentic Brands Group, LLC ("ABG" and "ABG Agreement"). ABG owns and co-markets 50 leadings brands throughout the world, including Juicy Couture, Brooks Brothers, Shaquille O'Neal, and Elvis Presley. When Tilray signed the ABG Agreement, ABG's brands did not offer cannabis or CBD-related products. According to Tilray, the ABG Agreement's purpose was to expand ABG's brands into cannabis-related products (predominantly CBD products) throughout the world.

96. The ABG Agreement was structured such that ABG received its consideration upfront but Tilray would only earn revenues if and when the partnership developed products that were customer hits:

a. Tilray initially pays ABG $100 million in cash and stock, and up to $150 million in future consideration ("Additional Tilray Consideration");

b. Tilray becomes ABG's preferred supplier of marijuana and CBD-related ingredients;

c. Tilray receives up to 49% of net revenue from cannabis products bearing ABG's brands' names, with a guaranteed annual minimum payment of $10 million ("Revenue Interest"); and

d. Unless and until Tilray pays the full Additional Tilray Consideration, Tilray's Revenue Interest will be reduced by the percentage of unpaid total consideration. Thus, for example, if Tilray did not pay any Additional Tilray Consideration, then Tilray would only receive 40% of the Revenue Interest, or about 12% of the net revenue. The guaranteed minimum annual payment would be $4 million.

97. As a result, the ABG Agreement's value to Tilray depended on the potential of the partnership's new products. While reasonable investors had no information to estimate this value, they would assume that Tilray's executives had taken the trouble to evaluate the necessary information and created promotional plans with ABG.

98. At a minimum, negotiating the agreement would have taken some time. Indeed, as more fully alleged below, ¶101, Kennedy maintained that the ABG Agreement had taken approximately 6 weeks to negotiate.

99. FE 3 reports that the ABG Agreement was proposed, negotiated, and closed in literally a matter of ***days***. Further, according to FE 3, only two Tilray representatives, one of whom was Defendant Kennedy, negotiated the ABG agreement. These representatives barely consulted with anyone else at Tilray. According to FE 3, the main reason Kennedy had entered into the ABG Agreement was to "prop up Tilray's stock [price]" by "mak[ing] a big splash."

100. According to FE 3, it was "immediately very clear" that the ABG Agreement was not worth what Tilray had paid for it. Tilray's own branding employees "push[ed] back" on the deal, asking "what are we going to do?" with ABG brands. Indeed, according to FE 3, it was apparent the ABG Agreement was "never going to bear fruit" the "second the deal was signed."

## VII. FALSE STATEMENTS

101. The Class Period begins on January 15, 2019. That day, Tilray announced the ABG Agreement. The same day, Kennedy presented at the ICR Conference for investors. During his presentation, Defendant Kennedy stated, unprompted:

> [ABG] had been looking at the industry for about a year both in the United States and in Canada, looking at some of the U.S. operators as well as the Canadian licensed producers. ***We met with them pretty late in that process, really just in the last, I guess, six weeks or so.*** And we reached an agreement that we announced this morning, the idea would be for us to together produce CBD products here in the U.S. and globally under their brand. So we have an exclusive perpetual global license for their brands around cannabinoids.

102. A January 16, 2019 article in the Financial Post presented Kennedy's explanation of how the deal had come together. According to Kennedy, after ABG reached a licensing agreement with another cannabis company in July 2018, it "had continued scouting out the cannabis industry, and had met with many different licensed producers across Canada before settling on Tilray for this particular revenue-sharing arrangement."

103. The Financial Post then quoted Kennedy's further explanation:

> ***They [ABG] liked our focus on research and science, and when the U.S. Farm Bill passed [on December 20, 2018], things started coming together[.]***[12]

104. Kennedy's emphasized statements were false or misleading because ABG and Tilray did not discuss any agreement before the U.S. Farm Bill or for anything like the six weeks preceding January 14, 2019. Instead, the ABG Agreement had been proposed, negotiated, with all due diligence conducted, in a matter of days. Kennedy's misrepresentations concerning the timing of the ABG Agreement gave reasonable investors the misleading impression that Tilray had only signed the ABG Agreement after speaking at length with ABG and determining that Tilray and ABG could create successful co-branding arrangements that would appeal to customers. Had

[12] Kennedy tweeted a link to the article from his personal twitter account.

reasonable investors known that it had taken mere days from mooting the ABG Agreement to execution, they would have understood that this preparatory work had never taken place, making the ABG Agreement far riskier than Kennedy's statements represented. Therefore, Kennedy's statement was materially misleading even if he subjectively believed that the ABG Agreement was a positive for Tilray.

105. On May 14, 2019, Tilray held a call to discuss its Q1 2019 earnings ("Q1 2019 Earnings Call").

106. On the call, Defendant Kennedy volunteered that Defendants' ability to convince ABG to do business with Tilray was evidence that consumer packaged goods companies saw Tilray as an attractive partner:

> Q: [] Just thinking about it from a perspective of a CPG [consumer packaged goods] company, evaluating the cannabis opportunity. What do you feel are the advantages or merits for a CPG company to partner with a Canadian-licensed producer versus considering a strategy such as leveraging offtake from a more dedicated extraction company and then just using their own CPG brands for whether it's with the U.S. CPG market or other markets out there.
>
> **Defendant Kennedy:** ***[W]e know how to partner well not only with pharmaceutical and alcohol companies but with companies like Authentic Brands Group that own over 50 iconic brands. They went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone.***

107. Kennedy's emphasized statements were misleading because ABG did not vet Tilray. The ABG Agreement was proposed, negotiated, and closed within a matter of days; there was no time for ABG to vet Tilray. Instead, Tilray's offer was so generous that ABG would have been foolish to decline it. Reasonable investors would take the misleading impression that Tilray had taken the time to ensure that Tilray and ABG would be able to create products that would appeal to investors, and they would thus have underrated the ABG Agreement's risk. Moreover, by falsely stating that ABG had given Tilray its seal of approval, Kennedy's statement gave the misleading impression that Tilray had demonstrated it was appealing to brand companies, such

that it would survive other companies' careful vetting. Therefore, Kennedy's statement was materially misleading even if he subjectively believed that the ABG Agreement was a positive for Tilray.

108. On May 15, 2019, Tilray filed its 10-Q for Q1 2019 ("Q1 2019 10-Q"). Kennedy signed the Q1 2019 10-Q and certified its accuracy by signing an accompanying certification under the Sarbanes-Oxley Act of 2002 ("SOX" and "SOX Certification") which provided, among other things, that Kennedy had "reviewed" the 10-Q and "based on [his] knowledge", the filing did not "contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made [] not misleading" and that it "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant."

109. On August 13, Tilray filed its 10-Q for the quarter ended June 30, 2019 ("Q2 2019 10-Q"). Kennedy signed the Q2 2019 10-Q and certified its accuracy by signing an accompanying SOX Certification.

110. On November 12, 2019, Tilray filed its 10-Q for Q3 2019 ("Q3 2019 10-Q"). Kennedy signed the Q3 2019 10-Q and certified its accuracy by signing an accompanying SOX Certification.

111. The Q1 2019 10-Q, Q2 2019 10-Q, and Q3 2019 10-Q (collectively, "2019 10-Qs") each stated that:

> *Inventory*
> Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.
>
> ***Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost.*** Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity.

> Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.
>
> ***Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation***.

112. The financial statements set out in the 2019 10-Qs reported the following financial metrics for the quarters ended March 31, 2019, June 30, 2019, and September 30, 2019:

| | **Q1 2019** | **Q2 2019** | **Q3 2019** |
|---|---|---|---|
| Revenue | $23.0 million | $45.9 million | $51.1 million |
| Cost of Sales ($) | $17.7 million | $33.6 million | $35.2 million |
| Gross margin ($) | $5.4 million | $12.3 million | $15.9 million |
| Gross margin (%) | 23% | 27% | 31% |
| Inventory | $48.7 million | $75.3 million | $111.5 million |

113. Defendants' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no ready market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, the Canadian government did not legalize products that used marijuana plant-based trim, or did not approve Tilray's specific products, or Tilray's marijuana plant trim wasted before it could be used in products, or a market did not develop or the market that developed was flooded with trim; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e) Defendants overstated both Tilray's inventory and gross margins.

114. As alleged above, approximately 31.5% of Tilray's inventory, as of December 31, 2019, consisted of unsellable marijuana plant trim. Applying this figure, the approximate amount of overstatement in each of the 2019 10-Qs was:

| | Q1 2019 | Q2 2019 | Q3 2019 |
|---|---|---|---|
| Amount of inventory overstatement | $15.3 million | $23.7 million | $34.8 million |
| True inventory | $33.4 million | $51.6 million | $75.7 million |
| Gross margin overstatement ($)[13] | $10.2 million | $8.4 million | $11.4 million |
| True gross margin ($) | ($4.84 million) | $3.9 million | $4.81 million |
| True gross margin (%) | (21%) | 9% | 9% |

116. Each of Tilray's 2019 10-Qs provided:

> ***At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value.***

117. This statement was false because, as set out in ¶¶127-139 below, Tilray did not assess inventory for obsolescence at the end of every reporting period. Instead, Tilray only assessed inventory in its year-end audited financial statements.

## VIII. LOSS CAUSATION

### A. Defendants Renegotiate the ABG Agreement

118. On January 30, 2020, Defendants announced that Tilray had renegotiated the ABG Agreement. The renegotiated agreement released ABG from its obligation to make guaranteed minimum annual payments. Instead, the renegotiated agreement provided that ABG would not pay the first $10 million in Revenue Interest that would otherwise be due under the ABG Agreement each year. Thus, Tilray would only start earning Revenue Interest when sales reached a level that would otherwise entitle it to $10,000,001 in payments from ABG. In exchange, ABG released Tilray from its obligation to pay Additional Consideration of $83.3 million in cash or stock.

119. The news surprised the markets because Tilray had boasted that the guaranteed annual payments were a key provision that aligned ABG's incentives with Tilray's. The announcement revealed that there were serious difficulties with the ABG Agreement.

[13] Calculated as 31.5% times the increase in inventory from the previous quarter.

120. On January 30, 2020, the price of Tilray's shares fell from their previous close of $19.22 to close at $17.54, down 8.8%, damaging investors.

### B. Tilray Impairs the ABG Agreement By 86% and Writes Off 44% of Its Inventory

121. On March 2, 2020, Tilray filed its 10-K for the year ended December 31, 2019, and held a conference call to discuss its Q4 2019 results.

122. Tilray disclosed in the 10-K and call that it had (a) impaired the ABG Agreement by $102.6 million, or 85.9% of its value; and (b) written off $68.1 million in inventory, or 44% of the value of its inventory at the time.

123. The impairment and write-off surprised the market. As an analyst employed by Jefferies wrote in a March 3, 2020 report that the "Key Takeaway" from Tilray's Q4 2019 results was there was "***Little to get excited about on Q4 with sales/[gross margin]/EBITDA all worsening sequentially, significant impairments on both inventories/ABG agreement [and two other factors].***" Later in the report, the Jefferies analyst commented: "***[t]rust ultimately needed for rerating:*** [] [U]ltimately, we think Tilray also needs to address trust and credibility before re-rating. ***We would flag [] universally positive comments before today on ABG[.]***". The analyst added that "the market is unlikely to believe until it sees."

124. Summing up, an analyst employed by Cantor Fitzgerald wrote in a March 3, 2020 report that: "[w]e continue to think Tilray's disclosure is the worst among the Canadian [cannabis Licensed Producers] that we track."

125. On March 3, 2020, the price of Tilray's shares fell from its previous close of $15.35 to close at $13.02, down 15.2%, damaging investors.

126. On March 4, 2020, even as overall stock prices and the prices of other cannabis companies rose substantially, the price of Tilray's shares fell from its previous close of $13.02 to close at $12.51, down 3.9%.

# IX. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

## A. Kennedy Admits that Tilray Did Not Review Inventory for Write-Offs Until Its Annual Financial Statements

127. Tilray's inventory valuation provided that it reviewed inventory for obsolescence after every ***quarter***:

> Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation. ***At the end of each reporting period***, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

128. On May 11, 2020, Tilray held its call to discuss its Q1 2020 earnings. On the call, Defendant Kennedy admitted that Tilray reviewed its inventory at the end of every ***year***:

> The other thing that I would mention about our gross margins is that we'll probably see a little bit of pressure on that due to the fact that we're accounting for our byproduct on a zero basis. And so I guess historically what's happened is that byproduct has been built up on the balance sheet and that's why there have been significant write-offs for us as well as for I guess in our industry, other industry players. And what we're doing is we're—except for a few instances, we are attributing zero value to that byproduct. So everything that we sell will have all the cost structure associated with it so that ***we don't have any write-offs at the end of the year.***

129. Tilray's historical practice confirms that, as Kennedy stated, it waited until the end of the year to write off inventory:

| Year | Write-off in Q4 | Write-off in Q1-3 combined |
|---|---|---|
| 2018 | $4.2 mln | $0.3 mln |
| 2019 | $68.1 mln | $0.5 mln[14] |

[14] Source: Tilray Press Release dated March 2, 2020, available at https://www.sec.gov/Archives/edgar/data/1731348/000156459020008144/tlry-ex99_46.htm . In some earlier filings, Tilray provided different numbers, but these were evidently errors because the numbers in the March 2 press release are nearly consistent with Tilray's other SEC filings. Tilray's 2019 10-K reported a $68.6 million write-off for the whole of 2019, while its Q3 2020 10-Q reported write-offs of $0.7 million during the first three months of 2019.

130. If Tilray followed its inventory valuation policy, it would analyze inventory at the end of each ***quarter***. There would be no reason to wait until the end of the year to write off inventory. In fact, Tilray would follow exactly the same procedure at the end of the year as it did at the end of each quarter. So write-offs would not occur at the end of the year, but every quarter.

131. Kennedy's admission describing the actions Tilray took at the end of any reporting period are false; each of the Q1, Q2, and Q3 contained a false statement.

132. In his SOX Certifications, Defendant Kennedy avowed:

(1) I have reviewed this [report] of Tilray, Inc.

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

133. The difference between Tilray's stated inventory policy (reviewing inventory every quarter) and what it was really doing (waiting until the end of the year to review inventory) was simple and obvious.

134. Kennedy had reviewed, or was reckless in not reviewing, the accounting treatment of Tilray's inventory and any efforts Tilray had made to determine whether its valuation should be impaired. In 2019, Tilray's inventory ballooned by nearly an order of magnitude as it recorded almost as much in inventory as it recognized in revenue. Tilray's increase in inventory also kept its gross margins from going above single digit percents.

135. Thus, Kennedy represented to investors that he reviewed the 10-Qs; he was obligated to review the 10-Qs; yet the 10-Qs contained false statements that would have been obvious to Kennedy.

136. Kennedy would have had a further reason to determine whether an adjustment to inventory had been completed: he was obligated to. In Tilray's 10-K, Kennedy recognized that there was a material weakness in Tilray's internal controls "related to inventory costing and the financial close process."

137. According to the 10-K, senior management had "developed a plan to remediate the material weakness."

138. In his SOX certifications, Kennedy acknowledged that:

> [Tilray's] other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) [and have]
>
> Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

139. Thus, Kennedy was obligated to determine whether Tilray actually had performed inventory costing during the quarter to determine whether Tilray's plan had addressed its known material weakness in internal controls. He would know that Tilray had not evaluated its inventory for obsolescence.

## B. Defendant Kennedy Sold $28 million of Tilray Shares During the Class Period

### 1. *Kennedy's Stock sales Were significant Both As a Proportion of His Total Stockholdings and For the Total Proceeds They Generated*

140. During the Class Period, Defendant Kennedy sold 643,164 Tilray shares, or **79.9%** of the shares he had available to sell, for net proceeds of **$28,388,154.68**:

**SALES**

| Type of transaction[15] | Date | Shares sold (received) | Price | Total proceeds | 10b5-1 plan adopted |
|---|---|---|---|---|---|
| **First false statement January 15, 2019** | | | | | |
| Stock sale | January 24, 2019 | 149,916 | $74.21 | $11,125,116.44 | None |
| Open market sales | March 1, 2019 | 53,897 | $79.49 | $4,284,272.53 | December 28, 2018 |
| | | 14,437 | $80.40 | $1,160,734.80 | |
| | | 7,454 | $81.67 | $608,759.24 | |
| | | 11,351 | $82.14 | $932,315.52 | |
| Open Market Sales | April 1, 2019 | 52,758 | $63.03 | $3,325,547.77 | |
| | | 32,539 | $63.84 | $2,077,351.58 | |
| | | 1,842 | $64.73 | $119,233.03 | |
| | | 18,970 | $63.78 | $1,209,923.67 | |
| Open market sale | December 11, 2019 | 100,000 | $18.30 | $1,829,540.00 | September 30, 2019 |
| Open market sales | January 13, 2020 | 29,593 | $15.52 | $459,304.08 | None |
| | | 67,113 | $16.74 | $1,123,344.11 | |
| | | 3,294 | $17.34 | $57,121.91 | |
| **First corrective disclosure, January 30, 2020** | | | | | |
| Open market sale | February 12, 2020 | 100,000 | $16.28 | $1,627,590.00 | December 12, 2019 |
| **Second corrective disclosure March 2, 2020** | | | | | |

[15] Excluding locked-up shares Kennedy received upon the dissolution of Privateer.

**AWARDS**

| Type of transaction[16] | Date | Shares sold (received) | Price | Total proceeds |
|---|---|---|---|---|
| Initial shares held | 14,706 | | | |
| Vesting of Restricted Stock | January 23, 2019 | (375,000) | 0 | 0 |
| Exercise of stock options | March 1, 2019 | (50,000) | $7.76 | ($388,000) |
| Exercise of stock options | April 1, 2019 | (50,000) | $7.76 | ($388,000) |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | | (47,875) | 0 | 0 |
| Grant | May 31, 2019 | (76,000) | 0 | 0 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | July 1, 2019 | (30,472) | 0 | 0 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | October 1, 2019 | (28,414) | 0 | 0 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | January 1, 2020 | (32,986) | 0 | 0 |
| Exercise of stock options | February 13, 2020 | (100,000) | ($7.76) | ($776,000) |

Total shares sold: **643,164**

Total shares available to sell: **805,453**

Percentage of shares sold: **79.9%**[17]

Total net proceeds: **$28,388,154.68**

---

[16] Excluding locked-up shares Kennedy received upon the dissolution of Privateer.
[17] In addition, at the close of the Class Period, Kennedy held 2,221,865 unexercised options, almost all at an exercise price of $7.06.

*2. The Timing of Kennedy's Sales was Suspicious*

141. In an October 17, 2018, interview with Bloomberg, Kennedy stated that he would not sell any shares because he was purportedly confident in Tilray's success:

> **Q:** Those big gains that we've seen in Tilray stock since the IPO. I'm curious, have you sold any of your own stock?
> **Defendant Kennedy:** Zero.
> **Q:** Zero? Have you been a buyer of any more?
> **Defendant Kennedy:** There was a public disclosure of a share purchase on the date of an IPO. So I was a buyer at the IPO.
> **Q:** All right. So you're holding on to the shares.
> **Defendant Kennedy:** ***I haven't sold a share, don't expect to sell a share. I've been doing this for eight years. I have a long-term view of the opportunity. It's a global growth opportunity.*** While today is a historic day, it is day one and ***we expect to be in this industry for a very long time and grow a very large company*** that not only is successful and obtain significant market share in Canada but gains significant market share in other medical cannabis countries and other adult-use countries around the world.

142. On January 6, 2019, Kennedy told Fortune that he had not sold any of his shares. Fortune also conveyed Kennedy's "promise[ that] he won't [sell shares] when post-IPO restrictions lift in January". The article was published on January 16. A week later, Kennedy sold $11,125,116.44 in shares, his largest Class Period payday.

143. The timing of Kennedy's other stock sales is suspicious. The Class Period begins with Kennedy's January 15, 2019 false statements about the ABG Agreement. All of his early Class Period sales were made within 76 days of this false statement.

144. Kennedy did not sell any stock in the 253 days between April 2, 2019 and December 11, 2019.

145. All of Kennedy's remaining stock sales (300,000 shares) took place in the last 81 days of the Class Period. The sales occurred just before Tilray was due to file its audited financial statements. As Kennedy knew, the audit of Tilray's 2019 financial statements would likely discover that Tilray had overstated its inventory and the value of the ABG Agreement. Kennedy

managed to sell out of his shares just before Tilray was due to file its 10-K correcting his misstatements, which Kennedy could predict would cause Tilray's stock price to fall.

*3. Kennedy Entered Into His 10b5-1 Plans at Suspicious Times*

146. Kennedy entered into three 10b5-1 plans that provided for Class Period sales. Kennedy did not publicly file any of the plans. Instead, he mailed them to the SEC so that they would not appear on EDGAR.

147. The SEC recently reformed Rule 10b5-1(c)(1) (the rule permitting 10b5-1 plans) because it recognized that the mere fact that sales were pursuant to a 10b5-1 plan was not necessarily exculpatory. The SEC cited extensive literature showing that insiders were adopting 10b5-1 plans close enough to planned sales to benefit from material nonpublic information.[18] The SEC thus amended Rule 10b5-1(c)(1) to mandate a 90-day cooldown between adoption of the plan and the first planned sales.

148. Kennedy's first 10b5-1 plan was exactly the kind that the SEC later concluded was not necessarily exculpatory. Kennedy entered into his first plan on December 29, 2018. This plan called for sales of 174,278 shares in March and April. Of these, 87,139 were sold on March 1, or well within the 90-day cooling off period the SEC has now adopted to prevent bad faith 10b5-1 plans.

149. On September 30, 2019, Kennedy entered into his second 10b5-1 plan, calling for the sale of 100,000 shares on December 11, 2019, again, well within 90 days of adoption.

150. On December 12, 2019, Kennedy entered into a third 10b5-1 plan, calling for the sale of 100,000 shares in February 2020, well within 90 days of adoption.

[18] Rule 10b5-1 & Insider Trading, Release No. 11013, 2022 WL 190554, at *6-7 (Jan. 13, 2022)

151. Notwithstanding that he had entered into 10b5-1 plans on December 28, 2018, and December 12, 2019, Kennedy sold almost 250,000 shares in January 2019 and 2020, that were not covered by his 10b5-1 plans.

*4. The Net Changes in Kennedy's Shareholdings Supports an Inference of Scienter*

152. In total, as of the time of the IPO, Kennedy owned 14,706 shares. Kennedy did not purchase any shares on the open market during the Class Period. Instead, during the Class Period, (a) certain of his Restricted Stock Units vested and (b) he exercised stock options with a $7.76 exercise price. Kennedy then immediately resold a substantial portion of the shares that became available for sale either for no cash consideration or at a price well below the current trading price.

153. While Kennedy also indirectly owned shares through his ownership of Privateer, these shares were not available for sale. At the beginning of the Class Period, only about 17 million Tilray shares were freely tradeable and not held by Privateer. Kennedy's large stock sales would not only signal his lack of confidence, but they would also significantly increase the number of tradeable Tilray shares, thus reducing their price. Then, after the Share Exchange, Kennedy's Privateer shares were locked up.

**C. Kennedy Engaged in Additional Self-Dealing**

154. The Controlling Shareholders used their control over Tilray to benefit themselves at Tilray's expense.

155. As of the end of 2018, Tilray licensed seven of its ten Canadian recreational marijuana brands from Privateer and its former subsidiaries, entitling Privateer to between 2.5% and 7.5% of revenues from the sale of products using those brands.

156. In July 2019, Kennedy faced a significant personal tax bill. To secure the cash necessary to pay the bill, Kennedy caused Tilray to purchase Smith & Sinclair, Ltd., which was 30% owned by Privateer. In 2019, Smith & Sinclair lost $2.7 million on revenues of $1.6 million.

157. Tilray paid approximately $2.4 million for Privateer's stake. Privateer then distributed the $2.4 million directly to Kennedy without paying anything to other Privateer investors. For the 70% not owned by Privateer, Tilray paid 79,289 shares and approximately $2 million in contingent consideration.

158. In its next audited financial statements, Tilray re-measured the value of the contingent consideration to $420, showing that the contingent consideration was a mere fig-leaf to conceal that Tilray was paying a disproportionate price for Privateer's interest. Tilray's re-valuation of the contingent consideration to ***precisely*** $420 (a prominent reference in the cannabis community)[19] suggests the contingent consideration was, and always had been, a cheap joke.

159. Tilray and Privateer share office space at 2701 Eastlake Avenue E, Seattle, WA 98102. In February 2019, Privateer spun off the last of its non-Tilray companies. Blue and Groh, the other Controlling Shareholders, ran the non-Tilray companies from the Eastlake office, while Kennedy managed Privateer.

160. In May 2019, Tilray paid Privateer $1 million and assumed the lease. Tilray's financial statements do not record any subsequent payments from Privateer for the lease, yet Kennedy, Blue, and Groh continue to work on Privateer business out of the shared Tilray and Privateer offices.

161. Tilray pays Privateer Management a monthly retainer of $25,000 to provide unspecified services.

---

[19] *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 923 n.10 (N.D. Cal. 2020); Maureen Meehan, *Fifty Years of 420 and The Waldos: Time Flies When You're Having Fun*, available at https://hightimes.com/culture/fifty-years-420-waldos/

### D. But for COVID-19, Defendant Kennedy's False Statements Would Have Given Him Control Over the World's Largest Cannabis Company

#### *1. Kennedy Makes False Statements To Obtain Personal Control Over Tilray*

##### i. Kennedy and Two Close Associates Control Tilray While Owning Less Than a Third of Tilray's Shares

162. Kennedy's false statements reassured Privateer investors that Tilray was stable and that it was successfully pursuing its business plan, convincing them to agree to a two-year lockup of their shares. By reassuring investors, Kennedy obtained personal control over Tilray, allowing him to decide its fate, while avoiding taxes.

163. Defendant Kennedy, alongside friends and close associates Michael Blue and Christian Groh (i.e., the Controlling Shareholders), founded Privateer, a holding company, in 2011. In 2014, they established Tilray's predecessor as a Privateer portfolio company.

164. In January 2018, a Privateer reorganization created Tilray in its current form. Privateer was issued 75 million shares of Tilray in exchange for the assets of Tilray's predecessor. Of these, 16,666,667 were Class 1 supervoting shares, each entitling the holder to 10 votes, and 58,333,333 were Class 2 ordinary shares, each with one vote.

165. In July 2018, Privateer took Tilray public through an IPO. Tilray sold about 9 million new Class 2 shares to the public. At the time of the IPO, non-Privateer shareholders held slightly less than 8 million Class 2 shares. The IPO left Privateer with 93% voting power over Tilray, but only an 82% economic interest.

166. By 2019, Kennedy, Blue, and Groh personally held 71% of Privateer's voting stock, but only 29% of its economic interest.

167. Exercising indirect control over Tilray through Privateer came with several disadvantages for the Controlling Shareholders. Privateer's charter provided that for several kinds of decisions, its supervoting shares would not receive extra votes. The Controlling Shareholders

would not control Tilray or Privateer for those decisions. Moreover, the Controlling Shareholders would not receive much of the proceeds from selling Privateer's Tilray stock. Sales proceeds would be distributed *pari passu* to Privateer investors based on their economic interest in Privateer, not their voting power. Thus, to receive proceeds equivalent to selling one personally-held share, the Controlling Shareholders had to sell three Privateer-held Tilray shares. And because Privateer held more than 80% of Tilray's stock, any substantial sales of its shares would dramatically increase the number of Tilray shares available for trading. The mere suspicion that Privateer might sell its shares would drive down Tilray's stock price.

168. Finally, any sales of Privateer's Tilray stock would be subject to double taxation. When Privateer sold its shares, it would have to pay 21% taxes on its profits. Because Privateer's cost basis for its Tilray shares was approximately $0.43, it would pay taxes on substantially all of the sales proceeds. Then, when Privateer distributed cash to its investors, they would have to pay long-term capital gains taxes of 23.8% on their distribution.

169. If he sought to monetize his interest, Kennedy would face a tax bill of more than 40% of the proceeds. If they sold all their Tilray shares at the $17/share IPO price, the Controlling Shareholders would collectively face a tax bill of more than $100 million.

ii. Kennedy Avoids Taxes While Securing Corporate Control Over Tilray

170. The Controlling Shareholders hatched and implemented a scheme that would (a) eliminate Privateer's corporate sales tax, (b) control the flow of Privateer investors' Tilray shares into the market, and (c) secure personal control over Tilray (i.e., the Share Exchange).

171. The Share Exchange had four elements:

a. Tilray cancels all of Privateer's Tilray shares;

b. Tilray acquires all of Privateer's shares;

c. Tilray issues new shares to Privateer investors in proportion to their economic interest in Privateer, but all its supervoting shares are issued to the Controlling Shareholders; and

d. Privateer investors agree to a two-year lockup.

172. Giving effect to the Share Exchange would leave the Controlling Shareholders with only 31% of the economic interest in Tilray but 73% of its voting power. Thus, the Controlling Shareholders would maintain personal majority control over Tilray with a hefty margin to sell their own Tilray shares or have Tilray issue new shares to raise proceeds or pay for acquisitions.

173. To obtain personal control over Tilray, the Controlling Shareholders needed Privateer investors' consent. Article IV(E)(2) of Privateer's Charter would have to be amended to permit Privateer to distribute all Class I Tilray shares to the Controlling Shares because it required that all in-kind distributions to Privateer investors be *pari passu*. Article IV(D)(2)(b)(i) required a majority of shares, without regard to supervoting status, for any such amendment. Thus, Kennedy needed the support of investors holding a majority of Privateer's shares to proceed with the Share Exchange on terms that gave the Controlling Shareholders personal voting control over Tilray.

174. The terms of the Share Exchange showed that Kennedy valued control. Kennedy could terminate the Share Exchange if the other Privateer investors declined to award him and the other Controlling Shareholders all the supervoting shares.

175. Privateer investors, moreover, could monetize their investment directly. Under Delaware law, the Share Exchange gave Privateer investors a right to appraisal of their Privateer shares. Privateer non-controlling investors accounted for more than half the economic interest in Tilray. Tilray could not afford to buy back more than half of its share capital. Further, the belief that other Privateer investors would exercise their appraisal rights could create the equivalent of a

bank run, as investors concerned that Tilray faced too many appraisals to be viable were pushed to seek appraisal themselves.

176. The Controlling Shareholders asked Privateer investors to agree to a substantial burden. Privateer investors had invested their money as early as 2011. Tilray had purportedly succeeded, but Privateer investors had not been able to sell their shares. Now, the Controlling Shareholders were asking Privateer investors to agree to two more years of lockup.

177. Tilray was a risky investment. Tilray is a young, unprofitable company operating in a nascent, quick-moving industry. From the beginning of the Class Period through December 2019, Tilray's stock price veered between $100/share and $19/share. Tilray's stock price might increase in the following years, but it could also crash. With a two-year lockup, Privateer investors could not sell their Tilray shares if the investment grew too risky for them, or if they wanted to make a profit.

178. Defendants' false statements were of the type that would reassure anxious Privateer investors. By overstating Tilray's gross margins, Defendants made it seem Tilray could operate profitably once it stopped making enormous capital and other investments. And by concealing that the ABG Agreement was a publicity stunt, Kennedy helped convince Privateer investors that Tilray was succeeding at the very strategy he had publicly touted: developing branded products.

179. And the statements were perfectly timed to influence Privateer investors. Privateer sent Tilray a letter of intent regarding the Share Exchange on January 9, 2019, a week before Tilray announced the ABG Agreement. The Share Exchange closed on December 12, 2019. A month later, Tilray would announce that it had renegotiated the ABG Agreement to remove the guaranteed $10 million payments and reduce its scope. Less than three months later, Tilray would impair the ABG Agreement by 86% and reduce the valuation of its inventory by $68 million, or 44% of its total value. Moreover, Defendants only corrected their misstatements when Tilray's

financial statements were audited. Defendants' false statements helped convince Privateer investors to vote their shares in favor of the Share Exchange and not seek an appraisal.

180. Tilray investors filed a derivative suit against Kennedy and others in connection with the Share Exchange based on allegations that it improperly benefited the Controlling Shareholders personally at the expense of all others. After the plaintiffs' amended complaint survived a motion to dismiss, Tilray convened a Special Litigation Committee.

181. The Special Litigation Committee extracted $39.9 million in settlements. The size of the settlement to resolve claims based on the Controlling Shareholders' self-interested acts speaks for itself.

*2. By Seizing Personal Control Over Tilray, Kennedy Set Himself Up to Engage In Large-Scale Mergers & Acquisitions Wherein He Could Pursue His Own Interests At the Expense of Other Shareholders'*

182. Defendants told investors that cannabis was a nascent market that would quickly reach enormous size. Tilray's IPO Registration Statement provided:

> We believe we are witnessing a global paradigm shift transforming the multibillion dollar cannabis industry from a state of prohibition to a state of legalization, but the legal market is still in its early stages. Moreover, we expect the number of countries with legalized regimes to continue to increase, creating numerous and sizable opportunities for market participants, including us. According to the United Nations, the global cannabis market, including the illicit market, is estimated to be $150 billion[.]

183. Defendants told investors Tilray aimed to be one of the largest companies in this market.

184. In an August 2, 2018 Reddit Ask Me Anything discussion, Kennedy stated that: "We are building a global company to be a market leader over the long-term, and appreciate that many of our investors will be with us for the long haul."

185. On Jim Cramer's Mad Money on September 18, 2018, Defendant Kennedy stated that: "Our intent is to build a company that dominates part of this $150 billion industry. I think

you'll see multiple hundred billion-dollar companies. We don't want to partner with ABI [AB Inbev, a beer conglomerate]. We want to build ABI."[20]

186. On December 20, 2018, Kennedy told Yahoo! Finance that:

> It's early days in this industry and we're not interested in being bought or acquired, unlike two of our competitors in Canada who have been bought by Ultra and Constellation. We control our own destiny and that's one of the things I'm most proud of. You know, we want to continue to partner with other global pioneers who are leaders in their respective sectors, but we think it's way too early to give up control of our own destiny.

187. On May 5, 2019, he told *Marijuana Venture* that:

> [T]his is a global paradigm shift, and while many companies look at it myopically, in terms of their corner of the world or their niche within cannabis, we really look at cannabis legalization as a global event. Companies with trusted brands and a multinational supply chain will be the companies that win.

188. And Kennedy was clear exactly what Tilray needed to do to survive: become one of the three or four companies that, he claimed, would dominate the cannabis industry.

189. At the November 4, 2015 Web Summit in Dublin, he stated that "Cannabis is the only thing we put into our bodies that is not branded in any way. That will change."

190. On October 16, 2019, he told Weed on Wall Street that he wanted to build a "massive" cannabis company:

> And I tell our employees, I tell our investors that this is just day one. I think globally, this is $150 to 200 billion industry. We're investing for the future, we've been doing this for eight and a half years. We have a long, patient, methodical view on how to build a massive company in this industry.

191. In a December 18, 2019 CNBC interview, Kennedy stated that only three or four companies would dominate the cannabis industry:

> Well, what I believe is that the cannabis industry globally adult-use and medical is somewhere between 150 to a $200 billion industry. And I think it ends up looking something like the global beer industry, where three or four companies control a dominant portion, 75, 80% of that market share. And so if three companies are divvying up a 150 billion industry, they'll each have a revenue somewhere around

---

[20] In January 2019, Tilray partnered with ABI.

> 50 billion. And so that's how I get to, there'll be three companies that have a hundred billion valuation and we would like to be one of those companies; we're methodical, we're patient. It's early days in this industry.

192. In a March 6, 2020 article, the Wall Street Journal observed that Kennedy "thinks that consolidation will continue, leaving the cannabis sector looking a look a lot like the beer business, with two or three companies dominating the marketplace." It then quoted him as saying "[o]ur strategy is to position ourselves so that we are one of those three companies[.]"

193. Kennedy could not secure his sweetheart deal for the Share Exchange after he had already closed the consolidation. Were Tilray to complete a merger ***before*** the Share Exchange, the Controlling Shareholders would not control Tilray during the Share Exchange.

194. Thus, by obtaining personal control over Tilray, Kennedy positioned himself to decide its fate during a crucial period in which Tilray would consolidate.

195. With personal control, Kennedy also ensured that he could negotiate a transaction that benefited him personally.

*3. Kennedy Nearly Succeeds In Making Himself CEO of the World's Largest Cannabis Company*

196. In fall 2019, Tilray initiated merger discussions with Aphria, Inc., a large Canadian cannabis company focused on the Canadian market ("Aphria Merger"). With Aphria roughly Tilray's size, the combined company would create the world's largest cannabis business by revenues in the world.

197. Discussions proceeded rapidly. On November 22, 2019 Aphria's CEO met with a member of Tilray's Board of Directors.

198. Only six days later, the companies signed a mutual non-disclosure agreement.

199. On December 18, the companies held a senior executive meeting to discuss the Aphria Merger.

200. Thereafter, the companies worked frenetically to push through the Aphria Merger. On January 14, 2020, Kennedy and Aphria's CEO had a further meeting. A week later, Kennedy and other senior Tilray executives toured Aphria's facilities. Tilray and Aphria each engaged financial advisors. After another February 5 senior executive meeting that included financial advisors, on February 10, Kennedy and other senior Tilray executives again toured Aphria's facilities.

201. On February 14, Tilray gave Aphria a draft of a non-binding term sheet for a stock-for-stock merger. Tilray anticipated a quick closing; the term sheet proposed an exclusivity period that terminated on March 2, 2020.

202. Kennedy's term sheet was not favorable to Tilray investors. His proposal would see former Tilray shareholders own only 56% of the combined company, with Aphria's shareholders holding 54%. In January and February 2020, Tilray's market value hovered around 54-55% of the combined company's market capitalization. Before January 2020, Tilray had usually been worth more than 60% of the combined company. Indeed, in its counter-offer, Aphria barely pushed back on the exchanging ratio, only changing suggesting 55%/45%.

203. Yet the term sheet provided that Kennedy would serve as the CEO of the combined company:

> On February 14, 2020, Tilray provided Aphria with an initial draft of a non-binding term sheet regarding a potential combination of the two businesses. Mr. Kennedy and Mr. Simon had a discussion regarding the key components of the draft term sheet and potential next steps. The draft term sheet contemplated, among other things: (i) that the transaction would be structured as an all-stock merger, with shareholders of Tilray and Aphria owning 56% and 44% of the Combined Company, respectively; (ii) a governance structure that would include (A) ***Mr. Kennedy as CEO*** and [Aphria CEO] Mr. Simon as Executive Chairman, and (B) a board of directors comprised of 8 members total, 4 directors designated by Tilray and 4 designated by Aphria; (iii) that the Combined Company would be called "Tilray"; and (iv) an exclusivity period through March 2, 2020, which was expected to coincide with the announcement of Tilray's Q4 2019 earnings.

204. The term sheet's other terms were not disclosed. However, based on Kennedy's past abuse of control and his insistence that he be CEO of the combined company, they would have benefited Kennedy personally.

205. On February 27, 2020, Aphria's CEO attended a Tilray Board meeting.

206. At the time, the Controlling Shareholders continued to control Tilray. The Controlling Shareholders could, by themselves, ensure shareholder approval of the combination. Their votes meant Tilray would not have to undertake the long and uncertain process of securing investors' consent. Further, by ensuring a quick approval, Kennedy made the combination more attractive to Aphria, a carrot he could use to make himself CEO and otherwise include provisions that would benefit him personally.[21]

207. For years, Kennedy had publicly stated that the global cannabis market would run to the hundreds of billions of dollars in annual revenues and would be controlled by three or four large companies. The Aphria Merger gave Kennedy a chance not only to create one of those companies and lead it, but also to engage in unprecedented self-dealing along the way. Kennedy's goal was within his grasp.

*4. Kennedy's Plan Comes to Naught Because of COVID-19*

208. On January 15, 2020, Canada activated a COVID-19 Emergency Operations Center. In early March, COVID-19 ravaged Northern Italy. On March 11, the World Health Organization declared COVID-19 a pandemic. On March 13, Washington State's Governor

---

[21] Delaware courts recognize that being able to guarantee closing is a valuable asset in a merger or acquisition. *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 960 (Del. Ch. 2007); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (noting that in mergers, stockholders "get to protect themselves by voting no if they believe that their bargaining agent has done a poor job[.]"). Deal certainty is part of the consideration a counterparty receives in a merger.

ordered all public and private schools closed. Beginning mid-March, New York suffered a devastating wave of infections. On March 16, all New York City schools were closed.

209. On March 18, 2020, Aphria's CEO told his Board of Directors that discussions of the Aphria Merger would be placed on hold in light of the COVID-19 pandemic. Like many other companies', the stock prices of Tilray and Aphria swung wildly in the early days of the pandemic, making it difficult if not impossible to create a reasonable and stable exchange ratio for the Aphria Merger.

210. Notwithstanding the volatility, on or about March 25, 2020, Kennedy suggested to Aphria an equity ownership split of exactly 50% for Tilray and 50% for Aphria. Tilray's charter requires a favorable vote of all shares regardless of supervoting status to approve any ***change of control*** transactions. Amended and Restated Certificate of Incorporation of Tilray, Inc., IV.D.2.(c). Tilray's charter defines a change of control to include a merger where ***more than*** 50% of the shares would be held by the counterparty. *Id.* IV.D.1.(a). Thus, Kennedy proposed the precise equity ownership split that would permit the Controlling Shareholders to force the Aphria Merger through.

211. Over the next nine months, Tilray and Aphria would continue to discuss the merger intermittently. These discussions eventually succeeded. On December 15, 2020, Aphria and Tilray announced a plan of merger, subject to approval by each company's shareholders.

212. Aphria's market value had grown substantially through COVID-19; Tilray's had shrunk. By then, Tilray's market capitalization was less than half Aphria's.

213. With Aphria accounting for more than two-thirds of the combined company, Aphria's CEO naturally became the combined company's CEO. Kennedy was relegated to the role of Director.

5. *The Controlling Shareholders Lose Control*

214. Since Tilray's IPO, its Certificate of Incorporation has provided that supervoting Class 1 shares would be converted into ordinary Class 2 shares once they accounted for less than 10% of Tilray's shares:

> "***Final Conversion Date***" means 5:00 p.m. in New York City, New York on the first Trading Day falling on or after the date on which the outstanding shares of Class 1 Common Stock represent less than ten percent (10%) of the aggregate number of shares of the then outstanding Class 1 Common Stock and Class 2 Common Stock.
>
> * * * * *
>
> **Final Conversion Date**. On the Final Conversion Date, each one (1) issued and outstanding share of Class 1 Common Stock shall automatically, without any further action, convert into one (1) fully paid and nonassessable share of Class 2 Common Stock

215. As Defendant Kennedy later acknowledged on Tilray's Q1 2020 earnings call, "the COVID-19 pandemic provides a level of uncertainty for Tilray and the broader industry."

216. As a result, on March 17, 2020, Tilray was forced to sell shares on brutal terms. Tilray sold a total of 19 million ordinary shares, each with a warrant to purchase an additional ordinary share at an exercise price of $5.95, for $4.76,[22] for gross proceeds of $90 million. The offering added up to 38 million more shares to Tilray's existing 98,561,398 shares. Each of these new shares was sold for less than a third of Tilray's IPO price.

217. In July 2020, enough Tilray warrant holders exercised their warrants to trigger the Final Conversion Date. All of the Controlling Shareholders' supervoting shares were converted into ordinary shares, eliminating their control.

---

[22] Of these, 11,750,000 million consisted of warrants which could be exercise for a nominal price. These so-called pre-funded warrants lets investors defer the tax and disclosure consequences of share ownership, but a pre-funded warrant and a share are otherwise economically identical.

218. After that, the Controlling Shareholders could no longer deliver the votes to approve the combination.

219. If a company's shares are largely held by discrete institutions, the company can call the institutions to ensure they vote their proxies. But Tilray's shareholder base largely consisted of retail, not institutional, investors. It cannot feasibly call a large number of small shareholders. So Tilray had to engage in shenanigans to push the merger through.

220. Tilray announced it would hold a Special Meeting to vote on the Aphria Merger on April 16, 2021, at 11:00 am.

221. On April 8, Tilray held a Board Meeting to discuss the proxy solicitation process. At the meeting, Tilray's proxy solicitor told the Board that it was unlikely that Tilray could reach quorum, citing the number of retail investors.

222. On April 15, 2021, Tilray published a Press Release announcing the postponement of the Special Meeting to April 30, 2021.

223. On April 16, 2021, Tilray's Board of Directors approved an amendment to Tilray's bylaws to reduce the quorum requirement for shareholder meetings from one half to one third of all votes.

224. Ultimately, only 69 million of Tilray's 179 million outstanding shares were voted at the Special Meeting.

**E. Tilray Uses Its Stock as Currency for Acquisitions**

225. Tilray used its stock to acquire companies:

a. Tilray agreed to pay consideration including $133.2 million in shares in connection with the ABG Agreement. To secure additional participation rights, Tilray would pay $83.3 million, consisting of $66.7 million in shares and $16.7 million in a combination of cash and shares, with the distribution to be specified by ABG;

b. On January 21, 2019, Tilray agreed to pay consideration including $20.0 million in shares in connection with its acquisition of Natura Natural Holdings Inc.

c. On February 19, 2019, Tilray agreed to acquire Manitoba Harvest for CDN $419 million, of which CDN $269 ($203.8 million at that day's exchange rate) million was in stock.

d. In July 2019, Tilray agreed to pay consideration including approximately $3.7 million in shares in connection with the acquisition of Smith & Sinclair Ltd.

e. On August 28, 2019, Tilray agreed to pay consideration including $53 million in shares to acquire 420 Investments Ltd.

226. Thus, in 2019, Tilray spent $497 million of its shares in total to fund acquisitions, giving Defendants a significant incentive to pump up Tilray's share price.

## F. The Volume of Trading in Tilray's Stock Increases Suspiciously After the Share Exchange

227. Privateer investors were required to sign a lockup agreement to receive Tilray shares in the Share Exchange ("Privateer Lockup"). Each lockup agreement provided:

> [T]he undersigned holder of Privateer Capital Stock and/or options to purchase Privateer Capital Stock is required to execute and deliver this Lock-up Agreement as a condition to the receipt of such holder's portion of the Total Merger Consideration. In light of the benefits that the Merger will confer upon the undersigned, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned pursuant to the Merger Agreement agrees with the Company that, during the period beginning on the Closing Date through and including the second anniversary of the Closing Date***, the undersigned will not, without the prior written consent of the Company, Transfer, or announce the intention to Transfer, any shares of Class 1 Common Stock of the Company, par value $0.0001 per share, or Class 2 Common Stock of the Company, par value $0.0001 per share (collectively, the "Common Stock"), that constitute Stock Merger Consideration*** (including, without limitation, Common Stock which may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations promulgated under the Securities Act of 1933, as amended (the "Securities Act"), (such shares, the "Beneficially Owned Shares")) or securities convertible into or exercisable or exchangeable for Common Stock that constitute Option Merger Consideration (collectively, such Common Stock and other securities, the "Merger Consideration Securities").

228. The Privateer Lockup categorically prohibited all unsanctioned sales during the first year after the Share Exchange closed:

> The restrictions set forth herein shall lapse as follows:
>
> (1) as of the first anniversary of the Closing Date, the restrictions with respect to 50% of the Applicable Securities shall lapse (for purposes of clarification, all Cash Consideration Shares and all Permitted Sales shall be credited towards and deemed to be included in such 50% lapse) []

229. The Privateer Lockup provided a limited exception for "Permitted Sales". These sales had to be authorized by Tilray's Board of Directors:

> "***Permitted Sale***" shall mean a sale of Merger Consideration Securities (i) in any Offering or (ii) following the Closing, in any other registered public offering, block trade or strategic sale ***approved or arranged by the Company, in each case at the discretion of the Board of Directors of the Company*** (subject to the Company's policies regarding approval of affiliate transactions).

230. Further, a Permitted Sale was material non-public information, such that the Company had to disclose its existence:

> The undersigned acknowledges and agrees that information regarding any Offering or any other Permitted Sale will constitute "material non-public information" pursuant to applicable securities Laws.

231. Thus, no former Privateer investor could sell any Tilray shares received in the Privateer Agreement without Tilray's Board's authorization and public disclosure of the sale.

232. Tilray did not disclose any Permitted Sales during the remainder of the Class Period.

233. Yet shortly after the Privateer Agreement, trading volume in Tilray shares soared:



234. On average, approximately 1.8 million shares traded daily during the Class Period. The average trading volume for the 90 days preceding the closing of the Privateer Agreement was also approximately 1.8 million shares. The average trading volume from the date of the Privateer Agreement through the close of the Class Period was 3.6 million shares.

235. On January 14 and 15, 2020, 30.0 million Tilray shares were traded. At the time, only approximately 25.2 million shares were authorized for trading.

236. The Privateer Lockup provided that the Tilray shares provided to investors as part of the Privateer Agreement would bear a legend indicating that the shares could not be resold:

> ***The undersigned hereby consents to the placing of legends on the certificates representing the shares of Common Stock issued as, or received upon the conversion of, the Merger Consideration Securities or the entry of stop transfer instructions with the Company's transfer agent and/or any other duly appointed transfer agent of the Company with respect to any Merger Consideration Securities.*** In furtherance of the foregoing, the Company and any other duly appointed transfer agent of the Company for the registration or transfer of shares of Common Stock are hereby authorized to decline to make any Transfer of shares of Common Stock if such Transfer would constitute a violation or breach of this Lock-up Agreement.

237. Accordingly, it would have been difficult or impossible for Privateer investors to sell the Tilray shares they received through the Privateer Agreement.

238. Thus, any Permitted Sales were authorized by Privateer's Board, but not disclosed to the public in violation of the Privateer Lock-Up's terms. At the time, the Controlling Shareholders continued to hold majority control over Tilray.

239. The definition of Permitted Sale in the Privateer Lock-Up provides:

> The Company will only conduct a Permitted Sale to the extent that each applicable Former Holder shall have an opportunity to sell a portion of his, her or its Merger Consideration Securities on a proportionate, pro rata basis relative to all other applicable Former Holders.

240. Accordingly, the Controlling Shareholders would share proportionally in any Permitted Sales after the Share Exchange.

## CLASS ACTION ALLEGATIONS

241. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tilray securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are (i) Defendants, (ii) officers and directors of Tilray and Privateer Holdings, Inc. ("Privateer"), and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii).

242. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tilray common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tilray or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

243. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

244. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

245. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tilray;
- whether the Individual Defendants caused Tilray to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Tilray securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

246. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET)**

247. The market for Tilray's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Tilray's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Tilray's securities and market information relating to Tilray, and they have been damaged thereby.

248. During the Class Period, the artificial inflation of Tilray's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Tilray's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Tilray and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

249. At all relevant times, the market for Tilray's securities was an efficient market for the following reasons, among others:

a. Tilray shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, Tilray filed periodic public reports with the SEC and/or the NASDAQ;

c. On average, 40.3% of Tilray's float traded every week, permitting a ***very strong*** presumption of efficiency;

d. Tilray regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. Tilray was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

f. At least 20 firms made a market in Tilray securities;

g. New company-specific information was rapidly reflected in Tilray's stock price; and

h. Tilray met the requirements for filing a Registration Statement on Form S-3.

250. As a result of the foregoing, the market for Tilray's securities promptly digested current information regarding Tilray from all publicly available sources and reflected such information in Tilray's share price. Under these circumstances, all purchasers of Tilray's securities during the Class Period suffered similar injury through their purchase of Tilray's securities at artificially inflated prices and a presumption of reliance applies.

251. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information

that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

252. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

253. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

254. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tilray securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Tilray securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

255. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tilray securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tilray's finances and business prospects.

256. By virtue of his position at Tilray, Kennedy had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Kennedy acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to him. Said acts and omissions were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

257. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the CEO and a Director of Tilray, Kennedy had knowledge of the details of Tilray's internal affairs.

258. Kennedy is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, Kennedy was able to and did, directly or indirectly, control the content of the statements of Tilray. As an officer and director of a publicly-held company, Kennedy had a duty to disseminate timely, accurate, and truthful information with respect to Tilray's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public

statements, the market price of Tilray securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Tilray's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tilray securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and they were damaged thereby.

259. During the Class Period, Tilray securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tilray securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or they would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Tilray securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Tilray securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

260. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

261. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented statements regarding its prospects to the investing public.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act Against Kennedy

262. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

263. During the Class Period, Kennedy participated in the operation and management of Tilray, and conducted and participated, directly and indirectly, in the conduct of Tilray's business affairs. Because of his senior position, he knew the adverse non-public information about Tilray's misstatements regarding its business and operations.

264. As an officer and director of a publicly owned company, Kennedy had a duty to disseminate accurate and truthful information with respect to Tilray's operations, and to correct promptly any public statements issued by Tilray which had become materially false or misleading.

265. Because of his position of control and authority as a senior officer, Kennedy was able to, and did, control the contents of the various reports, press releases and public filings which Tilray disseminated in the marketplace during the Class Period concerning Tilray's results of operations. Throughout the Class Period, Kennedy exercised his power and authority to cause Tilray to engage in the wrongful acts complained of herein. Kennedy therefore, was a "controlling person" of Tilray within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Tilray securities.

266. By reason of his senior management positions and directorship of Tilray, Kennedy had the power to direct the actions of, and exercised the same to cause, Tilray to engage in the unlawful acts and conduct complained of herein. Kennedy exercised control over the general

operations of Tilray and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

267. By reason of the above conduct, Kennedy is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tilray.

**COUNT III**
**For Violation of §20A of the Exchange Act**
**Against Defendant Kennedy**

268. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count III is brought pursuant to §20A of the Exchange Act against Kennedy, on behalf of Plaintiffs who were damaged by Kennedy's insider trading.

269. As detailed herein, Kennedy was in possession of material, non-public information concerning Tilray. Kennedy took advantage of his possession of material, non-public information regarding Tilray to obtain millions of dollars in insider trading profits during the Class Period.

270. Kennedy's sales of common stock were made contemporaneously with Plaintiffs' purchases of Tilray common stock during the Class Period:

| Kennedy Transaction | | | Contemporaneous purchase | | | |
|---|---|---|---|---|---|---|
| Date | Number of shares sold | Total proceeds | Purchaser | Date | Number of shares purchased | Price |
| January 24, 2019 | 149,916 | $11,125,116.44 | Kassim | January 22, 2019 | 6,000 | $73.47 |
| | | | | January 23, 2019 | 1,000 | $72.00 |
| | | | Chandok | January 22, 2019 | 1,000 | $90 |
| March 1, 2019 | 87,139 | $6,986,082.09 | Kassim | March 4, 2019 | 1,000 | $76.15 |
| | | | | March 6, 2019 | 4,000 | $76.38 |
| | | | Rose | March 7, 2019 | 100 | $73.77 |
| | | | | | 100 | $72.00 |
| | | | | March 8, 2019 | 100 | $64.86 |
| April 1, 2019 | 106,109 | $6,731,994.23 | Kassim | April 1, 2019 | 4,000 | $63.46 |
| | | | Rose | April 4, 2019 | 100 | $60.93 |
| | | | | | 60 | $60.95 |
| | | | | | 40 | $60.98 |
| | | | | | 100 | $64.90 |
| | | | | | 100 | $60.94 |
| December 11, 2019 | 100,000 | $1,829,540.00 | Scoggin | December 5, 2019 | 238 | $18.78 |
| | | | | December 16, 2019 | 25 | $18.18 |

271. Plaintiffs who purchased shares of Tilray common stock contemporaneously with sales by Kennedy suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 27, 2023

Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

/s/ Jonathan Horne
Jonathan Horne (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs and the putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Jonathan Horne