**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GANESH KASILINGAM, individually and on behalf of all others similarly situated,

                Plaintiff,

- against-

TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,

                Defendants.

Case No. 20-cv-03459-PAC

**MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS'**
**MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

I.     Introduction.............................................................................................................1

II.    Factual Background ................................................................................................4

       A.     Tilray is a Leader in the Nascent Global Cannabis Industry. ....................4

       B.     The Farm Bill Spurs First-of-Its-Kind ABG Agreement...........................4

       C.     Tilray Expresses Continued Optimism But Warns of Risks and
              Uncertainty................................................................................................6

       D.     Privateer Proposes Mutually Beneficial Downstream Merger. ..................7

       E.     Developments at the End of 2019 Raise Concerns and Tilray Takes
              Action........................................................................................................8

       F.     Tilray's 2019 10-K Recognizes ABG Impairment and Writes Down
              Inventory. ..................................................................................................9

       G.     Tilray and Aphria Negotiate and Consummate a Merger. ........................10

III.   Legal Argument ....................................................................................................11

       A.     Heightened Pleading Standards Govern Plaintiffs' Claims......................11

       B.     The Challenged Statements Were True and Not Misleading.....................11

              1.    Timing and Vetting of the ABG Agreement....................................11

              2.    Statements Related to Inventory and Gross Margins.......................14

       C.     Plaintiffs Cannot Allege a Strong Inference of Scienter..........................19

       D.     Plaintiffs Cannot State a Section 20A Claim for Insider Trading. ...........25

IV.    Conclusion ...........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ...................................................................................................22

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)......................................................................19

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb, Co.*,
28 F.4th 343 (2d Cir. 2022) ...............................................................................................21

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..................................................................................................25

*In re Barclays Bank PLC Sec. Litig.*,
2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017).....................................................................17

*Chapman v. Mueller Water Prod., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020).................................................................................22

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018).................................................................................19

*Dempsey v. Vieau*,
130 F. Supp. 3d 809 (S.D.N.Y. 2015).................................................................................17

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023).................................................................................21

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................................12, 19

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)................................................................................................20

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008).................................................................................14

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)................................................................................................17

*In re Farfetch Ltd. Sec. Litig.*,
2021 WL 4461264 (S.D.N.Y. Sept. 29, 2021)....................................................................22

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018)....................................................................................17

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001).................................................................................................24

*Kasilingam v. Tilray, Inc.*,
   2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021)............................................................. *passim*

*In re Keryx BioPharmaceuticals, Inc. Sec. Litig.*,
   2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)..........................................................................22

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)...................................................................................17

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty.*
   *Ret. Ass'n v. MDC Partners, Inc.*,
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)................................................................22, 23

*New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) .................................................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................................................11, 18

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010).................................................................................................12

*Reilly v. U.S. Physical Therapy, Inc.*,
   2018 WL 3559089 (S.D.N.Y. July 23, 2018) .......................................................................22

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...............................................................................................23

*Russo v. Bruce*,
   777 F. Supp. 2d 505 (S.D.N.Y. 2011)...................................................................................24

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019)...................................................................................14

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..........................................................................................2, 11, 20, 21

*Woolgar v. Kingstone Companies, Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020)...................................................................................16

*In re Yukos Oil Co. Sec. Litig.*,
  2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..............................................................25

**Statutes**

15 U.S.C. § 78, *et seq.* .............................................................................................11, 25

Agriculture Improvement Act of 2018 .........................................................................1, 5

Controlled Substances Act ..............................................................................................5

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................11

Rule 10b5-1 ...............................................................................................................3, 20

**Other Authorities**

Alexander Beadle, *Canada's Edibles Market Gets Off to a Slow Start*, *Analytical
  Cannabis*, (Dec. 20, 2019),
  https://www.analyticalcannabis.com/articles/canadas-edibles-market-gets-off-
  to-a-slow-start-312161 ..............................................................................................10

Alicia Wallace, *CBD product sales are booming. Now the FDA needs to weigh in*,
  CNN Business (July 9, 2019), https://www.cnn.com/2019/07/09/business/cbd-
  sales-fda/index.html ..................................................................................................8

Ed Lin, *Marijuana Stock Tilray is Slumping. 2 Executives are Making Big Sales*,
  Barron's, Apr. 8, 2019 ..............................................................................................22

Ed Lin, *Tilray Executives are Selling the Marijuana Stock*, Barron's, Jan. 30,
  2019.............................................................................................................................22

FDA, *FDA warns 15 companies for illegally selling various products containing
  cannabidiol as agency details safety concerns*, (Nov. 25, 2019),
  https://www.fda.gov/news-events/press-announcements/fda-warns-15-
  companies-illegally-selling-various-products-containing-cannabidiol-agency-
  details ........................................................................................................................8

Martin Baccardax, *Tilray Falls as July 2018 IPO Lock-Up Expires for Cannabis
  Group*, The Street (Jan. 15, 2019),
  https://www.thestreet.com/investing/cannabis/tilray-extends-gains-as-july-
  2018-ipo-lock-up-expires-for-cannabis-group-14833952 ...........................................7

Nathaniel Meyersohn, *Barneys. Neiman Marcus. America's stores are taking the leap into cannabis products*, CNN Business (Feb. 13, 2019), https://www.cnn.com/2019/02/12/business/cbd-cannabis-dsw-neiman-marcus-barneys-retail.................................................................................................................5

## I.      INTRODUCTION

This is Plaintiffs' fourth failed attempt to state a coherent case against Mr. Kennedy ("Kennedy") and Tilray, Inc. ("Tilray" or the "Company"). Through four iterations of pleadings, Plaintiffs have cast about for a case theory that makes sense—something that could explain the ABG impairment-related stock drop that precipitated this lawsuit as the result of fraud. They have not found one, and the case has moved further and further afield from the issues that motivated it. In short, this latest complaint has no legal merit and should once again be dismissed.

Originally, this lawsuit was about the ABG Agreement. Tilray is a global leader in legal cannabis research, cultivation, processing, and distribution. From the beginning, strong branding has been a key component of Tilray's long-term vision, and it has cultivated partnerships with leading companies in a variety of industries. When the opportunity arose in early 2019 to join forces with Authentic Brands Group ("ABG")—a brand management company with a global portfolio—it seemed like the perfect partnership at the perfect time: the U.S. Agricultural Improvement Act of 2018 ("Farm Bill") had just been enacted and was widely viewed as opening up the U.S. market for CBD products.

Unfortunately, the industry's hopes and expectations for regulatory clarity and a quick path forward in the U.S. did not materialize. By the end of 2019, it had become clear that the FDA was not moving quickly to greenlight CBD, and major retailers who had previously expressed interest in CBD became reluctant to move forward. In light of these changed regulatory and market conditions, Tilray renegotiated the Agreement and conducted an impairment analysis. On March 2, 2020, the Company issued its 2019 10-K, announcing that it had impaired the ABG Agreement by $102.6 million due to "delayed clarity from the FDA regarding CBD products." Ex. 2[1] (2019

---

[1] "Ex. _" refers to exhibits to the Greene Dec. filed herewith. Internal quotation marks and citations are omitted.

10-K), at 67. The Company also wrote-down inventory by $63.5 million, in part to account for "excess product based on current sales forecasts, which have been reduced from previous estimates due to the slower than expected transition of the Canadian adult use market[.]" *Id.* at 64.

The stock dropped following that earnings announcement, and Plaintiffs filed suit just a few days later, claiming that the ABG Agreement was never worth what Tilray paid for it and should have been impaired immediately, and that defendants had lied about this (and the value of Tilray's inventory) in service of some vaguely alleged, illogical scheme to avoid future taxes. On September 27, 2021, this Court dismissed the First Amended Complaint ("FAC") holding that it failed to plead scienter. *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788, at *13 (S.D.N.Y. Sept. 27, 2021) ("*Tilray I*"). The Court rejected Plaintiffs' theory that Kennedy "deliberately inflate[d] Tilray's value … to finalize [the Privateer downstream merger]" so that he and two other non-defendant Privateer owners could "maintain voting control of Tilray while unlocking the ability to sell off Tilray shares in the future with a reduced tax burden." *Id.* at *7. The Court rightly found that this theory made no sense: any such tax benefit would be "dwarfed" by the "foreseeable post-collapse loss in value of [Tilray] stock" Kennedy possessed, setting him up to be "among those most harmed by the natural and intentional consequences of this purported scheme." *Id.* The Court also concluded that the anonymous former employee ("FE") allegations were too "vague, speculative, and conclusory" to show that Defendants were "insincere in the[] belief[s]" expressed in their challenged statements. *Id.* at *10-13. Correctly applying *Tellabs*, the Court held that "other, stronger [innocuous] inferences [] lurk[ed] within the [FAC]" and that, without a personal financial motive, the pleadings "fail[ed] to conjure the *strong* inference required under the [Reform Act]." *Id.* at *8. Accordingly, the Court dismissed the FAC, stating that Plaintiffs' claims were nothing more than "impermissible retrospective critique" and "fraud by hindsight." *Id.* at *9, 11.

2

The Second Amended Complaint (Dkt. #95; the "SAC"), filed a few months later, contained the same FE allegations but added two new theories of motive: (1) that stock sales Kennedy made under Rule 10b5-1 plans and in connection with tax obligations during the class period were unusual and suspicious; and (2) that he made false statements in order to effectuate the downstream merger with Privateer as a *first step* in a longer term scheme to make himself CEO of an even larger, combined cannabis company through a later merger. Aside from the stock sales themselves, however, no new factual allegations were offered in support of either theory, and, ultimately, the Court rejected these theories as well. *See* 8/21/23 Op. Granting Defs' Mot. for Reconsideration (Dkt. #129; "MFR Op."). The Court correctly found that the vast majority of Kennedy's sales were under 10b5-1 plans and therefore not unusual or suspicious (since no facts suggest he entered into them in bad faith), and that the only two sales not pursuant to 10b5-1 plans were insufficient to establish scienter. *Id.* at 7-9. The Court also rejected Plaintiffs' new two-step long-con theory, recognizing that motives "generally possessed by most corporate directors and officers do not suffice" and "Kennedy's push of the Aphria merger and the ABG Agreement 'could easily be a sign of simple ambition[.]'" *Id.* at 9. The Court dismissed the SAC giving Plaintiffs one final chance to plead a factually supported claim that makes sense.

They have not done so. The Third Amended Complaint (Dkt. #132; "TAC") is significantly reorganized and repackaged: Plaintiffs abandoned the vast majority of their claims related to the ABG Agreement—now challenging only three statements about the timing of the deal and that it was "vetted"—while bulking up their hindsight assertion that inventory should have been written down sooner. But the additions are cosmetic and completely fail to plead any new particularized facts to cure the previous complaints' deficiencies: there are still no particularized, probative FE allegations, no smoking guns, and no facts at all indicating Kennedy entered into his 10b5-1 plans

3

in bad faith. The same theories of motive still don't make sense. And there are still far more compelling, non-culpable inferences, including that Kennedy chose to hold onto and lock-up far more shares than he sold during the class period, setting himself up, on Plaintiffs' theory, to be one of the biggest losers in the fraud he supposedly perpetrated. Plaintiffs have had more than ample opportunity to plead this case; they cannot. Because the TAC fails to plead loss causation as to certain challenged statements, fails to plead falsity with respect to any of them, and still fails to plead a strong inference of scienter, the TAC should be dismissed in its entirety with prejudice.

## II.    FACTUAL BACKGROUND

### A.  Tilray is a Leader in the Nascent Global Cannabis Industry.

Tilray is a global pioneer in what has been widely expected to be a $150 billion cannabis industry. Ex. 2 (2019 10-K), at 2. In July 2018, Tilray held an initial public offering and became the first cannabis company to IPO in the U.S. and trade on NASDAQ. TAC ¶¶ 12, 38. The Company's products are available across five continents and fall into three main channels—global medical cannabis, Canadian adult-use cannabis, and hemp products, including CBD. Ex. 2 (2019 10-K), at 1-8. The Company's global growth strategy has long emphasized strong branding, in part by partnering with established industry leaders, including Sandoz AG (the generic division of Novartis) and Anheuser-Busch InBev. Ex. 3 (3/18/19 Tr.), at 3-4; Ex. 4 (2018 10-K), at 3.

### B.  The Farm Bill Spurs First-of-Its-Kind ABG Agreement.

Regulated medical cannabis has been legal in Canada since 2001, but it was not until October 2018 that Canada legalized recreational cannabis use. The Cannabis Act left the regulation of sales and retail stores to Canada's individual provinces, but it limited legal sales initially to certain dried cannabis and extracted oil products, with the expectation that new classes of edibles, topicals, and other non-combustibles ("2.0" products) would be permitted in October 2019. *See* Ex. 4 (2018 10-K) at 13; TAC ¶¶ 55-57; Ex. 12 (1/15/19 *Financial Post*), at 003.

4

Around the same time, the U.S. took its first major step towards legalizing certain cannabis products at the federal level. The 2018 Farm Bill—which was passed by the Senate and House of Representatives on December 11 and 12, 2018, respectively, and signed into law on December 20, 2018[2]—exempted hemp and hemp-derived products from the U.S. Controlled Substances Act, paving the way for nationwide sale of CBD (a non-psychoactive component in cannabis plants), while preserving the FDA's regulatory authority over CBD products. Ex. 4 (2018 10-K), at 22; TAC ¶ 46. This created broad optimism that the FDA would soon clarify the regulatory path forward, ushering in a new era of CBD products widely available in traditional retail venues.[3]

As momentum grew around CBD, more mainstream companies like Authentic Brands Group ("ABG") started taking an interest in cannabis. As Kennedy explained when announcing the deal on January 15, 2019, "[ABG] had been looking at the [cannabis] industry for about a year . . . looking at some of the U.S. operators as well as the Canadian licensed producers. We met with them pretty late in that process, really just in the last, I guess, six weeks or so." TAC ¶ 101; Ex. 12 (1/15/19 *Financial Post*), at 004 (ABG "met with many different licensed producers across Canada before settling on Tilray"). The parties viewed this as the right partnership at the right time; for Tilray, it was an attractive opportunity consistent with its long-term strategy of partnering with industry leaders and iconic brands.[4] *See* TAC ¶ 101; Ex. 13 (1/15/19 Tr.), at 2-3.

Tilray and ABG carefully negotiated and vetted the deal with assistance from sophisticated outside experts, including BofA Merrill Lynch, acting as Tilray's financial advisor for the deal, and law firm Paul, Weiss, as ABG's legal advisor. Ex. 5 (1/15/19 PR), at 005. On January 15,

---

[2] Agriculture Improvement Act of 2018, Pub. Law 115-334, 132 STAT. 4490, Dec. 20, 2018.
[3] *See, e.g.*, Nathaniel Meyersohn, "Barneys. Neiman Marcus. America's stores are taking the leap into cannabis products," *CNN Business*, Feb. 13, 2019, https://www.cnn.com/2019/02/12/business/cbd-cannabis-dsw-neiman-marcus-barneys-retail.
[4] *See also* Ex. 12 (1/15/19 *Financial Post*), at 002 (ABG brands generate ~$9 billion in annual sales).

2019, the parties announced their long-term revenue-sharing agreement (the "ABG Agreement"), pursuant to which they agreed to jointly develop, market, and distribute a portfolio of consumer cannabis products within ABG's brand portfolio worldwide, with immediate focus on CBD in the U.S. *Id.* Just a month after signing the ABG Agreement, Tilray further signaled its confidence in the U.S. CBD market, acquiring Manitoba Harvest—"the world's largest hemp food company"— for $317 million. Ex. 4 (2018 10-K), at 4; Ex. 3 (3/18/19 Tr.), at 4.

### C. Tilray Expresses Continued Optimism But Warns of Risks and Uncertainty.

In March 2019, Defendants expressed continued optimism about the Farm Bill, the ABG Agreement, and U.S. CBD momentum generally, as well as the new adult-use 2.0 form factors Canada planned to legalize later that year. *See* Ex. 3 (3/18/19 Tr.), at 5, 11; Ex. 4 (2018 10-K), at 3-4. At the same time, the 2018 10-K cautioned that the regulatory framework for CBD in the U.S.—and the future profitability of the ABG deal—remained uncertain, and outlined the potential impacts of these clearly identified risks. Ex. 4 (2018 10-K), at 22-23. It also warned of the many risks inherent in the nascent Canadian adult-use cannabis market, including that: "[it], and the regulations governing [it], may develop in a way that is significantly different from our current expectations;" it "may experience supply fluctuations" including possible over-production such that the "available supply of cannabis could exceed demand" resulting in significant price decline and/or an inability to sell oversupply; and that these and many other related risks could significantly impact profits. *Id.* at 19-20. In addition, the 10-K reflected certain common corporate growing pains: it identified a material weakness as of December 31, 2018 in Tilray's internal controls for financial reporting "relating to inventory costing and the financial close process" and explained how management was working to remedy this deficiency. *Id.* at 58. Still, Tilray's outside auditor, Deloitte LLP, concluded that the 10-K "present[ed] fairly, in all material respects, the financial position of the Company." *Id.* at F-2.

Tilray also consulted extensively with Deloitte and other experts about the ABG Agreement and worked closely with ABG to develop product plans as quickly as possible.[5] In the March and May earnings calls, Tilray described how it was receiving large numbers of contacts from consumer packaged good ("CPG") companies and retailers interested in potential CBD partnerships, in part because its existing partnerships with industry giants gave it credibility.[6] At the same time, the Company acknowledged that not all U.S. retailers were comfortable yet. Ex. 1 (5/14/19 Tr.), at 18. And Defendants noted continued uncertainty with respect to the Canadian 2.0 market: while the industry expected 2.0 factors to be legalized in October 2019, this could get pushed out to December 2019 or even later, which could impact operations and financials.[7]

### D. Privateer Proposes Mutually Beneficial Downstream Merger.

Amidst all this excitement, Tilray and its founder and majority stockholder—private equity firm Privateer Holdings (started by Mr. Kennedy and two others)—also were working to unwind Privateer's interest in Tilray. Following Tilray's IPO, Privateer held approximately 82% of Tilray's economic interest, but all of its shares were subject to a six-month lockup. TAC ¶¶ 12-13, 38; Ex. 11 (2Q18 10-Q), at 039. Rather than sell those shares for billions of dollars when the lockup expired in January 2019, Mr. Kennedy and the other Privateer investors announced ahead of time that, for the time being, Privateer would continue to hold its shares to avoid the negative impact that large sales might have on Tilray's stock price.[8] After negotiations, Tilray and Privateer arrived at a mutually beneficial path forward: a downstream merger through which Tilray would cancel all of Privateer's existing shares and issue new shares to each Privateer investor while maintaining

---

[5] *See* Ex. 3 (3/18/19 Tr.), at 14; Ex. 1 (5/14/19 Tr.), at 18.
[6] Ex. 1 (5/14/19 Tr.), at 9, 12; Ex. 3 (3/18/19 Tr.), at 12-13.
[7] *See* Ex. 1 (5/14/19 Tr.), at 7-8, 11-16; Ex. 3 (3/18/19 Tr.), at 11.
[8] *See* Ex. 19, at 002; Martin Baccardax, "Tilray Falls as July 2018 IPO Lock-Up Expires for Cannabis Group," Jan. 15, 2019, The Street, *https://www.thestreet.com/investing/cannabis/tilray-extends-gains-as-july-2018-ipo-lock-up-expires-for-cannabis-group-14833952*.

the founders' voting control; in turn, Privateer investors agreed to lock up their newly issued shares with phased release controlled by Tilray's board. This transaction served all parties' interests, allowing Privateer to unwind, ensuring orderly, controlled release of its large number of Tilray shares, and providing tax benefits to *all* Privateer investors if and when they sold their shares.[9] On December 12, 2019, Tilray stockholders approved the downstream merger. *Id.* ¶¶ 171-79.

### E.  Developments at the End of 2019 Raise Concerns and Tilray Takes Action.

Enthusiasm around CBD lasted well into the latter half of 2019,[10] but the longer the FDA's process dragged on, the more reluctant retailers became to stock CBD products. CFO Mark Castaneda explained on the August and November earnings calls that, while they were still seeing significant retail interest in topicals, they were starting to see "a lot of the major retailers holding off, especially on the ingestible products until they have more clarity. As that clarity comes in the second half, we see a significant ramp in the second half of the year. If it does not, we see a much slower ramp on … the ingestible side." Ex. 6 (8/13/19 Tr.), at 13; Ex. 7 (11/12/19 Tr.), at 11, 17.

On November 25, 2019, however, the FDA surprised the industry: that day it sent warning letters to 15 companies for selling CBD products in illegal ways and revised its Consumer Update to state that the FDA could not conclude that CBD is "generally recognized as safe (GRAS)."[11] After months of silence, these actions signaled that the FDA still had substantial concerns, leading more retailers to hold off on CBD products. This new landscape had consequences for Tilray's ABG partnership as well—ABG's updated year-end sales projections showed that the Agreement's path to profitability would take longer than anticipated. Tilray consulted with

---

[9] *See* TAC ¶¶ 167-69; Ex. 8 (9/10/19 8-K), at 009.

[10] *See, e.g.*, Alicia Wallace, "CBD product sales are booming. Now the FDA needs to weigh in," *CNN Business*, July 9, 2019, *https://www.cnn.com/2019/07/09/business/cbd-sales-fda/index.html* (describing retail, consumer interest).

[11] *See* FDA, "FDA warns 15 companies for illegally selling various products containing cannabidiol as agency details safety concerns," Nov. 25, 2019, *https://www.fda.gov/news-events/press-announcements/fda-warns-15-companies-illegally-selling-various-products-containing-cannabidiol-agency-details*.

Deloitte and other experts to evaluate the financial and accounting impacts of the revised forecast, including an impairment analysis, and in January 2020, Tilray renegotiated the ABG Agreement to reflect the altered regulatory and commercial landscape and the parties' revised expectations.

### F.  Tilray's 2019 10-K Recognizes ABG Impairment and Writes Down Inventory.

Pursuant to GAAP and with assistance from outside experts, Tilray conducted an impairment analysis on the ABG Agreement and determined that the fair value was below the carrying value. Ex. 2 (2019 10-K), at F-35. It recognized "[a]n impairment of $112.1 million . . . in 2019 primarily due to the analysis of future cash flows . . . which have been reduced due to the delayed clarity from the FDA regarding CBD products in the United States." *Id.* at 67.

The 2019 10-K also announced inventory write-downs based on developments in the Canadian adult-use market. Throughout 2019, Tilray had valued certain "byproduct"— specifically, the usable portion of "trim" that could be sold in bulk and/or extracted for use in oil and other non-combustible products—as inventory, pursuant to GAAP, based on current bulk and extracted oil sales and the judgment that there would be additional, significant demand for this byproduct when Canada permitted the sale of 2.0 products in late 2019. Ex. 7 (11/12/19 Tr.), at 8-9. Inventory had grown significantly over the calendar year—both at the Company's new Portugal facility, as it awaited the final certifications that would allow it to sell that inventory, and in Canada, where "based on current regulations, we primarily sell flower and flower byproducts, which leaves byproducts for extraction in large supply." *Id.* In June 2019, Canada had enacted the anticipated new regulations permitting sale of 2.0 products later in the year, but it required producers to submit their products to the government for approval prior to sale, and that review period meant that sales could not start until December 16, 2019. TAC ¶ 61. Thus, in the fall of 2019, Tilray still expected that its byproduct inventory would ultimately be used or sold—it was simply a matter of timing. Ex. 7 (11/12/19 Tr.), at 8-9. ("We expect this inventory imbalance to

9

continue until we are able to convert this inventory to 2.0 products. We expect inventory levels to start to decrease throughout 2020."). When the Canadian 2.0 market opened in December 2019, however, it became apparent that it would not grow as rapidly as expected.[12] As a result, Tilray—like many of its competitors—wrote down inventory to match this new reality: "The total inventory valuation adjustment of $63.5 million . . . reflects our estimate of excess product based on current sales forecasts, which have been reduced from previous estimates due to the slower than expected transition of the Canadian adult use market[.]" Ex. 2 (2019 10-K), at 64. As CFO Michael Kruteck[13] explained in May 2020, Tilray also decided to value byproduct at zero moving forward to avoid significant write offs in future in light of current market conditions. *See* TAC ¶ 128.

### G. Tilray and Aphria Negotiate and Consummate a Merger.

Notwithstanding these challenges, Tilray never lost faith in the global cannabis industry's potential. In October 2019, a unique opportunity presented itself: a representative from an investment bank contacted Kennedy and Andrew Pucher, Tilray's Chief Corporate Development Officer, to propose a meeting with Irwin Simon, the Chairman and CEO of Aphria Inc. ("Aphria"), an Ontario-based cannabis company. Ex. 9 (3/12/21 Proxy), at 009; TAC ¶ 196. On November 22, 2019, Mr. Pucher and Mr. Simon held that initial meeting (Kennedy was not in attendance) wherein they agreed that the companies' global operations were "highly complementary" (*id*.), and six days later, Aphria and Tilray entered into a mutual non-disclosure agreement governing negotiation of a potential transaction. TAC ¶¶ 197-99. On February 14, 2020, Tilray provided Aphria with an initial draft of a non-binding term sheet, which contemplated an all-stock merger wherein Tilray and Aphria shareholders would respectively own 56% and 44% in the combined company

---

[12] *See* Alexander Beadle, "Canada's Edibles Market Gets Off to a Slow Start," *Analytical Cannabis*, Dec. 20, 2019, *https://www.analyticalcannabis.com/articles/canadas-edibles-market-gets-off-to-a-slow-start-312161*.
[13] The TAC incorrectly attributes this statement to Kennedy. *See* Ex. 21 (5/11/20 Tr.), at 13; TAC ¶ 128.

(reflecting Tilray's higher share price and market capitalization), with Kennedy as CEO and Mr. Simon as Executive Chairman. *Id.* ¶ 201. In late March, however—amid pandemic-induced, global stock slides and volatility—the share prices of Tilray and Aphria began to converge, and Tilray revised the offer to contemplate a 50/50 equity split. *Id.* ¶ 210. Negotiations continued throughout 2020, and, on December 15, 2020, the parties agreed to an equity split of 62%-38% for Aphria and Tilray, respectively, (now reflecting Aphria's higher share price), with Mr. Simon as CEO and Kennedy as a director. *Id.* ¶¶ 211-13; Ex. 9 (3/12/21 Proxy), at 018, 020.

## III.    LEGAL ARGUMENT

### A.  Heightened Pleading Standards Govern Plaintiffs' Claims.

Securities claims must meet the heightened standards of the Private Securities Litigation Reform Act ("Reform Act") and Rule 9(b). Under Section 10(b), in addition to pleading materiality and loss causation, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and, "state with particularity facts giving rise to a strong inference" that it was made with scienter. 15 U.S.C. §§ 78u-4(b)(1)(B), (2)(A). For both falsity and scienter, courts must consider the full factual context of the statements and conduct at issue. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323-24 (2007).

### B.  The Challenged Statements Were True and Not Misleading.

After much revision, the TAC now challenges only a handful of statements in two categories, concerning: (1) the timing and vetting of the ABG Agreement, and (2) Tilray's inventory—how and when its value was assessed, the reported valuations, and Kennedy's Sarbanes-Oxley ("SOX") certifications attesting to his belief in the fairness of each quarterly financial filing. None of these statements was false or misleading or can ground Plaintiffs' claims.

#### 1.  Timing and Vetting of the ABG Agreement

11

The TAC challenges only three, limited statements by Kennedy related to the *timing* of and *vetting process* for the ABG Agreement:

- On Jan. 15, 2019, at the ICR Conference, that "[w]e met with [ABG] pretty late in that process [of ABG evaluating potential cannabis partners], really just in the last, I guess, six weeks or so." (TAC ¶ 101);

- On Jan. 16, 2019, as quoted in a *Financial Post* article, that "They [ABG] liked our focus on research and science, and when the U.S. Farm Bill passed things started coming together" (*id.* ¶ 103); and

- On the May 14, 2019 earnings call, that "we know how to partner well not only with pharmaceutical and alcohol companies but with companies like [ABG].... They went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone" (*id.* ¶ 106).

Plaintiffs offer no explanation as to why statements about the timing and vetting of the ABG Agreement would have been important to investors separate from optimistic statements about its value and prospects, which Plaintiffs no longer challenge. Even if they were material, the statements did not cause Plaintiffs' loss: the alleged partial corrective disclosures—Tilray's announcements on January 30, 2020 that the ABG Agreement had been amended, and on March 2, 2020, that it had been impaired and Tilray's inventory written down—did not reveal any previously hidden truth about how long it took the parties to negotiate the ABG Agreement or the extent to which ABG vetted Tilray. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (plaintiff must show "a sufficient connection between [the false statement] and the losses suffered").

In any case, the statements in this category were true and not misleading accounts of how the deal came together. Plaintiffs argue the statements were false and misleading because "ABG and Tilray did not discuss any agreement before the U.S. Farm Bill or for anything like the six weeks" Kennedy indicated, and ABG must not have vetted Tilray because the Agreement "was proposed, negotiated, and closed within a matter of days." TAC ¶¶ 104, 107. But this is pure

12

speculation, and the record before the Court suggests otherwise. ABG had been looking at U.S. and Canadian producers for about a year and came to Tilray late in that process, "really just in the last, I guess, six weeks or so"[14] (indicating early-mid December 2018); "they liked our focus on research and science, and when the U.S. Farm Bill passed" (on December 11 and 12, 2018, signed by the President on December 20) "things started coming together." TAC ¶¶ 101, 103. These statements are consistent with one another and with what was happening at the time—it makes perfect sense that a partnership focused on the U.S. CBD market came together quickly once the Farm Bill passed, especially when ABG had been considering potential partners for a year already and both parties were anxious to move quickly into the new U.S. CBD market.

No factual pleadings support Plaintiffs' allegations. Instead, Plaintiffs rely entirely on FE3's conclusory assertions—that "the ABG Agreement was proposed, negotiated, and closed in literally a matter of *days*"; that Kennedy and another Tilray representative "barely consulted" with others at Tilray about it; and that Kennedy orchestrated the deal to "prop up Tilray's stock [price]"—to show that the deal was negotiated in a far shorter period than the statements indicated and with minimal due diligence. TAC ¶ 99. But these fatally vague allegations show no such thing. FE3 fails to allege a basis for personally knowing any of this: he does not claim to have been involved in Tilray's negotiations with ABG; to have any other basis for personally knowing when the negotiations started, how they proceeded, or what Tilray or ABG did to vet one another; or to have personally interacted with Kennedy (or anyone from ABG) at any time, in connection with the ABG Agreement or otherwise.[15] This it too vague even for the Court to consider these allegations, much less to show that the timeline was other than Kennedy described, or that ABG

---

[14] On its face, this is a rough estimate of timing and not a precise account; it also is consistent with his other statements.
[15] FE3 also baldly asserts that it was "immediately very clear" that the ABG Agreement was not worth what Tilray paid for it (TAC ¶ 100), but offers no personal-knowledge basis for that assertion; in any case, it has nothing to do with the challenged statements, which concerned how long negotiations took and whether ABG "vetted" Tilray.

did not "vet" Tilray. *See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (CW allegations must be sufficiently detailed "to support the probability that a person in the position occupied by the source would possess the information alleged.").[16] In any case, "a matter of days" is so vague as to be utterly meaningless; six days, six weeks, or six months each is a "matter of days." And even a relatively short period of negotiations does not suggest that the deal was insufficiently vetted by the parties and sophisticated outside experts who assisted with this deal. *See supra* 5-6. As the Court previously found, "FE 3's characterization of the company's due diligence merely reflects FE 3's *own* 'insufficiently particular' perception" (*Tilray I*, at *10); it does not establish that the due diligence was insufficient or undercut the undisputed fact that ABG conducted due diligence on Tilray. Moreover, the fact that Tilray was partnering with industry leaders like Sandoz, InBev, and ABG, almost certainly did (as Kennedy stated) give CPG companies comfort that Tilray was a strong potential partner.

### 2.  Statements Related to Inventory and Gross Margins.

The TAC also challenges substantially similar language in Tilray's 1Q, 2Q, and 3Q 2019 Form 10-Qs (i) describing how Tilray estimated inventory value, and when it assessed inventory for obsolescence; (ii) reporting quarterly inventory and gross margins; and (iii) attesting to Kennedy's belief that each quarterly report fairly presented Tilray's financial condition. TAC ¶¶ 108-117. Plaintiffs argue each of these challenged statements was false or misleading for the same reason: Tilray allegedly overstated inventory throughout 2019 by including "unsellable marijuana plant trim" in violation of GAAP, as evidenced by its write down at the end of the fiscal year. *Id.*

---

[16] *See also Tilray I*, at *9 ("Courts have generally been hostile to non-particular allegations from [CWs]' … where such allegations are conclusory, vague, or otherwise 'insufficiently particularized.'"); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (allegation that CW was "intimately involved" in clinical trials did not show basis for personally knowing about all aspects of trials or what defendants knew). The vague allegation that FE3 was "heavily involved in strategic initiatives" is nearly identical to *Elan*'s insufficient CW pleadings. TAC ¶ 42.

¶¶ 113-14, 117. This is classic fraud-by-hindsight, unsupported by any factual allegations.

### *Descriptions of How Tilray Estimated Inventory and When It Assessed for Obsolescence.*

Each of Tilray's 2019 quarterly filings described Tilray's inventory valuation as follows:

> Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and *by-products to be extracted.* . . . Inventory is stated at *the lower of cost or net realizable value* . . . . Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation.

TAC ¶¶ 111 (emphasis added). Plaintiffs claim Tilray was secretly not following this procedure (and violating GAAP) because it "recognized marijuana plant trim as inventory" when "there was no ready market" or "immediate use" for it (TAC ¶ 113), but this is demonstrably incorrect. As an initial matter, the description itself explicitly states that inventory included "work-in-progress such as . . . by-products to be extracted"; even if this had been inconsistent with GAAP (it was not), it was clearly disclosed. And this makes perfect sense because there *was* a market for trim and extract throughout the class period—it simply was not as large as Tilray and the industry believed it would be when the 2.0 market opened later in 2019.[17] Each quarterly report reflected that inventory was increasing and that Tilray was selling both trim in bulk and "extract" products derived from trim.[18]

Against this record evidence, Plaintiffs offer only vague and irrelevant allegations from anonymous FEs to show that "much of Tilray's inventory consisted of unsellable products, some of which had already begun to go to waste." TAC ¶ 70. The FE allegations do no such thing. FE1, who allegedly worked as a R&D Manager many administrative levels below Kennedy, claims that she "was told" in December 2019 that a lot of trim had accumulated (does not say when) and that she "learned" it "had never been worth anything" (again, no details or personal-knowledge basis

---

[17] Plaintiffs previously "concede[d] that there is at least some market for trim." *Tilray I*, at *13; FAC ¶ 30.

[18] *See* Ex. 14 (1Q19 10-Q), at 18, 23; Ex. 15 (2Q19 10-Q), at 20, 25; Ex. 16 (3Q19 10-Q), at 20, 24, 27; Ex. 2 (2019 10-K), at 3, 63 ($24M in extracts were 23% of 2019 cannabis revenue; $25M in bulk); Ex. 7 (11/12/19 Tr.), at 12-13.

pled). TAC ¶¶ 71-72. She also vaguely alleges that she saw "bags and bags, and boxes and boxes" of trim in a warehouse at some unspecified time. *Id.* ¶ 73. But FE1 fails to allege any personal-knowledge basis for her central, conclusory assertion that the trim "had never been worth anything."[19] And even crediting the vague allegations that she saw large amounts of trim sitting in a warehouse, and that someone told her *in December 2019* that Tilray had accumulated "large quantities of unusable materials," those allegations are consistent with Tilray's determination at the end of 2019 that it should write down inventory, as announced on March 2, 2020. None of these vague allegations suggests Tilray was not valuing inventory as described in the 10-Qs.[20]

Nor do any factual allegations suggest the Company did not, "[a]t the end of each reporting period . . . perform[] an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value." TAC ¶¶ 116, 129. Plaintiffs claim this must not have been true because if Tilray had been performing quarterly assessments it would not have had such a large write down at the end of 2019. But, once again, this is pure speculation: Tilray *was* assessing inventory quarterly, as demonstrated by the inventory write downs reported in each Form 10-Q,[21] and it was valuing inventory at cost;[22] no factual pleadings suggest otherwise. FE1's allegation that she "was told" in June 2019 that "numerous pallets of marijuana" (*not* trim) "had developed mold and could not be used," has nothing to do with trim or valuation of trim; indeed, it does not even say whether the purportedly moldy marijuana was counted as inventory at any time. And

---

[19] As an "R&D Manager"—not part of the Finance team—FE1 likewise offers no personal-knowledge basis for her bare assertion that "Tilray did not record an internal valuation for its end-of-run materials" (TAC ¶ 75), much less any explanation as to how that assertion, even if true, would undercut any specific challenged statement.

[20] *See Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 218-22 (S.D.N.Y. 2020) (CW allegations too vague to show falsity); *Tilray I*, at *12 ("Aside from being insufficiently particularized, these confidential reports again simply depict discord among Tilray staff regarding the potential marketability of these materials.").

[21] Ex. 14 (1Q19 10Q), at 9 (specifying quarterly inventory "write downs within work-in-process"); Ex. 15 (2Q19 10Q), at 9 (same); Ex. 16 (3Q19 10Q), at 10 (same; showing $726K in inventory write-downs over Q1-Q3 2019, $1.5M in inventory write-downs over Q1-Q3 2018); *see also* TAC ¶ 129 (reflecting quarterly write-downs).

[22] Ex. 6 (8/13/19 Tr.), at 11 ("[B]ecause we're U.S. GAAP, we're reporting costs. We don't mark up our inventory.").

even assuming FE2 (a "Senior Manager of Purchasing" many levels below Kennedy) had personal knowledge of his allegations (this is not sufficiently pleaded), his assertion that Tilray accumulated formulated oils for use in a new wellness brand and continued to value them as inventory after "kill[ing] the brand" is too vague and "unmoored in time" to show Tilray did not perform any particular quarterly inventory assessment or that any inventory valuation was wrong.[23] *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018); TAC ¶ 77, 113-14.[24]

In short, no particularized, factual pleadings show Tilray was not valuing inventory (or assessing it for obsolescence on a quarterly basis) as described in its Form 10-Qs. This is fatal to all of Plaintiffs' other inventory-related claims as well, as detailed below.

***Inventory Valuations & Gross Margins.*** With the wisdom of hindsight, Plaintiffs claim that the inventory estimates reported in the 1Q, 2Q, and 3Q 10-Qs—and the gross margins based on those estimates—were false and misleading because inventory should have been written down sooner. But the fact that Tilray's valuation of trim byproduct, based in part on expectations for the 2.0 market, proved too optimistic does not suggest that Kennedy did not believe these opinion statements at the time or that they were misleading in context. *Tilray I*, at *13; *Dempsey v. Vieau*, 130 F. Supp. 3d 809, 818 (S.D.N.Y. 2015) (no falsity based on inventory write-downs where plaintiff "failed to allege … Defendants did not honestly believe the opinion").

Inventory valuations are estimates involving complex, subjective judgment calls, and thus constitute opinions under the securities laws. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *8 (S.D.N.Y. Sept. 13, 2017) ("[v]aluations . . . are subjective statements of opinion [] and actionable only if they

---

[23] Nor did anyone "admit" on the May 11, 2020 call that Tilray reviewed inventory only at year-end; CFO Kruteck merely referenced the recent year-end write-down in explaining Tilray's approach moving forward. *Supra* n.13.
[24] *See also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799-800 & nn.19-21 (S.D.N.Y. 2020) (collecting cases where CW allegations disregarded as "insufficiently particular" or unable to "situate in time relevant occurrences").

[satisfy *Omnicare*].”); Ex. 2 (2019 10-K), at F-18-19 (inventory valuations are “based on estimated forecast of product demand, . . . market conditions, regulatory environment, and spoilage”). For an opinion to be false or misleading, a plaintiff must do more than allege that it turned out to be wrong: he must plead (1) facts showing the speaker did not actually hold the stated belief; or (2) particular facts that rendered the opinion “misleading to a reasonable person reading the statement fairly and in context.” *Omnicare*, 575 U.S. at 188-89, 194. This is “no small task.” *Id.*[25]

Here, no CW allegations or other facts suggest Kennedy did not believe the reported inventory valuations or rendered them misleading in context. *Supra* 15-19. The record reflects that Defendants (like their competitors) genuinely believed the byproduct recorded as inventory had both present and future value: Tilray was currently selling portions of it in bulk and using it to create and sell extract products and expected to sell and use even more of that inventory after the Canadian 2.0 market opened in late 2019. *Supra* 9-10, 15-19. Thus, CFO Castaneda explained that the increasing inventory balances were part of a strategic plan—even as late as November 2019, Tilray was accumulating large amounts of by-product reasonably expecting to sell it in the near future. Ex. 7 (11/12/19 Tr.), at 8-9. The fact that the estimated value did not fully materialize does not mean these opinion statements were false, or that Tilray was required to write down inventory earlier. Once the 2.0 market opened in December 2019, it became clear that the small number of provincial retail outlets was limiting demand for 2.0 products and that the industry had an oversupply of by-product and extracted oils. *Supra* 10. At that point, in light of new market conditions, Tilray appropriately wrote down inventory and chose to value byproduct at zero moving forward. But neither of those changes suggests that earlier valuations were wrong (or that Kennedy knew or believed them to be so); indeed, Deloitte gave extra scrutiny to Tilray’s

---

[25] *See also New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 171 (2d Cir. 2023).

inventory accounting in 2018 and 2019, in light of the identified material weakness, and no financials were ever restated. *Supra* 6. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud" (*Tilray I*, at *11), and they cannot establish that Tilray's 2019 quarterly inventory valuations were false or misleading.

The same is true for the gross margins reported in Tilray's quarterly filings (TAC ¶ 112): these too were statements of opinion, based on estimated inventory and other subjective judgments, and Plaintiffs fail to allege any facts showing that Kennedy did not believe these reported estimates or that they were misleading in context.[26] Whereas previous iterations of the complaint included additional (equally insufficient) FE allegations related to internal cost recording systems (SAC ¶¶ 47-54), those have been removed from the TAC, which now relies on the same falsity pleadings for both reported inventory and gross margins.

***SOX Certifications.*** Finally, Plaintiffs challenge Kennedy's attestations that, "based on [his] knowledge," each 2019 10-Q did not "contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made [] not misleading" and "fairly present[ed] in all material respects [Tilray's] financial condition." TAC ¶¶ 108-10. These too are true and not misleading statements of opinion. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *24 (S.D.N.Y. Sept. 9, 2019) (dismissing SOX certification claims where facts failed to show certifying officers did not believe them); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) (same). As discussed *supra*, no facts suggest Kennedy did not believe his certifications at the time, or that they were misleading in context.

## C. Plaintiffs Cannot Allege a Strong Inference of Scienter.

Plaintiff's claims also fail for lack of scienter. To plead scienter, Plaintiff must state "with

---

[26] Plaintiffs also fail to plead loss causation with respect to these statements: they do not allege that any "hidden truth" was revealed about gross margins—as opposed to inventory—causing their alleged losses. *See Dura*, 544 U.S. at 345.

particularity" facts giving rise to a "strong inference" that each Defendant acted with "an intent to deceive, manipulate, or defraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Plaintiffs must plead particularized facts showing (i) motive and opportunity for fraud or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Either way, the strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. Unlike other motions to dismiss, this "inherently comparative" inquiry requires courts to holistically weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24.

Here, there was no motive and non-fraudulent inferences abound. Over four complaints, Plaintiff's theory of motive has shifted from one improbable scheme to the next; none makes sense or has any factual support. The centerpiece of Plaintiff's latest theory is the baseless assertion that Kennedy lied to investors so that he could sell stock at artificially inflated prices before Tilray "predictably" had to write down inventory and impair the ABG Agreement. TAC ¶ 2. But this still makes no sense in context: Kennedy retained ownership of far more shares than he sold during the class period, meaning that he lost far more in stock value when the price dropped following the "predictabl[e]" corrective disclosures than he made on his class-period sales. *Id.* Moreover, all but two of his sales were pursuant to Rule 10b5-1 plans; as the Court found, this "makes Kennedy's unexplained stock sales less numerous, less lucrative, and less consistent within the Class Period, and therefore less probative of scienter." MFR Op. 8. "Absent sufficient allegations regarding Kennedy's financial benefit, Plaintiffs' arguments that he sought to be the leader of the cannabis world through the Aphria merger"—advanced again in the TAC, based on the same allegations— "appear significantly weaker and fail to cure the deficiencies plaguing [past complaints]." *Id.* at 9.

20

These findings apply equally to the TAC: aside from the dates of Kennedy's 10b5-1 plans and sales (which were already before the Court on the last MTD[27]), the TAC fails to allege any new facts in support of its previously rejected motive theories. Of particular note, the TAC still fails to allege any facts suggesting "Kennedy entered into the 10b5-1 plans in bad faith." MFR Op. 5. In *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb, Co.*, 28 F.4th 343 (2d Cir. 2022), the Second Circuit found the defendants' stock sales were not sufficiently "unusual or suspicious" to show motive because "the vast majority of the sales were conducted pursuant to a 10b5-1 trading plan or were executed for procedural purposes." *Id.* at 355-56. This was true "even though the defendant 'entered into such plan during the putative class period'—because, crucially, the complaint itself did not allege that the plan was entered into in bad faith." MFR Op. 5 (quoting *Bristol-Myers Squib*); *see In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 (S.D.N.Y. 2023) (no scienter where sales were pursuant to 10b5-1 plans entered into during class period). Here, as the Court previously found, twelve of Kennedy's fourteen class-period stock sales were pursuant to 10b5-1 plans,[28] and no factual pleadings suggest they were entered into in bad faith.[29] The remaining two sales (on January 24, 2019 and April 2, 2019) were made to satisfy Kennedy's immediate tax withholding obligations upon vesting of Restricted Stock Units ("RSUs"), as provided for in Tilray's Equity Incentive Plan and RSU Grant Notice.[30] Sales of shares "executed

---

[27] *See* Dkt. #102-10 (Kennedy Forms 4); Dkt. #104-5 (Kennedy Forms 144).

[28] *See* Ex. 10 (Forms 4), at 006-9, 013, 019-21. The TAC incorrectly states that the sales on Jan. 13, 2020 were not pursuant to a 10b5-1 plan (TAC ¶¶ 140, 151), but they were under a 10b5-1 plan adopted on Sept. 30, 2019. Ex. 10 (Forms 4), at 019-20; Ex. 17 (Forms 144), at 005-6. The only class-period sales not pursuant to 10b5-1 plans were on Jan. 24, 2019 (149,916 shares), and Apr. 2, 2019 (18,970 shares). Ex. 10 (Forms 4), at 005, 008.

[29] The fact that the SEC recently instituted a new 90-day "cooldown" period between adoption of a 10b5-1 plan and first sale cannot suggest that any of Kennedy's 10b5-1 plans were entered into in bad faith. Kennedy followed the rules in place at the time of his plans and sales.

[30] *See* Ex. 10 (Forms 4), at 005, 008-9; Ex. 11 (2018 Equity Incentive Plan), at 062; Ex. 11 (RSU Grant Notice), at 079; Ex. 11 (Employment Agreement), at 085-86; *see also* Ex. 19 (Ed Lin, *Tilray Executives are Selling the Marijuana Stock*, Barron's, Jan. 30, 2019) ("The sales . . . were a matter of complying with Tilray's vesting policy for [RSUs]"); Ex. 20 (Ed Lin, *Marijuana Stock Tilray is Slumping. 2 Executives are Making Big Sales*, Barron's, Apr. 8, 2019).

to cover the tax withholding obligations due upon the vesting of shares of restricted stock . . . are not indicative of fraud." *In re Keryx BioPharmaceuticals, Inc. Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014).[31]

Nor were Kennedy's sales suspicious in amount. Plaintiffs disingenuously assert that the 643,164 shares he allegedly sold during the class period represent "79.9% of the shares he had available to sell," but this improperly excludes millions of available stock options, which Kennedy could have exercised and sold for significant gain.[32] *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (including options in calculating sales as percentage of holdings). Regardless, only two sales were not made pursuant to 10b5-1 plans (on January 24 and April 2, 2019), and those sales represent just 7.9% and 1.1%, respectively, of the vested shares and exercisable options Kennedy could have sold on those dates.[33] These are far below what courts in this district have required even to support scienter, much less to show scienter solely through stock sales.[34] Moreover, Kennedy's overall holdings increased substantially over the class period,[35] and most of those shares were locked up until long after the alleged fraud inevitably came to light, meaning he lost far more stock value in the purported fraud than he is alleged to have gained from class-period

---

[31] *See also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (collecting cases). Plaintiffs also allege the January 24 sale timing was suspicious in light of two late-2018/early-2019 interviews in which Kennedy reportedly said he did not expect to sell his Tilray shares when the IPO lockup lifted (TAC ¶¶ 141-42). But it is clear in context that he was talking about not cashing in his substantial, long-term holdings—very different than selling newly-vested shares to cover a tax burden, as was the case for the January 24 sale.

[32] TAC ¶ 140 & n.17; Ex. 10 (7/18/18 Form 3; Form 4s), at 001-4. In addition to being wrong, this is inconsistent with Plaintiffs' own previous calculations of total shares available to sell. Dkt. #104-1 (Horne Ex. 1), at 1-2.

[33] *See* Ex. 10 (Forms 4) (showing 1,889,706 vested shares and exercisable options on 1/24/19; 1,799,887 on 4/2/19). Including *unvested* options and shares, these sales percentages fall to 3.6% and 0.5%, respectively. *Id.* (showing 4,108,441 vested and unvested shares and options on 1/24/19; 3,784,247 on 4/2/19); *see also Acito*, 47 F.3d at 54 (including both vested and unvested options in calculation of available shareholdings).

[34] *See, e.g., In re Farfetch Ltd. Sec. Litig.*, 2021 WL 4461264, at *5 (S.D.N.Y. Sept. 29, 2021) (no stock sale motive where defendant sold 50% of his shares; retaining 50% showed he "remained heavily invested" in the company); *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (same re sale of 65.6%); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (same re sale of 44%).

[35] Even excluding the 14,032,762 locked-up shares Kennedy directly controlled after the Privateer downstream merger, he obtained 1,066,400 shares from the vesting of RSUs and options during the class period, over 300,000 more than he sold during the class period, including sales pursuant to 10b5-1 plans. *See* Ex.10 (Forms 4).

22

sales.[36] This cuts strongly against scienter. *See MDC Partners*, 2016 WL 5794774, at *19 n.9.

Unable to allege any personal financial motive for Kennedy, the TAC, like the SAC, asserts an elaborate, multi-step scheme, in which Kennedy allegedly made false and misleading statements to effectuate the downstream merger with Privateer as a "first step" in a longer con to propel Kennedy to CEO of the "world's largest cannabis company." TAC ¶ 31. This remains pure speculation, unsupported by facts. Plaintiffs rely on prescient public statements Kennedy made about the cannabis industry—the remarkable market opportunity, the likelihood of consolidation, his desire to position Tilray as one of the industry's leaders—as evidence of the scheme Plaintiffs posit. But Kennedy's vision on Tilray's behalf shows leadership and foresight, not fraud.

The Court previously rejected the "first step" in Plaintiffs' alleged scheme, based on the same factual allegations, noting that Kennedy and the other two Privateer founders *already had* voting control of Tilray prior to the downstream merger, and that the downstream merger provided all Privateer shareholders with the same tax benefits when they eventually sold their stock. *See Tilray I*, at *7-8. The "second step" is equally illogical and factually unsupported. Plaintiffs claim that Kennedy started this alleged fraud in January 2019 to effectuate the downstream merger which was in turn necessary to effectuate the Aphria merger (TAC ¶¶ 162-224), but the downstream merger agreement was signed on September 9, 2019—a month before the initial meeting with Aphria was even proposed by a third party. *Supra* 10-11. Moreover, if the goal was to become CEO of a combined entity, why would Kennedy have lied about things he knew would have to be disclosed in the 2019 10-K, potentially tanking the deal before he could achieve his alleged objective? Plaintiffs also gloss over the fact that it was Kennedy who (1) later proposed a 50/50

---

[36] Indeed, the 643,164 shares Kennedy allegedly sold during the class period (only 168,886 of which were not pursuant to 10b5-1 plans) are dwarfed by his sales after revelation of the alleged fraud and the resulting stock price drop—4,600,000 shares between June 16, 2020 and November 6, 2020 pursuant to 10b5-1 plans. *See* Ex. 10 (Forms 4), at 025-39; *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter where insiders "miss[ed] the boat").

equity split once the companies' share prices converged, (2) lost his controlling interest in Tilray, and (3) ultimately negotiated the merger without becoming CEO. TAC ¶¶ 210-17. And even assuming Kennedy did want to become CEO, such ambition is not indicative of fraud.[37]

"Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. The SAC could not clear this high bar, and neither can the TAC, which relies on the same circumstantial pleadings. First, the FE scienter allegations still fail to allege any particularized facts demonstrating that "Kennedy *himself* was or should have been on notice" that the challenged statements related to inventory and the timing and vetting of the ABG deal were false or misleading. MFR Op. 12-13. Here, as in the SAC, no FE claims to have ever interacted with Kennedy, or identifies any specific report or statement available to Kennedy undermining the challenged statements.[38] *Id.* ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements"); *supra* 13-19. Thus, the TAC still fails to meet the high bar of alleging "a state of mind approximating actual intent, and not merely a heightened form of negligence." MFR Op. 11.

Nor can Plaintiffs' other circumstantial allegations—also recycled from the SAC— establish scienter. The Court previously rejected the Q1 2020 earnings call statement about trim valuation (made by CFO Kruteck, not Kennedy) as insufficient to show conscious misbehavior or recklessness, and should do the same here. MFR Op. 13-14; TAC ¶ 128; SAC ¶¶ 148-49; *supra* nn.13, 22-23. It should likewise adhere to its prior ruling that, "[a]s for the use of stock in acquisitions and the increase in the volume of Tilray's trades, Plaintiffs do little to tie these vague allegations to the misrepresentations at issue, so they alone cannot sustain a finding of scienter."

---

[37] *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (general corporate motives insufficient); *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011) (same re desire to "enhance [their] executive positions and . . . prestige").
[38] Indeed "the one document Plaintiffs point[ed] to" in the SAC no longer appears in the TAC. MFR Op. 12 (discussing insufficiency of SAC pleadings related to a "Bill of Materials").

MFR Op. 14; TAC ¶¶ 225-40; SAC ¶¶ 234-48 (same); *see also In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *18 (S.D.N.Y. Oct. 25, 2006). And Plaintiffs' vague allegations of "additional self-dealing" (TAC ¶¶ 154-61; SAC ¶¶ 227-33 (same)) still have nothing to do with the challenged statements and lack any specific factual allegations.

After four rounds of pleadings, the most compelling inference is still one of good faith—that Kennedy genuinely believed the ABG Agreement was a good deal for Tilray; believed Tilray was properly valuing the ABG Agreement and its cannabis inventory; and believed it was fairly representing those financial matters to investors. When the market and regulatory landscapes changed, Tilray determined that impairments were necessary and appropriately wrote down inventory. All this suggests responsible corporate stewardship, not fraud.[39]

### D.  Plaintiffs Cannot State a Section 20A Claim for Insider Trading.

To plead a 20A claim, Plaintiffs must allege that Kennedy traded his shares contemporaneously with Plaintiffs while in possession of "material nonpublic information," and that he committed a "predicate violation" under the Exchange Act. 15 U.S.C. § 78t–1(a); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.50 (S.D.N.Y. 2008) (heightened pleading standards apply to § 20A claims). Plaintiffs fail to allege any specific material nonpublic information Kennedy had at the time of any particular sale. And the only "predicate violations" Plaintiffs allege are their Sections 10(b) and 20(a) claims, which fail for the reasons discussed above. These flaws require dismissal of the 20A claim.

## IV.  CONCLUSION

Plaintiffs have now had four chances to sufficiently plead their claims. They failed again and should not get another chance. The Court should dismiss the TAC with prejudice.

---

[39] Because Plaintiffs cannot state a § 10(b) claim, their § 20(a) claim also fails. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Dated: November 8, 2023                                 Respectfully submitted,


                                                        BAKER & HOSTETLER LLP


                                             By:   /s/ Douglas W. Greene
                                                   Douglas W. Greene (*pro hac vice*)
                                                   dgreene@bakerlaw.com
                                                   Genevieve G. York-Erwin
                                                   gyorkerwin@bakerlaw.com
                                                   Zachary R. Taylor
                                                   ztaylor@bakerlaw.com
                                                   45 Rockefeller Plaza
                                                   New York, NY 10111
                                                   Telephone: 212.589.4200

                                                   *Attorneys for Defendants*

26