**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANESH KASILINGAM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br><br>v.<br><br><br>TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,<br><br>Defendants. | **CASE No.: 1:20-cv-03459-PAC**<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br><br>**<u>CLASS ACTION</u>** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................... 1

II.   THE COURT HAS ALREADY RULED THAT THE COMPLAINT'S
      ALLEGATIONS SUFFICE TO ALLEGE FALSITY ........................................ 2

   A.   Standard ............................................................................................................ 2

   B.   The Court Should Reiterate Its Ruling that the Complaint's Allegations Sufficiently
        Show Falsity ..................................................................................................... 3

III.  THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER ................................ 3

   A.   Standard ............................................................................................................ 3

   B.   The Complaint Sufficiently Alleges Kennedy's Motive ................................... 4

      1.   The Court's Initial Decision that Kennedy's Stock Sales Sufficed to Allege His Scienter
           Was Correct ................................................................................................. 4

      2.   Kennedy's Stock Sales Raise A Strong Inference of Scienter ........................ 5

      3.   The Complaint Sufficiently Alleges Kennedy's Other Motives ...................... 11

   C.   The Complaint Sufficiently Alleges Recklessness For the Inventory Statements ..... 14

      1.   Kennedy Was Personally Involved In Valuing Tilray's Inventory ................. 14

      2.   Defendants' Arguments Principally Challenge Falsity, Which the Court Has Already
           Found, Not Scienter, And They Fail On the Merits ...................................... 16

         (1)   Tilray Could Not Record Vast Amounts of Trim As Inventory Based on the Small
               Existing Marijuana Plant Extracts Market ................................................. 16

         (2)   Defendants' Statements Contained False Embedded Statements of Fact .................. 18

         (3)   Defendants Do Not Prove Their Truth-On-the-Market Defense .............................. 19

   D.   The Complaint Sufficiently Alleges Recklessness For the ABG Statements ............. 20

      1.   Kennedy Made His Statements With Scienter Because He Knew What His Own
           Activities Consisted of in the Month Before His Statements ........................ 20

      2.   Defendants Principally Argue Falsity, Not Scienter, and Their Arguments Are Based
           On Extrinsic Documents Not Before the Court ............................................. 22

    **E.**    **Considered Holistically, the Complaint's Allegations Establish Scienter** ................. 24

    **F.**    **The Complaint Sufficiently Alleges Insider Trading and Control Person Claims** ... 25

**IV.**  **CONCLUSION** ..................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020) .................................................................................................... 18

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ......................................................................................................... 11

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ........................................................................................................ 2

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ............................................................................................... 1, 4, 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................... 2

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................................................... 23

*Blank v. TriPoint Glob. Equities, LLC*,
  338 F. Supp. 3d 194 (S.D.N.Y. 2018) ...................................................................................... 21

*Chapman v. Mueller Water Prod., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020) .................................................................................. 9, 11

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ...................................................................................... 14

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
  565 F. Supp. 3d 478 (S.D.N.Y. 2021) .................................................................................. 4, 11

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020) ................................................................................ 22, 23

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ............................................................................................... passim

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................................................... 10

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) ..................................................................................................... 19

*Gelfer v. Pegasystems, Inc.*,
    96 F. Supp. 2d 10 (D. Mass. 2000) ........................................................................ 15

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ........................................................... 10

*Gurvey v. Cowan, Liebowitz & Latman, P.C.*,
    2015 WL 4460859 (S.D.N.Y. July 21, 2015) ............................................................ 3

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ..................................................................... 12

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018) ................................................................... 7, 8

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................................... 10

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018) ..................................................................... 15

*In re Comverse Tech., Inc. Sec. Litig.*,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008) ..................................................................... 20

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023) ..................................................................... 11

*In re DRDGOLD Ltd. Sec. Litig.*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007) ....................................................................... 7

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) ..................................................................... 23

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ................................................................... 7, 8

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) ......................................................................... 7

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
    20 F.4th 131 (2d Cir. 2021) ............................................................................... 4, 24

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
    2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ....................................................... 10, 11

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000)......................................................................................... 7

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008).................................................................................... 16

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................................... 6

*In re Rsrv. Fund Sec. & Derivative Litig.*,
   732 F. Supp. 2d 310 (S.D.N.Y. 2010)...................................................................................... 12

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)................................................................................................... 5, 6

*In re Synergy Pharms. Inc.*,
   2023 WL 5526675 (2d Cir. Aug. 28, 2023) ............................................................................ 20

*In re Synergy Pharms., Inc. Sec. Litig.*,
   2021 WL 4480625 (E.D.N.Y. Sept. 30, 2021)......................................................................... 20

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................................... 11

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016).................................................................................................. 4, 13

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
   14 F.4th 141 (2d Cir. 2021)..................................................................................................... 16

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   607 F. Supp. 3d 381 (S.D.N.Y. 2022)...................................................................................... 21

*Kasilingam v. Tilray, Inc.*,
   2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021)........................................................ 3, 12, 16, 22

*Kasilingam v. Tilray, Inc.*,
   2022 WL 4537846 (S.D.N.Y. Sept. 28, 2022).................................................................. 3, 4, 12

*Kasilingam v. Tilray, Inc.*,
   2023 WL 5352294 (S.D.N.Y. Aug. 21, 2023) ................................................................. passim

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).................................................................................................... 24

v

*Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*,
   2013 WL 6728869 (D. Vt. Dec. 20, 2013)................................................................. 10

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) ........................................................................ 8

*Meyer v. Concordia Int'l Corp.*,
   2017 WL 4083603 (S.D.N.Y. July 28, 2017) ........................................................... 13

*Miller v. Donnini*,
   2015 WL 1431103 (D. Mass. Mar. 27, 2015) ........................................................... 22

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v.
   MDC Partners, Inc.*,
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) .................................................... 10, 11

*Nat'l Credit Union Admin. Bd. v. HSBC Bank US, Nat'l Ass'n*,
   331 F.R.D. 63 (S.D.N.Y. 2019)................................................................................... 3

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023)....................................................................................... 18

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)......................................................................... 8

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003)....................................................................................... 9

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................................. 4, 14

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   432 F. Supp. 3d 131 (D. Conn. 2019) ....................................................................... 11

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) .............................................................. 7

*Puddu v. 6D Glob. Techs., Inc.*,
   2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ........................................................... 19

*Reilly v. U.S. Physical Therapy, Inc.*,
   2018 WL 3559089 (S.D.N.Y. July 23, 2018) ....................................................... 6, 11

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018).................................................................. 19

*Russo v. Bruce*,
   777 F. Supp. 2d 505 (S.D.N.Y. 2011) .................................................................................. 13

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019) .................................................................................. 23

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020) .................................................................................................. 4

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
   2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) ...................................................................... 21

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ...................................................................... 13

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999) ..................................................................................................... 5

*Takata v. Riot Blockchain, Inc.*,
   2020 WL 2079375 (D.N.J. Apr. 30, 2020) ........................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .......................................................................................................... 2, 4

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009) .................................................................................. 15

**Statutes**

15 U.S.C. §78u-4(b)(2)(A)............................................................................................................ 3

## I.    INTRODUCTION[1]

The Court's prior rulings establish that the Third Amended Complaint ("Complaint") sufficiently alleges that Defendants made false statements. The Complaint's new allegations support a strong inference of scienter. The Court should deny Defendants' motion to dismiss.

During the Class Period, Defendant Brendan Kennedy sold his Tilray shares for net proceeds of over $28 million. The Court found that allegations of Kennedy's stock sales sufficed to infer scienter, before deciding on reconsideration that an intervening Second Circuit decision overruled the cases the Court cited. Respectfully, the Court got it right the first time. While *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022) held that the plaintiffs must allege facts to overcome the presumption that sales pursuant to a Rule 10b5-1 plan (like some of Kennedy's) are innocent, it said nothing about what the showing would consist of. Here, based partly on controlling law, the suspicious timing of Kennedy's sales—just after his false statements and just before the corrective disclosure that ends the Class Period—negates any protection his 10b5-1 plan might afford him. Further, after *Bristol-Myers*, the SEC determined that stock sales made shortly after adoption of a plan—like Kennedy's—do not negate the presumption that such sales could be part of a "plan [] to take advantage of an inflated stock price." *Bristol-Myers*, 28 F.4th at 356 n.4

In 2019, Tilray improperly recorded $50 million of unsellable waste as inventory, boosting its gross margin, a key metric. The Complaint addresses the Court's ruling that the SAC did not show Kennedy knew of the improper accounting by alleging that Kennedy was, as he was legally

---

[1] Citations to "¶ _" are to the Third Amended Complaint ("Complaint"), Citations to "Def.Br. _" are to Defendants' Memorandum of Law in support of their motion to dismiss the Complaint ("Motion"), dkt. #134. Citations to "Def.Ex." are to exhibits to the Declaration of Douglas W. Greene in support of the Motion, dkt. # 136. Citations to "Pl.Ex." are to exhibits to the Declaration of Jonathan Horne in opposition to the Motion, filed herewith. The FAC and SAC are, respectively, the First and Second Amended Complaints. **All emphases are added and citations omitted.**

1

obligated to be, personally involved in the overstated inventory valuations. It also shows that Tilray adopted a policy of waiting until end-of-year audits to write off inventory, violating both Generally Accepted Accounting Principles ("GAAP") and its own accounting policies.

The Court held that the SAC sufficiently alleged that Kennedy misleadingly touted a rushed nine-figure agreement with Authentic Brands Group ("ABG"), but that it did not sufficiently establish that he subjectively thought it was a bad deal. Now, the Complaint alleges that Kennedy's objective statements about the amount of time it took Tilray to negotiate the ABG Agreement were false. Kennedy knew his statements were false—he was Tilray's negotiator.

The Court has already found that the Complaint sufficiently alleges falsity. The Complaint addresses the grounds for the Court's earlier dismissal for failure to allege scienter. The Court should deny Defendants' motion to dismiss.

## II. THE COURT HAS ALREADY RULED THAT THE COMPLAINT'S ALLEGATIONS SUFFICE TO ALLEGE FALSITY

### A. Standard

A complaint survives by alleging facts "stat[ing] a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even in actions alleging securities fraud, "courts must [] accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "Although pleading standards are heightened for securities fraud claims, '[courts] must be careful not to mistake heightened pleading standards for impossible ones.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021).

Defendants argue that the Complaint does not sufficiently allege they made a false or misleading statement ("falsity") or that the statements were made with scienter. The only falsity requirement Defendants challenge is the obligation to show "why the statements were fraudulent." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).

2

**B.      The Court Should Reiterate Its Ruling that the Complaint's Allegations Sufficiently Show Falsity**

"[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Nat'l Credit Union Admin. Bd. v. HSBC Bank US, Nat'l Ass'n*, 331 F.R.D. 63, 74 (S.D.N.Y. 2019). Thus, courts do not reconsider their rulings on earlier versions of a complaint if the facts have not changed materially. *E.g. Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 2015 WL 4460859, at *5 (S.D.N.Y. July 21, 2015) (collecting cases holding that courts apply law-of-the-case to subsequent complaints).

The Court has already decided many of the issues Defendants raise in their motion. The Court found that the FAC did not sufficiently allege scienter without reaching falsity. *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ("*Tilray I*"). Then, it found that the SAC sufficiently alleged both falsity and scienter. *Kasilingam v. Tilray, Inc.*, 2022 WL 4537846 (S.D.N.Y. Sept. 28, 2022) ("*Tilray II*"). On reconsideration, it found that the SAC did not sufficiently allege scienter but reiterated that it sufficiently alleged falsity. *Kasilingam v. Tilray, Inc.*, 2023 WL 5352294 (S.D.N.Y. Aug. 21, 2023) ("*Tilray III*"). Thus, the question before the Court is whether the Complaint sufficiently alleges scienter.

In *Tilray II*, the Court ruled that it could not consider extrinsic documents for the truth of their contents (other than Forms 3 or 4 signed under penalty of perjury). 2022 WL 4537846, at *1. Defendants again build their own narrative from newspaper articles, SEC filings, and bare assertions, which they ask the Court to take as fact. The Court should deny their motion to dismiss.

## III.     THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER

**A.      Standard**

The Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" 15 U.S.C. §78u-4(b)(2)(A), which includes

3

recklessness. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020). A "strong inference" is at least as probable as any competing nonculpable inference. *Tellabs*, 551 U.S. at 334. Plaintiffs can allege scienter through "circumstantial allegations" or allegations of defendants' "motive and opportunity" to make false statements. *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021). Courts analyze scienter allegations holistically. *Id.*

 **B.**  **The Complaint Sufficiently Alleges Kennedy's Motive**

   *1.*  *The Court's Initial Decision that Kennedy's Stock Sales Sufficed to Allege His Scienter Was Correct*

Motive allegations suffice if they show that the defendant obtained a "concrete and personal" benefit from the fraud, *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000), or could have expected to. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016). In *Tilray II*, the Court found that Kennedy's stock sales sufficed to establish scienter even though he had entered into a Rule 10b5-1 plan, citing cases holding (e.g.) that "the insider might be aware of an impending price drop and could use a 10b5-1 plan to make his or her premeditated stock dump appear legitimate." 2022 WL 4537846, at *9 (*quoting City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 488 (S.D.N.Y. 2021)). But on reconsideration, the Court ruled *Bristol-Myers* overruled the cases it had relied upon and that plaintiffs now had to show that the 10b5-1 plan was adopted in "bad faith." *Tilray III*, 2023 WL 5352294, at *3.

 The Court got it right the first time. *Bristol-Myers* observed that the plaintiffs failed to "sufficiently allege [ ] that the purpose of the plan was to take advantage of an inflated stock price," and, ***therefore***, they did not show bad faith. *Bristol-Myers*, 28 F.4th at 356 n. 4. But it did not address what facts would suffice to allege bad faith, because in *Bristol-Myers*, the sales were not suspicious under any standard. There, the insider left his position as the company's CEO and adopted a plan calling for sales of 23,200 shares starting on the 8th month of the 20-month class

period and continuing every month thereafter. Pl.Ex. 1 ¶¶30-31. The CEO was gradually selling shares because he was retiring, not because he was taking advantage of an artificially inflated price.

*Bristol-Myers*'s brief aside in a footnote left untouched existing case law, some of it controlling, that plaintiffs could overcome any presumption from a Rule 10b5-1 plan by showing that the timing of the sales was suspicious. *Bristol-Myers* relied on a Second Circuit case, *Blanford*, finding that sales pursuant to a 10b5-1 plan **did** raise an inference of scienter because the sales, which were scheduled to take place shortly after false statements, gave defendants a motive to lie to push up the company's stock price to make more money. 794 F.3d at 309. And many district court cases held that sales scheduled to occur shortly before a corrective disclosure are suspicious. *See* 6, below. These cases are still good law and the Court's initial decision was sound.

Even if *Bristol-Myers* overruled existing law, it would only require plaintiffs to allege "that the purpose of the plan was to take advantage of an inflated stock price." *Bristol-Myers*, 28 F.4th at 356 n.4. While Rule 10b5-1 did not specifically require a 90-day cooling down period at the time, the SEC subsequently implemented one because it determined that executives like Kennedy were using short-dated 10b5-1 plans to trade while in possession of material non-public information. ¶147. All but one of Kennedy's sales took place within 90 days of a plan's adoption; the only exception (the April 1 sales) took place 93 days after adoption. ¶140. Because the SEC's later determination was based on facts that existed at the time of Kennedy's sales, his short-dated 10b5-1 plans are not *per se* evidence of good faith; rather, they support a finding of bad faith.

       2.       *Kennedy's Stock Sales Raise A Strong Inference of Scienter*

The Second Circuit has held that "unusual" stock sales support scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). To determine whether sales are "unusual," courts consider the timing of the sales, *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 86 (2d Cir. 1999), as

well as other contextual factors like the amount and percentage of shares sold. *Scholastic*, 252 F.3d at 75. Because Kennedy is the only individual defendant, other insiders' sales are irrelevant. *Id.*

During the Class Period, Kennedy sold Tilray shares for net proceeds of $28.4 million. ¶140. These shares were either 21.1% or 79.9% of his shares available to sell, depending on whether the count includes vested options. ¶140; Pl.Ex. 3. Their timing was suspicious, occurring either shortly after Kennedy's first false statement or shortly before the end of the Class Period.

**Timing**: Stock sales made shortly after false statements raise an inference that the seller aimed to pump up the company's stock price through his misstatements. *Blanford*, 794 F.3d at 309. Stock sales made shortly before a corrective disclosure raise an inference that insiders are trying to cash out before the truth comes out. *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999); *cf. Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) (defendants' lack of sales within 100 days of class period end undercut scienter).

All of Kennedy's Class Period stock sales occurred within 75 calendar days after his first false statement or 81 days before the last corrective disclosure. ¶¶143, 145. He sold no stock during the Class Period's middle 253 days. ¶144. Kennedy's first sale is especially suspicious. In October 2018, Kennedy publicly stated that he "didn't expect to sell a share" because of his "long-term view of [Tilray's] opportunity." ¶225.[2] On January 6, 2019, he told Fortune magazine he "promise[s] he won't" sell shares when IPO restrictions lifted in January. ¶224. Nine days later, Kennedy announced the ABG Agreement. Nine days after that, Kennedy sold almost 150,000 shares for $11.1 million. Likewise, Kennedy could predict that his scheme would end when Tilray filed its audited financial statements, so his sales just before their due date were suspicious.

---

[2] Defendants' statement that the references were to Privateer's stock is plainly wrong. Indeed, the October 2018 interviewer specifically referenced Kennedy's "own stock" (he didn't own Privateer's Tilray shares) and Kennedy responded that he had personally purchased shares in the IPO. ¶141.

**Percentage of total holdings sold**: A court found sales of 13% and 17% of total shares probative of scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *5 (S.D.N.Y. Mar. 4, 2019). Sales of 18% of 38% of insiders' shares pursuant to a 10b5-1 plan were sufficient because they occurred shortly after the defendants' false statements. *Blanford*, 794 F.3d at 308. And courts have found far lower percentages sufficient when the timing of the sales was suspicious. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 624, 646 (E.D. Va. 2000) (co-founder's well-timed sale of 2.2% of his shares supported scienter).

The Second Circuit has not settled whether vested options count in determining the percentage sold. *Compare In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) (not counting vested options) *with In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) (counting vested options). Under either metric, Kennedy's stock sales suffice. He sold 79.9% of the Tilray shares that he had accumulated by the end of the Class Period, or 21.2% of all shares including vested options. ¶¶140 & n.17; Pl.Ex. 3. Because Kennedy's 10b5-1 plans provide no protection, that is enough under *Tilray II*.

Yet even if the Court discounts sales made pursuant to Kennedy's 10b5-1 plans, the percentage of stock Kennedy sold (15%) is still sufficient. The Court cited cases where sales of similar percentages did not trigger an inference. But in those cases, the alleged sales were made by bit players in the fraud rather than the chief culprits. In *DRDGold*, the selling defendant was the company's non-executive chairman; he made no false statements, and his sales of 18% of his shares raised total proceeds of only $57,656. *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 566 (S.D.N.Y. 2007). In *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) two lower-level executives sold 17.4% and 11.9% of their shares, respectively. These defendants collectively made just one statement that wasn't mere puffery, while the main players,

7

the CEO and CFO, did not sell any shares. *Id.* at 286, 289. So the court ruled that "the dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period[.]" *Id.* at 291. Likewise, in *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 151-53 (D. Conn. 2007) *aff'd*, 312 F. App'x 400 (2d Cir. 2009), an outside director (Bornhuetter) sold 30.9% of his shares, and a division head (Keeling) sold 14.4%. Keeling's alleged fraudulent conduct was "be[ing] present" for calls on which other defendants made false statements. *Id.* at 128, 151-53. The principal defendant, the CEO, only sold 6.83% (or 6.38%), "fairly evenly distributed throughout the Class Period". *Id.* at 151-53. If the courts found motive allegations sufficient even though the main culprits did not sell shares, plaintiffs could proceed to discovery just because one or two out of a potentially large number of company executives and even outside directors happened to sell shares in the relevant period.

Not so here. Kennedy is the only individual defendant and the fraud's prime mover. He was Tilray's CEO and its controlling shareholder (through Privateer) and the only one who made false statements about ABG. His well-timed sales of 79.9%/21.2% of his shares support scienter.

At a minimum, in calculating total shares available for sale, courts exclude from the denominator shares that an executive cannot actually sell, such as unvested shares or shares subject to a lock up. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 497 (S.D.N.Y. 2018), *rev'd in part on other grounds* 965 F.3d 165 (2d Cir. 2020) (not counting unvested shares because denominator is shares insider could have sold). "[T]he decisive question in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold." *Aratana*, 315 F. Supp. 3d at 763. Moreover, many of Kennedy's shares were supervoting Class 1 shares which he needed to

8

maintain control, and courts exclude such shares from the denominator. *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003).

From the beginning of the Class Period through December 2019, most of Kennedy's shares were held by a private equity company he founded, Privateer, in which he and the other two founders held only a 29% economic interest. ¶166.  Before December 2019, Kennedy would only realize $0.08 for every dollar of Privateer Tilray shares he sold. Pl.Ex. 3. Privateer held 80% of Tilray's shares and its shareholders' investments had been illiquid for at least five years, so to prevent a catastrophic selloff, Kennedy had to include a lock-up. Kennedy could not sell his Tilray shares initially held through Privateer at any point during the Class Period.

**Comparable period**: Before the Class Period, Kennedy was a net purchaser of Tilray securities; he purchased 14,706 additional shares in Tilray's IPO. ¶140; Def.Ex. 10 at 3.

To support a non-culpable inference, Defendants point to Kennedy's post-Class Period sales. Def.Br. 23 n.6. But these sales took place because Kennedy anticipated he would leave Tilray through a merger with Aphria. Defendants' cases establish that executives typically sell a large portion of their holdings when they depart. *See* 11 & n.5, below; *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 412 (S.D.N.Y. 2020). Kennedy's main selling spree began the week after Tilray sent Aphria a term sheet acknowledging that Aphria shareholders would receive a significant majority of the combined entity's shares (58% in Tilray's proposal).[3] Pl.Ex. 2 at 51-52.

**Net changes in shareholdings**: An insider's increasing overall holdings during the class period may, in some circumstances, cut against an inference of scienter. But not here, because substantially all of the shares Kennedy could have sold were restricted stock units or stock options that vested during the Class Period. The only sellable shares Kennedy personally owned at the

---

[3] In any case, Kennedy's defense that he sold stock in late 2020 when he possessed material non-public information about a looming merger raises general doubts about his compliance with the securities laws.

beginning of the Class Period were the 14,706 shares he purchased in the IPO. Kennedy's shareholdings were bound to increase unless he sold nearly all his shares.

**Net proceeds**: Kennedy's net profit of $28.4 million is far higher than amounts courts have ruled suspicious. *Blanford*, 794 F.3d at 308 (2d Cir. 2015) (gross proceeds of $49 million split between two defendants and three non-defendants);[4] *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (two defendants each selling $6 million). The shares Kennedy sold were either vesting restricted stock units, for which Kennedy paid nothing, or options with a low exercise price. ¶140. That Kennedy's sales were almost pure profit supports scienter. *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012).

**Tax liability**: Kennedy claims that his January 2019 sales were to pay off a tax liability. But in the two cases he cites, the sellers stated that they were satisfying a tax obligation on ***the Forms 4 themselves***. *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016). Forms 4 are completed under penalty of perjury. *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 583 (S.D.N.Y. 2011)(subsequent history omitted). As in Tilray II, the Court should decline to consider Kennedy's claim because it is not based on Forms 4 but instead on a statement Tilray employees offered to excuse their CEO's breaking a promise 18 days after making it.

**Defendants' cases are inapposite**: In each of the cases Defendants cite the plaintiffs' allegations suffered from ***at least two*** of the following infirmities: (a) the stock sales were made far in time from either the false statements or the corrective disclosures; (b) the stock sales were

---

[4] The amounts and timing are set out in the opinion the Second Circuit reversed, *Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2013 WL 6728869, at *12 (D. Vt. Dec. 20, 2013).

made or scheduled (through a Rule 10b5-1 plan) **before** the defendant obtained the strongest evidence that their statements were false **and** the defendants made only trivial stock sales **after** obtaining such evidence; (c) the sales were completed in connection with the defendant's departures, when executives typically unload many if not most of their shares; (d) the Forms 4 for the stock sales themselves indicated some other plausible non-fraud purpose; or (e) other equally or much more culpable defendants did not sell any shares.[5] There are no such infirmities here.

### 3.  The Complaint Sufficiently Alleges Kennedy's Other Motives

As the Court observed in *Tilray III*, the strength of the other motives the Complaint alleges depends on the strength of the stock sale allegations. 2023 WL 5352294, at *5. Because the Court correctly weighed the stock sales in *Tilray II*, its analysis in that opinion controls.

**Acquisitions**: "[T]he artificial inflation of a stock price in order to achieve [a] specific goal may satisfy the pleading requirement." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 169 (D. Conn. 2019). Courts find allegations sufficient if the plaintiff plausibly links the artificial inflation to specific acquisitions alleged in the complaint. *Id.* "[T]he question turns [] on the concreteness of the allegations." *Id.*

In *Vivendi*, the defendant made false statements concerning the company's liquidity even as it acquired companies using its stock. *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 166 (S.D.N.Y. 2003). The court found scienter because the acquisitions formed part of the defendant's years-long campaign to turn a sleepy environmental services company into an international media conglomerate and the statements were connected to the acquisitions. *Id.* at 166, 184-85.

---

[5] *Keryx*, 2014 WL 585658, at *13 ((a), (b), and (d)); *MDC*, 2016 WL 5794774, at *18-20 ((a), (b), and (d)); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ((a), (b), (c), and (e)); *Farfetch*, 565 F. Supp. 3d at 487-89, *aff'd* 2023 WL 2879304 (2d Cir. Apr. 11, 2023) ((b) and (c)); *Chapman*, 466 F. Supp. 3d at 411-13 ((a), (c), (d), and (e)); *Reilly*, 2018 WL 3559089, at *15 ((a) and (b)); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 174 (S.D.N.Y. 2023)((a) as to the major stock sales, (e)); Pl. Ex. 1 ¶260-61 (*Bristol-Myers*, ((a), (c)).

Kennedy had long declared that the cannabis industry was engaged in a protracted consolidation which would leave only 3-4 companies dividing a $150-200 billion market. ¶¶190-91. He hoped that Tilray would be one of these companies, but its pocketbook did not match his ambitions. So he relied on Tilray's stock as currency to fuel its growth: in 2019, he spent $497 million of its shares—almost three times its revenues—to acquire companies. ¶¶67, 226. Tilray's counterparties would only accept Tilray shares if they thought the shares would hold their value. Kennedy's statements about gross margins and the ABG Agreement gave the counterparties assurances that Tilray's stock would hold its price. ¶178.

**Control**: Kennedy used his false statements to take personal control of Tilray by distributing Privateer's supervoting shares to himself and two other founders ("Share Exchange"). ¶¶162-81. The Complaint "articulate[s] why continued voting control of a post-collapse Tilray [was] so dear to [him]." *Tilray I*, 2021 WL 4429788 at *8. He wanted control to make millions from self-dealing transactions and pursue a career-defining merger.

The desire to earn revenues at the company's expense is a concrete and personal benefit that can support scienter. *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 620 (S.D.N.Y. 2008) (generating additional fees from investment supplied motive); *accord In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 320 (S.D.N.Y. 2010) (same, as does personal stake in company). Kennedy's transactions with Tilray were rife with self-dealing. Among other things, Kennedy had Tilray purchase a failing company partially owned by Privateer, paying himself $2.4 million in cash, the non-Privateer shareholders in stock, and the other Privateer investors in contingent consideration. He later mocked investors by causing Tilray to revalue the contingent consideration to a prominent marijuana reference. ¶158; *Tilray II*, 2022 WL 4537846 at *10 & n.14.

Kennedy also used his control to pursue a merger with another large cannabis company, Aphria. Kennedy made two merger proposals in March 2020. ¶¶196-200. His first proposal undervalued Tilray but made him CEO of the combined company. ¶¶202-03. Aphria rejected his attempt because of the uncertainty COVID created. ¶209. He then made a last-ditch effort to complete a merger that would leave Tilray investors with 50% of the combined company, the ***exact*** percentage that would let him push the agreement without shareholder approval. ¶210. This is the kind of concrete and particular benefit from an acquisition that supports an inference of scienter.[6]

Defendants argue that the facts do not support a motive because Kennedy pushed for the Share Exchange before identifying a specific transaction with Aphria. But the Complaint alleges that Kennedy made false statements ***to complete the Share Exchange***, so that he could then choose Tilray's fate. And while Defendants argue that Kennedy's scheme was hardly foolproof, it need only have a plausible chance of success. *SAIC*, 818 F.3d at 97. In *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *6 (S.D.N.Y. July 28, 2017), defendants concealed that they had fired almost half their sales force for their top-selling product even as they solicited buyout bids. But the buyers could conduct due diligence, obviously, so they were not fooled and walked away. Even though the odds of success may have been quite low, the buyout was nonetheless a sufficient motive on a motion to dismiss. *Id.* Here, Kennedy did what he could to position himself to push through the merger. That his scheme might fail hardly distinguishes it from other fraudsters' "reckless [] gambles" are familiar to this District's Courts. *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *12 (S.D.N.Y. June 16, 2020).

---

[6] Defendants' case *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011) is inapposite because there the plaintiffs did not make any specific allegations about the defendant's motive or why it was important to the defendant.

**C.    The Complaint Sufficiently Alleges Recklessness For the Inventory Statements**

*1.    Kennedy Was Personally Involved In Valuing Tilray's Inventory*

Scienter allegations suffice if they show defendants had "knowledge of facts or access to information contradicting their public statements" or that they "failed to review or check information that they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). In the Second Circuit, it is enough if "[t]he danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* For example, the failure to admit that a publicly-disclosed delay of a mine's feasibility study would delay the publicly-disclosed estimated date of completion established recklessness. *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013).

Tilray's operations generated copious marijuana plant castoffs, called "trim." ¶50. During the Class Period, Tilray recorded these cast-offs in inventory at a value of almost $50 million, though the existing market was far too small for the quantity of marijuana plant trim Tilray had accumulated. ¶69. Instead, Tilray recorded this inventory based on the mere hope that Canada would legalize the sale of its products. ¶¶61-62; Def.Br. 18.

The Court found the SAC sufficiently alleged that these statements were false, but dismissed for failure to show that Kennedy was personally involved in recording inventory. *Tilray III*, 2023 WL 5352294, at *6. The Complaint newly alleges that Defendants disclosed in Tilray's 2019 10-K that it had a material weakness in its internal controls "related to inventory costing and the financial close process." ¶136. Kennedy ***personally*** created and oversaw the program to address the deficiency in inventory controls. ¶138. Each quarter, he ***personally*** certified that he had "disclosed any changes in [Tilray's] internal control over financial reporting that occurred during the registrant's most recent fiscal quarter." *Id.*

14

The internal control deficiency and Kennedy's role in addressing it support scienter. *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018). Kennedy had to be (and was) personally involved in inventory recording because he could not rely on internal controls he himself acknowledged were inadequate. *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009). That the misstatement occurred in the exact activity which Kennedy had acknowledged Tilray had poor internal controls over further supports scienter. *See Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 16 (D. Mass. 2000) (second restatement on similar issue supported inference of scienter).

Moreover, the Complaint alleges in far greater detail that the misstatement resulted from the adoption of a broad and undisclosed inventory recording policy that violated GAAP. The market for trim was tiny. Tilray's total medical marijuana sales in 2019 were $25.9 million, and these consisted predominantly of dried flower/leaf, not extracts. ¶62. Tilray could not lawfully use or sell its trim unless Canada approved the sale of its specific products. ¶¶80-82. Far from a rubber-stamp, the Canadian government stated that it would approve "a limited selection of products" case-by-case and these products would "appear *gradually*." ¶61. Tilray needed a quick approval for its perishable organic product, ¶63; predictably, some of Tilray's products had already begun to spoil by December 2019. ¶¶72, 76. Moreover, each product had precise specifications, forcing Tilray to write off up to $7.5 million in oils just because it never sold one particular brand. ¶77. This violated GAAP; because Tilray could not sell trim without the occurrence of events outside of its control, it could, at best, disclose a contingent gain and its value in the notes to its financial statements. ¶79. Moreover, that the misstatement resulted from an accounting policy supports scienter. Kennedy's job may not have involved visiting warehouses to detect spoilage, but it included overseeing critical accounting decisions he told investors he personally attended to.

15

Finally, the Complaint newly alleges that Tilray adopted a policy of overstating its inventory in unaudited quarterly filings, waiting until its auditor's year-end audit forced a write-off. While both the SAC and the Complaint quote Tilray's post-Class Period admissions that it would henceforth value trim at $0 "so that *we don't have any write-offs at the end of the year,*"[7] the Complaint alleges facts showing that Tilray "deliberately waited" to adopt a policy valuing inventory at $0. *Tilray I*, 2021 WL 4429788, at *13. Unlike the SAC, the Complaint alleges that more than 90% of Tilray's 2018 and 99% of Tilray's 2019 inventory write-offs occurred in the fourth quarter. ¶129. This pattern of year-end write downs supports an inference of scienter. *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *16 (D.N.J. Apr. 30, 2020) (that defendant engaged in several similar acts supported inference of scienter).

### 2. Defendants' Arguments Principally Challenge Falsity, Which the Court Has Already Found, Not Scienter, And They Fail On the Merits

Defendants' main challenge to the Complaint's allegations is that the statements are purportedly not false, an issue the Court has already decided in Plaintiffs' favor. In any case, it is not enough for Defendants to point to other plausible competing inferences. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021). They must show that the inferences Plaintiffs draw from the facts alleged are unreasonable. They do not.

### (1) Tilray Could Not Record Vast Amounts of Trim As Inventory Based on the Small Existing Marijuana Plant Extracts Market

Defendants acknowledge in their brief that Tilray's valuation of trim was not based on the existing market for marijuana plant trim but on potential sales should the Canadian government

---

[7] The Complaint incorrectly attributes the Q1 2020 admission to Kennedy rather than to Tilray's new CFO, who assumed his position on March 3, 2020. But correct attribution strengthens the inference of scienter. Kennedy wasn't coming clean. Rather, within about 2 months of assuming his position, Tilray's new CFO had easily determined that Twitter's past inventory recording policy violated GAAP and changed it. "[T]hat the new [officer] [] discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious[.]" *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008).

16

approve Tilray's recreational products. Def.Br. 18. Yet Tilray's ability to sell a small amount of trim in one market does not mean that a much larger amount of trim has a similar "estimated selling price *in the ordinary course of business*." ¶78. Nor do the extrinsic documents reporting that Tilray valued inventory "at cost" help Defendants, because recording unsellable waste at a value of more than $0 just means assigning a value to the byproduct and decreasing the cost of sales by that amount. ¶91. Otherwise, America's landfills would be full of potential "inventory" that could help prop up companies' balance sheets.

Defendants offer muddled interpretations of extrinsic documents to inflate the market's size. First, they cite Tilray's SEC filings' discussion of "bulk" sales and asks the Court to infer (on a motion to dismiss) that it refers to (a) sales of trim, not flower (b) of marijuana plants, not hemp (c) in Canada, not the U.S. or elsewhere. Def.Br. 18. They cite nothing for the argument, and bulk typically means "wholesale." Second, they cite "extract" sales, but ignore that "extracts" typically include, and are largely made up of, hemp plant CBD extracts which can be sold in the U.S. ¶¶46-47, 50-51. Moreover, even accepting Defendants' unreasonable inferences that all Tilray's extracts revenues related to (a) marijuana plant (b) trim, Tilray earned no more than $24.1 million in that segment in 2019. Revenue includes the costs of other materials, labor, sales and marketing, and markup, so the $50 million in just marijuana plant trim on Tilray's financial statements would be enough for many years.

Defendants also cite Tilray's alleged quarterly inventory write-downs. But the existence of these tiny markdowns (which Tilray's SEC filings inconsistently estimated as $0.5 million for all of 2019 or $1.6 million for just its first quarter)[8] ignores the primary issue: that Tilray inappropriately recorded inventory and waited for an end-of-year audit.

---

[8] Tilray's Q1 2019 10-Q reported write-downs of $1.6 million in that period. Def.Ex. 14 at 9. Its Q2 2019 10-Q reported that during the first 6 months of 2019, it had written down $0.5 million, or $1.1 million less than it claimed

17

(2)     Defendants' Statements Contained False Embedded Statements of
        Fact

Citing caselaw that predates seminal Second Circuit opinions, Defendants argue that the

Complaint must show that Kennedy did not honestly believe his opinions or conveyed false facts

about the manner in which they formed the opinion. Def.Br. 17-18. But "[b]y increasing the ability

of plaintiffs to plead material omissions with respect to statements of opinion as described above,

*Omnicare* reduced the significance of district courts' classification of statements as those of fact

or opinion." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020).  Opinions

are actionable if they contain "embedded statements of fact that are untrue." *New England*

*Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 171 (2d Cir. 2023).

"This occurs where [] there is an accepted method for assessing whether the statement is true, but

the statement is not justified by the accepted method and clearly contradicts the facts on which it

purports to rest," *id.*, like when a defendant does not follow objective GAAP provisions. *Id.* at 174.

The *DeCarlo* plaintiffs met their burden by pointing out that relying on a subjective GAAP

provision requiring "sufficient historical evidence" to support an accounting treatment implicitly

represented that there had been some historical evidence, though there was none. *Id.* at 173. Here,

even if valuing inventory required judgment,[9] GAAP does not permit the recognition of byproduct

as inventory when the company's ability to sell or use the inventory depends on timely legalization.

Until then, the trim's net realizable value was $0, and Tilray violated an objective GAAP provision

by valuing it for more than that. Defendants' statements conveyed a false impression of fact.[10]

---

it had written down in just Q1 2019. Def.Ex. 15 at 9. Then, in its 2019 10-Q, Tilray claimed it had written down
$0.7 million in Q1-Q3 2019, Def.Ex. 16 at 10, but in its 10-K, it claimed it had only written down $0.5 million over
the same period. ¶129 n.14.

[9] Though tellingly, Tilray does not include inventory valuation in its list of financial statement items requiring
"[s]ignificant estimates and judgments". *E.g.* Def.Ex. 14, at 6.

[10] The approach taken in the only case Defendants cite was overruled in 2020 by *Abramson*. *DeCarlo*, 80 F.4th at 169
(noting that the district judge "did not have the benefit of" *Abramson*).

(3)    Defendants Do Not Prove Their Truth-On-the-Market Defense

Defendants argue that they revealed that Tilray was improperly recording unsellable marijuana trim as inventory in disclosures made outside the financial statements themselves. A defendant's argument that disclosures in another forum or document corrected allegedly false statements is a disfavored "truth-on-the-market" defense. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). The "defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality" because defendants must show that "the corrective information [was] conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information.'" *Id.*

The first disclosure Defendants cite, that inventory valuations depended on the "regulatory environment", was in Tilray's *2019* 10-K, whose filing closes the Class Period. Def.Br.17. Tilray's class period filings contained no such warnings. Tilray's 2018 10-K only warned that "[f]actors considered in the determination of obsolescence include slow-moving or non-marketable items." Investors would not think Tilray's inventory valuation depended on a change in Canadian regulation because Tilray did not warn that regulations factored in valuing its inventory.

Defendants also cite a brief disclosure on an investor conference call by non-Defendant Mark Castenada that an increase in inventory on Tilray's balance sheet in Q3 consisted, in part, of "byproducts for extraction in large supply." Def.Br. 9. But courts do not recognize the truth-on-the-market defense when a defendant contemporaneously denies the allegations, as Tilray did by recording marijuana trim as inventory. *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021). "A company may not avoid GAAP requirements by disclosing underlying data to the market." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018). Even the disclosure that prior financial statements were incorrect does not establish a truth-on-the-market defense on a motion to dismiss if, like here, it does not quantify the

19

misstatement. *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 150 (E.D.N.Y. 2008). And the Second Circuit recently found that a defendants' misleading description of the terms of a contract is actionable even if the company publicly files the contract. *In re Synergy Pharms. Inc.*, 2023 WL 5526675, at *2 (2d Cir. Aug. 28, 2023) (November 9, 2017 statement made contemporaneously with release of contract); *In re Synergy Pharms., Inc. Sec. Litig.*, 2021 WL 4480625, at *5 (E.D.N.Y. Sept. 30, 2021) (opinion below setting out exact timing). Moreover, prudently setting aside production in anticipation of a period of elevated sales is not the same thing as recording unsellable waste as inventory on the hopes that the government might approve its sale. ¶115. The disclosures were insufficient.

Finally, Defendants cite a statement that inventory included "works-in-progress" such as "by-product." Def.Br. 15. That is the definition of inventory. ¶65. But it is a strawman: the Complaint alleges Tilray could not recognize unsellable byproduct as work-in-progress, which has nothing to do with whether any of Tilray's inventory was byproduct.

**D.      The Complaint Sufficiently Alleges Recklessness For the ABG Statements**

   *1.      Kennedy Made His Statements With Scienter Because He Knew What His Own Activities Consisted of in the Month Before His Statements*

The Class Period begins with Kennedy's January 2019 announcement that Tilray had negotiated a nine-figure co-licensing deal with ABG. On the day he announced the ABG Agreement, Kennedy reported on a conference call and in a separate interview that Tilray had spent a month to six weeks negotiating the deal. ¶¶101, 103. On May 14, 2019, Kennedy boasted that ABG "vett[ed]" Tilray before signing. ¶106. In reality, the ABG Agreement had taken mere days to negotiate; ABG signed because Kennedy's offer was too rich to pass up. ¶¶99, 107.

Kennedy's statements about the duration of negotiations and diligence were materially false. Companies closing large transactions receive exhaustive nonpublic information. Investors

expect that the companies will review the information before signing the deal. Knowing that it took a matter of days for the agreement to go from proposal to execution, not a month, suggested Kennedy was rashly gambling a nine-figure sum without having enough time even to consider the information rather than making a sound business decision. And this is so even if Kennedy subjectively believed that a handful of days was enough for due diligence. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *3 (N.D. Cal. Oct. 19, 2021) (claim stated by "averr[ing] that Defendants assured investors about their diligence, even though their diligence was less than what an investor would believe their statement meant"); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 396 (S.D.N.Y. 2022) (plaintiffs sufficiently alleged bank misled investors about KYC/AML programs by showing ultra-rich clients were exempted); *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 207 (S.D.N.Y. 2018) (false statement that broker reviewed assets to be acquired actionable).

Kennedy plainly knew his statements were false. He personally handled the negotiations with ABG, so his statements concerned what he himself had been doing in the past month of his life. ¶99. Further, Kennedy's consistent statements in an interview, prepared remarks for a call to discuss the ABG Agreement, and a subsequent earnings call, shows that the misstatements were part of a campaign to conceal the ABG Agreement's origin.

Kennedy's statement that ABG had "vett[ed]" Tilray is also misleading. A "vetting process" is *extensive*. The "most familiar" meaning of vetting is "to subject a person or thing to scrutiny; to examine for flaws."[11] In finance, "[v]etting is the process of *thoroughly investigating* an individual, company, or other entity before making a decision to go forward with a joint

---

[11] Merriam-Webster, A Brief History of the Verb Vet, https://www.merriam-webster.com/dictionary/vet#note-1

21

project."[12] For a nine-figure transaction, "vetting" is not completed in a matter of days. That Kennedy knew how long it had taken supports an inference of scienter.

The Court found that the FAC failed to allege "that Kennedy [] subjectively felt the company's due diligence was lacking, much less that [he] believed the deal to be worse for the company than advertised." *Tilray I*, 2021 WL 4429788, at *10. It held the exact same thing when it dismissed the SAC. *Tilray III*, 2023 WL 5352294, at *7. The Complaint's allegations that Kennedy misled investors about the duration of negotiations distinguishes *Tilray I* and *III*.

        2.      *Defendants Principally Argue Falsity, Not Scienter, and Their Arguments Are Based On Extrinsic Documents Not Before the Court*

Defendants' main argument against the ABG allegations denies the Complaint's allegations. The Complaint quotes the false statements, as required by Rule 9(b). But instead of crediting the Complaint's allegations that these statements are false, Defendants quote the Complaint as alleging that the statements are true because they appear in the Complaint. Def.Br. 12-13. If quoting a false statement in a complaint meant the statement was assumed to be true on a motion to dismiss, plaintiffs literally could not plead a fraud claim.

Defendants also cite extrinsic documents to show that their false statements were plausibly true if the Court ignores the adverse facts the Complaint alleges Defendants concealed. Def.Br. 13. Well, yes: if the statements hadn't been plausible, they wouldn't have worked.

In addition to outright denying the Complaint's allegations, Defendants argue it does not allege enough facts to make it plausible that FE 3 knew what FE 3 was talking about. Def.Br. 12. But courts employ a "liberal" test in determining whether witnesses have a basis for their statements. *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d

---

[12] https://www.investopedia.com/terms/v/vetting.asp. "Many courts have cited to Investopedia for purposes of a definition in the context of a motion to dismiss." *Miller v. Donnini*, 2015 WL 1431103, at *6 (D. Mass. Mar. 27, 2015), *report and recommendation adopted in relevant part* 2015 WL 1431075 (D. Mass. Mar. 27, 2015).

123, 132 (S.D.N.Y. 2020). For example, in *City of Warren*, a case about failed deal negotiations, the plaintiffs' reliance on an agent of the company's counterparty's hearsay reports of negotiations was proper because the agent's position was ***particular enough*** to support an inference that the witness knew the ***specific facts*** ascribed to him. *City of Warren*, 477 F. Supp. 3d at 132-33.

As the Tilray Vice President who "overs[aw] business development outside of Canada" and was "heavily involved with strategic initiatives," FE 3 would be included in discussions about the ABG Agreement (the largest such initiative) from inception. So while FE 3 might not know whether Kennedy subjectively believed the ABG Agreement was worthless, as the Court held in *Tilray I*, or exactly what procedures were conducted, FE 3 would know how many days it took to negotiate the ABG Agreement and who was involved. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (engineers and technical editors would have witnessed the consequences of stop work orders even though they had not seen the orders themselves).

Moreover, FE 3 adds corroborating details. For instance, Kennedy and the other employee barely consulted with anyone else at Tilray, and other Tilray employees reacted the way one might expect to a half-baked nine-figure agreement negotiated in days: they "push[ed] back" and asked "what are we going to do?" with the ABG Agreement. ¶99.[13]

Defendants argue that "a matter of days" is too vague because technically it is consistent with any number of days, including "six months". Def.Br. 14. But "a matter of days" takes its

---

[13] *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 197, 221 (S.D.N.Y. 2008) is inapposite. There, the plaintiffs' source alleged that the company's "senior management" was aware of undisclosed facts, but the source's "intimate[] involve[ment]" did not necessarily include knowing the specific contents of private communications to executives that plaintiffs admitted the witness was not privy to. Here, monitoring negotiations of the ABG Agreement was FE 3's job. In *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019), though the plaintiffs alleged that a former employee had accompanied executives to a building (a town hall) where bribes were paid, the witness was a security guard and the plaintiffs did not allege that he saw money changing hands, raising the inference that the witness was reporting only office gossip. Here, the facts FE 3 report are within FE 3's wheelhouse. In any case, *Cemex* is an outlier; opinions like *City of Warren* and *Berson*, which require plausible rather than exacting details, are much more common.

meaning from what it is not: weeks or months. It is precise enough for the judiciary; the expression has been used in more than 2,000 federal opinions.

Defendants also argue that Kennedy's rash gamble on the ABG Agreement did not cause Plaintiffs' losses. But the Second Circuit held the opposite in *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015). There, plaintiffs adequately alleged that false statements about the selection of assets for an asset-backed security "caused" their losses when the security collapsed in the Great Financial Crisis because the selection method made a collapse more likely. *Id.* at 186. An agreement rashly entered into without any time for adequate consideration is more likely to fail than one that was thoroughly vetted.

**E.    Considered Holistically, the Complaint's Allegations Establish Scienter**

Even if neither Plaintiffs' motive nor recklessness allegations established scienter, they raise an inference of scienter when read holistically. *Hain Celestial,* 20 F.4th at 137.

Tilray's IPO left Kennedy a paper billionaire but most of his fortune was tied up in unsellable Tilray shares. Six months later, he announced the ABG Agreement, supposedly fulfilling the business plan he had been touting for years. He personally negotiated the Agreement and was the only Tilray officer who spoke at length about it. He nonetheless made false statements about a basic and easily observable fact, the duration of negotiations. A week after his statements, he sold $11 million of Tilray stock, adding $14 million more over the next few months. Read holistically, the Complaint's recklessness and motive allegations raise the inference that Kennedy engaged in a deliberate ploy that quickly turned a large portion of his paper fortune into hard cash.

During the Class Period, Tilray made an executive decision to record unsellable trim as valuable inventory worth almost $50 million by the end of the year. Because of Tilray's internal control deficiencies, Kennedy was personally involved in determining what to record as inventory at what value. Shortly before the inventory was inevitably written off in the audit of Tilray's

24

financial statements, Kennedy sold almost $3.5 million of his Tilray shares. In light of his stock sales, Kennedy's decision to record trim as inventory is not negligent, it is deliberately reckless.

Kennedy benefited from Tilray's inflated stock price. He spent $497 million of it acquiring other companies or entering into agreements during the Class Period. He also used his statements to take personal control over Tilray. Kennedy had a motive make false statements: to realize his long-declared ambition of creating and leading the world's largest marijuana conglomerate.

Defendants propose an inference that Kennedy acted in good faith. But their inference is based largely on extrinsic documents and bare assertions which are not before the Court on a motion to dismiss. Even if the Court considers the inference, there are too many coincidences favoring Kennedy to find it more plausible than Plaintiffs' culpable inference.

### F.      The Complaint Sufficiently Alleges Insider Trading and Control Person Claims

Defendants claim the insider trading and control person claims fail because the Complaint fails to plead an underlying violation of Section 10(b). Def.Br. 25. Because the Complaint pleads an underlying violation, it adequately alleges these claims. Further, the Complaint alleges that Kennedy had non-public information regarding the ABG Agreement and Tilray's inventory valuation.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated: December 20, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Horne
Jonathan Horne (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Jonathan Horne