**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANESH KASILINGAM, individually and on behalf of all others similarly situated, <br><br><br> Plaintiff, <br><br> - against- <br><br> TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA, <br><br> Defendants. | Case No. 20-cv-03459-PAC |

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

I.     PLAINTIFFS FAIL TO PLEAD A FALSE OR MISLEADING STATEMENT................1

     A.     Statements Related to the Timing and Vetting of the ABG Agreement..................1

     B.     Statements Related to Inventory and Gross Margins...............................................3

II.     PLAINTIFFS STILL FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER. ...............................................................................................................4

III.     PLAINTIFFS CANNOT STATE A SECTION 20A CLAIM..........................................10

IV.     CONCLUSION...............................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020).......................................................................................................4

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ..........................................................................................................6

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
    2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..............................................................................4

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ....................................................................................................5, 6

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .....................................................................................................2

*Chapman v. Mueller Water Prod., Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020).......................................................................................7

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020).......................................................................................2

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018).......................................................................................9

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)....................................................................................................................2

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)........................................................................................................5

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011).......................................................................................................4

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009).......................................................................................7

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).......................................................................................................8

*Kasilingam v. Tilray, Inc.*,
    2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ("*Tilray I*") ..............................................2, 10

*Kasilingam v. Tilray, Inc.*,
   2023 WL 5352294 (S.D.N.Y. Aug. 21, 2023) ("*Tilray III*") ........................................... *passim*

*In re Keryx BioPharms., Inc. Sec. Litig.*,
   2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ...............................................................7

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ....................................................................................2

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ..................................................................................4, 8

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
   2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ...........................................................7

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) .................................................................................................3

*Reilly v. U.S. Physical Therapy, Inc.*,
   2018 WL 3559089 (S.D.N.Y. July 23, 2018) ............................................................7

*Ressler v. Liz Claiborne, Inc.*,
   75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz
   Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999) ...........................................................7

*Saraf v. Ebix, Inc.*,
   632 F. Supp. 3d 389 (S.D.N.Y. 2022) .......................................................................9

*In re Skechers USA, Inc. Sec. Litig.*,
   444 F. Supp. 3d 498 (S.D.N.Y. 2020) ....................................................................6, 7

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) .....................................................................10

**Other Authorities**

https://www.sec.gov/news/press-release/2021-256 ...........................................................6

In their fourth flawed complaint, Plaintiffs continue to rely on the same hindsight speculation and grab-bag of illogical scienter theories that this Court previously rejected. Because the TAC fails to allege new facts sufficient to show that any challenged statement was materially false or misleading (or caused Plaintiffs' losses), or a strong inference that Mr. Kennedy made any misstatement with fraudulent intent, the TAC should finally be dismissed with prejudice.

## I.    PLAINTIFFS FAIL TO PLEAD A FALSE OR MISLEADING STATEMENT.

Plaintiffs broadly assert that the Court has already found their allegations "sufficiently allege[] falsity" and therefore it should not consider the MTD's falsity arguments. Opp. 3. But as Plaintiffs acknowledge, several of the TAC's challenged statements were not even alleged in previous complaints.[1] Moreover, Plaintiffs have significantly revised the complaint, removing some allegations and adding others. While these changes are largely cosmetic, they are extensive enough that the TAC's allegations should be evaluated on their own merits.[2]

### A. Statements Related to the Timing and Vetting of the ABG Agreement

Plaintiffs now challenge only three statements tangentially related to the ABG Agreement. Unlike the SAC, the TAC no longer claims Defendants lied about the value of the Agreement or its prospects (allegations the Court found insufficient in previous complaints). Instead, Plaintiffs claim only that Defendants misled investors about the *timing* and *vetting* of the ABG Agreement by stating that Tilray met with ABG starting in early to mid-December and that ABG "vetted" Tilray, when, according to Plaintiffs, these statements must not have been true because the Agreement "was proposed, negotiated, and closed within a matter of days." TAC ¶¶ 101-07.

This theory is fatally flawed in multiple respects. As an initial matter, Plaintiffs still fail to

---

[1] TAC ¶ 101 (new ABG statement); ¶¶ 108-10 (new SOX statements); Opp. 2 (noting new challenged statements).

[2] This is particularly appropriate since the Court granted the MFR (Dkt. #111) concerning scienter without considering Defendants' falsity arguments. *Kasilingam v. Tilray, Inc.*, 2023 WL 5352294, at *6-8 & n.6 (S.D.N.Y. Aug. 21, 2023) ("*Tilray III*"); MFR 1-15.

explain why statements about the timing and vetting of the ABG Agreement would have been material to investors separate from statements about its value—which they no longer challenge, because those allegations were twice rejected by this Court. Nor can Plaintiffs show loss causation for these statements, since the allegedly corrective announcements in early 2020 did not reveal any previously hidden truth about when the parties started negotiating the ABG Agreement or the extent to which ABG vetted Tilray. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).[3]

But even if materiality and causation could be shown, Plaintiffs cannot plead falsity. FE3's spare, conclusory allegations—the only ones offered to show the statements were false—cannot do so because FE3 does not allege any involvement with or basis for personally knowing about the negotiations or vetting of the ABG Agreement. Plaintiffs argue that as a Tilray VP "heavily involved with strategic initiatives," FE3 "*would be* included in discussions about the ABG Agreement" (Opp. 23; emphasis added),[4] but, critically, they do not allege that he actually *was* involved. Indeed, FE3 alleges the opposite: that Kennedy and another Tilray representative negotiated the Agreement on their own and "barely consulted with anyone else at Tilray." TAC ¶ 99. Even if that were true (it is not), how would FE3 know when the negotiations began, or what due diligence ABG performed with respect to Tilray? Absent specific allegations demonstrating an actual (not theoretical) personal-knowledge basis, FE3's conclusory assertions are insufficient to show that the statements about timing and vetting of the Agreement were false or misleading.[5]

---

[3] The common-law fraud decision in *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015), cannot undercut *Dura*'s holding that securities losses must be caused by disclosure of a previously hidden truth.

[4] The same is true of the Opposition's over-reaching assertion that "monitoring negotiations of the ABG Agreement was FE 3's job" (Opp. 23 n.13)—if so, then Plaintiffs should have pled it. That is not what the TAC alleges.

[5] Plaintiffs argue they need only allege "plausible rather than exacting details" to show FE3's knowledge basis (Opp. 23 n.13), but the CW in *Warren* specifically alleged personal involvement in the project, and the CWs in *Berson* described a fact necessarily known to most employees. *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). FE3's allegations are far closer to the insufficient CW allegations rejected in *Schiro*, *Elan*, and many other cases. MTD 14 n.16; *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ("*Tilray I*"), at *9.

**B. Statements Related to Inventory and Gross Margins.**

The allegations related to the alleged misstatements concerning Tilray's inventory and gross margins are equally insufficient. MTD 14-19. No factual pleadings support the central assertion on which these claims turn—that it was improper and misleading to value trim as inventory in 2019 because "Tilray could not lawfully use or sell its trim unless Canada approved the sale of [2.0] products." Opp. 15; TAC ¶¶ 3, 113-14. This is simply untrue, as the Opposition concedes:[6] there was an existing market for trim/trim extract prior to and throughout the class period, as demonstrated by Tilray's uncontested financials, which show a significant portion of revenue coming from trim/extract sales.[7] Ex. 2, at 3, 63 ($24M in cannabis extracts was 23% of 2019 cannabis revenue); Ex. 4, at F-31 ($21M in cannabis extracts was ~49% of 2018 revenue); MTD 15-16. Indeed, Tilray routinely discussed its "extracts" business on earnings calls, including how it expected extract sales to increase as the Canadian adult-use market matured.[8] Tilray's 10-Qs also specifically disclosed that it was including "by-products to be extracted" in inventory (TAC ¶ 111), consistent with the extracts market it described.[9]

In these circumstances, it was appropriate under GAAP and not misleading to value trim as inventory, and doing so involved significant judgment calls "based on estimated forecast of product demand … market conditions, regulatory environment, and spoilage" that rendered the reported inventory amounts opinions under the securities laws. Ex. 2, at F-18-19; *see Fait v.*

---

[6] *See* Opp. 14 ("the existing market was far too small for the quantity of [trim]"), 16-17 (similar); TAC ¶ 62 (similar).

[7] Plaintiffs assert, without any support, that this extract revenue probably included hemp extracts as well as cannabis/trim extracts (Opp. 17), but the 2019 10-K clearly states that "cannabis extracts" and "Hemp products" (including hemp extracts) are separate business segments for which revenue is reported separately. Ex. 2 (2019 10-K), at 3, 53, 63 (revenue of $24.1 million from "cannabis extracts," separate from "Hemp products").

[8] *See, e.g.*, Ex. 1 (1Q19 Tr.), at 18-19; Ex. 7, at 12-13 (3Q19 Tr.) ("[A] lot of byproduct on the market that people are using for extraction" is driving down price so now Tilray's "keeping all that byproduct or oil that we've been selling").

[9] These public statements are not a "truth-on-the-market defense" (Opp. 19), but instead provide important and necessary context for evaluating whether the challenged statements were misleading. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015) (falsity can only be evaluated in full context).

*Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011);[10] *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *13-22 (S.D.N.Y. Sept. 9, 2019); MTD 17-18. No factual pleadings suggest Kennedy did not genuinely believe the inventory valuations reported in the 10-Qs (or his SOX certifications attesting to their fairness), or that any particular contemporaneous facts rendered them misleading in context.[11] And even if, as Plaintiffs argue, some of the challenged inventory statements contained an "embedded [] fact"—that Tilray followed GAAP in valuing inventory (Opp. 18)—that fact is not sufficiently alleged to have been false, as discussed above.

In short, no particularized facts show the inventory statements were false or misleading, and the mere fact that Tilray later wrote down inventory cannot establish that the initial valuations were false; that it was not assessing inventory for obsolescence at the end of each quarter, as its quarterly write-downs show it was (MTD 16-17 & n.21); or that Kennedy did not believe the SOX certifications he signed. *See DeCarlo*, 80 F.4th at 182 (affirming dismissal re SOX certifications).

## II.    PLAINTIFFS STILL FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER.

The TAC relies on essentially the same scienter allegations and theories rejected in *Tilray III*—that Kennedy's stock sales were unusual and suspicious and show motive in spite of the 10b5-1 plans (they do not); that an illogical two-step scheme to help position Kennedy to possibly become CEO of an even larger company in a potential later merger shows motive (it does not); and that the FE allegations, Kennedy's public statements, and other assorted circumstantial evidence, re-alleged in the TAC, show recklessness (they do not). *Tilray III*, at *3-7. As Plaintiffs note, "courts do not reconsider their rulings on earlier versions of a complaint if the facts have not

---

[10] *Fait* is still good law in this regard. *See New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 169 (2d Cir. 2023) ("*Fait* continues to guide [the Second Circuit] in distinguishing between a statement of fact and a statement of opinion[.]"). *DeCarlo* and *Abramson* merely confirmed that an opinion can be misleading under *Omnicare* if it conflicts with what a reasonable investor would understand it to convey about the basis for that opinion (including, sometimes, compliance with GAAP). *Id.* at 171; *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). Here, unlike in *DeCarlo*, no facts suggest Tilray's inventory valuation violated GAAP.
[11] The Opposition does not cite any FEs as support on inventory; Defendants agree they provide none. MTD 15-16.

4

changed materially." Opp. 3. Here, Plaintiffs have not pled any new facts concerning motive, and only a handful of immaterial new circumstantial facts to support recklessness. None of this moves the needle, particularly in light of the far stronger non-culpable inferences.

*Motive and Opportunity.* Notwithstanding the critical importance of Kennedy's stock sales to the Court's previous analysis, the TAC does not allege a single new fact with respect to those sales or the 10b5-1 plans under which all but two were made. Instead, Plaintiffs argue that the Court's reading of *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022), is wrong and that *Bristol-Myers* "left untouched" prior caselaw allowing "plaintiffs [to] overcome any presumption from a Rule 10b5-1 plan by showing that the timing of the sales was suspicious." Opp. 5 (citing *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015)). Not so: *Bristol-Myers* (like *Blanford*) held that 10b5-1 plans entered into during the class period are still protective unless plaintiffs "'sufficiently allege[] that the purpose of the plan was to take advantage of an inflated stock price'"—i.e., "that the plan was not given or entered into in good faith." 28 F.4th at 356 n.4 (quoting *Blanford*); *Tilray III*, at *3. In *Blanford*, the timing of the 10b5-1 plans themselves was highly suspicious: "Green Mountain held its second quarter investor call on May 3, and the next day, [its] stock price rose from $64.07 to $75.98 per share and [defendants] entered into new 10b5-1 trading plans" and the following week began dumping significant portions of their shares pursuant to those plans. 794 F.3d at 308. No such suspicious facts are pled here. Unlike in *Blanford*, each of the three 10b5-1 plans at issue was adopted months before the first sale made pursuant to it,[12] and both the plans and sales were much farther in time from any alleged misstatement or corrective disclosure. The mere fact that the SEC

---

[12] The first plan was adopted Dec. 28, 2018, two weeks before the class period, and the sales executed under it were not until March and April 2019. Ex. 17, at 2. The second plan was adopted on Sept. 30, 2019, and governed sales on Dec. 11, 2019 and Jan. 13, 2020. *Id.* at 4, 6. The third was adopted on Dec. 12, 2019, a month after the last alleged misstatement, and governed sales on Feb. 12, 2020, after the first alleged partial corrective disclosure. *Id.* at 8.

later adopted a 90-day "cooling off" period for 10b5-1 plan sales cannot demonstrate that Kennedy's plans, which complied with the rules at the time, were entered into in bad faith.[13]

Because Plaintiffs still fail to allege any facts suggesting Kennedy adopted any 10b5-1 plan in bad faith, his 10b5-1 sales are not "unusual or suspicious" under *Bristol-Myers*; as the Court previously held, this "makes Kennedy's unexplained stock sales less numerous, less lucrative, and less consistent within the Class Period, and therefore less probative of scienter." *Tilray III*, at *4.

Only two of Kennedy's class-period sales were not pursuant to 10b5-1 plans: 149,916 shares sold on Jan. 24, 2019, and 18,970 shares sold on Apr. 2, 2019. Ex. 10, at 005, 008.[14] Under the *Skechers* factors, these sales are plainly insufficient to show motive. *In re Skechers USA, Inc. Sec. Litig.,* 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020). As Plaintiffs acknowledge, "the decisive question in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold … relative to the total number of shares that he or she *could have* sold." Opp. 8.[15] Here, the net profits and percentage of holdings cut against motive and scienter: the sales on Jan. 24 and Apr. 2 were for just $11.1 and $1.2 million, respectively, representing only 7.9% and 1.1% of the shares Kennedy could have sold on those dates.[16] As the Court previously held on the same facts, "even following Plaintiffs' logic and discounting the shares that Kennedy had no ability to trade, the total 'suspicious' trades remaining account for only approximately 15% of Kennedy's

---

[13] The 90-day rule was not even proposed until 2021. *See* https://www.sec.gov/news/press-release/2021-256.

[14] TAC ¶ 140 incorrectly indicates the Jan. 13, 2020 sale of 100,000 shares was not pursuant to a 10b5-1 plan, but the undisputed Forms 4 and 144 show they were sold under a plan adopted Sept. 30, 2019. Ex. 10, at 019; Ex. 17, at 5-6.

[15] Elsewhere Plaintiffs argue "[t]he Second Circuit has not settled whether vested options count in determining the percentage sold" (Opp. 7), but this is inconsistent with their characterization of the "decisive question," and ignores that *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995), counted vested and unvested options in its totals.

[16] *See* Ex. 10 (Forms 4) (showing 1,889,706 vested shares and exercisable options on 1/24/19; 1,799,887 on 4/2/19). These calculations *exclude* Privateer-held shares, as well as unvested options and shares; including unvested options and shares, these percentages fall to 3.6% and 0.5%. MTD 7-8, 22 nn.33, 35. Plaintiffs' outlandish claim that Kennedy sold 79.9% of the shares he accumulated by the end of the class period, depends on improperly excluding from the available total millions of fully-vested RSUs and exercisable options that he could have sold during the class period.

available shares" which "is too small … to [infer] scienter." *Tilray III*, at *4 (collecting cases).[17]

Nor do the other *Skechers* factors suggest motive. No other insiders are alleged to have sold, and the timing was not suspicious, as the sales on Jan. 24 and Apr. 2 were made at Tilray's (not Kennedy's) discretion to satisfy immediate tax withholding obligations due to vesting RSUs. *See* MTD 21-22; Ex. 11, at 079; *In re Keryx BioPharms., Inc. Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014) (such sales "are not indicative of fraud").[18] Plaintiffs argue the Jan. 24 sale was suspicious because in their view it was inconsistent with statements Kennedy made to reporters in weeks prior, but what Kennedy truthfully said was that he did not plan to cash in his long-term holdings when the IPO lockup lifted in January—very different than Tilray selling just the number of newly-vested RSUs needed to cover the sudden, large tax obligation created by their vesting, and transmitting those proceeds directly to the IRS. Indeed, even with his class-period sales, Kennedy's holdings increased significantly over the class period, further cutting against scienter. MTD 22 n.35. Plaintiffs argue these gains were from vesting RSUs and options rather than out-of-pocket purchases, but what matters is that Kennedy chose not to sell those shares even though he allegedly knew the fraud would "inevitably" come to light with filing of the 2019 10-K. Opp. 24. This makes no sense in the context of the posited fraud—particularly given that he sold far more shares *after* the alleged corrective disclosures—and cuts strongly against scienter.[19]

The TAC's other motive pleadings fare no better. As the Court previously held with respect

---

[17] Plaintiffs argue these cases involved "bit players," but courts routinely reject larger percentages for central defendants. *See, e.g.*, *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (CEO's sale of 44.6% insufficient); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (same re 44%); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (same re 22.5%).
[18] Plaintiffs argue the Forms 4 do not specifically state the sales were made to pay taxes, but that is the only reasonable inference to be drawn from documents properly before the Court, and other courts have drawn similar inferences. *See* MTD 21-22; Ex. 11, at 79; *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58-60 & n.6 (E.D.N.Y. 1998) (inferring sales right after new-options exercise were to pay taxes; timing not suspicious); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *41 & n.284 (C.D. Cal. Apr. 14, 2015) (similar; Forms 4 did not state purpose of sales).
[19] This is true whether or not the post-class-period sales were associated with his planned departure (Opp. 9); either way, he chose to hold those shares past when he allegedly knew corrective disclosures would cause the price to drop.

7

to the same allegations, "motives that are generally possessed by most corporate directors and officers do not suffice" and "Kennedy's push of the Aphria merger and the ABG Agreement could easily be a sign of simple ambition." *Tilray III*, at \*3, 5. Plaintiffs again argue Kennedy was using Tilray stock to fuel acquisitions, but Plaintiffs still have not "tie[d] these vague allegations to the misrepresentations at issue" (*id.* at \*7), and "the desire to sustain the appearance of corporate profitability is not itself the kind of incentive or motivation that raises an inference of scienter" (*DeCarlo*, 80 F.4th at 177-78). Likewise, the vague allegations of "additional self-dealing"[20] still have nothing to do with the challenged statements and lack specific factual support.

  ***Circumstantial Evidence of Recklessness.*** "Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Moreover, recklessness requires "a state of mind approximating actual intent." *Tilray III*, at \*5. Plaintiffs' handful of new allegations fail to meet this high bar.

  With respect to the ABG statements, no particularized facts suggest the statements about the timing and vetting of the ABG Agreement were false or misleading, much less that Kennedy knew or believed them to be so. *Supra* 1-3. The sole basis for this speculation is FE3's vague and conclusory assertion that negotiations took less time, but he does not claim to have been involved in the negotiations or have any other basis for personally knowing about them. *Id.* 2-3. As Plaintiffs note, Kennedy "plainly knew . . . what he himself had been doing in the past month of his life" (Opp. 20), and absent particularized facts showing otherwise, the most plausible inference to be drawn from his "consistent statements" (*id.*) about the timing of negotiations is that they were true.

  As for Plaintiffs' inventory claims, the Court previously found that the same FE allegations

---

[20] Plaintiffs' assertion that Kennedy "mocked investors by causing Tilray to revalue the contingent consideration" for an acquisition to "$420" (Opp. 12) remains off-base. The "$420" was actually *$420,000* (rounded to nearest thousand) and represented the re-valued *aggregate* consideration for three different acquisitions, audited by Deloitte. *See* Ex. 2, at 58, 77, F-36, F-51. No facts suggest Kennedy was involved in the re-valuation or benefitted from it in any way. *Id.*

did not "suggest that Kennedy . . . actually knew or had been presented with information indicating that Tilray's trim was worthless." *Tilray III*, at \*7. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* The TAC still does not do so. The only new circumstantial allegations related to inventory are (i) that Kennedy signed SOX certifications for financials in which Tilray disclosed a material weakness related to inventory costing, and (ii) that Tilray's inventory write-downs were larger at the end of 2018 and 2019 than during the intervening quarters. TAC ¶ 136. Plaintiffs argue the SOX certifications show that Kennedy "personally created and oversaw the program to address the deficiency" and was "personally involved in determining what to record as inventory at what value" (Opp. 14, 24), but this is not what the SOX certifications said nor is it a reasonable inference. *See* TAC ¶¶ 137-38. His job as CEO was to ensure appropriate processes and staff were put in place to address the deficiency, and to manage at a high level the internal functions performing that work—not to perform the work himself. The mere fact that Kennedy signed the SOX certifications cannot suggest culpable knowledge or recklessness with respect to the inventory statements.[21] Nor do the relatively larger inventory write-downs at year-end support an inference of scienter. The only basis for this argument is the hindsight assumption that because Tilray later wrote down inventory, it must have been incorrectly valued earlier, but no facts support this and Tilray explained why it was accumulating inventory in 2019—it expected to sell even larger amounts of extracts later in 2019 and in 2020. MTD 9-10. Market changes (not the correction of previous errors)[22] drove both the write-down in the 2019 10-K and Tilray's new policy of

---

[21] *See, e.g.*, *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (plaintiff "cannot raise an inference of fraudulent intent [merely] based on the signing of a certification"); *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 399 (S.D.N.Y. 2022) (collecting cases). Unlike here, Plaintiffs' cases (Opp. 15) each involved particularized facts showing actual knowledge as well as at least one financial restatement—not just a write-down due to market changes.

[22] Plaintiffs concede that the purported "admission" on the 1Q20 earnings call attributed to Kennedy in the TAC was in fact made by new CFO Michael Kruteck, but now claim this "strengthens the inference of scienter" because it suggests he "quickly discovered the accounting violations." Opp. 16 n.7. It does not: Kruteck clearly stated that the

valuing byproduct at $0 beginning in 2020. MTD 9-10; TAC ¶ 128. And even if the year-end write-downs were somehow indicative of a GAAP violation, "absent particularized fraudulent intent, GAAP violations are not probative of scienter." *Tilray III*, at \*5; *see also Tilray I*, at \*9.

The sum of these scienter allegations is as weak as its parts. Plaintiffs argue that, "read holistically," the TAC shows "Kennedy engaged in a deliberate ploy that quickly turned a large portion of his paper fortune into hard cash" and allowed him "to take personal control of Tilray" (Opp. 24-25), but none of this makes sense. Kennedy already had voting control of Tilray, with two other founders, and he chose *not* to sell the vast majority of shares available to him until after the corrective disclosures, suffering losses along with other investors. Because the non-culpable inferences remain far stronger than any inference of scienter, the TAC must be dismissed.[23]

## III.   PLAINTIFFS CANNOT STATE A SECTION 20A CLAIM.

Plaintiffs offer no separate facts or arguments in support of their 20A claim, simply asserting (without support or citation) that the TAC "alleges that Kennedy had non-public information regarding the ABG Agreement and Tilray's inventory valuation." Opp. 25. The TAC contains no particularized factual pleadings as to what material, non-public information Kennedy supposedly knew at any time, much less tie it to any specific sales he made or show that they were contemporaneous with Plaintiffs'. *See* MTD 25; *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.50 (S.D.N.Y. 2008). And the only "predicate violations" alleged are Plaintiffs' Sections 10(b) and 20(a) claims, which fail as discussed above. These flaws require dismissal.

## IV.   CONCLUSION

Plaintiffs have now failed four times to plead a cognizable claim; they should not get another chance. Defendants respectfully ask the Court to dismiss the TAC with prejudice.

---

new policy was due to market changes, not previous GAAP violations, and no financials were restated. TAC ¶ 128.

[23] Because Plaintiffs fail to state a §10(b) primary violation, their § 20(a) claims also fail. *See* MTD 25.

Dated: January 26, 2024

Respectfully submitted,

BAKER & HOSTETLER LLP

By: _/s/ Douglas W. Greene_

Douglas W. Greene (*pro hac vice*)
dgreene@bakerlaw.com
Genevieve G. York-Erwin
gyorkerwin@bakerlaw.com
Zachary R. Taylor
ztaylor@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200

*Attorneys for Defendants*

11