UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____        │
│ DATE FILED:  9/30/2024   ___         │
└─────────────────────────────────────┘
```

GANESH KASILINGAM, *individually and on behalf of all others similarly situated*,

Plaintiff,

-against-

TILRAY, INC., BRENDAN KENNEDY, and MARK CASTANEDA,

Defendants.

1:20-cv-03459-MKV

**OPINION AND ORDER GRANTING MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH PREJUDICE**

MARY KAY VYSKOCIL, United States District Judge:

Lead Plaintiff Saul Kassin and Named Plaintiffs Craig Scoggin, Surinder Chandok, and Leslie Rose (together, "Plaintiffs"), investors in Defendant Tilray, Inc. ("Tilray"), bring this putative class action against Tilray and its President and Chief Executive Officer, Defendant Brendan Kennedy ("Kennedy") (together with Tilray, "Defendants")[1] asserting claims pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 2401.10b-5. Plaintiffs allege that Defendants disseminated false and misleading statements to artificially inflate the price of Tilray's stock. Specifically, Plaintiffs allege that Defendants materially misrepresented aspects of Tilray's financials and of a global co-marketing deal that Tilray entered with Authentic Brands Group, LLC (the "ABG Agreement").

Defendants move to dismiss Plaintiffs' Third Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because, for the reasons

---

[1] Defendant Mark Castaneda, originally sued in this case, is not named in the Third Amended Complaint.

that follow, the Court finds that Plaintiffs have failed to adequately plead scienter, Defendants'

motion is GRANTED and the Third Amended Complaint is dismissed with prejudice.

## BACKGROUND

The Court assumes familiarity with the facts of this case as set forth in several prior

opinions. *See Kasilingam v. Tilray, Inc.* (*Tilray I*), No. 20-CV-03459 (PAC), 2021 WL 4429788

(S.D.N.Y. Sept. 27, 2021); *Kasilingam v. Tilray, Inc.* (*Tilray II*), No. 20-CV-03459 (PAC), 2022

WL 4537846 (S.D.N.Y. Sept. 28, 2022); *Kasilingam v. Tilray, Inc.* (*Tilray III*), No. 20-CV-03459

(PAC), 2023 WL 5352294 (S.D.N.Y. Aug. 21, 2023).  The Court recites here only the key facts,

including newly pleaded allegations, that are relevant to the Court's resolution of the present

motion.

### I.    Defendants' Request for Judicial Notice

All allegations are drawn from the Third Amended Complaint [ECF No. 132 ("TAC")],

the pleaded facts of which are accepted as true for purposes of this motion. *See Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007);

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196

(2d Cir. 2009).  The Court also considers documents incorporated into the Third Amended

Complaint by reference and matters of which the Court may take judicial notice. *See Tellabs*, 551

U.S. at 322.

Defendants request that the Court take judicial notice of certain documents, including

transcripts of Tilray's earnings calls, various published SEC documents, and several news articles,

which they attach as exhibits to the Declaration of Douglas W. Greene submitted with their request.

[ECF Nos. 135, 136 ("Greene Decl.")].   Plaintiffs filed an opposition to Defendants' request for judicial notice.  [ECF No. 139].  Defendants filed a reply brief.  [ECF No. 141].

In *Tilray II*, the Court considered Defendants' request for a "full context review," which was based on substantially the same documents that Defendants now ask the Court to consider in their request for judicial notice.  [*See* ECF Nos. 101, 102].  The Court declined to conduct a "full context review" and cautioned that, to the extent it did consider Defendants' record, it did so only to "determine what the documents stated," not for the truth of the matters asserted therein.  *Tilray II*, 2022 WL 4537846, at *1 (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

Consistent with *Tilray II*, to which this Court defers under the law of the case doctrine*, see infra*, the Court will take judicial notice of all documents, namely published SEC documents, that are relied on by and incorporated into the Third Amended Complaint.  *See Tilray II*, 2022 WL 4537846, at *1; *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–84 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).  The Court will not review SEC documents that are not incorporated into the Third Amended Complaint.  *See Tilray II*, 2022 WL 4537846, at *1; *Gray*, 454 F. Supp. 3d at 383–84.  In addition, because "[i]t is improper for this Court to supplant the allegations of the Plaintiff[s] at the pleadings stage, . . . it declines to take judicial notice of Defendants' news articles."  *Tilray II*, 2022 WL 4537846, at *1.

## II.    Factual Background

### A.  The Parties

Tilray produces and sells marijuana, hemp, and related products derived from the cannabis plant.  TAC ¶ 37.  In July 2018, Tilray held an IPO and its shares began publicly trading on the NASDAQ.  TAC ¶¶ 12, 38.  Plaintiffs are individuals who purchased Tilray common shares on the NASDAQ at allegedly artificially inflated prices from January 16, 2019 to March 2, 2020 (the "Class Period").  TAC ¶¶ 1, 36.  Kennedy served as Tilray's President, Chief Executive Officer,

and a member of its board.  TAC ¶ 39.  In 2011, Kennedy and two other individuals founded Privateer Holdings, Inc. ("Privateer") to invest in the cannabis industry.  TAC ¶ 43.  Kennedy served as Privateer's Executive Chairman.  TAC ¶ 39.  At the beginning of the Class Period, Privateer held 82% of the economic interest in, and 93% of the voting power over, Tilray.  TAC ¶ 38.

    B.  <u>Marijuana "Trim" and Inventory</u>

Before and during the Class Period, Tilray earned most of its revenue from the Canadian market.  TAC ¶¶ 3, 37, 52–53.  In June 2018, Canada legalized marijuana for adult recreational use, effective October 2018 (the "Cannabis Act"). [2]  TAC ¶¶ 55–56.  Certain leaves, and the stalks, twigs, and stems of the cannabis plant, which the industry calls "trim," do not contain enough THC[3] to be smoked.  TAC ¶¶ 5, 50.  However, trim may be extracted and used to make other products.  TAC ¶ 50.  The Cannabis Act did not legalize the sale of products extracted from the cannabis plant.  TAC ¶ 58.  In June 2019, the Canadian government enacted new legislation that permitted producers to submit cannabis extract products to the government for case-by-case approval, beginning in December 2019.  TAC ¶ 61.  Accordingly, Plaintiffs allege that "Tilray's trim would only have value if (a) the Canadian government approved the sale of the products in which Tilray would use the trim (b) early enough that Tilray [could] sell the product" before the trim perished.  TAC ¶¶ 63–64.

Tilray historically recorded trim as inventory.  TAC ¶¶ 7, 68.  Plaintiffs allege that in doing so, Tilray violated Generally Accepted Accounting Principles ("GAAP"), which provide that if a product can only be sold if a contingency outside of the company's control occurs, the company

---

[2] Marijuana is a Schedule I controlled substance in the United States.  TAC ¶ 51; *see Gonzales v. Raich*, 545 U.S. 1, 15 (2005); *United States v. Amalfi*, 47 F.4th 114, 121 (2d Cir. 2022).

[3] THC, or tetrahydrocannabinol, is the active ingredient in marijuana.  TAC ¶ 45.

cannot record that product as inventory.  TAC ¶¶ 6, 79.  Plaintiffs further allege that "[b]y misclassifying trim, Defendants embellished Tilray's financial performance," because such misclassification resulted in an overstatement of Tilray's gross margin.  TAC ¶¶ 8–9, 83–91.

The Forms 10-Q filed by Tilray with the SEC for the first three quarters of 2019 described how Tilray valued its inventory, including that inventory was comprised of raw materials, finished goods, and work-in-process.  TAC ¶ 111.  Kennedy certified the 10-Qs pursuant to the Sarbanes-Oxley Act of 2002, attesting that he had "reviewed" the 10-Qs, which, "based on [his] knowledge," did not "contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made [] not misleading" (the "SOX Certifications").  TAC ¶¶ 108–110. Plaintiffs allege that the statement in the 10-Qs regarding inventory was false or misleading because Tilray recognized trim as inventory when it had "no ready market" for trim, in violation of GAAP.  TAC ¶ 113.

The 10-Qs further stated that Tilray performed an assessment of inventory obsolescence at the end of each reporting period.  TAC ¶ 116.  Plaintiffs allege that this statement was false or misleading because, in a statement after the close of the Class Period, during Tilray's Q1 2020 earnings call on May 11, 2020, Tilray's CFO[4] relayed that Tilray was "accounting for our byproduct on a zero basis" "so that we don't have any write-offs at the end of the year."  TAC ¶ 128.  Plaintiffs allege that this statement, and the historic timing of Tilray's write-offs, confirm that Tilray assessed inventory annually, not quarterly, in violation of the procedure it stated to investors.  *See* TAC ¶¶ 129–133.  Further, Plaintiffs allege that Kennedy was aware of Tilray's issues with inventory because, in Tilray's Form 10-K filed with the SEC, Tilray identified a "material weakness" "related to inventory costing and the financial close process."  TAC ¶ 136.

---

[4] The Third Amended Complaint incorrectly attributes this statement to Kennedy.  *See* Pl. Opp. 16 n.7.

"Specifically, [Tilray's] processes are manual in nature such that a timely, sufficiently precise and detailed review to mitigate the risk of material misstatement is not currently feasible due to the complexity of the spreadsheet-based models used in inventory cost calculations and the financial close." Greene Decl. Ex. 4 at 31. Tilray "developed a plan to remediate the material weakness" regarding inventory. TAC ¶ 137; Greene Decl. Ex. 4 at 31. Kennedy's SOX Certifications attested that he and Tilray's "other certifying officer(s) . . . are responsible for establishing and maintaining disclosure controls and procedures" and that the report "[d]isclosed . . . any change in [Tilray's] internal control over financial reporting that occurred during [Tilray's] most recent fiscal quarter . . . ." TAC ¶ 138.

Tilray's 2019 Form 10-K, filed with the SEC on March 2, 2020, reported that Tilray had written down its inventory by $63.5 million. Greene Decl. Ex. 2 at 64; TAC ¶ 68. In particular, "cannabis products were written down by [$49.3 million,] primarily as a result of an accumulation of oil and cannabis by-product to be converted into oil, as regulations did not allow the sale of these products until December 2019." Greene Decl. Ex. 2 at F-30; TAC ¶¶ 10, 69. On March 3, 2020, Tilray's share price fell from $15.35 to $13.02, down 15.2%. TAC ¶ 125. On March 4, 2020, Tilray's share price fell a further 3.9%, to $12.51. TAC ¶ 126.

### C. The ABG Agreement

On January 15, 2019, Tilray announced a co-branding agreement with Authentic Brands Group, LLC ("ABG"), which owns and markets leading brands such as Brooks Brothers and Juicy Couture. TAC ¶ 95. Kennedy had long touted branding as the future of the cannabis industry. *See, e.g.*, TAC ¶¶ 92–94. The purpose of the ABG Agreement was to expand ABG's brands into the cannabis market, namely through CBD[5] products, throughout the world. TAC ¶ 95. Pursuant

---

[5] Cannabidiol, or CBD, is a hemp-based derivative of the cannabis plant. The U.S. Farm Bill, passed on December 20, 2018, exempted hemp products from the Controlled Substances Act. TAC ¶¶ 46, 103; *see also United States v.*

to the ABG Agreement, Tilray would pay ABG $100 million in cash and stock, and up to $150 million in future consideration, to become ABG's preferred supplier of marijuana and CBD products, and would receive up to 49% of net revenue from cannabis products bearing ABG brand names, with a guaranteed annual minimum payment of $10 million.  TAC ¶ 96.

Kennedy made the following statements about the formation of the ABG Agreement:

- On January 15, 2019, the day Tilray announced the ABG Agreement, Kennedy stated at the ICR Conference for investors that "[ABG] had been looking at the industry for about a year both in the United States and in Canada, looking at some of the U.S. operators as well as the Canadian licensed producers.  [Tilray] met with them pretty late in that process, really just in the last, I guess, six weeks or so.  And we reached an agreement that we announced this morning, the idea would be for us to together produce CBD products here in the U.S. and globally under their brand." TAC ¶ 101.

- A January 16, 2019 *Financial Post* article quoted Kennedy as stating that "[ABG] liked our focus on research and science, and when the U.S. Farm Bill passed, things started coming together."  Kennedy posted a link to this article to his personal Twitter account.  TAC ¶¶ 102–103.

- On May 14, 2019, during Tilray's Q1 2019 earnings call, Kennedy stated:  "[W]e know how to partner well not only with pharmaceutical and alcohol companies but with companies like [ABG] that own over 50 iconic brands.  They went through a similar vetting process [considering partnering with a Canadian producer, versus using their own consumer packaged goods brands] and decided that it's much better for them in the long run to partner with Tilray than do it alone."  TAC ¶¶ 105–106.

Plaintiffs allege that these statements were false or misleading because, according to a confidential former-employee witness, "the ABG Agreement was proposed, negotiated, and closed in literally a matter of *days*."  TAC ¶ 99; *see* TAC ¶¶ 104, 107.  This employee alleges that only Kennedy and

---

*King*, No. 22-1024, 2023 WL 6842445, at *2 (2d Cir. Oct. 17, 2023) (explaining that CBD is not subject to the Controlled Substances Act and "is found in many consumer products such as oils and lotions").

one other Tilray representative negotiated the deal, and "barely consulted with anyone else at Tilray" about it.  TAC ¶ 99.

On January 30, 2020, Tilray announced that it had renegotiated the ABG Agreement such that it relieved ABG of its annual payments to Tilray, which "Tilray had boasted . . . were a key provision" of the deal.  TAC ¶¶ 16–17, 118–119.  On January 30, 2020, Tilray's share price fell from $19.22 to $17.54, down 8.8%.  TAC ¶ 120.

On March 2, 2020, Tilray disclosed in its 2019 Form 10-K that it had impaired the value of the ABG Agreement by $102.6 million, 85.9% of its value, due to "deferred regulatory clarity for sales of CBD products in the United States."  TAC ¶ 122; Greene Decl. Ex 2 at F-28.  As already noted with respect to Tilray's share prices following the inventory adjustments disclosed in its 2019 10-K, Tilray's share price fell 15.2% on March 3, 2020, and a further 3.9% on March 4, 2020.  TAC ¶¶ 125–126.

D. <u>Kennedy's Stock Sales</u>

During the Class Period, Kennedy sold over $28 million in Tilray shares.  TAC ¶ 140.  By Plaintiffs' calculation, Kennedy sold 79.9% of his total Tilray shares that were available to sell, although the parties dispute the proper percentage calculation.  TAC ¶ 140; *see Tilray III*, 2023 WL 5352294, at *4.  Plaintiffs allege that the timing of Kennedy's sales is suspicious, as they primarily occurred soon after Defendants announced the ABG Agreement on January 15, 2019, and then shortly before the announcement of the renegotiation of the Agreement (the "first corrective disclosure") on January 30, 2020.  TAC ¶¶ 140, 143.  Kennedy's remaining sales took place shortly before March 2, 2020, when Tilray filed its 2019 Form 10-K disclosing inventory adjustments and the impairment of the ABG Agreement (the "second corrective disclosure").  TAC ¶¶ 140, 145.  Plaintiffs also point to statements that Kennedy made in October 2018 and January 2019, stating that he did not expect to sell his Tilray shares, including after the post-IPO lockup

8

lifted.  TAC ¶¶ 141–142.  A week after Kennedy made the January 2019 statement, he sold over $11 million in shares.  TAC ¶ 142.

Thirteen of Kennedy's fourteen[6] stock sales during the Class Period were completed pursuant to Rule 10b5-1 trading plans.[7]  TAC ¶ 140.  Plaintiffs posit that these plans were suspiciously timed, alleging they were adopted close enough to the planned sales to permit Kennedy to benefit from material nonpublic information.  TAC ¶¶ 147–150.

E.  Tilray's Acquisitions and Kennedy's Aspirations

During the Class Period, Tilray used its stock to finance acquisitions of other companies.  Part of the consideration for the ABG Agreement included Tilray Shares.  TAC ¶ 225.  In addition, Tilray acquired other companies, including Natura Natural Holdings Inc., Manitoba Harvest, Smith & Sinclair, Ltd.[8], and 420 Investments Ltd.; at least part of the consideration for these acquisitions was paid in Tilray stock.  TAC ¶ 225.  In total, in 2019, "Tilray spent $497 million of its shares to fund acquisitions."  TAC ¶ 226.

Plaintiffs allege that Kennedy aspired for Tilray, and himself, to become global leaders in the cannabis industry.  *See, e.g.*, TAC ¶¶ 182–192, 196–207.  Plaintiffs allege that Kennedy positioned himself to do so by taking direct control of Tilray through a share exchange (the "Share Exchange") that closed on December 12, 2019, in which Privateer's Tilray shares were cancelled and acquired by Tilray, and Privateer investors received new Tilray shares in proportion to their

---

[6] Defendants note that the Third Amended Complaint incorrectly states that only ten sales were made pursuant to 10b5-1 plans.  [ECF No. 134 at 21 n.28].  Plaintiffs do not dispute this correction, which is supported by SEC records and is thus accepted by the Court.  *See* Greene Decl. Ex. 10 at 019–20 (establishing that Kennedy's January 13, 2020 sales were made pursuant to a 10b5-1 trading plan).

[7] Rule 10b5-1 allows company insiders to sell company stock while remaining in compliance with insider trading laws by adopting a trading plan that predetermines the number of shares and the time of sale.

[8] Smith & Sinclair, Ltd. was 30% owned by Privateer.  TAC ¶ 156.  Tilray paid approximately $2.4 million for Privateer's stake, which was distributed directly to Kennedy.  TAC ¶ 157.  Plaintiffs allege that this transaction was completed to secure cash for Kennedy to pay a personal tax bill.  TAC ¶ 156.

economic interest, but with all supervoting shares going to the controlling shareholders, including Kennedy.  TAC ¶¶ 171, 179.  Privateer investors agreed to a two-year lockup of their shares as part of the Share Exchange.  TAC ¶¶ 27–29.  The Share Exchange left the controlling shareholders with 31% of the economic interest in Tilray, but 73% of its voting power.  TAC ¶ 172.

Plaintiffs allege that through the Share Exchange, Kennedy was able to determine Tilray's future.  TAC ¶¶ 30, 194–195.  In the fall of 2019, Tilray entered merger negotiations with a Canadian cannabis company, Aphria, Inc.  TAC ¶ 196.  An early term sheet in Tilray's negotiations with Aphria provided that Kennedy would become CEO of the combined company.  TAC ¶ 203.  Tilray's controlling shareholders, by themselves, could ensure swift shareholder approval of the Aphria merger.  TAC ¶¶ 206, 210.  The COVID-19 pandemic put Tilray's discussions with Aphria on hold, but a plan of merger was announced on December 15, 2020.  TAC ¶¶ 208–211.  Pursuant to the final proposed merger, Kennedy would become Director, and Aphria's CEO would become CEO, of the combined company.  TAC ¶ 213.[9]

## **PROCEDURAL HISTORY**

This action was commenced upon the filing of a Complaint and was initially assigned to the Honorable Paul A. Crotty.  [ECF No. 1].  Following the Court's appointment of Lead Plaintiff and lead counsel for the class, Plaintiffs filed the First Amended Complaint.  [ECF No. 78].  Defendants moved to dismiss the First Amended Complaint pursuant to Rule 12(b)(6).  [ECF No. 82].  The Court granted Defendants' motion, finding that the First Amended Complaint failed to adequately plead scienter as to its Section 10(b) and Rule 10b-5 claim under either a theory of motive and opportunity to commit fraud, or conscious misbehavior or recklessness, and that

---

[9] The merger was completed on May 3, 2021, after the Class Period and prior to the filing of this case.  *See* Stephanie Bedard-Chateauneuf, *Tilray's Merger With Aphria Closes, Creates Global Cannabis Leader*, Nasdaq (May 3, 2021, 11:52 AM), https://www.nasdaq.com/articles/tilrays-merger-with-aphria-closes-creates-global-cannabis-leader-2021-05-03.

Plaintiffs' remaining claims failed by extension for failure to allege a primary violation of the securities laws. [ECF No. 92]. *See Tilray I*, 2021 WL 4429788, at *1, *8, *13. The Court granted Plaintiffs leave to replead, *id.* at *13, and Plaintiffs filed the Second Amended Complaint. [ECF No. 95 ("SAC")].

Defendants again moved to dismiss the Second Amended Complaint. [ECF No. 99]. The Court denied Defendants' motion except as to Plaintiffs' allegations regarding Defendants' misrepresentation of labor costs, for which the Court found Plaintiffs did not adequately allege loss causation. [ECF No. 109]. *See Tilray II*, 2022 WL 4537846, at *1, *11. Regarding the element of scienter, the Court found that Plaintiffs' allegations regarding Kennedy's stock sales throughout the Class Period plausibly indicated motive and opportunity to commit fraud. *Id.* at *9. As to motive, the Court found that the Second Amended Complaint "plausibly alleges that Kennedy significantly and foreseeably received a concrete, personal benefit from the alleged fraud by selling a significant amount of his tradeable stock just after the announcement of the ABG Agreement." *Id.* As to opportunity, the Court found that "Plaintiffs[] plausibly allege the ABG Agreement significantly arrested the fall of the Tilray stock price." *Id.* Although Defendants offered, as a competing nonculpable inference, evidence that Kennedy's Tilray trades were completed pursuant to several 10b5-1 plans, the Court held that "the mere presence of a 10b5-1 plan is not a complete defense to scienter," especially because the plans were entered into shortly before and during the Class Period. *Id.*

Defendants moved for reconsideration of the Court's denial of their motion to dismiss. [ECF No. 110]. The Court granted Defendants' motion for reconsideration, and based on its reconsidered analysis of the motion to dismiss, dismissed the Second Amended Complaint for failure to plead scienter. [ECF No. 129]. *See Tilray III*, 2023 WL 5352294, at *1, *7–*8. The Court explained that in previously determining that Plaintiffs had adequately pleaded scienter, the

Court had "neglected aspects of Defendants' arguments and overlooked controlling Second Circuit precedent" in *Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022). *Tilray III*, 2023 WL 5352294, at *3. In *Bristol-Myers Squibb*, the Second Circuit held that the defendants' stock trades, though resulting in significant profits, were not unusual enough to warrant a finding of motive to support scienter, including because "the vast majority of the sales were conducted pursuant to a 10b5-1 trading plan or were executed for procedural purposes, and therefore could not be timed suspiciously." *Bristol-Myers Squibb Co.*, 28 F.4th at 355–56. The Second Circuit noted that the plaintiffs had failed to allege suspicious timing of the defendants' 10b5-1 plan because, even though the plan was entered into during the class period, the plaintiffs did not allege "that the purpose of the plan was to take advantage of an inflated stock price"—in other words, that the plan was entered into in bad faith. *See id.* at 356 n.4 (internal quotation marks omitted). Thus, under *Bristol-Myers Squibb*, the *Tilray II* Court erred in finding scienter by way of motive and opportunity, because it relied solely on the purported suspicious timing of the 10b5-1 plans without addressing whether Plaintiffs alleged that Kennedy had entered into the plans in bad faith. *Tilray III*, 2023 WL 5352294, at *3.

Applying *Bristol-Myers Squibb* in its reconsidered analysis, the *Tilray III* Court concluded that the Second Amended Complaint failed to adequately allege scienter. The Court found that its prior analysis had "weighed Kennedy's financial benefit too heavily," and that "[b]y providing evidence that Kennedy traded pursuant to 10b5-1 plans, Defendants have offered at least one cogent inference of a non-culpable explanation for Kennedy's trades and his financial benefit during the Class Period . . . (that is, that those trades were innocently scheduled pursuant to 10b5-1 plans)." *Id.* at *4. "[T]hat inference is stronger than the one presented by Plaintiffs." *Id.* In addition, the Court found that "[a]bsent sufficient allegations regarding Kennedy's financial benefit" being pursued in bad faith, Plaintiffs' other motive allegations regarding Kennedy's

ambitions to become "the leader of the cannabis world" were weaker and failed to cure the complaint's deficiencies, because "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Id.* at *5 (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007)).

The Court proceeded to consider Plaintiffs' allegations of Kennedy's conscious misbehavior or recklessness, which had not been necessary in *Tilray II* as the Court had found motive and opportunity. *See id.* at *5–*6. The Court found that Plaintiffs' allegations, supported by confidential witnesses, Defendants' former employees, were insufficient to plead Kennedy's intent to deceive, particularly because "[e]ven where . . . Plaintiffs adequately alleged that [Tilray's] inventory analysis was false, the SAC contains no allegations that Kennedy *himself* was or should have been on notice that the analysis was false." *Id.* at *6. The Court further found, as to the ABG Agreement, that Plaintiffs did not allege facts "to suggest that Kennedy or other Tilray decisionmakers subjectively felt the company's due diligence was lacking, much less that they believed the deal to be worse for the company than advertised." *Id.* at *7 (quoting *Tilray I*, 2021 WL 4429788, at *10). The Court finally rejected Plaintiffs' remaining alleged circumstantial evidence in support of scienter: "(1) Kennedy's statements on the valuation of trim (in a manner that would violate GAAP); (2) Kennedy referring to extract revenues as Tilray's favorite metric; (3) the volume of Tilray stock immediately after the [S]hare [E]xchange; and (4) Tilray's use of stock as currency for acquisitions." *Id.*

The Court concluded on reconsideration that because Plaintiffs failed to adequately plead scienter in the Second Amended Complaint, their Section 10(b) and Rule 10b-5 claim failed and must be dismissed. It further held that because Plaintiffs failed to allege an underlying securities claim, their Section 20(a) and 20A claims should be dismissed as well. *Id.* The Court granted Plaintiffs "one final opportunity to amend the deficiencies in their complaint." *Id.* at *8.

Thereafter, Plaintiffs filed the operative Third Amended Complaint.  [ECF No. 132].  Defendants moved to dismiss the Third Amended Complaint, filing a memorandum of law in support.  [ECF Nos. 133, 134 ("Def. Mem.")].  Plaintiffs filed an opposition to the motion to dismiss [ECF No. 137 ("Pl. Opp.")], and a Declaration of Jonathan Horne accompanied by several exhibits [ECF No. 138].[10]  Defendants filed a reply brief in further support of their motion.  [ECF No. 140 ("Def. Reply")].  After the motions became fully briefed, the case was reassigned to the undersigned.

## LEGAL STANDARDS

### I.    Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  While the Court "must accept as true all of the allegations contained in a complaint," this "tenet . . . is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference," "matters of which judicial notice may be taken," and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks omitted) (quoting

---

[10] The Court did not rely on these exhibits in resolving the present motion.

*Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see Tellabs*, 551 U.S. at 322.

## II.    Securities Fraud Claims and Heightened Pleading Requirements

"To state a private securities-fraud claim under section 10(b) and Rule 10b-5, a plaintiff must plead '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *see also Tellabs*, 551 U.S. at 319 (defining scienter as "a mental state embracing intent to deceive, manipulate, or defraud" (internal quotation marks omitted)).

Securities fraud claims must meet the heightened pleading standards imposed by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See In Re Philip Morris*, 89 F.4th at 416–17. Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

"The PSLRA builds on Rule 9's particularity requirement, dictating the pleading standard for claims brought under the Exchange Act." *Id.* at 304. The PSLRA mandates that a securities fraud complaint "specify each statement alleged to have been misleading[ and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind," or scienter. 15 U.S.C. § 78u-4(b)(1)–(2)(A); *In Re Philip Morris*, 89 F.4th at 417. "This 'state of mind' requires a showing 'of intent to deceive, manipulate, or defraud,' or recklessness." *Blanford*, 794 F.3d at 305 (citations omitted) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976), and citing *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).

To adequately plead scienter, a complaint must allege facts showing either: (1) a "motive and opportunity to commit the fraud"; or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 306 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Id.* (quoting *ECA, Loc. 134*, 553 F.3d at 199).

"[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, [and] thus strong in light of other explanations." *Id.* at 324. Accordingly, a securities fraud "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* "Therefore, '[w]hile [a court] normally draw[s] reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Loc. 134*, 553 F.3d at 196 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)); *see also In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 578

(S.D.N.Y. 2010) (noting that the PSLRA "modifies the Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action"); *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 n.8 (S.D.N.Y. 2017) (*Tellabs* requires "the consideration of competing nonculpable inferences") .

## **DISCUSSION**

### I.    **The Court's Prior Opinions are the Law of the Case**

As an initial matter, the Court notes that "[t]he law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks omitted).  This principle applies to a court's rulings on a motion to dismiss, and "prohibits a plaintiff from reasserting in an amended pleading claims that have previously been dismissed" "without material alteration."  *Gurvey v. Cowan, Liebowitz & Latman, P.C.*, No. 06 CIV. 1202 LGS HBP, 2015 WL 4460859, at *5 (S.D.N.Y. July 21, 2015); *see also Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y.) (where "the Amended Complaint . . . is in large part identical to Plaintiffs' first Complaint, the law of the case doctrine counsels against reconsideration of the Court's . . . dismissal of the first Complaint"), *aff'd*, 626 F. App'x 20 (2d Cir. 2015); *State Farm Mut. Auto. Ins. Co. v. Mallela*, No. CV-00-4923 (CPS), 2002 WL 31946762, at *8 (E.D.N.Y. Nov. 21, 2002) ("A dismissal without prejudice for failure to state a claim may have a binding effect on later motions to dismiss so long as the determination being accorded preclusive effect was essential to the dismissal." (internal quotation marks omitted)).

Upon the reassignment of a case, "the new judge is well advised to pay particular heed to the doctrine of law of the case, and not to attempt a *de novo* review of all of the many orders and decisions made over a lengthy period by diligent and experienced judicial officers who have

handled the case previously." *Peyser v. Searle Blatt & Co.*, No. 99 CIV. 10785 (GEL), 2004 WL 307300, at *1 (S.D.N.Y. Feb. 17, 2004) (internal quotation marks omitted); *see Waverly Props., LLC v. KMG Waverly*, No. 09 CIV. 3940 (PAE), 2011 WL 13322667, at *1 (S.D.N.Y. Dec. 19, 2011) ("A reassignment . . . does not itself supply a persuasive basis to revisit the prior rulings in a case.").

In this case, the Court finds no cogent and compelling reason to revisit Judge Crotty's rulings resolving Defendants' prior motions to dismiss, as modified by his grant of Defendants' motion for reconsideration. *See Tilray I*, 2021 WL 4429788; *Tilray II*, 2022 WL 4537846; *Tilray III*, 2023 WL 5352294. Accordingly, the Court analyzes Plaintiffs' allegations in the Third Amended Complaint guided by Judge Crotty's decisions in *Tilray I*, *Tilray II*, and *Tilray III*, and will not depart from his findings to the extent the Third Amended Complaint repleads allegations on which the Court has previously ruled.

## II.    Plaintiffs Fail to Plead Scienter

As noted, to adequately plead the scienter element of their Section 10(b) and Rule 10b-5 claim, Plaintiffs must allege facts showing either Defendants': (1) "motive and opportunity to commit the fraud"; or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Blanford*, 794 F.3d at 306 (quoting *ATSI Commc'ns*, 493 F.3d at 99). The Court finds that Plaintiffs continue to fail to plead scienter through either avenue in the Third Amended Complaint, and therefore fail to state a Section 10(b) and Rule 10b-5 claim.

A.    <u>Motive and Opportunity</u>

The Court first considers whether Plaintiffs adequately plead Kennedy's scienter through allegations of his "motive and opportunity to commit the fraud." *Id.* "Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quoting *Novak v.*

*Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).  "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  *Id.*  Plaintiffs allege motive based on two theories: (1) Kennedy's stock sales during the Class Period; and (2) Kennedy's "other motives," including Tilray's acquisitions of other companies and Kennedy's ambitions to gain control of Tilray and ultimately lead the global cannabis industry.  *See* Pl. Opp. 4–13.  Neither theory succeeds.

> ### i.  *Kennedy's Stock Sales*

Where a defendant's concrete benefit is alleged through stock sales, "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter."  *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020) (quoting *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344 (W.D.N.Y. 2008)).  Rather, the Court must determine whether "plaintiffs . . . establish that the sales at issue were 'unusual' or suspicious."  *Id.*  To do so, the Court considers the following factors:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

*Id.*  The Second Circuit has held that where "the vast majority of [stock] sales were conducted pursuant to a 10b5-1 trading plan or were executed for procedural purposes," they "could not be timed suspiciously" absent allegations "that the purpose of the plan was to take advantage of an inflated stock price," *i.e.*, that the plan was adopted in bad faith.  *Bristol-Myers Squibb*, 28 F.4th at 356 & n.4 (internal quotation marks omitted); *see In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 (S.D.N.Y. 2023) (holding that while "the mere existence of a trading plan will not

defeat an otherwise strong inference of scienter where, as here, the plans were entered into during the class period . . . the SAC does not plead facts giving rise to an inference that the plans themselves were suspect" (internal quotation marks omitted)).

In *Tilray III*, the Court analyzed all of Kennedy's stock sales that Plaintiffs now reallege in the Third Amended Complaint. *Compare* SAC ¶ 220, *with* TAC ¶ 140. The Court, applying *Bristol-Myers Squibb*, found that Kennedy's sales were not unusual or suspicious, primarily because the majority of the sales were executed pursuant to Rule 10b-5 trading plans and Plaintiffs did not allege that the plans were adopted in bad faith. *See Tilray III*, 2023 WL 5352294, at *3–*4. "This narrows any potential untoward financial benefit received by Kennedy significantly. . . . The explanation of the 10b5-1 plan thus makes Kennedy's unexplained stock sales less numerous, less lucrative, and less consistent within the Class Period, and therefore less probative of scienter— in timing, scale, and in number of shares sold." *Id. at* *4. The Court also found that, removing the sales conducted pursuant to 10b5-1 plans, the percentage of shares sold as a total of Kennedy's available shares "is too small, on its own, to create an inference of scienter" under the case law of this District. *Id.*

In the Third Amended Complaint, Plaintiffs have not alleged any new facts regarding Kennedy's stock sales sufficient to persuade the Court that there are cogent and compelling reasons to depart from *Tilray III*'s holding. *See Johnson*, 564 F.3d at 99. The sole new factual allegation that Plaintiffs raise with respect to Kennedy's stock sales is that the SEC recently amended Rule 10b5-1 to mandate a 90-day cooling-off period between the adoption of a trading plan and the first planned sale. *See* TAC ¶ 147. Plaintiffs note that in making the revision, the "[t]he SEC cited extensive literature showing that insiders were adopting 10b5-1 plans close enough to planned sales to benefit from material nonpublic information." TAC ¶ 147. Plaintiffs in turn posit that because some of Kennedy's 10b5-1 plan sales occurred within 90 days of the plans' adoption, the

plans must have been adopted in bad faith. *See* TAC ¶¶ 148–150; Pl. Opp. 5. But Plaintiffs cannot use an SEC rule change enacted *after* Kennedy's 10b5-1 plans were adopted to retroactively imbue bad faith into sales that complied with the SEC rule in effect at the time. *See* Def. Mem. 21 & n.29; Def. Reply 5–6 & n.13 (noting that the SEC's amendment was not proposed until 2021). Moreover, courts in this District have rejected "generalized allegations" of suspect 10b5-1 plans that "rel[y] only on recent publications suggesting that trading plans may be abused." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764 (S.D.N.Y. 2018). That is particularly true where, as here, the complaint "does not plead any facts about the trading plans" that the defendant, specifically, adopted. *In re DraftKings*, 650 F. Supp. 3d at 176; *In re Aratana*, 315 F. Supp. 3d at 764.

Plaintiffs all but concede that they do not plead any new material allegations regarding Kennedy's stock sales, instead arguing that "the Court's initial decision [in *Tilray II*] that Kennedy's stock sales sufficed to allege his scienter was correct" and that "[t]he Court got it right the first time." Pl. Opp. 4; *see also* Pl. Opp. 7–8 (attempting to distinguish cases that the *Tilray III* Court cited in support of dismissal). Plaintiffs' opposition to Defendants' motion to dismiss the Third Amended Complaint is not a proper vehicle for Plaintiffs to seek reconsideration of the *Tilray III* Court's decision. Because the allegations in the Third Amended Complaint regarding Kennedy's stock sales largely repeat the already dismissed allegations in the Second Amended Complaint "without material alteration," the Court must, under the law of the case doctrine, reject Plaintiffs' allegations of Kennedy's stock sales as probative of Kennedy's motive sufficient to plead his scienter. *Gurvey*, 2015 WL 4460859, at *5; *see Weslowski*, 96 F. Supp. 3d at 316.

    *ii.  Kennedy's Other Motives*

In *Tilray III*, the Court found that "[a]bsent sufficient allegations regarding Kennedy's financial benefit, Plaintiffs' arguments that he sought to be the leader of the cannabis world through

the Aphria merger appear significantly weaker and fail to cure the deficiencies plaguing the FAC." *Tilray III*, 2023 WL 5352294, at *5. Thus, the Court in *Tilray III* clarified that its finding in *Tilray II* that allegations of Kennedy's other motives supported scienter relied on the buttressing strength of his suspicious stock trades; Plaintiffs' "other motives" allegations could not, on their own, establish scienter. *See id.* ("The Court relied heavily on Kennedy's suspicious trading practices to bolster Plaintiffs' allegations of motive in *Tilray II*. If those trades are not suspicious, the Court must find that Plaintiffs failed to establish an adequate motive from which the Court may infer scienter." (citation omitted)). Plaintiffs argue that "[b]ecause the Court correctly weighed the stock sales in *Tilray II*, its analysis in that opinion controls." Pl. Opp. 11. However, as the Court has already stated, it will not depart from the findings in *Tilray III* with respect to Kennedy's stock sales, and thus will not revisit its findings regarding Kennedy's other motives either.

Plaintiffs do not offer any compelling new allegations regarding Kennedy's other motives to alter this outcome. Plaintiffs continue to rely on their allegations regarding Tilray's acquisitions of other companies with its stock and Kennedy's pushing through the Share Exchange with a goal of becoming a leader of the global cannabis industry, "realiz[ing] his long-declared ambition of creating and leading the world's largest marijuana conglomerate." Pl. Opp. 11–13, 25. The *Tilray III* Court rejected Plaintiffs' allegations of Tilray's "use of stock in acquisitions," noting that "Plaintiffs do little to tie these vague allegations to the misrepresentations at issue, so they alone cannot sustain a finding of scienter." *Tilray III*, 2023 WL 5352294, at *7. The Third Amended Complaint does not fare any better in connecting Tilray's acquisitions to the alleged misrepresentations. *See* Pl. Opp. 11–12.

As to Kennedy's broader quest for control and power, the *Tilray III* Court recognized that "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit*, 264 F.3d at 139; *see Tilray III*, 2023 WL 5352294, at *3. Plaintiffs' alleged facts could

"as easily be a sign of simple ambition or run-of-the-mill greed as of fraud," *In re Refco*, 503 F. Supp. 2d at 645, failing to overcome the stronger opposing inference that Kennedy simply believed in the promise of the cannabis industry and had grand, "career-defining" aspirations for himself within it.  Pl. Opp. 12; *see Tellabs*, 551 U.S. at 324, 326; *Slayton v. American Exp. Co.*, 604 F.3d 758, 776–77 (2d Cir. 2010) (finding competing inference of non-fraudulent intent to be more compelling under *Tellabs*); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009) (same); *Tilray III*, 2023 WL 5352294, at *5.  Moreover, as the Court noted in *Tilray I*, Kennedy and the other Privateer founders "*already controlled* Tilray prior to the Share Exchange," *Tilray I*, 2021 WL 4429788, at *7 (emphasis added); *see* TAC ¶ 26, and thus Plaintiffs' allegation of Kennedy's multi-part scheme falls apart at the very first step.  *See* Pl. Opp. 12–13; Def. Mem. 23.  The Court does not find that Plaintiffs' renewed allegations of Kennedy's "other motives" are sufficient to establish scienter.

Accordingly, Plaintiffs have failed to adequately allege Kennedy's motive to commit fraud from which the Court may infer scienter.

B. Conscious Misbehavior or Recklessness

Because Plaintiffs have failed to plead Kennedy's motive to commit fraud from which to infer scienter, the Court must consider whether Plaintiffs have pleaded "strong circumstantial evidence of conscious misbehavior or recklessness."  *Blanford*, 794 F.3d at 306 (quoting *ATSI Commc'ns*, 493 F.3d at 99).  Where, as in this case, "there is no [sufficient allegation of] motive," "the strength of the circumstantial allegations must be correspondingly greater."  *ECA, Loc. 134*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142); *see In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 232 (S.D.N.Y. 2023).

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information

contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kalnit*, 264 F.3d at 142 (quoting *Novak*, 216 F.3d at 308).  A plaintiff proceeding on such a theory of scienter must allege "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quoting *In re Carter-Wallace*, 220 F.3d at 39).

As the Court recognized in *Tilray I*, the Second Circuit has "identified several important limitations on the scope of liability for securities fraud based on reckless conduct" that are relevant in this case.  *Novak*, 216 F.3d at 309; *see Tilray I*, 2021 WL 4429788, at *9.  First, the Court cannot "allow plaintiffs to proceed with allegations of 'fraud by hindsight,'" and a defendant is "only responsible for revealing those material facts reasonably available to them."  *Novak*, 216 F.3d at 309.  Second, a plaintiff "must specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements," including by "specifically identify[ing] the reports or statements containing this information."  *Id.* at 308–09.  Finally, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  *Id.* at 309 (internal quotation marks and citations omitted).

Plaintiffs allege recklessness based on two theories: (1) Kennedy's involvement in, and statements about, Tilray's inventory; and (2) Kennedy's statements about the ABG Agreement.

*See* Pl. Opp. 14–24.  Plaintiffs fail to make a strong circumstantial showing of Kennedy's recklessness under either theory.

        i.    *Inventory Statements*

In *Tilray III*, the Court found that Plaintiffs' allegations regarding Kennedy's inventory statements were insufficient to establish recklessness because "the SAC contains no allegations that Kennedy *himself* was or should have been on notice that the [inventory] analysis was false." *Tilray III*, 2023 WL 5352294, at *6.  Plaintiffs attempt to cure this deficiency in the Third Amended Complaint through two new allegations: (1) that Tilray's 10-K, for which Kennedy signed a SOX Certification, disclosed a "material weakness" in Tilray's internal controls related to inventory valuation, the remedial program for which "Kennedy *personally* created and oversaw," TAC ¶¶ 136–138; Pl. Opp. 14; and (2) that Tilray adopted a policy of overstating inventory on quarterly filings and waiting until year-end to write off inventory, inconsistent with the inventory valuation procedure Tilray communicated to investors, supported by evidence that Tilray's 2018 and 2019 write-downs were larger at year-end than at the end of the intervening quarters, TAC ¶¶ 127–135; Pl. Opp. 16.[11]

As to the first allegation, although Plaintiffs do not misstate the 10-K, the inference that they urge the Court to draw—that "Kennedy *personally* created and oversaw" Tilray's "plan to remediate the material weakness" in inventory valuation, Pl. Opp. 14; TAC ¶¶ 136–137—is far too attenuated to constitute strong circumstantial evidence of recklessness.  The 10-K stated that

---

[11] Plaintiffs also argue that the Third Amended Complaint contains significantly supplemented allegations "that the misstatement resulted from the adoption of a broad and undisclosed inventory recording policy that violated GAAP." Pl. Opp. 15.  But these allegations do not reference Kennedy or his knowledge, notwithstanding Plaintiffs' unsupported contention that while "Kennedy's job may not have involved visiting warehouses to detect spoilage, . . . it included overseeing critical accounting decisions he told investors he personally attended to." Pl. Opp. 15.  "[A]bsent [allegations of] particularized fraudulent intent, GAAP violations are not probative of scienter." *Tilray III*, 2023 WL 5352294, at *5; *see Novak*, 216 F.3d at 309.

"[w]e have developed a plan to remediate the material weakness" regarding inventory.  Greene

Decl. Ex. 4 at 31.  According to the definitions in the 10-K, "'we,' 'our,' 'us,' 'Tilray,' and 'the

Company' refer to Tilray, Inc."  Greene Decl. Ex. 4 at i.  Indeed, in the Third Amended Complaint,

Plaintiffs allege that "senior management" was responsible for the remedial plan; Plaintiffs'

contention that Kennedy *personally* oversaw the plan appears only in their opposition brief.

*Compare* TAC ¶ 137, *with* Pl. Opp. 14, 24.  Moreover, even assuming, *arguendo*, that Kennedy

was personally involved in a process to address deficiencies in inventory valuation such that he

knew or must have known that Tilray's inventory statements were false, "[w]here plaintiffs

contend defendants had access to contrary facts, they must *specifically identify* the reports or

statements containing this information."  *Novak*, 216 F.3d at 309 (emphasis added).  Tilray's 10-

K is not such a report or statement, and the Third Amended Complaint nowhere identifies any

other document to which Kennedy had access.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d

553, 584 (S.D.N.Y. 2014) (allegations that employees were involved in deficient quality control

procedures yet "nevertheless misled investors" were insufficient where the complaint failed to

"support[] these inferences []or set[] forth facts concerning the specific 'reports or statements'

containing the alleged contradictory information" (quoting *Novak*, 216 F.3d at 309)), *aff'd*, 604 F.

App'x 62 (2d Cir. 2015).  The single document alleged in the Second Amended Complaint to

support recklessness, which the *Tilray III* Court found to be insufficient, is no longer pleaded in

the Third Amended Complaint.  *See Tilray III*, 2023 WL 5352294, at *6 ("The one document

Plaintiffs point to is a 'flawed' Bill of Materials with errors that 'carried over into the financial

documents.'  SAC ¶ 52.  There is no general allegation that Kennedy ever saw the Bill of Materials

or knew of the errors, much less particularized allegations of his knowledge.");  Def. Mem. 24 &

n.38.  Moreover, if anything, Tilray's disclosure of a remedial plan undermines Plaintiffs'

recklessness theory, because "implementing remedial efforts following the discovery of a problem

is 'a prudent course of action that weakens rather than strengthens an inference of scienter.'" *In re Lululemon*, 14 F. Supp. 3d at 583 (quoting *Slayton*, 604 F.3d at 777).

Nor do Plaintiffs' bare allegations of Kennedy's SOX Certifications establish that Kennedy was personally involved in Tilray's inventory valuation and had knowledge of falsity.  *See* Pl. Opp. 14.  "Courts in this District have uniformly held that SOX certifications will not support an inference of scienter where, as here, a plaintiff does not allege that the defendants had contemporaneous awareness of falsity."  *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 399 (S.D.N.Y. 2022); *see Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) ("[A] plaintiff cannot raise an inference of fraudulent intent based on the signing of a [SOX] certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements."); *cf. In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) (finding that signing of annual reports did support scienter where plaintiffs alleged that internal audits of which defendants were aware "indicated significant problems with a lack of controls," contrary to defendants' public statements).  Here, because the Third Amended Complaint "does not adequately allege that [Kennedy] had actual knowledge" that Tilray's inventory analysis was false, "it undermines the allegations that [he] knew that the SOX [C]ertifications were false."  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (internal quotation marks omitted).

Plaintiffs' second new allegation regarding large year-end write-offs is weakened by Plaintiffs' admission that the Third Amended Complaint misattributes the allegedly pivotal statement—that Tilray was "accounting for . . . byproduct on a zero basis" "so that we don't have any write-offs at the end of the year," TAC ¶ 128—to Kennedy, when it was in fact made by Tilray's CFO.  *See* Pl. Opp. 16 n.7.  For the same reasons discussed above, Kennedy's SOX

Certifications do not rehabilitate these allegations because Plaintiffs have not independently pleaded Kennedy's knowledge of falsity. *See Saraf*, 632 F. Supp. 3d at 399.

This allegation fails to raise strong circumstantial evidence of recklessness in any event. The more compelling, nonculpable inference that may be drawn from Tilray's behavior, as Defendants posit, is that market changes and a new policy of valuing trim at $0 drove the large 2019 write-down, not that the inventory "must have been incorrectly valued earlier" and that Kennedy was aware of that error but deliberately delayed correcting it. Def. Reply 9; Pl. Opp. 16; TAC ¶ 128; *see Tellabs*, 551 U.S. at 324, 326; *Slayton*, 604 F.3d at 776–77; *S. Cherry St.*, 573 F.3d at 114. Even if Plaintiffs contend that Tilray should have determined earlier that its trim was worthless and could not be counted as inventory, this is simply unactionable "fraud by hindsight"—"allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309. And, once again, "allegations of GAAP violations or accounting irregularities . . . are insufficient to state a securities fraud claim" absent, as here, "evidence of corresponding fraudulent intent." *Id.* (internal quotation marks omitted).

*ii.*    *ABG Agreement Statements*

Plaintiffs' allegations of recklessness based on Kennedy's statements about the ABG Agreement are even weaker. As Defendants note, Plaintiffs have culled their allegations of Kennedy's false statements about the ABG Agreement to just three statements about the deal negotiation and vetting process. *See* Def. Mem. 12; TAC ¶¶ 101, 103, 106. The alleged falsity of these statements is based solely on the recollection of a confidential former-employee witness that the ABG Agreement "was proposed, negotiated, and closed within a matter of *days*," not the "six

weeks or so" with a "vetting process" by ABG that Kennedy referenced in his public statements. TAC ¶¶ 99, 101, 106; Pl. Opp. 20–24.

These allegations do not cure the deficiency that the Court identified in *Tilray I* and *Tilray III*: "Plaintiffs do not allege, through [their confidential witness] or elsewhere, 'the kind of required specific factual allegations (by [confidential witnesses] or otherwise)' to suggest that Kennedy or other Tilray decisionmakers subjectively felt the company's due diligence [as to the ABG Agreement] was lacking, much less that they believed the deal to be worse for the company than advertised." *Tilray III*, 2023 WL 5352294, at \*7 (quoting *In re Lululemon*, 14 F. Supp. 3d at 580); *see Tilray I*, 2021 WL 4429788, at \*10. Plaintiffs argue that the Third Amended "Complaint's allegations that Kennedy misled investors about the duration of [the ABG Agreement] negotiations distinguishes *Tilray I* and *III*." Pl. Opp. 22. But they do not. Even assuming, *arguendo*, that the ABG Agreement did come to fruition in a few days and that Kennedy's statements about its exact timing were material misrepresentations (which the Court does not reach because it finds that Plaintiffs fail to plead scienter), Plaintiffs have failed to allege strong circumstantial evidence that, even on this abbreviated timeframe, Kennedy, contrary to his public statements, subjectively believed that the deal was not properly diligenced and vetted such that he was reckless in making the statements, approximating an intent to deceive or defraud. *See In re Lululemon*, 14 F. Supp. 3d at 580; *cf. In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at \*17 n.183 (S.D.N.Y. Sept. 9, 2019) ("A plaintiff alleging scienter must do more" than a plaintiff alleging falsity.). And even if Kennedy had concerns about the health of the ABG Agreement, which Plaintiffs do not allege, "as long as the public statements

are consistent with reasonably available data, corporate officials need not present an overly gloomy

or cautious picture of current performance and future prospects." *Novak*, 216 F.3d at 309.

Accordingly, Plaintiffs have failed to adequately allege Kennedy's conscious misbehavior

or recklessness from which the Court may infer scienter.

\*   \*   \*

Plaintiffs, in a final effort, urge the Court to read the Third Amended Complaint holistically

to find adequate allegations of scienter even if their motive and recklessness theories fail in

isolation.  *See* Pl. Opp. 24–25.  The Court has analyzed Plaintiffs' allegations of scienter

holistically, as it must.  *See Tellabs*, 551 U.S. at 326.  Yet as the Court in *Tilray I* found, "[o]ther,

stronger, [opposing] inferences are lurking within the [Third] Amended Complaint."  *Tilray I*,

2021 WL 4429788, at \*8; *see Tellabs*, 551 U.S. at 324, 326; *Slayton*, 604 F.3d at 776–77; *S. Cherry

St.*, 573 F.3d at 114.  It is just as, if not more, likely, based on the allegations in the Third Amended

Complaint, that Defendants were erroneously but genuinely optimistic about the promise of

regulatory developments and their impact on Tilray's operations, such as the possibility of selling

trim in Canada.  Similarly, Defendants may have been overzealous in predicting the success of the

ABG Agreement in a nascent U.S. CBD market.  "But being wrong—even embarrassingly so—is

not the same as being dishonest," as a securities fraud claim requires.  *Tilray I*, 2021 WL 4429788,

at \*11 (citing Defendants' misplaced regulatory bullishness and noting that even if Plaintiffs'

allegations "strongly suggest[] that [Defendants] should have been more alert and more skeptical,"

they "fail[] to establish that [Defendants] were promoting a fraud" (internal quotation marks

omitted) (quoting *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 573 (S.D.N.Y. 2007))).

And it remains the case that "less innocuous, but nonetheless unactionable inferences also flow

naturally from the [Third] Amended Complaint, including that Defendants acted out of a general

'desire for the corporation to appear profitable,' and that their various misjudgments were 'at best,

a product of . . . negligence.'" *Id.* at \*8 (citation omitted) (quoting *Kalnit*, 264 F.3d at 139 and *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 148 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 754 (2d Cir. 2009)).

Plaintiffs fail to explain why, although he sold some stock during the Class Period, Kennedy "chose *not* to sell the vast majority of shares available to him until after the corrective disclosures," Def. Reply 10, illogically "suggest[ing] that among those most harmed by the natural and intentional consequences of this purported scheme was the schemer himself." *Tilray I*, 2021 WL 4429788, at \*7. Nor do Plaintiffs articulate a cogent theory as to why "voting control"— which Kennedy already possessed—"of a post-collapse Tilray would have been so dear to" him. *Id.* at \*8. Plaintiffs' narrative of Tilray's acquisition spree and Kennedy's quest for control and power in the cannabis industry is more plausibly read as a story of unactionable "[m]otives that are generally possessed by most corporate directors and officers," *Kalnit*, 264 F.3d at 139— ambition, and perhaps greed, but not fraud. *See In re Refco*, 503 F. Supp. 2d at 645.

In sum, Plaintiffs have failed to "state with particularity facts giving rise to a strong inference" of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent" as required by the PSLRA, and Plaintiffs therefore fail to state a claim under Section 10(b) and Rule 10b-5.[12] *Tellabs*, 551 U.S. at 314, 321. The Court need not consider Defendants' other arguments seeking dismissal of this claim. *See Vining v. Oppenheimer Holdings*

---

[12] "Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter[,] or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted). Plaintiffs have not alleged that any statements would have been approved by Tilray corporate officials with the requisite knowledge, and because Plaintiffs fail to allege scienter with respect to Kennedy, their allegations regarding Tilray's corporate scienter necessarily fail as well. *See In re Skechers*, 444 F. Supp. 3d at 529–30; *Tilray III*, 2023 WL 5352294, at \*7.

*Inc.*, No. 08 Civ. 4435 LAP, 2010 WL 3825722, at *15 (S.D.N.Y. Sept. 29, 2010) ("As Plaintiffs have not adequately pleaded scienter, the Court declines to address Defendants' other grounds for dismissal of the Section 10(b) claim.").

### III.    Plaintiffs Fail to State a Claim Under Sections 20(a) and 20A

"To state a claim under Sections 20(a) and 20A of the Exchange Act, a plaintiff must allege a primary violation, such as one under Section 10(b) and Rule 10b-5." *Bristol-Myers Squibb*, 28 F.4th at 356. Because Plaintiffs have failed to state a securities fraud claim under Section 10(b) and Rule 10b-5, Plaintiffs also fail to adequately allege their claims under Sections 20(a) and 20A, and those claims must be dismissed as well. *See id.* at 356–57; *ATSI Commc'ns*, 493 F.3d at 108; *In re Bristol-Myers Squibb*, 658 F. Supp. 3d at 238.

### IV.    Leave to Amend Is Denied

A court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)); *see ATSI Commc'ns.*, 493 F.3d at 108 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

Judge Crotty recognized these principles in twice granting Plaintiffs leave to replead to cure the deficiencies in their scienter allegations. *See Tilray I*, 2021 WL 4429788, at *8, *13; *Tilray III*, 2023 WL 5352294, at *8. In *Tilray III*, however, the Court cautioned that the Third Amended Complaint would be Plaintiffs' "final opportunity to amend the deficiencies in their complaint." *Tilray III*, 2023 WL 5352294, at *8. For the reasons discussed above, the Third Amended Complaint fails to cure the deficiencies of Plaintiffs' prior pleadings. Having had three opportunities to cure (out of four chances to plead sufficiently), Plaintiffs have failed to allege any

plausible theory of scienter. The Court does not find that further amendment would allow Plaintiffs to rectify this flaw. "Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Accordingly, the Court declines to grant leave to amend and the Third Amended Complaint will be dismissed with prejudice.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED and the Third Amended Complaint is dismissed with prejudice. The Clerk of Court is respectfully requested to terminate the motion pending at docket entry 133 and to close this case.

**SO ORDERED.**

**Date:  September 30, 2024**
      **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**